IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE NATIONAL BANK OF BIG SPRING
901 South Main Street
Big Spring, TX 79720;

THE 60 PLUS ASSOCIATION, INC
515 King Street
Suite 315
Alexandria, VA 22314;

and

THE COMPETITIVE ENTERPRISE INSTITUTE
1899 L Street
Floor 12
Washington, DC 20036,

*Plaintiffs*,

v.

Case No. _____

TIMOTHY GEITHNER, in his official capacity as
United States Secretary of the Treasury and *ex officio*
Chairman of the Financial Stability Oversight Council
1500 Pennsylvania Avenue, NW
Washington, DC 20220;

U.S. DEPARTMENT OF THE TREASURY;

RICHARD CORDRAY, in his official capacity as
Director of the Consumer Financial Protection Bureau, in
his official capacity as *ex officio* Director of the Federal
Deposit Insurance Corporation, and in his official
capacity as *ex officio* member of the Financial Stability
Oversight Council
1700 G Street NW
Washington, DC 20552;

THE CONSUMER FINANCIAL PROTECTION
BUREAU;

BENJAMIN BERNANKE, in his official capacity as

Chairman of the Board of Governors of the Federal
Reserve System, and in his official capacity as *ex officio*
Member of the Financial Stability Oversight Council
20th Street and Constitution Avenue NW
Washington, DC 20551;

MARTIN GRUENBERG, in his official capacity as
Vice Chairman and Acting Chairman of the Board of
Directors of the Federal Deposit Insurance Corporation,
and in his official capacity as *ex officio* Member of the
Financial Stability Oversight Council
550 17th Street NW
Washington, DC 20429;

THOMAS CURRY, in his official capacity as U.S.
Comptroller of the Currency, and *ex officio* member of
the Financial Stability Oversight Council
Comptroller of the Currency
Washington, DC 20219;

MARY SCHAPIRO, in her official capacity as Chairman
of the U.S. Securities and Exchange Commission and *ex
officio* member of the Financial Stability Oversight
Council
100 F Street NE
Washington, DC 20549;

GARY GENSLER, in his official capacity as Chairman
of the U.S. Commodity Futures Trading Commission and
*ex officio* member of the Financial Stability Oversight
Council
Three Lafayette Center
1155 21st Street
Washington, DC 20581;

DEBBIE MATZ, in her official capacity as Chairman of
the National Credit Union Administration Board and *ex
officio* Member of the Financial Stability Oversight
Council
1775 Duke Street
Alexandria, VA 22314;

S. ROY WOODALL, in his official capacity as Member
of the Financial Stability Oversight Council;

and

THE FINANCIAL STABILITY OVERSIGHT
COUNCIL
1500 Pennsylvania Avenue, NW
Washington, DC 20220,

                *Defendants.*

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The above-captioned plaintiffs, by and through their undersigned attorneys, allege as follows:

### INTRODUCTION

1.      This action challenges the unconstitutional formation and operation of the Consumer Financial Protection Bureau ("CFPB"), an agency created by Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203 (July 21, 2010) ("Dodd-Frank Act").

2.      This action challenges the unconstitutional appointment of CFPB Director Richard Cordray, appointed to office neither with the Senate's advice and consent, nor during a Senate recess.

3.      Finally, this action challenges the unconstitutional creation and operation of the Financial Stability Oversight Council ("FSOC"), an inter-agency "council" created by Title I of the Dodd-Frank Act.

4.      Titles I and X of the Dodd-Frank Act comprise unprecedented violations of "the basic concept of separation of powers and the checks and balances that flow from the scheme of a tripartite government," *United States v. Nixon*, 418 U.S. 683, 704 (1974), in several ways:

3

5.      First, the CFPB's formation and operation violates the Constitution's separation

of powers.  Title X of the Dodd-Frank Act delegates effectively unbounded power to the CFPB,

and couples that power with provisions insulating CFPB against meaningful checks by the

Legislative, Executive, and Judicial Branches, as described in ¶¶ 31-77, below.  Taken together,

these provisions remove all effective limits on the CFPB Director's discretion, a violation of the

separation of powers.

6.      Second, the President unconstitutionally appointed Richard Cordray to be CFPB

Director by refusing to secure the Senate's advice and consent while the Senate was in session,

one of the few constitutional checks and balances on the CFPB left in place by the Dodd-Frank

Act, as described in ¶¶ 78-86, below.

7.      Third, FSOC's formation and operation violates the Constitution's separation of

powers. FSOC has sweeping and unprecedented discretion to choose which nonbank financial

companies are "systemically important" (or, "too big to fail").  That designation signals that the

selected companies have the implicit backing of the federal government—and, accordingly, an

unfair advantage over competitors in attracting scarce, fungible investment capital.  Yet FSOC's

sweeping powers and discretion are not limited by any meaningful statutory directives.  And the

FSOC, whose members include nonvoting state officials appointed by state regulators rather than

the President, is insulated from meaningful judicial review—indeed, from all judicial review

brought by third parties injured by an FSOC designation—as described in ¶¶ 87-108, below.

Taken together, these provisions provide the FSOC virtually boundless discretion in making its

highly consequential designations, a violation of the separation of powers.

8.      The above violations of the Constitution's separation of powers, both individually

and together, "create a 'here-and-now' injury that can be remedied by" this court. *Free*

4

*Enterprise Fund v. Public Company Accounting Oversight Board*, 130 S. Ct. 3138, 3164 (2010)

(quoting *Bowsher v. Synar*, 478 U.S. 714, 727 n.5 (1986)).

## JURISDICTION AND VENUE

9.       This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 2201.

10.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (e).

## PARTIES

11.      Plaintiff State National Bank Of Big Spring ("Bank") is a Texas corporation and federally-chartered bank headquartered in Big Spring, Texas. The Bank opened in 1909 and currently has three locations in Big Spring, Lamesa, and O'Donnell, Texas. The Bank is a local community bank with less than $275 million in deposits and offers customers access to checking accounts, savings accounts, certificates of deposit, and individual retirement accounts.

