**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| STATE NATIONAL BANK OF BIG SPRING *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 1:12-cv-01032 (ESH) |
| TIMOTHY GEITHNER, in his official capacity as United States Secretary of the Treasury and *ex officio* Chairman of the Financial Stability Oversight Council, *et al.*, | ) ) ) ) ) | |
| Defendants. | ) ) | |

_____

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE AMENDED COMPLAINT
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1)**
_____

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

STATUTORY AND REGULATORY FRAMEWORK:  THE DODD-FRANK ACT ................. 5

    I.     THE CONSUMER FINANCIAL PROTECTION BUREAU ................................. 6

        A.  ESTABLISHMENT AND LEADERSHIP ........................................................... 6

        B.  THE BUREAU'S REGULATORY AUTHORITY ................................................. 7

        C.  THE BUREAU'S SUPERVISORY AND ENFORCEMENT AUTHORITY ................ 8

    II.    THE FINANCIAL STABILITY OVERSIGHT COUNCIL ................................. 9

    III.   THE ORDERLY LIQUIDATION AUTHORITY ............................................. 12

PROCEDURAL BACKGROUND .................................................................................. 14

STANDARD OF REVIEW ........................................................................................... 15

ARGUMENT .............................................................................................................. 15

    I.     NONE OF THE PLAINTIFFS HAS STANDING. ........................................... 15

        A.  PLAINTIFF STATE NATIONAL BANK OF BIG SPRING:  COUNT I. .............. 16

             1.  *SNB's Purported Fear of a Future Enforcement Action Does Not Constitute an Injury in Fact.* ............................................... 17

             2.  *The Bureau's Remittance Transfer Rule Does Not Constitute an Injury in Fact Fairly Traceable to the Challenged Provisions of the Act.* ........................................................................... 22

        B.  PLAINTIFF STATE NATIONAL BANK OF BIG SPRING:  COUNT II. ............. 27

        C.  PLAINTIFF STATE NATIONAL BANK OF BIG SPRING:  COUNT III. ............ 29

             1.  *SNB Speculates that One of Its Direct Competitors Will Be Designated a SIFI.* ............................................................... 31

             2.  *SNB Speculates that Creditors Will React to a Council Designation by Providing Capital to the Designated Entity on More Favorable Terms.* ............................................................... 33

             3.  *SNB Speculates that a SIFI Designation Will Result in an Overall Competitive Advantage to the Designated Entity.* ............. 36

        D.  PLAINTIFF STATE NATIONAL BANK OF BIG SPRING:  COUNTS IV, V, AND VI. .......... 38

        E.  PLAINTIFFS 60 PLUS ASSOCIATION AND COMPETITIVE ENTERPRISE INSTITUTE:  COUNTS I THROUGH VI. ................................................... 39

F.   PLAINTIFFS MICHIGAN, OKLAHOMA, AND SOUTH CAROLINA:   COUNTS IV, V, AND VI. ................................................................................................................. 42

1.   *The States Speculate that One of the Financial Companies of Which Their Pension Funds Are Allegedly Creditors Will Fail.* ........ 43

2.   *The States Speculate that One of the Financial Companies of Which Their Pension Funds Are Allegedly Creditors Will Be Subject to Title II.* .............................................................................. 44

3.   *The States Speculate that Their Pension Funds Will Suffer an Injury Flowing From Title II.* ............................................................ 46

II.   PLAINTIFFS' CLAIMS ARE NOT RIPE. ........................................................... 48

CONCLUSION ................................................................................................................. 50

## INTRODUCTION

This lawsuit cobbles together an array of disparate challenges to the constitutionality of three titles of an act of Congress and the constitutionality of the President's appointment of an executive officer.  Despite the roving allegations of unconstitutionality set forth in the Amended Complaint, not one of the statutorily authorized actions that Plaintiffs speculate might someday cause them harm has yet occurred.  As such, each of the Plaintiffs' various claims of injury falls far short of the imminent, non-conjectural injury required to demonstrate Article III standing and, for similar reasons, each of their claims is unripe.

Plaintiffs are a community bank, two advocacy organizations, and three States.  They challenge the constitutionality of multiple provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub L. No. 111-203, 124 Stat. 1376 (2010) ("Dodd-Frank" or "Act").  In particular, the bank and advocacy organizations claim that the authority granted to the Consumer Financial Protection Bureau ("CFPB" or "Bureau") to identify "unfair, deceptive, or abusive" acts or practices ("UDAAPs") and the authority granted to the Financial Stability Oversight Council ("FSOC" or "Council") to subject certain nonbank financial companies to more stringent federal regulation are unconstrained by meaningful checks and balances, in violation of the separation of powers (Counts I and III, respectively).  All of the Plaintiffs claim that the provisions of Dodd-Frank allowing for the orderly liquidation of failing financial companies violate the constitutional separation of powers, due process, and requirement for uniformity in bankruptcy (Counts IV, V, and VI).  Finally, the bank and advocacy organizations claim that the President's appointment of Richard Cordray as Director of the Bureau was invalid under the Recess Appointments Clause because the Senate allegedly was not in recess at the time of the appointment (Count II).

Plaintiff State National Bank of Big Spring ("SNB") lacks standing.  As to Counts I and II, SNB first claims that the Bureau's authority to enforce Dodd-Frank's prohibition on UDAAPs has created a "chilling effect" on its consumer lending practices that caused SNB to exit the mortgage lending business in October 2010.  But the Bureau has no authority to enforce the UDAAP prohibition against SNB.  SNB's supervisor, the Office of the Comptroller of the Currency ("OCC"), has exclusive authority to enforce SNB's compliance with the UDAAP prohibition.  As to SNB, the Bureau's enforcement authority is limited to making recommendations to OCC; not only is OCC free to accept or reject such recommendations (and to initiate enforcement actions without a Bureau recommendation), but SNB has failed to allege that any such recommendation by the Bureau has occurred or is imminent.  And, in any event, district courts are barred from entertaining pre-enforcement challenges against the OCC. Consequently, SNB's departure from the mortgage lending industry, allegedly in fear of some unidentified future enforcement action, was a voluntary decision that does not confer standing.

SNB's claim that it stopped providing remittance transfers due to a not-yet-effective Bureau regulation imposing disclosure requirements on certain providers of remittance transfers also fails to support its standing to bring Counts I or II.  As an initial matter, SNB has failed to allege sufficient facts demonstrating that it will be subject to the regulation, which applies only to those financial institutions that provide remittance transfers in the normal course of their business.  But even if SNB could demonstrate that it will be subject to the regulation, that regulation would not support SNB's standing to bring Count I.  The remittances regulation was promulgated pursuant to the Bureau's authority to implement the Electronic Fund Transfer Act ("EFTA"), not pursuant to the Bureau's UDAAP authority.  SNB does not allege that the Bureau's authority to implement the EFTA is unconstitutional or that the regulation is traceable

to the Bureau's allegedly "unlimited" UDAAP authority.  SNB cannot utilize an alleged injury caused by one statutory grant of authority to challenge an entirely distinct grant of authority; its bootstrapping theory of standing must fail.  In sum, having failed to allege any actual or imminent injury flowing from the challenged provisions of Dodd-Frank establishing the Bureau, or from Richard Cordray's appointment as Director of the Bureau, SNB lacks standing to pursue these claims.

As to Count III, SNB has suffered no injury flowing from the Council's authority to designate certain nonbank financial companies as systemically important financial institutions ("SIFIs")[1] that will be subject to more stringent government regulation.  SNB does not claim that it has been or will ever be designated a SIFI.  Instead, it attempts to cast a SIFI designation and the heightened federal regulation that accompanies it as a *benefit*, and then claims that it will suffer a competitive injury because it has *not* been designated.  SNB's asserted injury, however, is based on speculation that one of its direct competitors will someday be designated a SIFI (no such designations have occurred), layered upon speculation that this competitor will receive a cost-of-capital advantage from its creditors as a result of the designation (no entities have received such a benefit), layered upon speculation that this cost-of-capital advantage will outweigh the costs associated with heightened federal regulation (not yet finalized).  Not only does SNB's speculative theory of injury directly contradict Congress's express statement of purpose in granting designation authority to the Council, it also falls far short of an injury that is sufficiently concrete to confer standing.

---

[1] Dodd-Frank itself does not use the term "systemically important financial institution" to describe a designated nonbank financial company.  Rather, the term is a short-hand description frequently used by the public and throughout financial literature.

As to Counts IV, V, and VI, SNB has not even attempted to identify an injury flowing from the orderly liquidation authority and thus plainly lacks standing to pursue those claims.

The advocacy organizations' claims of injury are even more attenuated than those of SNB. The Competitive Enterprise Institute ("CEI") lacks standing because it alleges only that it holds accounts at financial companies that might be subject to Bureau or Council authority. CEI alleges no facts demonstrating that the alleged constitutional violations have impaired anything other than its abstract interest in the constitutional separation of powers, the sort of generalized grievance that does not give rise to standing. Likewise, the 60 Plus Association, Inc. ("60 Plus") lacks standing because it has failed to identify at least one member whose account has been affected by the challenged provisions of the Act or by Director Cordray's appointment. Even if it could identify such a member, the link between any changes to the member's account by its financial institution and any alleged constitutional infirmity is far too attenuated to sustain the organization's standing.

The States, whose claims are limited to Counts IV, V, and VI, also lack standing. Their theory that the orderly liquidation authority – which has never been invoked – may be applied to a financial company of which their pension funds are allegedly creditors is pure conjecture. The orderly liquidation authority was designed for the extraordinary situation in which the failure of a financial company and its resolution under otherwise applicable law would have serious adverse effects on the nation's financial stability; despite this new authority, the statutory framework incorporates a strong presumption that failing financial companies will be resolved through existing bankruptcy procedures. The States have failed to allege that invocation of the challenged authority as to *any* financial company, much less one of which the States' pension funds are allegedly creditors, is imminent.

Finally, and for reasons similar to the reasons they lack standing, Plaintiffs' claims are unripe. Plaintiffs have not demonstrated that their claims are presently fit for judicial resolution or that they will suffer hardship if review is postponed. Future Bureau enforcement actions or regulations, future Council designations, and future orderly liquidation processes that affect Plaintiffs are contingent upon subsequent events that may not occur as Plaintiffs suggest or may not occur at all. Because the Court may never need to resolve these claims, they are not fit for judicial resolution. Furthermore, because Plaintiffs have failed to allege any actual or imminent injury flowing from the challenged provisions of the Act or from Director Cordray's appointment, Plaintiffs will suffer no hardship at this time in the absence of judicial intervention.

For these reasons, the Court should dismiss the Amended Complaint for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).

## STATUTORY AND REGULATORY FRAMEWORK:  THE DODD-FRANK ACT

On July 21, 2010, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub L. No. 111-203, 124 Stat. 1376 (2010). The legislation provided "a direct and comprehensive response to the financial crisis that nearly crippled the U.S. economy beginning in 2008." S. Rep. No. 111-176, at 2 (2010). Its overarching purpose was to "promote the financial stability of the United States" through the establishment of measures designed to improve accountability, resiliency, and transparency in the financial system. *Id.* The Act enhanced consumer and investor protections, established an early warning system to detect and address emerging threats to financial stability and the economy, strengthened the supervision of large complex financial organizations, established a mechanism to liquidate large and complex failing companies without any loss to taxpayers, and imposed limitations on certain trading activity. *Id.* The Act changed the pre-existing regulatory structure by creating several new

governmental entities, by eliminating others, and by transferring regulatory authority among agencies.[2]

## I.   THE CONSUMER FINANCIAL PROTECTION BUREAU

### A.   ESTABLISHMENT AND LEADERSHIP

Title X of Dodd-Frank established the Consumer Financial Protection Bureau in order to ensure "that all consumers have access to markets for consumer financial products and services and that markets for [such] services are fair, transparent, and competitive."  12 U.S.C. § 5511(a). Prior to Dodd-Frank, the statutory authority to regulate consumer financial products and services was spread among seven different federal agencies.  *See* S. Rep. No. 111-176, at 10 (2010).  This fragmentation of authority was viewed as a contributing factor to the recent financial crisis, *see id.*, and Congress responded by creating the Bureau, a single agency with the authority and accountability to ensure that Federal consumer financial law[3] is "comprehensive, fair, and vigorously enforced," *see* H.R. Rep. No. 111-517, at 730 (2010).

