IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE NATIONAL BANK OF BIG SPRING
901 South Main Street
Big Spring, TX 79720;

STATE OF ALABAMA, by and through LUTHER
STRANGE, in his official capacity as Attorney General
of Alabama
501 Washington Avenue
Montgomery, AL 36130;

STATE OF GEORGIA, by and through SAMUEL S.
OLENS, ATTORNEY GENERAL OF THE STATE OF
GEORGIA
40 Capitol Square SW
Atlanta, GA 30334;

STATE OF KANSAS *ex rel.* DEREK SCHMIDT,
in his official capacity as
Attorney General of Kansas
120 SW 10th Avenue, 2nd Floor
Topeka, KS 66612;

BILL SCHUETTE, ATTORNEY GENERAL
OF THE STATE OF MICHIGAN, ON BEHALF OF
THE PEOPLE OF MICHIGAN;
G. Mennen Williams Building, 7th Floor
525 W. Ottawa St.
P.O. Box 30212
Lansing, MI 48909;

STATE OF MONTANA, by and through TIMOTHY C.
FOX, ATTORNEY GENERAL OF THE STATE OF
MONTANA
215 North Sanders
P.O. Box 201401
Helena, MT 59620;

STATE OF NEBRASKA, by and through JON C.
BRUNING, ATTORNEY GENERAL OF THE STATE
OF NEBRASKA
2115 State Capitol

Case No. 1:12-cv-01032

Judge:  Hon. Ellen S. Huvelle

P.O. Box 98920
Lincoln, NE 68509;

STATE OF OHIO, by and through MICHAEL DeWINE,
ATTORNEY GENERAL OF OHIO
30 East Broad Street, 14th Floor
Columbus, OH 43215;

STATE OF OKLAHOMA
EX REL. SCOTT PRUITT
in his official capacity as
Attorney General of Oklahoma
313 NE 21st Street
Oklahoma City, OK 73105;

STATE OF SOUTH CAROLINA
EX REL. ALAN WILSON
in his official capacity as
Attorney General of South Carolina
Rembert Dennis Building
1000 Assembly Street, Room 519
Columbia, SC 29201;

STATE OF TEXAS, by and through
GREG ABBOTT, ATTORNEY GENERAL
OF THE STATE OF TEXAS
300 W. 15th Street
Austin, TX 78701;

STATE OF WEST VIRGINIA
EX REL. PATRICK MORRISEY
in his official capacity as
Attorney General of West Virginia
State Capitol Complex,
Building 1 Room 26-E
Charleston, WV 25305;

THE 60 PLUS ASSOCIATION, INC
515 King Street
Suite 315
Alexandria, VA 22314;

and

THE COMPETITIVE ENTERPRISE INSTITUTE

1899 L Street
Floor 12
Washington, DC 20036,

*Plaintiffs*,

v.

NEIL S. WOLIN,[1] in his official capacity as
Acting United States Secretary of the Treasury and *ex officio* Chairman of the Financial Stability Oversight
Council
1500 Pennsylvania Avenue, NW
Washington, DC 20220;

U.S. DEPARTMENT OF THE TREASURY
1500 Pennsylvania Avenue, NW
Washington, DC 20220;

RICHARD CORDRAY, in his official capacity as
Director of the Consumer Financial Protection Bureau, in
his official capacity as *ex officio* Director of the Federal
Deposit Insurance Corporation, and in his official
capacity as *ex officio* member of the Financial Stability
Oversight Council
1700 G Street NW
Washington, DC 20552;

THE CONSUMER FINANCIAL PROTECTION
BUREAU
1700 G Street NW
Washington, DC 20552;

BENJAMIN BERNANKE, in his official capacity as
Chairman of the Board of Governors of the Federal
Reserve System, and in his official capacity as *ex officio*
Member of the Financial Stability Oversight Council

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Acting U.S. Secretary of the Treasury Wolin
has been substituted as a defendant for former Secretary Geithner, and Chairman of the U.S.
Securities and Exchange Commission Walter has been substituted as a defendant for former
Chairman Schapiro.  Additionally, the caption has been revised to reflect Mr. Gruenberg's new
office as Chairman of the Board of Directors of the Federal Deposit Insurance Corporation.
Corresponding conforming changes have been made to paragraphs 45, 57, 62, and 150.

20th Street and Constitution Avenue NW
Washington, DC 20551;

JANET YELLEN, in her official capacity as Vice
Chairman of the Board of Governors of the Federal
Reserve System
20th Street and Constitution Avenue NW
Washington, DC 20551;

ELIZABETH DUKE, in her official capacity as Member
of the Board of Governors of the Federal
Reserve System
20th Street and Constitution Avenue NW
Washington, DC 20551;

JEROME POWELL, in his official capacity as Member
of the Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue NW
Washington, DC 20551;

SARAH BLOOM RASKIN, in her official capacity as
Member of the Board of Governors of the Federal
Reserve System
20th Street and Constitution Avenue NW
Washington, DC 20551;

JEREMY STEIN, in his official capacity as Member of
the Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue NW
Washington, DC 20551;

DANIEL TARULLO, in his official capacity as Member
of the Board of Governors of the Federal
Reserve System
20th Street and Constitution Avenue NW
Washington, DC 20551;

THE BOARD OF GOVERNORS OF THE FEDERAL
RESERVE SYSTEM
20th Street and Constitution Avenue NW
Washington, DC 20551;

MARTIN GRUENBERG, in his official capacity as
Chairman of the Board of Directors of the Federal
Deposit Insurance Corporation, and in his official

capacity as *ex officio* Member of the Financial Stability
Oversight Council
550 17th Street NW
Washington, DC 20429;

THOMAS HOENIG, in his official capacity as Director
of the Federal Deposit Insurance Corporation
550 17th Street NW
Washington, DC 20429;

JEREMIAH NORTON, in his official capacity as
Director of the Federal Deposit Insurance Corporation
550 17th Street NW
Washington, DC 20429;

THOMAS CURRY, in his official capacity as U.S.
Comptroller of the Currency, in his official capacity as *ex
officio* Director of the Federal Deposit Insurance
Corporation, and in his official capacity as *ex officio*
member of the Financial Stability Oversight Council
Comptroller of the Currency
Administrator of National Banks
Washington, DC 20219;

THE FEDERAL DEPOSIT INSURANCE
CORPORATION
550 17th Street NW
Washington, DC 20429;

ELISSE B. WALTER, in her official capacity as
Chairman of the U.S. Securities and Exchange
Commission and *ex officio* member of the Financial
Stability Oversight Council
100 F Street NE
Washington, DC 20549;

GARY GENSLER, in his official capacity as Chairman
of the U.S. Commodity Futures Trading Commission and
*ex officio* member of the Financial Stability Oversight
Council
Three Lafayette Center
1155 21st Street
Washington, DC 20581;

DEBBIE MATZ, in her official capacity as Chairman of

the National Credit Union Administration Board and *ex officio* Member of the Financial Stability Oversight Council
1775 Duke Street
Alexandria, VA 22314;

S. ROY WOODALL, in his official capacity as Member of the Financial Stability Oversight Council
1500 Pennsylvania Avenue, NW
Washington, DC 20220;

    and

THE FINANCIAL STABILITY OVERSIGHT COUNCIL
1500 Pennsylvania Avenue, NW
Washington, DC 20220,

        *Defendants*.

## SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The above-captioned plaintiffs, by and through their undersigned attorneys,[2] allege as follows:

### INTRODUCTION

1.   By this action, the Private Plaintiffs challenge the unconstitutional formation and operation of the Consumer Financial Protection Bureau ("CFPB"), an agency created by Title X

---

[2] This action consists of two groups of plaintiffs: the "Private Plaintiffs," consisting of State National Bank of Big Spring, the 60 Plus Association, Inc., and the Competitive Enterprise Institute; and the "State Plaintiffs," consisting of the State of Alabama, the State of Georgia, the State of Kansas, the State of Michigan, the State of Montana, the State of Nebraska, the State of Ohio, the State of Oklahoma, the State of South Carolina, the State of Texas, and the State of West Virginia.  As specified in the signature block, they are represented by separate counsel. The State Plaintiffs' allegations and claims are limited to Title II of the Dodd-Frank Act, as described below.

of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203 (July 21, 2010) ("Dodd-Frank Act").

2.       By this action, the Private Plaintiffs challenge the unconstitutional appointment of CFPB Director Richard Cordray, appointed to office neither with the Senate's advice and consent, nor during a Senate recess.

3.       By this action, the Private Plaintiffs challenge the unconstitutional creation and operation of the Financial Stability Oversight Council ("FSOC"), an inter-agency "council" created by Title I of the Dodd-Frank Act.

4.       By this action, the Plaintiffs challenge the unconstitutional creation and operation of a new authority for the "orderly liquidation" of financial institutions under Title II of the Dodd-Frank Act ("Orderly Liquidation Authority").

5.       These Titles of the Dodd- Frank Act violate the Constitution in several ways:

6.       First, the CFPB's formation and operation violates the Constitution's separation of powers.  Title X of the Dodd-Frank Act delegates effectively unbounded power to the CFPB, and couples that power with provisions insulating the CFPB against meaningful checks by the Legislative, Executive, and Judicial Branches, as described in ¶¶ 51-107, below.  Taken together, these provisions remove all effective limits on the CFPB Director's discretion, a violation of the separation of powers.

7.       Second, the President unconstitutionally appointed Richard Cordray to be CFPB Director by refusing to secure the Senate's advice and consent while the Senate was in session, one of the few constitutional checks and balances on the CFPB left in place by the Dodd-Frank Act, as described in ¶¶ 108-118, below.

8.      Third, the FSOC's formation and operation violates the Constitution's separation of powers.  The FSOC has sweeping and unprecedented discretion to choose which nonbank financial companies to designate as "systemically important" (or, "too big to fail").  That designation signals that the selected companies have the implicit backing of the federal government—and, accordingly, an unfair advantage over competitors in attracting scarce, fungible investment capital.  Yet the FSOC's sweeping powers and discretion are not limited by any meaningful statutory directives.  And the FSOC, whose members include nonvoting state officials appointed by state regulators rather than the President, is insulated from meaningful judicial review—indeed, from all judicial review brought by third parties injured by an FSOC designation—as described in ¶¶ 119-141, below.  Taken together, these provisions provide the FSOC virtually boundless discretion in making its highly consequential designations, a violation of the separation of powers.

9.      Fourth, the "Orderly Liquidation Authority" violates the separation of powers.  Title II of the Dodd-Frank Act empowers the Treasury Secretary to order the liquidation of a financial company with little or no advance warning, under cover of mandatory secrecy, and without either useful statutory guidance or meaningful legislative, executive, or judicial oversight.  Moreover, Title II empowers the FDIC to unilaterally violate the rights of financial companies' creditors (and unilaterally choose favorites among similarly situated creditors) while carrying out that "liquidation."  All of this occurs without meaningful judicial review, as described in ¶¶ 142-178, below.

10.      Fifth, the Orderly Liquidation Authority violates the mandate of the Fifth Amendment to the United States Constitution that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."  The forced liquidation of a company with little

8

or no advance warning, in combination with the FDIC's virtually unlimited power to choose favorites among similarly situated creditors in implementing the liquidation, denies the subject company and its creditors constitutionally required notice and a meaningful opportunity to be heard before their property is taken—and likely becomes unrecoverable, as described in ¶¶ 142-178, below.

11.     Sixth, the Orderly Liquidation Authority violates the requirement in Article I, Section 8, Clause 4 of the United States Constitution, that any "Laws on the subject of Bankruptcies throughout the United States" be "uniform."  With no meaningful limits on the discretion conferred on the Treasury Secretary or on the FDIC, Title II not only empowers the FDIC to choose which companies will be subject to liquidation under Title II, but also confers on the FDIC unilateral authority to provide special treatment to whatever creditors the FDIC, in its sole and unbounded discretion, decides to favor, as described in ¶¶ 142-178, below.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 2201.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (e).

