## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE NATIONAL BANK OF BIG SPRING, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) Case No. 1:12-cv-01032 (ESH) |
| NEIL S. WOLIN, in his official capacity as Acting United States Secretary of the Treasury and *ex officio* Chairman of the Financial Stability Oversight Council 1500 Pennsylvania Avenue, NW Washington, DC 20220, *et al.*, | ) ) Judge: Hon. Ellen S. Huvelle ) ) ) ) ) |
| Defendants. | ) ) |

### PRIVATE PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1)

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................... 1

STATUTORY AND REGULATORY BACKGROUND........................................... 2

    A.    TITLE X: THE CFPB ...................................................................3

        1.    Pre-Existing Federal Law .............................................3

        2.    The "UDAAP" Authority ...............................................3

        3.    Lack of Oversight and Accountability...........................5

    B.    TITLE I:  THE FSOC ...................................................................6

PROCEDURAL HISTORY........................................................................................ 7

    A.    STATE NATIONAL BANK ........................................................7

        1.    The CFPB.......................................................................7

        2.    The FSOC .......................................................................9

    B.    THE COMPETITIVE ENTERPRISE INSTITUTE AND 60 PLUS ASSOCIATION ...............................................................10

STANDARD OF REVIEW ...................................................................................... 10

ARGUMENT ............................................................................................................ 11

    I.    THE BANK HAS STANDING TO CHALLENGE THE UNCONSTITUTIONAL FORMATION AND OPERATION OF THE BUREAU ...............................................................................12

    A.    The Bank Is Injured by Compliance Costs that Have Increased as a Result of the Bureau's Acts ......................................................12

    B.    The Bank Is Also Injured by the Bureau's Regulation of Mortgage Foreclosures ...............................................................................14

    C.    The Bank Is Further Injured by the Bureau's Limitations on Remittance Transfers ................................................................16

        1.    The Bank Is Subject to the Remittance Rule ................16

        2.    The Complaint Challenges All Instances of the CFPB's Formation and Operation, Including the Remittance Rule ...........17

i

# TABLE OF CONTENTS

Page

        3.     Even if the Bank's Constitutional Challenge Were Limited to the UDAAP Authority, the Bank Would Have Standing ..........19

   D.    The Bank Is Injured by the Bureau's UDAAP Authority..........................20

        1.     The CFPB's UDAAP Authority Has Already Caused the Bank Financial Loss and Continues to Affect its Present Economic Behavior.......................................................20

        2.     The Bank's Injuries Are Neither Self-Inflicted Nor Speculative.............................................................23

        3.     The Additional Authority Conferred Upon the OCC Does Not Negate SNB's Standing ......................................25

            i.     SNB's Injury Is Fairly Traceable to the CFPB ................25

            ii.    Section 1818(i)(1) Does Not Apply Here ..........................29

   E.    The Bank Has Standing Because It Is Directly Regulated by the CFPB .......................................................................30

II.    THE BANK HAS STANDING TO CHALLENGE THE UNCONSTITUTIONAL APPOINTMENT OF MR. CORDRAY ......................31

III.   PLAINTIFFS CEI AND 60 PLUS ASSOCIATION HAVE STANDING TO CHALLENGE THE BUREAU ......................................................34

IV.   THE BANK HAS STANDING TO CHALLENGE THE UNCONSTITUTIONAL OPERATION OF THE FSOC...................................35

   A.    An FSOC Designation Benefits SNB's Competitors and Injures SNB.......................................................................36

   B.    SNB's Injury from SIFI Designation Is Fairly Traceable to the FSOC.......................................................................37

   C.    Plaintiffs Have Standing Irrespective of Any Alleged Net Benefit to SIFIs.....................................................................38

V.    THE QUESTIONS PRESENTED ARE RIPE FOR REVIEW............................39

CONCLUSION..................................................................................40

## <u>CASES</u>

*Abbott Laboratories v. Gardner,*
  387 U.S. 136 (1967)........................................................................................ 39

*Action for Children's Television v. FCC,*
  59 F.3d 1249 (D.C. Cir. 1995)........................................................................ 40

*Akins v. FEC,*
  101 F.3d 731 (D.C. Cir. 1997)........................................................................ 14

*Already, LLC v. Nike, Inc.,*
  133 S. Ct. 721 (2013)...................................................................................... 14

*Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius,*
  --- F. Supp. 2d ----, 2012 WL 5353562 (D.D.C. Oct. 31, 2012)................... 34

*Ass'n of Private Sector Colls. & Univs. v. Duncan,*
  681 F.3d 427 (D.C. Cir. 2012)........................................................................ 12

*Baker v. Carr,*
  369 U.S. 186 (1962)........................................................................................ 11

*Bennett v. Spear,*
  520 U.S. 154 (1997)................................................................................ 25, 26

*Bhd. of Locomotive Eng'rs & Trainmen v. Surface Transp. Bd.,*
  457 F.3d 24 (D.C. Cir. 2006)........................................................................ 24

\*  *Catholic Soc. Serv. v. Shalala,*
  12 F.3d 1123 (D.C. Cir. 1994)........................................................................ 20

*Cellco P'ship v. FCC,*
  357 F.3d 88 (D.C. Cir. 2004).......................................................................... 13

*Chambers Med. Technologies of S.C., Inc. v. Bryant,*
  52 F.3d 1252 (4th Cir. 1995) ........................................................................ 13

*City of Jersey City v. Cons. Rail Corp.,*
  668 F.3d 741 (D.C. Cir. 2012)........................................................................ 11

*City of Lakewood v. Plain Dealer Publ'g Co.,*
  486 U.S. 750 (1988)........................................................................................ 19

*Clapper v. Amnesty International USA,*
  No. 11-1025 (S. Ct. Feb. 26, 2013)............................................................ 2, 38

*Clinton v. City of New York,*
  524 U.S. 417 (1998).................................................................................... 2, 38

\* *Comm. for Monetary Reform v. Bd. of Governors of the Fed. Reserve Sys.*,
766 F.2d 538 (D.C. Cir. 1985) ................................................................. 15, 31, 32

*Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*,
901 F.2d 107 (D.C. Cir. 1990) ........................................................................ 38

*Constellation Energy Commodities Grp., Inc. v. FERC*,
457 F.3d 14 (D.C. Cir. 2006) ..................................................................... 2, 39

*D.E.K. Energy Co. v. FERC*,
248 F.3d 1192 (D.C. Cir. 2001) ...................................................................... 37

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) ......................................................................................... 14

*Del Monte Fresh Produce Co. v. United States*,
570 F.3d 316 (D.C. Cir. 2009) ....................................................................... 16

*Energy Action Educ. Found. v. Andrus*,
654 F.2d 735 (D.C. Cir. 1980) ....................................................................... 35

*Evans v. Stephens*,
387 F.3d 1220 (11th Cir. 2004) ..................................................................... 31

*FEC v. Akins*,
524 U.S. 11 (1998) ........................................................................................... 31

\* *FEC v. NRA Political Victory Fund*,
6 F.3d 821 (D.C. Cir. 1993) ................................................................. 2, 32, 36

*Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.*,
493 U.S. 331 (1990) ......................................................................................... 11

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.*,
130 S. Ct. 3108 (2010) ........................................................................ 30, 32, 33

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*,
528 U.S. 167 (2000) ......................................................................................... 29

*Great Lakes Gas Transmission Ltd. P'ship v. FERC*,
984 F.2d 426 (D.C. Cir. 1993) ....................................................................... 25

*Grocery Mfrs. Ass'n v. EPA*,
693 F.3d 169 (D.C. Cir. 2012) ................................................................. 11, 24

*Haase v. Sessions*,
835 F.2d 902 (D.C. Cir. 1987) ....................................................................... 39

iv

*Inv. Co. Inst. v. CFTC*,
    --- F. Supp. 2d ----, 2012 WL 6185735 (D.D.C. Dec. 12, 2012) .......................................... 13

*Jones v. Gale*,
    405 F. Supp. 2d 1066 (D. Neb. 2005) ................................................................................... 35

*KERM, Inc. v. FCC*,
    353 F.3d 57 (D.C. Cir. 2004) ................................................................................................ 37

*La. Energy & Power Auth. v. FERC*,
    141 F.3d 364 (D.C. Cir. 1998) .............................................................................................. 36

*LaRoque v. Holder*,
    650 F.3d 777 (D.C. Cir. 2011) ........................................................................................ 11, 16

*Lee v. Bd. of Governors of the Fed. Reserve Sys.*,
    118 F.3d 905 (2d Cir. 1997) .................................................................................................. 37

*Local 514 Transport Workers Union of Am. v. Keating*,
    358 F.3d 743 (10th Cir. 2004) ............................................................................................... 20

*Markva v. Haveman*,
    317 F.3d 547 (6th Cir. 2003) ................................................................................................. 39

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ......................................................................................................... 11, 12

*Meese v. Keene*,
    481 U.S. 465 (1987) ............................................................................................................... 36

*Nat'l Family Planning & Reproductive Health Ass'n, Inc. v. Gonzales*,
    486 F.3d 826 (D.C. Cir. 2006) .............................................................................................. 29

*Nat'l Parks Conservation Ass'n v. Manson*,
    414 F.3d 1 (D.C. Cir. 2005) ............................................................................................ 26, 27

*Nat'l Treasury Emps. Union v. United States*,
    101 F.3d 1423 (D.C. Cir. 1996) ............................................................................................ 24

*Navegar, Inc. v. United States*,
    103 F.3d 994 (D.C. Cir. 1997) .............................................................................................. 21

*Neighborhood Assistance Corp. of Am. v. CFPB*,
    --- F. Supp. 2d ----, 2012 WL 5995739 (D.D.C. Dec. 3, 2012) ............................................ 14

*Noel Canning v. NLRB*,
    --- F.3d ----, 2013 WL 276024 (D.C. Cir. Jan. 25, 2013) ................................................. 6, 31

*Ord v. District of Columbia*,
   587 F.3d 1136 (D.C. Cir. 2009) ................................................................. 10, 11, 19

*Pelican Chapter, Associated Builders & Contractors, Inc. v. Edwards*,
   128 F.3d 910 (5th Cir. 1997) ............................................................................... 15

*Raytheon Co. v. Ashborn Agencies, Ltd.*,
   372 F.3d 451 (D.C. Cir. 2004) ...................................................................... 11, 14

*Ridder v. Office of Thrift Supervision*,
   146 F.3d 1035 (D.C. Cir. 1998) .......................................................................... 30

\* *Rio Grande Pipeline Co. v. FERC*,
   178 F.3d 533 (D.C. Cir. 1999) ...................................................................... 22, 39

\* *Sabre, Inc. v. Dep't of Transp.*,
   429 F.3d 1113 (D.C. Cir. 2005) .................................................................... 21, 22

*Seegars v. Gonzales*,
   396 F.3d 1248 (D.C. Cir. 2005) ...................................................................... 2, 21

*Shays v. FEC*,
   414 F.3d 76 (D.C. Cir. 2005) ............................................................................. 36

*Sherley v. Sebelius*,
   610 F.3d 69 (D.C. Cir. 2010) ............................................................................. 36

*Smith v. Pro Football, Inc.*,
   593 F.2d 1173 (D.C. Cir. 1978) ......................................................................... 39

*Sossamon v. Texas*,
   131 S. Ct. 1651 (2011) ....................................................................................... 19

*Spann v. Colonial Vill., Inc.*,
   899 F.2d 24 (D.C. Cir. 1990) ............................................................................. 13

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ........................................................................................... 34

*Toca Producers v. FERC*,
   411 F.3d 262 (D.C. Cir. 2005) ........................................................................... 40

*Town of Barnstable v. FAA*,
   659 F.3d 28 (D.C. Cir. 2011) ............................................................................. 27

\* *Tozzi v. U.S. Dep't of Health & Human Servs.*,
   271 F.3d 301 (D.C. Cir. 2001) .............................................................. 26, 27, 38

*U.S. Telecomms. Ass'n v. FCC*,
   295 F.3d 1326 (D.C. Cir. 2002) ........................................................................ 36

*United States ex rel. Schweizer v. Océ N.V.*,
   677 F.3d 1228 (D.C. Cir. 2012) ........................................................................ 24

*United States v. Woodley*,
   751 F.2d 1008 (9th Cir. 1985) .......................................................................... 31

