# Exhibit A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

STATE NATIONAL BANK OF BIG SPRING
*et al.*,

Plaintiffs,

v.

TIMOTHY GEITHNER, in his official
capacity as United States Secretary of the
Treasury and *ex officio* Chairman of the
Financial Stability Oversight Council, *et al.*,

Defendants.

Case No. 1:12-cv-01032 (ESH)

Judge: Hon. Ellen S. Huvelle

## DECLARATION OF JIM R. PURCELL

In Accordance with 28 U.S.C. § 1746, I, Jim R. Purcell, declare as follows, under the pains and penalties of perjury:

1.       I am the Chairman of the Board and CEO of the State National Bank of Big Spring in Big Spring, Texas ("the Bank"). I have served as CEO since 1988 and became Chairman of the Board in 2012.

2.       I served as President of the Bank from 1988 to 2012.

3.       I am familiar with the Bank's legal compliance practices, remittance services, and mortgage lending.

### Compliance Practices

4.       The regulatory and enforcement authority conferred on and exercised by the Consumer Financial Protection Bureau (the "Bureau" or "CFPB") under the Dodd-Frank Act has required the Bank to incur significant legal compliance costs.

5.       In the year 2012, for example, the Bank incurred $231,000 in compliance costs.

That includes costs for compliance personnel (including an outside auditor), compliance software, and compliance education.

6. In particular, the Bank's annual compliance costs in 2012 included over $2,500 to send a representative to the Texas Bankers Association Compliance School. That training covered, among other things, the Bureau's regulations governing electronic funds transfers and mortgage disclosures.

7. In addition, after the Dodd-Frank Act was passed, the Bank determined that it needed to stay informed of the regulatory requirements that would be adopted by the CFPB and other agencies under the Act. The Bureau's authority to enforce its views of "unfair, deceptive, or abusive" practices ex post facto further made it necessary to stay abreast of its interpretations, announcements, and enforcement actions. For this reason the Bank began to subscribe to a service from the Texas Bankers Association, the Compliance Alliance, that keeps the Bank informed of the activities and pronouncements of Government agencies that regulate the Bank, including the Bureau, as well as their impact on the Bank. Attached to this declaration are true and correct copies of marketing materials the Bank received from the Compliance Alliance to induce the Bank to subscribe to its service, which specifically note that the service is necessary because of the Dodd-Frank Act and CFPB. The Bank found these materials persuasive.

8. The Bank used the Compliance Alliance service to aid in its understanding of the CFPB's rules governing international remittance transfers, mortgage disclosures, and ability-to-pay requirements, as well as to stay abreast of Bureau interpretations and enforcement actions. Attached to this declaration are true and correct copies of materials the Bank has received from the Compliance Alliance.

9. The Compliance Alliance subscription costs the Bank $9,900 annually. The

original subscription price was $12,000, but so many institutions signed up for the service that the Compliance Alliance was able to lower its fees. The Compliance Alliance now has customer banks in 18 States and is sponsored by 16 state banking associations.

10.     The Bank also responded to the Dodd-Frank Act by subscribing to the compliance service TriNovus, paying $2,340 for a one-year subscription in 2011.

## Remittance Transfers

11.     Until May 22, 2012, the Bank offered international remittance transfers to consumers and businesses that requested them. The Bank regularly offered more than 25 transfers a year and has offered up to 70 transfers a year.

12.     From May 1, 2011 to April 30, 2012, for example, the Bank offered 18 international consumer remittance transfers and 8 mixed use transfers.

13.     On February 7, 2012, the CFPB published a rule governing the provision of international remittance transfers. Electronic Fund Transfers, 77 Fed. Reg. 6194 (Feb. 7, 2012) (to be codified at 12 C.F.R. pt. 1005) ("the Remittance Rule").

14.     The 18 international consumer remittance transfers the Bank offered from May 2011-2012 are covered by the Remittance Rule. For the 8 mixed-use transfers offered during that period, the Bank does not have the details necessary to determine whether they would be covered by the Rule.

15.     On May 22, 2012, the Bank determined that it would not be able to comply with the requirements of the Bureau's Remittance Rule and still offer international consumer remittance transfers at a profit.

16.     On June 21, 2012, the Bank filed this suit.

17.     On August 20, 2012, the Bureau revised the Remittance Rule to include a safe

harbor exemption for providers that perform 100 or fewer international consumer remittance transfers per calendar year. Electronic Fund Transfers, 77 Fed. Reg. 50244 (Aug. 20, 2012).

18.     On November 27, 2012, in response to the Bureau's revision of the Remittance Rule, the Bank adopted an exception to its policy barring international consumer remittance transfers under which the Bank may offer those transfers but will never perform more than 99 such transfers in any given year. The Bank did so in order to fall within the Remittance Rule exception for banks performing under 100 international consumer remittance transfers annually.

19.     But for the Remittance Rule, the Bank would offer an international consumer remittance transfer to any customer that requested it, even if the Bank exceeded 100 transfers each year.

20.     The Bureau's Remittance Rule has caused the Bank financial harm. The Bank lost income on the international consumer remittance transfers it declined to offer after the adoption of the original Rule. In addition, the revised Remittance Rule limits the Bank's opportunity to expand that transfer business in the future. The Rule therefore has placed the Bank at a competitive disadvantage vis-à-vis other (typically larger) banks that can afford to offer remittances under the Rule without limitation, a service expected of a lending institution from its existing and prospective customers.

