UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE NATIONAL BANK OF BIG )
SPRING *et al.*, )
　　　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　Plaintiffs, )
　　　　　　　　　　　　　　　　　　　　　　　　　)
　　v. )
　　　　　　　　　　　　　　　　　　　　　　　　　) Case No. 1:12-cv-01032 (ESH)
JACOB J. LEW, in his official capacity as )
United States Secretary of the Treasury and ) Judge: Hon. Ellen S. Huvelle
*ex officio* Chairman of the Financial Stability )
Oversight Council )
1500 Pennsylvania Avenue, NW )
Washington, DC 20220, *et al.*, )
　　　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　Defendants. )

**SUPPLEMENTAL DECLARATION OF GREGORY JACOB IN SUPPORT OF PRIVATE PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1)**

Under 28 U.S.C. § 1746, I, Gregory Jacob, state:

1.　　I am a partner with the law firm of O'Melveny & Myers LLP. I represent Plaintiffs State National Bank, the Competitive Enterprise Institute, and the 60 Plus Association ("Private Plaintiffs") in the above-entitled action, and I am admitted to practice in the United States District Court for the District of Columbia.

2.　　I submit this supplemental declaration in support of Private Plaintiffs' Opposition to Defendants' Motion to Dismiss the Second Amended Complaint ("Motion") in the above-entitled action. I have personal knowledge of the matters set forth in this declaration, and if called to testify to the facts stated herein, I could and

would do so competently.

3. Attached hereto as Exhibit 1 is a true and correct copy of the prepared remarks of Under Secretary for Domestic Finance Mary Miller at the Annual Washington Conference of the Institute of International Bankers (Mar. 4, 2013), http://www.treasury.gov/press-center/press-releases/Pages/jl1868.aspx. In those prepared remarks, Under Secretary Miller states that:

> The FSOC is also in the final stages of evaluating an initial set of nonbank financial companies for potential designation, which will subject them to enhanced prudential standards and supervision by the Federal Reserve, closing an important regulatory gap. . . . For this first set of companies, we are nearing the end of that process, and our hope is that the Council will vote on designations in the next few months.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of March 2013, at Washington, DC.

s/Gregory Jacob<br>Gregory Jacob

# Exhibit 1

U.S. DEPARTMENT OF THE TREASURY

## Press Center

**Remarks of Under Secretary for Domestic Finance Mary Miller at the Annual Washington Conference of the Institute of International Bankers (IIB)**

3/4/2013

*As prepared for delivery*

**WASHINGTON** - Good morning and welcome. Thank you for inviting me to join you again this year at your annual Washington conference.

This month marks the five-year anniversary of the failure of Bear Stearns and the start of the financial crisis and biggest recession our country has experienced since the Great Depression. Those events in turn led to the passage of the Dodd-Frank Wall Street Reform and Consumer Protection Act that President Obama signed into law in the summer of 2010 – the most comprehensive set of reforms to our financial system in 80 years.

The Dodd-Frank Act was a needed antidote for regulations that were too antiquated and weak to prevent or respond effectively to a financial crisis that inflicted devastating damage on the U.S. economy and American families.  The inadequacy of our previous financial regulatory system was a major reason the crisis was so severe.

Americans are already beginning to see benefits of the reforms implemented in the wake of the crisis reflected in a safer and stronger financial system and a broader economic recovery.  Although the financial markets have recovered more vigorously than the overall economy, with the stock market near its October 2007 all-time high, the economic recovery is also gaining traction.  Private-sector payrolls have increased by more than 6 million jobs from the low point in February 2010, marking the 35th consecutive month of private-sector job growth.  The unemployment rate, while still too high at 7.9 percent, has fallen more than two percentage points since October 2009.  The recovery in the housing market also still has further to go, but it appears to be taking firmer hold as measured by rising home prices, stronger sales, and declining numbers of defaults and foreclosures.