12.      Title X of the Dodd-Frank Act, and CFPB Director Richard Cordray's unconstitutional appointment to direct that agency, injure the Bank. As a result of the CFPB's promulgation of a Final Rule regulating international remittance transfers imposing burdensome requirements on financial institutions and other providers of those services, the Bank has stopped offering those services to its customers. And, the Bank must conduct its business, and make decisions about what kinds of business to conduct, without knowing whether the CFPB will retroactively announce that one or more of the Bank's consumer lending practices is "unfair," "deceptive," or "abusive" and enforce that interpretation through supervision, investigation, or enforcement activities. Title X's open-ended grant of power to the CFPB, combined with the absence of checks and balances limiting the CFPB from expansively interpreting that grant of power, creates a cloud of regulatory uncertainty that forces banks to censor their own offerings—a chilling effect that, for example, left the Bank with no safe choice but to exit the consumer

5

mortgage business and not return until the CFPB's authority and discretion are defined with greater specificity, transparency, and accountability.

13.     Indeed, statements of CFPB Director Cordray and other officials connected to the CFPB heighten the possibility that the Bank's mortgage products could be deemed unlawful, after the fact, by the CFPB—as described in ¶¶ 31-77, below.

14.     Plaintiff 60 Plus Association, Inc. ("Association") is a seven-million member, non-profit, non-partisan seniors advocacy group that is tax-exempt under Section 501(c)(4) of the Internal Revenue Code.  It is devoted to advancing free markets and strengthening limits on government regulation. One of its goals is to preserve access to credit and financial products for seniors, such as mortgages and reverse mortgages.  Founded in 1992, it is based in Alexandria, Virginia.

15.     Dodd-Frank harms the members of the 60 Plus Association in that it has reduced, and will further reduce, the range and affordability of banking, credit, investment, and savings options available to them.  For example, provisions enforced by the CFPB have reduced the availability of free checking, and the number of banks offering it; they have reduced the number of companies offering mortgages; and they have increased mortgage fees.

16.     The 60 Plus Association surveys its members regarding their interest in a variety of financial products that it might offer to them as benefits.  These products range from investment programs and bank accounts to credit cards and insurance.  Dodd-Frank harms both the Association and its members by increasing the cost and reducing the availability of such products, both currently and in the near future.

17.     Plaintiff Competitive Enterprise Institute (CEI) is a tax-exempt, nonprofit public interest organization under Section 501(c)(3) of the Internal Revenue Code.  It is dedicated to

advancing the principles of individual liberty and limited government. To those ends, CEI

engages in research, education, and advocacy efforts involving a broad range of regulatory and

legal issues. It also participates in cases involving financial regulation and constitutional checks

and balances, such as the separation of powers and federalism: *e.g.*, *Free Enterprise Fund v.*

*Public Company Accounting Oversight Board*, 130 S. Ct. 3138 (2010); *Florida v. United States*

*Dep't of Health & Human Services*, 648 F.3d 1235 (11th Cir. 2011); and *Watters v. Wachovia*

*Bank, N.A.*, 550 U.S. 1 (2007). Founded in 1984, it is based in Washington, D.C.

      18.     CEI has checking and brokerage accounts and certificates of deposit ("CDs") in

banks and brokerage firms regulated by the CFPB that qualify as systemically important as

enforced by FSOC. For example, it has checking accounts and CDs at Wells Fargo, and CDs at

Merrill Lynch. It also has credit cards with terms subject to regulation by the CFPB under Dodd-

Frank. The nature and cost of these accounts are jeopardized by the CFPB's sweeping regulatory

authority over them and over the institutions in which they are based.

      19.     Defendant Timothy Geithner is the United States Secretary of the Treasury, and

the *ex officio* Chairman of the Financial Stability Oversight Council; he is located in

Washington, D.C., and he is named in his official capacity.

      20.     Defendant U.S. Department of the Treasury is located in Washington, D.C.

      21.     Defendant Richard Cordray is Director of the Consumer Financial Protection

Bureau, an *ex officio* Director of the Federal Deposit Insurance Corporation, and an *ex officio*

member of the Financial Stability Oversight Council; he is located in Washington, D.C., and he

is named in his official capacity.

      22.     Defendant Consumer Financial Protection Bureau is located in Washington, D.C.

23.     Defendant Benjamin Bernanke is Chairman of the Board of Governors of the Federal Reserve System, and an *ex officio* member of the Financial Stability Oversight Council; he is located in Washington, D.C., and he is named in his official capacity.

24.     Defendant Martin Gruenberg is Vice Chairman and Acting Chairman of the Board of Directors of the Federal Deposit Insurance Corporation, and an *ex officio* member of the Financial Stability Oversight Council; he is located in Washington, D.C., and he is named in his official capacity.

25.     Defendant Thomas Curry is U.S. Comptroller of the Currency, and an *ex officio* member of the Financial Stability Oversight Council; he is located in Washington, D.C., and he is named in his official capacity.

26.     Defendant Mary Schapiro is Chairman of the U.S. Securities and Exchange Commission, and an *ex officio* member of the Financial Stability Oversight Council; she is located in Washington, D.C., and she is named in her official capacity.

27.     Defendant Gary Gensler is Chairman of the U.S. Commodity Futures Trading Commission, and an *ex officio* member of the Financial Stability Oversight Council; he is located in Washington, D.C., and he is named in his official capacity.

28.     Defendant Debbie Matz is Chairman of the National Credit Union Administration Board, and an *ex officio* member of the Financial Stability Oversight Council; she is located in Washington, D.C., and she is named in her official capacity.

29.     Defendant S. Roy Woodall is a member of the Financial Stability Oversight Council; he is located in Washington, D.C., and he is named in his official capacity.

30.     Defendant Financial Stability Oversight Council is located in Washington, D.C.

## THE CONSUMER FINANCIAL PROTECTION BUREAU

31.     Section 1011(a) of the Dodd-Frank Act establishes a new Consumer Financial

Protection Bureau to "regulate the offering and provision of consumer financial products or

services under the Federal consumer financial laws."