The Bureau is an independent agency within the Federal Reserve System.  12 U.S.C. § 5491(a).  It is headed by a Director who is appointed by the President with the advice and consent of the Senate and is removable by the President for cause.  *Id.* § 5491(b), (c).  On January 4, 2012, the President appointed Richard Cordray as the Bureau's first Director pursuant

---

[2]      *See* Dodd-Frank §§ 111-23, 124 Stat. at 1392-1412 (creating the Council); *id.* §§ 151-56, 124 Stat. at 1412-20 (creating the Office of Financial Research); *id.* §§ 1001-1100H, 124 Stat. at 1955-2113 (creating the Bureau); *id.* §§ 312-13, 124 Stat. at 1521-23 (eliminating the Office of Thrift Supervision ("OTS") and transferring its authority to the OCC, the Board of Governors of the Federal Reserve System ("Federal Reserve Board" or "Board"), and the Federal Deposit Insurance Corporation ("FDIC")); *id.* §§ 1061-67, 124 Stat. at 2035-56 (transferring certain existing regulatory authority from seven different federal agencies to the Bureau).

[3]      Under Dodd-Frank, the term "Federal consumer financial law" includes certain pre-existing "enumerated consumer laws," 12 U.S.C. § 5481(12), the provisions of Title X, the laws for which authorities are transferred under subtitles F and H of Title X, and all rules or orders prescribed by the Bureau under these laws and authorities.  *Id.* § 5481(14).

to the President's authority under the Recess Appointments Clause, U.S. Const. art. II, § 2, cl. 3. *See* White House, President Obama Announces Recess Appointments to Key Administration Posts (Jan. 4, 2012), at www.whitehouse.gov/the-press-office/2012/01/04/president-obama-announces-recess-appointments-key-administration-posts.   Because Director Cordray was appointed pursuant to the President's recess appointment authority, his term will expire at the end of the Senate's next session.  *See* U.S. Const. art. II, § 2, cl. 3.

## B.   THE BUREAU'S REGULATORY AUTHORITY

Under Title X of the Act, much of the authority to regulate consumer financial products and services that had been maintained by other federal agencies transferred to the Bureau.  *See* 12 U.S.C. § 5581.  This transferred authority includes the authority to prescribe regulations implementing a number of existing federal statutes, including the Truth in Lending Act, the Equal Credit Opportunity Act, the Real Estate Settlement Procedures Act, and the EFTA.  *Id.* §§ 5581, 5481(12), (14).  Dodd-Frank amended many of these existing laws, and the authority to implement those amendments also transferred to the Bureau.  Of relevance here, Dodd-Frank amended the EFTA to establish a comprehensive new system of consumer protections for remittance transfers sent by consumers in the United States to individuals and businesses in foreign countries.  *See* Dodd-Frank Act § 1073(a)(4) (codified at 15 U.S.C. § 1693o-1).  The Bureau published in the *Federal Register* a final rule implementing this statutory amendment on February 7, 2012, and an amendment to that final rule on August 20, 2012.  *See* Electronic Fund Transfers, 77 Fed. Reg. 6194 (Feb. 7, 2012) (codified at 12 C.F.R. pt. 1005, subpart B); Electronic Fund Transfers, 77 Fed. Reg. 50244 (Aug. 20, 2012) (amending 12 C.F.R. pt. 1005).

In addition to its transferred authority to issue regulations implementing existing enumerated consumer laws, Title X also grants the Bureau authority to issue regulations

implementing the provisions of Title X itself.  *See, e.g.*, 12 U.S.C. § 5512(b)(1) (granting the

Bureau general rulemaking authority to administer the Federal consumer financial laws); *id.*

§ 5532(a) (granting the Bureau authority to issue rules to ensure full, accurate, and effective

disclosure of the features of any consumer financial product or service).  In particular, Title X

prohibits the commission of any "unfair, deceptive, or abusive act or practice" by a "covered

person" or "service provider," as those terms are defined in Title X.  *Id.* §§ 5531(a),

5536(a)(1)(B), 5481(6), (26).  And it authorizes the Bureau to issue regulations identifying acts

or practices as unfair, deceptive, or abusive.  *Id.* § 5531(b).  The Bureau has not yet promulgated

any such regulations.

### C.     THE BUREAU'S SUPERVISORY AND ENFORCEMENT AUTHORITY

In addition to its regulatory authority, the Bureau has the authority to "supervis[e]

covered persons for compliance with Federal consumer financial law, and tak[e] appropriate

enforcement action to address violations of Federal consumer financial law."  12 U.S.C.

§ 5511(c)(4).  This authority, however, does not extend to every participant in the consumer

financial marketplace but is instead subject to Title X's division of authority between the Bureau

and other federal agencies.  *See id.*  As relevant here, for example, the Bureau has only limited

supervisory authority over smaller insured depository institutions and credit unions (*i.e.*, those

with $10 billion or less in total assets that are not affiliates of very large banks and credit

unions), and it has no authority to enforce the substantive requirements of Federal consumer

financial law with respect to such institutions.  *See id.* § 5516.

Instead, the "prudential regulators"[4] retain the primary authority to examine these smaller insured depository institutions and credit unions for compliance with Federal consumer financial law. *See id.* §§ 5581(c)(1)(B), 5516(a). The prudential regulators' supervisory authority is exclusive relative to the Bureau, *id.*, except that the Bureau may require reports from such institutions for certain purposes and participate in the prudential regulators' examinations of such institutions on a sampling basis, *id.* § 5516(b), (c). And, except for its ability to enforce compliance with a request for a report pursuant to this limited supervisory authority, the prudential regulators retain "exclusive authority (relative to the Bureau) to enforce compliance with Federal consumer financial laws" with respect to these smaller insured depository institutions or credit unions. *Id.* § 5581(c)(2)(B); *see also id.* § 5516(d)(1). Although the Bureau may recommend appropriate action to the prudential regulator when it has reason to believe that a smaller depository institution or credit union has violated Federal consumer financial law, the prudential regulator's only obligation is to respond to such a recommendation in writing. *Id.* § 5516(d)(2).

## II.     THE FINANCIAL STABILITY OVERSIGHT COUNCIL

Title I of Dodd-Frank established the Financial Stability Oversight Council.[5] 12 U.S.C. § 5321. In the recent financial crisis, financial distress at certain nonbank financial companies

---

[4]     The "prudential regulators" are the Federal Reserve Board, the FDIC, the OCC, the National Credit Union Administration ("NCUA"), and, formerly, the OTS. *See id.* §§ 5841(24), 1813(q).

[5]     The Council comprises ten voting members: (1) the Secretary of the Treasury, who serves as the Chairperson of the Council; (2) the Chairman of the Federal Reserve Board; (3) the Comptroller of the Currency; (4) the Director of the Bureau; (5) the Chairperson of the Securities and Exchange Commission ("SEC"); (6) the Chairperson of the FDIC; (7) the Chairperson of the Commodity Futures Trading Commission; (8) the Director of the Federal Housing Finance Agency; (9) the Chairman of the NCUA Board; and (10) an independent member with insurance expertise appointed by the President with the advice and consent of the Senate. *Id.* § 5321(b)(1).

contributed to a broad seizing up of financial markets and stress at other financial firms. *Authority to Require Supervision and Regulation of Certain Nonbank Financial Companies*, 77 Fed. Reg. 21637, 21637 (Apr. 11, 2012).  Many of these companies were not subject to the type of regulation and consolidated supervision that applied to bank holding companies, nor were there effective mechanisms in place to wind down the largest and most interconnected of these companies without causing further instability.  *Id.*; *see also* S. Rep. No. 111-176, at 43 (2010) ("[N]o financial regulator was responsible for assessing the impact the failure of a single firm might have on the state of the financial system.  Indeed, as the crisis grew more severe, the interconnected relationships among financial companies increased the pressure on those already struggling to survive, which only served to accelerate the downfall of some firms.").  Congress responded by creating the Council, the purposes of which are to identify risks to the nation's financial stability posed by large, interconnected companies, 12 U.S.C. § 5322(a)(1)(A), and to promote market discipline by eliminating any expectation on the part of shareholders and creditors of such companies that the government will bail them out in the event of their failure, *id.* § 5322(a)(1)(B).

In particular, the Act authorizes the Council (upon a two-thirds vote of its voting members that must include the affirmative vote of the Treasury Secretary) to designate certain "nonbank financial companies"[6] as SIFIs that will be subject to supervision by the Federal

---

The Council also comprises five nonvoting members who serve in an advisory capacity only and may be excluded from Council deliberations in certain circumstances.  *Id.* § 5321(b)(3).

[6]        Under the Act, a "nonbank financial company" is a domestic or foreign company that is "predominantly engaged in financial activities," other than bank holding companies and certain other types of firms.  *Id.* § 5311(a)(4).  Certain bank holding companies that could pose risks to the nation's financial stability are, by statute, already subject to heightened regulation and thus are not subject to a designation by the Council.  *Id.* § 5365(a)(1) (designating all bank holding companies with total consolidated assets equal to or greater than $50 billion as entities subject to heightened government regulation).

Reserve Board and more stringent government regulation in the form of prudential standards and early remediation requirements established by the Board. *See id.* §§ 5323(a)(1), (b)(1), 5365, 5366. The Council may determine that a nonbank financial company should be subject to heightened government regulation upon a determination that "material financial distress at the U.S. nonbank financial company, or the nature, scope, size, scale, concentration, interconnectedness, or mix of the activities of the U.S. nonbank financial company, could pose a threat to the financial stability of the United States." *Id.* § 5323(a)(1); *see also id.* § 5323(b)(1) (establishing a comparable standard governing the determination applicable to foreign nonbank financial companies). In exercising this designation authority, the Act specifies eleven factors that the Council must consider. *See id.* § 5323(a)(2), (b)(2). Prior to any designation by the Council, a nonbank financial company must receive written notice of the proposed determination and is entitled to a hearing. *Id.* § 5323(e). A financial company that is ultimately subject to a Council determination may seek judicial review of that determination. *Id.* § 5323(h). The reviewing court may set aside a Council determination if it is arbitrary and capricious. *Id.*

On April 11, 2012, the Council published in the *Federal Register* a final rule and interpretive guidance describing the manner in which the Council intends to apply the statutory factors. Authority to Require Supervision and Regulation of Certain Nonbank Financial Companies, 77 Fed. Reg. 21637 (Apr. 11, 2012). The Council has not, however, made any SIFI designations pursuant to its authority under Title I. *See* U.S. Government Accountability Office ("GAO"), "Agencies Continue Rulemakings for Clarifying Specific Provisions of Orderly Liquidation Authority" (July 2012), at http://www.gao.gov/assets/600/592318.pdf ("[N]onbank financial companies' . . . have yet to be designated.").

## III.    THE ORDERLY LIQUIDATION AUTHORITY

Title II of Dodd-Frank established a process for "liquidat[ing] failing financial companies that pose a significant risk to the financial stability of the United States in a manner that mitigates such risk and minimizes moral hazard."  12 U.S.C. § 5384(a).  During the recent financial crisis, "[w]hen Lehman Brothers declared bankruptcy, the markets panicked and the crisis escalated.  With no other means to resolve large, complex and interconnected financial firms, the government was left with few options other than to provide massive assistance to prop up failing companies in an effort to prevent the crisis from spiraling into a great depression."  *See* S. Rep. No. 111-176, at 43 (2010).  In order to avoid "the undesirable choice . . . between bankruptcy of a large, complex financial company that would disrupt markets and damage the economy, and bailout of such financial company that would expose taxpayers to losses and undermine market discipline," Congress established the orderly liquidation authority.  *Id.* at 4.  Despite this new authority, the Act incorporates "a strong presumption that the bankruptcy process will continue to be used to close and unwind failing financial companies, including large, complex ones."  *Id.*

Pursuant to the orderly liquidation authority, the Treasury Secretary may appoint the FDIC as receiver of a failing "financial company."[7]  *See* 12 U.S.C. §§ 5382-84.  Because Title II was designed to be invoked only in the most extraordinary of circumstances, however, "the threshold for triggering the orderly liquidation authority is very high."  S. Rep. No. 111-176, at 4

---

[7]    "Financial compan[ies]" include:  (1) bank holding companies; (2) nonbank financial companies supervised by the Federal Reserve Board; (3) other companies that are predominantly engaged in activities that are financial in nature or incidental thereto; and (4) subsidiaries of these companies that are predominantly engaged in activities that are financial in nature or incidental thereto, except subsidiaries that are insured depository institutions or insurance companies.  *Id.* § 5381(a)(11).  Furthermore, Title II exempts from its coverage insured depository institutions, *id.* § 5381(a)(8); under the Federal Deposit Insurance Act, the FDIC already had authority to serve as receiver for failing banks, *see id.* § 1821.