## PARTIES

14.     Plaintiff State National Bank of Big Spring ("Bank") is a Texas corporation and federally-chartered bank headquartered in Big Spring, Texas.  The Bank opened in 1909 and currently has three locations in Big Spring, Lamesa, and O'Donnell, Texas.  The Bank is a local community bank with less than $275 million in deposits and offers customers access to checking accounts, savings accounts, certificates of deposit, and individual retirement accounts.

15.     Title X of the Dodd-Frank Act, and CFPB Director Richard Cordray's unconstitutional appointment to direct that agency, injure the Bank.  As a result of the CFPB's

promulgation of a Final Rule regulating international remittance transfers imposing burdensome requirements on financial institutions and other providers of those services, the Bank has stopped offering those services to its customers.

16.     The Bank is further injured because Title X requires the Bank to conduct its business, and make decisions about what kinds of business to conduct, without knowing whether the CFPB will retroactively announce that one or more of the Bank's consumer lending practices is "unfair," "deceptive," or "abusive" and enforce that interpretation through supervision, investigation, or enforcement activities.  Title X's open-ended grant of power to the CFPB, combined with the absence of checks and balances limiting the CFPB from expansively interpreting that grant of power, creates a cloud of regulatory uncertainty that forces banks to censor their own offerings—a chilling effect that, for example, left the Bank with no safe choice but to exit the consumer mortgage business and not return until the CFPB's authority and discretion are defined with greater specificity, transparency, and accountability.

17.     Indeed, statements of CFPB Director Cordray and other officials connected to the CFPB heighten the likelihood that the Bank's mortgage products could be deemed unlawful, after the fact, by the CFPB—as described in ¶¶ 51-107, below.

18.     Plaintiff 60 Plus Association, Inc. ("Association") is a seven-million member, non-profit, non-partisan seniors advocacy group that is tax-exempt under Section 501(c)(4) of the Internal Revenue Code.  It is devoted to advancing free markets and strengthening limits on government regulation.  One of its goals is to preserve access to credit and financial products for seniors, such as mortgages and reverse mortgages.  Founded in 1992, it is based in Alexandria, Virginia.

19.     The Dodd-Frank Act harms the members of the 60 Plus Association in that it has reduced, and will further reduce, the range and affordability of banking, credit, investment, and savings options available to them.  For example, provisions enforced by the CFPB have reduced the availability of free checking, and the number of banks offering it; they have reduced the number of companies offering mortgages; and they have increased mortgage fees.

20.     The 60 Plus Association surveys its members regarding their interest in a variety of financial products that it might offer to them as benefits.   These products range from investment programs and bank accounts to credit cards and insurance.  The Dodd-Frank Act harms both the Association and its members by increasing the cost and reducing the availability of such products, both currently and in the near future.

21.     Plaintiff Competitive Enterprise Institute ("CEI") is a tax-exempt, nonprofit public interest organization under Section 501(c)(3) of the Internal Revenue Code.  It is dedicated to advancing the principles of individual liberty and limited government.  To those ends, CEI engages in research, education, and advocacy efforts involving a broad range of regulatory and legal issues.  It also participates in cases involving financial regulation and constitutional checks and balances, such as the separation of powers and federalism: *e.g.*, *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138 (2010); *Florida v. U.S. Dep't of Health & Human Servs.*, 648 F.3d 1235 (11th Cir. 2011); and *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1 (2007).  Founded in 1984, it is based in Washington, D.C.

22.     CEI has checking and brokerage accounts and certificates of deposit ("CDs") in banks and brokerage firms regulated by the CFPB that qualify as systemically important under the Dodd-Frank Act as enforced by FSOC.  For example, it has checking accounts and CDs at Wells Fargo, and CDs at Merrill Lynch.  It also has credit cards with terms subject to regulation

by the CFPB under Dodd-Frank.  The nature and cost of these accounts are jeopardized by the CFPB's sweeping regulatory authority over them and over the institutions in which they are based.

23.     Plaintiff State of Alabama, by and through Luther Strange, Attorney General of the State of Alabama, is a sovereign State of the United States of America.

24.     Alabama's pension funds have investments in a variety of institutions that qualify as financial companies as defined by Section 210 of the Dodd-Frank Act, rendering those companies subject to the Orderly Liquidation Authority created by Title II of the Dodd-Frank Act.  A non-exhaustive list of those investments is attached to this Complaint as Exhibit A, and is incorporated into this complaint by reference.  The State of Alabama is ultimately liable for the payment of pensions that have been promised to State employees, and thus any loss of property rights or investment value suffered by the State's pension funds directly harms the State of Alabama.  The terms "Alabama" and "State of Alabama" are accordingly used interchangeably throughout this Complaint with the term "Alabama's pension funds."

25.     Plaintiff State of Georgia, by and through Samuel S. Olens, Attorney General of the State of Georgia, is a sovereign State of the United States of America.

26.     Georgia has investments in a variety of institutions that qualify as financial companies as defined by Section 210 of the Dodd-Frank Act, rendering those companies subject to the Orderly Liquidation Authority created by Title II of the Dodd-Frank Act.  A non-exhaustive list of those investments is attached to this Complaint as Exhibit B, and is incorporated into this complaint by reference.  The State of Georgia is directly harmed by any loss of property rights or investment value in those assets.

27.     Plaintiff State of Kansas, by and through Derek Schmidt, Attorney General of the State of Kansas, is a sovereign State of the United States of America.

28.     Kansas's pension funds have investments in a variety of institutions that qualify as financial companies as defined by Section 210 of the Dodd-Frank Act, rendering those companies subject to the Orderly Liquidation Authority created by Title II of the Dodd-Frank Act.  A non-exhaustive list of those investments is attached to this Complaint as Exhibit C, and is incorporated into this complaint by reference.  The State of Kansas is ultimately liable for the payment of pensions that have been promised to State employees, and thus any loss of property rights or investment value suffered by the State's pension funds directly harms the State of Kansas.  The terms "Kansas" and "State of Kansas" are accordingly used interchangeably throughout this Complaint with the term "Kansas's pension funds."

29.     Bill Schuette, Attorney General of Michigan, is bringing this action on behalf of the People of Michigan under Mich. Comp. Law § 14.28, which provides that the Michigan Attorney General may "appear for the people of [Michigan] in any other court or tribunal, in any cause or matter, civil or criminal, in which the people of [Michigan] may be a party or interested."  Under Michigan's constitution, the people are sovereign.  Mich. Const. art. I, § 1 ("All political power is inherent in the people. Government is instituted for their equal benefit, security, and protection.").  The State of Michigan is a sovereign State of the United States of America.

30.     Michigan's pension funds have investments in a variety of institutions that qualify as financial companies as defined by Section 210 of the Dodd-Frank Act, rendering those companies subject to the Orderly Liquidation Authority created by Title II of the Dodd-Frank Act.  A non-exhaustive list of those investments is attached to this Complaint as Exhibit D, and

13

is incorporated into this complaint by reference.  The State of Michigan is ultimately liable for the payment of pensions that have been promised to State employees, and thus any loss of property rights or investment value suffered by the State's pension funds directly harms the State of Michigan.  The terms "Michigan" and "State of Michigan" are accordingly used interchangeably throughout this Complaint with the term "Michigan's pension funds."

31.     Plaintiff State of Montana, by and through Timothy C. Fox, Attorney General of the State of Montana, is a sovereign State of the United States of America.

32.     Montana's pension funds have investments in a variety of institutions that qualify as financial companies as defined by Section 210 of the Dodd-Frank Act, rendering those companies subject to the Orderly Liquidation Authority created by Title II of the Dodd-Frank Act.  A non-exhaustive list of those investments is attached to this Complaint as Exhibit E, and is incorporated into this complaint by reference.  The State of Montana is ultimately liable for the payment of pensions that have been promised to State employees, and thus any loss of property rights or investment value suffered by the State's pension funds directly harms the State of Montana.  The terms "Montana" and "State of Montana" are accordingly used interchangeably throughout this Complaint with the term "Montana's pension funds."

33.     Plaintiff State of Nebraska, by and through Jon C. Bruning, Attorney General of the State of Nebraska, is a sovereign State of the United States of America.

34.     Nebraska's pension funds have investments in a variety of institutions that qualify as financial companies as defined by Section 210 of the Dodd-Frank Act, rendering those companies subject to the Orderly Liquidation Authority created by Title II of the Dodd-Frank Act.  A non-exhaustive list of those investments is attached to this Complaint as Exhibit F, and is incorporated into this complaint by reference.  The State of Nebraska is ultimately liable for the

payment of pensions that have been promised to State employees, and thus any loss of property rights or investment value suffered by the State's pension funds directly harms the State of Nebraska.  The terms "Nebraska" and "State of Nebraska" are accordingly used interchangeably throughout this Complaint with the term "Nebraska's pension funds."

35.     Plaintiff State of Ohio, by and through its Attorney General Michael DeWine, is a sovereign State of the United States of America.

36.     Various governmental entities in Ohio, including the Ohio Attorney General's Office, have public monies in public investment pools that hold commercial paper and/or bonds issued by financial companies as defined by Section 210 of the Dodd-Frank Act and thereby subject to the Orderly Liquidation Authority created by Title II of the Dodd-Frank Act.  A non-exhaustive list of those investments is attached to this Complaint as Exhibit G, and is incorporated into this complaint by reference.  The State of Ohio is directly harmed by any loss of property rights or investment value suffered in connection with such holdings.

37.     Plaintiff State of Oklahoma, by and through E. Scott Pruitt, Attorney General of the State of Oklahoma, is a sovereign State of the United States of America.

38.     Oklahoma's pension funds have investments in a variety of institutions that qualify as financial companies as defined by Section 210 of the Dodd-Frank Act, rendering those companies subject to the Orderly Liquidation Authority created by Title II of the Dodd-Frank Act.  A non-exhaustive list of those investments is attached to this Complaint as Exhibit H, and is incorporated into this complaint by reference.  The State of Oklahoma is ultimately liable for the payment of pensions that have been promised to State employees, and thus any loss of property rights or investment value suffered by the State's pension funds directly harms the State

of Oklahoma.  The terms "Oklahoma" and "State of Oklahoma" are accordingly used

interchangeably throughout this Complaint with the term "Oklahoma's pension funds."

39.     Plaintiff State of South Carolina, by and through Alan Wilson, Attorney General

of the State of South Carolina, is a sovereign State of the United States of America.

40.     South Carolina's pension funds have investments in a variety of institutions that

qualify as financial companies as defined by Section 210 of the Dodd-Frank Act, rendering those

companies subject to the Orderly Liquidation Authority created by Title II of the Dodd-Frank

Act.  A non-exhaustive list of those investments is attached to this Complaint as Exhibit I, and is

incorporated into this complaint by reference.  The State of South Carolina is ultimately liable

for the payment of pensions that have been promised to State employees, and thus any loss of

property rights or investment value suffered by the State's pension funds directly harms the State

of South Carolina.  The terms "South Carolina" and "State of South Carolina" are accordingly

used interchangeably throughout this Complaint with the term "South Carolina's pension funds."

41.     Plaintiff State of Texas, by and through Greg Abbott, Attorney General of Texas,

is a sovereign State of the United States of America.

42.     Texas, through the Texas Treasury Safekeeping Trust Company, has investments

in a variety of institutions that qualify as financial companies as defined by Section 210 of the

Dodd-Frank Act, rendering those companies subject to the Orderly Liquidation Authority created

by Title II of the Dodd-Frank Act.  A non-exhaustive list of those investments is attached to this

Complaint as Exhibit J, and is incorporated into this complaint by reference.  The State of Texas

is directly harmed by any loss of property rights or investment value suffered by the Texas

Treasury Safekeeping Trust Company.  The terms "Texas" and "State of Texas" are accordingly

used interchangeably throughout this Complaint with the term "Texas Treasury Safekeeping Trust Company."