*Warth v. Seldin*,
   422 U.S. 490 (1975).............................................................................................. 8

*Wheaton Coll. v. Sebelius*,
   -- F. Supp. 2d ----, 2012 WL 3637162 (D.D.C. Aug. 24, 2012)..................... 24, 25

*Whitney v. Guys, Inc.*,
   700 F.3d 1118 (8th Cir. 2012) .......................................................................... 37

*Zivotofsky v. Clinton*,
   132 S. Ct. 1421 (2012)....................................................................................... 31

## STATUTES

12 U.S.C. § 1813 ...................................................................................................... 30

12 U.S.C. § 1818(i)(1) ........................................................................................ 29, 30

12 U.S.C. § 1818p-1 ................................................................................................ 30

12 U.S.C. § 1818o .................................................................................................... 30

12 U.S.C. § 5321 ........................................................................................................ 6

12 U.S.C. § 5323 ........................................................................................................ 6

12 U.S.C. § 5325 ........................................................................................................ 6

12 U.S.C. § 5481 ................................................................................................. 23, 28

12 U.S.C. § 5491 ................................................................................................... 3, 5

12 U.S.C. § 5497 ........................................................................................................ 5

12 U.S.C. § 5511 ...................................................................................................... 28

12 U.S.C. § 5512 ............................................................................................... 3, 5, 27

12 U.S.C. § 5516................................................................................................ 4, 23, 27

12 U.S.C. § 5531 .................................................................................................... 4

12 U.S.C. § 5536 .................................................................................................. 23

12 U.S.C. § 5564 .................................................................................................... 3

12 U.S.C. § 5565 .................................................................................................. 21

12 U.S.C. § 5586 .................................................................................................. 33

15 U.S.C. § 1607 .................................................................................................. 23

15 U.S.C. § 1639c ................................................................................................ 23

15 U.S.C. § 1640 .................................................................................................. 23

15 U.S.C. § 1693 .................................................................................................... 3

Tex. Prop. Code Ann. § 51.002 (West 2012) .................................................... 15

## OTHER AUTHORITIES

Alvin C. Harrell, *Commentary: State Chartered Financial Institutions in the
    1990s—A New Perspective*, 48 Consumer Fin. L.Q. Rep. 2 (1994) ...................................... 35

Complaint for Injunctive Relief and Damages, *CFPB v. Payday Loan Debt
    Solution, Inc.*, No. 12-24410 (S.D. Fla. Dec. 14, 2012)...................................... 4, 23

Dodd-Frank Burden Tracker, financialservices.house.gov,
    http://financialservices.house.gov/uploadedfiles/ dodd-
    frank_pra_spreadsheet_7-9-2012.pdf (last visited Feb. 11, 2013) ......................................... 8

Fitch Ratings, Press Release, *CFPB Overdraft Inquiry Keeps Pressure on U.S.
    Banks* (Apr. 24, 2012)......................................... 34

John Carney*, Surprise! Dodd-Frank Helps JP Morgan*, CNBC.com (Feb. 4, 2011)
    (http://www.cnbc.com/id/100431660)......................................... 8

Joint Consent Order, Joint Order for Restitution, and Joint Order to Pay Civil
    Money Penalty Complaint for Injunctive Relief and Damages, *In re American
    Express Centurion Bank Salt Lake City, Utah*, No. 2012-CFPB-0002 (Oct. 1,
    2012) ......................................... 4, 23

Joint Response by the Inspectors General of the Department of the Treasury and
    Board of Governors of the Federal Reserve System to Request for Information
    Regarding the Bureau of Consumer Financial Protection from the U.S. House
    of Representatives Financial Services Committee (Jan. 10, 2011)......................................... 33

Letter from Senators Sherrod Brown and David Vitter to Comptroller General
    Gene L. Dodaro (January 1, 2013) ............................................................................ 36

Memorandum of Understanding on Supervisory Coordination (May 16, 2012) ......................... 28

PNC Financial Services Group, *Annual Report for the Fiscal Year Ended
    December 31, 2011* ...................................................................................................... 34

Stipulation and Consent Order, *In re Capital One Bank (USA) N.A.*, No. 2012-
    CFPB-0001 (July 16, 2012) ............................................................................................ 4

Walter Hamilton, *With Interest Rates So Low, What's a Saver to Do?*, Los
    Angeles Times, Sept. 18, 2011 ..................................................................................... 35

Wells Fargo & Company Annual Report 2011 ........................................................................... 34

## RULES

Fed. R. Civ. P. 12(b)(1) ............................................................................................................ 10

## REGULATIONS

76 Fed. Reg. 64,264 (Oct. 18, 2011) .......................................................................................... 6

77 Fed. Reg. 6194 (Feb. 7, 2012) ................................................................................. 3, 16, 32

Ability-to-Repay and Qualified Mortgage Standards Under the Truth in Lending
    Act (Regulation Z), 78 Fed. Reg. 6407 (Jan. 30, 2013) ............................................ 14, 23

Mortgage Servicing Rules under the Real Estate Settlement Procedures Act
    (Regulation X), 78 Fed. Reg. 10696 (Feb. 14, 2013) ..................................................... 15

## INTRODUCTION

Plaintiffs have pled *concrete* and *present* injuries caused by the challenged titles of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("the Act"), which are described at length in the Second Amended Complaint ("SAC" or "Complaint").  The formation and operation of the Consumer Financial Protection Bureau ("CFPB" or "Bureau") has substantially increased Plaintiff State National Bank's ("SNB" or the "Bank") compliance costs, imposed new costs on the management of its outstanding mortgages, and forced it to exit from two profitable lines of business.  The authority of the Financial Stability Oversight Council ("FSOC" or "Council") to designate non-bank financial institutions with which SNB competes for scare capital as "systemically important"—and thus Government-backed—imminently threatens SNB with competitive harm.  And as consumers of services offered by financial institutions that are subject to the Act, the Competitive Enterprise Institute ("CEI" or the "Institute") and the members of the 60 Plus Association have experienced increased service costs and decreased services as a direct result of the regulatory burdens imposed by the Act.  Each of these injuries is cognizable under Article III and independently confers on Plaintiffs standing to bring this suit.[1]

Although the allegations contained in the Complaint make Plaintiffs' standing plain, the Government has manufactured a jurisdictional challenge by mischaracterizing, fabricating, and ignoring Plaintiffs' pleadings and attacking a suit entirely of its own making.  And just as the Government attacks a warped version of the Complaint, it has distorted and disregarded governing case law that disposes of the Government's argument on its own terms.  Binding precedent dictates that the Plaintiffs have standing to sue:

---

[1] This opposition addresses the Private Plaintiffs' claims under Title I and Title X of the Act (the FSOC and the CFPB), and uses 40 of the 70 pages allocated to Plaintiffs.  (Minute Order, Feb. 23, 2013.)  The State Plaintiffs, which are separately represented, are filing their own opposition to the motion to dismiss the Title II claims, using the remaining 30 pages.

1)    to  assert "a present injurious effect on [their] business decisions," *Constellation Energy Commodities Group, Inc. v. FERC*, 457 F.3d 14, 20 (D.C. Cir. 2006) (internal quotation marks omitted);

2)    to "secure review before enforcement so long as the issues are fit for judicial review without further factual development and denial of immediate review would inflict a hardship," *Seegars v. Gonzales*, 396 F.3d 1248, 1253 (D.C. Cir. 2005);

3)    to raise a separation of powers challenge to an agency whenever "they have been directly subject to the authority of the agency," *FEC v. NRA Political Victory Fund*, 6 F.3d 821, 824 (D.C. Cir. 1993) (internal quotation marks omitted); and

4)    to assert "'probable economic injury resulting from [governmental actions] that alter competitive conditions,'" *Clinton v. City of New York*, 524 U.S. 417, 433 (1998) (quoting 3 K. Davis & R. Pierce, *Administrative Law Treatise* 13–14 (3d ed. 1994) (alteration in original)).

Contrary to the Government's claims, this suit does not turn on speculation, but rather focuses on the concrete injuries that have already been inflicted on Plaintiffs by the unchecked and unprecedented powers conferred on defendants by the Dodd-Frank Act.

## STATUTORY AND REGULATORY BACKGROUND

In the Dodd-Frank Act, Congress and the President adopted a set of sweeping financial reforms, fundamentally restructuring the legal framework that governs the Nation's financial institutions, markets, and consumers.  But the elected Branches did not themselves adopt the rules under which those entities and individuals must now do business.  Instead, the Act creates a variety of new federal agencies and bestows on them unparalleled power to regulate the country's financial system, with an unprecedented lack of oversight from the Legislative, Executive, and Judicial Branches.  This lawsuit challenges three separate Titles of the Act, each of which violates the separation of powers demanded by the U.S. Constitution, and also seeks to correct the President's unconstitutional appointment of Mr. Richard Cordray to serve as Director of one of the new agencies created by the Act.

### A.  TITLE X: THE CFPB

Title X of the Dodd-Frank Act establishes the CFPB, a new "Executive agency" that the Act declares to be an "independent bureau" "established in the Federal Reserve System."  12 U.S.C. § 5491(a).  With minimal oversight by any branch of government, the CFPB "regulate[s] the offering and provision of consumer financial products or services under the Federal consumer financial laws," *id.*, by exercising two principal authorities.

#### 1.  Pre-Existing Federal Law

First, the CFPB bears the responsibility (previously held by other agencies) for enforcing many pre-existing federal financial statutes—laws covering everything from mortgages to debt collection to international remittance transfers.  *See* SAC ¶¶ 98-101 (citing statutes); 15 U.S.C. § 1693 (Electronic Funds Transfer Act ("EFTA")).  The Dodd-Frank Act authorizes the Bureau to promulgate any rule it deems "necessary or appropriate to enable the [CFPB] to administer and carry out the purposes and objectives of th[ose] Federal consumer financial laws, and to prevent evasions thereof."  12 U.S.C. § 5512(b)(1).  The Bureau is also authorized to directly enforce those laws, including through civil enforcement actions.  *Id.* § 5564.

The CFPB has already exercised its authority to administer one such law, the EFTA, by promulgating a "Remittance Rule" that imposes substantial disclosure and compliance requirements on institutions wishing to offer international remittance transfers.  77 Fed. Reg. 6194 (Feb. 7, 2012) (to be codified at 12 C.F.R. pt. 1005).  As published, the Rule applied to "any person that provides remittance transfers for a consumer in the normal course of its business," *id.* at 6285, which includes the Bank.  *See* SAC ¶¶ 15, 102.

#### 2.  The "UDAAP" Authority

Second, the Dodd-Frank Act authorizes the CFPB to take action, including direct

enforcement action, to prevent a covered provider from engaging in "unfair," "deceptive," or "abusive act[s] or practice[s]"—a power the Government describes as the Bureau's "UDAAP" authority.  12 U.S.C. § 5531(a); *see* Memorandum in Support of Defts' Motion to Dismiss the Amended Complaint ("Mem.") at 2.  As part of this authority, the CFPB may require depository institutions like the Bank to provide the Bureau reports concerning the institution's activities and services.  12 U.S.C. § 5516(b).  In addition, "[t]he Bureau may, at its discretion, include [its own] examiners on a sampling basis" on examinations performed by an institution's prudential regulator—in the case of SNB, the Office of the Comptroller of the Currency ("OCC")—"to assess compliance with the requirements of Federal consumer financial law."  *Id.* § 5516(c)(1).  The CFPB is also required to refer to prudential regulators reports of any activity the Bureau deems to be "a material violation of a Federal consumer financial law" and "recommend appropriate action to respond."  *Id.* § 5516(d)(2)(A).  The prudential regulator is required to "provide a written response to the Bureau not later than 60 days thereafter."  *Id.* § 5516(d)(2)(B).