**Mortgage Lending**

21.     In addition to authorizing the CFPB to regulate remittance transfers, the Dodd-Frank Act prohibits unfair, deceptive, and abusive consumer financial practices and authorizes the Bureau to identify what those practices entail and to take or recommend enforcement against institutions that engage in such practices. 12 U.S.C. § 5531(a)-(b).

22.     The Director of the Bureau, Richard Cordray, has acknowledged the abstract

nature of the term "abusive," explaining in a January 24, 2012 hearing before a subcommittee of the U.S. House Committee on Oversight and Government Reform, that it is "a little bit of a puzzle because it is a new term" and is "not something [the Bureaus is] likely to be able to define in the abstract. Probably not useful to try to define a term like that in the abstract; we are going to have to see what kind of situations may arise where that would seem to fit the bill under the prongs."

23.     Government officials have repeatedly stated that the Bureau's enforcement efforts will focus on mortgage lending practices. President Obama stated that the Bureau would "crack down on the abusive practice of unscrupulous mortgage lenders" on September 17, 2010. In March 2012, Director Cordray reiterated the Bureau's intention to "address the origination of mortgages, including loan originator compensation and the origination of high-priced mortgages."

24.     Up until the last quarter of 2010, the Bank offered consumers several types of mortgages, including mortgages with five-year balloon payments and "character loans," which are loans based on the borrower's known character in addition to estimates of the borrower's ability to repay.

25.     Before leaving the market, the Bank offered several loans at interest rates that were at least 1.5% higher than the Average Prime Offer Rate, as calculated with reference to the "Average Prime Offer Rates – Fixed" listed at http://www.ffiec.gov/ratespread/aportables.htm. Had it continued to offer consumer mortgage loans, it would have expected many of them to be of this character.

26.     Based on statements Government officials made after the enactment of Dodd-Frank concerning the Bureau's authority over mortgage practices and the limits the Bureau could

impose on those practices, the Bank became concerned that the Bureau might retroactively deem its mortgage loans abusive. The Bank is a local, community bank, and it operates under different internal guidelines than other financial institutions. For example, the Bank's charter specifically provides that the Bank will serve the community, and the Bank therefore focuses on serving the needs of the community. The Bank does not sell its loans. As a result, the Bank has offered mortgages to its customers, based on its knowledge of their character and circumstances, that other institutions have been (and still today would likely be) unwilling to provide. The Bank would continue this practice of serving the community if it were to reenter the mortgage market.

27. For example, if the Bank were approached by a young couple whose income alone did not suggest ability to repay under traditional standards, but the Bank knew the parents of the couple were members of the community who themselves would be willing and able to pay for the mortgage, even if they were not themselves on the note, the Bank would be willing and able to offer that couple the mortgage. But the Bank would be concerned that the Bureau, looking at only the figures directly involved in such a loan, and not the unique circumstances the Bank evaluates as a community banker making that loan, would deem it abusive.

28. As another example, the Bank in the past made a loan with a 50% debt-to-income ratio to a borrower because the Bank had engaged in past transactions with the customer and knew that the customer—a single head-of-household whose credit had been negatively impacted by a previous relationship—would repay the obligations the customer incurred, even if the customer's former spouse had not.

29. When the Bank became concerned that it could not safely offer mortgages consistent with the Bureau's authority under the Dodd-Frank Act, the Bank expressed its concerns to officials at its prudential regulator, the Office of the Comptroller of the Currency (the

"OCC"). The OCC provided the Bank with no reassurance that it could remain in the market without fear of prosecution under the Bank's then-current practices.

30.　　　In the last quarter of 2010, the Bank decided to exit the consumer mortgage business and determined that it would no longer offer any consumer mortgage loans. The Bank did so due to fear that those loans would be subject to enforcement action under the Dodd-Frank Act because they might be deemed to violate the prohibition against unfair, deceptive, and abusive practices.

31.　　　The Bank also recognized that if it attempted to stay in the consumer mortgage market, it would have to incur significant additional costs to comply with proposed regulations governing mortgage loans, and thus would not be able to offer them in the cost-effective manner to which it was previously accustomed.

32.　　　For example, if the Bank were to reenter the mortgage market and offer the terms it previously provided on consumer mortgage loans, many of the mortgages would constitute higher-priced covered transactions under the Bureau's new regulations. That means the loans would not fall within the safe harbor created by the Bureau pursuant to which the Bank could not be held liable to the borrower or to the Government on the theory that it did not adequately consider the borrower's ability to repay. The Bureau's regulations providing the Bank with only a rebuttable presumption of an adequate investigation, but otherwise leaving it subject to the costs of litigation, would require the Bank to reconsider whether it could offer the customer the loan at all and would impose an additional risk factor that would affect the costs and structure of the loan if the Bank were to offer it.

33.　　　The Bank's inability to offer mortgages has harmed it financially in a number of ways. First, the Bank's mortgage business was regularly profitable. It was one of the best and

most prudent ways to invest and earn a return on the Bank's deposits and also one of the best ways for the Bank to reinvest in the community. The Bank's alternative use of funds is not as profitable.