*****

It looks like you have a packed agenda over the next two days during which you will hear directly from a number of the financial regulators responsible for implementing Wall Street Reform.  While additional work remains to be done, we have already made significant progress and are much closer to the end of the process than the beginning.

Consumers have access to better information about financial products and are benefiting from new protections.  Financial markets and companies have become more transparent.  Regulators have become better equipped to monitor, mitigate, and respond to threats to the financial system.

Our financial system has become smaller as a share of the economy and significantly less leveraged, reducing our vulnerability to a potential future crisis.  Capital requirements for the largest banks have increased substantially, and U.S. banks have raised their capital levels to approximately $1 trillion, up 75 percent from three years ago.  We have a new framework in place for protecting the financial system, the economy, and taxpayers from the consequences of the failure of a large financial company.

Eleven of the largest bank holding companies have already submitted their living wills to the Federal Reserve and Federal Deposit Insurance Corporation.  The other firms required to submit living wills will follow suit by the end of this year, providing their regulators with a roadmap to wind them down should they fail.  The costs of resolving a failed financial company will not be borne by taxpayers, but by the company's stockholders, creditors, and culpable management – and if necessary by the broader financial services industry.

The newly created Consumer Financial Protection Bureau (CFPB) has taken important steps to provide clarity on consumer financial products for ordinary Americans.  The CFPB is cracking down on deceptive or abusive practices and helping to level the playing field between banks and nonbanks, so that they play by the same rules when dealing with customers.

Expanded enforcement authorities at the Securities and Exchange Commission (SEC) and the Commodity Futures Trading Commission (CFTC), along with their new whistleblower rules, are providing investors with increased protections, and the agencies' vigorous enforcement efforts should serve as a greater deterrent to misconduct.  Investors in thousands of publicly traded companies have exercised new rights to vote on executive compensation packages as a result of Dodd-Frank's say-on-pay provisions.

A new framework for regulatory oversight of the over-the-counter (OTC) derivatives market is largely in place.  It will significantly reduce risks and provide much-needed transparency for both market participants and regulators.  As a result of trade-reporting requirements, the price and volume of certain swap transactions are now available to regulators and the public, at no charge, and reporting for additional asset classes has just begun.  Swap dealers now have to register with the CFTC and adhere to new standards for business conduct and recordkeeping.  Beginning later this month, certain types of financial institutions transacting in clearable interest-rate or credit-index swaps must move those transactions to central clearinghouses, reducing overall risk to the financial system.

*****

Some of Treasury's specific responsibilities under the Dodd-Frank Act include standing up new organizations to strengthen coordination of financial regulation both domestically and internationally, and better respond to potential risks to the financial system. Over the past 30 months, we have focused considerable effort on creating the Financial Stability Oversight Council, the Office of Financial Research, and the Federal Insurance Office.

The Financial Stability Oversight Council

The Financial Stability Oversight Council (FSOC) has become a valuable forum for collaboration among financial regulators and, despite its relative youth, has assumed a central role in financial regulatory reform and in

addressing risks to the financial system.  Our new Treasury Secretary Jack Lew chaired his first FSOC meeting last week following his confirmation by the Senate, and we are fortunate to have his leadership.

The FSOC and its subcommittees are key forums for coordination among regulators.  There is steady and understandable demand from the financial industry for enhanced regulatory coordination.  Given the different statutory mandates and supervisory responsibilities of the various independent financial regulators, they are not always able to achieve as much alignment as regulated entities and market participants might desire.  However, by having a regular forum available for frank discussion and early identification of areas of mutual interest, the financial regulatory community has been able to strengthen coordination.

Perhaps of particular interest to this group, the FSOC can also help promote collaboration among U.S. regulators on international regulatory issues.  The U.S. representatives to groups such as the Financial Stability Board, the International Organization of Securities Commissions, and the International Association of Insurance Supervisors are able to use the FSOC as a means of sharing information and collaborating with a broader group of domestic colleagues on international efforts.

The benefits of strengthened coordination go beyond regulatory implementation.  One of the strongest attributes of the FSOC has been its ability to quickly bring the key regulators together to respond to such events as the failure of MF Global and the disruption to financial markets caused by Superstorm Sandy.