32.     Section 1011(a) declares the CFPB to be an "Executive agency" within the

meaning of 5 U.S.C. § 105. But the same provision also declares the CFPB to be an

"independent bureau" that is "established in the Federal Reserve System," which is in turn led by

the Board of Governors of the Federal Reserve System ("FRB"), an "independent regulatory

agency" under 44 U.S.C. § 3502(5).

### *Title X Delegates Effectively Unlimited Power To The CFPB To Litigate, Investigate, Or Regulate Over Practices That The CFPB Deems To Be "Unfair," "Deceptive," or "Abusive"*

33.     The Dodd-Frank Act grants the CFPB vast authority over consumer financial

product and service firms, including Plaintiff State National Bank of Big Spring.

34.     Section 1031(a) of the Dodd-Frank Act authorizes the CFPB to take any action to

prevent a covered person or service provider from committing or engaging in "unfair,"

"deceptive," or "abusive" practices in connection with the provision or offering of a consumer

financial product or service.

35.     And Section 1031(b) of the Act authorizes the CFPB to prescribe rules identifying

unfair, deceptive or abusive acts or practices under Federal law in connection with any

transaction with a consumer for a consumer financial product or service.

36.     But the Act provides *no* definition for "unfair" or "deceptive" acts or practices,

leaving those terms to the CFPB to interpret and enforce, either through *ad hoc* litigation or

through regulation. Nor is the CFPB bound by prior agencies' interpretation of similar statutory

terms.

9

37.     Nor does the Act provide meaningful limits on what the CFPB can deem an "abusive" act or practice. Section 1031(d) leaves that term to be defined by the CFPB, subject only to the requirement that the CFPB not define an act or practice to be "abusive" unless it "(1) materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; or (2) takes unreasonable advantage of — (A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service; (B) the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or (C) the reasonable reliance by the consumer on a covered person to act in the interests of the consumer." Sec. 1031(d).[1] Those nominal limits offer no transparency or certainty for lenders, because the limits consist exclusively of subjective factors that can only be ascertained on a case-by-case, borrower-by-borrower, *ex post facto* basis, and can be interpreted broadly by the CFPB because the agency is subject to no effective checks or balances by the other branches.

38.     In fact, the CFPB Director has himself acknowledged this. In a January 24, 2012 hearing before a subcommittee of the U.S. House Committee on Oversight and Government Reform, CFPB Director Cordray stated that the Act's use of the term "abusive" is "a little bit of a puzzle because it is a new term"; the CFPB has "been looking at it, trying to understand it, and we have determined that that is going to have to be a fact and circumstances issue; it is not something we are likely to be able to define in the abstract. Probably not useful to try to define a term like that in the abstract; we are going to have to see what kind of situations may arise where that would seem to fit the bill under the prongs."

---

[1]     All "Sec." citations refer to the sections of the Dodd-Frank Act.

39.     The Act's open-ended grant of power over what the CFPB deems to be "unfair,"
"deceptive," or "abusive" lending practices is further exacerbated by the CFPB's discretion to
unilaterally exempt any class of covered persons, service providers, or consumer financial
products or services from the scope of any rule promulgated under Title X.  Sec. 1022(b)(3).

40.     While the Act allows the CFPB to define and enforce those open-ended standards
through rulemaking, CFPB Director Cordray already announced (as noted above) his intention to
define and enforce them primarily through ad hoc, *ex post facto* enforcement activities. That
leaves regulated entities, such as State National Bank of Big Spring, to discover the CFPB's
interpretation of the law only *after* the bank has executed a mortgage or other consumer lending
transaction.

41.     The CFPB's unbridled authority to newly define what constitutes an "unfair,"
"deceptive," or "abusive" lending practice on a case-by-case, *ex post facto* basis, imposes severe
regulatory risk upon lenders, including Plaintiff State National Bank of Big Spring, which cannot
know in advance, with reasonable certainty, whether longstanding or new financial services will
open them to retroactive liability according to the CFPB.

42.     The resulting chilling effect forces lenders such as the Bank to either risk federal
prosecution or curtail their own services and products.

43.     For example, Title X's broad terms, as administered by the CFPB, already have
forced Plaintiff Big Spring National Bank to discontinue its own mortgage lending, because its
mortgage lending practices are within the CFPB's jurisdiction (*i.e.*, they are consumer financial
products or services) yet the Bank cannot be certain, *ex ante*, whether the CFPB will investigate
or litigate against them, deeming those practices to be "unfair," "deceptive," or "abusive"
pursuant to an *ex post facto* CFPB interpretation of the law.

11

44.     The Bank's mortgage services and products traditionally focused on real estate in the Bank's geographic area where real estate is generally bought and sold at relatively low prices, and where mortgage borrowers traditionally pay relatively large down payments; rather than charging their customers "points" for the mortgages, the Bank structured its mortgages to feature a five-year "balloon payment."

45.     Unfortunately, due to Dodd-Frank's lack of detail on the question of what constitutes an "unfair," "deceptive," or "abusive" practice, as well as statements by public officials critical of mortgage lenders, the Bank could not be reasonably certain that continued lending on these terms would not expose the Bank to sudden enforcement actions by the CFPB.

46.     For example, on September 17, 2010, President Obama announced the appointment of Elizabeth Warren as his "Special Advisor to the Secretary of the Treasury on the Consumer Financial Protection Bureau" (*i.e.*, the initial organizer and leader of the CFPB, prior to the appointment of a CFPB Director); in making that announcement, President Obama asserted that the CFPB would "crack down on the abusive practice of unscrupulous mortgage lenders," and that "[b]asically, the Consumer Financial Protection Bureau will be a watchdog for the American consumer, charged with enforcing the toughest financial protections in history."

47.     Similarly, on the very day after the President's announcement of his appointment, CFPB Director Cordray gave a press conference at a think-tank in Washington, D.C., announcing that "[o]ur team is taking complaints about credit cards and mortgages, with other products to be added as we move forward," and that to act upon "outrageous" stories from mortgage borrowers and other named and unnamed members of the public "is exactly what the consumer bureau is here to do."