(2010).  In particular, activation of the orderly liquidation authority requires action by two-thirds

of the Federal Reserve Board and two-thirds of the FDIC Board to furnish a written

recommendation to the Treasury Secretary that contains an evaluation of eight statutory factors,

including whether the company "is in default or in danger of default," the effects that a default

would have on the financial stability of the United States, and why a case under the Bankruptcy

Code is not appropriate.[8]  12 U.S.C. § 5383(a).  Upon receiving such a recommendation, the

Treasury Secretary cannot authorize the use of the orderly liquidation authority unless he first

makes seven determinations in consultation with the President, including that the financial

company "is in default or in danger of default" and that resolving the financial company under

otherwise applicable law "would have serious adverse effects on financial stability in the United

States."  *Id.* § 5383(b).   Finally, if the financial company does not acquiesce or consent to the

appointment, the Secretary must petition the District Court for the District of Columbia for an

order authorizing the appointment.  *Id.* § 5382(a)(1).  The district court cannot authorize the

appointment if the Secretary's determination that the covered financial company is in default or

in danger of default, or his determination that the company satisfies the definition of a financial

company, was arbitrary and capricious.  *Id.* § 5382(a)(1)(A)(iii).  The district court's

determination is subject to review by the Court of Appeals under the same standard.  *Id.*

§ 5382(a)(2).

    Following any appointment of the FDIC as receiver, the FDIC would have to provide

notice to the failing company's creditors, who may then file claims.  *Id.* § 5390(a)(2)(B)-(C).

Under Title II, all claimants "shall, in no event, receive less than [an] amount" that "equal[s] the

---

[8]     If the financial company or its largest U.S. subsidiary is a broker or dealer, the SEC,
instead of the FDIC Board, must recommend that the company placed in receivership, and if it
is an insurance company, the Director of the Federal Insurance Office, instead of the FDIC
Board, must recommend receivership in consultation with the FDIC.  *Id.* § 5383(a)(1)(B), (C).

amount that such claimant would have received" if the FDIC "had not been appointed receiver with respect to the covered financial company" and if the company instead "had been liquidated under chapter 7 of the Bankruptcy Code."  *Id.* § 5390(a)(7)(B), (d)(2).  The claimant may seek judicial review of a disallowed claim with the appropriate federal district court.  *Id.* § 5390(a)(4).

The Secretary of the Treasury has not appointed the FDIC as receiver of any failing financial company pursuant to the procedures outlined in Title II.  *See* GAO, "Agencies Continue Rulemakings for Clarifying Specific Provisions of Orderly Liquidation Authority," at 2 (July 2012), at http://www.gao.gov/assets/600/592318.pdf ("OLA has not been invoked.").

## PROCEDURAL BACKGROUND

On June 21, 2012, Plaintiffs SNB, 60 Plus, and CEI filed the initial Complaint in this case.  *See* Compl. for Decl. & Inj. Relief, June 21, 2012 (ECF No. 1).  In that Complaint, those Plaintiffs claimed that the Bureau's authority to identify "unfair, deceptive, or abusive" acts and practices and the Council's authority to subject certain nonbanks to more stringent federal regulation are unconstrained by meaningful checks and balances, in violation of the separation of powers.  *See id.* ¶¶ 5, 7, 31-77, 87-108.  They also claimed that the President's appointment of Richard Cordray as Director of the Bureau was invalid under the Recess Appointments Clause because the Senate allegedly was not in recess at the time of the appointment.  *See id.* ¶¶ 6, 78-86.

On September 20, 2012, Plaintiffs SNB, 60 Plus, CEI, and the States of Michigan, Oklahoma, and South Carolina together filed an Amended Complaint.  *See* First Am. Compl. for Decl. & Inj. Relief, Sept. 20, 2012 (ECF No. 6) ("Am. Compl.").  In the Amended Complaint, Plaintiffs SNB, 60 Plus, and CEI reassert and expand upon the claims they made in the Complaint as to the authority of the Bureau and the Council and as to Director Cordray's

appointment.  *See id.* ¶¶ 6-8, 51-141.  In addition, all Plaintiffs newly assert that the Treasury

Secretary's authority to appoint the FDIC as receiver of failing financial companies and/or the

FDIC's receivership authority are unconstrained by meaningful checks and balances, violate due

process, and violate the constitutional requirement for uniformity in bankruptcy.  *See id.* ¶¶ 9-11,

142-78.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) requires dismissal of a complaint if the court

lacks subject matter jurisdiction.  Plaintiffs bear the burden of establishing that the court has

subject matter jurisdiction, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992), and courts

should "presume that [they] lack jurisdiction unless the contrary appears affirmatively from the

record," *Renne v. Geary*, 501 U.S. 312, 316 (1991) (quotations omitted).  Because a court has an

affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority, the

court must scrutinize plaintiffs' allegations more closely when considering a motion to dismiss

pursuant to Rule 12(b)(1) than it would when considering a motion to dismiss pursuant to Rule

12(b)(6).  *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 65 (D.D.C. 2011); *Edwards v.

Aurora Loan Servs., LLC*, 791 F. Supp. 2d 144, 149 (D.D.C. 2011).

## ARGUMENT

## I.   NONE OF THE PLAINTIFFS HAS STANDING.

The doctrine of Article III standing demands that a plaintiff have "a personal stake in the

outcome of the controversy [so] as to warrant his invocation of federal-court jurisdiction."

*Warth v. Seldin*, 422 U.S. 490, 498 (1975) (quotations omitted).  To demonstrate Article III

standing, a plaintiff must satisfy three prerequisites.  *Lujan*, 504 U.S. at 560.  First, a plaintiff

must demonstrate that it has suffered an "injury in fact" – "an invasion of a legally protected

interest" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* (quotations omitted).  Second, that injury must be "fairly traceable to the challenged action of the defendant." *Id.* (quotations omitted).  Finally, it must be "likely, as opposed to merely speculative," that the injury will be redressed by a favorable decision. *Id.* at 561 (quotations omitted).

These Article III standing requirements assure that legal questions "will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll.* v. *Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982).  The analysis of these requirements, which reflect fundamental separation-of-powers concerns, must be "especially rigorous" when federal courts are asked to conduct constitutional review of the actions of co-equal branches of government. *Raines* v. *Byrd*, 521 U.S. 811, 819-820 (1997).  In this challenge to the constitutionality of three titles of an Act of Congress, and to the President's exercise of his recess appointment power, none of the Plaintiffs has satisfied these core requirements.  None of the Plaintiffs has been injured by a Bureau regulation, Bureau enforcement action, Council designation, or Title II liquidation, and their subjective and unfounded fears that they might someday be affected by such actions are not enough to invoke this Court's jurisdiction.

### A.   PLAINTIFF STATE NATIONAL BANK OF BIG SPRING:  COUNT I.

In Count I of the Amended Complaint, Plaintiff SNB claims that the Bureau's UDAAP authority is unconstrained by meaningful checks and balances, in violation of the separation of powers. *See* Am. Compl. ¶¶ 6, 95, 107, 183, 189.  More specifically, SNB claims that the Bureau's UDAAP authority is too open-ended, *see id.* ¶¶ 54-79, and that it is not constrained by

Congress's appropriations authority, *id.* ¶¶ 96-101, by presidential or Federal Reserve Board oversight, *id.* ¶¶ 102-04, 106, or by appropriate judicial review, *id.* ¶ 105.  SNB lacks standing to raise its Count I claim because it has failed to identify any present injury or certainly impending injury caused by the challenged provisions of the Act.

1. *SNB's Purported Fear of a Future Enforcement Action Does Not Constitute an Injury in Fact.*

SNB first claims that the Bureau's authority to enforce the UDAAP prohibition has created a "chilling effect" on its consumer lending practices that caused SNB to exit the mortgage lending business in October 2010.  Am. Compl. ¶¶ 16, 78.  SNB's purported fear of enforcement does not constitute an injury in fact.

a. <u>The Bureau Has Virtually No Enforcement Authority Over SNB</u>.  As an initial matter, the Bureau has virtually no authority to enforce any consumer financial law against an insured depository institution with $10 billion or less in assets.  *See* 12 U.S.C. § 5516(d)(1).[9]  With respect to such institutions, the applicable prudential regulator has "exclusive authority (relative to the Bureau) to enforce" any violation of any Federal consumer financial law, including the UDAAP prohibition.  *Id.*  The Bureau's authority is limited to making enforcement recommendations to the prudential regulators, *id.* § 5516(d)(2)(A), whose only obligation is to respond to such recommendations in writing, *id.* § 5516(d)(2)(B).  The prudential regulators have thus retained their independent authority to make enforcement decisions with respect to insured depository institutions with $10 billion or less in assets.

SNB is a federally-chartered bank with less than $275 million in deposits.  Am. Compl. ¶ 14.  As such, the OCC is SNB's prudential regulator.  *See* 12 U.S.C. §§ 5481(24), 1813(q)(1);

---

[9]   Although the Bureau does have authority to enforce its right to require reports from such institutions during examinations, *id.* § 5516(d)(1), SNB has not alleged that the Bureau has required such a report.

OCC, National Banks and Federal Savings Associations, at

http://www.occ.treas.gov/topics/licensing/national-bank-lists/index-active-bank-lists.html

(explaining that "[n]ational banks . . . are chartered and regulated by [OCC]" and listing SNB as

an OCC-chartered national bank).  Any action to enforce Title X's UDAAP prohibition against

SNB would thus be taken pursuant to the OCC's independent enforcement authority.  As such, at

the time that it voluntarily abandoned its mortgage lending business in October 2010, SNB was

under no threat whatsoever that the Bureau would exercise its allegedly unbridled authority to

initiate an enforcement action against it, and it is under no such threat now.

      b.  <u>A Future OCC Enforcement Action Is Not Presently Subject to Judicial Review and,</u>

<u>in Any Event, Is Speculative.</u>  SNB suggests that the OCC might initiate an enforcement action

against it based on a hypothetical Bureau regulation identifying acts or practices as UDAAPs, or

based on less formal guidance from the Bureau.  *See* Am. Compl. ¶ 66.  SNB also suggests that

the OCC might initiate an enforcement action against it based on the Bureau's authority to

participate in the OCC's examination of smaller depository institutions on a sampling basis or its

authority to refer suspected violations of Federal consumer financial law by SNB to the OCC.

*See id.*  Neither theory satisfies SNB's burden to establish that this Court has jurisdiction.

      As an initial matter, SNB's claim is precluded by statute.  Under 12 U.S.C. § 1818(i)(1),

except as specifically provided, "no court shall have jurisdiction to affect by injunction or

otherwise the issuance or enforcement of any notice or order under [12 U.S.C. §§ 1818, 1831o,

or 1831p-1], or to review, modify, suspend, terminate, or set aside any such notice or order."

This Circuit has held that § 1818(i)(1) bars any actions seeking injunctive or declaratory relief in

an effort to block an enforcement action by a banking agency, including actions raising

constitutional claims.  *See Ridder v. Office of Thrift Supervision*, 146 F.3d 1035, 1040-42 (D.C.

Cir. 1998) (holding that district court lacked jurisdiction over plaintiff's constitutional claims in which he sought to enjoin an OTS enforcement proceeding).  The Supreme Court has likewise affirmed the scope of this "plain, preclusive language."  *Bd. of Governors of the Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 38-39 (1991).  Accordingly, any claim premised upon a future OCC enforcement action is barred by statute.