43.     Plaintiff State of West Virginia, by and through Patrick Morrisey, Attorney General of the State of West Virginia, is a sovereign State of the United States of America.

44.     The State of West Virginia has public monies, including monies in public pension funds, in investment pools that hold commercial paper and/or bonds issued by financial companies as defined by Section 210 of the Dodd-Frank Act and thereby subject to the Orderly Liquidation Authority created by Title II of the Dodd-Frank Act.  A non-exhaustive list of those investments is attached to this Complaint as Exhibit K, and is incorporated into this complaint by reference.  The State of West Virginia is directly harmed by any loss of property rights or investment value suffered in connection with such holdings. With regard to monies in public pension funds in particular, the State of West Virginia is liable for the payment of pensions to qualifying State employees, and thus any loss of property rights or investment value suffered by the State's pension funds directly harms the State of West Virginia.

45.     Defendant Neil S. Wolin is the Acting United States Secretary of the Treasury, and the *ex officio* Chairman of the Financial Stability Oversight Council; he is located in Washington, D.C., and he is named in his official capacity.

46.     Defendant U.S. Department of the Treasury is located in Washington, D.C.

47.     Defendant Richard Cordray is Director of the Consumer Financial Protection Bureau, an *ex officio* Director of the Federal Deposit Insurance Corporation, and an *ex officio* member of the Financial Stability Oversight Council; he is located in Washington, D.C., and he is named in his official capacity.

48.     Defendant Consumer Financial Protection Bureau is located in Washington, D.C.

17

49.     Defendant Benjamin Bernanke is Chairman of the Board of Governors of the Federal Reserve System, and an *ex officio* member of the Financial Stability Oversight Council; he is located in Washington, D.C., and he is named in his official capacity.

50.     Defendant Janet Yellen is Vice Chairman of the Board of Governors of the Federal Reserve System; she is located in Washington, D.C., and she is named in her official capacity.

51.     Defendant Elizabeth Duke is a member of the Board of Governors of the Federal Reserve System; she is located in Washington, D.C., and she is named in her official capacity.

52.     Defendant Jerome Powell is a member of the Board of Governors of the Federal Reserve System; he is located in Washington, D.C., and he is named in his official capacity.

53.     Defendant Sarah Bloom Raskin is a member of the Board of Governors of the Federal Reserve System; she is located in Washington, D.C., and she is named in her official capacity.

54.     Defendant Jeremy Stein is a member of the Board of Governors of the Federal Reserve System; he is located in Washington, D.C., and he is named in his official capacity.

55.     Defendant Daniel Tarullo is a member of the Board of Governors of the Federal Reserve System; he is located in Washington, D.C., and he is named in his official capacity.

56.     Defendant the Board of Governors of the Federal Reserve System is an agency of the United States, located in Washington, D.C.

57.     Defendant Martin Gruenberg is Chairman of the Board of Directors of the Federal Deposit Insurance Corporation, and an *ex officio* member of the Financial Stability Oversight Council; he is located in Washington, D.C., and he is named in his official capacity.

58.    Defendant Thomas Hoenig is a Director of the Federal Deposit Insurance Corporation; he is located in Washington, D.C., and he is named in his official capacity.

59.    Defendant Jeremiah Norton is a Director of the Federal Deposit Insurance Corporation; he is located in Washington, D.C., and he is named in his official capacity.

60.    Defendant Thomas Curry is U.S. Comptroller of the Currency, an *ex officio* Director of the Federal Deposit Insurance Corporation, and an *ex officio* member of the Financial Stability Oversight Council; he is located in Washington, D.C., and he is named in his official capacity.

61.    Defendant Federal Deposit Insurance Corporation is located in Washington, D.C.

62.    Defendant Elisse B. Walter is Chairman of the U.S. Securities and Exchange Commission, and an *ex officio* member of the Financial Stability Oversight Council; she is located in Washington, D.C., and she is named in her official capacity.

63.    Defendant Gary Gensler is Chairman of the U.S. Commodity Futures Trading Commission, and an *ex officio* member of the Financial Stability Oversight Council; he is located in Washington, D.C., and he is named in his official capacity.

64.    Defendant Debbie Matz is Chairman of the National Credit Union Administration Board, and an *ex officio* member of the Financial Stability Oversight Council; she is located in Washington, D.C., and she is named in her official capacity.

65.    Defendant S. Roy Woodall is a member of the Financial Stability Oversight Council; he is located in Washington, D.C., and he is named in his official capacity.

66.    Defendant Financial Stability Oversight Council is located in Washington, D.C.

### THE CONSUMER FINANCIAL PROTECTION BUREAU

67.    The Private Plaintiffs allege as follows, with respect to the CFPB:

68.     Section 1011(a) of the Dodd-Frank Act establishes a new Consumer Financial

Protection Bureau to "regulate the offering and provision of consumer financial products or

services under the Federal consumer financial laws."

69.     Section 1011(a) declares the CFPB to be an "Executive agency" within the

meaning of 5 U.S.C. § 105.  But the same provision also declares the CFPB to be an

"independent bureau" that is "established in the Federal Reserve System," which is in turn led by

the Board of Governors of the Federal Reserve System ("FRB"), an "independent regulatory

agency" under 44 U.S.C. § 3502(5).

***Title X Delegates Effectively Unlimited Power To The CFPB To Litigate, Investigate,
Regulate, and Enforce Against Practices That The CFPB Deems To Be "Unfair,"
"Deceptive," or "Abusive"***

70.     The Dodd-Frank Act grants the CFPB vast authority over consumer financial

product and service firms, including Plaintiff State National Bank of Big Spring.

71.     Section 1031(a) of the Dodd-Frank Act authorizes the CFPB to take any of

several enumerated actions, including direct enforcement action, to prevent a covered person or

service provider from committing or engaging in "unfair," "deceptive," or "abusive" practices in

connection with the provision or offering of a consumer financial product or service.

72.     And Section 1031(b) of the Act authorizes the CFPB to prescribe rules identifying

unfair, deceptive, or abusive acts or practices under Federal law in connection with any

transaction with a consumer for a consumer financial product or service.

73.     But the Act provides *no* definition for "unfair" or "deceptive" acts or practices,

leaving those terms to the CFPB to interpret and enforce, either through *ad hoc* litigation or

through regulation.  Nor is the CFPB bound by prior agencies' interpretation of similar statutory

terms.

20

74.     Nor does the Act provide meaningful limits on what the CFPB can deem an "abusive" act or practice.  Section 1031(d) leaves that term to be defined by the CFPB, subject only to the requirement that the CFPB not define an act or practice to be "abusive" unless it "(1) materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; or (2) takes unreasonable advantage of — (A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service; (B) the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or (C) the reasonable reliance by the consumer on a covered person to act in the interests of the consumer."  Sec. 1031(d).[3]  Those nominal limits offer no transparency or certainty for lenders, because the limits consist exclusively of subjective factors that can only be ascertained on a case-by-case, borrower-by-borrower, *ex post facto* basis, and can be interpreted broadly by the CFPB because the agency is subject to no effective checks or balances by the other branches.

75.     In fact, the CFPB Director has himself acknowledged this.  In a January 24, 2012 hearing before a subcommittee of the U.S. House Committee on Oversight and Government Reform, CFPB Director Cordray stated that the Act's use of the term "abusive" is "a little bit of a puzzle because it is a new term"; the CFPB has "been looking at it, trying to understand it, and we have determined that that is going to have to be a fact and circumstances issue; it is not something we are likely to be able to define in the abstract. Probably not useful to try to define a term like that in the abstract; we are going to have to see what kind of situations may arise where that would seem to fit the bill under the prongs."

---

[3]    All "Sec." citations refer to the sections of the Dodd-Frank Act.

76.     The Act's open-ended grant of power over what the CFPB deems to be "unfair," "deceptive," or "abusive" lending practices is further exacerbated by the CFPB's discretion to unilaterally exempt any class of covered persons, service providers, or consumer financial products or services from the scope of any rule promulgated under Title X.  Sec. 1022(b)(3).

77.     While the Act allows the CFPB to define and enforce those open-ended standards through rulemaking, CFPB Director Cordray already announced (as noted above) his intention to define and enforce them primarily through ad hoc, *ex post facto* enforcement activities.  That leaves regulated entities, such as State National Bank of Big Spring, at substantial risk that the CFPB will define or re-define what is legal and illegal, likely on a case-by-case, *ex post facto* basis, only *after* the bank has executed a mortgage or other consumer lending transaction.

78.     The CFPB's unbridled authority to newly define what constitutes an "unfair," "deceptive," or "abusive" lending practice on a case-by-case, *ex post facto* basis, imposes severe regulatory risk upon lenders, including Plaintiff State National Bank of Big Spring, which cannot know in advance, with reasonable certainty, whether longstanding or new financial services will open them to retroactive liability according to the CFPB.

79.     In pursuing practices it deems to be "unfair," "deceptive," or "abusive," the CFPB is further empowered to require insured depository institutions, including Plaintiff State National Bank of Big Spring, to provide reports to the CFPB containing "information owned or under the control of [the institution], regardless of whether such information is maintained, stored or processed by another person," for the purpose of "assess[ing] and detect[ing] risks to consumers and consumer financial markets."  Sec. 1026(b).

80.     The CFPB is also empowered to refer activities it deems to be "a material violation of a Federal consumer financial law" to the prudential regulator of an insured

depository institution—in the case of Plaintiff State National Bank of Big Spring, the Office of the Comptroller of the Currency—"and recommend appropriate action to respond."  Sec. 1026(d)(2)(A).  When the CFPB makes such a referral to a prudential regulator, the prudential regulator is required to "provide a written response to the Bureau not later than 60 days thereafter."  Sec. 1026(d)(2)(B).

81.     The CFPB can also intervene directly in examinations conducted by the prudential regulators of insured depository institutions such as Plaintiff State National Bank of Big Spring.  Specifically, the CFPB can include CFPB examiners on a sample basis in examinations conducted by the prudential regulator.  Sec. 1026(c)(1).  When the CFPB includes one of its examiners in an examination conducted by a prudential regulator, the regulator is required to "involve such Bureau examiner in the entire examination process," "provide all reports, records, and documentation related to the examination process … to the Bureau on a timely and continual basis," and "consider input of the Bureau concerning the scope of an examination, conduct of the examination, the contents of the examination report, the designation of matters requiring attention, and examination ratings."  Sec. 1026(c)(2).

82.     The CFPB thus not only has direct enforcement authorities of its own, but also substantially influences and effectively directs and controls the enforcement and examination activities of prudential regulators, by defining the terms "unfair," "deceptive," and "abusive" in ways that bind prudential regulators, both through formal regulations and through informal directives and guidance; by referring insured depository institutions to prudential regulators for investigation and requiring the prudential regulators to provide a written response to such referrals; and by inserting the CFPB and its examiners directly into the examinations conducted by prudential regulators.

83.     The resulting chilling effect of the direct and indirect investigative, enforcement, and referral authorities vested in the CFPB by Title X forces lenders such as the Bank to either risk burdensome federal investigation or prosecution or curtail their own services and products.

84.     For example, Title X's broad terms, as administered by the CFPB, already have forced Plaintiff Big Spring National Bank to discontinue its own mortgage lending, because its mortgage lending practices are within the CFPB's jurisdiction (*i.e.*, they are consumer financial products or services) yet the Bank cannot be reasonably certain, *ex ante*, whether the CFPB and/or the Office of the Comptroller of the Currency (influenced and directed by the CFPB, and subject to the CFPB's interpretation of the consumer financial laws) will investigate or litigate against them, deeming those practices to be "unfair," "deceptive," or "abusive" pursuant to an *ex post facto* CFPB interpretation of the law.