The CFPB has already taken actions to enforce its UDAAP authority.  For example, after concluding that Capital One Bank (U.S.A.), N.A. engaged in deceptive practices, the Bureau secured a consent order under which Capital One is required to refund approximately $140 million to customers and to pay an additional $25 million penalty.  *See* Stipulation and Consent Order, *In re Capital One Bank (USA) N.A.*, No. 2012-CFPB-0001 (July 16, 2012).[2]

In addition, Bureau officials, including Mr. Cordray, have advised financial institutions that "complaints about … mortgages" will be an enforcement priority—particularly "the

---

[2] The Bureau has charged other companies with UDAAP violations, as well.  *See, e.g.*, Joint Consent Order, Joint Order for Restitution, and Joint Order to Pay Civil Money Penalty Complaint for Injunctive Relief and Damages, *In re American Express Centurion Bank Salt Lake City, Utah*, No. 2012-CFPB-0002 (Oct. 1, 2012) ("American Express Order"); Complaint for Injunctive Relief and Damages, *CFPB v. Payday Loan Debt Solution, Inc.*, No. 12-24410 (S.D. Fla. Dec. 14, 2012) ("*Payday Loan* Complaint").

origination of high-priced mortgages." SAC ¶¶ 89-91. Mr. Cordray has further stated that the Bureau will not define in advance what "abusive" mortgage lending practices are, but rather will apply an *ad hoc* "facts and circumstances" test as "situations may arise," providing financial institutions such as SNB no advance notice as to what conduct may later be deemed by the Bureau to be unlawful and subject to enforcement action. SAC ¶ 75.

### 3. Lack of Oversight and Accountability

In addition to granting unparalleled powers, the Dodd-Frank Act strips Congress, the President, and the Judiciary of the power to oversee the Bureau's activities. Congress retains no "power of the purse" control over the CFPB: the Act authorizes the Bureau's Director to determine for himself the amount of funding the agency should receive, up to 12 percent of the Federal Reserve Board's operating expenses. 12 U.S.C. § 5497(a)(1)-(2). The President also lacks the power to oversee the Bureau; the Act allows him to remove the Director only for "inefficiency, neglect of duty, or malfeasance in office." *Id.* § 5491(c)(2), (3). The Judiciary, too, is required to accord unusual deference to the CFPB's interpretation of Federal consumer financial laws, treating the Bureau as if it "were the only agency authorized to apply, enforce, interpret, or administer the provisions of such" law. *Id.* § 5512(b)(4)(B). Finally, there are no internal constraints within the CFPB. All of the powers of the Bureau are vested solely in a single Director, without the moderating influence of other commissioners or officials as are present in other agencies vested with quasi-legislative and quasi-judicial powers. SAC ¶ 120.

Thus, the Dodd-Frank Act grants the CFPB virtually unbounded power without any meaningful accountability to the elected branches or judicial scrutiny. And to make matters worse, the President took it upon himself to entirely bypass the one check Congress retained over the Bureau—the constitutional right and duty of the Senate to advise and consent to the Bureau

director's appointment.  On January 4, 2012, President Obama announced that he was using his

"recess appointment" power to appoint Mr. Cordray Director of the CFPB, despite the fact that

the Senate was not in recess.  *See* SAC ¶¶ 124-134; *Noel Canning v. NLRB*, --- F.3d ----, 2013

WL 276024, at *16 (D.C. Cir. Jan. 25, 2013) (holding constitutionally infirm other appointments

the President made on January 4, 2012 to NLRB because Senate was not in recess).

###### B.  TITLE I:  THE FSOC

Title I of the Dodd-Frank Act establishes the FSOC, an interagency "council" with broad

executive powers.  The Council is comprised of ten voting members appointed by the Executive

Branch and five nonvoting members "designated" for two-year terms by a selection process

determined by State officials.  12 U.S.C. § 5321.  By a two-thirds vote of the voting members,

the Council may determine that a nonbank financial company—generally, a financial institution

that provides banking services but does not hold a banking license or take deposits—presents a

"threat to the financial stability of the United States," *id.* § 5323, which in effect labels the

company as "systemically important."  76 Fed. Reg. 64,264, 64,267 (Oct. 18, 2011).  Companies

determined to be systemically important financial institutions (known as "SIFIs") may be subject

to additional federal oversight, *see* 12 U.S.C. § 5325, but also receive a competitive advantage

over non-SIFI financial institutions, such as SNB, because they are seen by the public and public

markets as backed by the Government and thus a less risky investment.  *See* SAC ¶ 142-149.

Despite the serious consequences of a SIFI designation, the Dodd-Frank Act gives the FSOC

virtually unlimited discretion in deciding what companies should be declared SIFIs, by allowing

it to consider any "risk-related factors that [the Council] deems appropriate" (in addition to other

enumerated factors) when making SIFI designations.  12 U.S.C. § 5323(a)(2)(K).  Furthermore,

the Act insulates SIFI designations from meaningful judicial review—indeed, from all judicial

review brought by third parties injured by an FSOC designation.  SAC ¶¶ 8, 154-157.

## PROCEDURAL HISTORY

The Bank, CEI, and the 60 Plus Association filed the initial Complaint in this case on June 21, 2012.  *See* Compl. for Decl. & Inj. Relief.  The original Complaint challenged as unconstitutional: (1) the formation and operation of the CFPB (Compl. ¶ 1); (2) the appointment of Bureau Director Cordray without the Senate's advice and consent, when the Senate was not in recess (Compl. ¶ 2); and (3) the creation and operation of the FSOC (Compl. ¶ 3).  The initial Complaint alleged that each of these actions and aspects of the Dodd-Frank Act violates the separation of powers mandated by the Constitution.

On September 20, 2012, the States of Michigan, Oklahoma, and South Carolina joined the original Plaintiffs in filing a First Amended Complaint.  In addition to asserting the three original constitutional challenges (which the States did not join), all six Plaintiffs in that Complaint challenged "the unconstitutional creation and operation" of the Orderly Liquidation Authority ("OLA") under Title II of the Dodd-Frank Act.  SAC ¶¶ 4, 9-11.  On February 20, 2013, the States of Alabama, Georgia, Kansas, Montana, Nebraska, Ohio, Texas, and West Virginia joined the constitutional challenges to the OLA in a Second Amended Complaint.

Throughout the Complaint, the Plaintiffs alleged several concrete ways in which they had been injured as a result of the constitutional violations alleged:

A.    STATE NATIONAL BANK

1. The CFPB

To begin, SNB averred in the Complaint that the unconstitutional formation and operation of the CFPB, and the illegal appointment of Director Cordray, caused it to suffer three distinct financial injuries.  First, the Bank has been injured by "the burdens of substantially increased compliance costs" caused by the Bureau's vast regulatory and enforcement authority.

SAC ¶ 95.  SNB alleged that, to avoid transgressing whatever the Bureau might next deem

Federal consumer financial law to prohibit, the Bank "would be forced to constantly monitor and

predict the CFPB's regulatory priorities and legal interpretations."  SAC ¶ 95.  And the Bureau

has, in fact, already caused the Bank to incur significant compliance costs.  In the year 2012

alone, the Bank spent over $230,000 on legal compliance, including over $2,500 to send a

representative to "Compliance School" that offered classes on, among other things, CFPB

regulations.  Ex. A, Declaration of Jim R. Purcell ¶ 5-6 ("Ex. A.").[3]  In addition, the Bank

responded to the creation of the CFPB by purchasing a subscription to a new service known as

the "Compliance Alliance" created by the Texas Bankers Association in response to the passage

of the Dodd-Frank Act.  That Service provides notification and counsel regarding new and

proposed regulations, interpretations, and enforcement actions that would affect the Bank's

business, and was specifically marketed to SNB and other banks as necessary to stay up-to-date

with (among other things) the activities of the CFPB.  Id. ¶ 7.  The Bank continues to subscribe

to the service at a cost of $9,900 per year—down from the initial fee of $12,000 per year because

such a large volume of banks saw the need to subscribe.[4]  Id. ¶ 9.  In 2011, the Bank also

subscribed to another compliance service, TriNovus, at a cost of over $2,300.  Id. ¶ 10.

---

[3] *See Warth v. Seldin*, 422 U.S. 490, 501 (1975) (court may, on motion to dismiss for
want of standing, "allow . . . the plaintiff to supply, by amendment to the complaint or by
affidavits, further particularized allegations of fact deemed support of plaintiff's standing").

[4] That the Bank would be forced to incur such costs is hardly surprising: the U.S. House
of Representatives Committee on Financial Services estimates that compliance with the 224 rules
issued pursuant to Dodd-Frank to date will require 24,180,856 man hours every year.  Dodd-
Frank Burden Tracker, financialservices.house.gov, http://financialservices.house.gov/uploaded
files/dodd-frank_pra_ spreadsheet_7-9-2012.pdf.  Such costs are particularly problematic for
small institutions like SNB.  Indeed, the current chairman, president, and chief executive officer
of JPMorgan Chase, one of the largest banks in the country, has referred to the newly imposed
costs as a "moat" that makes it more difficult for smaller institutions to enter the market and
compete with JPMorgan.  *See* John Carney, *Surprise! Dodd-Frank Helps JPMorgan Chase*,
CNBC.com (Feb. 4, 2011) (http://www.cnbc.com/id/100431660).

Next, SNB explained that it had "instituted a policy to cease providing … remittance transfer services" because the CFPB's "promulgation of a Final Rule regulating international remittance transfers" "increase[d] the cost of providing th[o]se services to the Bank's customers to an unsustainable level." SAC ¶¶ 15, 102. As a result of the CFPB's Rule, the Bank lost the profits it previously earned in providing remittance services, lost the competitive benefit of being able to make those services available without restriction to current and prospective customers, and has been required to forego the opportunity to expand that business in the future. Ex. A ¶ 20.

SNB also averred that it has been "injured because Title X requires the Bank to conduct its business, and make decisions about what kinds of business to conduct, without knowing whether the CFPB will retroactively announce that one or more of the Bank's consumer lending practices" is "unfair," "deceptive," or "abusive," and thus subject to enforcement proceedings and penalties under the Act. SAC ¶ 16. In particular, the CFPB's UDAAP authority caused the Bank to cease offering previously profitable consumer mortgages. SAC ¶ 94. SNB explained that prior to the Dodd-Frank Act it offered (1) mortgages that included balloon payments and (2) "character loans"—loans based not only on the borrower's ability to repay but also his known credibility and character. SAC ¶ 94. Given the CFPB's avowed enforcement focus on "the origination of mortgages, including … high-priced mortgages"—which include many mortgages previously offered by SNB (SAC ¶ 94; Ex. A ¶¶ 25, 32)—SNB was forced to "exit the consumer mortgage business" for fear that the Bureau would deem its practices unlawful and have that decision enforced through "*ex post facto* enforcement activities." SAC ¶¶ 16-17, 77, 91.[5]

### 2. The FSOC

Addressing Title I, SNB asserted that it faces imminent competitive injury as a result of

---

[5] As explained below, the Bureau's recent issuance of a rule governing foreclosures also has impacted the Bank's mortgage practices and increased the Bank's costs of doing business.

"the FSOC's official designation of 'systemically important' nonbank financial companies."

SAC ¶ 149.  The Council's designations give named SIFIs "a direct cost-of-capital subsidy not

enjoyed by … other companies," including SNB, which also "compet[e] for scarce, fungible

capital."  SAC ¶ 148.  Thus, "each additional [SIFI] designation will require the Bank to compete

with yet another … newly designated nonbank financial company … able to attract scarce,

fungible investment capital at artificially low cost."  SAC ¶ 149.

### B.  THE COMPETITIVE ENTERPRISE INSTITUTE AND 60 PLUS ASSOCIATION

Plaintiff CEI is a public interest organization that engages in research and advocacy

efforts involving a broad range of legal issues.  SAC ¶ 21.  The Institute alleged that it relies on

the services of banks regulated by the CFPB, including checking accounts at Wells Fargo.  SAC

¶ 22.  "The nature and cost of these accounts are jeopardized by the CFPB's sweeping regulatory

authority over them and over the institutions in which they are based."  SAC ¶ 22.

Plaintiff 60 Plus Association is a seven-million-member, non-profit advocacy group.

One of the Association's "goals is to preserve access to credit and financial products for seniors."

SAC ¶ 18.  As the Complaint explains, "the Dodd-Frank Act harms the members of the 60 Plus

Association in that it has reduced, and will further reduce, the range and affordability of banking,

credit, investment, and savings options available to them."  SAC ¶ 19.  In particular,

"[p]rovisions enforced by the CFPB have reduced the availability of free checking."  SAC ¶ 19.