34.     Moreover, the Bank can no longer offer the full array of mortgage services existing and prospective customers expect of a lending institution, putting the Bank at a competitive disadvantage.

35.     Finally, the Bureau's new rules governing mortgage foreclosure increase the Bank's costs of doing business. On January 17, 2013, the Bureau issued a rule that governs, among other things, the mortgage loan foreclosure process. *See* Mortgage Servicing Rules under the Real Estate Settlement Procedures Act (Regulation X) (Jan. 17, 2013), *available at* http://www.consumerfinance.gov/regulations/2013-real-estate-settlement-procedures-act-regulation-x-and-truth-in-lending-act-regulation-z-mortgage-servicing-final-rules/. Under this rule, "[a] small servicer shall not make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process unless a borrower's mortgage loan obligation is more than 120 days delinquent." *Id.* at 696 (to be codified at 12 CFR §1024.41(j)).

36.     Although the Bank no longer makes new consumer mortgage loans, it still holds several such loans from previous years that have yet to be satisfied. Under Texas law, the Bank could initiate foreclosure proceedings on such a loan, should the borrower default, if the borrower did not cure that default within 20 days of a letter notifying him of the delinquency. *See* Tex. Prop. Code Ann. § 51.002(a), (b), (d) (West 2012). After those 20 days expired, the Bank could post a foreclosure notice at the courthouse, file the notice with the county clerk, and notify the borrower of the foreclosure sale, which could be held as soon as 21 days thereafter. *Id.* Even if the Bank does not intend to actually foreclose on a defaulted borrower, posting a

foreclosure notice at the courthouse soon after a default can be a useful tool to induce such a borrower to get current on their payments—but the Bank is now prohibited by the Bureau's new rule from doing so for 120 days.  The Bureau's new rule will increase the Bank's costs by drawing out the process by which the Bank may seek to recover on a defaulted loan.

37.     Any new loans the Bank would make would also be subject to the Bureau's foreclosure limitations.

38.     But for the Bureau, its rules, and its enforcement authority, the Bank would reenter the consumer mortgage and remittance markets without limitation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 12, 2013, at Big Spring, Texas.

Jim R. Purcell



## Compliance Alliance

**Are the hundreds of new and changing rules and regulations forcing you to hire additional staff to keep your bank in compliance?**

Compliance officers receive an average salary of $62,000 plus benefits. Bank attorneys are paid upwards of $100,000. The risk of noncompliance is too great to not get help.

## HELP IS AVAILABLE!

CALL TODAY
**888-353-3933**

OR VISIT

**www.compliancealliance.com**





# Compliance Alliance

## Has the onset of regulatory changes made your bank struggle to keep its head above water?

With the tsunami of regulations coming, the amount of work, financial resources and time demands will put a tremendous strain on banks. Facing the storm alone can be risky. Compliance Alliance is a banker's life raft to safety and security.

# HELP IS AVAILABLE!

CALL TODAY
**888-353-3933**

OR VISIT
**www.compliancealliance.com**



# The Industry – Ready or Not –
## *It's Coming...*

- You have undoubtedly heard and read much about the compliance and operational impacts of the Dodd-Frank Act.

- The Dodd-Frank Act will have a significant and costly effect on traditional banks.

- Banks should pay close attention to the rules, regulations and statements that come from the newly created CFPB and other regulatory banking agencies.

- Each of these new compliance mandates will affect consumer financial products and services and enterprise risk management throughout the bank.



Compliance ✦ Alliance

# Survey Says...

- Survey results indicated that banks plan to hire or redirect one or more FTEs to handle compliance needs

- Average salary for a compliance officer is $62,000 plus benefits (Based on TBA Salary Survey)

# Research Says...

TBA is a member-driven Association that strives to meet our members' needs. When we saw the insurmountable compliance burden grow for our members, we set out to help our members navigate through the complexity of the compliance maze.

- Held a Compliance Focus Group meeting in 2010, comprised of 16 banking compliance personnel from TBA member banks across the state to explore ways to ease the compliance and regulatory burdens on banks.

- Surveyed our TBA Board of Directors to get feedback on their plans to adapt to the compliance and operational impacts of the Dodd-Frank Act.



Compliance ★ Alliance

# What we found…
## Compliance Focus Group

### Focus Group Findings:

 **Understaffed.** Bank employees spreading compliance duties across departments to accommodate the load

 **Hard to track.** Bankers' need for a simple calendar to track all things compliance and the mandatory effective dates

 **Mundane tasks.** There is an enormous amount of tedious tasks related to taking a new regulation from introduction to policy

 **Trusted source.** There are other compliance website resources out there, but can they be trusted?

 **One location.** Other compliance websites may have one or two beneficial resource tools, but there is not one site that offers it all, which creates multiple and time consuming web searches. There is a need for a one-stop, up-to-date and trusted website

 **Full Capacity.** Compliance staff are already overloaded with the current level of regulations – How will they survive the 200+ coming?

**Extra Set of Hands.** Compliance staff repeatedly reported the need for an extra set of hands. Hiring is one option, but leveraging the expertise and economies of scale with a trusted and knowledgeable third party will be more economical and free up existing staff's time to take on more.