In addition to the FSOC's coordination role, it has certain authority to provide for more stringent regulation of a financial activity by issuing recommendations to the responsible regulatory agencies.  An example along these lines is vulnerability in the short-term funding markets, which the FSOC first noted in its 2011 annual report and then again in 2012.  The focus on this exposure ultimately led to the FSOC's issuance of proposed recommendations on money market mutual fund reforms.  The comment period on those proposed recommendations closed last month, and we are currently reviewing and analyzing the comments.

The FSOC has also taken significant steps to designate and increase oversight of financial companies whose failure or distress could negatively impact financial markets or the financial stability of the United States.  In July 2012, the FSOC designated eight financial market utilities, companies that play important roles in our clearing, payment, and settlement systems, as systemically important.  These companies are now subject to higher risk-management standards and coordinated oversight by the Federal Reserve, the SEC, and the CFTC.

The FSOC is also in the final stages of evaluating an initial set of nonbank financial companies for potential designation, which will subject them to enhanced prudential standards and supervision by the Federal Reserve, closing an important regulatory gap.  This is not a power the Council wields cavalierly.  Since October 2010, we have designed a rigorous designation process that is thorough and fair and takes into account both quantitative data and qualitative judgment.  The Council is evaluating the potential for companies to pose a threat to financial stability based on a broad array of factors.

Careful assessments of these firms take time.  Over the last year, we have reviewed public data, engaged with an initial set of companies to gather additional information, and coordinated with the companies' regulators to develop thorough assessments. For this first set of companies, we are nearing the end of that process, and our hope is that the Council will vote on designations in the next few months.

The Office of Financial Research

Treasury has also made significant progress in establishing the Office of Financial Research (OFR).

The OFR provides important support for the FSOC, including data for the FSOC annual report, data and analysis relating to the designation of nonbank financial companies, and financial stability metrics and indicators for use by the FSOC's Systemic Risk Committee.

At this conference last year, I mentioned the ongoing work to establish a global Legal Entity Identifier (LEI), a code that uniquely identifies parties to financial transactions.  The OFR plays a leadership role in this international initiative, with its chief counsel recently having been named Chair of the LEI Regulatory Oversight Committee.

With the planned launch of the global LEI system later this month, the goal of standardizing the identification of these entities will become a reality.  Financial companies and financial regulators worldwide will gain a better view of true exposures and counterparty risks across the global financial system.  In addition, financial entities such as the institutions represented in this audience will benefit from a common standard for identification of counterparties in their own risk management systems.

Federal Insurance Office

Treasury has also worked to establish the Federal Insurance Office (FIO) and develop its ability to serve as the federal voice on insurance issues, both domestically and internationally.

With the establishment of FIO, the United States has gained a single, unified federal voice in the development of international insurance supervisory standards.  FIO now provides important leadership in developing international insurance policy.  FIO serves on the Executive Committee of the International Association of Insurance Supervisors (IAIS) and chairs its Technical Committee.  FIO is working on the IAIS's designations process for global systemically important insurers.  Apart from its work with the IAIS, FIO established and has provided leadership in the European Union-United States insurance project regarding matters such as group supervision, capital requirements, reinsurance, and financial reporting.  FIO has worked and will continue to work closely and consult with state insurance regulators and other federal agencies in this work.

*****

When I spoke to you last year, I also mentioned some of Treasury's other ongoing work.  Since last year, we finalized the foreign exchange determination regarding the treatment of FX forwards and swaps under new derivatives rules.  This was one of the specific authorities given to Treasury in the Dodd-Frank Act.

Another area where the Dodd-Frank Act gives Treasury certain duties is the Volcker Rule.  Treasury is not the rule-writer, but the Secretary in his role as Chairperson of the FSOC is responsible for coordinating the regulations issued by the five agencies charged with implementing the Volcker Rule.  I can tell you that the agencies have been diligently working to finalize the Volcker Rule.  As you probably have heard, there were approximately 19,000 comment letters addressing highly complex issues, and the agencies are extremely focused on getting the substance right.  We remain focused on completing our work on this important part of the Dodd-Frank Act.