12

48.     Similarly, in a March 14, 2012 address Director Cordray reiterated that the CFPB would continue to "address the origination of mortgages, including loan originator compensation and the origination of high-priced mortgages."

49.     In each of these announcements, and others, CFPB Director Cordray and other CFPB officials reinforce responsible lenders' reasonable fears that the CFPB will aggressively interpret its open-ended statutory mandate to retroactively punish good-faith consumer lending practices—which the CFPB can do because of the lack of checks and balances limiting the agency's discretion.

50.     Accordingly, the Bank ceased its consumer mortgage lending operations on or about October 2010, and it continues to decline to re-enter the market for offering consumer mortgages, including mortgages with "balloon payments," in light of the risks and uncertainty imposed by CFPB's unlimited powers and lack of checks and balances.

51.     These and other examples justify the Bank's reasonable, good-faith concerns about the CFPB's threat of *ex post facto* liability.

52.     To re-enter the mortgage market would entail not just the aforementioned assumption of risk by the Bank, given the uncertain nature of CFPB enforcement and investigation under Title X, but also the burdens of substantially increased compliance costs, as State National Bank of Big Spring—a small community bank—would be forced to constantly monitor and predict the CFPB's regulatory priorities and legal interpretations.

### *The CFPB's Other Substantive Powers*

53.     In addition to the CFPB's open-ended power to define and prosecute what it deems to be "unfair," "deceptive," or "abusive" practices, the CFPB also is empowered under Title X to enforce myriad pre-existing statutes, and to "supervise" certain classes of banks.

The CFPB's Authority To Administer Pre-Existing Statutes

13

54.     The Act commits to the CFPB's jurisdiction myriad pre-existing "Federal consumer financial laws" heretofore administered by other executive or independent agencies.

55.     Specifically, the Act authorizes the CFPB to "regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws," including the power to promulgate rules "necessary or appropriate to enable the [CFPB] to administer and carry out the purposes and objectives of the Federal consumer financial laws, and to prevent evasions thereof." Sec. 1011(a), 1022(b)(1).

56.     According to Section 1002(12) & (14) of the Act, the "Federal consumer financial laws" include: the Alternative Mortgage Transaction Parity Act, of 1982, 12 U.S.C. § 3801 *et seq.*; the Consumer Leasing Act of 1976, 15 U.S.C. § 1667, *et seq.*; the Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq.* (except with respect to section 920); the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*; the Fair Credit Billing Act, 15 U.S.C. § 1666 *et seq.*; the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* (except with respect to sections 615(e) and 628); the Home Owners Protection Act of 1998, 12 U.S.C. § 4901 *et seq.*; the Fair Debt Collections Practices Act, 15 U.S.C. § 1692 *et seq.*; subsections (b) through (f) of section 43 of the Federal Deposit Insurance Act, 12 U.S.C. § 1831t(c)-(f); sections 502 through 509 of the Gramm-Leach-Bliley Act, 15 U.S.C. § 6802-6809 (except section 505 as it applies to section 501(b)); the Home Mortgage Disclosure Act of 1975, 12 U.S.C. § 2801 *et seq*; the Homeownership and Equity Protection Act of 1994, 15 U.S.C. § 1601; the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. § 2601 *et seq.*; the S.A.F.E. Mortgage Licensing Act of 2008, 12 U.S.C. § 5101 *et seq.*; the Truth in Lending Act, 15 U.S.C. § 1601 et seq.; the Truth in Savings Act, 12 U.S.C. § 4301 *et seq.*; section 626 of the Omnibus Appropriations Act, 2009 (Public Law 111-8); the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701; and several laws for which authority of

14

enforcement is transferred to the CFPB, and rules or orders prescribed by the CFPB under its statutory authority.

57.     Accordingly, the Dodd-Frank Act transfers to the CFPB authority over aspects of consumer financial products and services previously exercised by a range of other federal agencies—including the FRB, the Office of the Comptroller of the Currency, the Office of Thrift Supervision, the FDIC, the Federal Trade Commission, the National Credit Union Administration, and the Department of Housing and Urban Development.

58.     The CFPB's interpretation of these existing statutes has already caused injury to State National Bank of Big Spring. On February 7, 2012, the CFPB published in the *Federal Register* its Final Rule with respect to international remittance transfers, pursuant to which the Bank's customers in the United States could send money to family members overseas. Electronic Fund Transfers, 77 Fed. Reg. 6194 (Feb. 7, 2012) (to be codified at 12 C.F.R. pt. 1005). The Final Rule imposes substantial new disclosure and compliance requirements on the Bank, which increase the cost of providing these services to the Bank's customers to an unsustainable level. On May 23, 2012, the Bank's Board of Directors instituted a policy to cease providing these remittance transfer services to its consumers because of the increased costs arising out of the CFPB's Final Rule.

The CFPB's Supervisory Authority

59.     Section 1024 of the Dodd-Frank Act vests the CFPB with exclusive authority to prescribe rules, issue guidance, conduct examinations, require reports or issue exemptions with respect to covered non-depository institutions under the Federal consumer financial laws. Sec. 1024(d).

60.     Section 1025 vests the CFPB with exclusive authority to require reports and conduct periodic examinations of insured depository institutions or credit unions with total assets

15

of more than $10 billion and any affiliate thereof or service provider thereto.  Sec. 1025(b), (d).

Likewise, the Act vests the CFPB with primary authority to enforce Federal consumer financial

laws with respect to insured depository institutions or credit unions with total assets of more than

$10 billion and any affiliate thereof or service provider thereto.  Sec. 1025(c).