Even in the absence of this clear jurisdictional bar, neither of SNB's theories suffices to demonstrate a concrete and particularized injury.  To establish an "injury in fact" for purposes of Article III standing, a plaintiff must show more than a "possible future injury"; it must show that harm has actually occurred or is "certainly impending."  *See Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (quotations omitted); *see also Pub. Citizen, Inc. v. NHTSA*, 489 F.3d 1279, 1294 (D.C. Cir. 2007).  In particular, and as this Court recently recognized, "[a]llegations of injury based on predictions regarding future legal proceedings are too speculative to invoke the jurisdiction of an Article III Court."  *Wheaton Coll. v. Sebelius,* -- F. Supp. 2d --, Civ. No. 12-1169 (ESH), 2012 WL 3637162, at *4 (D.D.C. Aug. 24, 2012) (quotations and alteration omitted).  Instead, "[w]here a plaintiff has yet to face prosecution under a statute he seeks to challenge," the plaintiff must "(1) alleg[e] an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and (2) demonstrat[e] that there exists a credible threat of prosecution thereunder."  *Ord v. Dist. of Columbia*, 587 F.3d 1136, 1140 (D.C. Cir. 2009) (quotations omitted).  More specifically, the plaintiff must demonstrate that it has been "singled out or uniquely targeted" for enforcement.  *Id*.

SNB has not alleged any credible and imminent threat that it will be subject to an OCC enforcement action traceable to some action of the Bureau.  First, the Bureau has not issued any regulations pursuant to its authority to identify acts or practices as UDAAPs, 12 U.S.C.

§ 5531(b).  Nor has SNB identified any less formal Bureau guidance upon which the OCC might base an enforcement proceeding against SNB.  Second, SNB has not alleged that the Bureau has participated in any examination of SNB or recommended any enforcement action against SNB, or that any such Bureau actions are "certainly impending."[10]  SNB's mere speculation that the OCC could someday initiate an enforcement action against SNB that would be "fairly traceable" to a future Bureau rulemaking, guidance, examination, or recommendation does not satisfy its burden of demonstrating Article III standing.

c.  SNB's Voluntary Decision to Cease Mortgage Lending Does Not Confer Standing. SNB's allegation that it stopped its mortgage lending in October 2010 based on its fear of a future Bureau enforcement action, *see* Am. Compl. ¶ 78, is a self-inflicted harm that does not confer standing under Article III.  *See Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 177 (D.C. Cir. 2012) (manufacturers' voluntary decision to take actions not mandated by law was a self-inflicted harm that did not confer standing to challenge the law); *Bhd. of Locomotive Eng'rs & Trainmen v. Surface Transp. Bd.*, 457 F.3d 24, 28 (D.C. Cir. 2006) (union's voluntary agreement to a collective bargaining agreement term limiting its right to bargain was a self-inflicted harm that did not confer standing to challenge a Surface Transportation Board action that triggered the term); *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1429 (D.C. Cir. 1996) (plaintiff's additional expenditure of funds to lobby the President based on how plaintiff anticipated the President might use the line item veto was not an injury in fact).

---

[10]     Even if SNB had alleged that the Bureau intends to recommend an OCC enforcement action against SNB, SNB has not alleged facts sufficient to demonstrate that any subsequent enforcement action taken by the *OCC*, whose statutory authority SNB does not challenge, would be fairly traceable to the Act's allegedly unbridled grant of authority to the *Bureau*.  *See, e.g.*, *Scheibe v. Nat'l Bd. of Med. Exam'rs*, 424 F. Supp. 2d 1140, 1145 (W.D. Wis. 2006) (no standing where defendant made recommendations to a third party who "may reject defendant's recommendations").

Any loss of business caused by SNB's voluntary decision to exit the mortgage lending industry was plainly self-inflicted.  The Bureau has no direct enforcement authority with respect to SNB, and any enforcement action taken by the OCC upon a Bureau regulation or the Bureau's recommendation is entirely speculative at this point.  Moreover, as noted, SNB is supervised for compliance with Federal consumer financial law (including the UDAAP prohibition) by the OCC, but SNB has failed to allege that it sought any guidance from OCC, prior to exiting the industry, regarding the legality of the mortgage lending practices it suspected might be viewed as unfair, deceptive, or abusive.  *See Nat'l See Family Planning & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) (association's failure to seek clarification from the agency regarding an alleged conflict between a statutory amendment and a regulation led to self-inflicted injury).  For these reasons, SNB's own decision caused any loss of business it has suffered as a result of its departure from the mortgage lending industry, and that alleged harm is therefore not a cognizable injury in fact fairly traceable to the challenged provisions of the Act.

SNB's broader allegations that the Bureau's allegedly unlimited UDAAP authority will have a "chilling effect" on the activity of financial service providers, *see* Am. Compl. ¶ 67, are insufficient to constitute an injury in fact.  "Allegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm; the federal courts . . . do not render advisory opinions."  *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972) (quotations omitted); *see also Winsness v. Yocum*, 433 F.3d 727, 732 (10th Cir. 2006) ("The mere presence on the statute books of an unconstitutional statute . . . does not entitle anyone to sue, even if they allege an inhibiting effect on constitutionally protected conduct prohibited by the statute."); *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 294 (6th Cir. 1997) ("Except for cases involving core First Amendment rights, the existence of a chilling effect has never been

considered a sufficient basis, in and of itself, for prohibiting government action.") (quotations and alterations omitted); *Wheaton Coll.,* -- F. Supp. 2d --, Civ. No. 12-1169 (ESH), 2012 WL 3637162, at *6 ("[A]llegations of chilling injury are not sufficient basis for standing to challenge a government action[.]") (quotations omitted).

*     *     *

Accordingly, SNB's alleged fear of a future enforcement action pursuant to the Bureau's authority to identify acts or practices as UDAAPs, or its authority to make enforcement recommendations regarding such acts or practices, does not constitute an injury in fact sufficient to confer standing upon SNB to raise its Count I claim.

> 2.      *The Bureau's Remittance Transfer Rule Does Not Constitute an Injury in Fact Fairly Traceable to the Challenged Provisions of the Act.*

Plaintiff SNB next claims that it has suffered an injury as a result of the Bureau's final rule establishing disclosure requirements for certain remittance transfer providers ("Remittances Rule"). Am. Compl. ¶ 15. As set forth above, Dodd-Frank amended the Electronic Fund Transfer Act to require new consumer protections for remittance transfers sent by consumers in the United States to individuals and businesses in foreign countries. *See* Dodd-Frank Act § 1073(a)(4) (codified at 15 U.S.C. § 1693o-1). The Federal Reserve Board published a notice of proposed rulemaking to implement this provision on May 23, 2011, pursuant to its rulemaking authority under the EFTA. *See* Electronic Fund Transfers, 76 Fed. Reg. 29902 (May 23, 2011). After the transfer of this rulemaking authority to the Bureau, the Bureau published its final Remittances Rule in the *Federal Register* on February 7, 2012, and published an amendment to that rule on August 20, 2012, pursuant to the same authority. *See* Electronic Fund Transfers, 77 Fed. Reg. 6194 (Feb. 7, 2012) (codified at 12 C.F.R. pt. 1005, subpart B ("Regulation E"))*;* Electronic Fund Transfers, 77 Fed. Reg. 50244 (Aug 20, 2012) (amending 12 C.F.R. pt. 1005).

22

The Final Rule, as amended, goes into effect on February 7, 2013.  77 Fed. Reg. at 6194; 77 Fed.

Reg. at 50244.  The Remittances Rule is not an injury in fact sufficient to confer standing upon

SNB to assert its constitutional challenge to Title X of the Act.

    a.  <u>SNB Has Failed to Allege Facts Demonstrating that It Is Subject to the Remittances</u>

<u>Rule</u>.  First, SNB has failed to plead sufficient facts demonstrating that it is even subject to the

Remittances Rule.  Significantly, the Remittances Rule applies only to a "remittance transfer

provider," which is statutorily defined as a "financial institution that provides remittance

transfers for a consumer *in the normal course of its business*."  15 U.S.C. § 1693o-1(g)(3)

(emphasis added).  Because the statutory definition includes only those entities that provide

remittance transfers "in the normal course of [their] business," the implementing regulation

includes a "safe harbor" for those entities that consistently provide 100 or fewer remittance

transfers per year:

> *Safe harbor*.  Under § 1005.30(f)(2)(i), a person that provided 100 or fewer remittance transfers in the previous calendar year and provides 100 or fewer remittance transfers in the current calendar year is deemed not to be providing remittance transfers in the normal course of its business.  Accordingly, a person that qualifies for the safe harbor in § 1005.30(f)(2)(i) is not a ''remittance transfer provider'' and is not subject to the requirements of subpart B.

Electronic Fund Transfers, 77 Fed. Reg. at 50285 (codified at 12 C.F.R. § 1005.30(f)(2)).[11]  In

the preamble to the final rule adopting the safe harbor, the Bureau noted that "a meaningful

portion" of the depository institutions and credit unions covered by the applicable data sets

collected by the Bureau were sending 100 or fewer remittance transfers annually.  *Id.* at 50252.

---

[11]      Furthermore, under the general definition of "remittance transfer provider," 12 C.F.R. § 1005.30(f)(1), an entity that does not qualify for the safe harbor may still demonstrate that it does not provide remittance transfers in "the normal course of its business" depending on the facts and circumstances, including the total number and frequency of remittance transfers sent and whether remittance transfers are generally made available to customers.  *See* Electronic Fund Transfers, 77 Fed. Reg. at 50285.

In particular, the Bureau found that between roughly 40 percent and 90 percent of those responding to or covered by the data, who reported any transactions in the most recent calendar year, reported providing 100 or fewer such transactions in that year.  *Id.*  As a result of these regulatory actions, institutions that provide international remittances to their customers on an infrequent or *ad hoc* basis will not be subject to the rule and will generally be able to make this determination with certainty.

Although SNB bears the burden "clearly to allege facts demonstrating that [it] is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers," *Warth*, 422 U.S. at 517-18, it has failed to do so here.  According to the Amended Complaint, SNB stopped providing remittance transfers altogether following the Bureau's promulgation of the February final rule.  Am. Compl. ¶ 15.  Although it claims it did so to avoid the costs associated with compliance, *id.* ¶ 86, SNB has failed to allege facts sufficient to demonstrate that its prior remittance transfer activity would have subjected it to the rule's requirements or that, but for the regulation, it would resume that activity at a level that would subject it to the rule's requirements.  *See id.* ¶¶ 15, 86.  Indeed, SNB's Chairman and CEO has suggested just the opposite, testifying before Congress that SNB offered remittance transfers in the past primarily as a one-off service to a few customers who "found themselves in some tough scrapes" and that "remittances make up a relatively small part of [SNB's] business."  Testimony of Jim R. Purcell, Chairman and C.E.O. of the State National Bank of Big Spring, "The Adverse Consequences of the Dodd-Frank Act on Community Bank Customers and Borrowers," at 5 (July 19, 2012), at http://financialservices.house.gov/UploadedFiles/HHRG-112-BA09-WState-JPurcell-20120719.pdf.  Because SNB has not alleged that the volume of its remittance transfer business is, or even was, sufficient to bring the bank within the regulatory scope of the Remittances Rule,

it cannot invoke the regulatory compliance costs associated with that rule as a basis for challenging the Bureau's formation and operation.

      b.  <u>The Remittances Rule Was Not Promulgated Pursuant to the Authority SNB Challenges.</u>  Even if it were subject to the Remittances Rule, SNB could not rely on that rule to bring its constitutional challenge to Title X.  To establish standing, a plaintiff must demonstrate that its asserted injury is "fairly traceable to the challenged action of the defendant."  *Lujan*, 504 U.S. at 560-61 (quotations omitted).  More specifically, and as relevant here, a plaintiff's injury must flow from the provision of the statute it seeks to challenge.  *See Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) ("[S]tanding is not dispensed in gross."); *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 233-35 (1990) (declining to assess constitutionality of certain provisions of ordinance that no plaintiff had standing to challenge); *Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 430 (4th Cir. 2007) ("[A] plaintiff must establish that he has standing to challenge each provision of an ordinance by showing that he was injured by application of those provisions.").