85.     The Bank's mortgage services and products traditionally focused on real estate in the Bank's geographic area where real estate is generally bought and sold at relatively low prices, and where mortgage borrowers traditionally pay relatively large down payments; rather than charging their customers "points" for the mortgages, the Bank structured its mortgages to feature a five-year "balloon payment."

86.     The Bank's mortgage business was regularly profitable, and was deemed by the Bank to be one of the best and most prudent ways to invest and make a return on the Bank's deposits.

87.     Unfortunately, due to Title X's lack of meaningful limits on what constitutes an "unfair," "deceptive," or "abusive" practice, combined with the lack of checks and balances guiding and limiting the CFPB's discretion in administering those open-ended grants of power, the Bank could not be reasonably certain that continued lending on these terms would not expose

the Bank to sudden enforcement actions by the CFPB or, at the influence and direction of the CFPB, by the Office of the Comptroller of the Currency.

88.     The overwhelming uncertainty inherent in Title X's open-ended grant of power to the CFPB and the lack of checks and balances limiting the CFPB's exercise of that power has been exemplified and amplified by statements from various officials stressing the breadth of the CFPB's power and the CFPB's intent to define consumer finance law on a case-by-case basis.

89.     For example, on September 17, 2010, President Obama announced the appointment of Elizabeth Warren as his "Special Advisor to the Secretary of the Treasury on the Consumer Financial Protection Bureau" (*i.e.*, the initial organizer and leader of the CFPB, prior to the appointment of a CFPB Director); in making that announcement, President Obama asserted that the CFPB would "crack down on the abusive practice of unscrupulous mortgage lenders," and that "[b]asically, the Consumer Financial Protection Bureau will be a watchdog for the American consumer, charged with enforcing the toughest financial protections in history."

90.     Similarly, on the very day after the President's announcement of his appointment, CFPB Director Cordray gave a press conference at a think-tank in Washington, D.C., announcing that "[o]ur team is taking complaints about credit cards and mortgages, with other products to be added as we move forward," and that to act upon "outrageous" stories from mortgage borrowers and other named and unnamed members of the public "is exactly what the consumer bureau is here to do."

91.     Similarly, in a March 14, 2012 address Director Cordray reiterated that the CFPB would continue to "address the origination of mortgages, including loan originator compensation and the origination of high-priced mortgages."

92.     In each of these statements, and others, CFPB Director Cordray and other CFPB officials have validated and reinforced responsible lenders' reasonable fears that Title X empowers the CFPB to aggressively interpret its open-ended statutory mandate to retroactively punish good-faith consumer lending practices—which the CFPB can do because of the lack of checks and balances limiting the agency's discretion.

93.     These and other statements justify the Bank's reasonable, good-faith concerns about the threat of liability established by the CFPB on a case-by-case, *ex post facto* basis.

94.     Accordingly, in light of Title X's grant of effectively unlimited power to the CFPB, the Bank ceased its consumer mortgage lending operations on or about October 2010, and it continues to decline to re-enter the market for offering consumer mortgages, including mortgages with "balloon payments," as well as "character loans"—loans based not only on quantitative estimates of the borrower's ability to pay and the resale value of collateral property but also the borrower's known credibility and character—in light of the risks and uncertainty imposed by CFPB's unlimited powers and lack of checks and balances.

95.     To re-enter the mortgage market would entail not just the aforementioned assumption of risk by the Bank, given the uncertain nature of CFPB enforcement and investigation under Title X, as well as the CFPB's ability directly and indirectly to influence the examinations and enforcement activities of the Office of the Comptroller of the Currency, but also the burdens of substantially increased compliance costs, as State National Bank of Big Spring—a small community bank—would be forced to constantly monitor and predict the CFPB's regulatory priorities and legal interpretations.

96.     Furthermore, the Bank would be required to comply with the extensive mortgage disclosure rules the CFPB is poised to adopt.  The CFPB recently promulgated a set of proposed

rules on mortgage disclosures. *See* Integrated Mortgage Disclosures under the Real Estate

Settlement Procedures Act (Regulation X) and the Truth In Lending Act (Regulation Z), 77 Fed.

Reg. 51,116 (Aug. 23, 2012).

### *The CFPB's Other Substantive Powers*

97.      In addition to the CFPB's open-ended power to define and prosecute what it

deems to be "unfair," "deceptive," or "abusive" practices, the CFPB also is empowered under

Title X to enforce myriad pre-existing statutes, and to "supervise" certain classes of banks.

The CFPB's Authority To Administer Pre-Existing Statutes

98.      The Act commits to the CFPB's jurisdiction myriad pre-existing "Federal

consumer financial laws" heretofore administered by other executive or independent agencies.

99.      Specifically, the Act authorizes the CFPB to "regulate the offering and provision

of consumer financial products or services under the Federal consumer financial laws," including

the power to promulgate rules "necessary or appropriate to enable the [CFPB] to administer and

carry out the purposes and objectives of the Federal consumer financial laws, and to prevent

evasions thereof." Sec. 1011(a), 1022(b)(1).

100.      According to Section 1002(12) & (14) of the Act, the "Federal consumer financial

laws" include: the Alternative Mortgage Transaction Parity Act, of 1982, 12 U.S.C. § 3801 *et

seq.*; the Consumer Leasing Act of 1976, 15 U.S.C. § 1667, *et seq.*; the Electronic Fund Transfer

Act, 15 U.S.C. § 1693 *et seq.* (except with respect to section 920); the Equal Credit Opportunity

Act, 15 U.S.C. § 1691 *et seq.*; the Fair Credit Billing Act, 15 U.S.C. § 1666 *et seq.*; the Fair

Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* (except with respect to sections 615(e) and 628);

the Home Owners Protection Act of 1998, 12 U.S.C. § 4901 *et seq.*; the Fair Debt Collections

Practices Act, 15 U.S.C. § 1692 *et seq.*; subsections (b) through (f) of section 43 of the Federal

Deposit Insurance Act, 12 U.S.C. § 1831t(c)-(f); sections 502 through 509 of the Gramm-Leach-Bliley Act, 15 U.S.C. § 6802-6809 (except section 505 as it applies to section 501(b)); the Home Mortgage Disclosure Act of 1975, 12 U.S.C. § 2801 *et seq*; the Homeownership and Equity Protection Act of 1994, 15 U.S.C. § 1601; the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. § 2601 *et seq.*; the S.A.F.E. Mortgage Licensing Act of 2008, 12 U.S.C. § 5101 *et seq.*; the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*; the Truth in Savings Act, 12 U.S.C. § 4301 *et seq.*; section 626 of the Omnibus Appropriations Act, 2009 (Public Law 111-8); the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701; and several laws for which authority of enforcement is transferred to the CFPB, and rules or orders prescribed by the CFPB under its statutory authority.

101.    Accordingly, the Dodd-Frank Act transfers to the CFPB authority over aspects of consumer financial products and services previously exercised by a range of other federal agencies—including the FRB, the Office of the Comptroller of the Currency, the Office of Thrift Supervision, the FDIC, the Federal Trade Commission, the National Credit Union Administration, and the Department of Housing and Urban Development.

102.    The CFPB's interpretation of these existing statutes has already caused injury to State National Bank of Big Spring.  On February 7, 2012, the CFPB published in the *Federal Register* its Final Rule with respect to international remittance transfers, pursuant to which the Bank's customers in the United States could send money to family members overseas.  *See* Electronic Fund Transfers, 77 Fed. Reg. 6194 (Feb. 7, 2012) (to be codified at 12 C.F.R. pt. 1005).  The Final Rule imposed substantial new disclosure and compliance requirements on the Bank, which increase the cost of providing these services to the Bank's customers to an unsustainable level.  On May 23, 2012, the Bank's Board of Directors instituted a policy to cease

28

providing these remittance transfer services to its consumers because of the increased costs arising out of the CFPB's Final Rule.

103.    The CFPB thus asserted and exercised authority to regulate the Bank's international wire transfers.

The CFPB's Supervisory Authority

104.    Section 1024 of the Dodd-Frank Act vests the CFPB with exclusive authority to prescribe rules, issue guidance, conduct examinations, require reports or issue exemptions with respect to covered non-depository institutions under the Federal consumer financial laws.  Sec. 1024(d).

105.    Section 1025 vests the CFPB with exclusive authority to require reports and conduct periodic examinations of insured depository institutions or credit unions with total assets of more than $10 billion and any affiliate thereof or service provider thereto.  Sec. 1025(b), (d). Likewise, the Act vests the CFPB with primary authority to enforce Federal consumer financial laws with respect to insured depository institutions or credit unions with total assets of more than $10 billion and any affiliate thereof or service provider thereto.  Sec. 1025(c).

106.    The Dodd-Frank Act grants the FRB authority to delegate to the CFPB its authority to examine persons subject to the jurisdiction of the FRB for compliance with Federal consumer financial laws.  Sec. 1012(c)(1).  Once the FRB has delegated examination authority to the CFPB, the FRB may not intervene in any matter or proceeding before the Director, including examinations or enforcement actions, or appoint, direct, or remove any officer or employee of the CFPB, including the Director.  *Id*.

107.    Title X also gives the CFPB the authority to supervise an entity that: (1) offers or provides origination, brokerage, or servicing of consumer loans secured by real estate: (2) is a

"larger participant of a market for other consumer financial products or services;" (3) the CFPB determines after notice to the entity and opportunity for response may be engaging in conduct that poses risks to consumers with regard to the provision of consumer financial products or services; (4) offers to any consumer a private education loan; or (5) offers to a consumer a payday loan.  Sec. 1024(a)(1).

### Title X Grants The CFPB Aggressive Investigation And Enforcement Powers

108.    Subtitle E of Title X of the Dodd-Frank Act sets forth the CFPB's enforcement authority.  Section 1052 authorizes the CFPB to engage in investigations, to issue subpoenas for the attendance and testimony of witnesses and production of documents and materials, to issue civil investigative demands, and to commence judicial proceedings to compel compliance with those demands.

109.    Section 1053 of the Dodd-Frank Act authorizes the CFPB to conduct hearings and adjudicative proceedings to ensure or enforce compliance with the Act, any rules promulgated thereunder, or any other Federal law the CFPB is authorized to enforce.

110.    Subject to limitations described in other provisions of Title X, Section 1054 authorizes the CFPB to commence a civil action against any person whom it deems to have violated a Federal consumer financial law, and to seek all legal and equitable relief, including a permanent or temporary injunction, as permitted by law.

### The Dodd-Frank Act Eliminates The Checks And Balances That Could Otherwise Limit The CFPB's Exercise of Those Broad, Undefined Powers

111.    As noted above, in addition to granting the CFPB effectively unlimited rulemaking, enforcement, and supervisory powers over "unfair," "deceptive," or "abusive" lending practices, Title X of the Dodd-Frank Act also eliminates the Constitution's fundamental checks and balances that would ordinarily limit or channel the agency's use of that power.

Those checks and balances are necessary to prevent the CFPB from expansively and aggressively interpreting its open-ended mandate; the absence of those checks and balances, combined with the open-ended grant of power, constitutes a violation of the separation of powers.

112.   First, Congress has no "power of the purse" over the CFPB, because the Act authorizes the CFPB to fund itself by unilaterally claiming funds from the FRB.

113.   Specifically, the Director of the CFPB, who cannot be removed at the pleasure of the President, determines for himself the amount of funding the CFPB receives from the FRB; then the FRB must transfer those funds to the CFPB.  Sec. 1017(a)(1).