### STANDARD OF REVIEW

On a motion to dismiss for lack of standing under Rule 12(b)(1), this Court "must accept

as true all material allegations of the complaint, and must construe the complaint in favor of the

complaining party."  *Ord v. District of Columbia*, 587 F.3d 1136, 1140 (D.C. Cir. 2009) (quoting

*Warth v. Seldin*, 422 U.S. 490, 501 (1975)).  The Court "must make all reasonable inferences in

[the Plaintiffs'] favor," *id.* at 1143, "presum[ing] that general allegations [in the complaint] embrace those specific facts that are necessary to support the claim." *LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011) (internal quotation marks omitted).  In addition, the Court must "assume that plaintiffs will prevail on the merits of their claims." *City of Jersey City v. Cons. Rail Corp.*, 668 F.3d 741, 744 (D.C. Cir. 2012).

To proceed with the litigation, the Court need identify only one plaintiff who has standing to assert each claim. *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 175 (D.C. Cir. 2012).

## ARGUMENT

As the Supreme Court has explained, "the gist of the question of standing" is, "at bottom," whether plaintiffs have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness" that "sharpens" the presentation of issues to the Court. *Baker v. Carr*, 369 U.S. 186, 204 (1962); *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007).   To assure such "adverseness," a plaintiff must demonstrate that "it has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury." *Massachusetts*, 549 U.S. at 517 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

In addition, "it does not matter how many persons have been injured by [a] challenged action" so long as the plaintiff has been injured in a concrete and personal way. *Id.* (internal quotation marks omitted).  Even the "threat of relatively small financial injury [is] sufficient to confer Article III standing." *Raytheon Co. v. Ashborn Agencies, Ltd.*, 372 F.3d 451, 454 (D.C. Cir. 2004) (describing holding of *Franchise Tax Bd. of Ca. v. Alcan Aluminum Ltd.*, 493 U.S. 331 (1990)).  And where plaintiffs have already been injured, although the risk of significant future harm they allege may be "remote," if it is "nevertheless real," and "would be reduced to

11

some extent if [plaintiffs] received the relief they seek," then they "have standing to challenge" the Government act contributing to the harm.  *Massachusetts*, 549 U.S. at 526.

As explained below, each of the Plaintiffs' allegations, properly understood, satisfies the requirements for suit.  Indeed, even under the Government's mischaracterization of the allegations of the Complaint, Plaintiffs would still have standing to sue.

## I.    THE BANK HAS STANDING TO CHALLENGE THE UNCONSTITUTIONAL FORMATION AND OPERATION OF THE BUREAU

The Bank has experienced four here-and-now financial injuries directly caused by the unconstitutional formation and operation of the Bureau, each of which independently confers standing.  First, SNB has incurred and will continue to incur substantial compliance costs to ensure it acts consistently with the Bureau's regulations and interpretations of Federal consumer financial law.  Second, the Bureau's new rules governing mortgage foreclosure increase the Bank's costs of doing business with respect to mortgage loans it has already made.  Third, as a result of the Bureau's Remittance Rule, SNB ceased offering profitable remittance transfers and is now strictly limited in its development of this business.  Fourth, the Bank has discontinued a profitable mortgage practice to avoid prosecution pursuant to the Bureau's UDAAP authority.

### A.  The Bank Is Injured by Compliance Costs that Have Increased as a Result of the Bureau's Acts

In the 40-plus pages the Government spends attacking Plaintiffs' standing, it devotes but a footnote to the significant compliance costs the Bank has incurred and will continue to incur as a result of the Bureau's exercise of its authority under Dodd-Frank (SAC ¶ 95).  *See* Mem. 28 n.14.  But the law is clear that plaintiffs "harmed because they will face even greater compliance costs" as a result of agency action have standing to sue.  *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 458 (D.C. Cir. 2012) (internal quotation marks omitted); *accord*, *e.g.*,

*Cellco P'ship v. FCC*, 357 F.3d 88, 100 (D.C. Cir. 2004) ("As an entity continuously burdened

by the costs of complying . . . with what it contends are 'unnecessary' regulations[,] …

[plaintiff's] injuries are concrete and actual"); *Inv. Co. Inst. v. CFTC*, --- F. Supp. 2d ----, No.

12–00612, 2012 WL 6185735, at *16 (D.D.C. Dec. 12, 2012) (finding standing due to "relative

increased [Dodd-Frank] regulatory burden and … associated costs").

 In particular, courts have recognized that plaintiffs have standing to assert injury due to

the "increased time and expense necessary for" an organization "to monitor [an agency's]

activities under new agency regulation."  *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 28 (D.C. Cir.

1990) (describing holding of *Pac. Legal Found. v. Goyan*, 664 F.2d 1221 (4th Cir. 1981)).  In

*Chambers Medical Technologies of South Carolina, Inc. v. Bryant*, for example, the Fourth

Circuit considered whether a company that incinerated waste had standing to challenge a law

prohibiting it from accepting waste from any State that prohibited incineration in that State.  52

F.3d 1252, 1265 (4th Cir. 1995).  The defendant argued that the incinerator lacked standing

because no other State had enacted such a law.  The Court of Appeals held, however, that the

incinerator had standing because it had alleged it would "incur costs in monitoring the laws of

other states so that it may avoid violation of the provision."  *Id.* at 1266.

 Here, too, the CFPB has imposed significant compliance costs on the Bank.  In the year

2012 alone, the Bank spent thousands of dollars to ensure it was aware of and complied with the

hundreds of pages of regulations the Bureau has promulgated, the interpretive positions the

Bureau has taken, and the enforcement actions it has brought.  Ex. A ¶¶ 5-9.  Indeed, given the

CFPB's refusal to define the term "abusive," it is only through such constant monitoring that the

Bank can ensure it does not violate the CFPB's understanding of what the law requires.

Furthermore, in the last six months alone, the CFPB has issued over a thousand pages of

interpretations and rules—including one rule over 800 pages long.  *See* Ability-to-Repay and

Qualified Mortgage Standards Under the Truth in Lending Act (Regulation Z), 78 Fed. Reg.

6407, 6586 (Jan. 30, 2013) ("Regulation Z") (to be codified at 12 C.F.R. § 1026.43(e)(1)),

*available at* http://files.consumerfinance.gov/f/201301_cfpb_final-rule_ability-to-repay.pdf.[6]

The Government's only response to that injury is to discount it as a "generalized

grievance" not cognizable under Article III, supposedly because the Bureau has imposed

compliance costs on other institutions.  Mem. 28 n.14.  But an injury is not "generalized" simply

because it has been inflicted upon a number of parties.  *FEC v. Akins*, 524 U.S. 11, 23-24 (1998).

Rather, that "term … refers to the diffuse and abstract nature of the injury."  *Akins v. FEC*, 101

F.3d 731, 737 (D.C. Cir. 1997), *vacated and remanded on other grounds*, *Akins*, 524 U.S. 11; *see*

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344 (2006).  It is hard to see how the over

$10,000 in costs absorbed by SNB could be deemed either diffuse or abstract; the costs are a

significant, concrete burden directly attributable to the Bureau.  And even if the costs were

instead minimal, the "threat of relatively small financial injury [is] sufficient to confer Article III

standing."  *Raytheon*, 372 F.3d at 454; *accord Neighborhood Assistance Corp. of Am. v. CFPB*, -

-- F. Supp. 2d ----, No. 11–cv–1312, 2012 WL 5995739, at *5 (D.D.C. Dec. 3, 2012).

**B.  The Bank Is Also Injured by the Bureau's Regulation of Mortgage Foreclosures**

The Bank also has standing because it is subject to and injured by the Bureau's

promulgation of a new rule governing mortgage foreclosures that increases the Bank's costs of

---

[6] This case therefore bears no resemblance to *Clapper v. Amnesty International USA*, No.
11-1025 (S. Ct. Feb. 26, 2013), where the expenditures on which the plaintiffs' claim to standing
was based were made to address a "hypothetical future harm."  Slip Op., at 2.  Here, the CFPB
has already issued several regulations that directly govern the services the Bank currently offers,
such as international remittance transfers and mortgage servicing, and the Bank must keep up
with these and other CFPB interpretations, rules, and enforcement actions to ensure that it does
not violate Federal consumer financial law.  *See infra* 15-17.

doing business.  *See* Mortgage Servicing Rules under the Real Estate Settlement Procedures Act (Regulation X) 78 Fed. Reg. 10696, 10885 (Feb. 14, 2012).  Although the Bank no longer initiates new consumer mortgage loans, it still holds loans from previous years that have yet to be fully satisfied.  Ex. A ¶ 36.  Under the Bureau's new rule, a small servicer such as the Bank "shall not make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process unless a borrower's mortgage loan obligation is more than 120 days delinquent."  78 Fed. Reg. at 10885 (to be codified at 12 C.F.R. §1024.41(j)).  Under previously-applicable law, the Bank could initiate foreclosure sale proceedings on a defaulted loan if the borrower did not cure within 20 days of a letter notifying him of the delinquency.  After the 20 days expired, the Bank could post a foreclosure notice at the courthouse, file a notice with the county clerk, and notify the borrower of the foreclosure sale, which could be held as soon as 21 days thereafter.  Tex. Prop. Code Ann. § 51.002(a), (b), (d).  Even where the Bank does not intend to foreclose on a defaulted borrower, posting a foreclosure notice soon after default is a useful tool to induce borrowers to get current on payments—but the Bank is now prohibited by the Bureau's new rule from doing so for 120 days.  Ex. A ¶ 36.  The Bureau's rule increases the Bank's costs by drawing out the process by which the Bank can recover on defaulted loans.

The Bureau's direct regulation of the Bank's business, not to mention the financial injury imposed by the new foreclosure regulation, independently confers standing on SNB to challenge the creation and formation of the Bureau as unconstitutional.  *See Committee for Monetary Reform v. Board of Governors of the Federal Reserve System*, 766 F.2d 538, 543 (D.C. Cir. 1985) (party "directly subject to the authority of [an] agency" has "standing to challenge the authority of an agency on separation-of-powers grounds"); *Pelican Chapter, Associated Builders & Contractors, Inc. v. Edwards*, 128 F.3d 910, 916 (5th Cir. 1997) ("increased costs of doing

15

business imposed on contractors by [an applicable] Rule" were an actionable injury).

### C. The Bank Is Further Injured by the Bureau's Limitations on Remittance Transfers

In addition, the Bank has standing to challenge the unconstitutional formation and operation of the CFPB because it has been injured by the Bureau's Remittance Rule. The Government does not (and cannot) argue that the loss of remittance profits is not a cognizable injury but would have this Court disregard it because, the Government claims: (1) SNB has not pleaded facts showing that it is subject to the Rule; and (2) the Rule is not traceable to the separation of powers violation the Complaint alleges. The Government is wrong on both counts.