# What we do....

## Compliance Alliance Benefits:

- Cliff Notes on New Regulations (White Papers)
- Policy Templates
- Procedures
- Processes
- Action Plans
- Lending Matrices
- Compliance Hotline


Compliance Alliance

# What we do...

## Compliance Alliance Benefits:

- Cheat Sheets
- Checklists
- Worksheets
- Compliance Calendar
- Risk Assessment Tools
- Tracking Tools
- Review of Advertising and Marketing
- Review of Website


Compliance Alliance

# What we do...

## Compliance Alliance Benefits:

- Evaluate new products to ensure compliance

- Review Disclosures

- Training Tools

- Statutes

- Regulations

- Rules

- Interpretations

- Compliance Webinars

- Compliance Newsletter



Compliance ★ Alliance

# What we do...

## Compliance Alliance Benefits:

- Forms
- Notices
- Website
- Notification of changes, updates, and news
- FAQs
- And more to come...



Compliance Alliance

# Regulatory Cliff Notes
## (White Papers)

Compliance ★ Alliance

Sample Letters

Policy

Procedures

Compliance ★ Alliance

# Flowcharts

# Check Lists

# Processes



Compliance ✦ Alliance

---



**Compliance Alliance**

## Regulation O Flowchart

Is Applicant an insider of the holding Company, Bank, or Affiliate?

Reg O Provisions Do Not Apply

### Reg O Violations

Civil Money Penalties - FIRREA

Tier 1: $5,000 per day
Tier 2: $27,500 per day
Tier 3: $1.1 million per day

www.compliancealliance.com

---

**Compliance Alliance**

## Verification Processes to Support Compliance with Reg O:

1. Review the integrity controls over software used to generate insider lending reports.

2. Select a sample of insider loans from insider lending reports.

   a. Determine if they are properly coded and reflected on the reports.

   b. Prepare confirmation form to insiders. Confirmations should include the original amount, interest rate, current loan balance, and a brief description of the collateral.

   c. After a reasonable period of time, mail second requests, if necessary.

   d. Follow up on any 'no reply' or exceptions.

   e. Determine that required signatures of approving officer(s) were obtained.

   f. Determine that the note is signed and appears to be genuine.

   g. Determine if collateral held is consistent with the collateral register and loan terms.

   h. List and investigate all collateral exceptions.

   i. Determine if any collateral held by outside customers is consistent with loan terms and conditions.

   j. Confirm any collateral held outside of the bank.

   k. Determine that each loan file contains documentation supporting the terms and conditions of the loan.

3. Review payment history and compare to the loan terms, investigating any differences.

4. Test interest rate and accrual calculations and compare to the general ledger.

5. Look for any extensions or renewals and determine if they are consistent with loan policy and reported to the Board.

Page 1

---

**Compliance Alliance**

## Preparing for the Audit/Exam of Insider Activities

Review each specified section for content, accuracy, and compliance.

**Policies**

1. Has the bank adopted a written insider policy that seeks to avoid both the existence and appearance of conflicts of interest and breaches of fiduciary duty? Verify the last date approved and documented in the Board minutes.

2. Review policy to ensure it addresses:

   a. Disclosure to the Board of actual or potential conflicts of interest?

   Is effective insider abstaining from the approval process on any transaction in which the insider may benefit directly or indirectly from the decision?

   Acquisition of "related interests" as defined in 12 CFR 215?

   Acquisition by insiders of any material interest in the business of a borrower, an insider, other bank customer, vendor, or supplier?

   Acquisition of insider transactions with the bank including payment to or payment from the bank of fees or commissions by insiders?

   Remuneration of the circumstances and conditions under which the bank may bar insider transactions?

   Remuneration of the circumstances and conditions under which the bank will allow the use of its facilities, real or personal property, or personnel available to insiders?

   Prohibition from soliciting anything of value from anyone in return for any business service or confidential information of the bank?

   Prohibition from accepting anything of value other than bona fide salary, wages, or other compensation paid in the usual course of business from anyone in connection with the business of the bank, either before or after a transaction discussed or consummated?

   Guidelines for arm's-length transactions with insiders, or inappropriate transactions?