*****

International

Our progress domestically is mirrored by our work internationally through the G-20 and the Financial Stability Board (FSB) to support efforts to make financial regulations more consistent worldwide.  By moving early with the Dodd-Frank Act, we have been able to lead from a position of strength in setting the international reform agenda and elevating the world's standards to our own.  We remain attentive to the inevitable inconsistencies and lags on

implementation.  Successful delivery of global financial regulatory reforms is essential for promoting U.S. financial sector competitiveness; building a stable, secure, and more resilient financial system; and avoiding regulatory arbitrage and a race to the bottom.

We are pursuing a comprehensive international reform agenda spanning bank capital and liquidity, resolution, and OTC derivatives markets.

On capital and liquidity, the Basel III standards raise the quality and quantity of capital and strengthen liquidity requirements so that banks can better protect themselves against losses of the magnitude seen in the crisis.  These form the bulwark of core reforms that will enhance the stability of the international banking system.  In June 2012, the federal banking agencies issued proposed rules and currently are working to adopt final rules to implement the Basel III standards in 2013.  It is critical that our international partners implement Basel III faithfully as soon as possible.  In fact, the majority of the largest U.S. banks already meet Basel III capital targets – well ahead of schedule.

On resolution, we have reached an important agreement that key financial jurisdictions should have the tools to resolve large cross-border financial firms without the risk of severe disruption or taxpayer exposure to loss.  The FSB is working actively to see that this international commitment will improve the "resolvability" of systemically important institutions and lead to the development of cross-border recovery and resolution plans.

On derivatives, U.S. regulators have led with reforms to centrally clear derivatives and require transaction reporting.  We have also led the call for the development of a global margin standard for OTC derivatives that are not centrally cleared. The G-20 and the FSB are making steady progress in their efforts to develop such a standard.  In fact, the international Working Group on Margining Requirements recently issued its second consultative document on margin requirements for non-centrally cleared derivatives, requesting comments by March 15.

We have made real progress internationally on all of these fronts and must continue to do so.  As global markets recover from the crisis, the urgency for reform may wane.  Progress remains uneven internationally and significant work remains.  In particular, we must be careful to avoid a fragmentation in financial regulation internationally, which can lead to uneven regulation, unequal treatment, constrained capital flows, and increased uncertainty.  Treasury will continue to work with our partners around the world to achieve global regulatory convergence.

Conclusion

Financial regulatory reform implementation has presented one of the most challenging sets of responsibilities for regulators in nearly 80 years.  We have a highly complex, international financial system with many intricately linked parts.  While the demand for simple rules has a superficial appeal, simple rules do not always suffice to address the nuances of a complex financial system.

Also, as the work of regulatory reform proceeds, issues inevitably arise such as MF Global's failure, the so-called "London Whale" trading losses, and LIBOR manipulation that inform the work of regulators in important ways, but that also require significant attention in and of themselves.  It is worth noting that each of these issues is not purely a domestic concern but also demonstrates the need for a coordinated global approach to financial regulation.

As we move forward, it is critical to strike the appropriate balance of measures to protect the strength and stability of the U.S. financial system while preserving liquid and efficient markets that promote access to capital and economic growth.  Rules must also be properly calibrated to risks, taking into account, for example, the reduced risks that community banks pose compared to large, complex financial institutions.

We have made significant progress since the events of five years ago.  We have put in place stronger protections for consumers, investors, and taxpayers.  We have made important strides towards restoring investors' confidence in the integrity and stability of financial markets and institutions, with resulting benefits for the broader economy.  The progress we have made so far is because of the reforms that we are putting in place, not in spite of them, and our work must continue both in the United States and internationally.  Completion of these reforms provides the best path to achieving continued economic growth and prosperity, grounded in financial stability.

###