61.     The Dodd-Frank Act grants the FRB authority to delegate to the CFPB its

authority to examine persons subject to the jurisdiction of the FRB for compliance with Federal

consumer financial laws.  Sec. 1012(c)(1).  Once the FRB has delegated examination authority to

the CFPB, the FRB may not intervene in any matter or proceeding before the Director, including

examinations or enforcement actions, or appoint, direct or remove any officer or employee of the

CFPB, including the Director.  *Id.*

62.     Title X also gives the CFPB the authority to supervise an entity that: (1) offers or

provides origination, brokerage, or servicing of consumer loans secured by real estate: (2) is a

"larger participant of a market for other consumer financial products or services;" (3) the CFPB

determines after notice to the entity and opportunity for response may be engaging in conduct

that poses risks to consumers with regard to the provision of consumer financial products or

services; (4) offers to any consumer a private education loan; or (5) offers to a consumer a

payday loan.  Sec. 1024(a)(1).

*Title X Grants The CFPB Aggressive Investigation And Enforcement Powers*

63.     Subtitle E of Title X of the Dodd-Frank Act sets forth the CFPB's enforcement

authority.  Section 1052 authorizes the CFPB to engage in investigations, to issue subpoenas for

the attendance and testimony of witnesses and production of documents and materials, to issue

civil investigative demands, and to commence judicial proceedings to compel compliance with

those demands.

64.     Section 1053 of the Dodd-Frank Act authorizes the CFPB to conduct hearings and adjudicative proceedings to ensure or enforce compliance with the Act, any rules promulgated thereunder, or any other Federal law the CFPB is authorized to enforce.

65.     Section 1054 authorizes the CFPB to commence a civil action against any person whom it deems to have violated a Federal consumer financial law, and to seek all legal and equitable relief, including a permanent or temporary injunction, as permitted by law.

### *The Dodd-Frank Act Eliminates The Checks And Balances That Could Otherwise Limit The CFPB's Exercise of Those Broad, Undefined Powers*

66.     In addition to granting the CFPB effectively unlimited rulemaking, enforcement, and supervisory powers over "unfair," "deceptive," or "abusive" lending practices, Title X of the Dodd-Frank Act also eliminates the Constitution's fundamental checks and balances that would ordinarily limit or channel the agency's use of that power. Those checks and balances are necessary to prevent the CFPB from expansively and aggressively interpreting its open-ended mandate; the absence of those checks and balances, combined with the open-ended grant of power, constitutes a violation of the separation of powers.

67.     First and foremost, Congress has no "power of the purse" over the CFPB, because the Act authorizes the CFPB to fund itself by unilaterally claiming funds from the FRB.

68.     Specifically, the Director of the CFPB, who cannot be removed at the pleasure of the President, determines for himself the amount of funding the CFPB receives from the FRB; then the FRB must transfer those funds to the CFPB. Sec. 1017(a)(1).

69.     The Act authorizes the CFPB to claim an increasing percentage of the Federal Reserve System's 2009 operating expenses, beginning in fiscal year 2011 at 10 percent, and reaching 12 percent in fiscal year 2013 and thereafter. This amount will be adjusted for inflation. Sec. 1017(a)(2)(B).

70.     Because the Federal Reserve System's 2009 operating expenses were
$3,694,000,000, the CFPB Director will be empowered to unilaterally requisition up to
$443,280,000 in 2013 and thereafter, adjusted for inflation. *See* Board of Governors of the
Federal Reserve System, 96th Annual Report 186 (2009), *available at*
http://www.federalreserve.gov/boarddocs/rptcongress/annual09/pdf/ar09.pdf.

71.     In other words, the CFPB's automatic budget authority is nearly 50% greater than
the Federal Trade Commission's entire budget request to Congress for fiscal year 2013 (*i.e.*,
$300 million). *See* FTC, Fiscal Year 2013 Congressional Budget Justification (2012), *available
at* http://www.ftc.gov/ftc/oed/fmo/2013_CBJ.pdf.

72.     In addition to allowing the CFPB to fund itself, Title X goes so far as to explicitly
*prohibit* the House and Senate Appropriations Committees from even attempting to "review" the
CFPB's self-funded budget.  Sec. 1017(a)(2)(C).

73.     Second, in addition to the Act's elimination of Congress's "power of the purse,"
the Act also insulates the CFPB Director from presidential oversight.

74.     Specifically, once the CFPB Director is appointed by the President with the
advice and consent of the Senate, Sec. 1011(b)(1)-(2), he receives a five-year term in office and
may be removed by the President only for "inefficiency, neglect of duty, or malfeasance in
office."  Sec. 1011(c)(2), (3).

75.     The judicial branch's oversight power is also limited, because the Dodd-Frank
Act requires the courts to grant the same deference to the CFPB's interpretation of Federal
consumer financial laws that they would "if the Bureau were the only agency authorized to
apply, enforce, interpret, or administer the provisions of such Federal consumer financial law."
Sec. 1022(b)(4)(B).

18

76.     The CFPB's regulatory authority is further insulated from accountability to the
very agency in which it is housed.  Section 1012(c) provides that no rule or order promulgated by
the CFPB shall be subject to approval or review by the FRB, and that the FRB shall not delay or
prevent the issuance of any rule or order promulgated by the CFPB.

77.     In sum, Title X eliminates the fundamental checks and balances that would
ordinarily serve to limit the CFPB's expansive interpretation of its open-ended statutory mandate
against State National Bank of Big Spring and other responsible lenders.  This violates the
Constitution's separation of powers.

### RICHARD CORDRAY'S APPOINTMENT AS CFPB DIRECTOR

78.     Richard Cordray was appointed CFPB Director without the Senate's advice and
consent, and without a Senate recess.

79.     Specifically, on January 4, 2012, President Obama announced that he was using
his "recess appointment" power to appoint Richard Cordray as the Director of the CFPB, an
unconstitutional act that circumvented one of the only few remaining (and minimal) checks on
the CFPB's formation and operation.

80.     The appointment of Mr. Cordray is unconstitutional because the Senate was not in
"recess," as required to give effect to the President's power to make recess appointments.  This is
so for at least three reasons:

81.     First, the Constitution gives the Senate the exclusive power to determine its rules,
and the Senate declared itself to be in session;

82.     Second, the House of Representatives had not consented to a Senate adjournment
of longer than three days, as it must to effect a recess;

83.     And third, the Senate passed significant economy policy legislation during the
session that the executive branch alleged to be a recess.