      In Count I of the Amended Complaint, SNB claims that the Bureau's allegedly unlimited and open-ended UDAAP authority is not constrained by adequate checks and balances, in violation of the separation of powers.  *See* Am. Compl. ¶¶ 6, 95, 107, 183, 189.  The Remittances Rule, however, was not promulgated pursuant to the Bureau's UDAAP authority, 12 U.S.C. § 5531(a), (b).  The regulation was instead promulgated pursuant to the Bureau's separate authority, transferred from the Federal Reserve Board, to implement the Electronic Fund Transfer Act.  *See* 12 U.S.C. §§ 5581(b)(1), 5481(12); *see also* 12 C.F.R. § 1005.1(a) (citing as authority the EFTA, 15 U.S.C. §§ 1693-1700).  Although the Amended Complaint's wandering discussion of Title X includes a general description of the Bureau's transferred authority, the

Amended Complaint does not allege that this transferred authority is unlimited, open-ended, or otherwise constitutionally defective, nor does it explain whether or how this transferred authority contributes to the separation of powers violation it has alleged.[12]  *See* Am. Compl. ¶¶ 82-87. Instead, the Amended Complaint's description of the Bureau's transferred authority appears to have been included solely in an effort to convince the Court that SNB has suffered some kind of injury at the hands of the Bureau.  *See id.* ¶¶ 15, 86-87.  But SNB cannot bootstrap an injury flowing from a statutory grant of authority it has not challenged into standing to challenge a wholly separate grant of authority.  *See Covenant Media of S.C., LLC*, 493 F.3d at 430 ("[A] plaintiff must establish that he has standing to challenge each provision of an ordinance by showing that he was injured by application of those provisions.").

Because the Remittances Rule was not promulgated pursuant to the statutory authority that SNB has challenged, any injury flowing from that regulation is not an injury that is fairly traceable to the challenged provisions of the Act.

*      *      *

In sum, the Bureau has not yet taken any action that affects Plaintiff SNB.  For this Court to entertain SNB's Title X claim at this point would defeat the "underlying purpose of the imminence requirement," which is to ensure that the Court "does not render an advisory opinion in a 'case in which no injury would have occurred at all.'"  *Animal Legal Def. Fund, Inc. v. Espy*, 23 F.3d 496, 500 (D.C. Cir. 1994) (quoting *Lujan*, 504 U.S. at 564 n.2).  Because the injuries that

---

[12]      Indeed, the Amended Complaint is clear that the "effectively unlimited" authority that forms the basis of Count I, Am. Compl. ¶ 183, is the Bureau's "effectively unlimited rulemaking, enforcement, and supervisory powers over 'unfair,' 'deceptive,' or 'abusive' lending practices," *id.* ¶ 95.

SNB claims flow from the challenged provisions of Title X are presently non-existent, SNB has failed to establish that it has standing to assert its Title X claim.[13]

### B.   PLAINTIFF STATE NATIONAL BANK OF BIG SPRING:  COUNT II.

In Count II of the Amended Complaint, Plaintiff SNB claims that Director Cordray was unconstitutionally appointed because the Senate allegedly was not in recess at the time of the appointment and because the President did not secure the Senate's advice and consent.  Am. Compl. ¶¶ 108-18.  For the reasons set forth in Sections I.A.1 and I.A.2.a, *supra*, SNB has failed to allege an injury flowing from the President's recess appointment because it has failed to allege that the Bureau, under the supervision of Director Cordray or otherwise, has taken action that has injured SNB or that any such action is imminent:  SNB has not been subject to a Bureau enforcement action for commission of a UDAAP (nor could it be), and SNB has not alleged facts demonstrating that it is subject to the Remittances Rule.  SNB's allegations thus stand in stark contrast to those that courts have found give rise to standing to challenge the constitutionality of an executive officer's appointment.  *See, e.g., Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868 (1991) (adjudicating an appointments clause challenge brought by taxpayers against a special tax judge who had entered a judgment against them); *Landry v. FDIC*, 204 F.3d 1125 (D.C. Cir. 2000) (adjudicating an appointments clause challenge brought by an individual challenging an Administrative Law Judge's decision recommending that the individual be prohibited from banking).[14]

---

[13]    SNB also complains that it may experience "increased compliance costs" because it must "monitor and predict" the activities of the Bureau.  *Id.* ¶ 79.  In the absence of any Bureau action that presently applies to SNB, however, SNB's concern that it must watch for future government regulations that might apply to its business is a "generalized grievance[]" that  is insufficient to confer standing.  *See Valley Forge Christian Coll.*, 454 U.S. at 475 (quotations omitted).

[14]    Citing *Free Enterprise Fund v. Public Co. Accounting Oversight Board ("PCAOB")*, 130 S. Ct. 3138 (2010), SNB suggests that the constitutional violations it has asserted in Counts I and

Furthermore, SNB's first asserted injury – the alleged chilling effect that caused SNB to stop offering mortgages, *supra* § I.A.1 – cannot support its standing to challenge Director Cordray's appointment for yet another reason:  that alleged injury is not traceable to Director Cordray's appointment and is unlikely to be redressed by a favorable decision.  *See Lujan*, 504 U.S. at 560-61.  Although SNB suggests that some of Director Cordray's statements have "validated and reinforced" its fear of enforcement, Am. Compl. ¶ 76, SNB's alleged injury flows from the UDAAP prohibition itself (and the OCC's authority to enforce this prohibition), not from the Director's appointment or any Bureau action under his leadership, *id.* ¶¶ 16, 62, 78.  That SNB's asserted injury flows from the Act itself – and not from Director Cordray's appointment or any Bureau action under Director Cordray – is illustrated by SNB's voluntary decision to exit the mortgage lending industry in October 2010, *id.* ¶ 78, more than a year before the President's appointment of Director Cordray on January 4, 2012.  A decision by this Court declaring Director Cordray's appointment invalid would not alter the circumstances that SNB claims caused it to exit the mortgage lending industry at that time.  SNB's first asserted injury is thus neither traceable to Director Cordray's appointment nor likely to be redressed by a decision declaring Director Cordray's appointment unconstitutional.  For this additional reason, it is not an injury sufficient to confer standing upon SNB to challenge Director Cordray's appointment.

---

II of the Amended Complaint themselves establish an injury that confers standing.  *See* Am. Compl. ¶¶ 190, 199.  *PCAOB* does not support SNB's claim of standing.  The plaintiffs in *PCAOB* had been subject to a concrete administrative action by the Board whose composition they challenged.  *PCAOB*, 130 S. Ct. at 3149 ("The Board inspected the firm, released a report critical of its auditing procedures, and began a formal investigation.").  In contrast, SNB has failed to allege facts sufficient to demonstrate that it is presently subject to any action by the Bureau, under Director Cordray's supervision or otherwise.

### C.    PLAINTIFF STATE NATIONAL BANK OF BIG SPRING:  COUNT III.

As set forth above, Title I of the Act authorizes the Council to designate certain "nonbank financial companies" as SIFIs; such a designation will subject the company to supervision by the Federal Reserve Board and to heightened prudential standards prescribed by the Board.  12 U.S.C. § 5323.  In Count III of the Amended Complaint, SNB alleges that several aspects of that designation authority together violate the separation of powers.  Am. Compl. ¶ 8.  In particular, it claims that the statutory factors governing the Council's designation determinations impose no meaningful limits on the Council's authority, *id.* ¶¶ 136-37; that some of the Council's nonvoting members are not appointed by an individual in the Executive Branch, *id.* ¶¶ 122-24; and that the applicable judicial review provision authorizes actions for judicial review by designated entities only and establishes an arbitrary and capricious standard for that review, *id.* ¶¶ 138-41.

SNB lacks standing to assert its Title I claim.  It does not allege that it is or will ever be the subject of a SIFI designation by the Council.  Indeed, it is highly unlikely that, as a community bank with total deposits of less than $275 million, *id.* ¶ 14, it would even be considered for designation, much less designated.  *See* 12 C.F.R. pt. 1310, app. A, § III.a. (establishing a $50 billion total consolidated asset threshold as a presumptive threshold for designation).  Because it is unlikely ever to be designated a SIFI, SNB instead purports to claim an injury based on the Council's designation of *other* entities – SNB's alleged competitors – as SIFIs.  *See* Am. Compl. ¶¶ 133.   In so doing, it attempts to cast a SIFI designation and the heightened federal regulation that accompanies it as a *benefit*, and then claims that it will suffer a competitive injury because it will *not* be designated.  But "when the party is not himself the object of the government action or inaction he challenges, standing . . . is ordinarily substantially

more difficult to establish." *New World Radio, Inc. v. FCC*, 294 F.3d 164, 170 (D.C. Cir. 2002)

(quotations and alteration omitted).

Indeed, SNB falls woefully short of meeting its burden to allege an injury that would give

it standing to challenge any part of Title I.  The Council has not yet designated a single entity as

a SIFI, so SNB could not possibly allege a present injury.  SNB instead alleges that it will suffer

harm in the future, if and when one of its competitors is designated a SIFI.  *See* Am. Compl.

¶¶ 132-33.  As set forth above, however, speculation about possible future events does not

constitute an injury in fact.  *Whitmore*, 495 U.S. at 158.  Rather, "[a] threatened injury must be

certainly impending to constitute injury in fact." *Id.* (quotations omitted); *see also N.Y. Reg'l*

*Interconnect, Inc. v. FERC*, 634 F.3d 581, 587 (D.C. Cir. 2011) (theory of injury that "stacks

speculation upon hypothetical upon speculation . . . does not establish an actual or imminent

injury") (quotations omitted); *Block v. Meese*, 793 F.2d 1303, 1308 (D.C. Cir. 1986) ("mixture of

speculation and conclusory assertion . . . does not satisfy the Supreme Court's requirement for

specific, concrete facts demonstrating injury, and particularized allegations of fact").  SNB's

claim of future injury is based upon at least three layers of speculation about possible future

events.  As detailed below, SNB first speculates that the Council will designate one of its direct

competitors a SIFI subject to heightened government supervision and regulation.  It then

speculates that the designated entity's creditors will, as a result of such a designation, provide

capital to that entity on more favorable terms.  SNB then speculates that this hypothetical cost-

of-capital benefit will outweigh the costs associated with the more stringent government

regulation to which the hypothetically-designated entity will be subject, thereby resulting in an

overall competitive disadvantage to SNB.  SNB's long, attenuated chain of guesswork regarding

an imagined course of future events is insufficient to constitute a concrete and imminent injury.

1.       *SNB Speculates that One of Its Direct Competitors Will Be Designated a SIFI.*

To assert a cognizable injury as a competitor of an entity that is the object of government action, a plaintiff must allege that it is "a *direct* and *current* competitor whose bottom line may be adversely affected by the challenged government action." *New World Radio, Inc.*, 294 F.3d at 170 (emphases in original). More specifically, a plaintiff must allege that it offers the same product in the same market as the entity that is the object of the government action. *See id.* at 170-71 (Washington, D.C. radio station lacked standing to challenge license granted to Maryland radio station); *In re U.S. Catholic Conference*, 885 F.2d 1020, 1029 (2d Cir. 1989) ("[I]n order to establish an injury as a competitor a plaintiff must show that he personally competes in the same arena with the party to whom the government has bestowed the assertedly illegal benefit."). And it must allege a "concrete" likelihood of financial injury, instead of "bare allegations" that it competes generally with the entity that is the object of the government action. *KERM, Inc. v. FCC*, 353 F.3d 57, 60-61 (D.C. Cir. 2004). As such, SNB's claim of competitive injury necessarily depends on the Council's future designation of an entity with which SNB is a "direct and current competitor." SNB's suggestion that such an entity will be designated is both non-specific and speculative.

SNB is a bank. It offers checking and savings accounts, certificates of deposit ("CDs"), and individual retirement accounts through its branches in three small Texas towns. Am. Compl. ¶ 14. It is owned by a bank holding company. Certificate Rule LCvR7.1, June 21, 2012 (ECF 2). Its direct competitors are therefore other bank holding companies and their subsidiaries that offer customers in the same market these same banking services. Bank holding companies, however, are not subject to the specific SIFI designation process to which SNB objects. *See* 12 U.S.C. § 5311(a)(4) (excluding "bank holding company" from the definition of "nonbank

financial company"). Instead, bank holding companies are subject to a separate statutory SIFI designation scheme. *See id.* § 5365(a)(1) (designating all bank holding companies with total consolidated assets equal to or greater than $50 billion as entities subject to heightened federal regulation). Accordingly, SNB's direct competitors in the banking industry are simply not the type of entities that would ever be subject to a Council designation.