114.   The Act authorizes the CFPB to claim an increasing percentage of the Federal Reserve System's 2009 operating expenses, beginning in fiscal year 2011 at up to 10 percent of those expenses, and reaching up to 12 percent in fiscal year 2013 and thereafter.  This amount will be adjusted for inflation.  Sec. 1017(a)(2)(B).

115.   Because the Federal Reserve System's 2009 operating expenses were $4,980,000,000, the CFPB Director will be empowered to unilaterally requisition up to $597,600,000 in 2013 and thereafter, adjusted for inflation.  *See* Board of Governors of the Federal Reserve System, 96th Annual Report 491 (2009), *available at* http://www.federalreserve.gov/boarddocs/rptcongress/annual09/pdf/ar09.pdf; *see also* CFPB, FY 2013 Budget Justification 7 (2012), *available at* http://files.consumerfinance.gov/f/2012/02/budget-justification.pdf.

116.   In other words, the CFPB's automatic budget authority is nearly double the Federal Trade Commission's entire budget request to Congress for fiscal year 2013 (*i.e.*, $300

million).  *See* FTC, Fiscal Year 2013 Congressional Budget Justification (2012), *available at* http://www.ftc.gov/ftc/oed/fmo/2013_CBJ.pdf.

117.    In addition to allowing the CFPB to fund itself, Title X goes so far as to explicitly *prohibit* the House and Senate Appropriations Committees from even attempting to "review" the CFPB's self-funded budget.  Sec. 1017(a)(2)(C).

118.    Second, in addition to the Act's elimination of Congress's "power of the purse," the Act also insulates the CFPB Director from presidential oversight.

119.    Specifically, once the CFPB Director is appointed by the President with the advice and consent of the Senate, Sec. 1011(b)(1)-(2), he receives a five-year term in office and may be removed by the President only for "inefficiency, neglect of duty, or malfeasance in office."  Sec. 1011(c)(2), (3).

120.    The absence of this check is particularly significant because all of the powers of the Bureau are vested solely in the CFPB Director, without the moderating influence of other commissioners, officials, or governors on the decisions of the CFPB, as is the case with other administrative agencies that are vested with quasi-legislative and quasi-judicial powers.

121.    The judicial branch's oversight power is also reduced, because the Dodd-Frank Act requires the courts to grant the same deference to the CFPB's interpretation of Federal consumer financial laws that they would "if the Bureau were the only agency authorized to apply, enforce, interpret, or administer the provisions of such Federal consumer financial law." Sec. 1022(b)(4)(B).

122.    The CFPB's regulatory authority is further insulated from accountability to the very agency in which it is housed.  Section 1012(c) provides that no rule or order promulgated by

the CFPB shall be subject to approval or review by the FRB, and that the FRB shall not delay or prevent the issuance of any rule or order promulgated by the CFPB.

123.    In sum, Title X eliminates the fundamental checks and balances that would ordinarily serve to limit the CFPB's expansive interpretation of its open-ended statutory mandate against State National Bank of Big Spring and other responsible lenders.  This violates the Constitution's separation of powers.

## RICHARD CORDRAY'S APPOINTMENT AS CFPB DIRECTOR

124.    The Private Plaintiffs allege as follows, with respect to the appointment of CFPB Director Richard Cordray:

125.    Richard Cordray was appointed CFPB Director without the Senate's advice and consent, and without a Senate recess.

126.    Specifically, on January 4, 2012, President Obama announced that he was using his "recess appointment" power to appoint Richard Cordray as the Director of the CFPB, an unconstitutional act that circumvented one of the only few remaining (and minimal) checks on the CFPB's formation and operation.

127.    The appointment of Mr. Cordray is unconstitutional because the Senate was not in "recess," as required to give effect to the President's power to make recess appointments.  This is so for at least three reasons:

128.    First, the Constitution gives the Senate the exclusive power to determine its rules, and the Senate declared itself to be in session;

129.    Second, the House of Representatives had not consented to a Senate adjournment of longer than three days, as it must to effect a recess;

33

130.    And third, the Senate passed significant economic policy legislation during the session that the executive branch alleged to be a recess.

131.    The Constitution gives the Senate the sole authority to declare when it is, and is not, in session, subject only to House consent. The Constitution expressly vests in each House of Congress the exclusive power to "determine the rules of its Proceedings." U.S. Const. art. I, § 5, cl. 2.

132.    As Senator Ron Wyden stated on the floor of the Senate on December 17, 2011, the Senate agreed by unanimous consent to continue its 111th Session from December 20, 2011 through January 3, 2012; and to begin its 112th Session on January 3, as required by Section 2 of the Twentieth Amendment to the United States Constitution, and continue that session at least through January 23, 2012.  157 Cong. Rec. S8783-8784 (Dec. 17, 2011).

133.    These sessions were substantive.  For example, during these sessions Congress passed a major piece of economic policy legislation, perhaps President Obama's most significant legislative priority of the fall of 2011, the Temporary Payroll Tax Cut Continuation Act of 2011, by unanimous consent. *See* 157 Cong. Rec. S8789 (Dec. 23, 2011) (Sen. Reid).  The President signed the bill into law the next day.  This decision to continue in session, rather than recess, was necessary to discharge the Senate's obligations under both the Twentieth Amendment and Article I, Section 5, Clause 4 of the Constitution, which prohibits one House of Congress from adjourning for more than three days without the consent of the other. The House of Representatives had not consented to adjournment.

134.    The President's attempt to "recess"-appoint CFPB Director Cordray in this context was unprecedented and unconstitutional.

## THE FINANCIAL STABILITY OVERSIGHT COUNCIL

135.     The Private Plaintiffs allege as follows, with respect to the FSOC:

136.     Title I of the Dodd-Frank Act establishes the FSOC, an interagency "council" with sweeping power and effectively unbridled discretion.

### *The Organization of FSOC*

137.     The FSOC is a 15-member body with broad executive powers.  The FSOC is chaired by the Secretary of the Treasury.  Its other nine voting members, under Section 111(b)(1), are:

- the Chairman of the Securities & Exchange Commission;

- the Chairman of the Commodities Futures Trading Commission;

- the Chairman of the FRB;

- the Chairman of the FDIC;

- the Comptroller of the Currency;

- the Director of the CFPB;

- the Director of the Federal Housing Finance Agency;

- the Chairman of the National Credit Union Administration Board; and

- an independent member appointed by the President having "insurance expertise."

138.     In addition to the ten voting members, the FSOC also has five nonvoting members: the Director of the Office of Financial Research (a newly created office within the Department of the Treasury); the Director of the Federal Insurance Office; a state insurance commissioner; a state banking supervisor; and a state securities commissioner.

139.     Of the non-voting members, no member of the Executive Branch of the federal government has a role in appointing the three state officials to the FSOC; rather, the state

officials are to be "designated" for two-year terms "by a selection process determined by the State insurance commissioners," "State banking supervisors," or "State securities commissioners," respectively.  Sec. 111(b)(2), 111(c)(1).

140.    Non-voting members of the FSOC cannot be excluded from any of the proceedings, meetings, discussions, or deliberations of the FSOC unless necessary to protect confidential supervisory information submitted by financial institutions to regulatory agencies. Sec. 111(b)(3).

### The FSOC Has Effectively Unlimited Discretion To Pick Which Nonbank Financial Companies Are "Systemically Important"

141.    By a two-thirds vote of the FSOC's voting members (with the affirmative vote of the Treasury Secretary), the FSOC may determine that a "U.S. nonbank financial company" could, if in distress, "pose a threat to the financial stability of the United States."  Sec. 113(a).

142.    As the FSOC (like countless commentators and analysts) recognizes, those determinations by the FSOC announce, in substance, that the designated nonbank financial companies "are, or are likely to become, *systemically important*."  *See* 76 Fed. Reg. 64,264, 64,267 (Oct. 18, 2011) (emphasis added).

143.    By designating a nonbank financial company as "systemically important," the FSOC subjects the company to the possibility of heightened federal oversight.  *See* Sec. 115. But the designation also confers a substantial competitive advantage upon the selected company—and it imposes concomitant competitive disadvantage upon the company's competitors.

144.    Specifically, financial companies that receive a "systemic importance" designation will be seen by the investing public as less risky (because they are seen as having the

implicit backing of the government), and therefore those companies will be able to attract capital—in terms of both debt and equity investment—at an artificially low rate.

145.    The benefits awaiting FSOC-designated systemically important financial institutions ("SIFIs") are well documented in economic literature.  Banks perceived by the public as "systemically important" (or, "too big to fail") enjoy a substantial advantage over their competitors in terms of their respective cost-of-capital.  *See*, *e.g.*, David A. Price, "Sifting for SIFIs," Region Focus, Federal Reserve Bank of Richmond (2011), *available at* www.richmondfed.org/publications/research/region_focus/2011/q2/pdf/federal_reserve.pdf; Joseph Noss & Rhiannon Sowerbutts, *The Implicit Subsidy of Banks* 6 (Bank of England Financial Stability Paper No. 15, May 2012), *available at* http://www.bankofengland.co.uk/publications/Documents/fsr/fs_paper15.pdf.

146.    Furthermore, this dynamic was illustrated by Defendant Bernanke in a March 2010 speech.  Noting that "one of the greatest threats to the diversity and efficiency of our financial system is the pernicious problem of financial institutions that are deemed 'too big to fail,'" he warned that "if a firm is publicly perceived as too big, or interconnected, or systemically critical for the authorities to permit its failure, its creditors and counterparties have less incentive to evaluate the quality of the firm's business model, its management, and its risk-taking behavior.  As a result, such firms face limited market discipline, allowing them to obtain funding on better terms than the quality or riskiness of their business would merit and giving them incentives to take on excessive risks."

147.    Finally, Bernanke added that "[h]aving institutions that are too big to fail also creates competitive inequities that may prevent our most productive and innovative firms from prospering."

148.    The FSOC's power to formally designate nonbank SIFIs will do for nonbanks what unofficial SIFI status long has done for unofficial SIFIs: give them a direct cost-of-capital subsidy not enjoyed by the other companies competing for scarce, fungible capital—such as Plaintiff State National Bank of Big Spring.  Indeed, formal SIFI designations promulgated by the FSOC will enhance any direct cost-of-capital subsidy previously enjoyed by institutions considered by some in capital markets to enjoy unofficial SIFI status, by removing uncertainty as to the government's views on their SIFI status, and will extend this direct cost-of-capital subsidy to institutions not previously considered by those in capital markets to enjoy unofficial SIFI status.

149.    Accordingly, Plaintiff State National Bank of Big Spring is injured by the FSOC's official designation of "systemically important" nonbank financial companies, because each additional designation will require the Bank to compete with yet another financial company—*i.e.*, a newly designated nonbank financial company—that is able to attract scarce, fungible investment capital at artificially low cost.

150.    By former Treasury Secretary and Defendant Geithner's own admission, the FSOC's nonbank SIFI designations are imminent: On February 2, 2012, Secretary Geithner announced that, "[t]his year, the Council will make the first of these designations."

151.    Despite all of the consequences riding upon the FSOC's determination, the Dodd-Frank Act gives the FSOC unlimited discretion in making those determinations.

152.    After listing several broad standards for the FSOC to consider in making its determinations (*e.g.*, that the company's "scope, size, scale, concentration, interconnectedness, or mix of activities . . . could pose a threat to the financial stability of the United States," Sec. 113(a)(1)), Title I opens the door to unlimited other considerations by authorizing the FSOC to

38

consider "any other risk-related factors that [the FSOC] deems appropriate" in subjecting a company to this stringent oversight.  Sec. 113(a)(2)(K).

153.    Accordingly, the nominal standards prescribed by Title I of the Dodd-Frank Act impose no limits on the FSOC's designation of nonbank financial companies as "systemically important."