#### 1. *The Bank Is Subject to the Remittance Rule*

It is well established that "standing is assessed as of the time a suit commences." *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 324 (D.C. Cir. 2009). At the time this suit was filed, the CFPB's remittance rule imposed substantial disclosure and compliance requirements on "any person that provides remittance transfers for a consumer in the normal course of its business," 77 Fed. Reg. at 6285—a definition that included the Bank. *See* SAC ¶ 15 (explaining that, "[a]s a result of the CFPB's promulgation of a Final Rule regulating international remittance transfers … the Bank has stopped offering those services to its customers"); SAC ¶ 102 (before the Rule, "the Bank's customers … could send money to family members overseas" through the covered transfers).[7] Subsequently adopted safe harbors and delayed effective dates do not deprive the Bank of standing to assert and to challenge the injury

---

[7] Mischaracterizing Mr. Purcell's congressional testimony, the Government fabricates a description of the Bank's remittance practice as a "one-off service" to "a few customers." Mem. 24. That assertion finds no support anywhere in the Complaint, which must be construed in SNB's favor. *LaRoque*, 650 F.3d at 785. The Government's contention is also factually incorrect. Prior to the Rule, the Bank offered international consumer remittance transfers to any customer who requested them. From the period of May 1, 2011 to April 30, 2012, for example, the Bank offered 18 consumer and 8 mixed-use international remittance transfers. Ex. A ¶ 12.

described in the original Complaint (and the SAC).[8]

          2.   *The Complaint Challenges All Instances of the CFPB's Formation and Operation, Including the Remittance Rule*

Next, the Government argues that SNB cannot rely on the Remittance Rule to establish standing because (the Government contends) the Complaint only challenges the constitutionality of the Bureau's UDAAP authority. Mem. 26, 27. The Government is again mistaken. The allegations of the Complaint include, but are in no way limited to, the Bureau's UDAAP authority. To the contrary, the Complaint challenges *any and all* exercises of authority by the CFPB—including the Bureau's authority to enforce Federal consumer financial laws generally—as an unconstitutional violation of the separation of powers, because of the Bureau's structure and operation. Moreover, even if the Complaint were limited to challenging the UDAAP authority, precedent is clear that: (1) to raise a separation-of-powers challenge to a federal agency's formation and operation, a plaintiff need only show that it has been subject to that agency's authority; and (2) a plaintiff injured by one feature of an act has standing to challenge a

---

[8] To the extent the Government might argue the challenge to the initial Rule has been mooted by subsequent developments—namely, the CFPB's unilateral decision to create a safe harbor to the Rule, and then to delay the Rule's final effective date to some unspecified time within the CFPB's control (*see* Mem. 8)—it would be mistaken. As an initial matter, the Bank has been harmed by the new version of the Rule, because the Bank's inability to cost-effectively comply with the Rule has caused it to adopt a policy pursuant to which it has limited its business opportunities by mandating that it will never perform more than 99 covered transfers in any given year. Ex. A ¶¶ 18-20. Furthermore, "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 727 (2013) (internal quotation marks omitted). Given the CFPB's constantly changing positions on remittances, it would be hard-pressed to prove it is "absolutely clear" that it could not reasonably be expected to regulate the Bank's transfers again.

second feature as long as the remedy for the challenged violation will redress the alleged injury.[9]

To begin, the Government wholly misrepresents the allegations of the Complaint in arguing that the Bank "does not allege that the Bureau's authority to implement the EFTA is unconstitutional." Mem. 2. In fact, the Complaint alleges without qualification that "the CFPB's formation and operation violates the Constitution's separation of powers." SAC ¶ 6; *see also* SAC ¶ 1 ("By this action, the Private Plaintiffs challenge the unconstitutional formation and operation of the [CFPB]."). The Bureau's promulgation of the Remittance Rule is unquestionably encompassed by that challenge, as it is the CFPB *formed* by the Act that did the promulgating, and it is the CFPB's *operation* that resulted in the Rule's finalization.

In addition, the specific objections Plaintiffs have raised apply equally to UDAAP and the Bureau's other delegated authorities (including the EFTA). The Complaint's objections that "Congress has no 'power of the purse' over the CFPB," that the Dodd-Frank Act "insulates the CFPB Director from presidential oversight," and that the "judicial branch's oversight power [over the CFPB] is also reduced" all apply to the Bureau's EFTA authority. SAC ¶¶ 112, 118, 121; *see also* SAC ¶ 123. And the Complaint specifically objects to the CFPB's "aggressive investigation and enforcement powers" over all "Federal consumer financial law." SAC p.30 & ¶ 110. Moreover, the Complaint describes in detail the authority pursuant to which the Bureau adopted the Remittance Rule, identifying as constitutionally problematic the CFPB's power to "regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws" by promulgating any rule it deems "necessary or appropriate" to "carry out the purposes and objectives" of those laws. SAC ¶ 99; *see also* SAC ¶ 100 (listing EFTA as

---

[9] To the extent the Court agrees with the Government on this issue, Plaintiffs seek leave to amend the Complaint to even more explicitly state that their challenge to the constitutionality of the CFPB includes, but is not limited to, its UDAAP authority.

covered law). In sum, while the Bureau's UDAAP authority may be *particularly* constitutionally infirm, the Complaint plainly challenges the formation and operation of the CFPB *in its entirety*, and objects to structural flaws that necessarily infect everything that it does.

The Government's argument to the contrary rests entirely on a crabbed reading of the Complaint that the Government buries in a footnote, where it contends that Count I of the Complaint should be read as limited to the CFPB's exercise of an "'effectively unlimited' authority" that encompasses only the Bureau's UDAAP power. Mem. 27 n.13 (citing SAC ¶ 199). But the Government offers no support for that assertion. Neither paragraph 199 of the Complaint nor any statement in Count I specifically references, much less limits itself to, the UDAAP authority. And there can be no serious question that paragraphs 97-100 of the Complaint sufficiently allege that the Bureau's separate "necessary and appropriate" authority constitutes an "open-ended" statutory mandate. *See, e.g.*, *Sossamon v. Texas*, 131 S. Ct. 1651, 1659 (2011); *City of Lakewood v. Plain Dealer Publ'n Co.*, 486 U.S. 750, 772 (1988) (holding portions of "ordinance giving the mayor … unbounded authority to condition the permit on any additional terms he deems 'necessary and reasonable[]'" unconstitutional). The Government's argument thus cannot be squared with the text of the Complaint, or the mandate that on a motion to dismiss the Complaint must be construed in the Bank's favor. *Cf. Ord*, 587 F.3d at 1143 ("Ord never alleges in so many words that he intends to enter the District of Columbia while armed. But at this stage of the litigation, we must make all reasonable inferences in Ord's favor.").

### 3. *Even if the Bank's Constitutional Challenge Were Limited to the UDAAP Authority, the Bank Would Have Standing*

Even if the Bank's challenge were limited to the Bureau's UDAAP authority, D.C. Circuit precedent makes clear that the Remittance Rule injury confers standing on the Bank to

raise that challenge because its success would necessarily have the effect of remedying the injury. *See Catholic Soc. Serv. v. Shalala*, 12 F.3d 1123, 1125 (D.C. Cir. 1994) (plaintiffs had standing to argue agency lacked authority to promulgate retroactive rule, even where plaintiffs were harmed only prospectively, because if plaintiffs prevailed on their retroactivity claim the rule would be voided in its entirety). The Tenth Circuit likewise has held that plaintiffs harmed by one provision in an act have standing to challenge a separate provision where invalidation of the second provision would necessarily result in invalidation of the first. *Local 514 Transport Workers Union of Am. v. Keating*, 358 F.3d 743, 749-50 (10th Cir. 2004). Here, a decision holding that the CFPB was formed and operates unconstitutionally would prevent the Bureau from applying the Remittance Rule to the Bank, thus remedying the injury it has suffered.

### D. The Bank Is Injured by the Bureau's UDAAP Authority

The Government next asserts that SNB's loss of profits from its mortgage business is insufficient to confer standing. Again, the Government does not (and cannot) deny that such a financial injury is generally cognizable under Article III. The Government instead discounts the injury as "self-inflicted," and further argues that the injury is not traceable to the Bureau. The Government misstates the law on both counts.

> 1. *The CFPB's UDAAP Authority Has Already Caused the Bank Financial Loss and Continues to Affect its Present Economic Behavior*

The Bank's exit from the mortgage market to avoid the likelihood of a Bureau-driven prosecution, and to avoid the *certainty* that it would have been required to alter its mortgage lending practices had it stayed in the market, is a constitutionally cognizable injury that gives the Bank standing to sue, even though the Bureau has not yet taken enforcement action against it. Under D.C. Circuit precedent, a company has standing to challenge a law, even if that law has yet to be enforced, when it is "reasonably certain" that the company's "business decisions will be

affected" by it. *Sabre, Inc. v. Dep't of Transp.*, 429 F.3d 1113, 1119 (D.C. Cir. 2005).[10]  In

*Sabre*, the court concluded that a plaintiff had standing to challenge a department's interpretation

of a statute to cover the plaintiff's industry, despite the fact that "no regulations promulgated by

the Department … constrain[ed] [the plaintiff's] business activity and no relevant enforcement

actions [we]re pending," because three criteria were met: (1) the Department claimed jurisdiction

over the industry; (2) the Department's "statements indicate[d] a very high probability" that the

Department would "act against a practice [the plaintiff] would otherwise find financially

attractive," and (3) the Department had the authority to impose "civil penalties … without prior

warning by rulemaking or [a] cease-and-desist order."  429 F.3d at 1115.

    The same is true here.  The CFPB has already asserted and exercised jurisdiction over

mortgage servicing and foreclosure, and the Dodd-Frank Act renders SNB subject to civil

penalties without prior warning if it is found to have engaged in a practice the CFPB ultimately

deems unfair, deceptive, or abusive.  *See* 12 U.S.C. § 5565(c)(1)-(c)(2) (providing for daily civil

---

[10] There is no merit to the Government's contention that SNB cannot raise a pre-
enforcement challenge unless it "alleg[es] an intention to engage in a course of conduct arguably
affected with a constitutional interest" and "demonstrat[es] that it has been singled out or
uniquely targeted for enforcement."  Mem. 20, 23 (internal quotation marks omitted).  That is the
standard the D.C. Circuit uniquely applies to plaintiffs asserting a threat of *criminal* prosecution,
which the Court of Appeals has explicitly distinguished from the well-established rule that
governs pre-enforcement challenges in the civil, administrative context.  *See Seegars v.
Gonzales*, 396 F.3d 1248, 1253 (D.C. Cir. 2005) (noting that the standard argued for by
Government in this case, which derives from *Navegar, Inc. v. United States*, 103 F.3d 994 (D.C.
Cir. 1997), applies to "preenforcement challenges to a criminal statute not burdening expressive
rights" and explaining that "*Navegar*'s analysis is in sharp tension with standard rules governing
preenforcement challenges to agency regulations, where an affected party may generally secure
review before enforcement so long as the issues are fit for judicial review without further factual
development and denial of immediate review would inflict a hardship on the challenger.").  The
*Navegar* standard referenced by the Government is also inconsistent with Supreme Court
precedent.  *See Ord*, 587 F.3d at 1146 (Brown, J., dissenting) (arguing that Court of Appeals
should reconsider *Navegar* en banc).  To the extent the Court concludes the standard applies,
Plaintiffs contend, for preservation purposes, that it should be overruled.

penalty up to $1,000,000 for knowing violation of "any provision of Federal consumer financial law").  Furthermore, as in *Sabre*, the Bureau's "statements, taken as a whole, indicate a very high probability that it will act against a practice that" the Bank "would otherwise find financially attractive"—specifically, offering the higher-priced mortgages the Bank used to offer, and would continue to offer but for the threat of enforcement.  *Sabre*, 429 F.3d at 1115, 1117; *see infra* at 23-24.  Mr. Cordray has already advised that "complaints about … mortgages" will be an enforcement priority—particularly "the origination of high-priced mortgages."  SAC ¶¶ 89-91.

Other precedents confirm that enforcement action need not be "certainly impending" (Mem. 17) before a business acquires standing to challenge an assertedly unconstitutional law, where the threat of enforcement has a present impact on the plaintiff's business decisions.  In *Rio Grande Pipeline Co. v. FERC*, 178 F.3d 533, 540 (D.C. Cir. 1999), for example, the Court of Appeals held that a pipeline company had standing to challenge an agency decision approving the company's proposed rate under one regulatory section, but not under another, because the approval that was granted was subject to potential challenge by third parties in future litigation, whereas the approval that was withheld would not have been.  The court held that the company had standing to sue, despite the fact that no third party challenge was imminent, because the uncertainty created by the potential for future litigation "affect[ed] both [the company's] present economic behavior—investment plans and creditworthiness—and its future business relationships."  Here, too, the potential that the UDAAP enforcement authority will be employed against the Bank has "affect[ed] both [the Bank's] present economic behavior"—in the form of its exit from the consumer mortgage market—"and its future business relationships"—since SNB can no longer offer current or prospective customers the full range of services they expect.