Page 2

www.compliancealliance.com

**Compliance Alliance**

## Regulatory Policy & Training Requirements and Penalties

| Regulation | Policies *** | Training | Penalties for non compliance |
|---|---|---|---|
| **Regulation B, Equal Credit Opportunity Act** | Expected | Strongly Recommended For New Account and Loan Personnel | • FIRREA Penalties Civil liability:<br>  • Actual damages<br>  • Punitive damages<br>    a. $10,000 in individual cases,<br>    b. the lesser of $500,000 or ½ of the creditor's net worth in class action suits<br>• Attorney's fees |
| **Regulation C, Home Mortgage Disclosure Act** | Expected | Recommended Regularly For New Account and Loan Personnel (Consumer Compliance Handbook Examination Manuals 132) | • FIRREA Penalties |
| **Regulation D, Reserve Requirements of Depository Institutions** | Expected | Recommended Regularly For New Account Personnel | • FIRREA Penalties: Civil penalties are available, Federal Reserve may waive penalties exempt for gross negligence or willful noncompliance |
| **Regulation E, Electronic Fund Transfer Act** | Expected | Recommended Regularly For Teller and New Account Personnel (Consumer Compliance Handbook Examination Manual pg 25) | • FIRREA Penalties Civil liability:<br>  • Actual damages<br>  • Court costs and attorney's fees Criminal liability:<br>  • Fines up to $5,000 and/or imprisonment of up to one year for knowingly giving false information<br>  • Fines up to $10,000 and/or imprisonment for 10 years for forgery, counterfeiting, and stealing debit devices |
| **Flood Insurance Flood Disaster Protection Act** | Expected 12 CFR 208.25 | Recommended Regularly For New Account and Loan Personnel 12 CFR 208.25 | • FIRREA Penalties Statutory penalties<br>  • $385 per violation<br>  • Up to $135,000 per lender per; calendar year<br>• Potential of negligence liability if lender does not comply with the act and the borrower's property is damaged or destroyed |
| **Regulation M, Consumer Leasing** | | | • FIRREA Penalties Civil liability:<br>  • Actual damages<br>  • Court costs, attorney's fees<br>  • Statutory damages ($100 to $1,000)<br>  • Class Actions ($500,000 or 1% of the creditor's net worth, whichever is less) Criminal liability |

# Risk Assessment Tools

Compliance ★ Alliance

## Fair Lending Risk Assessments

**Compliance Alliance**

**Directions:** In this Assessment, summarize the factors supporting the Level of Risk, the Aggregate Level, and the Direction by checking Low, Moderate, or High or High boxes in the Totals Box below to determine your bank's overall

### ▶ Quantity of Risk

| High | L | M | H | Comments |
|---|---|---|---|---|
| table volume of consumer ud be encouraging to | | | | |
| posure offered (e.g., sub-ngages, etc.) Prime and , offers appear similar. | | | | |
| tory exceptions to-areas. | | | | |
| oes a high level of subjective actors. | | | | |
| tiates among approved denied t basis groups. | | | | |
| imbiguous/incomplete chibited basis groups. | | | | |
| s in lending patterns identified s. | | | | |

alliance.com

Page 1

---

**Compliance Alliance**

## Overall Compliance Risk Assessments

**Directions:**
In this Assessment, summarize the factors supporting the Level of Risk, the Aggregate Level, and the Direction by checking Low, Moderate, or High for each category. Then, total the number of check marks in the Low, Moderate, or High boxes in the Totals Box below to determine your bank's overall risk. Please be sure to also note comments regarding your bank's status for each category.

### QUANTITY OF COMPLIANCE RISK INDICATORS

| LOW | MODERATE | HIGH | L | M | H | COMMENTS |
|---|---|---|---|---|---|---|
| Violations or noncompliance issues are insignificant, as measured by their number or seriousness. | The frequency or severity of violations or noncompliance is reasonable. | Violations or noncompliance expose the company to significant impairment of reputation, value, earnings, or business opportunity. | | | | |
| The institution has a good record of compliance. The bank has a strong control structure that has proven effective. Compliance management systems are sound and minimize the likelihood of excessive or serious future violations or noncompliance. | The institution has a satisfactory record of compliance. Compliance management systems are adequate to avoid significant or frequent violations of noncompliance. | The institution has an unsatisfactory record of compliance. Compliance management systems are deficient and reflect an inadequate commitment to risk management. | | | | |
| Management fully understands all aspects of compliance risk and exhibits a clear commitment to compliance. The commitment is communicated throughout the institution. | Management reasonably understands the key aspects of compliance risk. The commitment to compliance is reasonable and satisfactorily communicated. | Management does not understand, or has chosen to ignore, key aspects of compliance risk. Its importance of compliance is not emphasized or communicated throughout the organization. | | | | |

Compliance ★ Alliance

# Cheatsheets

Compliance ★ Alliance

## Quick Reference Info Chart for Revocable Living Trust Accounts

| | |
|---|---|
| STYLE OF ACCOUNT AND OWNERSHIP OF FUNDS | The account should be styled either in the name of the trust or in the name(s) of the trustee(s). For example: • John Doe Revocable Living Trust, John Doe, Trustee; or • Doe Family Trust, John Doe, Trustee The funds in the trust account are owned by the grantor/Trustees just/manage the trust. |
| TAXPAYER IDENTIFICATION NUMBER (TIN) REQUIREMENTS | Either the grantor's SSN (trustee must have grantor sign the SSN certification), or EIN certified by the trustee. |
| DOCUMENTATION | Documents should be obtained at the time a deposit account is opened. Documents include: 1. Signature card signed only by the trustee(s); 2. TIN (SSN) or EIN certification; 3. Trust Authorization and Agreement; and 4. A copy of the trust agreement, or certificate of trust (affidavit). The certificate of trust should include (sample mode): 1. Trustee; 2. Names of trustee and successor trustee, if any; 3. Name and address of each beneficiary; 4. Powers granted to the trustee; and 5. Indemnification of the bank. |
| INFORMATION | The following CIP information is required from the grantor(s) at the time the deposit account is opened: 1. Name; 2. Date of birth; 3. Physical address of residence; 4. Appropriate TIN; and 5. Proof of trust indicate. FDIC Coverage Limits: ✓ $250,000 for each named beneficiary, or the total amount allocated to each beneficiary, whichever is greater ✓ Trustees, co-trustees, and successor trustees are not relevant |

Under Texas Statute, the indemnification should specify that... The bank is not liable for administering the account as provided by the certificate of trust, even if the certificate of trust is contrary to the terms of the trust agreement, unless the bank has actual knowledge of the terms of the trust agreement.