19

84.     The Constitution gives the Senate the sole authority to declare when it is, and is

not, in session, subject only to House consent. The Constitution expressly vests in each House of

Congress the exclusive power to "determine the rules of its Proceedings." U.S. Const. art. I, § 5,

cl. 2.

85.     As Senator Ron Wyden stated on the floor of the Senate on December 17, 2011,

the Senate agreed by unanimous consent to continue its 111th Session from December 20, 2011

through January 3, 2012; and to begin its 112th Session on January 3, as required by Section 2 of

the Twentieth Amendment to the United States Constitution, and continue that session at least

through January 23rd, 2012. 157 Cong. Rec. S8783-8784 (Dec. 17, 2011). These sessions were

substantive.  For example, during these sessions Congress passed a major piece of economic

policy legislation, perhaps President Obama's most significant legislative priority of the fall of

2011, the Temporary Payroll Tax Cut Continuation Act of 2011, by unanimous consent. See 157

Cong. Rec. S8789 (Dec. 23, 2011) (Sen. Reid). The President signed the bill into law the next

day.This decision to continue in session, rather than recess, was necessary to discharge the

Senate's obligations under both the Twentieth Amendment and Article I, Section 5, Clause 4 of

the Constitution, which prohibits one House of Congress from adjourning for more than three

days without the consent of the other. The House of Representatives had not consented to

adjournment.

86.     The President's attempt to "recess"-appoint CFPB Director Cordray in this

context was unprecedented and unconstitutional.

## THE FINANCIAL STABILITY OVERSIGHT COUNCIL

87.     Title I of the Dodd-Frank Act establishes FSOC, an interagency "council" with

sweeping power and effectively unbridled discretion.

20

***The Organization of FSOC***

88.    FSOC is a 15-member body with broad executive powers.  FSOC is chaired by
the Secretary of the Treasury.  Its other nine voting members, under Section 111(b)(1), are:

- the Chairman of the Securities & Exchange Commission;

- the Chairman of the Commodities Futures Trading Commission;

- the Chairman of the FRB;

- the Chairman of the FDIC;

- the Comptroller of the Currency;

- the Director of the CFPB;

- the Director of the Federal Housing Finance Agency;

- the Chairman of the National Credit Union Administration Board; and

- an independent member appointed by the President having "insurance expertise."

89.    In addition to the ten voting members, FSOC also has five nonvoting members:
the Director of the Office of Financial Research (a newly created office within the Department of
the Treasury); the Director of the Federal Insurance Office; a state insurance commissioner; a
state banking supervisor; and a state securities commissioner.

90.    Of the non-voting members, no member of the Executive Branch of the federal
government has a role in appointing the three state officials to the FSOC; rather, the state
officials are to be "designated" for two-year terms "by a selection process determined by the
State insurance commissioners," "State banking supervisors," or "State securities
commissioners," respectively. Sec. 111(b)(2), 111(c)(1).

91.    Non-voting members of FSOC cannot be excluded from any of the proceedings,
meetings, discussions, or deliberations of FSOC unless necessary to protect confidential

supervisory information submitted by financial institutions to regulatory agencies. Sec.
111(b)(3).

### The FSOC Has Effectively Unlimited Discretion To Pick Which Non-Bank Financial Companies Are "Systemically Important"

92.     By a two-thirds vote of FSOC's voting members (with the affirmative vote of the
Treasury Secretary), FSOC may determine that a "U.S. nonbank financial company" could, if in
distress, "pose a threat to the financial stability of the United States." Sec. 113(a).

93.     As the FSOC (like countless commentators and analysts) recognizes, those
determinations by the FSOC announce, in substance, that the designated nonbank financial
companies "are, or are likely to become, *systemically important*." *See* 76 Fed. Reg. 64,264,
64,267 (Oct. 18, 2011) (emphasis added).

94.     By designating a nonbank financial company as "systemically important," the
FSOC subjects the company to the possibility of heightened federal oversight, *see* Sec. 115, but
the costs of a "systemic importance" designation are outweighed by its benefits.

95.     By receiving a "systemic importance" designation, nonbank financial companies
will be seen by the investing public as less risky (because they are seen as having the implicit
backing of the government), and therefore those companies will be able to attract capital—in
terms of both debt and equity investment—at an artificially low rate.

96.     The benefits awaiting FSOC-designated systemically important financial
institutions ("SIFIs") are well documented in economic literature.  Banks perceived by the public
as "systemically important" (or, "too big to fail") enjoy a substantial advantage over their
competitors in terms of their respective cost-of-capital. *See*, *e.g.*, David A. Price, "Sifting for
SIFIs," Region Focus, Federal Reserve Bank of Richmond (2011), *available at*
www.richmondfed.org/publications/research/region_focus/2011/q2/pdf/federal_reserve.pdf.

22

97.     Furthermore, this dynamic was illustrated by Defendant Bernanke in a March
2010 speech. Noting that "one of the greatest threats to the diversity and efficiency of our
financial system is the pernicious problem of financial institutions that are deemed 'too big to
fail,'" he warned that "if a firm is publicly perceived as too big, or interconnected, or
systemically critical for the authorities to permit its failure, its creditors and counterparties have
less incentive to evaluate the quality of the firm's business model, its management, and its risk-
taking behavior. As a result, such firms face limited market discipline, allowing them to obtain
funding on better terms than the quality or riskiness of their business would merit and giving
them incentives to take on excessive risks."

98.     Finally, Bernanke added that "[h]aving institutions that are too big to fail also
creates competitive inequities that may prevent our most productive and innovative firms from
prospering."

99.     The FSOC's power to formally designate non-bank SIFIs will do for nonbanks
what unofficial SIFI status long has done for SIFIs: give them a direct cost-of-capital subsidy not
enjoyed by the other companies competing for scarce, fungible capital—such as Plaintiff State
National Bank of Big Spring.

100.    Accordingly, Plaintiff State National Bank of Big Spring is injured by the FSOC's
official designation of "systemically important" nonbank financial companies, because each
additional designation will require the Bank to compete with yet another financial company—
*i.e.*, a newly designated nonbank financial companies—that is able to attract scarce, fungible
investment capital at artificially low cost.