Unlike SNB and its direct competitors, entities subject to a Council designation are "nonbank" financial companies. *Id.* § 5323(a)(1), (b)(1). SNB has neither identified a single nonbank that offers services that compete with those offered by SNB in Big Spring, Lamesa, and O'Donnell, Texas, nor alleged that any such entity is certain to be the subject of a Council designation. *See* Am. Compl. ¶¶ 133 (alleging only that future Council designations will require SNB to compete with other, unidentified financial companies). SNB's failure to identify a direct competitor that has been or will be subject to a government action is fatal to its plea for competitor standing. *See KERM, Inc.*, 353 F.3d at 60-61 (no competitor standing where "KERM vaguely asserts only that it competes with KAYH and that its own radio stations serve much of the same audience as KAYH" and failed to "introduce[] evidence that KAYH's broadcast of the disputed announcements resulted in lost advertising revenues for KERM or otherwise adversely affected KERM's financial interests"); *DEK Energy Co. v. FERC*, 248 F.3d 1192, 1196 (D.C. Cir. 2001) (no competitor standing where there was only "some vague probability that any gas" sold by plaintiff's competitor would "actually reach [the] market" in which plaintiff sold its gas); *Lee v. Bd. of Governors of the Fed. Reserve Sys.*, 118 F.3d 905, 913 (2d Cir. 1997) (no competitor standing because petitioner had not shown that it competed in the same arena).

2. *SNB Speculates that Creditors Will React to a Council Designation by Providing Capital to the Designated Entity on More Favorable Terms.*

Even if SNB had identified a direct competitor that is certain to be designated a SIFI, its claim of injury depends upon the additional layer of speculation that this entity will realize a cost-of-capital advantage as a result of that designation. *See* Am. Compl. ¶ 132. In particular, SNB hypothesizes that creditors will lower the rates at which they lend money to SIFIs because creditors will view designated entities as "having the implicit backing of the government," *id.* ¶ 128, and as entities that the government will not allow to fail, *id.* ¶ 129.

As an initial matter, SNB misunderstands the import of a Council designation. A Council designation does not mean that the federal government is "backing" the financial company or that the government will not allow that company to fail. Instead, a Council designation means that the company will be subject to more stringent government regulation, 12 U.S.C. §§ 5323(a)(1), (b)(1), 5365(a)(1), and that, if the company does fail, it may be subject to orderly liquidation under the terms of Title II, *id.* § 5381(a)(11)(B)(ii). Indeed, the Act expressly provides that one of the purposes of the Council is to "*eliminate*[] expectations on the part of . . . creditors . . . of [large, interconnected financial] companies that the Government will shield them from losses in the event of failure." *Id.* § 5322(a)(1)(B) (emphasis added). The Act's orderly liquidation authority was designed to do the same, by creating an alternative for resolving failing firms that is neither a disorderly bankruptcy nor a bailout, *see* S. Rep. No. 111-176, at 4 (2010), and, in particular, by expressly prohibiting regulators from using taxpayer funds to prevent the liquidation of a failing financial company, 12 U.S.C. § 5394(a).[15] SNB's theory that a Council

---

[15] The statement of Chairman Bernanke that SNB cites, *see* Am. Compl. ¶¶ 130-31, further illustrates this point. Prior to the passage of Dodd-Frank, Chairman Bernanke explained that "if a firm is publicly perceived as too big, or interconnected, or systemically critical for the authorities to permit its failure, its creditors and counterparties have less incentive to evaluate the

designation will give creditors an incentive to offer capital on more favorable terms to the

designated entity – because the federal government is allegedly "backing" that company – is thus

based on a fundamental misunderstanding of Dodd-Frank.

Regardless, SNB has failed to identify any nonbank SIFI that has received a cost-of-

capital reduction from any creditor.  Nor could it.  The Council has yet to designate a SIFI, so

any hypothetical SIFI's creditors have not yet had the opportunity to consider the designation

and respond to it.  SNB is thus able to offer nothing but vague assertions that creditors generally

may offer more favorable terms to SIFIs generally.  Such generalized assertions of injury –

wholly unconnected to SNB – are insufficient to support its standing.  *See Fla. Audubon Soc'y v.*

*Bentsen*, 94 F.3d 658, 667 (D.C. Cir. 1996) (en banc) (plaintiff must show more than that the

challenged government action would cause an environmental harm generally; it must also show

that the harm "actually threatens the plaintiff's particular interests").

Furthermore, assuming *arguendo* that a designated entity might realize a cost-of-capital

benefit, any such benefit would "depend[] on the unfettered choices made by independent actors

not before the courts and whose exercise of broad and legitimate discretion the courts cannot

presume either to control or to predict."  *See Lujan*, 504 U.S. at 562.  A SIFI's creditors will

make their lending decisions based on any number of market and regulatory variables.  SNB's

"unadorned speculation" as to the existence of a relationship between a Council designation and

creditors' lending decisions "[does] not suffice to invoke the federal judicial power."  *Nat'l*

---

quality of the firm's business model, its management."  *See* Speech, Chairman Ben S. Bernanke,
"Preserving a Central Role for Community Banking" (Mar. 20, 2010), at
http://www.federalreserve.gov/newsevents/speech/bernanke20100320a.htm.  Chairman
Bernanke then explained that this problem could be remedied by "a new legal framework that
will allow the government to wind down a failing, systemically critical firm" – i.e., "an
alternative for resolving failing firms that is neither a disorderly bankruptcy nor a bailout."  *Id.*
Title II of Dodd-Frank established such a framework.

*Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004) (quotations

omitted); *see also Fla. Audubon Soc'y*, 94 F.3d at 670 (en banc) (noting the improbability of

establishing an injury traceable to a government action when such injury depends on predicting

the acts of "dozens of individual actors, each of whom must react to other market or regulatory

inputs"); *Comm. for Monetary Reform v. Bd. of Governors of the Fed. Reserve Sys.*, 766 F.2d

538, 542 (D.C. Cir. 1985) ("[I]n light of the complexity of the modern economy, it is . . . highly

uncertain whether and to what extent [government] policies were responsible for the adverse

economic conditions that allegedly resulted in harm to the appellants."); *Nebraska v. U.S. Dep't

of Health & Human Servs.*, -- F. Supp. 2d --, No. 4:12CV3035, 2012 WL 2913402, at *19 (D.

Neb. July 17, 2012) (no standing when "plaintiffs only speculate that third parties will respond to

the Rule" in a way that will harm them).

Demonstrative of the weaknesses in SNB's attenuated chain of causation is SNB's

allegation that large financial companies *already* enjoy a cost-of-capital advantage, even without

a formal Council designation, because creditors perceive such institutions as "too big to fail."

Am. Compl. ¶ 132 ("The FSOC's power to formally designate nonbank SIFIs will do for

nonbanks what unofficial SIFI status long has done for unofficial SIFIs:  give them a direct cost-

of-capital subsidy not enjoyed by . . . [SNB]."); *id.* ¶ 130 (describing benefits of being deemed

"too big to fail" *before* Dodd-Frank granted designation authority to the Council).  Assuming

*arguendo* the correctness of SNB's allegation, the allegation defeats SNB's own assertion of

standing.  If its allegation is correct, then SNB has failed to demonstrate that its alleged injury – a

cost-of-capital benefit to designated entities – is fairly traceable to a Council designation and

redressable by an order of this Court enjoining all Council designations.  *See Lujan*, 504 U.S. at

560-61.  Although SNB vaguely speculates that a SIFI designation will "enhance" this pre-

existing benefit, *see* Am. Compl. ¶ 132, it fails to allege that a Council designation has actually done so, or is certain to do so in the near future, as to any entity with which SNB directly competes.  Its "enhance[ment]" theory smacks of wild speculation.

   3. *SNB Speculates that a SIFI Designation Will Result in an Overall Competitive Advantage to the Designated Entity.*

  SNB's theory of injury necessarily depends upon the additional layer of speculation that any hypothetical cost-of-capital advantage that might be enjoyed by a designated entity will outweigh the costs associated with the more stringent government regulation associated with a Council designation, thus giving the designated entity a net competitive advantage.  SNB offers no specifics in support of this generalized speculation.

  As set forth above, designated entities will be subject to prudential standards established by the Federal Reserve Board.  12 U.S.C. §§ 5323(a)(1), (b)(1), 5365.  Under the Act, these prudential standards must be "more stringent than the standards and requirements applicable to nonbank financial companies and bank holding companies that do not present similar risks to the financial stability of the United States."  *Id.* § 5365(a)(1)(A).  The prudential standards must include, *inter alia*, liquidity requirements, risk management requirements, and resolution plan requirements, *id.* § 5365(b)(1)(A), and may include, *inter alia*, a contingent capital requirement, enhanced public disclosures, and short-term debt limits, *id.* § 5365(b)(1)(B).  Designated entities will also be subject to minimum capital requirements.[16]  *Id.* § 5371(b).  On January 5, 2012, the Board issued a series of proposed prudential standards.  *See* Enhanced Prudential Standards and

---

[16]  In addition, if the Board determines that a designated entity poses a grave threat to the financial stability of the United States, the Board, upon an affirmative vote of not fewer than two-thirds of the voting members of the Council then serving, must take certain risk-mitigating actions, including limiting the ability of the company to merge with, acquire, consolidate with, or otherwise become affiliated with another company, restricting the company's ability to offer a financial product, and requiring a company to terminate one or more of its activities.  12 U.S.C. § 5331(a).

Early Remediation Requirements for Covered Companies, 77 Fed. Reg. 594-01 (Jan. 5, 2012). The Board has not yet finalized those standards; as such, the effect that the final standards will have on designated entities is presently speculative.

Although SNB suggests that a SIFI designation will confer upon a designated entity a net competitive advantage, it has failed to compare the actual costs that its hypothetical SIFI will incur as a result of more stringent government regulation with the actual cost-of-capital advantage that this SIFI will (allegedly) realize.  Apart from the fact that the Council has not yet made a single designation, and apart from the fact that creditors have not yet had an opportunity to respond to such a designation, the Board has not yet finalized the more stringent standards that will apply to the designated entities.  Before it does so, SNB could not possibly make any allegations with the requisite level of specificity regarding the net competitive costs or benefits associated with a SIFI designation.[17]  *See KERM, Inc.*, 353 F.3d at 61 ("vague[]" and "bare" assertions of injury are insufficient to confer standing) (quotations and alteration omitted).

\*     \*     \*

In sum, the Council has not yet taken any action that could possibly have affected Plaintiff SNB.  Instead of alleging a present injury, SNB speculates that the Council will someday designate as a SIFI some unidentified nonbank financial company with which SNB directly competes, that creditors will provide capital to that entity on more favorable terms than they provide capital to SNB, and that this cost-of-capital advantage will outweigh any costs the

---

[17]    Indeed, the authority that SNB cites contravenes its theory that designated entities will enjoy an overall competitive advantage, as that authority concludes that "institutions appear to believe that they would be *worse off* as SIFIs" and notes that "large nonbanks and their trade associations have argued that they should *not* be considered systemically important."  *See* David A. Price, "Sifting for SIFIs," *Region Focus* (2011) (emphases added), at http://www.richmondfed.org/publications/research/region_focus/2011/q2/pdf/federal_reserve.pdf ; *see also* Am. Compl. ¶ 129 (citing Price article).

entity incurs as a result of its designation, thus resulting in an overall competitive advantage to the designated entity.  Not only is SNB's speculative theory of injury unlikely ever to come to pass, but *any* theory of injury that "stacks speculation upon hypothetical upon speculation . . . does not establish an actual or imminent injury."  *N.Y. Reg'l Interconnect, Inc.*, 634 F.3d at 587 (quotations omitted).  In the absence of a particularized injury to SNB flowing from some concrete Council action, SNB's critique of the Council amounts to no more than a generalized grievance, and it thus lacks standing to pursue its challenge to Title I of the Act.[18]

### D.    PLAINTIFF STATE NATIONAL BANK OF BIG SPRING:  COUNTS IV, V, AND VI.

Although SNB purports to join the Amended Complaint's challenges to the orderly liquidation authority established by Title II of the Act, *see* Am. Compl. ¶ 4 (suggesting that all Plaintiffs challenge Title II), SNB has not even attempted to claim an injury flowing from those provisions of the Act.  *See id.* ¶¶ 14-17, 142-78.  It has not claimed that it is or will ever be subject to Title II's orderly liquidation authority, which is intended only for the extraordinary situation in which the failure of a financial company would have serious adverse effects on financial stability in the United States.  12 U.S.C. § 5383(b)(2).  Moreover, unlike the States, SNB has not even attempted to claim that it might be harmed indirectly by the exercise of that authority.  In the absence of any allegations of injury, SNB lacks standing to pursue its Title II claims.