### The FSOC's Determinations Are Not Subject To Meaningful Judicial Review

154.    Because the FSOC has open-ended discretion to designate nonbank financial companies as systemically important, it is all the more important that the courts be available to review the FSOC's conclusions and analysis.  But instead, Title I closes the courthouse doors to those who object to the FSOC's legal interpretations.

155.    Specifically, a party designated by the FSOC as systemically important may appeal to federal district court, but its appeal is limited to the question of whether the FSOC's determination is "arbitrary and capricious."  Sec. 113(h).  Whereas courts are normally permitted to review administrative agency decisions to determine whether they are "in accordance with law," *cf.* 5 U.S.C. 706(2)(A), Section 113 eliminates this important judicial review criterion.

156.    And even more importantly, Title I provides *no* right of judicial review for a third party—*i.e.*, State National Bank of Big Spring, or other market participants—to challenge the FSOC's systemic-importance designation of another company, even if the FSOC designation puts that third-party at a competitive disadvantage in terms of relative cost-of-capital.

157.    Accordingly, even though the FSOC's determinations that certain nonbank financial companies are systemically important will place Plaintiff State National Bank of Big Spring at yet further competitive disadvantage, Title I denies it the right to challenge any aspect of the nonbanks' FSOC designation.

## ORDERLY LIQUIDATION AUTHORITY

158.    Title II of the Dodd-Frank Act empowers the Treasury Secretary and the FDIC to entirely liquidate a financial company and to pick and choose favorites among creditors in the liquidation process.

159.    Upon a two-thirds vote of the FRB and the FDIC Board, these two agencies may recommend to the Secretary of the Treasury that the Secretary initiate a process through which a financial company is entered into FDIC receivership and ultimately liquidated.

160.    The Secretary may initiate the Orderly Liquidation Authority if he finds:

(1)  the financial company is "*in default* or *in danger of default*";

(2)  the company's failure and resolution would "have *serious adverse effects* on *financial stability* in the United States";

(3)  "no *viable* private sector alternative is *available* to prevent the default of" the company;

(4)  the effects of this action on the interests of creditors, counterparties, and shareholders are "*appropriate*" given the impact any action taken under the Act would have on financial stability in the United States;

(5)  action taken under Title II would avoid or mitigate adverse effects on creditors;

(6)  a Federal regulatory agency has ordered the financial company to convert all of its convertible debt instruments that are subject to regulatory order; and

(7)  the company is a financial company as defined in § 201 of the Act.

Sec. 203(b) (emphasis added).

161.     These standards offer no meaningful or enforceable limits or direction.  None of the italicized terms in the previous paragraph is defined in the Dodd-Frank Act.

162.     The Treasury Secretary can liquidate a financial company under Title II even if the company was not previously designated by the FSOC as "systemically important."  *See* Sec. 201(a)(11)(A) (defining "financial company" for purposes of Sec. 203(b) liquidation determination).

163.     While Title II speaks of "orderly liquidation," the FDIC's powers and discretion are vastly broader than simply winding down the company:

164.     First, the FDIC may merge the company with another company, or sell substantially all of the company's assets, "without obtaining any approval, assignment, or consent[.]"  Sec. 210(a)(1)(G).

165.     Second, the FDIC can also transfer assets and claims to a "bridge financial company" owned and controlled by the FDIC, with virtually unlimited discretion.  Sec. 210(h)(1)(A).

166.     Third, the FDIC is permitted to repudiate any contract it views as "burdensome." Sec. 210(c)(1).

167.     Finally, the FDIC is given blanket authority to "take any action" it chooses to treat similarly-situated creditors differently, if the FDIC determines that disparate treatment is necessary to "initiate and continue operations essential to implementation of the receivership or any bridge financial company," to maximize the value of the  liquidated company's assets, to "maximize the present value return from the sale or other disposition of the assets of the covered financial company," or to "minimize the amount of any loss realized upon the sale or other disposition of" the liquidated company's assets.  Sec. 210(b)(4).

41

168.     As such, the Orderly Liquidation Authority involves the "adjustment of a [potentially] failing debtor's obligations," "includes the power to discharge the debtor from his contracts and legal liabilities," and governs the relations between a potentially insolvent debtor and his creditors.  *Ry. Labor Executives' Ass'n v. Gibbons*, 455 U.S. 457, 466 (1982) (internal quotation marks omitted).  Title II thus constitutes an exercise of Congress's power under the Bankruptcy Clause.

169.     Each of the plaintiff States has invested in, and is a creditor of, either directly or through the State's pension fund(s), financial companies that are subject to resolution under the Orderly Liquidation Authority.  *See* Exhibits A-K.

170.     On its face, Section 210(b)(4) of the Act abrogates the rights under the U.S. Bankruptcy Code of creditors of institutions that could be liquidated, destroying a valuable property right held by creditors—including the State Plaintiffs—under bankruptcy law, contract law, and other laws, prior to the Dodd-Frank Act.  Section 210(b)(4) exposes those creditors to the risk that their credit holdings could be arbitrarily and discriminatorily extinguished in a Title II liquidation, and without notice or input.  Title II's destruction of a property right held by each of the State Plaintiffs harms each State, and is itself a significant, judicially cognizable injury that would be remedied by a judicial order declaring Title II unconstitutional.

171.     In addition to destroying the State Plaintiffs' valuable property rights, Title II exposes the State Plaintiffs to a present and ongoing substantial risk of direct economic harm, in the event of the Treasury Secretary's and FDIC's liquidation of a financial company for which a State Plaintiff is a creditor.  Such a liquidation can happen at any time, and would happen without advance warning; indeed, the State Plaintiffs would be barred, as a matter of law, from being told of the liquidation until after the Treasury Secretary's liquidation order goes into effect.

Thus, the State Plaintiffs would not have any adequate opportunity to raise a constitutional challenge to protect their interests in the event an orderly liquidation occurred.

172.    For creditors who, like the State Plaintiffs, invest in the debt of multiple financial institutions, the Dodd-Frank Act's elimination of creditor rights is all the more injurious, as it multiplies the risk that a creditor will realize actual financial loss in a liquidation under Title X: Even assuming *arguendo* that there is a relatively low risk that any single financial company will someday be liquidated, States invested in the debt of many financial companies face the aggregate risk that any one of those companies could be liquidated.

### *Judicial Review of The Treasury Secretary's Liquidation Decision Is Subject to Draconian Limits*

173.    Despite Title II's grant of vast authority to the Treasury Secretary, Title II severely limits judicial oversight of the Secretary's exercise of his powers under the Orderly Liquidation Authority.

174.    When the targeted company refuses to acquiesce to the Treasury Secretary's determination that the company shall be liquidated under Title II, the Treasury Secretary enforces his decision by petitioning the U.S. District Court for the District of Columbia for an order affirming his decision.

175.    This judicial review is subject to draconian limitations that render it little more than a rubber stamp:

176.    First, upon the filing of the petition by the Treasury Secretary, the District Court must conduct a hearing and issue a final decision on the merits "within *24 hours* of receipt of the petition."  Sec. 202(a)(1)(A)(v) (emphasis added).

177.    Second, the hearing must be conducted "[o]n a strictly confidential basis, and without any prior public disclosure," depriving the public (including creditors) of the

transparency of the judicial system and the ability to participate in the limited judicial process provided for in Title II.  Sec. 202(a)(1)(A)(iii).

178.    Third, Title II of the Dodd-Frank Act severely limits the *scope* of judicial review available.  The District Court deciding the Treasury Secretary's Title II liquidation petition may review only the Secretary's findings that (1) the company is a "financial company" and (2) the company "is in default or in danger of default."  Sec. 202(a)(1)(A)(iii).  The Court is accordingly *prohibited* from reviewing five of the seven factors upon which the lawfulness of the Secretary's decision turns.  A company subject to the Secretary's Title II liquidation decision has no right to mount any challenge to the Secretary's determination that its default would "have serious adverse effects on financial stability in the United States," that "no viable private sector alternative is available to prevent the default of" the company; or that the effects of the Secretary's decision on the interests of creditors, counterparties, and shareholders are "appropriate."  *See* Sec. 203(b).  Thus, a company challenging the Secretary of the Treasury's decision cannot argue that the Secretary's decision violated or misinterpreted the law.

179.    Fourth, with respect to the only two determinations that the District Court may review, the Court is limited to considering whether the Secretary's decision was arbitrary and capricious.  Sec. 202(a)(1)(A)(iii).

180.    Fifth, if the District Court fails to overturn the Secretary's decision within the limited 24-hour period provided for in the Act, the Secretary's petition is "granted by operation of law."  Sec. 202(a)(1)(A)(v).

181.    Sixth, appellate review is limited.  The U.S. Court of Appeals for the District of Columbia Circuit is confined to the same narrow arbitrary and capricious review that binds the District Court's review of the Secretary's liquidation decision.

182.    Seventh, the company to be liquidated may not secure a stay of the Secretary's decision, or the FDIC's receivership activities, while the appeal is pending. It is entirely possible, perhaps even likely, that the FDIC will complete liquidation of the company, thereby mooting the appellate court's review, before the D.C. Circuit can reach a decision on the merits. Sec. 202(a)(1)(B).

183.    Furthermore, the draconian limits on a liquidated company's right of judicial review pale in comparison to the limits imposed on the *creditors'* right to judicial-review: creditors enjoy *no* right to judicial review of the Treasury Secretary's liquidation determination under Title II.

184.    Indeed, Local Civil Rule 85 of the U.S. District Court for the District of Columbia, promulgated for the specific purpose of governing judicial review of Title II liquidation determinations, makes *no* allowance for participation by third parties in contested Title II proceedings; rather, the District Court will adjudicate the matter "on a confidential basis and without public disclosure" as prescribed by the Dodd-Frank Act. Local Civ. R. 85(g).

185.    Because a Title II proceeding is subject to mandatory secrecy, Sec. 202(a)(1)(A)(iii), creditors will not know of a contested liquidation determination until the 24-hour district court proceedings are complete.

186.    And because a company may simply choose to accept the Treasury Secretary's Title II liquidation determination—indeed, a company may in fact *request* liquidation—that company's creditors will have *no* opportunity to contest a "friendly" liquidation, even if that liquidation subjects the creditor to the immediate risk of financial loss.

187.    Accordingly, as creditors, the States of Alabama, Georgia, Kansas, Michigan, Montana, Nebraska, Ohio, Oklahoma, South Carolina, Texas, and West Virginia would have no

45

right or opportunity to intervene in the 24-hour district court review of a Treasury Secretary's

contested liquidation determination, nor any right or opportunity to file their own judicial

challenges to a liquidation.

188.    Moreover, Title II eliminates the remedy ordinarily available to persons whose

property rights are confiscated by the Government—*i.e.*, the Tucker Act, 28 U.S.C. § 1491. Title

II caps the possible compensation available to aggrieved parties at artificially low levels.  Sec.

210(d)-(e).

189.    In sum, by authorizing the Treasury Secretary to order the liquidation of a

company not in default, yet requiring the courts to calculate compensation in light of a purely

hypothetical default scenario, Title II presents a substantial likelihood that the aggrieved

creditors' ultimate cash recovery will not be "the full and perfect equivalent in money of the

property taken," *Blanchette v. Conn. Gen. Ins. Corp.*, 419 U.S. 102, 150 (1973) (quotation

omitted), but rather a cash recovery "close to zero,"  Douglas G. Baird & Edward R. Morrison,

*Dodd-Frank for Bankruptcy Lawyers*, 19 Am. Bankr. Inst. L. Rev. 287, 316 (2011).

### Orderly Liquidation Is Not Subject To Congress's "Power of the Purse"

190.    The Dodd-Frank Act establishes an "Orderly Liquidation Fund" ("OLF") to fund

the FDIC's operations as receiver—including orderly liquidation of covered financial companies,

payment of administrative expenses, and the payment of principal and interest by the FDIC on

debt it issues to cover shortfalls.  Sec. 210(n).