2.   *The Bank's Injuries Are Neither Self-Inflicted Nor Speculative*

Although the Government characterizes the Bank's mortgage market injury as self-inflicted, the Bank in fact has no means to escape injury by the Bureau.  If the Bank reentered the mortgage market, the Bureau's new rules concerning qualified mortgages would require the Bank to modify its mortgage practices.  First, each new mortgage would be subject to the Bureau's new foreclosure limitations, *see section* I(B), *supra*, increasing the Bank's costs.  Second, under the CFPB's new rules, lenders who offer first-lien mortgage loans at an interest rate 1.5% higher than the Average Prime Offer Rate—as SNB did when it was in the mortgage market, Ex. A ¶¶ 25, 32—are deemed to have offered "higher priced covered transactions."  *See* Regulation Z, 78 Fed. Reg. 6407, 6586 (to be codified at 12 C.F.R. § 1026.43(e)(1)).  Like the agency-approved rates at issue in *Rio Grande*, "higher priced" mortgage transactions are subject to future litigation by third parties or by the Government to challenge whether the lender adequately investigated the borrower's ability to repay.[11]  The Bureau's new rule accords the Bank a rebuttable presumption of adequacy in such litigation, *id.*, but the Bureau could and should have granted small banks like SNB broader immunity that would spare them litigation and compliance costs.  If the Bank resumed offering mortgages today, the additional risks and

---

[11] *Id.*; *see also* 15 U.S.C. §§ 1607(a) (permitting agency enforcement of Truth In Lending Act ("TILA")), 1639c(a)(1) (TILA's ability-to-repay requirement), 1640(a) (permitting consumer suits to enforce TILA); 12 U.S.C. § 5516 (providing for prudential regulator's enforcement of "Federal consumer financial laws"); 12 U.S.C. § 5481(14) (defining those laws to include "the provisions of this title," which includes 12 U.S.C. § 5536, which prohibits "unfair, deceptive, or abusive act[s] or practice[s]"); Regulation Z, 78 Fed. Reg. at 6420 (it is the purpose of TILA provisions, "as amended by the Dodd-Frank Act, to assure that consumers" receive loan terms "that are understandable and not unfair, deceptive, and abusive").  In previous enforcement actions, the Bureau has cited both pre-existing Federal consumer financial law and its Dodd-Frank Act UDAAP authority.  *See* American Express Order at 1-2 (finding that company engaged in deceptive practices as well as violations of TILA and other statutes); *Payday Loan* Complaint ¶ 1 (asserting violations of § 5531(a) and a rule promulgated under the Telemarketing and Consumer Fraud and Abuse Prevention Act).

costs would necessarily impact the pricing, structure, and profitability of the mortgages it could offer.  These injuries are inflicted by the Bureau—the Bank did not inflict them on itself.[12]

The Government errs in asserting that SNB lacks standing because "'[a]llegations of injury based on predictions regarding future legal proceedings are too speculative to invoke the jurisdiction of an Article III Court,'" and because "[a]llegations of chilling injury are not sufficient … for standing."  Mem. 20, 22 (quoting *Wheaton Coll. v. Sebelius*, -- F. Supp. 2d ----, Civ. No. 12-1169 (ESH), 2012 WL 3637162, at *4 (D.D.C. Aug. 24, 2012)).  In *Wheaton*, the Government firmly committed to take no enforcement action against the plaintiff, *id.* at *6; the Bank, by contrast, enjoys no such assurance.  Moreover, whereas the Court determined in *Wheaton* that the private litigation the plaintiff purported to fear was highly unlikely to occur because of the professed beliefs of the hypothetical plaintiffs, *id.* at *5, the Bureau has made clear that higher-priced mortgages such as the Bank's are among its chief targets.  The Bank is unquestionably regulated by the Dodd-Frank Act's prohibition on unfair, deceptive, and abusive practices—as well as the CFPB's interpretation of whatever that law might mean—and the Bureau has already acted to regulate activities in which the Bank has engaged.

---

[12] The cases on which the Government relies to argue that SNB's injury is voluntary are entirely inapposite: none involves a situation in which a plaintiff ceased profitable economic activity in response to threatened agency enforcement of the law.  *See Grocery Mfrs. Ass'n*, 693 F.3d at 177 (plaintiffs challenged EPA rule providing option of introducing new fuel they did not wish to produce); *Bhd. of Locomotive Eng'rs & Trainmen v. Surface Transp. Bd.*, 457 F.3d 24, 28 (D.C. Cir. 2006) (union negotiated term that limited bargaining rights with respect to "exempted" track and then challenged agency decision exempting part of track); *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) (union failed to show expenditure of extra funds to lobby President following passage of line-item veto was necessary to organizational mission).  Notably, the Court of Appeals has confirmed that a party may raise a separation-of-powers challenge to a governing statute where it "exposes [the party] to a risk" of financial loss from which the party would otherwise be protected.  *United States ex rel. Schweizer v. Oce N.V.*, 677 F.3d 1228, 1235 (D.C. Cir. 2012) (litigant had standing to assert separation-of-powers challenge to statute requiring judicial review of qui tam settlements because it "expose[d] [the litigant, a named defendant in a qui tam suit] to a risk that the agreement will be rejected and a larger sum required to dispose of" claims).

In this case, moreover, the Bank's injury is not based on the predicted outcome of future legal proceedings; rather, it is based on losses SNB has *already* incurred in response to the Bureau's broad authority under the Dodd-Frank Act. Unlike *Wheaton*, therefore, but like the *Chamber of Commerce* plaintiffs that this Court distinguished in *Wheaton*, all "allegations of chilling injury" have been "substantiated by evidence that the government action has a present and concrete effect" in the form of the Bank's specified and objective losses in the mortgage market. *Id.* at *5-*6 (internal quotation marks omitted). The Bureau's UDAAP authority has caused the Bank a cognizable injury "because it affects [SNB's] present behavior and because economic injury flows from it; to find otherwise would ignore the reality of the long-range economic planning involved in the sound management of an enterprise." *Great Lakes Gas Transmission Ltd. Pship v. FERC*, 984 F.2d 426, 430-31 (D.C. Cir. 1993).

3. *The Additional Authority Conferred Upon the OCC Does Not Negate SNB's Standing*

The Government next asserts that SNB's injuries in the mortgage market do not confer standing to challenge the unconstitutional formation and operation of the CFPB because any enforcement action related to SNB's mortgage practices would be taken by the Bank's prudential regulator, the OCC, and thus would not be (1) traceable to the CFPB, or (2) subject to the Court's review at this time. Mem. 17-21 & nn.10-11. Both arguments lack merit.

i. SNB's Injury Is Fairly Traceable to the CFPB

To begin, it is immaterial for standing purposes that the OCC, rather than the Bureau, would initiate an enforcement action against the Bank, as the statutory scheme ensures that OCC enforcement actions will be significantly influenced by the Bureau and will in many instances be taken at its prompting and/or direction. The Supreme Court rejected an analogous attempt to divide and conquer in *Bennett v. Spear*, 520 U.S. 154 (1997), where the Government contended

25

that the plaintiffs' asserted injury was not fairly traceable to a challenged opinion from the Fish

and Wildlife Service because a separate body, the federal Bureau of Reclamation, made the

ultimate determination whether to proceed with the project about which the opinion had been

issued.  The Court explained that the Government's argument "wrongly equates injury 'fairly

traceable' to the defendant with injury as to which the defendant's actions are the very last step

in the chain of causation."  *Id.* at 168-69.  The Court also clarified that Article III "does not

exclude injury produced by determinative or coercive effect upon the action of someone else."

*Id.* at 169 (holding that plaintiffs had standing where "statutory scheme … presuppose[d]" the

challenged opinion "w[ould] play a central role in the action agency's decisionmaking process").

D.C. Circuit precedent is to the same effect:  where an injury allegedly "flows not

directly from the challenged action" of an agency, "but rather from independent actions of"

another party, the Court "require[s] only a showing that the [challenged] agency action is at least

a substantial factor motivating the third parties' actions."  *Tozzi v. U.S. Dep't of Health &*

*Human Servs.*,  271 F.3d 301, 308-09 (D.C. Cir. 2001) (internal quotation marks omitted).  In

*National Parks Conservation Association v. Manson*, for example, the Court of Appeals rejected

an argument that plaintiffs lacked standing to challenge the Department of Interior's withdrawal

of an "adverse impact letter" because the state agency that had the final say on the project had

"discretionary authority to conduct an independent evaluation when it receive[d] a federal

adverse impact report."  414 F.3d 1, 5, 6 (D.C. Cir. 2005).  As the Court explained, the question

is whether the issuing agency "expects and intends its decision to influence" the recipient.  *Id.*  In

that case, the plaintiffs had standing where, "[h]ad Interior not withdrawn its adverse impact

report, the Montana [agency] would have been bound to consider that report before proceeding

with its permitting decision and, crucially, would have been required to justify its decision in

writing if it disagreed with the federal report." *Id.*

Similarly, in *Town of Barnstable v. FAA*, the Court of Appeals held that plaintiffs had standing to challenge an FAA determination that certain wind turbines were not hazardous, even though the "Interior Department … [wa]s the ultimate arbiter of whether the wind farm receives government permission," and the FAA determinations " ha[d] no enforceable legal effect," because the Court "f[ou]nd it likely, as opposed to merely speculative, that the Interior Department would rethink the project if faced with an FAA determination that the project posed an unmitigable hazard." 659 F.3d 28, 30-34 (D.C. Cir. 2011) (internal quotation marks omitted).

SNB easily satisfies the demands of that precedent. However ineffectual the Government might now attempt to portray the CFPB to be, any suggestion that its written recommendation of enforcement would not constitute at least a "substantial factor" motivating the OCC, *Tozzi*, 271 F.3d at 308, is totally implausible. For one, it is inconsistent with the statutory provisions that govern the Bureau's interactions with the OCC. When the OCC receives notice from the Bureau of a material violation of the law, it is bound to provide "a written response … not later than 60 days thereafter." 12 U.S.C. § 5516(d)(2)(B); *compare id. with Nat'l Parks*, 414 F.3d at 6. Furthermore, there can be no serious doubt that the Bureau "expects and intends its decision to influence" the OCC. *Nat'l Parks*, 414 F.3d at 6. The CFPB is *the* authority on what constitutes an unfair, deceptive, or abusive practice under Federal consumer financial law. When granted rulemaking power, the Bureau has "exclusive authority" to issue regulations "for purposes of assuring compliance with Federal consumer financial law," and courts are required to defer to the Bureau's "determination[s] … regarding the meaning or interpretation of any provision of a Federal consumer financial law …  as if the Bureau were the only agency authorized to apply, enforce, interpret, or administer" it. 12 U.S.C. § 5512(b)(4)(A), (B).

Lest there be any doubt on this point, the Comptroller of the Currency has already confirmed that he views the OCC and other bank regulatory agencies as "general practitioner[s]," with the CFPB "as the specialist" whose "insights can help [them] do [their] job." Remarks by Thomas J. Curry, Comptroller of the Currency, Before the FFIEC Consumer Compliance Specialists Conference at 5 (Jan. 30, 2013). In fact, the Bureau and other banking regulators, including the OCC, have already adopted a Memorandum of Understanding ("MOU") under which, "[i]f the CFPB notifies the Prudential Regulator that it will examine or take supervisory or enforcement action … against any Nondepository Subsidiary" of a small depository institution like SNB, "*the Prudential Regulator will defer to the CFPB* on matters relating to the supervision or enforcement of the Federal consumer financial laws." MOU on Supervisory Coordination at 3 n.4 (May 16, 2012) (emphasis added). The MOU does not cover small depository institutions like SNB, *see id.* & n.1, but the Government offers no reason to believe agencies will proceed any differently with respect to those institutions than with respect to their Nondepository Subsidiaries. Furthermore, the Dodd-Frank Act itself instructs that "Federal consumer financial law"—which includes the UDAAP authority, *see* 12 U.S.C. § 5481(14)— should be "enforced consistently, without regard to the status of a person as a depository institution, in order to promote fair competition." *Id.* § 5511(b)(4). It is no surprise, therefore, that the Government recognizes the CFPB as the "single agency with *the authority and accountability to ensure* that Federal consumer financial law is 'comprehensive, fair, and vigorously enforced.'" Mem. 6 (quoting H.R. Rep. No. 111-517, at 730 (2010) (emphasis added)).