## Quick Reference Info Chart for Corporate Accounts

| | |
|---|---|
| STYLE OF ACCOUNT AND OWNERSHIP OF FUNDS | The account should be styled in the legal name of the entity. For example: • Food Market, Inc. • Food Market, Corporation • Food Market, Inc., DBA Sunset Produce (assumed name certificate required) |
| TAXPAYER IDENTIFICATION NUMBER (TIN) REQUIREMENTS | EIN is required, and SSNs are never permissible. Certification of the EIN is provided by the officer of the corporation. |
| DOCUMENTATION | The following documentation should be obtained at the time the account is opened: 1. Signature card signed by those persons authorized to sign on the account; 2. EIN certification signed by one of the officers of the corporation; 3. Certificate of Corporate Resolution (TX); or Delete copy of Certificate of Formation or Articles of Incorporation (if formed before January 1, 2006), and Certificate of Filing (TX); 5. Certificate of Authority for foreign corporations (TX); 6. Assumed name certificate if applicable (TX, CIP) |
| INFORMATION | The following CIP information is required: 1. Name of corporation; 2. Address of corporation; 3. EIN; and 4. Corporate Resolution. Tip: Find or verify proof of corporation's legal existence and assumed name documentation on the Texas Secretary of State's (SOS's) website, http://www.sos.state.tx.us. Tip: Obtain the name and address of the corporation's registered agent. This can be found on the SOS's website. Tip: To also remove a signer a financial institution will need a new corporate resolution and a new signature card. FDIC Corporate Accounts/Coverage Limits: ✓ $250,000 per corporation |

* Legal name of the entity includes the form of ownership.
* TIC means under Texas law.
** No signer open not... the business or individual designated to receive service of process when a business entity is a party.
It is legal action such as a lawsuit or summons.

# Loan Matrix

## Compliance Alliance

## Current Compliance
## Alliance Staff Experience

- **One Attorney with 18 Years Banking Experience**

- **One Attorney with 9 Years Banking Experience**

- **One Compliance Specialist with 13 years at OCC and 14 years of Compliance and Auditing Experience**

- **One Compliance Specialist with 25 years of Bank Compliance Experience**



Compliance ★ Alliance

We listened to you...
and designed

a bank compliance company
for bankers by bankers.



Compliance Alliance

# Compliance Alliance
## Pricing

| Three Year Contract – signed by 08/15/11 | Three Year Contract – signed after 08/15/11 | One Year Contract |
|---|---|---|
| $12,000/ yr. | $15,000/ yr. | $18,000/ yr. |



Compliance ★ Alliance

# Join Compliance Alliance

- Due to the vast interest and demand for service, Compliance Alliance will start servicing banks based on the order of sign-up.

- To join, please contact us at:

  (888) 353-3933  or email
  compliancealliance@texasbankers.com





Search  ×

Compliance ✦ Alliance

| ABOUT US | LAWS & REGS | TOOLS | RESOURCES | LINKS OF INTEREST |

## CFPB Issues Rule To Protect Consumers From Irresponsible Mortgage Lending

01/10/13

**CFPB Issues Rule to Protect Consumers from Irresponsible Mortgage Lending**

Today the Consumer Financial Protection Bureau (CFPB) adopted a new rule that will protect consumers from irresponsible mortgage lending by requiring lenders to ensure prospective buyers have the ability to repay their mortgage. The rule also protects borrowers from risky lending practices such as "no doc" and "interest only" features that contributed to many homeowners ending up in delinquency and foreclosure after the 2008 housing collapse.

"When consumers sit down at the closing table, they shouldn't be set up to fail with mortgages they can't afford," said CFPB Director Richard Cordray. "Our Ability-to-Repay rule protects borrowers from the kinds of risky lending practices that resulted in so many families losing their homes. This common-sense rule ensures responsible borrowers get responsible loans."

Leading up to the mortgage crisis, certain lenders originated mortgages to consumers without considering their ability to repay the loans. The gradual deterioration in underwriting standards led to dramatic increases in mortgage delinquencies and rates of foreclosures. What followed was the collapse of the housing market in 2008 and the subsequent financial crisis. The 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act created broad-based changes to how creditors make loans and included new ability-to-repay requirements, which the CFPB is charged with implementing... Read more.

Read Other news

© 2013 COMPLIANCE ALLIANCE, INC.   CONTACT US | ABOUT US | PRIVACY POLICY | TERMS OF SERVICE

LOGOUT

MY PROFILE

EMAIL UPDATES

HAVE A COMMENT
OR SUGGESTION?
Feedback Form

COMPLIANCE
HOTLINE

Phone: (888) 353-3933
Email Compliance Alliance

COMPLIANCE CALENDAR
Save A Reminder
(What's this?)