23

101.    By Defendant Geithner's own admission, the FSOC's nonbank SIFI designations are imminent: On February 2, 2012, Defendant Geithner announced that, "[t]his year, the Council will make the first of these designations.

102.    Despite all of the consequences riding upon FSOC's determination, the Dodd-Frank Act gives FSOC unlimited discretion in making those determinations.

103.    After listing several broad standards for FSOC to consider in making its determinations (*e.g.*, that the company's "scope, size, scale, concentration, interconnectedness, or mix of activities . . . could pose a threat to the financial stability of the United States," Sec. 113(a)(1)), Title I opens the door to unlimited other considerations by authorizing FSOC to consider "any other risk-related factors that [FSOC] deems appropriate" in subjecting a company to this stringent oversight.  Sec. 113(a)(2)(K).

104.    Accordingly, the nominal standards prescribed by Title I of the Dodd-Frank Act impose no limits on the FSOC's designation of nonbank financial companies as "systemically important."

### *The FSOC's Determinations Are Not Subject To Meaningful Judicial Review*

105.    Because the FSOC has open-ended discretion to designate nonbank financial companies as systemically important, it is all the more important that the courts be available to review the FSOC's conclusions and analysis.  But instead, Title I closes the courthouse doors to those who object to the FSOC's legal interpretations: Section 113 prohibits the courts from reviewing whether the FSOC's actions are "in accordance with law."  *Cf.* 5 U.S.C. 706(2)(A).

106.    Specifically, a party designated by FSOC as systemically important may appeal to federal district court, but its appeal is limited to the question of whether the FSOC's determination is "arbitrary and capricious."  Sec. 113(h).

24

107.    And even more importantly, Title I provides *no* right of judicial review for a third party—*i.e.*, State National Bank of Big Spring, or other market participants—to challenge FSOC's systemic-importance designation of another company, even if the FSOC designation puts that third-party at a competitive disadvantage in terms of relative cost of capital.

108.    Accordingly, even though FSOC's determinations that certain nonbank financial companies are systemically important will place Plaintiff State National Bank of Big Spring at yet further competitive disadvantage, Title I denies it the right to challenge any aspect of the nonbanks' FSOC designation.

## COUNT I
### (Violation of the Separation of Powers - CFPB)

109.    Plaintiffs reallege and incorporate by reference the allegations contained in all of the preceding paragraphs.

110.    The Constitution provides that all "legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const. art. I, § 1.

111.    The Constitution further provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law…" U.S. Const. art. I, § 9.

112.    Furthermore, the Constitution provides that the "executive Power shall be vested in a President," U.S. Const. art. II, § 1, and that "he shall take Care that the Laws be faithfully executed," U.S. Const. art. II, § 2. Those provisions vest all executive power, including the power to enforce the law, in the President of the United States.

113.    By delegating effectively unlimited power to the CFPB, by eliminating Congress's own "power of the purse" over the CFPB, by eliminating the President's power to

remove the CFPB Director at will, and by limiting the courts' judicial review of the CFPB's actions and legal interpretations, Title X of the Dodd-Frank Act violates the Constitution's separation of powers.

114.    Neither Congress nor the President can negate those structural constitutional requirements by signing or enacting (and thereby acceding to) Title X. "Perhaps an individual President"—or Congress—"might find advantages in tying his own hands," the Supreme Court recently noted, "[b]ut the separation of powers does not depend on the views of individual Presidents"—or particular Congresses. *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3155 (2010). The Constitution's separation of powers does not depend "on whether 'the encroached-upon branch approves the encroachment.'" *Id.* (quoting *New York v. United States*, 505 U.S. 144, 182 (1992)).

115.    Neither the President nor Congress may "choose to bind [their] successors by diminishing their powers, nor can [they] escape responsibility for [their] choices by pretending that they are not [their] own." *Id.*

116.    "The diffusion of power" away from Congress and the President, to the independent CFPB, "carries with it a diffusion of accountability. . . . Without a clear and effective chain of command, the public cannot 'determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall." *Id.* (quoting The Federalist No. 70, p. 476 (J. Cooke ed. 1961) (A. Hamilton).

117.    While the Supreme Court has approved the constitutionality of certain removals of checks or balances in *isolation*—*e.g.*, a limit on the President's power to remove certain officers—the Court has never held that it is constitutional to remove all of the checks and balances that Title X removes, *and* to combine that lack of checks and balances with the open-

26

ended statutory mandate that Title X provides the CFPB—thereby effectively granting unlimited discretion to the agency.

118.    And so while the Supreme Court has "previously upheld limited restrictions on" individual checks and balances, the CFPB's "novel structure does not merely add to the [CFPB's] independence, but transforms it." *Free Enter. Fund*, 130 S. Ct. at 3154.

119.    Accordingly, Title X's delegation of unlimited power to the CFPB, together with the Title X's elimination of the necessary checks and balances upon the CFPB's exercise of that power, is unconstitutional, must be declared unconstitutional, and must be enjoined.

## COUNT II
### (Appointments Clause - CFPB)

120.    Plaintiffs reallege and incorporate by reference the allegations contained in all of the preceding paragraphs.

121.    President Obama's appointment of Cordray as director of the CFPB violates the Appointments Clause of the Constitution.  The Constitution provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States all other officers of the United States, whose appointments are not herein otherwise provided for . . ."  U.S. Const. art. II, § 2.

122.    The CFPB possesses significant powers over the market for consumer financial products and services and participants in that market including (but not limited to) issuing rules, orders and guidance implementing federal consumer financial law and supervising covered persons for compliance with federal consumer financial law.  The CFPB Director is authorized to employ personnel as may be deemed necessary to carry out the business of the CFPB.  It is the Director of the CFPB who has ultimate authority to exercise any power vested in the CFPB

under law, and the Director may delegate such authority to any duly authorized employee, representative, or agent. The CFPB Director is an Officer of the United States.