---

[18]    Apart from the speculative nature of its alleged injury, SNB's theory of standing also fails because it has not indicated how this alleged injury – *i.e.*, a competitive injury flowing from a Council designation – is traceable to the presence on the Council of nonvoting members not appointed by the Executive Branch, the applicable judicial review provisions, or the allegedly overly broad delegation of power to the Council.  *See Comm. for Monetary Reform*, 766 F.2d at 542 ("[T]he appellants have given no indication as to how they can succeed in establishing that an overly broad delegation of power to the Federal Reserve System" has caused their alleged injury).  Because SNB has not been – and will likely never be – the direct object of any Council action, SNB's standing to assert its Title I separation of powers claim requires this additional showing.  *See id.* at 542-44.

### E.    PLAINTIFFS 60 PLUS ASSOCIATION AND COMPETITIVE ENTERPRISE INSTITUTE: COUNTS I THROUGH VI.

Like SNB, neither CEI nor 60 Plus has "a personal stake in the outcome of the controversy as to warrant the invocation of federal-court jurisdiction." *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995).  Neither has "suffered injury in fact, including such concrete and demonstrable injury to the organization's activities" as opposed to "simply a setback to the organization's abstract social interests." *Id.* (quotations and alteration omitted).  Neither is directly subject to Bureau or Council regulation or supervision, or to the FDIC's orderly liquidation authority, making it exceedingly difficult for either to point to a government action that has caused or will cause it harm.  *See Pub. Citizen, Inc.*, 489 F.3d at 1289-90 ("[S]tanding is substantially more difficult to establish where . . . the parties invoking federal jurisdiction are not the object of the government action or inaction they challenge.") (quotations omitted).

More specifically, CEI's allegations of injury are insufficient to demonstrate that it has standing to bring any of its claims.  CEI claims that it has checking, brokerage, CD, and credit card accounts at firms "regulated by the CFPB that qualify as systemically important . . . as enforced by FSOC," and alleges that "the nature and cost of these accounts are jeopardized by the CFPB's sweeping regulatory authority over them and over the institutions in which they are based."  Am. Compl. ¶ 22.  CEI does not explain how these accounts have been altered to its detriment and/or how any changes to these accounts made by the firms that hold them would be traceable to the Bureau or the Council.[19]  CEI instead appears to rely upon its interest in "advancing the principles of individual liberty and limited government" through "participat[ion]

---

[19]    Indeed, CEI's suggestion that it will be harmed because it allegedly holds accounts at entities subject to the Council's designation authority, Am. Compl. ¶ 22, directly contradicts its subsequent allegation that a Council designation will *benefit* the designated companies, *id.* ¶ 127.

in cases involving financial regulation and constitutional checks and balances." *Id.* ¶ 21.  Harm

to the organization's purpose and theoretical harm to its accounts do not demonstrate that CEI

has "suffered injury in fact, including such concrete and demonstrable injury to the

organization's activities – with a consequent drain on the organization's resources." *Nat'l*

*Taxpayers Union, Inc.*, 68 F.3d at 1433 (quotations and alterations omitted).  Because CEI has

given no indication that the alleged violations have "perceptibly impaired" anything other than

its abstract interest in constitutional checks and balances, it has not shown organizational

standing sufficient to satisfy Article III.  *See Nat'l Ass'n of Homebuilders v. EPA*, 667 F.3d 6, 12

(D.C. Cir. 2011) (quotations omitted).

 Plaintiff 60 Plus claims that Dodd-Frank harms its members by reducing the "range and

affordability of banking, credit, investment, and savings options available to them."[20]  Am.

Compl. ¶ 19.  As an initial matter, when an organization such as 60 Plus asserts representational

standing on behalf of its members, it is not enough to claim that unidentified members have been

injured.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 498-99 (2009).  Instead, the association

must make "specific allegations . . . that at least one identified member ha[s] suffered or would

suffer harm."  *Id.* at 498; *Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 820 (D.C.

Cir. 2006) ("[A]n organization bringing a claim based on associational standing must show that

at least one specifically-identified member has suffered an injury-in-fact. . . .  At the very least,

the identity of the party suffering an injury in fact must be firmly established.").  Because 60 Plus

---

[20]  An association such as 60 Plus has standing to sue on behalf of its members if "(1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit." *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).

has not identified a single member who has been or will be injured by the statutory provisions it

challenges, or by Director Cordray's appointment, it lacks standing to raise any of its claims. *Id.*

Even if 60 Plus had identified a specific member who claims some sort of injury, "[t]he

links in the chain of causation between the [alleged constitutional violations] and the asserted

injury are far too weak for the chain as a whole to sustain [60 Plus's] standing." *Allen v. Wright*,

468 U.S. 737, 759 (1984).  60 Plus makes no allegations at all that the Council's designation

authority or the orderly liquidation authority have contributed to its alleged injury. *See* Am.

Compl. ¶¶ 19-20.  Instead, 60 Plus broadly blames its alleged injury – a reduction in the

availability of certain banking services and an increase in certain banking fees – on "provisions

enforced by the CFPB." *Id.* ¶ 19.  But it fails to identify the offending Dodd-Frank provisions,

what regulatory or enforcement action the Bureau has taken pursuant to these provisions, and/or

how these governmental actions have caused its members' banks to cease offering these services

or to increase their fees. *See id.*

Indeed, because 60 Plus's alleged injury is based on the "Government's regulation of a

third party that is not before the court," an injury in fact necessary to confer standing is

"'substantially more difficult' to establish." *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 938

(quoting *Lujan*, 504 U.S. at 562).  60 Plus's "mere 'unadorned speculation' as to the existence of

a relationship between the challenged government action and the third-party conduct 'will not

suffice to invoke the federal judicial power.'" *Id.* (quoting *Simon v. E. Ky. Welfare Rights Org.*,

426 U.S. 26, 44 (1976)); *see also Bennett v. Donovan*, 797 F. Supp. 2d 69, 76 (D.D.C. 2011)

(plaintiffs lacked standing because the requested relief was not likely to affect lenders'

independent decisions to foreclose); *Nat'l Maritime Union v. Dole*, Civ. A. No. 86-1295, 1987

WL 10495, at *3-6 (D.D.C. Apr. 27, 1987) (plaintiffs failed to establish that their loss of

employment opportunities was traceable to the agency's designation of foreign vessels as capable of aiding in the defense of national security, as opposed to the independent decisions of private actors).

In sum, neither CEI nor the members of 60 Plus are or will ever be subject to the authority of the Bureau or the Council, or to the FDIC's orderly liquidation authority, and they cannot rely for their standing on their vague and non-specific assertions that they are customers of financial institutions that might change the terms or availability of certain products because of regulation by the Bureau or the Council.  It is 60 Plus and CEI's burden to establish standing, and they, like SNB, have failed to do so.

### F.   PLAINTIFFS MICHIGAN, OKLAHOMA, AND SOUTH CAROLINA:   COUNTS IV, V, AND VI.

In Counts IV, V, and VI of the Amended Complaint, the States claim that certain provisions of Title II establishing a process for the orderly liquidation of failing financial companies together violate the separation of powers, procedural due process, and the constitutional requirement for uniformity in bankruptcy.  Am. Compl. ¶¶ 142-78, 210-39.  In particular, they claim that the Treasury Secretary's authority to appoint the FDIC as receiver of a failing financial company and the FDIC's authority to liquidate such a company are unlimited, *id.* ¶¶ 142-51, that neither the Secretary's nor the FDIC's authority is constrained by appropriate judicial review, *id.* ¶¶ 157-73, that the FDIC's authority to liquidate the company is not constrained by Congress's power of the purse, *id.* ¶¶ 174-78, and that the FDIC may treat similarly situated creditors differently, *id.* ¶ 151.

The States claim an injury flowing from Title II based on their allegation that their pension funds are investors in – and creditors of – financial companies that are theoretically subject to the orderly liquidation authority.  *Id.* ¶¶ 24, 26, 28, 153.  But Title II has never been

invoked as to any financial company, much less one of which the States' pension funds are allegedly creditors. The States have therefore suffered no injury. Instead, the States speculate that one of the financial companies of which their pension funds are allegedly creditors may someday be subject to orderly liquidation under Title II, and that those pension funds will suffer a loss as a result of the Title II process that would be greater than the loss they would have suffered if the company had instead been liquidated under the Bankruptcy Code. *See id.* ¶¶ 154-56. Such a scenario is not only unlikely, but, as set forth above, speculation about possible future events does not constitute an injury in fact. *Whitmore*, 495 U.S. at 158. Rather, "[a] threatened injury must be certainly impending to constitute injury in fact." *Id.* (quotations omitted). The States have failed to allege any facts suggesting that their asserted injury is certainly impending. As with SNB's theory that it will be injured by the Council's designation authority, the States' theory that they will be injured by the FDIC's orderly liquidation authority piles speculation upon speculation and falls far short of establishing a non-conjectural, imminent injury necessary to support Article III standing.[21]

1. *The States Speculate that One of the Financial Companies of Which Their Pension Funds Are Allegedly Creditors Will Fail.*

The States first speculate that a financial company of which their pension funds are allegedly creditors will someday be "in default or in danger of default," which is a necessary precondition of any determination by the Secretary of the Treasury to appoint the FDIC as receiver of that company. *See* 12 U.S.C. § 5383(b)(1). But they have failed to allege that a

---

[21] The States mistakenly rely upon *Massachusetts v. EPA*, 549 U.S. 497 (2007), to bolster their standing to bring this lawsuit. Am. Compl. ¶ 227. While states may be entitled to "special solicitude" in claiming standing in certain types of cases, "[t]his special solicitude does *not* eliminate the state petitioner's obligation to establish a concrete injury." *Del. Dep't of Natural Res. v. FERC*, 558 F.3d 575, 579 n.6 (D.C. Cir. 2009) (emphasis in original). The States have not established a concrete injury here, for the reasons set forth in this section.

single company of which they are allegedly creditors will fail and that such a failure is imminent.

Absent such allegations, the States could not even begin to demonstrate a concrete and

particularized harm flowing from the challenged provisions of Title II.  The States' pension

funds, like countless other individuals and entities, are presently nothing more than investors in

financial companies.  That generalized status is plainly insufficient to give them standing.

> 2.     *The States Speculate that One of the Financial Companies of Which Their
>         Pension Funds Are Allegedly Creditors Will Be Subject to Title II.*

Assuming *arguendo* that one of the financial companies of which the States' pension

funds are allegedly creditors is in danger of failing, the States further speculate that the Treasury

Secretary will invoke his authority under Title II to appoint the FDIC as receiver.  But an

asserted injury cannot be "imminent" where, as here, it is based on "speculati[on] that

[government] officials will" take harmful actions.  *DaimlerChrysler Corp. v. Cuno*, 547 U.S.

332, 344-345 (2006).  Such conjecture gives "no assurance that the asserted injury is . . .

certainly impending."  *Id.* at 345 (quotations omitted).

The States' theory that the government is certain to take action under Title II with respect

to financial companies of which their pension funds are allegedly creditors is particularly

conjectural in view of the extraordinary circumstances in which Title II was designed to be

invoked.  A failing financial company may only be resolved under Title II in the exceptional

situation in which that company's failure and resolution under otherwise applicable law "would

have serious adverse effects on financial stability in the United States."  12 U.S.C. § 5383(b)(2).

Indeed, the procedures for invoking Title II "include[] several steps intended to make the use of

th[e] authority very rare."  S. Rep. No. 111-176, at 58 (2010), *see also id.* at 4 ("[T]he threshold

for triggering the orderly liquidation authority is very high.").  Specifically, appointment of the

FDIC as receiver requires a two-thirds vote of the Federal Reserve Board, a two-thirds vote of

the FDIC Board, written recommendations from the Federal Reserve Board and FDIC Board that evaluate multiple elements, and a series of determinations by the Treasury Secretary in consultation with the President of the United States.  12 U.S.C. § 5383(a), (b).  And, if the financial company does not consent to the appointment, the Secretary must petition this Court for an order authorizing the appointment.  *Id.* § 5382(a)(1).  Whether any one of these actors – much less all of them – would take the action necessary to invoke the extraordinary authority of Title II as to a failing financial company of which the States' pension funds are allegedly creditors is pure conjecture.