191.    Once the Treasury Secretary has designated a company for FDIC receivership, the

FDIC funds its support and management of the company through the OLF.  Sec. 210(n).

192.    The Dodd-Frank Act insulates the Orderly Liquidation Authority from the

appropriations process by providing that "[a]ll funds expended in the liquidation of a financial

company under this title shall be recovered from the disposition of assets of such financial company," or shall be recouped via assessments on other financial companies.  Sec. 212(b).

193.    The Dodd-Frank Act contemplates that if the assets of a company being liquidated are insufficient to cover the costs of the company's liquidation, the FDIC can incur debt obligations, which it would later repay through assessments on the financial-services industry. Specifically, the FDIC is authorized to borrow money from the Treasury, but must repay that amount by levying "assessments" on the company's creditors, and, if necessary, bank holding companies and nonbank financial companies designated by the FSOC as systemically risky.  Sec. 210(n), (o).  Neither the issuance of debt nor the levy of assessment requires Congressional approval.  Sec. 210(o).

194.    By funding the Orderly Liquidation Authority outside of the normal appropriations process, the Dodd-Frank Act limits legislative oversight of the liquidation authority.

## COUNT I
### (Violation of the Separation of Powers – Title X)

195.    The Private Plaintiffs reallege and incorporate by reference the allegations contained in all of the preceding paragraphs.

196.    The Constitution provides that all "legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."  U.S. Const. art. I, § 1.

197.    The Constitution further provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law…"  U.S. Const. art. I, § 9.

198.    Furthermore, the Constitution provides that the "executive Power shall be vested in a President," U.S. Const. art. II, § 1, and that "he shall take Care that the Laws be faithfully

executed," U.S. Const. art. II, § 3.  Those provisions vest all executive power, including the power to enforce the law, in the President of the United States.

199.    By delegating effectively unlimited power to the CFPB, by eliminating Congress's own "power of the purse" over the CFPB, by eliminating the President's power to remove the CFPB Director at will, and by limiting the courts' judicial review of the CFPB's actions and legal interpretations, Title X of the Dodd-Frank Act violates the Constitution's separation of powers.

200.    Neither Congress nor the President can negate those structural constitutional requirements by signing or enacting (and thereby acceding to) Title X.  "Perhaps an individual President"—or Congress—"might find advantages in tying his own hands," the Supreme Court recently noted, "[b]ut the separation of powers does not depend on the views of individual Presidents"—or particular Congresses.  *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3155 (2010).  The Constitution's separation of powers does not depend "on whether 'the encroached-upon branch approves the encroachment.'"  *Id.* (quoting *New York v. United States*, 505 U.S. 144, 182 (1992)).

201.    Neither the President nor Congress may "choose to bind [their] successors by diminishing their powers, nor can [they] escape responsibility for [their] choices by pretending that they are not [their] own."  *Id.*

202.    "The diffusion of power" away from Congress and the President, to the independent CFPB, "carries with it a diffusion of accountability.  . . .  Without a clear and effective chain of command, the public cannot 'determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall."  *Id.* (quoting The Federalist No. 70, p. 476 (J. Cooke ed. 1961) (A. Hamilton).

203.    While the Supreme Court has approved the constitutionality of certain removals of checks or balances in *isolation—e.g.*, a limit on the President's power to remove certain officers—the Court has never held that it is constitutional to remove all of the checks and balances that Title X removes, *and* to combine that lack of checks and balances with the open-ended statutory powers that Title X provides the CFPB—thereby effectively granting unlimited discretion to the agency.

204.    And so while the Supreme Court has "previously upheld limited restrictions on" individual checks and balances, the CFPB's "novel structure does not merely add to the [CFPB's] independence, but transforms it." *Free Enter. Fund*, 130 S. Ct. at 3154.

205.    Accordingly, Title X's delegation of unlimited power to the CFPB, together with the Title X's elimination of the necessary checks and balances upon the CFPB's exercise of that power, is unconstitutional, must be declared unconstitutional, and must be enjoined.

206.    Because the Bank is directly subject to the CFPB's authority, Title X's violation of the separation of powers creates a "here-and-now" injury entitling the Bank to judicial review to ensure that the standards to which it is subject "will be enforced only by a constitutional agency accountable to the Executive." *Free Enter. Fund*, 130 S. Ct. at 3164 (quoting *Bowsher v. Synar*, 478 U.S. 714, 727 n.5 (1986)).

## COUNT II
### (Appointments Clause - CFPB)

207.    The Private Plaintiffs reallege and incorporate by reference the allegations contained in all of the preceding paragraphs.

208.    President Obama's appointment of Defendant Cordray as director of the CFPB violates the Appointments Clause of the Constitution.  The Constitution provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint

Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose appointments are not herein otherwise provided for." U.S. Const. art. II, § 2, cl. 2.

209.    The CFPB possesses significant powers over the market for consumer financial products and services and participants in that market including (but not limited to) issuing rules, orders and guidance implementing federal consumer financial law and supervising covered persons for compliance with federal consumer financial law.  The CFPB Director is authorized to employ personnel as may be deemed necessary to carry out the business of the CFPB.  It is the Director of the CFPB who has ultimate authority to exercise any power vested in the CFPB under law, and the Director may delegate such authority to any duly authorized employee, representative, or agent.  The CFPB Director is an Officer of the United States and, indeed, a principal Officer of the United States.

210.    The Constitution expressly vests in each House of Congress the exclusive power to "determine the rules of its Proceedings." U.S. Const. art. I, § 5, cl. 2.

211.    As discussed above, on December 17, 2011, the Senate voted by unanimous consent to remain in session during the period between December 20, 2011 and January 23, 2012.  The Senate's schedule provided for a series of sessions, and the *Congressional Record* indicates that those sessions actually occurred.  *See* 153 Cong. Rec. S1 (Jan. 3, 2012), S3 (Jan. 6, 2012), S5 (Jan. 10, 2012), S7 (Jan. 13, 2012), S9 (Jan. 17, 2012), S11 (Jan. 20, 2012).

212.    During these sessions, Congress passed the Temporary Payroll Tax Cut Continuation Act of 2011 on December 23, 2011.  President Obama signed that legislation, never protesting that it was invalidly enacted due to a congressional recess.

213.    The Constitution requires that "[n]either House, during the [s]ession of Congress, shall, without the Consent of the other, adjourn for more than three days."  U.S. Const. art. I, § 5, cl. 4.  The House of Representatives never consented to a Senate adjournment of longer than three days, as it must to effect a recess.

214.    Because the Senate, by its own vote, pursuant to its own actions, and based on the inaction of the House of Representatives, was in session when President Obama nominated Mr. Cordray to the position of CFPB Director, and because the President nonetheless did not secure its "advice and consent" for the Cordray nomination, Mr. Cordray's appointment to the CFPB is unconstitutional.

215.    Because the Bank is directly subject to the CFPB Director's authority, the unconstitutional appointment of the CFPB Director creates a "here-and-now" injury entitling the Bank to judicial review to ensure that the standards to which it is subject "will be enforced only by a constitutional agency accountable to the Executive."  *Free Enter. Fund* , 130 S. Ct. at 3164 (quoting *Bowsher*, 478 U.S. at 727 n.5).

## COUNT III
### (Separation of Powers – Title I)

216.    The Private Plaintiffs reallege and incorporate by reference the allegations contained in all of the preceding paragraphs.

217.    The Constitution provides that all "legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."  U.S. Const. art. 1, § 1.

218.    Furthermore, the Constitution provides that the "executive Power shall be vested in a President," U.S. Const. art. II, § 1, and that "he shall take Care that the Laws be faithfully

executed," U.S. Const. art. II, § 3.  Those provisions vest all executive power, including the power to enforce the law, in the President of the United States.

219.    Title I of the Dodd-Frank Act grants the FSOC effectively unlimited power, and eliminates the judiciary's ability to exercise meaningful judicial review of the FSOC's execution of that power—especially in cases where a competitor of the FSOC-designated company seeks to challenge the designation.

220.    In addition to vesting executive power in the President, the Constitution also mandates that he, or the heads of executive departments, "shall appoint" all "Officers of the United States."   U.S. Const. art. II, § 2, cl. 2.  But the FSOC includes non-voting members, such as insurance and banking officials, who are not appointed by the President or anyone in the executive branch, yet participate in its deliberations and proceedings.  *See* Sec. 111(b)(2),(c)(1); ¶¶ 122-124, *supra*.  For all of these reasons, Title I of the Dodd-Frank Act violates the Constitution's separation of powers.

221.    As set forth in ¶¶ 119-141, *supra*, Congress cannot negate those structural constitutional requirements by enacting (and thereby acceding to) Title I.  "The [Constitution's] separation of powers does not depend" on whether "'the encroached-upon branch approves the encroachment.'"  *Free Enter. Fund*, 130 S. Ct. at 3155 (quoting *New York*, 505 U.S. at 182). Congress may not "choose to bind [its] successors by diminishing their powers, nor can [it] escape responsibility for [its] choices by pretending that they are not [its] own." *Id.*

222.    "The diffusion of power" away from Congress, to the independent FSOC, "carries with it a diffusion of accountability.  . . .  Without a clear and effective chain of command, the public cannot 'determine on whom the blame or the punishment of a pernicious measure, or

series of pernicious measures ought really to fall." *Id.* (quoting The Federalist No. 70, p. 476 (J. Cooke ed. 1961) (A. Hamilton)).

223.    Title I's open-ended grant of power and discretion to the FSOC, combined with the elimination of the indispensable check of judicial review on the FSOC's judgments, and the inclusion of members who are neither appointed by the President nor confirmed by the Senate, gives the FSOC unfettered discretion in determining which nonbank financial companies will be designated "systemically important." That structure "does not merely add to the [FSOC's] independence, but transforms it." *Free Enter. Fund*, 130 S. Ct. at 3154.

224.    Accordingly, Title I of the Dodd-Frank Act, violates the Constitution's separation of powers, must be declared unconstitutional, and must be enjoined.

225.    Judicial review is necessary to prevent imminent injury to the Bank, which suffers competitive harm each time the FSOC designates any institution that competes with it for capital as "systemically important."

## COUNT IV
### (Separation of Powers – Title II)

226.    The Private Plaintiffs reallege and incorporate by reference the allegations contained in all of the preceding paragraphs; the State Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶ 4, 9-13, 23-50, and 142-178, with respect to Title II of the Dodd-Frank Act.

227.    The Constitution provides that all "legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const. art. 1, § 1.

228.    The Constitution further provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const., art. I, § 9, cl. 7.

229.     The Constitution also provides that the "executive Power shall be vested in a President," U.S. Const. art. II, § 1, and that "he shall take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3.  Those provisions vest all executive power, including the power to enforce the law, in the President of the United States.

230.     In addition, the Constitution provides that the "judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."  U.S. Const. art. III, § 1.

231.     As set forth above, Title II of the Dodd-Frank Act delegates effectively unlimited power to the Treasury Secretary to determine that a company should be liquidated under the Orderly Liquidation Authority and to the FDIC in carrying out that liquidation.

232.     Furthermore, Title II eliminates all meaningful checks upon and balances against the power granted to the Treasury Secretary and the FDIC.  Congress wields no power of the purse over Title II proceedings, and the President cannot terminate the FDIC's proceedings.

233.     In addition, judicial review of the Treasury Secretary's determinations either is subject to draconian limitations (in the case of the 24-hour proceedings available for a company contesting its own liquidation) or is prohibited altogether (with respect to five of the seven factors on which the lawfulness of the Secretary's action turns and in the case of a creditor seeking to intervene in a contested liquidation determination or to protest a "friendly" liquidation).

234.     With respect to the creditors of liquidated companies, Title II not only prohibits judicial review of the Treasury Secretary's liquidation determination; it also restricts judicial review of the FDIC's compensation determination.