The Government's criticism of the Bank for failing to allege "that it sought any guidance from OCC" prior to exiting the industry is similarly misplaced. Mem. 21. It is the CFPB, not

the OCC, that has the authority to define unfair and abusive practices under the law.  And at the time SNB exited the market, the Bureau lacked a director and was in no position to issue any authoritative guidance aside from its insistence that the law would be enforced—and vigorously. Thus, unlike the situation in *National Family Planning & Reproductive Health Association, Inc. v. Gonzales* (*see* Mem. 21-22), this is not a case in which the Bank had an "easy means for alleviating" its uncertainty.  468 F.3d 826, 831 (D.C. Cir. 2006).  The CFPB to this day has refused to clarify its UDAAP authority through rulemaking.  Furthermore, when the Bank became concerned that it could not safely offer its traditional menu of mortgages consistent with the Bureau's authority under the Dodd-Frank Act, the Bank did express its concerns to OCC officials, and the OCC provided the Bank with no reassurance that it could remain in the market with its then-current practices.  Ex. A ¶ 29.  It was that absence of authoritative guidance, as well as the very real threat that an officially-led Bureau might subsequently—and retroactively— deem the Bank's practices to violate Federal consumer financial law, that led the Bank's directors to determine in good faith that they could no longer risk the penalties that might accompany their higher-priced mortgage practice.  That is enough to support the Bank's standing.  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 181-85 (2000) (plaintiffs had standing to challenge alleged violation of the Clean Water Act where they averred they had ceased engaging in activities near allegedly illegal discharges for fear that they would be harmed by the pollution, because plaintiffs had "reasonable concerns about the effects of" the challenged discharges and had been injured as a result of their response to those concerns).

ii.  Section 1818(i)(1) Does Not Apply Here

The Government is also mistaken in its assertion that this suit is nonjusticiable under 12 U.S.C. § 1818(i)(1).  That law by its terms says nothing about general constitutional challenges

to the authority of the OCC, apart from any order, and it in no way limits judicial review of *another* agency's constitutional authority under an entirely different statute. *Cf. Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 130 S. Ct. 3108, 3150 (2010) (rejecting argument that petitioners were required to seek agency review of Board's standards before raising constitutional challenge in court to the Board's composition and noting that "petitioners object to the Board's existence, not to any of its auditing standards"). In fact, § 1818(i)(1) and the statutes it cites govern when an "appropriate Federal banking agency" may take certain actions. 12 U.S.C. §§ 1818(i)(1), 1831o, 1831p-1. That term is defined by statute, *see id.* § 1813(q), and it does not include the CFPB.

Even assuming the focus of this suit were the order of an "appropriate Federal banking agency," the Government errs in suggesting that the statute necessarily precludes review of a constitutional claim. The Court of Appeals in *Ridder v. Office of Thrift Supervision*, 146 F.3d 1035 (D.C. Cir. 1998), did not in fact apply § 1818(i) to bar it from considering the constitutional questions posed by a challenge to an enforcement order. To the contrary, the Court explicitly considered whether the plaintiffs had made "a 'strong and clear' showing that the issuance of the [challenged] Order violated their constitutional rights" and after some analysis concluded that the constitutional claim at issue lacked merit. *Id.* at 1041. The Court also recognized that "only upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review." *Id.* Nothing in § 1818 evidences an intent to bar a constitutional challenge of the type at issue here with respect to the CFPB (or the OCC).

**E. The Bank Has Standing Because It Is Directly Regulated by the CFPB**

The Bank also has standing to raise its constitutional challenge because it is directly regulated by the Bureau. The D.C. Circuit has held that "litigants have standing to challenge the

30

authority of an agency on separation-of-powers grounds … where they are directly subject to the authority of the agency, whether such authority is regulatory, administrative, or adjudicative in nature." *Comm. for Monetary Reform*, 766 F.2d at 543.  The Government does not deny that the Bank is directly subject to the Bureau's rulemaking authority, and concedes it is subject to the Bureau's administrative authority to require reports.  *See* Mem. 9; *id.* at 25-26.

## II.    THE BANK HAS STANDING TO CHALLENGE THE UNCONSTITUTIONAL APPOINTMENT OF MR. CORDRAY

The Government's argument that the Bank lacks standing to challenge the unconstitutional appointment of Mr. Cordray rests on the same flawed premises on which the Government bases its claim that SNB lacks standing to challenge the unconstitutional formation and operation of the Bureau generally—that SNB has not shown actual or imminent injury from actions taken by the CFPB.  *See* Mem. 28.  For the reasons stated above, that contention fails.[13] Furthermore, the Bank—an FDIC-insured institution—is directly subject to Mr. Cordray's authority as "as ex officio Director of the Federal Deposit Insurance Corporation" (SAC p.2) and has standing to challenge his appointment on that ground, as well.

The Government also objects that SNB's coerced exit from the mortgage market cannot support SNB's standing to challenge Mr. Cordray's appointment because "that alleged injury is not traceable to … [the] appointment and is unlikely to be redressed by a favorable decision."

---

[13] The Government had good reason not to advance Amicus Professor Williams' meritless argument that the challenge to Mr. Cordray's appointment presents a political question. The constitutionality of such an appointment is a legal question that the courts are well equipped to answer, *see Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1430 (2012), and no court called upon to address the issue has held it a nonjusticiable political question—including the D.C. Circuit, which had a similar brief from Professor Williams before it in *Noel Canning* but did not hold that the case presented a political question.  *See Noel Canning*, 2013 WL 276024; *see also, e.g., United States v. Woodley*, 751 F.2d 1008, 1009 (9th Cir. 1985) (en banc); *cf. Evans v. Stephens*, 387 F.3d 1220, 1227 (11th Cir. 2004) (resolving general appointment question and rejecting as "political" separate question whether President acted with sufficient "political wisdom").

Mem. 29.[14]  The Government contends that this alleged injury "flows from the UDAAP

prohibition itself[,] … not from the Director's appointment or any Bureau action under his

leadership."  *Id.*  The Government's argument is foreclosed by precedent.

As noted above, "litigants have standing to challenge the authority of an agency on

separation-of-powers grounds … where they are directly subject to the authority of the agency,

whether such authority is regulatory, administrative, or adjudicative nature."  *Comm. for

Monetary Reform*, 766 F.2d at 543.  "A litigant is not required to show that he has received less

favorable treatment than he would have if the agency were lawfully constituted and otherwise

authorized to discharge its functions."  *NRA Political Victory Fund*, 6 F.3d at 824 (internal

quotation marks omitted).  Rather, "litigants need only demonstrate that they have been directly

subject to the authority of the agency."  *Id.* (internal quotation marks omitted).  In *NRA Political

Victory Fund*, therefore, the D.C. Circuit rejected the Government's argument that the plaintiff

could not fairly trace its injury to the alleged constitutional defects of a commission because it

did not allege that the outcome of the commission's decisionmaking process would have been

different if the commission were constitutionally composed.  *Id.*

Similarly, in *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 130 S. Ct.

3138 (2010), the Supreme Court rejected the Board's argument that plaintiffs could not trace

their asserted injury to appointments that were allegedly invalid because they were made by a

committee, rather than by the Chairman alone, simply because none of the appointments was

made over the Chairman's objection.  As the Court explained, "[w]e cannot assume … that the

---

[14] The Government's argument on this point addresses only the CFPB's UDAAP
authority.  Perhaps for obvious reasons, the Government does not assert that any injury flowing
from the Remittance Rule that Mr. Cordray himself authorized (*see* 77 Fed. Reg. at 6309) is not
fairly traceable to his appointment, and the Government does not contend that compliance costs
incurred to stay abreast of rules, interpretations, and enforcement actions authorized by Mr.
Cordray cannot be traced to his appointment.

Chairman would have made the same appointments acting alone; and petitioners' standing does not require precise proof of what the Board's policies might have been in that counterfactual world." *Id.* at 3163 n.12. Here, too, the Court cannot assume that actions taken by the Bureau would be the same absent the appointment of Mr. Cordray. It cannot be said with certainty, for example, that the Bureau would hold the same enforcement priorities (including the focus on mortgages) if Mr. Cordray were removed from office. Here, as in *Free Enterprise*, plaintiffs are "entitled to declaratory relief sufficient to ensure that the … standards to which they are subject will be enforced only by a constitutional agency accountable to the Executive." *Id.* at 3164.

The Government's argument also fails because the Bank's injuries plainly are traceable to Mr. Cordray's appointment. The Dodd-Frank Act severely curtails the implementation of Title X when the Bureau lacks a director, such that had Mr. Cordray not been appointed, the Bureau could exercise no UDAAP authority at all. *See* Joint Response by the Inspectors General of the Department of the Treasury and Board of Governors of the Federal Reserve System to Request for Information Regarding the Bureau of Consumer Financial Protection from the U.S. House of Representatives Financial Services Committee at 7 (Jan. 10, 2011) ("[I]f there is no Senate-confirmed Director by the designated transfer date [of power to the CFPB]," the "Treasury Secretary is not permitted to exercise the Bureau's authority to …. prohibit unfair, deceptive, or abusive acts or practices under subtitle C").[15] As such, there can be no question that SNB's mortgage-related injuries are fairly traceable to Mr. Cordray's appointment and fully redressable by a court order declaring it unconstitutional.

---

[15] Before a director is confirmed, the Treasury Secretary is authorized to perform only "the functions of the Bureau under this part," 12 U.S.C. § 5586, which authorizes the CFPB to (among other things) prescribe rules under pre-existing consumer financial laws. That part does not, however, encompass the Bureau's UDAAP authority (which is granted in Subtitle C) or the Bureau's enforcement powers generally (which are in set forth in Subtitle E).

### III.  PLAINTIFFS CEI AND 60 PLUS ASSOCIATION HAVE STANDING TO CHALLENGE THE BUREAU

The Government also errs in contending that CEI and the 60 Plus Association lack the "personal stake in the outcome" of this case necessary to invoke federal jurisdiction.  Mem. 40 (internal quotation marks omitted).  As explained in the Complaint, both the Institute and the 60 Plus Association have suffered concrete injuries as a result of Title X, which has increased the costs, and limited the availability, of financial services on which the Institute and the Association's members depend.  *See* SAC ¶¶ 18-22.  CEI, for example, maintains checking accounts with Wells Fargo, which has recently increased fees on such accounts.[16]  CEI has thus suffered concrete financial injuries as a result of the formation and operation of the CFPB.

The 60 Plus Association and its members have been similarly harmed.[17]  The increased fees and more limited selection of financial services that have resulted from the CFPB's

---

[16] *See* Ex. B, Declaration of Sam Kazman; *see also* Wells Fargo & Company Annual Report 2011, at 102 ("our consumer businesses … may be negatively affected by the activities of the CFPB, which has broad rulemaking powers and supervisory authority over consumer financial products and services"; although its "full impact" is uncertain, "CFPB's activities may increase our compliance costs and require changes in our business practices as a result of new regulations and requirements which could limit or negatively affect the products and services that we currently offer our customers").  Wells Fargo certainly is not alone in increasing fees for such services; numerous other financial institutions have responded in kind to the increased costs imposed by the Bureau's regulatory authority.  *See* Fitch Ratings, Press Release, *CFPB Overdraft Inquiry Keeps Pressure on U.S. Banks* (Apr. 24, 2012) ("We also anticipate the CFPB inquiry [into overdraft methods], coupled with regulatory and legislative changes, will further hasten the demise of free checking accounts"), *available at* http://www.fitchratings.com/credit desk/press_releases/detail.cfm?pr_id =748170.

[17] At the motion-to-dismiss stage, the Association need not identify which of its members have been harmed by the Bureau.  Since the decision in *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), "several Courts have found that a plaintiff need not identify the affected members by name at the pleading stage."  *Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius*, --- F. Supp. 2d ----, No. 10–0499 (ABJ), 2012 WL 5353562, at *5 (D.D.C. Oct. 31, 2012) (collecting cases).  "At the pleading stage, the Court presumes that general allegations encompass the specific facts necessary to support the claim, so the plaintiff need not identify an affected member by name."  *Id.* (internal citation omitted).

authority under Dodd-Frank constitute an injury sufficient to support CEI's and the Association's standing.[18]  *See Energy Action Educ. Found. v. Andrus*, 654 F.2d 735, 756 n.** (D.C. Cir. 1980) (consumers had standing to challenge leasing activity claimed to "inflat[e] prices, limit[] supplies, and restrict[] choice on the market"), *rev'd on other grounds sub nom. Wyatt v. Energy Action Educ. Found.*, 454 U.S. 151 (1981); *Jones v. Gale*, 405 F. Supp. 2d 1066, 1076 (D. Neb. 2005) (standing to challenge law that, among other things, "impaired his financial and estate-planning options").  The 60 Plus Association's millions of members (*see* SAC ¶ 14) are further disproportionately impacted by the reduced interest rates offered by banks as a result of the increased regulatory burdens imposed by the CFPB.[19]

## IV.  THE BANK HAS STANDING TO CHALLENGE THE UNCONSTITUTIONAL OPERATION OF THE FSOC

The Government next asserts that the imminent injury SNB faces from the FSOC's designation of nonbank SIFIs is insufficient to provide standing to sue.  But what the Government disparages as layers of "speculation" in fact involve nothing more than reliance on the Government's promise that SIFI designations are imminent, and the application of

---

[18] For example, the 60 Plus Association has checking and money market accounts at PNC Bank (*see* Ex. C, Declaration of Laura Clauser), which has been raising, or imposing new fees, on depositors since Dodd-Frank was enacted.  *See* PNC Financial Services Group*, Annual Report for the Fiscal Year Ended December 31, 2011 at 6 (*available at* http://quote.morningstar.com/stock-filing/AnnualReport/2011/12/31/t.aspx?t=XNYS:PNC&ft=10K&d=fb2f2e5966b99745aee8ed415f5c7f7f) (as a result of the Bureau's formation and operation, among other factors, PNC expects "to experience an increase in regulation of [its] retail banking business and additional compliance obligations, revenue and costs impacts").