📧 f 8+ in

COMPLIANCE
CALENDAR

Compliance ✦ Alliance

🔍 Search  ×

COMPLIANCE
CALENDAR

| ABOUT US | LAWS & REGS | TOOLS | RESOURCES | LINKS OF INTEREST |

LOGOUT

MY PROFILE

EMAIL UPDATES

HAVE A COMMENT
OR SUGGESTION?

Feedback Form

COMPLIANCE
HOTLINE

Phone: (888) 353 3933
Email Compliance Alliance

⬛ CHAT WITH CA!!!
Leave a message
(What's this?)

📷 ⬛ f 8+ in

# CFPB Launches Inquiry On Campus Financial Products

01/31/13

**CFPB Launches Inquiry on Campus Financial Products**

The Consumer Financial Protection Bureau (CFPB) announced that it is launching an inquiry into the impact of financial products marketed to students through colleges and universities. The CFPB intends to use the information gathered to determine whether these arrangements are in the best interest of students.

"We have seen many colleges establish relationships with financial institutions to offer banking services to their students," said CFPB Director Richard Cordray. "The Bureau wants to find out whether students using college-endorsed banking products are getting a good deal."

The Credit CARD Act of 2009 (CARD Act) restricted financial institutions from using certain types of marketing practices on college campuses. The CARD Act also made agreements between credit card issuers and institutions of higher education subject to public disclosure. However, less is known about arrangements regarding other products marketed to students. To better understand the market, the CFPB is publishing today a Notice and Request for Information on the topic of campus financial products. Campus financial products include student identification cards that double as debit cards, cards used to access scholarships and student loans, and school-affiliated bank accounts. Read more.

Read Other news

© 2013 COMPLIANCE ALLIANCE, INC.    CONTACT US | ABOUT US | PRIVACY POLICY | TERMS OF SERVICE

If this email does not display properly, please view our online version.
To ensure receipt of our email, please add 'info@compliancealliance.com' to your address book.



April 10, 2012


**Email to a friend**

## REMEMBER CONSUMER COMPLAINTS WHEN REVIEWING YOUR OVERDRAFT PROGRAM

In the wake of the comment period ending for overdrafts, we wanted to address an important component to remember when reviewing your overdraft program, whether it is automated or ad hoc.

If you have been out in the trenches you know that customers seem to have shorter fuses these days. Aggravation and stress levels seem higher than normal. Right in the middle of the aggravation, the regulatory agencies are going to make sure the stakes for keeping our customers happy have never been higher, especially now that the new Consumer Financial Protection Bureau has "gone live."

One of the first icons that any visitor to the Consumer Financial Protection Bureau's home page sees is a reddish box labeled "Submit a credit card complaint." That is just the first complaint reporting function the Bureau plans.

"The Dodd-Frank Act directs the CFPB to facilitate the collection and monitoring of and response to consumer complaints regarding certain financial products and services. These complaints and consumers' inquiries will help the CFPB identify areas of concern and will help the CFPB in its supervision and other responsibilities."

How the Bureau will handle complaints remains to be seen. But bank regulators have already stepped up their own attention to consumer complaints, both those filed with the agencies and those made to banks directly. New channels for complaints, ranging from tweets on Twitter and demonstrative videos on YouTube to angry blogs and more, underscore that consumer dissatisfaction with their financial services providers have entered a new age.

The message to remember is … Don't wait for Washington to come to you. Before you get a visit from the regulators or the Department of Justice, your bank should have a process in place to address consumer complaints. The complaints that are coming in should be being used as an early warning system to protect customers and the bank from an unintentional problem. It is important to note that anything the customers are telling the banks, good or bad, can be used to "control our destiny." Don't wait for the Consumer Financial Protection Bureau or other regulatory agencies to notify the bank that they have received numerous complaints about your overdraft checking program.

Complaints represent an opportunity to spot weaknesses, places where the bank needs to improve processes, procedures, or, where those are correct, communication with consumers so they understand what is going on. Regulators' exam procedures now stress not only that examiners review a bank's complaints management process, but weigh how well the bank is dealing with what its systems







track.

The Federal Reserve exam manual procedure states: "Determine whether the bank reviews consumer complaints to identify potential compliance problems and negative trends that have the potential to be unfair or deceptive. Determine whether the bank reviews concentrations of complaints about the same product or about bank conduct in order to identify potential areas of concern."

It is not unusual for consumers, when first sending a letter of complaint, for instance, to ramp things up immediately. They not only write to the bank, but carbon copy all banking regulators.

A strong complaint management system will give a bank an overview of six critical factors:

1. Overall volume of complaints.

2. Number of open complaints at a given time, versus resolved complaints.

3. Number of complaints open for a given length of time.

4. Number of complaints where the issue involved has resulted in regulatory violations.

5. Concentrations of complaints tied to a specified area of the bank.

6. The number of complaints arising from a specific source among the bank's operations.

In some areas of banking compliance and regulation, a "dispute" and a "complaint" are not the same thing (for example: electronic funds transfer transactions). Don't confuse disputes with complaints, but don't let a dispute go unresolved and turn into a complaint.

Complaints have always been a serious matter, but they have grown more critical to a bank's compliance record because banking regulators are playing hard ball these days.