123.    The Constitution expressly vests in each House of Congress the exclusive power to "determine the rules of its Proceedings." U.S. Const. art. I, § 5, cl. 2.

124.    As discussed above, on December 17, 2011, the Senate voted by unanimous consent to remain in session during the period between December 20, 2011 and January 23, 2012. The Senate's schedule provided for a series of sessions, and the *Congressional Record* indicates that those sessions actually occurred. *See* 153 Cong. Rec. S1 (Jan. 3, 2012), S3 (Jan. 6, 2012), S5 (Jan. 10, 2012), S7 (Jan. 13, 2012), S9 (Jan. 17, 2012), S11 (Jan. 20, 2012).

125.    During these sessions, Congress passed the Temporary Payroll Tax Cut Continuation Act of 2011 on December 23, 2011. President Obama signed that legislation, never protesting that it was invalidly enacted due to a congressional recess.

126.    The Constitution requires that "[n]either House, during the [s]ession of Congress, shall, without the Consent of the other, adjourn for more than three days." U.S. Const. art. I, § 5, cl. 4. The House of Representatives never consented to a Senate adjournment of longer than three days, as it must to effect a recess.

127.    Because the Senate, by its own vote, pursuant to its own actions, and based on the inaction of the House of Representatives, was in session when President Obama nominated Mr. Cordray to the position of CFPB Director, and because the President nonetheless did not secure its "advice and consent" for the Cordray nomination, his appointment to the CFPB is unconstitutional.

## COUNT III
### (Separation of Powers - FSOC)

128.    Plaintiffs reallege and incorporate by reference the allegations contained in all of the preceding paragraphs.

129.    The Constitution provides that all "legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const. art. 1, § 1.

130.    Furthermore, the Constitution provides that the "executive Power shall be vested in a President," U.S. Const. art. II, § 1, and that "he shall take Care that the Laws be faithfully executed," U.S. Const. art. II, § 2. Those provisions vest all executive power, including the power to enforce the law, in the President of the United States.

131.    Title I of the Dodd-Frank Act grants the FSOC effectively unlimited power, and eliminates the judiciary's ability to exercise meaningful judicial review of the FSOC's execution of that power—especially in cases where a competitor of the FSOC-designated company seeks to challenge the designation.

132.    In addition to vesting executive power in the President, the Constitution also mandates that he, or the heads of executive departments, "shall appoint" all "Officers of the United States." U.S. Const. art. II, § 2, cl. 2. But the FSOC includes non-voting members, such as insurance and banking officials, who are not appointed by the President or anyone in the executive branch, yet participate in its deliberations and proceedings. See Sec. 111(b)(2),(c)(1); ¶¶ 51-53, *supra*. For all of these reasons, Title I of the Dodd-Frank Act violates the Constitution's separation of powers.

133.    As set forth in ¶¶ 87-108, *supra*, Congress cannot negate those structural constitutional requirements by enacting (and thereby acceding to) Title I. "The [Constitution's]

29

separation of powers does not depend" on whether "'the encroached-upon branch approves the encroachment.'" *Free Enterprise Fund*, 130 S. Ct. at 3155 (quoting *New York*, 505 U.S. at 182). Congress may not "choose to bind [its] successors by diminishing their powers, nor can [it] escape responsibility for [its] choices by pretending that they are not [its] own." *Id.*

134.    "The diffusion of power" away from Congress, to the independent FSOC, "carries with it a diffusion of accountability. . . . Without a clear and effective chain of command, the public cannot 'determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall." *Id.* (quoting The Federalist No. 70, p. 476 (J. Cooke ed. 1961) (A. Hamilton)).

135.    Title I's open-ended grant of power and discretion to the FSOC, combined with the elimination of the indispensible check of judicial review on the FSOC's judgments, and the inclusion of members who are neither appointed by the President nor confirmed by the Senate, gives the FSOC unfettered discretion in determining which nonbank financial companies will be designated "systemically important." That structure "does not merely add to the [FSOC's] independence, but transforms it." *Free Enterprise Fund*, 130 S. Ct. at 3154.

136.    Accordingly, Title I of the Dodd-Frank Act, violates the Constitution's separation of powers, must be declared unconstitutional, and must be enjoined.

## PRAYER FOR RELIEF

Wherefore, plaintiffs pray for the following relief:

1.    an order and judgment declaring unconstitutional the provisions of the Act creating and empowering the CFPB, and enjoining Defendants Cordray and the CFPB from exercising any powers delegated to them by Title X of the Act;

30

2.       an order and judgment declaring unconstitutional Richard Cordray's appointment as CFPB director, and enjoining Cordray from carrying out any of the powers delegated to the office of CFPB Director by the Act;

3.       an order and judgment declaring unconstitutional the provisions of the Act creating and empowering the FSOC, and enjoining Defendants from exercising any powers delegated to them by Title I of the Act;

4.       costs and attorneys' fees pursuant to any applicable statute or authority; and

5.       any other relief this Court deems just and appropriate.

Respectfully submitted,

C. Boyden Gray (D.C. Bar 122663)
Adam J. White (D.C. Bar 502007)
BOYDEN GRAY & ASSOCIATES P.L.L.C.
1627 I St. NW, Suite 950
Washington, D.C.  20006
(202) 706-0620
(202) 955-0621 (fax)
adam@boydengrayassociates.com

*Counsel for Plaintiffs*

Gregory Jacob (D.C. Bar 474639)
O'MELVENY & MYERS LLP
1625 I St. NW
Washington, D.C.  20006
(202) 383-5110
(202) 383-5413 (fax)
gjacob@omm.com

*Counsel for Plaintiffs*

Sam Kazman (D.C. Bar 946376)
Hans Bader (D.C. Bar. 466545)
COMPETITIVE ENTERPRISE INSTITUTE
1899 L St. NW, Floor 12
Washington, D.C.  20036
(202) 331-1010
(202) 331-0640 (fax)
skazman@cei.org

*Co-counsel for Plaintiff*
*Competitive Enterprise Institute*

June 21, 2012