Congress established a high threshold for triggering the orderly liquidation authority because it sought to incorporate into the statute "a strong presumption that the bankruptcy process will continue to be used to close and unwind failing financial companies, including large, complex ones."  *See* S. Rep. No. 111-176, at 4 (2010).  To this end, Title I of Dodd-Frank requires all SIFIs to prepare and provide to the FDIC and the Federal Reserve Board a plan for their rapid and orderly resolution under the U.S. Bankruptcy Code.  12 U.S.C. § 5365(d).  Moreover, any recommendation by the FDIC or the Federal Reserve Board to appoint the FDIC as receiver must explain why "a case under the Bankruptcy Code is not appropriate for the financial company," *id.* § 5383(a)(2)(F), and the Treasury Secretary must determine that resolution of the company under "otherwise applicable . . . law" would have serious adverse effects on the nation's financial stability, *id.* § 5383(b)(2).

Accordingly, although Title II establishes a process by which financial regulators can avoid the undesirable choice between costly government bailouts and catastrophic harm to the nation's financial system like the choice the government faced in 2008, Congress nonetheless intended for bankruptcy to remain the default process for resolving failing financial companies,

even those that are systemically important.  The States do not even attempt to allege that one of

the financial companies of which their pension funds are allegedly creditors has been or is about

to be subject to the authority granted to financial regulators in Title II of the Act.  *See* Am.

Compl. ¶¶ 153-56; *see also* Certain Orderly Liquidation Authority Provisions under Title II of

the Dodd-Frank Wall Street Reform and Consumer Protection Act, 76 Fed. Reg. 41626, 41626

(July 15, 2011) ("[I]t is not expected that the FDIC will be appointed as receiver for a covered

financial company in the near future.").

3.     *The States Speculate that Their Pension Funds Will Suffer an Injury
Flowing From Title II.*

Assuming *arguendo* that the Treasury Secretary does invoke Title II as to one of the

financial companies of which the States' pension funds are allegedly creditors, the States' theory

of standing requires the additional layer of speculation that their pension funds will suffer harm

as a result of the application of Title II.  Title II, however, grants to creditors a "right to payment,

resolution, or other satisfaction of their claims."  12 U.S.C. § 5390(a)(1)(M).  It further provides

that "[a] creditor shall, in no event, receive less than the amount that the creditor is entitled to

receive under . . . subsection (d)."  *Id.* § 5390(a)(7)(B).  Subsection (d) in turn provides that the

FDIC's maximum liability to claimants "shall equal the amount that such claimant would have

received" if "the [FDIC] had not been appointed receiver with respect to the covered financial

company" and if "the covered financial company had been liquidated under chapter 7 of the

Bankruptcy Code."  *Id.* § 5390(d)(2).  In view of these statutory provisions providing for the

payment of creditor claims, it is pure speculation that the States' pension funds would suffer any

losses as result of the application of Title II, as opposed to the failure and resulting bankruptcy of the financial company in which the States' pension funds have chosen to invest.[22]

\*      \*      \*

As with the other claims in this case, for this Court to resolve the States' Title II claims at this juncture would defeat one of the central purposes of the imminent injury requirement by creating the "possibility of deciding a case in which no injury would have occurred at all." *Lujan*, 504 U.S. at 564 n.2.  Because Title II has never been invoked to liquidate any failing financial company, the States could not possibly claim an injury flowing from Title II.  Unless and until a financial company of which the States' pension funds are allegedly creditors is in default or danger of default, unless and until the FDIC is appointed as receiver to liquidate that company pursuant to Title II, and unless and until the States receive less for their claims under Title II than they would have received under Chapter 7, the States' theory of injury necessarily "stacks speculation upon hypothetical upon speculation," *N.Y. Reg'l Interconnect, Inc.*, 634 F.3d at 587.  The States lack standing to challenge the constitutionality of Title II.[23]

---

[22]    Furthermore, the States' Title II claims are premised in significant part on the provision establishing that similarly-situated creditors "shall be treated in a similar manner" but allowing the FDIC to make exceptions if specified circumstances exist, 12 U.S.C. § 5390(b)(4).  *See* Am. Compl. ¶¶ 9-11, 151, 215, 223-24, 229, 235, 237.  Unless the FDIC invokes one of these exceptions to treat the States' pension funds differently – and less favorably – than other similarly situated creditors, the States' pension funds will not be harmed by this provision of the Act.  Prior to the initiation of any Title II liquidation, whether the FDIC would invoke its authority in any particular Title II liquidation and with respect to any particular creditor is purely speculative.

[23]    Moreover, even if the States someday do suffer a cognizable injury as a creditor of a financial company that is subject to the orderly liquidation authority, Title II establishes a comprehensive administrative scheme for the FDIC's resolution of creditors' claims and for judicial review thereof.  *See* 12 U.S.C. § 5390(a)(2) (requiring notice to creditors); *id.* § 5390(a)(3) (establishing a procedure for the FDIC's resolution of claims); *id.* § 5390(a)(4) (providing for judicial review of claims).

## II.    PLAINTIFFS' CLAIMS ARE NOT RIPE.

Ripeness is an Article III justiciability doctrine designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).  The ripeness inquiry "evaluate[s] both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149.

Whether a case is fit for judicial resolution depends upon whether the claim "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotations omitted); *see also Friends of Keeseville Inc. v. FERC*, 859 F.2d 230, 235-36 (D.C. Cir. 1988) (in ripeness inquiry, court "may properly give weight to the interests in judicial economy that are furthered by the avoidance of unnecessary adjudication"); *State Farm Mut. Auto. Ins. Co. v. Dole*, 802 F.2d 474, 479 (D.C. Cir. 1986) (case not fit for judicial review if "resolution of the dispute is likely to prove unnecessary").  "Similarly, with respect to the 'hardship to the parties' prong, an abstract harm is not sufficient; there must be an immediate harm with a 'direct effect on the day-to-day business of the plaintiffs.'"  *Grand Lodge of the Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 17-18 (D.D.C. 2001) (quoting *Texas*, 523 U.S. at 301).

The doctrines of standing and ripeness often converge:  "Ripeness . . . shares the constitutional requirement of standing that an injury in fact be certainly impending." *Coal. for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102, 130 (D.C. Cir. 2012); *Elend v. Basham*, 471

F.3d 1199, 1205 (11th Cir. 2006) ("[W]hether this case is examined through the prism of standing or ripeness, it can be distilled to a single question:  whether the Plaintiffs have sufficiently alleged an imminent and concrete threat of future injury[.]"); *Roshan v. Smith*, 615 F. Supp. 901, 904 (D.D.C. 1985) ("[T]o the extent that the justiciability challenge focuses on the sufficiency versus remoteness of the alleged injury, ripeness and standing concerns merge.").

For reasons similar to the reasons they lack standing, Plaintiffs' challenges satisfy neither prong of the ripeness inquiry.  As discussed above, SNB has not alleged any credible and imminent threat of enforcement by the Bureau, a Bureau regulation to which it is subject, an imminent Council designation of a nonbank SIFI that will impact SNB's banking business, or an imminent Title II liquidation.  Nor have Plaintiffs CEI and 60 Plus alleged with any specificity that either a provision of the Act or Director Cordray's appointment has caused harm to them or their members.  Finally, the States have not alleged that any Title II liquidation is imminent, much less the liquidation of a financial company of which their pension funds are allegedly creditors.  Future enforcement actions, regulations, designations, and orderly liquidations affecting any of the Plaintiffs are therefore "contingent [upon] future events that may not occur as anticipated, or indeed may not occur at all," *Texas,* 523 U.S. at 300 (quotations omitted), making Plaintiffs' claims not currently fit for judicial resolution.[24]  *See id.* at 301 ("[D]etermination of the scope of legislation in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of the judicial function.") (quotations and alterations omitted).

---

[24]     Indeed, if the Bureau does eventually take some action that affects Plaintiffs, such action may not even be taken under the supervision of Director Cordray, whose recess appointment will expire at the end of the Senate's next session, *see* U.S. Const. art. II, § 2, cl. 3.

Nor have Plaintiffs established that they would suffer hardship in the absence of judicial intervention.  Unlike in *Abbott Laboratories v. Gardner*, where the plaintiffs had demonstrated an immediate harm with a "direct effect on the[ir] day-to-day business" 387 U.S. at 152, here Plaintiffs have shown no hardship at all.  In the absence of an OCC enforcement proceeding taken at the Bureau's recommendation or a Bureau regulation that applies to it, SNB cannot suffer any hardship.  As for SNB's challenge to the Council, even under its own questionable assumption that a Council designation will place SNB at a competitive disadvantage, no competitive disadvantage could possibly arise until such a designation actually occurs. Likewise, the abstract claims of harm asserted by CEI and 60 Plus are insufficient to demonstrate that they would suffer any hardship if review were postponed.  And, finally, even granting the States' theory that a Title II liquidation of an entity of which their pension funds are allegedly creditors could harm them, they could not possibly suffer any such harm until that liquidation occurs.  Thus, even though the issues presented here are "purely legal," *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 163 (1967), such uncertainty whether a statutory provision will harm Plaintiffs renders the controversy not ripe for review, *id.* at 164; *see also The Toca Producers v. FERC*, 411 F.3d 262, 266 (D.C. Cir. 2005) (rejecting purely legal claim as unripe).

## CONCLUSION

For the foregoing reasons, this Court should dismiss the Amended Complaint for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).

Respectfully submitted,

*Of Counsel:*

CHRISTOPHER J. MEADE
Acting General Counsel
U.S. Department of the Treasury
1500 Pennsylvania Ave. NW

STUART F. DELERY
Principal Deputy Assistant Attorney General

RONALD C. MACHEN JR.
United States Attorney

Washington, DC  20220

MEREDITH FUCHS
General Counsel
TO-QUYEN TRUONG
Deputy General Counsel
DAVID M. GOSSETT
Assistant General Counsel
RACHEL RODMAN
JOHN R. COLEMAN
Senior Counsel
Consumer Financial Protection Bureau
1700 G St. NW
Washington, DC  20552

KATHERINE H. WHEATLEY
Associate General Counsel
JOSHUA P. CHADWICK
Counsel
Board of Governors of the Federal Reserve
System
20th and C Streets NW
Washington, DC  20551

COLLEEN J. BOLES
Acting Deputy General Counsel
KATHRYN R. NORCROSS
Acting Assistant General Counsel
BARBARA SARSHIK
Senior Counsel
ANDREW DOBER
Counsel
Federal Deposit Insurance Corporation
3501 Fairfax Dr., VS-D7176
Arlington, VA  22226-3500

DANIEL P. STIPANO
Acting Chief Counsel
GREGORY F. TAYLOR
CAROLINE STAPLETON
GABRIEL HINDIN
Attorneys, Litigation Division
Office of the Comptroller of the Currency
250 E St. SW
Washington, DC  20219

IAN HEATH GERSHENGORN
Deputy Assistant Attorney General

SUSAN K. RUDY
Assistant Director
Federal Programs Branch

_s/ Wendy M. Doty_____
WENDY M. DOTY, DC Bar No. 490228
BRADLEY H. COHEN, DC Bar No. 495145
ETHAN P. DAVIS, NY Bar
Trial Attorneys
Federal Programs Branch
U.S. Department of Justice, Civil Division
20 Massachusetts Ave. NW, Rm. 7218
Washington, DC  20530
Telephone:  (202) 616-7420
Fax:  (202) 616-8470
Email:  wendy.doty@usdoj.gov

*Counsel for Defendants*

MICHAEL A. CONLEY
Deputy General Counsel
JACOB H. STILLMAN
Solicitor
WILLIAM K. SHIREY
Senior Litigation Counsel
Office of General Counsel
Securities and Exchange Commission
100 F St. NE
Washington, DC  20549

AJAY B SUTARIA
Counsel
Office of General Counsel
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st St. NW
Washington, DC  20581

JOHN K. IANNO
Senior Associate General Counsel
GERARD S. POLIQUIN
Trial Attorney
Office of General Counsel
National Credit Union Administration
1775 Duke St.
Alexandria, VA  22314

Dated:  November 20, 2012

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 20, 2012, a copy of the foregoing document was filed electronically via the Court's ECF system, through which a notice of the filing will be sent to all counsel of record.

*s/ Wendy M. Doty*
WENDY M. DOTY