235.     Accordingly, Title II's delegation of authority to the Treasury Secretary and FDIC, with the accompanying elimination of checks and balances, violates the Constitution's separation of powers.

236.     As set forth in ¶¶ 142-178, *supra*, Congress cannot negate those structural constitutional requirements by enacting (and thereby acceding to) Title II.  The Constitution's separation of powers does not depend "on whether 'the encroached-upon branch approves the encroachment.'"  *Free Enter. Fund*, 130 S. Ct. at 3155.

237.     Congress may not "choose to bind [its] successors by diminishing their powers, nor can [they] escape responsibility for [its] choices by pretending that they are not [its] own." *Id.*

238.     "The diffusion of power" away from Congress, to the Treasury Secretary and independent FDIC, "carries with it a diffusion of accountability. . . .  Without a clear and effective chain of command, the public cannot 'determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall."  *Id.* (quoting The Federalist No. 70, p. 476 (J. Cooke ed. 1961) (A. Hamilton).

239.     While the Supreme Court may have approved the constitutionality of any single removal of a check or balance in isolation—*e.g.*, a limit on the Congress's power of the purse— the Court has never approved all of Title II's delegations, and eliminations of checks and balances, in a single law.  In particular, the Supreme Court has never sustained the constitutionality of a statute that prohibits any meaningful judicial review of the Government's action in the manner of Title II of the Dodd-Frank Act.  Title II's combinations of delegations, and eliminations of checks and balances, is unprecedented and unconstitutional.  *Cf. Free Enter. Fund*, 130 S. Ct. at 3153 ("we have previously upheld limited restrictions on the President's

removal power.  In those cases, however, only one level of protected tenure separated the President from an officer exercising executive power.  . . .  This novel structure does not merely add to the Board's independence, but transforms it.")

240.    Accordingly, Title II's delegation of unlimited power to the Treasury Secretary and FDIC, with the elimination of meaningful judicial review of the execution of that power, violates the separation of powers, must be declared unconstitutional, and must be enjoined.

241.    Judicial review is necessary to restore the rights of the State Plaintiffs and other creditors that previously existed under bankruptcy law and other laws but that were nullified by Title II.

242.    Review is also necessary to prevent the States from suffering sudden financial losses in liquidation for which they would not receive prior notice.

243.    The State Plaintiffs are entitled to "special solicitude" with respect to their standing to challenge Title II's nullification of their rights.  *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007).

## COUNT V
### (Due Process – Title II)

244.    The Private Plaintiffs reallege and incorporate by reference the allegations contained in all of the preceding paragraphs; the State Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶ 4, 9-13, 23-50, 142-178, and 210-227, with respect to Title II of the Dodd-Frank Act.

245.    As set forth above, Title II of the Dodd-Frank Act delegates effectively unlimited power to the Treasury Secretary to determine that a company should be liquidated under the Orderly Liquidation Authority, and to the FDIC to choose favorites among similarly situated creditors in carrying out that liquidation.

246.    In addition, judicial review of the Treasury Secretary's determinations either is subject to draconian limitations (in the case of the 24-hour proceedings available for a company contesting its own liquidation) or is prohibited altogether (with respect to five of the seven factors on which the lawfulness of the Secretary's action turns and in the case of a creditor seeking to intervene in a contested liquidation determination or to protest a "friendly" liquidation).

247.    With respect to the creditors of liquidated companies, Title II not only prohibits judicial review of the Treasury Secretary's liquidation determination; it also restricts judicial review of the FDIC's compensation determination.

248.    Title II thus fails to provide both companies facing liquidation and their creditors, all of whom are likely to have their property taken during the course of a liquidation, the "notice and a meaningful opportunity to be heard" that is the "core of due process." *LaChance v. Erickson*, 522 U.S. 262, 266 (1998).

249.    Accordingly, Title II's delegation of unlimited power to the Treasury Secretary and FDIC, without meaningful judicial review of the execution of that power, violates the Due Process Clause, must be declared unconstitutional, and must be enjoined.

## COUNT VI
### (Bankruptcy Uniformity – Title II)

250.    The Private Plaintiffs reallege and incorporate by reference the allegations contained in all of the preceding paragraphs; the State Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶ 4, 9-13, 23-50, 142-178, and 210-232, with respect to Title II of the Dodd-Frank Act.

251.    As set forth above, Title II of the Dodd-Frank Act delegates effectively unlimited power to the Treasury Secretary to determine that a company should be liquidated under the

Orderly Liquidation Authority, and to the FDIC to choose favorites among similarly situated creditors in carrying out that liquidation.  Title II constitutes an exercise of Congress's power under the Bankruptcy Clause.

252.    Furthermore, Title II eliminates all meaningful checks upon and balances against the Treasury Secretary's determinations and the FDIC's actions.  Congress wields no power of the purse over Title II proceedings; the President cannot terminate the FDIC's proceedings.  In addition, judicial review of the Treasury Secretary's determinations either is subject to draconian limitations (in the case of the 24-hour proceedings available for a company contesting its own liquidation) or is prohibited altogether (with respect to five of the seven factors on which the lawfulness of the Secretary's action turns and in the case of a creditor seeking to intervene in a contested liquidation determination or to protest a "friendly" liquidation).

253.    Title II thus authorizes the Treasury Secretary and the FDIC to craft from whole cloth a new regime for liquidating each company subjected to the Orderly Liquidation Authority. Title II empowers the executive to decide not only whether a company will be subjected to that authority in the first instance but also which creditors will be favored among others in the liquidation process, and it provides for no meaningful limits on, or review of, the executive's exercise of discretion in either regard.  The "orderly liquidation" authority thereby allows similarly situated creditors to be treated completely differently based on the whim of the executive, without any advance warning or meaningful constraints.

254.    With respect to the creditors of liquidated companies, Title II not only prohibits judicial review of the Treasury Secretary's liquidation determination; it also restricts judicial review of the FDIC's compensation determination.

255.     Title II's delegation of unlimited power to the Treasury Secretary and the FDIC, without meaningful judicial review of the execution of that power, constitutes a non-uniform law of bankruptcy that must be declared unconstitutional and must be enjoined.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for the following relief:

256.     The Private Plaintiffs pray for an order and judgment declaring unconstitutional the provisions of the Act creating and empowering the CFPB, and enjoining Defendants Cordray and the CFPB from exercising any powers delegated to them by Title X of the Act;

257.     The Private Plaintiffs pray for an order and judgment declaring unconstitutional Richard Cordray's appointment as CFPB director, and enjoining Cordray from carrying out any of the powers delegated to the office of CFPB Director by the Act;

258.     The Private Plaintiffs pray for an order and judgment declaring unconstitutional the provisions of the Act creating and empowering the FSOC, and enjoining Defendants from exercising any powers delegated to them by Title I of the Act;

259.     Plaintiffs pray for an order and judgment declaring unconstitutional the provisions of the Act creating and empowering the Orderly Liquidation Authority, and enjoining Defendants from exercising any powers delegated to them by Title II of the Act;

260.     Plaintiffs pray for costs and attorneys' fees pursuant to any applicable statute or authority; and

261.     Plaintiffs pray for any other relief this Court deems just and appropriate, to remedy the Plaintiffs' respective claims.

Dated: February 13, 2013                    Respectfully submitted,

                                            s/Gregory Jacob_____
                                            Gregory Jacob (D.C. Bar 474639)
                                            O'MELVENY & MYERS LLP
                                            1625 I St. NW
                                            Washington, DC  20006
                                            (202) 383-5110
                                            (202) 383-5413 (fax)
                                            gjacob@omm.com

                                            C. Boyden Gray (D.C. Bar 122663)
                                            Adam J. White (D.C. Bar 502007)
                                            BOYDEN GRAY & ASSOCIATES P.L.L.C.
                                            1627 I St. NW, Suite 950
                                            Washington, DC  20006
                                            (202) 955-0620
                                            (202) 955-0621 (fax)
                                            adam@boydengrayassociates.com

                                            *Counsel for Plaintiffs State National Bank
                                            of Big Spring, the 60-Plus Association,
                                            Inc., and the Competitive Enterprise
                                            Institute*

                                            s/Luther Strange_____
                                            Luther Strange
                                            Attorney General of Alabama
                                            Office of the Attorney General
                                            501 Washington Avenue
                                            Montgomery, AL 36130
                                            (334) 242-7300
                                            (334) 353-8440 (fax)

                                            *Counsel for Plaintiff the State of Alabama*

                                            s/Samuel S. Olens_____
                                            Samuel S. Olens
                                            Attorney General of Georgia
                                            Georgia Department of Law
                                            40 Capitol Square SW
                                            Atlanta, GA 30334
                                            (404) 656-3300
                                            (404) 463-1519 (fax)

*Counsel for Plaintiff the State of Georgia*

s/Derek Schmidt_____
Derek Schmidt
Attorney General of Kansas
Office of the Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, KS 66612
(785) 296-2215
(785) 291-3767 (fax)

*Counsel for Plaintiff the State of Kansas*

s/Bill Schuette_____
Bill Schuette
Attorney General of Michigan
G. Mennen Williams Building, 7th Floor
525 W. Ottawa St.
P.O. Box 30212
Lansing, MI 48909
(517) 373-1110
(517) 373-3042 (fax)
miag@michigan.gov

*Plaintiff on Behalf of the People of Michigan*

s/Timothy C. Fox_____
Timothy C. Fox
Attorney General of Montana
Office of the Attorney General
Department of Justice
215 North Sanders
P.O. Box 201401
Helena, MT 59620
(406) 444-2026
(406) 444-3549 (fax)

*Counsel for Plaintiff the State of Montana*

s/ Jon C. Bruning_____
Jon C. Bruning
Attorney General of Nebraska
Office of the Attorney General
2115 State Capitol

P.O. Box 98920
Lincoln, NE 68509
(402) 471-2683
(402) 471-3297 (fax)

***Counsel for Plaintiff the State of Nebraska***

s/Michael DeWine
Michael DeWine
Attorney General of Ohio
Office of the Attorney General
30 East Broad Street, 14th Floor
Columbus, OH 43215
(614) 728-4948
(866) 452-0269 (fax)

***Counsel for Plaintiff the State of Ohio***

s/E. Scott Pruitt
E. Scott Pruitt
Attorney General of Oklahoma
Office of the Attorney General
313 NE 21st Street
Oklahoma City, OK 73105
(405) 521-3921
(405) 522-0669 (fax)
scott.pruitt@oag.ok.gov

***Counsel for Plaintiff the State of
Oklahoma***

s/Alan Wilson
Alan Wilson
Attorney General of South Carolina
Rembert Dennis Building
1000 Assembly Street, Room 519
Columbia, SC 29201
(803) 734-3970
(803) 734-4323 (fax)
AGAlanWilson@SCAG.gov

***Counsel for Plaintiff the State of South
Carolina***

s/Greg Abbott

Greg Abbott
Attorney General of Texas
Office of the Attorney General
300 W. 15th Street
Austin, TX 78701
(512) 936-1342
(512) 936-0545 (fax)

*Counsel for Plaintiff the State of Texas*

s/ Patrick Morrisey
Patrick Morrisey
Attorney General of West Virginia
State Capitol Complex
Building 1 Room 26-E
Charleston, WV 25305
(304) 558-2021
(304) 558-0140 (fax)

*Counsel for Plaintiff the State of West Virginia*

Sam Kazman (D.C. Bar 946376)
Hans Bader (D.C. Bar. 466545)
COMPETITIVE ENTERPRISE INSTITUTE
1899 L St. NW, Floor 12
Washington, DC  20036
(202) 331-1010
(202) 331-0640 (fax)
skazman@cei.org

*Co-counsel for Plaintiff Competitive Enterprise Institute*