[19] Alvin C. Harrell, *Commentary: State Chartered Financial Institutions in the 1990s—A New Perspective*, 48 Consumer Fin. L.Q. Rep. 2, 52-53 (1994) ("[b]y saving $100-$200,000 annually in regulatory costs," small bank "could afford to pay substantially higher deposit interest rates").  Lowered interest rates on bank accounts "are especially hard on the elderly, many of whom rely on interest income to pay basic living expenses."  Walter Hamilton, *With Interest Rates So Low, What's a Saver to Do?*, Los Angeles Times Sept. 18, 2011.

elementary economic logic routinely relied on by the D.C. Circuit in competitor standing cases.

### A.    An FSOC Designation Benefits SNB's Competitors and Injures SNB

The D.C. Circuit has held time and time again that a plaintiff has standing to sue when it "face[s] intensified competition" as a result of agency action affecting a relevant market.  *Shays v. FEC*, 414 F.3d 76, 86 (D.C. Cir. 2005); *see, e.g.*, *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) (citing cases); *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998) (noting "repeated[]" holdings of competitor standing).  In particular, that court has "recognized that regulatory decisions that permit subsidization of some participants in a market can have the requisite injurious impact on those participants' competitors" to confer standing.  *U.S. Telecomms. Ass'n v. FCC*, 295 F.3d 1326, 1331 (D.C. Cir. 2002).  Knowledgeable individuals from the industry, the academy, and the Government have all recognized the existence of a status-related subsidy that provides SIFIs a competitive advantage.  *See* Ex. D, Declaration of Greg Jacob, Ex. 1 (Letter from Senators Sherrod Brown and David Vitter to Comptroller General Gene L. Dodaro at 1-2 (Jan. 1, 2013) (collecting sources)).  SNB has standing to challenge that subsidy here.

Although the FSOC has not yet made any SIFI designations, the Complaint clearly alleges an *imminent* injury based on then-Treasury Secretary Geithner's 2012 announcement that designations are imminent.  SAC ¶ 150.  An imminent injury is sufficient to confer standing.  *See* Mem. 1.; *e.g.*, *Sherley*, 610 F.3d at 72 ("Because increased competition almost surely injures a seller in one form or another, he need not wait until allegedly illegal transactions … hurt [him] competitively before" bringing suit (alteration in original; internal quotation marks omitted).).

The Government suggests that FSOC designees would not compete with SNB because they are not banks, Mem. 33, but the Complaint explicitly and plausibly alleges that SNB

competes with "*nonbank* SIFIs." SAC ¶ 148 (emphasis added). The Bank competes with non-banks both in markets in which it seeks to raise capital, SAC ¶¶ 144, 149, and in markets in which it seeks to sell loans to consumers, and the cost-of-capital advantage that non-banks designated as SIFIs will enjoy will place SNB at a competitive disadvantage in each. The Bank is thus injured by each additional SIFI designation.[20]

### B. SNB's Injury from SIFI Designation Is Fairly Traceable to the FSOC

That some large financial companies may already enjoy a cost-of-capital advantage, even without formal SIFI status, does not mean that no harm to SNB is fairly traceable to FSOC designations. The Complaint expressly alleges *both* that the FSOC's imminent designations will confer a cost-of-capital advantage on non-bank entities that did not previously enjoy it, *and* that formal designations will enhance any cost-of-capital advantage already enjoyed by "unofficial" SIFIs. SAC ¶ 148. Either way, the Bank is harmed. *See Meese v. Keene*, 481 U.S. 465, 476-77 (1987) (recognizing reputational impact of government designations).[21]

---

[20] None of the cases on which the Government relies to suggest that SNB must "introduce[] evidence" of the alleged competition arose on a motion to dismiss. Mem. 33-34 (alteration in original); *see KERM, Inc. v. FCC*, 353 F.3d 57, 60-61 (D.C. Cir. 2004) (petition for review of merits of agency decision); *D.E.K. Energy Co. v. FERC*, 248 F.3d 1192, 1196 (D.C. Cir. 2001) (same); *Lee v. Bd. of Governors of the Fed. Reserve Sys.*, 118 F.3d 905, 913 (2d Cir. 1997) (same). At this stage—as the Government at one point acknowledges—it is sufficient for SNB to "allege that it is a direct and current competitor" with potential SIFI designees. Mem. 32 (emphases and internal quotation marks omitted); *see, e.g.*, *Whitney v. Guys, Inc.* 700 F.3d 1118, 1128 (8th Cir. 2012) ("Evidence is not required because on a motion to dismiss, inferences are to be drawn in favor of the non-moving party." (internal quotation marks omitted)). That the Bank has done.

[21] Although the Government claims in a footnote (Mem. 40 n.19) that SNB cannot trace this competitive injury to the constitutional violations in the composition of the FSOC, unbounded delegation of authority to select SIFIs, and limitation on judicial review of FSOC designations, it is those very provisions that inflict the imminent competitive injury on SNB. The uncabined delegation permits the FSOC to designate entities as SIFIs based on whatever criteria it deems relevant, and the limitations on judicial review prevent the Bank from seeking any redress of the competitive harm such a delegation inflicts.

Nor is there any merit to the Government's suggestion that the Bank lacks standing because the cost-of-capital benefit enjoyed by SIFI designees "would depend[] on the unfettered choices made by independent actors not before the courts"—creditors' investment decisions. Mem. 36 (internal quotation marks omitted).  The D.C. Circuit has consistently "allowed plaintiffs claiming that regulatory changes have caused competitive injury, defined only as exposure to competition, to sue the regulating agencies, even though the harm resulted most directly from independent purchasing decisions of third parties."  *Tozzi*, 271 F.3d at 308-09 (internal quotation marks omitted).[22]  And, of course, *all* competitive injuries necessarily arise from the independent choices of market actors.  Where, as here, the source of the injury is clearly identified—specifically, the FSOC's unbounded conferral on competitors of formal SIFI status— and the market's reaction thereto is both predictable and reasonable—as the sources previously-cited show it to be—the harm is sufficiently concrete to confer standing.[23]

## C.    Plaintiffs Have Standing Irrespective of Any Alleged Net Benefit to SIFIs

The Government cites no authority for the novel proposition that the benefits flowing from a statute should be netted against its harms for purposes of determining whether a party has

---

[22] *See also Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 113 (D.C. Cir. 1990) ("For standing purposes, petitioners need not prove a cause-and-effect relationship with absolute certainty …. This is true even in cases where the injury hinges on the reactions of third parties … to the agency's conduct."); *Clinton v. City of New York*, 524 U.S. 417, 426-28, 432-33 (1998) (holding that farmer's cooperative seeking to acquire processing plant had standing to challenge line-item veto of law providing deferred tax treatment to certain refiners who might sell plants to cooperatives—even though the injury depended on whether refiner would wish to avail itself of the cancelled deferral, and citing similar precedent).

[23] *Already, LLC* dealt with very different circumstances.  There, the Court determined that it was "absolutely clear" that Already could not be harmed by any further trademark litigation brought by Nike.  133 S. Ct. at 730.  The Court therefore refused to find an alleged competitive harm based on the unreasonable and speculative belief of some market participants that Nike could still harm Already through trademark litigation.

been injured, Mem. 37, and authority is to the contrary.  *See, e.g., Constellation Energy Commodities Group, Inc. v. FERC*, 457 F.3d 14, 20 (D.C. Cir. 2006) (offset not taken into account for purposes of assessing injury); *Markva v. Haveman*, 317 F.3d 547 (6th Cir. 2003) (rejecting netting of costs and benefits for purposes of assessing injury to Medicaid recipients); *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1175 n.2 (D.C. Cir. 1978) (for antitrust standing, "'offsetting benefits' … are utterly irrelevant to a determination of 'injury-in-fact' at the Standing stage").  Moreover, the Government has not offered even a scintilla of evidence to support its bald assertion that "the costs associated with the more stringent government regulation associated with a Council designation" might outweigh the cost-of-capital advantage. Mem. 37.  The Court must at this stage accept Plaintiffs' plausible pleading of harm.  *Haase v. Sessions*, 835 F.2d 902, 907 (D.C. Cir. 1987).

## V.      THE QUESTIONS PRESENTED ARE RIPE FOR REVIEW

The Government briefly argues that Plaintiffs' challenges are not ripe "[f]or reasons similar to the reasons" the Government alleges that plaintiffs lack standing.  Mem. 51.  The Government is again mistaken.  As explained above, Plaintiffs have standing to raise each of the constitutional challenges asserted in the Complaint.  Furthermore, the Government offers "a mangled view of the ripeness doctrine," *Rio Grande*, 178 F.3d at 540, that is inconsistent with Circuit precedent and must be rejected.

When determining whether a claim is ripe, the Court considers two factors: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967). "When a petitioner raises a purely legal question," the Court "assume[s] that issue is suitable for judicial review."  *Rio Grande*, 178 F.3d at 550 (internal quotation marks omitted).  Plaintiffs' claims are plainly ripe

under this standard.  As the Government acknowledges, "the issues presented here are purely

legal."  Mem. 52 (internal quotation marks omitted).  And the Government "does not argue that

this dispute would look any different, be more ripe if you will, were [the Court] to put off review

until another day."  *Action for Children's Television v. FCC*, 59 F.3d 1249, 1258 (D.C. Cir.

1995).[24]  Because the claims are fit for immediate review, the Court need not consider the

hardship to SNB of withholding it.  *Id.*  However, to the extent hardship is considered, the

ongoing harm caused to SNB by the Dodd-Frank Act, including increased compliance costs and

the loss of two profitable lines of business, weighs in favor of immediate review.

## CONCLUSION

The Government's Motion to Dismiss the Second Amended Complaint should be denied.

Respectfully submitted,

/s/ Gregory Jacob
Gregory Jacob (D.C. Bar 474639)
O'MELVENY & MYERS LLP
1625 I St. NW
Washington, DC 20006
(202) 383-5300
(202) 383-5413 (fax)
gjacob@omm.com

C. Boyden Gray (D.C. Bar. 122663)
Adam J. White (D.C. Bar 502007)
BOYDEN GRAY & ASSOCIATES P.L.L.C.
1627 I St. NW, Suite 950
Washington, DC 20006
(202) 955-0620
(202) 955-0621 (fax)
adam@boydengrayassociates.com

---

[24] The one instance the Government offers of the Court of Appeals dismissing a purely legal claim as unripe is totally inapposite: in *Toca Producers v. FERC*, 411 F.3d 262, 264 (D.C. Cir. 2005), the court dismissed a petition because it determined "the [petitioners] may yet secure th[e] very relief [they sought] in a proceeding now pending before the [defendant]."  In this case, by contrast, the only way for Plaintiffs to obtain the relief they seek is before this Court.

*Counsel for Plaintiffs State National Bank of Big Spring, the 60-Plus Association, Inc., and Competitive Enterprise Institute*

Sam Kazman (D.C. Bar 946376)
Hans Bader (D.C. Bar. 466545)
COMPETITIVE ENTERPRISE INSTITUTE
1899 L St. NW, Floor 12
Washington, DC 20036
(202) 331-1010
(202) 331-0640 (fax)
skazman@cei.org

*Co-counsel for Plaintiff Competitive Enterprise Institute*

Dated: February 27, 2013