When regulators see multiple complaints that all fall into the same area, they may regard this as a pattern or practice of behavior by the bank.

Complaints can wind up as exam issues and be written into the formal report as a "matter requiring attention," and it has been reported that examiners may follow up independently of formal visits to determine how the bank is following up on complaints.

It is important to note that patterns that indicate systemic issues may result in regulatory referrals to the Department of Justice, and even morph into "UDAAP" under the Dodd-Frank Act. (UDAP stood for "Unfair or Deceptive Acts and Practices," while UDAAP underscores the expansion of the standard to "Unfair Deceptive and Abusive Acts and Practices.")

That being said, the banks should not assume they have done something wrong just because a complaint has been received, but if the bank was in the wrong, self-identification will weigh in the bank's favor when regulators examine the bank's complaint record and its impact on overall compliance issues.

The goals of a complaint handling system range from tracking them so they are dealt with to providing an appropriate overview to various levels of bank leadership.

One of the regulators' key interests when reviewing complaint handling systems is whether senior management and the board are given "meaningful data" on customer complaints. Only reporting numbers is not enough. We recommend that complaint reports include the following elements:

• Summaries of significant items,

• Status of complaints,

• Age of pending complaints awaiting resolution,

• Lines of business and bank regions impacted by complaints,

• Regulations impacted by complaints,

• Trends in complaints, and

• Opportunities for improvement.

Once this information is received and reported, the bank can use this information to improve the affected product or line of business.

Compliance Alliance, Inc.
Phone: 888-353-3933 | Feedback

We are sending you this email primarily for your information, to meet your needs and further our valued relationship. We value your privacy. **Privacy Policy**

**STAY CONNECTED**



If you prefer not to receive any further email from Compliance Alliance, Inc., please unsubscribe here.

If this email does not display properly, please view our online version.
To ensure receipt of our email, please add 'info@compliancealliance.com' to your address book.



May 30, 2012



**Email to a friend**





## THE CFPB TAKES AIM AT CURTAILING RULES FOR MORTGAGES

I am sure you have heard the news regarding one of the CFPB's latest proposals, specifically regarding flat fee compensation instead of origination fees being tied to a loan amount. On May 8, 2012, the Consumer Financial Protection Bureau (CFPB) said it plans to propose tighter mortgage lending regulations that would limit the ability of banks to charge specified transaction fees to consumers when they buy a house.

If you recall, on March 9, 2012, the CFPB announced that they will propose residential mortgage loan origination (MLO) rules this summer with a goal of adopting the final rules by January 2013. According to the CFPB, these rules will make it easier for consumers to understand mortgage costs and compare loans in order to get the best deal.

Director Richard Cordray stated that "Mortgages today often come with so many different types of fees and points that it can be hard to compare offers. We want to bring greater transparency to the market so consumers can clearly see their options and choose the loan that is right for them."

The CFPB is considering proposals that would:

- Require an interest-rate reduction when consumers elect to pay discount points;
- Require lenders to offer consumers a no-discount-point loan option;
- Ban origination charges that vary with the size of the loan;
- Implement federal standards for qualification of loan originators; and
- Reconfirm the prohibition on paying steering incentives to mortgage loan originators.

The CFPB also has plans to convene a Small Business Review Panel that will meet with a group of representatives of the small financial services providers that would be directly affected by the proposals under consideration.

In my opinion, the most concerning proposals issued by the CFPB are the complete ban on dual compensation of loan origination, the potential flat charge per loan originated, regardless of size, and the limitations on upfront payments of discount points, origination points, or fees. While the CFPB may create some exemptions related to the points and fees provision if it finds that doing so would be "in the interest of consumers and in the public interest," the Bureau believes generally that points and fees present the possibility of consumer confusion. Thus, by providing



no exemptions, lenders would be forced to offer no-point, no-fee loans and to recover their administrative costs through the rate over time, rather than through upfront payments.

The CFPB's lack of forethought as to the overall effect these types of bans will have on the consumers ability to actually availability of consumer credit and the mortgage industry as a whole is disturbing.

Similarly, with regard to the licensing requirements, the CFPB's suggestion of one size fits all, namely, that licensing requirements will be the same for all originators (e.g., banks, thrifts, mortgage brokers, nonprofit organizations), will likely increase problems in implementation and effectiveness. These types of ultimatums, invariably, will cause small businesses to struggle, given the increased regulatory burdens and limitations. Further, the availability of consumer credit to borrowers seeking smaller mortgages may decrease if banks are not able to seek some sort of guaranteed compensation for the risk they incur to offer credit to many of their customers.

These proposals will be reviewed by the public and a small-business panel to be convened by the consumer bureau. This panel is a requirement of Dodd-Frank, as a way of trying to limit the effect of new regulations on small businesses.

After taking comments, the bureau will formally propose the rules this summer and, after another round of comments, hopes to make them permanent by January.

Please take the time to write a comment letter addressing these concerns.

Compliance Alliance, Inc.
Phone: 888-353-3933 | Feedback

We are sending you this email primarily for your information, to meet your needs and further our valued relationship. We value your privacy. **Privacy Policy**

STAY CONNECTED



–

If you prefer not to receive any further email from Compliance Alliance, Inc., please unsubscribe here.