UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                              )
STATE NATIONAL BANK of BIG                    )
SPRING *et al.*,                              )
                                              )
        Plaintiffs,                           )
                                              )
        v.                                    )   Civil Action No. 12-1032 (ESH)
                                              )
JACOB J. LEW *et al.*,[1]                     )
                                              )
        Defendants.                           )
_____)

MEMORANDUM OPINION

Plaintiffs State National Bank of Big Spring ("SNB" or the "Bank"), the 60 Plus

Association ("60 Plus"), the Competitive Enterprise Institute ("CEI") (collectively the "Private

Plaintiffs"), and the States of Alabama, Georgia, Kansas, Michigan, Montana, Nebraska, Ohio,

Oklahoma, South Carolina, Texas, and West Virginia (collectively "the States") have sued to

challenge the constitutionality of Titles I, II, and X of the Dodd-Frank Wall Street Reform and

Consumer Protection Act, Pub. L. No. 111-203 (July 21, 2010) (the "Dodd-Frank Act"), as well

as the constitutionality of Richard Cordray's appointment as director of the Consumer Financial

Protection Bureau ("CFPB" or the "Bureau").[2]  (*See generally* Second Amended Complaint

[ECF No. 24] ("Second Am. Compl.").)  Defendants, who include more than a dozen federal

government officials and entities, have filed a motion to dismiss pursuant to Fed. R. Civ. P.

_____

[1] Pursuant to Fed. R. Civ. P. 25(d), if a public officer named as a party to an action in his official capacity ceases to hold office, the Court will automatically substitute that officer's successor. Accordingly, the Court substitutes Secretary Lew for Neil S. Wolin.

[2] The Supreme Court has agreed to hear a similar case involving the recess appointments of three members of the National Labor Relations Board during its next term.  *See NLRB v. Noel Canning*, 705 F.3d 490 (D.C. Cir. 2013), *cert. granted*, 133 S. Ct. 2861 (June 24, 2013) (No. 12-1281).

12(b)(1) on the grounds that plaintiffs lack Article III standing, or, in the alternative, that their claims are not ripe for review.  For the reasons stated below, the Court will grant defendants' motion.

## BACKGROUND

On July 21, 2010, Congress enacted the Dodd-Frank Act as "a direct and comprehensive response to the financial crisis that nearly crippled the U.S. economy beginning in 2008."  S. Rep. No. 111-176, at 2 (2010).  The purpose of the Act was to "promote the financial stability of the United States . . . through multiple measures designed to improve accountability, resiliency, and transparency in the financial system[.] "  *Id.*  Those measures included "establishing an early warning system to detect and address emerging threats to financial stability and the economy, enhancing consumer and investor protections, strengthening the supervision of large complex financial organizations and providing a mechanism to liquidate such companies should they fail without any losses to the taxpayer, and regulating the massive over-the-counter derivatives market."  *Id.*  The Act "creat[ed] several new governmental entities, [] eliminate[ed] others, and [] transferr[ed] regulatory authority among the agencies."  (*See* Defendants' Motion to Dismiss [ECF No. 26-1] ("Def. Mot.") at 6.)

In this suit, plaintiffs challenge Title I of Dodd-Frank, which established the Financial Stability Oversight Council ("FSOC" or the "Council"), *see* 12 U.S.C. § 5321; Title II, which established the Orderly Liquidation Authority ("OLA"), *see* 12 U.S.C. § 5384; and Title X, which established the CFPB.  *See* 12 U.S.C. §§ 5491, 5511.[3]  Specifically, in Count III, the

---

[3] In several unrelated cases, plaintiffs have mounted challenges to regulations promulgated pursuant to authority delegated by Dodd-Frank.  Judge Howell recently held that a plaintiff lacked standing to challenge a CFTC regulation setting minimum liquidation times for swaps and future contracts, which was promulgated, in part, pursuant to Dodd-Frank's DCO Core Principles.  *See Bloomberg L.P. v. CFTC*, No. 13-523, 2013 WL 2458283, at *26 (D.D.C. June

Private Plaintiffs challenge the constitutionality of Title I on separation-of-powers grounds, alleging that the FSOC "has sweeping and unprecedented discretion to choose which nonbank financial companies to designate as 'systematically important'" and that such "powers and discretion are not limited by any meaningful statutory directives."  (Second Am. Compl. ¶ 8.)  In Count I, the Private Plaintiffs challenge Title X on the grounds that it violates the separation of powers by "delegat[ing] effectively unbounded power to the CFPB, and coupl[ing] that power with provisions insulating the CFPB against meaningful checks by the Legislative, Executive, and Judicial Branches[.]"  (*Id.* ¶ 6.)  And, in Count II, the Private Plaintiffs challenge the appointment of Richard Cordray as CFPB Director as unconstitutional on the grounds that he was appointed without the Senate's advice and consent in violation of the Appointments Clause of the United States Constitution.  U.S. Const. art. II, § 2, cl. 2.  (*See* Second Am. Compl. ¶ 7.)[4]

All plaintiffs challenge Title II on three separate grounds.  In Count IV, they allege that Title II violates the separation of powers because it "empowers the Treasury Secretary to order the liquidation of a financial company with little or no advance warning, under cover of

---

7, 2013).  The D.C. Circuit also affirmed Judge Howell's ruling in yet another suit challenging CFTC rulemaking in the wake of Dodd-Frank.  *See Inv. Co. Inst. v. CFTC*, 12-5413, 2013 WL 3185090, at *1 (D.C. Cir. June 25, 2013).  In *Am. Petroleum Inst. v. SEC*, No. 12-1668, 2013 WL 3307114, at *1 (D.D.C. July 2, 2013), the plaintiff challenged a provision of Dodd-Frank now codified at section 13(q) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(q), on First Amendment grounds, and regulations promulgated pursuant to the statute under the Administrative Procedure Act, 5 U.S.C. § 706.  Judge Bates vacated the challenged rule, while declining to reach the constitutional challenge as premature in view of the fact that the SEC "has yet to interpret section 13(q) in light of its discretionary authority, and the interpretation it adopts could alter the First Amendment analysis."  *Id.* at *15.  *See also Am. Petroleum Inst. v. SEC*, 714 F.3d 1329 (D.C. Cir. 2013) (Court of Appeals dismissing simultaneously filed suit for lack of subject matter jurisdiction and leaving plaintiff to pursue its claims in the district court).  And, in *Nat'l Ass'n of Mfrs. v. SEC*, No. 13-0635, 2013 WL 3803918, at *1, 31 (D.D.C. July 23, 2013), Judge Wilkins held that section 1502 of the Dodd-Frank Act and a rule promulgated under that authority did not violate the First Amendment.

[4] The States have not joined Counts I, II, or III.

mandatory secrecy, and without either useful statutory guidance or meaningful legislative, executive, or judicial oversight."  (Second Am. Compl. ¶ 9.)  In Count V, they allege that Title II violates the due process clause of the Fifth Amendment, because the "[t]he forced liquidation of a company with little or no advance warning, in combination with the FDIC's virtually unlimited power to choose favorites among similarly situated creditors in implementing the liquidation, denies the subject company and its creditors constitutionally required notice and a meaningful opportunity to be heard before their property is taken – and likely becomes unrecoverable[.]" (*Id.* ¶ 10.)  And, in Count VI, they allege that Title II violates the constitutional requirement of uniformity in bankruptcy because "[w]ith no meaningful limits on the discretion conferred on the Treasury Secretary or on the FDIC, Title II not only empowers the FDIC to choose which companies will be subject to liquidation under Title II, but also confers on the FDIC unilateral authority to provide special treatment to whatever creditors the FDIC, in its sole and unbounded discretion, decides to favor[.]"  (*Id.* ¶ 11.)

Defendants have moved to dismiss the complaint on the grounds that plaintiffs lack Article III standing to pursue their claims, or, in the alternative, that their claims are not ripe. (*See* Def. Mot. at 4-5.)  This is an unusual case, as plaintiffs have not faced any adverse rulings nor has agency action been directed at them.  Most significantly, no enforcement action – "the paradigm of direct governmental authority" – has been taken against plaintiffs.  *FEC v. NRA Political Victory Fund*, 6 F.3d 821, 824 (D.C. Cir. 1993).  As a result, plaintiffs' standing is more difficult to parse here than in the typical case.  *See, e.g., Noel Canning v. NLRB*, 705 F.3d 490, 492-93 (D.C. Cir. 2013) (employer challenged NLRB decision finding that it had violated the National Labor Relations Act).  Furthermore, while the Bank is a regulated party under Title X, none of the plaintiffs is subject to regulation under Titles I or II.  Nonetheless, plaintiffs maintain

that they have standing to pursue their Title I and II claims, based, respectively, on their status as competitors and as creditors of the regulated entities.

## ANALYSIS

## I.   LEGAL STANDARDS

Plaintiffs bear the burden of establishing that the Court has jurisdiction over their claims. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998).  Nonetheless, "[f]or purposes of ruling on a motion to dismiss for want of standing, [the court] must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."  *Warth v. Seldin*, 422 U.S. 490, 501 (1975).  "While the burden of production to establish standing is more relaxed at the pleading stage than at summary judgment, a plaintiff must nonetheless allege 'general factual allegations of injury resulting from the defendant's conduct' (notwithstanding 'the court presumes that general allegations embrace the specific facts that are necessary to support the claim')."[5] *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011).  Moreover, where a court's subject matter jurisdiction is called into question, the court may, as it has done here, consider matters outside the pleadings to ensure that it has jurisdiction over the case.  *See Teva Pharms., USA, Inc. v. U.S. Food & Drug Admin.*, 182 F.3d 1003, 1006 (D.C. Cir. 1999).  "For each claim, if constitutional and prudential standing can be shown for at least one plaintiff, [the court] need not consider the standing of the other plaintiffs to raise that claim."  *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996).

---

[5] Since plaintiffs raise only facial challenges to the constitutionality of various titles of Dodd-Frank, it is agreed that further development of the record through discovery is unlikely to occur. (*See* 6/11/13 Motions Hearing Transcript ("Tr.") at 12.)

## A.    Standing

"[T]o establish constitutional standing, plaintiffs must satisfy three elements: (1) they must have suffered an injury in fact that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical'; (2) the injury must be 'fairly traceable to the challenged action of the defendant'; and (3) 'it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'"  *NB ex rel. Peacock v. Dist. of Columbia*, 682 F.3d 77, 81 (D.C. Cir. 2012) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).  Where a plaintiff is seeking declaratory or injunctive relief, he "must show he is suffering an ongoing injury or faces an immediate threat of injury."  *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011).

It is well-established that where "the challenged regulations 'neither require nor forbid any action on the part of [the challenging party],' – *i.e.*, where that party is not 'the object of the government action or inaction' – 'standing is not precluded, but it is ordinarily substantially more difficult to establish."  *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 457-58 (D.C. Cir. 2012) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009)).  "In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction – and perhaps on the response of others as well."  *Lujan*, 504 U.S. at 562.  It then "becomes the burden of the plaintiff to adduce facts showing that . . . choices [of the independent actors] have been or will be made in such a manner as to produce causation and redressibility of injury."  *Id.*  The Supreme Court recently reaffirmed its hesitation to "endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment."  *Clapper v. Amnesty International*, 133 S. Ct. 1138, 1150 (2013).  Thus, as observed by the D.C. Circuit, "courts [only] occasionally

find the elements of standing to be satisfied in cases challenging government action on the basis

of third-party conduct." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 940

(D.C. Cir. 2004).

### B. Ripeness

"'Ripeness is a justiciability doctrine' that is 'drawn both from Article III limitations on

judicial power and from prudential reasons for refusing to exercise jurisdiction.'" *Devia v.*

*Nuclear Regulatory Comm'n*, 492 F.3d 421, 424 (D.C. Cir. 2007) (quoting *Nat'l Park*

*Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807-08 (2003)) (internal quotation marks

and brackets omitted).  "In assessing the prudential ripeness of a case," courts consider two

factors: "the 'fitness of the issues for judicial decision' and the extent to which withholding a

decision will cause 'hardship to the parties.'" *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387

(D.C. Cir. 2012) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *overruled on other*

*grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977)).  The underlying purpose of ripeness

in the administrative context "is to prevent the courts, through avoidance of premature

adjudication, from entangling themselves in abstract disagreements over administrative policies,

and also to protect the agencies from judicial interference until an administrative decision has

been formalized and its effects felt in a concrete way by the challenging parties." *Devia*, 492

F.3d at 424 (quoting *Abbott Labs.*, 387 U.S. at 148-49).  Ripeness also prevents a court from

making a decision unless it absolutely has to, underpinned by the idea that if the court does not

decide the claim now, it may never have to.  *Id.*

I.      **TITLE I: FINANCIAL STABILITY OVERSIGHT COUNCIL ("FSOC")**

   A.      **The Statutory Provision**

   Title I of Dodd-Frank established the FSOC.  *See* 12 U.S.C. § 5321.  The purposes of the

Council are

> to identify risks to the financial stability of the United States that could arise from
> the material financial distress or failure, or ongoing activities, of large,
> interconnected bank holding companies or nonbank financial companies, or that
> could arise outside the financial services marketplace; [] to promote market
> discipline, by eliminating expectations on the part of shareholders, creditors, and
> counterparties of such companies that the Government will shield them from
> losses in the event of failure; and [] to respond to emerging threats to the stability
> of the United States financial system.

12 U.S.C. § 5322(a)(1).  The Council has ten voting members: the Secretary of the Treasury,

who serves as the Council Chairperson; the Chairman of the Federal Reserve Board; the

Comptroller of the Currency; the Director of the CFPB; the Chairperson of the Securities and

Exchange Commission ("SEC"); the Chairperson of the Federal Deposit Insurance Corporation

("FDIC"); the Chairperson of the Commodity Futures Trading Commission ("CFTC"); the

Director of the Federal Housing Finance Agency ("FHFA"); the Chairman of the National Credit

Union Administration ("NCUA") Board; and an independent member with insurance expertise

appointed by the President with the advice and consent of the Senate.  *See* 12 U.S.C. §

5321(b)(1).  The Council also includes five nonvoting members.  *See id.* § 5321(b)(3).

   Title I authorizes the Council, upon a two-thirds vote of its voting members, including the

affirmative vote of the Treasury Secretary, to designate certain "nonbank financial companies"

as "systematically important financial institutions" or SIFIs.[6]  12 U.S.C. §§ 5323(a)(1), (b)(1),

---

[6] A "nonbank financial company" is defined as a company "predominately engaged in financial
activities," other than bank holding companies and certain other entities.  12 U.S.C. § 5311(a)(4).
The term "systematically important financial institution" does not actually appear in the Dodd-

5365, 5366.  SIFI designation is based on consideration of eleven enumerated factors leading to a determination that "material financial distress at the U.S. nonbank financial company, or the nature, scope, size, scale, concentration, interconnectedness, or mix of the activities of the U.S. nonbank financial company, could pose a threat to the financial stability of the United States." 12 U.S.C. § 5323(a)(1).  *See id.* (a)(2), (b)(2).  If an entity is designated as a SIFI, it "will be subject to supervision by the Federal Reserve Board and more stringent government regulation in the form of prudential standards and early remediation requirements established by the Board." (*See id.*)  Before designating any company as a SIFI, the Council must give written notice to the company of the proposed determination.  *See* 12 U.S.C. § 5323(e)(1).  The company is entitled to a hearing at which it may contest the proposed determination.  *See id.* § 5323(e)(2). Additionally, once the Council makes a final decision to designate a company as a SIFI, that company may seek judicial review of the determination, and a court will determine whether the decision was arbitrary and capricious.  *See id.* § 5323(h).  There is no provision for third-party challenges to SIFI designation under Title I.  (*See* Second Am. ¶ 157.)

On April 11, 2012, following a notice-and-comment period, the Council published a "final rule and interpretive guidance . . . describ[ing] the manner in which the Council intends to apply the statutory standards and considerations, and the processes and procedures that the Council intends to follow, in making determinations under section 113 of the Dodd-Frank Act." Authority to Require Supervision and Regulation of Certain Nonbank Financial Companies, 77 Fed. Reg. 21637 (Apr. 11, 2012).  On June 3, 2013, while this motion was pending, the Council voted to make proposed determinations regarding a set of nonbank financial companies but did not release the names of the designated companies.  (*See* Second Supplemental Declaration of

Frank Act, but because it has come into common parlance (*see* Def. Mot. at 3 n.2), and the parties have used the term throughout their briefs, the Court will do so as well.

9

Gregory Jacob [ECF No. 34-1] ("Second Jacob Decl.") ¶ 5; *id.*, Exs. 3-4.)  Those companies then had thirty days to request a hearing before a final determination would be made.  (*See* Second Jacob Decl. ¶ 5.)  American International Group, Inc. ("AIG"), Prudential Financial Inc., and the GE Capital Unit of General Electric have confirmed that they are among the designated companies.  (*See id.* ¶ 6; *id.*, Ex. 4.)  AIG and GE Capital have chosen not to contest their designations, but Prudential has announced that it will appeal.  *See* Danielle Douglas, *Prudential enters uncharted legal realm by appealing its regulatory label*, WASH. POST, July 3, 2013, at A14.

## B.      Count III

### 1.      Injury-in-Fact

The Bank claims to have standing to challenge the creation and operation of the FSOC as a violation of the Constitution's separation of powers.  The Bank is not a regulated party under Title I and so, while "standing is not precluded, it is . . . substantially more difficult to establish" under these circumstances.  *Duncan*, 681 F.3d at 457-58.  The Bank's theory of standing relies on an allegation of "competitor injury" arising out of the "illegal structuring of a competitive environment."  *Shays v. Fed. Election Com'n*, 414 F.3d 76, 85 (D.C. Cir. 2005).  The D.C. Circuit has "recogniz[ed] that economic actors 'suffer [an] injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition' against them."  *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) (quoting *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998)).  The Court has also applied this principle to evaluate how campaign finance regulations affect the political "market," generalizing that "any one competing for a governmental benefit should [] be able to assert competitor standing when the Government takes a step that benefits his rival and therefore injures him economically."  *Id.*

Importantly, however, the plaintiff must allege that it is "a *direct* and *current* competitor whose bottom line may be adversely affected by the challenged government action." *New World Radio, Inc. v. FCC*, 294 F.3d 164, 170 (D.C. Cir. 2002) (emphasis in the original). A plaintiff's "'chain of events' injury is too remote to confer standing" where the plaintiff has not stated a "concrete, economic interest that *has been perceptibly damaged*" by the agency action. *Id*. at 172 (internal quotation marks and citation omitted) (emphasis in the original). *See also KERM, Inc. v. FCC*, 353 F.3d 57, 60-61 (D.C. Cir. 2004) ("party must make a *concrete showing* that it is in fact likely to suffer financial injury as a result of the challenged action") (emphasis added). The Supreme Court has likewise made clear that there are limits to the competitor standing doctrine. For instance, in *Already, LLC v. Nike, Inc*., 133 S. Ct. 721 (2013), the Court rejected plaintiff's "boundless theory of standing," remarking, "[t]aken to its logical conclusion, [plaintiff's] theory seems to be that a market participant is injured for Article III purposes whenever a competitor benefits from something allegedly unlawful – whether a trademark, the awarding of a contract, a landlord-tenant arrangement, or so on." *Id*. at 731.

The Bank relies on just such a "boundless theory." *Id*. The assumption underlying the Bank's assertion of injury is that the FSOC's designation of GE Capital as a SIFI will confer a competitive advantage on GE and a corresponding disadvantage on the Bank. (*See* Private Plaintiffs' Opposition to Defendants' Motion to Dismiss [ECF No. 27] ("Pvt. Pl. Opp.") at 36.)[7]

_____

[7] Because no SIFI designations had yet been made when this motion was briefed, the Bank made arguments about "imminent" SIFI designations without identifying any particular competitor that might be designated. (*See* Pvt. Pl. Opp. at 36-39.) Following the designation of GE Capital while this motion was pending, the Bank has sought to establish that GE Capital is a competitor and that it will gain a competitive advantage from its SIFI designation. (*See* Second Jacob Decl., Exs. 3, 4, 5; Second Declaration of Jim R. Purcell [ECF No. 35-1] ("Second Purcell Decl.") ¶¶ 13-17; Third Supplemental Declaration of Gregory Jacob [ECF No. 36-1] ("Third Jacob Decl."), Ex. 1.) While it is unclear if the Bank can seek to identify competitors based on facts that did not

The Bank alleges that GE Capital is its direct competitor in the market to raise capital and in the market to sell consumer loans, and that GE will benefit from a cost-of-capital advantage that "will place SNB at a competitive disadvantage in each" market.  (*Id.* at 37.)

In support of the Bank's allegation that GE is a direct and current competitor in the consumer loan market, Chairman and former President of SNB Jim Purcell asserts in a recent declaration that "approximately 37% of the Bank's outstanding loans are agricultural loans" and "[a]ccording to publicly available information, GE Capital and its subsidiaries offer numerous loans in the agricultural sector, including in markets that are served by the Bank."  (Second Declaration of Jim R. Purcell [ECF No. 35-1] ("Second Purcell Decl.") ¶¶ 4, 11.)  Purcell indicates that there are two farm equipment dealerships within a 100-mile radius of the Bank that provide financing through GE Capital or its subsidiaries.  (*See id.* ¶ 11.)   With respect to the market to raise capital, Purcell indicates that "[t]he Bank competes with a wide variety of bank and non-bank financial institutions for deposits," and offers interest rates ranging from .05% on checking account deposits to .40% on 1-year CDs as of May 31, 2013.  (*See id.* ¶¶ 13, 15.) Based on publicly available data, Purcell represents that GE Capital offers accounts that pay as much as 1.10% as of June 13, 2013.  (*See id.* ¶ 17.)  He asserts that "[c]ustomers can apply for these accounts and fund them online through the GE Capital website from anywhere in the United States, including the geographic areas in which the Bank does its business."  (*Id.*)

While these assertions lend some plausibility to the Bank's allegation that GE is a "direct and current" competitor at least in the agricultural loan business, the Bank relies on conjecture to

---

exist at the time that the suit was filed (*see* Section III.B.3), these added facts still do not make the Bank's injury sufficiently concrete to confer standing.

argue that the SIFI designation will benefit GE and harm the Bank.[8]  The Bank speculates that

the designation will cause investors to flock to the designees because they will be perceived as

safer investments due to the possibility of government backing.  (*See* 6/11/13 Motions Hearing

Transcript ("Tr.") at 72-73, 82.)  Of course, SIFI designation does not, in fact, mean that the

federal government is "backing" the SIFI or that the government will not allow the company to

fail.  Instead, it means that the SIFI will be subject to more stringent regulation and government

oversight.  *See* 12 U.S.C. § 5323(a)(1), (b)(1), 5365(c)(I).  But whether SIFI designation will

mean anything else is simply unknown at this early stage.

 The ambiguous consequences of SIFI designation are underscored by David Price, the

very source cited by the Bank:

> The precise implications of being designated as a SIFI are not known yet because
> the new regulatory regime has not yet been defined. . . . On the plus side, SIFI
> designation may confer benefits on a company by reducing its cost of capital.
> Creditors may believe that enhanced supervision lowers an institution's credit
> risk. . . .The extent of this benefit to creditors, if any, is not clear at this point
> however. . . . So far, institutions appear to believe that they would be worse off as
> SIFIs.  In public comments filed with FSOC and in public statements, large
> nonbanks and their trade associations have argued that they should not be
> considered systematically important. . . . The institutions' concerns about the
> regulatory regime for SIFIs may be heightened by a fear that the as-yet-unwritten
> rules will turn out to be overly restrictive.

David A. Price, "Sifting for SIFIs," Region Focus, Federal Reserve Bank of Richmond (2011), at

www.richmondfed.org/publications/research/region_focus/20110q2/pdf/federal_reserve.pdf

(cited in Second Am. ¶ 145).

 Indeed, one of the proposed SIFIs, Prudential Financial, is appealing its designation,

which indicates that at least one nonbank perceives the designation more as a detriment than a

---

[8] Given the significantly higher interest rates offered by GE Capital, it is somewhat difficult to
understand why the Bank believes it is a direct and current competitor with GE Capital with
respect to the raising of capital.

benefit.  On the other hand, GE Capital has declined to appeal, because it "is already supervised

by the Fed and as a result has strong liquidity and capital."  (Third Supplemental Declaration of

Gregory Jacob [ECF No. 36-1] ("Third Jacob Decl."), Ex. 1, Daniel Wilson, *GE Capital, AIG

Accept SIFI Label While Prudential Protests*, Law 360, July 2, 2013.)  Since the SIFIs

themselves are far from unanimous as to the consequences of being designated, it is difficult to

prophesize that the designation confers a clear benefit on them, much less a corresponding

disadvantage on non-SIFI institutions like SNB.  *See Already, Inc.*, 133 S. Ct. at 731.   In short,

the Bank has not come close to a "*concrete showing* that it is in fact likely to suffer financial

injury as a result of the challenged action."  *KERM, Inc.*, 353 F.3d at 60-61 (emphasis in

original).

       The Bank objects to defendants' suggestion that the burden of being designated a SIFI

may outweigh the advantages, arguing that "the Government cites no authority for the novel

proposition that the benefits flowing from a statute should be netted against its harms for

purposes of determining whether a party has been injured."  (Pvt. Pl. Opp. at 38-39.)  But

standing requires a showing of "certainly impending" injury, *Clapper*, 133 S. Ct. at 1151, and at

this stage, nothing is certainly impending.  The Bank's theory of injury "require[s] guesswork as

to how independent decisionmakers will exercise their judgment," *id.* at 1150, and consequently,

guesswork as to whether the Bank will suffer an injury-in-fact from the designation of GE

Capital or any other alleged competitor.  Here the need for such guesswork defeats the Bank's

attempt to demonstrate that it faces an "imminent" injury.  *Lujan*, 504 U.S. at 560-61.

       **2.**      **Causation and Redressability**

       Furthermore, the Bank has not made an adequate showing with regard to the causation

and redressability prongs of the standing requirement.  *See Lujan*, 504 U.S. at 560-61.  The

Bank's attenuated claim of causation is highlighted by its admission that large financial

companies already enjoy a cost-of-capital advantage, even without a formal SIFI designation,

because these institutions have been perceived by the public as "too big to fail."  (*See* Second

Am. ¶ 146 (Federal Reserve Chairman Bernanke describing benefits that businesses enjoyed of

being perceived as "too big to fail" before Dodd-Frank granted designation authority to FSOC).)

The Bank asserts that the

> formal SIFI designations promulgated by the FSOC will enhance any direct cost-
> of-capital subsidy previously enjoyed by institutions considered by some in
> capital markets to enjoy unofficial SIFI status, by removing uncertainty as to the
> government's views on their SIFI status, and will extend this direct cost-of-capital
> subsidy to institutions not previously considered by those in capital markets to
> enjoy unofficial SIFI status.

(*See id*. ¶ 148.)  Indeed, GE Capital *already* offers interest rates between 2.75 and 22 times

greater than those offered by the Bank.   (*See* Second Purcell Decl. ¶¶ 13, 15, 17.)  No

explanation has been given for the disparity, but given the large gap in what the two institutions

already offer, it is hardly reasonable to infer that GE's greater ability to attract deposits is fairly

traceable to the SIFI designation proposed only weeks ago or that it is redressable by a court.

Whereas the Bank has demonstrated that GE Capital already has a distinct advantage, whether

because of "unofficial SIFI status" or merely because it is a larger, more highly capitalized

company, it can only speculate that SIFI designation will "enhance" this pre-existing benefit.

(Second Am. Compl. ¶ 148.)  Because the Bank has failed to establish that GE's SIFI

designation is the cause of an injury to the Bank, it has also failed to establish that this Court

could redress any such injury by invalidating Title I.

### 3.      Ripeness

For the same reason that the Bank lacks standing, the Bank's claim under Count III is not

ripe: the lack of a "certainly impending" injury caused by Title I.  *See Coal. for Responsible*

*Regulation, Inc. v. EPA*, 684 F.3d 102, 130 (D.C. Cir. 2012) ("Ripeness . . . shares the constitutional requirement of standing that an injury in fact be certainly impending.")  Therefore, in the absence of a concrete and particular injury, Count III will be dismissed under Fed. R. Civ. P. 12(b)(1).

## II.     TITLE II: THE ORDERLY LIQUIDATION AUTHORITY ("OLA")

### A.     The Statutory Provision

Pursuant to the OLA of Title II, the Treasury Secretary may appoint the FDIC as receiver of a failing "financial company."[9]  The purpose of Title II of Dodd-Frank is "to provide the necessary authority to liquidate failing financial companies that pose a significant risk to the financial stability of the United States in a manner that mitigates such risk and minimizes moral hazard."  12 U.S.C. § 5384(a).  Title II is viewed as providing "the U.S. government a viable alternative to the undesirable choice it faced during the financial crisis between bankruptcy of a large, complex financial company that would disrupt markets and damage the economy, and bailout of such financial company that would expose taxpayers to losses and undermine market discipline."  S. Rep. No. 111-176, at 4.  The statute provides that this authority

> shall be exercised in the manner that best fulfills such purpose, so that [] creditors and shareholders will bear the losses of the financial company; [] management responsible for the condition of the financial company will not be retained; and [] the [FDIC] and other appropriate agencies will take all steps necessary and appropriate to assure that all parties . . . having responsibility for the condition of the financial company bear losses consistent with their responsibility, including actions for damages, restitution, and recoupment of compensation and other gains not compatible with such responsibility.

---

[9] "Financial company" is defined under Title II as any company that is a bank holding company, a "nonbank financial company supervised by the Board of Governors," a "company predominately engaged in activities that the Board of Governors has determined are financial in nature", or any subsidiary of any of the above, except not insured depository institutions or insurance companies.  12 U.S.C. § 5381(a)(11).  Title II also exempts from coverage insured depository institutions, *see id.* § 5381(a)(8), for which the FDIC already had authority to serve as receiver under the Federal Deposit Insurance Act.  *See id.* § 1821.

12 U.S.C. § 5384(a).

The OLA replaces, in limited instances, the liquidation and reorganization mechanisms of Chapters 7 and 11 of the Bankruptcy Code.  (*See* State Plaintiffs' Opposition to Defendants' Motion to Dismiss [ECF No. 28] ("States' Opp.") at 5.)  Traditionally, bankruptcy proceedings begin with the filing of a petition by either the debtor company or the company's creditors in federal bankruptcy court.  (*See id.* (citing 11 U.S.C. §§ 301, 303).)  A trustee elected by the creditors' committee and the United States trustee act, under court supervision, to ensure that creditors' rights are protected.  (*See id.* (citing 11 U.S.C. §§ 307, 341, 702, 704, 705, 1102, 1104, 1106, 1129).)  Central to this dispute is the principle under bankruptcy law that "similarly situated creditors are entitled to equal treatment [in the form of] the pro rata payment on their claims."  (*See id.* at 6 (citing 11 U.S.C. §§ 726(b), 1123(a)(4)).)  The "automatic stay" provided by bankruptcy proceedings "reinforces that right, by preventing individual creditors and other stakeholders from seeking preferential treatment from the company."  (*See id.* (citing 11 U.S.C. § 362).)

"There is a strong presumption that the bankruptcy process will continue to be used to close and unwind failing financial companies, including large, complex ones," as the "orderly liquidation authority could be used if and only if the failure of the financial company would threaten U.S. financial stability."  S. Rep. No. 111-176, at 4.  "Therefore the threshold for triggering the [O]rderly [L]iquidation [A]uthority is very high."  *Id.*  In order to activate the OLA, two-thirds of the Federal Reserve Board and two-thirds of the FDIC Board provide a written recommendation to the Treasury Secretary.  *See* 12 U.S.C. § 5383(a).  The recommendation must include an evaluation of eight statutory factors: [1] "whether the financial company is in default or in danger of default"; [2] "the effect that the default . . . would have on

17

financial stability in the United States"; [3] "the effect that the default . . . would have on economic conditions or financial stability for low income, minority, or underserved communities"; [4] "the nature and extent of actions to be taken"; [5] "the likelihood of a private sector alternative to prevent the default"; [6] "why a case under the Bankruptcy Code is not appropriate"; [7] "the effects on creditors, counterparties, and shareholders of the financial company and other market participants"; and [8] "whether the company satisfies the definition of a financial company" under the statute. *Id.*

Before the Treasury Secretary can authorize use of the OLA, he must make seven findings: [1] that the company is "in default or in danger of default"; [2] that "the failure of the financial company . . . would have serious adverse effects on financial stability in the United States"; [3] that "no viable private sector alternative is available to prevent the default"; [4] that "any effect on the claims or interests of creditors, counterparties, and shareholders of the financial company and other market participants . . . is appropriate"; [5] that "any action taken [under this authority] would avoid or mitigate such adverse effects"; [6] that "a Federal regulatory agency has ordered the financial company to convert all of its convertible debt instruments that are subject to the regulatory order"; and [7] that "the company satisfies the definition of a financial company" under the statute. *Id.* § 5383(b).

If the financial company "does not acquiesce or consent to the appointment of the [FDIC] as receiver, the Secretary shall petition the United States District Court for the District of Columbia for an order authorizing the Secretary to appoint the [FDIC] as receiver." *Id.* § 5382(a)(1). The Secretary's petition is filed under seal. *See id.* The Court "[o]n a strictly confidential basis, and without any prior public disclosure . . . after notice to the covered financial company and a hearing in which the [] company may oppose the petition, shall

determine whether the determination of the Secretary that the covered financial company is in default or in danger of default and satisfies the definition of a financial company under section 5381(a)(11) is arbitrary and capricious." *Id*. § 5382(a)(1)(A)(iii). The Secretary's other findings are not subject to review. *See id*. Additionally, the Act establishes criminal penalties for any "person who recklessly discloses" the Secretary's determination or petition, or the pendency of court proceedings. *See id*. § 5382(a)(1)(C).

A court must make a decision within twenty-four hours of receiving the Secretary's petition; if it does not, the government wins by default. *See id*. §5382(a)(1)(A)(v). The Court of Appeals reviews the district court's determination under the arbitrary and capricious standard. *See id*. § 5382(a)(2). Once the district court affirms the Secretary's determination, or fails to issue a decision within 24 hours, the Secretary may begin the liquidation by appointing the FDIC as receiver, and the liquidation "shall not be subject to any stay or injunction pending appeal." *Id*. § 5382(a)(1)(A)(v), (B). This judicial review process does not include creditors. (*See* States' Opp. at 9-10.)

After the FDIC is appointed as receiver, it "succeed[s] to . . . all rights, titles, powers, and privileges of the covered financial company and its assets, and of any stockholder, member, officer, or director[.]" 12 U.S.C. § 5390(a)(1)(A). Under Title II, the FDIC has a broad range of tools available to it. It may merge the company with another, sell its assets, transfer assets and claims to a "bridge financial company" owned and controlled by the FDIC, and repudiate "burdensome" contracts or leases. *See id*. §5390(a)(1)(G), (h)(1)(A), (c)(1).

Once appointed as receiver, the FDIC must provide notice to the failing company's creditors. *See id*. § 5390(a)(2)(B). Those creditors may file claims, which the FDIC as receiver may pay "in its discretion" and "to the extent that funds are available." *Id*. § 5390(a)(7). The

FDIC is required to treat all similarly situated creditors in a similar manner unless it determines

that differential treatment is "necessary [] to maximize the value of the assets of the covered

financial company; [] to initiate and continue operations essential to the implementation of the

receivership of any bridge financial company; [] to maximize the present value return from the

sale or other disposition of the assets of the . . . company; or [] to minimize the amount of any

loss realized upon the sale or other disposition of the assets of the covered financial company."

*Id.* § 5390(b)(4). "A creditor shall, in no event, receive less than the amount" that it would have

received if the FDIC "had not been appointed receiver" and the company instead "had been

liquidated under chapter 7 of the Bankruptcy Code." *Id.* § 5390(a)(7)(B), (d)(2). A creditor may

seek judicial review on any disallowed claim in federal district court. *See id.* § 5390(a)(4). To

date, the OLA has not been invoked. (*See* Def. Mot. at 14 (citing GAO, "Agencies Continue

Rulemakings for Clarifying Specific Provisions of Orderly Liquidation Authority," at 2 (July

2012), at http://www.gao.gov/assets/600/592318.pdf).)

## B.      Counts IV, V, and VI

### 1.      Standing

Plaintiffs challenge Title II on three separate legal grounds. For all three, they assert

standing based on the States' status as creditors, in that the States or their pension funds hold

investments in institutions that qualify as "financial companies" under Section 210 of the Dodd-

Frank Act, which renders those companies potentially subject to Title II's OLA.[10]  As was the

case with the Bank's challenge to Title I, the States are not themselves "the object of the

government action or inaction [they] challenge[]," and so  "standing is not precluded, but it is . . .

substantially more difficult to establish." *Summers*, 555 U.S. at 493.

---

[10] The Private Plaintiffs ostensibly join these counts but make no attempt to establish that they
have standing in their own right.

### a.     Present Injury

The State Plaintiffs insist that their standing is based on the existence of a present injury caused by "Dodd-Frank's express abrogation of the statutory rights that the State Plaintiffs previously retained under the Bankruptcy Code."  (States' Opp. at 14 (citing Second Am. Compl. ¶ 170).)  They maintain that "[a]s investors in the unsecured debt of financial companies, the State Plaintiffs were protected by the federal bankruptcy laws' guarantee of equal treatment of similarly situated creditors.  By abridging that guarantee, Title II invades the State Plaintiffs' legally protected interests, injuring them and giving them standing to challenge Title II's constitutionality."  (*Id.*)

The States suggest that their "property rights in their investments [are] a bundle of sticks, [and] one of the 'sticks' that [they]  held before the Dodd-Frank Act was enacted was the statutory right to equal treatment in bankruptcy."  (*Id.* at 19.)  They argue that "[w]hen the Act became law . . . that 'stick' was removed from the States' bundle," which constitutes an injury because "a rational investor would prefer an investment that includes a guarantee of equal treatment in bankruptcy to an investment that does not include such a guarantee."  (*Id.*)  By casting their claim in this manner, the States attempt to escape the obvious conclusion that any future injury is too conjectural and remote.  However, the Court is unconvinced that the States have a present injury because the States' underlying premise that they have a "property right" in the configuration of the Bankruptcy Code is flawed.  Simply put, the States' holding of certain statutory rights does not amount to an inalienable property right under the Bankruptcy Code.

Nor is the Court persuaded by the States' argument that the loss of a right in the abstract is sufficient to confer standing.  The States cite *Lujan* for the proposition that an "injury" is "an invasion of a legally protected interest[,]" and the injury "may exist solely by virtue of statutes

creating legal rights, the invasion of which creates standing."  (*Id.* at 20 (quoting *Lujan*, 504 U.S. at 560, 578).)  But the States misinterpret *Lujan*.  In the passage that the States cite, the Supreme Court clarified its holding in an earlier case by reiterating that the "[statutory] broadening [of] the categories of injury that may be alleged in support of standing is a different matter from abandoning the requirement that the party seeking review must himself have suffered an injury." *Lujan*, 504 U.S. at 578-79.  As to the latter requirement, the Supreme Court affirmed that "the concrete injury requirement *must* remain" in suits against the government.  *Id*. (emphasis added). There is no real question then that an injury could arise out of the invasion of a statutory right, *as long as there is a concrete injury based on that invasion*.  Nor is there a real debate that an injury can be of a non-financial nature, as in FOIA cases, *see, e.g., Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989), or in cases such as *Zivotofsky v. Sec'y of State*, 444 F.3d 614, 617-18 (D.C. Cir. 2006).  (*See* States' Opp. at 19-23.)  But there must be a *concrete, present injury*, which the States have not shown here.

The cases cited by the States are not to the contrary.  The States rely primarily on *Zivotofsky*, where the Court of Appeals stated:

> Although it is natural to think of an injury in terms of some economic, physical, or psychological damage, a concrete and particular injury for standing purposes can also consist of the violation of an individual right conferred on a person by statute.  Such an injury is concrete because it is of a form traditionally capable of judicial resolution, . . . and it is particular because, as the violation of an individual right, it affects the plaintiff in a personal and individual way.

444 F.3d at 619 (citations, brackets, emphasis, and internal quotation marks omitted). Significantly, however, the injury in *Zivotofsky* was not an abstract, hypothetical loss of a statutory right.  Rather, it was the actual, concrete loss of a right granted by statute to have Israel listed as the place of birth on the passport of a child born in Jerusalem.  *See* Foreign Relations Authorization Act, Fiscal Year 2003, Pub. L. No. 107-228, § 214(d), 116 Stat. 1350, 1365-66

(2002).  Despite the clear right granted by statute, the U.S. Embassy in Israel denied the request

of the child's American parents.  *Zivotofsky*, 444 F.3d at 615-16.  The States' claims here are not

remotely similar to the concrete loss in *Zivotofsky*, since in this case no violation of any statutory

right has occurred and it may never occur in the future.

      The States represent that "the scholarship is virtually unanimous" that "as a rational

creditor you are harmed now by having the certainty that you had under the Bankruptcy Code

and the knowledge of what would happen in the event of a default taken away" (*see* Tr. at 92-

93), but a review of their citations does not support this assertion.  One author, highlighted by the

States at the oral argument on this motion (*see id.* at 93), cautions that there could be adverse

impacts for creditors, but concludes that the ultimate effects are far from clear:

> One of the challenging aspects of considering the potential impact of Title II on creditors and other stakeholders of nonbank financial companies that are eligible to be a debtor under the Bankruptcy Code is that many provisions of Title II are subject to the enactment of rules and regulations that are necessary for implementing and clarifying its terms. Since most of those regulations have yet to be promulgated, the impact of Title II on creditors and other stakeholders will continue to evolve. It is possible that many regulations may further "harmonize" certain provisions of Title II with the provisions of the Bankruptcy Code. It is also possible that the very significant differences between the provisions of Title II and those of the Bankruptcy Code will cause creditors of nonbank financial companies that face future financial crises to be more amenable to finding private sector alternatives, including restructuring of debt and consent to sales of assets, in order to avoid the uncertainties posed by this new and as yet untested insolvency regime.

Hollace T. Cohen, *Orderly Liquidation Authority: A New Insolvency Regime to Address Systemic*

*Risk*, 45 U. Rich. L. Rev. 1143, 1153 (2011) (cited in States' Opp. at 5, 7, 12, 18).

      While it may be true that the OLA could generate some uncertainty, which could affect

the behavior of investors and others, this type of market uncertainty is insufficient to constitute

an injury, either present or future, that is fairly traceable to Title II.[11]  In this regard, the D.C.

Circuit's reasoning in *Committee for Monetary Reform v. Board of Governors of the Federal
Reserve System*, 766 F.2d 538 (D.C. Cir. 1985), is relevant.  In that case, appellants included

businesses, associations, and individuals who alleged that they suffered financial damage "as a

result of monetary instability and high interest rates."  *Id.* at 542.  The Court assumed that the

allegations were sufficient to meet the requirements of injury-in-fact, but held that appellants

"failed to show that their injuries are fairly traceable to the asserted constitutional violation,"

because

> [i]t is entirely speculative whether the influence of the Reserve Bank members is
> responsible for the FOMC's alleged pursuit of restrictive or erratic monetary
> policies.  Moreover, in light of the complexity of the modern economy, it is also
> highly uncertain whether and to what extent such policies were responsible for the
> adverse economic conditions that allegedly resulted in harm to the appellants.
> Similarly, the appellants have given no indication as to how they can succeed in
> establishing that an overly broad delegation of power to the Federal Reserve
> System has had the consequence of undermining economic certainty and thereby
> increasing interest rates.

*Id.*

---

[11] As Professor Hal Scott describes,

> [B]ecause [the OLA process] appl[ies] only to institutions determined to be
> systemically important, and appl[ies] to banks only at the holding company level,
> all other institutions will be subject to the bankruptcy regime where impairment is
> even more likely . . . . If short-term debt holders do not know whether their issuer
> will be deemed systemically important, then they will not know which resolution
> principles will apply to them, compounding uncertainty in the marketplace.
> Moreover, because the regulators have significant discretion in determining the
> circumstances that constitute danger of default the OLA adds another layer of
> uncertainty for creditors of financial companies who could run at an earlier point
> in time in order to avoid impairment in the OLA receivership.

Hal S. Scott, *Interconnectedness and Contagion* 216-217 (Nov. 20, 2012) (cited in States' Opp.
at 18).

The injuries asserted here are even more speculative, for the States have not claimed any actual damage resulting from increased economic uncertainty.  Moreover, they have not presented evidence that any harm is fairly traceable to the OLA, nor could they since the OLA exists only on paper at this point in time.  While it may be true that certain economic actors have already adjusted their behavior in response to Title II, "[t]he fact that some individuals may base decisions on 'conjectural or hypothetical' speculation does not give rise to the sort of 'concrete' and 'actual' injury necessary to establish Article III standing."  *Already*, 133 S. Ct. at 730 (quoting *Lujan*, 540 U.S. at 560).

### b.    Future Injury

Nor can the States prevail on an allegation of future injury.  There are a series of contingencies that must occur before they would suffer any actual harm.  It is true that Dodd-Frank empowers the FDIC to treat creditors' claims somewhat differently than they are treated in traditional bankruptcy proceedings, but no one can know if this will ever happen.  Thus, the States do not face a future harm that is "certainly impending."  *Clapper*, 133 S. Ct. at 1151.

The D.C. Circuit's recent decision in *Deutsche Bank Nat'l Trust Co. v. FDIC*, 717 F.3d 189 (D.C. Cir. 2013), is instructive.  There, the Court of Appeals agreed that appellants' economic interest in receivership funds constituted a legally protected interest, but found that they were "not persuasive in showing that their economic interest faces an imminent, threatened invasion – *i.e.*, one that is not conjectural or speculative."  *Id.* at 193.  The Court found that

> at least two major contingencies must occur before Deutsche Bank's suit could result in economic harm to appellants: (1) the district court must interpret the Agreement to find that FDIC did not transfer the relevant liability to J.P. Morgan; and (2) Deutsche Bank must prevail on the merits against FDIC in its breach-of-contract claims. . . Under such circumstances, where a threshold legal interpretation must come out a specific way before a party's interests are even at risk, it seems unlikely that the prospect of harm is actual or imminent.

*Id.*  Here, too, there are a host of contingencies that must occur before the States could arguably suffer economic harm under Title II, and "because [the statute] at most *authorizes* – but does not *mandate* or *direct* – the [enforcement] that respondents fear, respondents' allegations are necessarily conjectural." *Clapper*, 133 S. Ct. at 1149 (emphasis in original).[12]

First, "[a] systematically important financial company in which the States are invested would have to be in default or in danger of default."  (Defendants' Reply [ECF No. 30] ("Def. Reply") at 30.)  Second, "[t]he Secretary of the Treasury would have to exercise his discretion to seek the appointment of a receiver under Title II's [O]rderly [L]iquidation [A]uthority, and he could do so only if numerous statutory prerequisites were met, including consultation with the President of the United States, and a written recommendation from the Federal Reserve Board and the FDIC, or another agency."  (*Id.*)  Third, "the States as creditors would have to suffer a greater loss in a Title II liquidation than they would have in bankruptcy, and this would have to happen despite Title II's requirement that each creditor will receive no less than it would have under a liquidation pursuant to chapter 7 of the Bankruptcy Code."  (*Id.*)[13]

---

[12] The States also argue that "denying judicial review of the State Plaintiffs' constitutional claims until after a Title II liquidation occurs would in fact prevent them from ever raising those constitutional claims . . . [because] Dodd-Frank expressly prohibits the courts from reaching these constitutional issues after a liquidation occurs."  (States' Opp. at 28.)  This is incorrect, as there is ample precedent suggesting that statutory limitations on judicial review do not prevent parties from raising constitutional challenges to the statute itself.  *See, e.g., Gen. Elec. Co. v. EPA*, 360 F.3d 188, 193 (D.C. Cir. 2004) (allowing pre-enforcement review of facial constitutional challenge to statute, despite statutory limitations on judicial review of orders and actions taken under the statute); *Time Warner v. FCC*, 93 F.3d 957, 965, 973 (D.C. Cir. 1996) (same).

[13] Even the States' articulation of the harm they face highlights its highly speculative nature:

> On its face, Section 210(b)(4) of the Act abrogates the rights under the U.S. Bankruptcy Code of creditors of institutions that *could* be liquidated, destroying a valuable property right held by creditors – including the State Plaintiffs – under bankruptcy law, contract law, and other laws, prior to the Dodd-Frank Act.

In some instances, when and if the OLA is ever invoked, a given creditor may find itself worse off than it would have been had the debtor company been subject to a Chapter 11 proceeding.  Other creditors may, however, find themselves better off since the very point of the OLA authority is to try to minimize the losses and maximize the value of the assets of the failing financial company.  *See* 12 U.S.C. § 5390(b)(4).  It is entirely speculative that the States will be among the creditors that will end up worse off.  Furthermore, it is possible that regulations will be enacted that will provide greater certainty, as Cohen suggests, and that the doom the States foresee will never come to pass.  In short, the States' theory "stacks speculation upon hypothetical upon speculation, which does not establish an 'actual or imminent'" injury.  *N.Y. Reg'l Interconnect Inc. v. FERC*, 634 F.3d 581, 587 (D.C. Cir. 2011) (quoting *Lujan*, 504 U.S. at 560).  Any injury is "hopelessly conjectural," depending upon a chain of potential but far from inevitable developments.  *Deutsche Bank*, 717 F.3d at 193.  *See also* Price, *Sifting for SIFIs*, at 8 (suggesting that the existence of the OLA could prompt some creditors to "believe that they may . . . get protection unavailable in a normal bankruptcy").  Accordingly, the States lack standing to challenge Title II.

### 2.  Ripeness

The States' claims are also not ripe because they are not "fit for judicial review."  *See, e.g., Seegars v. Gonzales*, 396 F.3d 1248, 1253 (D.C. Cir. 2005) (citations omitted).  In such an instance, the issues would be much clearer for judicial review with further factual development,

---

Section 210(b)(4) exposes those creditors to *the risk that* their credit holdings *could* be arbitrarily and discriminatorily extinguished in a Title II liquidation, and without notice or input.  Title II's destruction of a property right held by each of the State Plaintiffs harms each State, and is itself a significant, judicially cognizable injury that would be remedied by a judicial order declaring Title II unconstitutional.

(Second Am. Compl. ¶ 170 (emphasis added).)

and "denial of immediate review would [not] inflict a hardship on the challenger – typically in the form of its being forced either to expend non-recoverable resources in complying with a potentially invalid regulation or to risk subjection to costly enforcement processes." *Id*.  Even a "pure legal issue," such as a facial challenge, may not be ripe.  *See, e.g., Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 812 (2003) (even a "purely legal" "facial challenge" is unripe if "further factual development would significantly advance [the court's] ability to deal with the legal issues presented.").  Of particular relevance here, "a claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *CTIA-The Wireless Ass'n v. FCC*, 530 F.3d 984, 987 (D.C. Cir. 2008) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).  As the D.C. Circuit has noted, in rejecting a separation-of-powers claim on ripeness grounds:

> In the instant case, as in *Buckley* [*v. Valeo*, 424 U.S. 1 (1976)], appellant asks this court to pass on the constitutionality of an entire Act of Congress that vests in an entity a host of powers, most of which have not been invoked and many of which may never be invoked in the proceedings concerning appellant. To decide the legitimacy of powers whose exercise is the antithesis of "all but certain" would clearly contravene the principle of constitutional avoidance underlying both this court's and the Supreme Court's decisions in *Buckley*, the principle that "the quarrel must be with the official and not the statute book." . . . In the course of time we may have a more concrete application of the Act as a whole. Then, and only then, will we be justified in deciding the facial constitutionality of the Act.

*Hastings v. Judicial Conference*, 770 F.2d 1093, 1101–03 (D.C. Cir. 1985) (citation omitted). Similarly, the States ask the Court to invalidate all of Title II, despite the fact that none of the OLA powers "have [] been invoked and many of which may never be invoked" in matters concerning the States.  *Id*. at 1101.  For the Court to do so would be the height of imprudence. Therefore, even if the States could survive a challenge to their standing, which they cannot, their claims are not ripe.

For these reasons, the Court finds that the States lack standing on Counts IV, V, and VI, or in the alternative, that their claims are not ripe, and will accordingly dismiss these counts pursuant to Fed. R. Civ. P. 12(b)(1).

## III.    TITLE X: CONSUMER FINANCIAL PROTECTION BUREAU

### A.    The Statutory Provision

Title X established the Consumer Financial Protection Bureau in order to "implement and . . . enforce Federal consumer financial law consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive."  12 U.S.C. § 5511(a).  The Bureau is an independent agency within the Federal Reserve System.  *See id.* § 5491(a).  The Bureau is headed by a Director appointed by the President, with the advice and consent of the Senate and removable by the President for cause.  *See* 12 U.S.C. § 5491(b), (c). The President appointed Richard Cordray as the Bureau's first Director on January 4, 2012, pursuant to the Recess Appointments Clause, U.S. Const. art. II, § 2, cl.3.  The President renominated Cordray to a full term on February 13, 2013.  Cordray's recess appointment was due to expire at the end of the Senate's current session or upon the Senate's confirmation of his nomination if earlier, but on July 16, 2013, the Senate confirmed Cordray's appointment.[14]  *See* Danielle Douglas, *Senate confirms Cordray to head consumer agency*, WASH. POST, July 17, 2013, at A12.

---

[14] In supplemental pleadings submitted in response to the Court's request (*see* 7/17/13 Order [ECF No. 37]), the parties appear to agree that the challenge to Cordray's recess appointment in Count II is not moot.  (*See* Private Plaintiffs' Supplemental Brief in Support of the Court's Jurisdiction over Count II [ECF No. 38]; Defendants' Response to Plaintiffs' Supplemental Brief [ECF No. 40].)

Title X transferred regulatory authority to the Bureau over consumer financial products and services that had previously been exercised by other federal agencies.  *See* 12 U.S.C. § 5581.  This includes regulatory authority under, among others, the Truth in Lending Act ("TILA"), the Equal Credit Opportunity Act, the Real Estate Settlement Procedures Act ("RESPA"), and the Electronic Funds Transfer Act ("EFTA").  *See id.* §§ 5581, 5481(12), (14).  The Dodd-Frank Act also amended many existing laws related to consumer financial issues and transferred the authority to implement those amendments to the Bureau.  (*See* Def. Mot. at 7.)  Under the Act, the Bureau is also authorized to promulgate any rule that it deems "necessary or appropriate to enable the Bureau to administer and carry out the purposes and objectives of the Federal consumer financial laws, and to prevent evasions thereof."  12 U.S.C. § 5512(b)(1).  The Bureau has authority to directly enforce these laws, including the power to initiate civil enforcement actions.  *See* 12 U.S.C. § 5564.

### 1.     UDAAP Authority

In addition to granting existing regulatory authority to the Bureau, Title X also authorizes the Bureau to issue new regulations to implement the provisions of Title X, including its prohibition against any "unfair, deceptive, or abusive act or practice" by a "covered person" or "service provider."  12 U.S.C. §§ 5512(b)(1), 5531(a), 5532(a)), 5536(a)(1)(B), 5481(6), (26).  Although Title X authorizes the Bureau to issue regulations under this "UDAAP authority," it has yet to do so.  (*See* Def. Mot. at 8.)  The Bureau has, however, commenced enforcement actions pursuant to its UDAAP authority, such as filing complaints and securing consent orders against third parties in matters unrelated to this litigation.  (*See* Pvt. Pl. Opp. at 4.)

The Bureau also has the authority to "supervis[e] covered persons for compliance with Federal consumer financial law, and tak[e] appropriate enforcement action to address violations

30

of Federal consumer financial law." 12 U.S.C. § 5511(c)(4).  The "prudential regulators" – the

Federal Reserve Board, the FDIC, the OCC, the NCUA, and previously, the OTS – remain

primarily responsible for examining the compliance of smaller insured depository institutions

and credit unions (*i.e.*, those with $10 billion or less in total assets that are not affiliates of large

banks and credit unions) with Federal consumer financial law.  *See id.* §§ 1813q, 5481(24),

5581(c)(1)(B), 5516(a).  SNB falls under the authority of the OCC.  (*See* Pvt. Pl. Opp. at 4.)  The

Bureau may require reports from those smaller institutions and may participate in the prudential

regulators' examinations of those institutions "on a sampling basis."  12 U.S.C. § 5516(b), (c)).

  The Bureau may also recommend to the prudential regulator that it take action when there

is reason to believe that one of the smaller institutions has violated Federal consumer financial

law.  *See* 12 U.S.C. § 5516(d)(2).  The prudential regulator has an obligation to respond in

writing to any such recommendation.  *See id.*  To date, no reporting requirement has been

imposed on SNB, and neither the OCC nor the Bureau has taken any action against SNB.

  **2.**  **Remittance Rule**

  Dodd-Frank amended the EFTA to establish greater consumer protections for remittance

transfers from consumers in the United States to businesses and individuals abroad.  (*See* Def.

Mot. at 7 (citing 15 U.S.C. § 1693o-1).)  With the EFTA regulatory authority that it now

exercises, the Bureau promulgated the Remittance Rule to implement this statutory amendment.

The Remittance Rule establishes disclosure and compliance requirements for institutions that

offer international remittance transfers, and it applies to "any person that provides remittance

transfers for a consumer in the normal course of its business."  Electronic Fund Transfers

(Regulation E) ("EFT"), 77 Fed. Reg. 6194, 6205 (Feb. 7, 2012) (to be codified at 12 C.F.R. pt.

1005)).  On February 7, 2012, the Bureau published the final rule, and on August 20, 2012, it

published an amendment to that rule establishing a safe harbor provision.  *See* EFT, 77 Fed. Reg. 6194 (Feb. 7, 2012) (codified at 12 C.F.R. pt. 1005, subpart B); EFT, 77 Fed. Reg. 50244 (Aug. 20, 2012) (amending 12 C.F.R. pt. 1005).  Following several months of additional rulemaking, the Bureau issued a final rule on May 22, 2013, amending several aspects of the rule not relevant here, and establishing that the rule would take effect on October 28, 2013.  *See* EFT, 77 Fed. Reg. 77188 (Dec. 31, 2012); EFT Temporary Delay of Effective Date, 78 Fed. Reg. 6025 (Jan. 29, 2013); EFT 78 Fed. Reg. 30661 (May 22, 2013).

### 3.      Rules Relating to Mortgages

The Bureau has also promulgated two rules regarding mortgages that are relevant to SNB's claim of standing.

### a.      RESPA Servicing Rule

On February 14, 2013, the Bureau issued a final rule governing mortgage servicing under RESPA, 12 U.S.C. § 2601 *et seq.* ("RESPA Servicing Rule").  *See* Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X), 78 Fed. Reg. 10696 (Feb. 14, 2013) (to be codified at 12 C.F.R. § 1024.41(j)).  Although multi-faceted, the portion of the rule relevant here will prohibit a servicer from making "the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process unless a borrower's mortgage loan obligation is more than 120 days delinquent."  *Id.* at 10885.  This rule will take effect on January 10, 2104.  *See id.* at 10696.

### b.      ATR-QM Rule

On January 10, 2013, the Bureau issued a final rule implementing Title XIV of the Dodd-Frank Act and amending Regulation Z, which implements the Truth in Lending Act, 15 U.S.C. 1601 *et seq.* ("ATR-QM Rule").  *See* Ability-to-Repay and Qualified Mortgage Standards under

the Truth in Lending Act (Regulation Z), 78 Fed. Reg. 6408 (Jan. 30, 2013) (to be codified at 12

C.F.R. § 1026.43).  This rule requires lenders to determine potential borrowers' ability to repay

before extending mortgage credit to them.  *See* 15 U.S.C. § 1639c(1).  The failure to conduct this

determination leaves lenders subject to liability and a foreclosure defense by borrowers.  *See id.*

§ 1640(a), (k).  Title XIV and the ATR-QM Rule both provide for a safe harbor under which a

lender will be deemed to have made the ability-to-repay determination for qualified mortgages,

and a rebuttable presumption that a lender has made the ability-to-repay determination for

qualified mortgages that are "higher-priced covered transactions."[15]  *See id.* § 1639c(b); 78 Fed.

Reg. at 6585-87.  On May 29, 2013, the Bureau expanded the scope of the safe harbor, by

> [r]aising the threshold defining which qualified mortgages receive a safe harbor
> under the ability-to-repay rules for loans that are made by small creditors under
> the balloon-loan or small creditor portfolio categories of qualified mortgages.
> Because small creditors often have higher cost of funds, the final rule shifts the
> threshold separating qualified mortgages that receive a safe harbor from those that
> receive a rebuttable presumption of compliance with the ability-to-repay rules
> from 1.5 percentage points above the average prime offer rate (APOR) on first-
> lien loans to 3.5 percentage points above APOR.

78 Fed. Reg. 35430, 35431 (June 12, 2013).[16]

## B.     Counts I and II

In its Opposition, the Bank bases its claim of standing as to Count I on "four here-and-

now financial injuries directly caused by the unconstitutional formation and operation of the

Bureau."  (Pvt. Pl. Opp. at 12.)  First, it alleges that it "has incurred and will continue to incur

---

[15] A "higher-priced covered transaction" was initially defined as a mortgage with "an annual
percentage rate that exceeds the average prime offer rate for a comparable transaction as of the
date the interest rate is set by 1.5 or more percentage points for a first-lien covered transaction, or
by 3.5 or more percentage points for a subordinate-lien covered transaction."  78 Fed. Reg. at
6584.

[16] A "small creditor" is defined as a creditor with no more than $2 billion in assets, a category
that includes SNB.  *See* 78 Fed. Reg. at 35431.

substantial compliance costs to ensure it acts consistently with the Bureau's regulations and interpretations of Federal consumer financial law." (*Id*.)  Second, it alleges that the Bureau's Remittance Rule caused the Bank initially to "cease[] offering profitable remittance transfers" and subsequently to resume offering the transfers on a limited basis.  (*Id*.)  Third, it alleges that "the Bureau's new rules governing mortgage foreclosure increase the Bank's costs of doing business with respect to mortgage loans it has already made." (*Id*.)  Fourth, it alleges that as of October 2010, it "discontinued a profitable mortgage practice to avoid prosecution pursuant to the Bureau's UDAAP authority." (*Id*.)  In addition, the Bank asserts that it has standing simply "because it is directly regulated by the Bureau." (Pvt. Pl. Opp. at 30-31.)

As an initial matter, the Bank errs to the extent that it suggests that it need only show that it is "directly subject to the authority of the agency" without meeting the basic standing requirements of injury-in-fact, causation, and redressability.  (Pvt. Pl. Opp. at 30 (quoting *Comm. for Monetary Reform*, 766 F.2d at 543).)[17]  The Bank claims to be relying on D.C. Circuit precedent for this proposition, but it has misinterpreted that precedent.  In *Committee for Monetary Reform*, the Court held that "litigants have standing to challenge the authority of an agency on separation-of-powers grounds only where they are directly subject to the authority of the agency, whether such authority is regulatory, administrative, or adjudicative in nature." 766 F.2d at 543.  Ultimately, the Court found no standing because plaintiffs did not allege that "they are directly subject to the governmental authority they seek to challenge, but merely assert[ed] that they are substantially affected by the exercise of that authority." *Id*.  The Court did not

---

[17] The Bank backtracked somewhat from this bold position during the oral argument, conceding that an injury is necessary for standing and offering the qualification that its direct regulation argument is "the fifth argument for standing that we have in our brief.  So we have many alternative arguments." (Tr. at 44.)

conclude, however, that being subject to the challenged governmental authority was *sufficient*. Lest there be any doubt, the Court later cited this holding in *NRA Political Victory Fund*, where it stated, "[b]ecause an enforcement action is the paradigm of 'direct governmental authority,' appellants have standing[.]"  6 F.3d at 824.  While the parameters of direct governmental authority have yet to be established, no case stands for the proposition that standing can be established merely by being subject to governmental regulatory authority in the absence of any agency action that causes injury.[18]

The Bank's claim of standing with respect to Count II is based on the same factual allegations as it relies on for Count I.[19]  (*See* Pvt. Pl. Opp. at 31.)  It is settled that the Bank need not show that the results of any agency action would have been different without an unconstitutional appointment.  In other words, the Bank need not present "precise proof of what the [Bureau]'s policies might have been in that counterfactual world."  *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3163 n.12 (2010).  *See also Comm. for Monetary Reform*, 766 F.2d at 543 ("a party is not required to show that he has received less favorable treatment than he would have if the agency were lawfully constituted and otherwise authorized to discharge its functions").

Nevertheless, while the Bank does not have to demonstrate that a constitutionally-appointed director would have made different decisions than Cordray has, it must demonstrate that it has been harmed by some decisions made by Cordray or under his direction.  Thus, it

---

[18] For example, if this were the case, any entity that pays taxes could challenge any action of the IRS even if it had not been the object of an IRS ruling or enforcement action.

[19] The Bank asserts standing for Count II based on the fact that as "an FDIC-insured institution [it] is directly subject to Mr. Cordray's authority as an "ex officio Director of the Federal Deposit Insurance Corporation."  (Pvt. Pl. Opp. at 31.)  The Bank never elaborates on this argument, and appears to have abandoned it in its further briefing.  In the absence of any explanation for this claim, the Court need not address it.

cannot complain in Count II about the Bank's 2010 exit from the mortgage market, since that predated Cordray's 2012 appointment, *see Lujan*, 504 U.S. at 560-61, but it can point to the Remittance Rule, the RESPA Servicing Rule, and the ATR-QM Rule that issued during his tenure and the compliance costs incurred after his 2012 appointment.[20]   Nonetheless, as to both Counts I and II, the Bank must satisfy the injury-in-fact prong of standing, for, as the Supreme Court stated long ago:

> We have no power per se to review and annul acts of Congress on the ground that they are unconstitutional. That question may be considered only when the justification for some direct injury suffered or threatened, presenting a justiciable issue, is made to rest upon such an act. . . . The party who invokes the [court's jurisdiction] must be able to show, not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally.

*Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923).  The Court will turn to the four grounds upon which the Bank relies to satisfy its burden as to standing.

### 1.      Compliance Costs

The Bank argues that it has spent money to keep abreast of developments under the Dodd-Frank Act and that these expenditures are subsumed under the heading of "compliance costs."[21]   In particular, it asserts that it spent over $230,000 in compliance costs in 2012, including "over $2,500 to send a representative to 'Compliance School' that offered classes on, *among other things*, CFPB regulations."  (Pvt. Pl. Opp. at 8 (citing Declaration of Jim R. Purcell [ECF No. 27-2] ("First Purcell Decl.") ¶¶ 5, 6) (emphasis added).)  The Bank also began

---

[20] As noted below (*see infra* Section III.B.3), the fact that the RESPA Servicing Rule and the ATR-QM Rule were issued subsequent to the filing of this suit poses a separate problem for the Bank's standing.

[21] At the oral argument, counsel characterized this claim as its strongest pillar for a finding of standing as to Count I.  (*See* Tr. at 4.)

subscribing, at a cost of $9,900 annually, to a service called the "'Compliance Alliance' created

by the Texas Bankers Association in response to the passage of the Dodd-Frank Act." (*Id*.)  In

the Bank's careful phrasing, the "[s]ervice provides notification and counsel regarding new and

proposed regulations, interpretations, and enforcement actions that would affect the Bank's

business, and was specifically marketed to SNB and other banks as necessary to stay up-to-date

with (*among other things*) the activities of the CFPB." (*Id*. (emphasis added).)  In 2011, prior to

Cordray's appointment, the Bank also subscribed to a second compliance service, TriNovus, at a

cost of $2,300. (*See id*.)[22]  In sum, the Bank's "compliance costs" consist of the costs of learning

about the Bureau's regulatory and enforcement activities.

In proposing this novel and overly broad interpretation of the term "compliance costs,"

the Bank would have this Court adopt a theory of standing that goes beyond any decision in this

jurisdiction.  Certainly, courts in this jurisdiction have found standing based on expenditures that

have been categorized as "compliance costs,"[23] but in each case, those costs were incurred to

come into compliance with the law, rather than merely to keep abreast of developments in the

law.  *See, e.g., Duncan*, 681 F.3d at 458 (plaintiff schools "harmed because they will face even

greater compliance costs" due to new regulation requiring states to institute school authorization

process and complaint-review process).  As defendants suggest, a compliance cost is typically

"the cost a regulated party incurs to satisfy a legal mandate – *e.g*., money spent to retrofit a

---

[22] At the oral argument, SNB's counsel made clear that $230,000 represents the "total figure for all [of the Bank's] compliance costs, but then [the Bank] broke out several specific costs that were specific to the CFPB and Title X," which amounted to $12,400 for 2012.  (Tr. at 16.)

[23] The fact that these costs are relatively minor does not matter, for even the "threat of relatively small financial injury [is] sufficient to confer Article III standing." *Raytheon Co. v. Ashborn Agencies, Ltd.*, 372 F.3d 451, 454 (D.C. Cir. 2004) (citing *Franchise Tax Bd. of Ca. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990)).

factory to bring it into compliance with a new environmental code," not the cost the party incurs to determine *whether* it needs to satisfy a legal mandate.  (Def. Reply at 21.)  But the Bank does not claim to have any costs of the former type, only the latter.

A compliance cost has also been interpreted to include the cost of complying with statutory reporting requirements.  *See, e.g., Cellco P'ship v. FCC*, 357 F.3d 88, 100 (D.C. Cir. 2004) (in assessing a challenge to two regulations involving extensive reporting requirements, the Court held that "[a]s an entity continuously burdened by the costs of complying . . . with what it contends are 'unnecessary' regulations[,] . . . [plaintiff's] injuries are concrete and actual"); *Inv. Co. Instit. v. CFTC*, 891 F.Supp.2d 162, 177, 185 (D.D.C. 2012) (in assessing challenge to regulations issued pursuant to Dodd-Frank involving reporting and registration requirements, Court found standing based on "relative increased regulatory burden and . . . associated costs").  But, while the Bureau has the authority to demand the production of reports from covered entities, the Bank has not been required to submit any reports, nor is it clear that it will be required to do so in the future.[24]

Because the Bank's overly broad conception of "compliance costs" has never been recognized in this jurisdiction, the Bank resorts to reliance on two cases from the Fourth Circuit. In addition to not being binding on this Court, both of the cases cited by the Bank are distinguishable.  In *Chambers Med. Tech. of S.C. v. Bryant,* 52 F.3d 1252 (4th Cir. 1995), the plaintiff challenged a blacklisting provision under South Carolina state law that prohibited an owner or operator of a waste treatment facility within South Carolina from accepting infectious waste generated in a jurisdiction that prohibits the treatment, storage, or disposal of the waste in that jurisdiction.  *See id*. at 1265.  The plaintiff was found to have standing because it "would

---

[24] Under Title X, the Bureau is required to use existing reports before demanding the production of an independent report from a covered entity.  *See* 12 U.S.C. § 5516(b)(1).

incur costs associated with monitoring the laws of [sixteen] states to ensure that they did not enact . . . legislation" that would automatically trigger the blacklisting provision. *Id*. Importantly, in *Chambers*, the costs of monitoring the other states' laws were necessarily incurred in order to avoid violating South Carolina law.  By contrast, the expenditures that SNB includes as "compliance costs" are ones that it has voluntarily incurred to keep track of the CFPB's activities, not to actually comply with any regulations.

Similarly, in *Pac. Legal Found v. Goyan*, 664 F.2d 1221 (4th Cir. 1981), a funding program that the plaintiff was challenging would have expanded public participation in FDA rulemaking proceedings in which the plaintiff frequently participated, necessitating its increased "vigilance and efforts" to maintain its "'institutional presence'" in those proceedings.  *Id.* at 1224.  The Fourth Circuit found that the plaintiff had standing based on the "increased time and expense necessary for it to monitor not only proposals by the FDA and comments thereto, but also proposals by applicants for reimbursement under the program here in question."  *Id.*  In that case, there was no question that the plaintiff would participate in future FDA proceedings and that its participation would become more expensive under the funding program.  Thus, its injury was "certainly impending."  *Clapper*, 133 S. Ct. at 1143.  The same is not true here, where the Bank is monitoring CFPB proposals and actions to determine *if* the Bureau will take any actions that will affect the Bank.  In addition, both of these cases predate *Clapper*, 133 S. Ct. at 1152, wherein the Supreme Court held that "self-inflicted" injuries, which arguably encompass the harms claimed by the plaintiffs in the Fourth Circuit cases, do not give rise to Article III standing.[25]

---

[25] In their recently filed Notice of Supplemental Authority [ECF No. 42] ("Pl. Supp. Authority"), plaintiffs cite to another Fourth Circuit case, *Liberty Univ. v. Lew*, No. 10-2347, 2013 WL 3470532 (4th Cir. July 11, 2013).  In that case, the court found that Liberty University had

Nevertheless, to the extent that the Fourth Circuit cases can be read to justify the Bank's theory of standing and survive *Clapper*, this Court is unwilling to accept their rationale. The logical extension of the Bank's expansive definition of compliance costs would be that any time a party spends money or uses its resources (including its in-house counsel) to identify its statutory obligations, or indeed to determine if it even has any, it would then have standing to challenge that statute. That cannot be the law. Just as "a plaintiff cannot achieve standing to litigate a substantive issue by bringing suit for the cost of bringing suit," *Steel Co.*, 523 U.S. at 107, a plaintiff should not be able to achieve standing to litigate an injury based on the cost of figuring out whether it has an injury. To accept the Bank's definition of compliance costs would amount to an evisceration of the requirement of injury-in-fact, and would grant standing to a party that is merely a subject of a regulation or statute. (*See supra* Section III.B.)

But even if these costs could be construed to constitute an injury, it is a self-inflicted injury, neither caused by Title X nor redressable by this Court. As the Supreme Court recently held, plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 133 S. Ct. at 1151. The Bank's assertion that it was forced to expend these costs rings hollow since it is not

---

standing to challenge the Affordable Care Act on the grounds that "[e]ven if the coverage Liberty currently provides ultimately proves sufficient, it may well incur additional costs because of the administrative burden of assuring compliance with the employer mandate, or due to an increase in the cost of care." *Id.* at *7. Once again, the Court agrees that Article III standing may be based on this traditional conception of "compliance costs" – *i.e.*, "the burden of assuring compliance" – but the costs claimed by the Bank do not fall into that category. In the same filing, plaintiffs also cite a recent D.C. Circuit case, *Ass'n of Am. R.R. v. U.S. Dep't of Transp.*, No. 12-5204, 2013 WL 3305715 (July 3, 2013), in support of their compliance costs argument. However, plaintiffs mischaracterize the case as holding that compliance costs constitute Article III injury. (*See* Pl. Supp. Authority at 2-3.) Rather, in dicta in a footnote, the Court refers to "the immediate actions the metrics and standards have forced" the plaintiff to take as evidence of the "considerable hardship" the plaintiff would face if review of its claims were denied under the second prong of *Abbott Lab*'s prudential ripeness test. *See Ass'n of Am. R.R.*, 2013 WL 3305715, at 10 n.6 (citing *Abbott Labs.*, 387 U.S. at 149).

clear that Compliance Alliance and TriNovus provide needed information about Bureau regulations that is not readily accessible from the Bureau's own comprehensive and comprehensible website.  (*See generally* http://www.consumerfinance.gov.)  Furthermore, the Compliance Alliance is a service of the Texas Bankers Association, a trade association to which the Bank belongs, which further undermines the Bank's claim that these expenses constitute an injury caused by the Bureau.  In addition, while the service may have been inspired by Dodd-Frank, as the Bank suggests, it is not focused exclusively on Bureau regulations.  Instead, its publications and resources cover a wide range of federal and state regulations, so it is an overstatement to claim that the entire subscription fee is attributable to Title X of Dodd-Frank.  (*See* Pvt. Pl. Opp. at 8; *see generally* http://www.compliancealliance.com.)  Similarly, the "Compliance School" training related to a variety of subjects, including, but certainly not limited to, CFPB regulations.  (*See* Pvt. Pl. Opp. at 8; Tr. at 18.)  Thus, if Dodd-Frank had never been passed, the Bank presumably would still have to spend money to learn about its compliance responsibilities under other federal and state regulations; likewise, if the Court were to invalidate Title X, the Bank would continue to spend money to learn about its other compliance responsibilities.  As a result, the Bank has not established that these costs were caused by Title X or that they are redressable by a court.

In short, these expenditures are not "a reasonable reaction to a risk of harm," but rather expenditures that the Bank would make in the normal course of business irrespective of Title X, or, to the extent that they are costs unique to Title X, they are an injury that the Bank has inflicted on itself "based on [its] fears of hypothetical future harm that is not certainly impending."  *Clapper*, 133 S. Ct. at 1151.

### 2.    Remittance Rule

The Bank claims that the Bureau's Remittance Rule has constrained its remittance business, thereby causing it Article III injury.  Importantly, on the day the Bureau issued the rule, it also issued a notice of proposed rulemaking indicating that the Bureau was considering the establishment of a safe harbor.  (*See* Def. Reply at 8.)  Although the safe harbor, as initially contemplated, would have covered only institutions that provided 25 or fewer remittances, the safe harbor that was ultimately adopted in August 2012 protects institutions that provide 100 or fewer remittances.  (*See* 77 Fed. Reg. at 6203; EFT, 77 Fed. Reg. at 50244.)

The Bank stopped offering remittances when the initial rule was promulgated – despite the fact that the rule had not come into effect and there was a notice of proposed rulemaking – and it began offering remittances again after the safe harbor provision was adopted.  (*See* First Purcell Decl. ¶¶ 15, 18, 20.)  The Bank now argues that its "inability to cost-effectively comply with the Rule has caused it to adopt a policy pursuant to which it has limited its business opportunities by mandating that it will never perform more than 99 covered transfers in any given year."  (Pvt. Pl. Opp. at 17 n.8.)  However, the Bank has never come close to 100 remittances, as it "regularly offered more than 25 transfers a year," but it has never offered more than 70 transfers in a year.  (*See* First Purcell Decl. ¶ 11.)  Thus, it falls comfortably within the safe harbor that was ultimately adopted, and its assertion that it would issue more than 100 remittances annually in the future were it not subject to the regulation lacks plausibility.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  For, as the Supreme Court has held, "'some day' intentions – without any description of concrete plans, or indeed even any specification of when the some day will be – do not support a finding of the 'actual or imminent' injury that" is required.  *Lujan*, 504 U.S. at 564.

The Bank also argues that even if the Court does not accept its proposition that the rule as currently configured causes it injury, it has standing because when it filed suit, the final Remittance Rule had been issued but the final rule regarding the safe harbor had not yet been formally promulgated.  Of course, "standing is assessed at the time of filing." *Wheaton Coll. v. Sebelius*, 703 F.3d 551, 552 (D.C. Cir. 2012).  Nonetheless, the Court disagrees with the Bank's premise.  At the time that the suit was filed, the Remittance Rule had not taken effect, and the Bureau had made it clear that it was still in the midst of drafting a rule to provide for a safe harbor.  Furthermore, as defendants have noted, further amendment was not only contemplated at the time the rule was issued, it was all but inevitable.  (*See* Tr. at 64.)  The statute and the rule specified that the rule would apply only to entities that provide remittance transfers "in the normal course of business," but that phrase was left undefined.  (*Id.*)  Ultimately, the safe harbor amendment defined "in the normal course of business" as the issuance of 100 or more remittances annually, thereby limiting the application of the Remittance Rule to institutions that have a far more active remittance business than the Bank.  While a plaintiff need not necessarily wait until the effective date of a regulation to challenge it, *see Pierce v. Soc'y of the Sisters*, 268 U.S. 510, 529, 536 (1925), where it is clear that the administrative process is ongoing to the extent that the regulation's application to the plaintiff is unclear, there is no "certainly impending" injury.  *Clapper*, 133 S. Ct. at 1143.

In addition, considerations of prudential ripeness will sometimes lead courts to refrain from interfering with an agency's ongoing decision-making process.  *See Reno v. Catholic Soc. Servs.*, 509 U.S. 43, 58 n.18 (1993) ("Even when a ripeness question in a particular case is prudential, we may raise it on our own motion, and cannot be bound by the wishes of the parties.") (internal quotation marks and citation omitted).  As the Court of Appeals recently

noted, "[i]n the context of agency decision making, letting the administrative process run its course before binding parties to a judicial decision prevents courts from 'entangling themselves in abstract disagreements over administrative policies, and . . . protect[s] the agencies from judicial interference' in an ongoing decision-making process." *Am. Petroleum Inst.*, 683 F.3d at 386. Of course, the Bank is not challenging a specific agency decision, but rather the existence of the agency itself. Nonetheless, in the context of this Court's attempts to assess its jurisdiction over the Bank's claims, similar reasoning applies, for the Bank's claims remain abstract until there is some regulation that actually causes harm or will plausibly harm in the near future.

Furthermore, the Bank's claim is not ripe because the Bank has no imminent injury based on the Remittance Rule as presently promulgated. The Bank alleges that the Bureau could alter the rule at any time to make it applicable to the Bank, "[g]iven the CFPB's constantly changing positions on remittances." [26] But the promulgation of a handful of amendments to clarify and refine the rule hardly qualifies as taking "constantly changing positions." Furthermore, while anything is possible, that does not render it plausible, much less "certainly impending." *Clapper*, 133 S. Ct. at 1143. *See also Coal. for Responsible Regulation*, 684 F.3d at 130 ("Ripeness . . . shares the constitutional requirement of standing that an injury in fact be certainly impending." (internal quotation marks and citation omitted)).

---

[26] The Bank relies heavily on the voluntary cessation doctrine as articulated most recently in *Already LLC v. Nike, Inc.*, 133 S. Ct. 721, 727 (2013), arguing that the CFPB could change the Remittance Rule again to do away with the safe harbor, because it has amended the rule in the past. (*See* Pvt. Pl. Opp. at 17 n.8; Tr. at 8-9.) However, the Bank's reliance is misplaced. This doctrine is an exception to mootness, and "if a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 191 (2000). It is instead standing and ripeness that are at issue here.

### 3.    Mortgage Foreclosure Rules

The Bank also relies on the RESPA Servicing Rule and the ATR-QM Rule, both issued

by the CFPB under Cordray's direction, as evidence of injury.  As a threshold matter, it is

significant that neither rule had been issued at the time of the filing of the suit.  As defendants

point out, although the Second Amended Complaint was filed subsequent to the rules'

promulgation, the Bank added no allegations about the rules, mentioning them for the first time

in its Opposition to defendants' Motion to Dismiss.  (*See* Def. Reply at 13, 15, 16 (citing

*Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C.

2003) ("It is axiomatic that a complaint may not be amended by the briefs in opposition to a

motion to dismiss.")).)  Moreover, "federal jurisdiction depends on the facts as they exist when

the complaint is filed."  *Commercial Union Ins. Co. v. United States*, 999 F.2d 581, 585 (D.C.

Cir. 1993) (citing *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989)).

Otherwise stated, "[t]o satisfy Article III, an injury in fact must be both 'concrete and

particularized' and 'actual or imminent' *at the time the plaintiff files suit*."  *Equal Rights Ctr. v.

Post Props., Inc.*, 633 F.3d 1136, 1141 (D.C. Cir. 2011) (quoting *Lujan*, 504 U.S. at 560 and

citing *Worth v. Jackson*, 451 F.3d 854, 860 (D.C. Cir. 2006)) (emphasis added).  *See also Lujan*,

504 U.S. at 571 n.5 ("standing is to be determined as of the commencement of suit").  Because

these two rules did not exist at the time the suit was filed, they cannot form the basis of the

Bank's standing.  But even if they could, the Bank's alleged injuries based on the two rules are

far too speculative.

### a.    RESPA Servicing Rule

The RESPA Servicing Rule has numerous requirements, most of which exempt SNB as a

small servicer.  (*See* Tr. at 59.)  The Bank is not exempt, however, from § 1024.41(j), which

prohibits small servicers from making "the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process unless a borrower's mortgage loan obligation is more than 120 days delinquent."  12 U.S.C. § 1024.41(j).  The Bank claims that this provision is causing it present injury because it "increases the Bank's cost of doing business" with regard to the outstanding mortgages it holds.  (Pvt. Pl. Opp. at 14-15.)  Under Texas law, the Bank was able to initiate foreclosure proceedings 20 days after issuing a letter notifying the borrower that he was in default, and a foreclosure sale could be held as soon as 21 days thereafter.  (*See* First Purcell Decl. ¶ 36 (citing Tex. Prop. Code. Ann. § 51.002(a), (b), (d)).)  SNB Chairman Purcell asserts that "[e]ven if the Bank did not intend to actually foreclose on a defaulted borrower, posting a foreclosure notice at the courthouse soon after a default can be a useful tool to induce such a borrower to get current on their payments – but the Bank is now prohibited by the Bureau's new rule from doing so for 120 days."  (*Id.*)  Therefore, according to Purcell, the new rule "will increase the Bank's costs by drawing out the process by which the Bank may seek to recover on a defaulted loan."  (*Id.*)

There is substantial doubt, however, whether the Bank would ever run afoul of this rule. Defendants have cited to public records showing that the Bank has not initiated a single foreclosure from the beginning of 2008 through the end of 2012 – a time during which foreclosures were rampant nationwide – and indeed, that no mortgage has gone into default from the beginning of 2007 through the end of 2012.  (*See* Def. Reply at 17-18; *id.*, Exs. 3, 4.)[27]

---

[27] The Bank contends that this information is not properly before the Court because, while the plaintiff can supplement the record on a 12(b)(1) motion, the defendant is limited to arguing based on the plaintiff's pleadings.  (*See* Tr. at 13-15 (citing *Haase v. Sessions*, 835 F.2d 902 (D.C. Cir. 1987)).)  While conversion does not apply in the 12(b)(1) context, a court can look beyond the pleadings to satisfy itself that it has standing.  *Haase*, 835 F.2d at 906, 908.  Of course, the Court may take judicial notice of public records, and the information regarding SNB's foreclosure history is derived from information provided by the Bank and contained in

Because the Bank chose to exit the mortgage lending business in 2010, it holds a dwindling number of mortgages, which will total only $577,000 when this rule takes effect in January 2014. (*See* Def. Reply at 17.)[28]  Furthermore, loans secured by property of 25 acres or more are exempt from RESPA's requirements (*see id.* at 18 (citing 12 C.F.R. § 1024.5(b)(1))), and § 1024.41(j) only comes into effect if the loans are secured by a borrowers' principal residence.  (*See id.*)  The Bank, however, has failed to disclose whether any of its existing mortgages are actually subject to this rule.  Moreover, following the oral argument on this motion, the Bank asked for and was given an opportunity to adduce additional facts to support its arguments.  Although it did file supplementary declarations, it noted only that "[t]he Bank has previously used the foreclosure-notice-posting process provided for in Tex. Prop. Code. Ann. § 51.002(a), (b), (d)."  (Second Purcell Decl. ¶ 12.)  Since it is unknown when or how often this occurred, Purcell's declaration does little to sustain the Bank's burden as to standing, and it provides no basis upon which to predict that the Bank will be injured in the future with respect to the dwindling number of residential mortgages that it will hold when the rule becomes effective in 2014.

In sum, given the scant record before the Court, it is simply too speculative to suggest that the Bank would ever wish to issue a notice in less than 120 days; that it would be prevented from doing so by § 1024.5(j); and that it would incur costs as a result.[29]  And, even if the Bank

---

public records published by federal agencies.  *See Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004).

[28] As of December 2012, the Bank held $725,000 in outstanding residential mortgage loans; it will hold $577,000 by the time rule takes effect in January 2014; and, assuming it does not re-enter the mortgage business, it will not hold any residential mortgages within five years.  (*See* Def. Reply at 16-17.)  The record does not reflect how many individual mortgages make up these figures.

[29] The Bank argues that the public call data reflects only formal foreclosures and does not account for instances in which the Bank has used informal processes to induce its mortgage

were to re-enter the mortgage market at some point in the future, as it claims it wants to do, the record does not support the Bank's claim that the rule would impose additional costs.

### b.    ATR-QM Rule

The Bank also alleges injury based on the ATR-QM Rule, which implements the Truth in Lending Act, as well as provisions of Title XIV of the Dodd-Frank Act.  (*See* Pvt. Pl. Opp. at 14, 23; Def. Reply at 12.)  But the Bank cannot base Article III standing on the rule nor does the rule satisfy the prudential ripeness standard.  First, as noted above, the rule did not exist at the time the suit was filed, but rather was promulgated seven months later on January 10, 2013.  Thus, to the extent that standing is based on injury "at the time the plaintiff files suit," *Equal Rights Center*, 633 F.3d at 1141, the rule cannot give rise to standing.

Furthermore, since its initial promulgation on January 10, 2013, the rule has included several provisions that significantly limit the scope of its application.  The rule has always provided that a qualified mortgage that is not "higher-priced" falls within a safe harbor, meaning that the lender is conclusively presumed to have complied with the rule's requirements.  *See* 78 Fed. Reg. at 6408.  The Bank has not stated whether it holds any mortgages that fall into this category, or if it would hold any if it chose to re-enter the consumer mortgage market.  The rule has also always included a rebuttable presumption for "higher-priced" mortgage loans that do not qualify for the safe harbor.  *Id*. at 6510.  When the rule was first issued in January 2013, "higher-priced" mortgages were defined as "having an APR that exceeds APOR by 1.5 percentage points

---

customers to get current on their payments.  (*See* Tr. at 31-32.)  However, the data reflects that there were no defaults from 2007 through 2012, so it is unclear when in the past six years, a period that includes the height of the housing mortgage crisis, the Bank would have had occasion to use even the informal process.  (*See* Def. Reply, Ex. 4.)

for first liens[.]"[30]  *Id.*   Accordingly, on February 12, 2013, SNB Chairman Jim Purcell stated

that "[b]efore leaving the market, the Bank offered *several loans* at interest rates that were at

least 1.5% higher than the Average Prime Offer Rate. . . . Had it continued to offer consumer

mortgage loans, it would have expected many of them to be of this character."  (First Purcell

Decl. ¶ 25 (emphasis added).)

Importantly, however, on the same day the rule was issued, the agency proposed raising

the safe harbor ceiling for small creditors from 1.5% to 3.5% APR over APOR, *see* 78 Fed. Reg.

6621, 6624 (to be codified at 12 CFR 1026) (Jan. 30, 2013), and after notice and comment, the

agency issued such a rule on May 29, 2013.  *See* 78 Fed. Reg. 35429, 35431 (June 12, 2013).  As

noted in the rulemaking,

> [b]ecause small creditors often have higher cost of funds, the final rule shifts the
> threshold separating qualified mortgages that receive a safe harbor from those that
> receive a rebuttable presumption of compliance with the ability-to-repay rules
> from 1.5 percentage points above the average prime offer rate (APOR) on first-
> lien loans to 3.5 percentage points above APOR.

*Id.*  In response, on June 13, 2013, SNB Chairman Purcell submitted a supplemental declaration

indicating that the Bank currently holds only three loans that exceed the prime rate by 3.5% (*see*

Second Purcell Decl. ¶ 10), and thus, these loans, if they still exist when the rule becomes

---

[30] The rule also treats "certain balloon-payment mortgages as qualified mortgages if they are
originated and held in portfolio by small creditors operating predominantly in rural or
underserved areas."  78 Fed. Reg. at 6409.  In 2013, Dawson and Howard Counties, where SNB
is based, fell into this category.  *See Final list of rural and underserved counties for use in 2013*,
http://consumerfinance.gov/blog/final-list-of-rural-and-or-underserved-counties-for-use-in-2013
(announcing list of counties in which small creditors will be eligible for safe harbors under
Escrow Requirements under the Truth in Lending Act Rule ("Escrows Rule"); High-Cost
Mortgage and Homeownership Counseling Amendments to the Truth in Lending Act Rule
("HOEPA Rule"); and Appraisals for Higher-Priced Mortgage Loans Rule.)  However, Howard
County, where the Bank states that the majority of its mortgages originated, has been removed
from the list for 2014.  (*See* Pl. Supp. Brief at 3 n.3 (*citing Final list of rural and underserved
counties for use in 2014* (July 2, 2013), http://www.consumerfinance.gov/blog/final-list-of-rural-
and-underserved-counties-for-use-in-2014*.)

effective on January 10, 2014, will be entitled to the rebuttable presumption, not the safe harbor, in the event that a mortgagee sues or raises a defense based on the rule.  *See* 78 Fed. Reg. at 35429.

But whether this rule will be invoked by a litigant is sheer conjecture since the Bank has had no mortgages in default, nor has it initiated any foreclosures or become involved in litigation over foreclosures since 2008.  (*See* Def. Reply, Ex. 4.)  Furthermore, there is a three-year statute of limitations for affirmative cases brought under the rule; after three years, the rule can be invoked only as a defense to foreclosure.  (*See* 78 Fed. Reg. 6416.)  For these same reasons, the Bank's claim that it is being prevented from re-entering the mortgage market because the rule "would impose an additional risk factor that would affect the costs and structure of the loan if the Bank were to offer it" lacks plausibility.  (First Purcell Decl. ¶ 32.  *See also* Pvt. Pl. Opp. at 23; Tr. at 25-26.)[31]

---

[31]  The Bureau noted in its notice of final rulemaking that it investigated the impacts of potential litigation and found that:

> even without the benefit of any presumption of compliance, the actual increase in costs from the litigation risk associated with ability-to-pay requirements would be quite modest.  This is a function of the relatively small number of potential claims, the relatively small size of those claims, and the relatively low likelihood of claims being filed and successfully prosecuted.  The Bureau notes that litigation likely would arise only when a consumer in fact was unable to repay the loan (i.e. was seriously delinquent or had defaulted), and even then only if the consumer elects to assert a claim and is able to secure a lawyer to provide representation; the consumer can prevail only upon proving that the creditor lacked a reasonable and good faith belief in the consumer's ability to repay at consummation or failed to consider the statutory factors in arriving at that belief. The rebuttable presumption of compliance being afforded to qualified mortgages that are higher-priced reduces the litigation risk, and hence the potential transaction costs, still further.

78 Fed. Reg. 6407, 6512 (Jan. 30, 2013).

As noted above, the Supreme Court is reluctant to find standing based on theories that "require guesswork as to how independent decisionmakers will exercise their judgment," *Clapper*, 133 S. Ct. at 1150, and it is "the burden of the plaintiff to adduce facts showing that . . . choices [of the independent actors] have been or will be made in such a manner as to produce causation and redressibility of injury." *Lujan*, 504 U.S. at 562. *See also Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 940.   The Bank has failed to carry this burden here.   For even if the Bank were to offer mortgages that exceed the prime rate by 3.5%, its past record indicates that this would be a small number of mortgages; the rate of defaults would be low even among this class of borrowers; and no one can know if any of the defaulting borrowers would choose to raise the ATR-QM Rule as a defense to foreclosure.

It should also be noted that the Bank's claim of injury based on the ATR-QM Rule faces a redressability problem, insofar as the Bank has not challenged Title XIV, nor asked that the rule be set aside under the Administrative Procedure Act, 5 U.S.C. § 706.   (*See* Def. Reply at 14.)   Even if the Court were to invalidate Title X with the effect of nullifying the Bureau, it is arguable that rulemaking authority for TILA, which the ATR-QM Rule implements, could revert to the Federal Reserve Board, which held that authority prior to Dodd-Frank.   *See* 76 Fed. Reg. 27389.[32]

Moreover, it is obvious that the rule is still a work in progress.   The agency is clearly taking seriously public comments that it has received, as it has already made adjustments to the

---

[32] In fact, "in 2008 the Federal Reserve Board . . . adopted a rule under the Truth in Lending Act which prohibits creditors from making 'higher-price mortgage loans' without assessing consumers' ability to repay the loans. Under the Board's rule, a creditor is presumed to have complied with the ability-to-repay requirements if the creditor follows certain specified underwriting practices. This rule has been in effect since October 2009."  78 FR at 6408.  The fact that a substantially similar rule was already issued by the agency that previously held regulatory authority for TILA further underscores defendants' argument that the ATR-QM Rule does not constitute an injury redressable by this Court.

rule based on concern that "small creditors operating in rural and underserved areas may reduce the number of mortgage loans they make or stop making mortgage loans altogether, limiting the availability of nonconforming mortgage credit and of mortgage credit in rural and underserved areas." 78 Fed. Reg. at 35478. So again, considerations of prudential ripeness strongly counsel against the Court's intervention. *See Devia*, 492 F.3d at 424 (the purpose of ripeness "'is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties'" (quoting *Abbott Labs.*, 387 U.S. at 148-49)).

### 4.   UDAAP Authority

Finally, the Bank contends that it has standing to attack Title X based on the Bureau's UDAAP authority. Its challenge rests on a two-prong attack. First, the Bank claims that in October 2010, several months after the passage of the Dodd-Frank Act, it decided to exit the consumer mortgage business "to avoid the likelihood of a Bureau-driven prosecution, and to avoid the *certainty* that it would have been required to alter its mortgage lending practices had it stayed in the market." (Pvt. Pl. Opp. at 20 (emphasis in original); *see also* First Purcell Decl. ¶ 30 ("The Bank did so due to fear that those loans would be subject to enforcement action under the Dodd-Frank Act because they might be deemed to violate the prohibition against unfair, deceptive and abusive practices.").) Second, the Bank claims that "[b]ut for the Bureau, its rules, and its enforcement authority, the Bank would reenter the consumer mortgage and remittance markets without limitation." (First Purcell Decl. ¶ 38.) Neither of these claims can withstand scrutiny as a matter of law or fact.

As an initial matter, one must place the Bank's claims in context in order to understand whether either its decision to get out of the mortgage business or its decision to stay out of that business constitutes a concrete injury-in-fact caused by Title X of the Dodd-Frank Act and redressable by this Court.  At the time the Bank ceased offering new mortgages in October 2010, the Bureau was barely in operation; it had not used its UDAAP authority to regulate mortgages or any other consumer products; it had not enacted any regulations; and it had not undertaken any enforcement actions.[33]  In fact, the only event from that time period that plaintiffs point to in support of their claim about the "overwhelming uncertainty inherent in Title X" (Second Am. Compl. ¶ 88) is a September 17, 2010 statement by President Obama in which he asserted that the CFPB would "crack down on the abusive practice of unscrupulous mortgage lenders."[34]  (*Id.* ¶ 89.)

Thereafter, the Bank filed suit on June 21, 2012, complaining about the lack of certainty as to "whether the CFPB will investigate or litigate against them, deeming [the Bank's mortgage lending] practices to be 'unfair,' 'deceptive' or 'abusive' pursuant to an *ex post facto* CFPB interpretation of the law" (Original Complaint [ECF No. 1] ("Compl.") ¶ 43), and adding allegations in 2013 when it amended the complaint about "[t]he resulting chilling effect . . . [that] forces lenders such as the Bank to either risk federal prosecution or curtail their own services and products."  (Second Am. Compl. ¶ 83.)  Yet, even at the time that suit was filed – two years after

---

[33] Indeed, the first enforcement action that the CFPB brought pursuant to its UDAAP Authority was not filed until May 30, 2013.  That action was brought against a "debt-relief" company.  (*See* Pvt. Pl. Opp. at 4; Jacob Second Decl., Exs. 1-2, *CFPB v. Am. Debt Settlement Solutions*, No. 13-80548 (S.D. Fla. filed May 30, 2013).)

[34] According to plaintiffs, it was not until after Cordray's appointment in January 2012 that he specifically zeroed in on the need to "address the origination of mortgages, including loan originator compensation and the origination of high-priced mortgages" in a speech given on March 14, 2012.  (Second Am. Compl. ¶ 91)

the enactment of Dodd-Frank – the Bureau still had not enacted any rule that impacted the Bank's mortgage lending practices. In fact, the only mortgage rules that the Bank complains about – the ATR-QM Rule and the RESPA Servicing Rule – were promulgated on January 10, 2013 and February 14, 2013, respectively, and neither was even mentioned in the Second Amended Complaint, which was filed on February 19, 2013.[35] Moreover, neither rule was promulgated under the Bureau's dreaded UDAPP authority, but rather under preexisting laws for which the regulatory authority had been transferred to the Bureau.[36]

Nonetheless, in opposing the motion to dismiss, the Bank raised the two mortgage rules for the first time and argued that "but for the Bureau, its rules, and its enforcement authority, the Bank would reenter the consumer mortgage and remittance markets without limitation." (First Purcell Decl. ¶ 38.) Of course, as of the filing of this lawsuit, neither the mortgage rules nor the Remittance Rule had become effective, and they still have not become effective. Furthermore, each rule has been amended multiple times with the addition of significant safe harbors, which further blunt any possible future impact on either the Bank's present mortgage holdings or its future holdings should it chose to reenter the market. [37] For instance, at the time that Purcell

---

[35] The Remittance Rule was first promulgated on February 7, 2012, and was cited in plaintiffs' original complaint (Compl. ¶ 58). However, it is unrelated to mortgage practices and it was enacted pursuant to the EFTA, not the Bureau's UDAPP authority.

[36] The Bureau issued the final ATR-QM Rule to implement Title XIV of the Dodd-Frank Act and Amended Regulation Z, which itself implements TILA, 15 U.S.C. § 1601 *et seq.* The RESPA Servicing Rule was issued, as its name implies, under RESPA, 12 U.S.C. § 2601 *et seq.*

[37] The Court has previously discussed each of these rules and why they do not that provide standing and/or are not ripe for judicial review. (*See supra* Section III.B.2, 3.) In particular, given the record before the Court, one cannot plausibly argue that the rules inflict a current harm on the Bank nor do they plausibly impose an increase on the Bank's business costs if the Bank were to reenter the market. Alternatively, for prudential ripeness reasons, the Court will refrain from interfering in the ongoing administrative process.

executed his first declaration on February 12, 2013, he pointed to the ATR-QM Rule as a

contributing factor to the Bank's unwillingness to reenter the mortgage market, but at that time,

the rule's safe harbor was limited to mortgages with a rate less than 1.5% above APOR on first-

lien loans.  (First Purcell Decl. ¶¶ 25, 32.)  Then, on May 29, 2013, the Bureau amended the rule

to raise the threshold so that at present, the safe harbor includes all mortgages up to 3.5% above

APOR.  Thus, much of the reason for the Bank's distress has been alleviated given the expanded

scope of the safe harbor, for, as of June 13, 2013, the Bank only had three outstanding mortgage

loans that exceeded 3.5% above APOR. (Second Purcell Decl. ¶ 10.)  And it still remains

unknown whether it would offer similar higher-priced mortgages in the future if it were to

reenter the market.

      As this chronology demonstrates, the Bank left the mortgage market three months after

the law was enacted and long before the adoption of any rule governing residential mortgages so

one can only infer that the Bank's generalized fear (or dislike) of the law, and not the mere

possibility of increased costs associated with the rules governing mortgages, provides the

primary motivation for the Bank to stay out of this business.  According to the Bank, its fear

arises from the "cloud of regulatory uncertainty" (Compl. ¶ 12), which cannot, by definition

satisfy *Clapper*'s requirement of "clearly impending" injury.  133 S. Ct. at 1151.[38]

---

[38] It is questionable that Title X is the cause of the Bank's fears, since even without its UDAAP
authority, the government has ample authority to regulate mortgages.  For instance, the Bank has
been governed for decades by the Federal Trade Commission Act prohibition on "unfair" and
"deceptive" practices.  *See* 15 U.S.C. § 45.  It is therefore difficult to understand how the
insertion of the word "abusive" in defining the Bureau's regulatory authority could make any
real difference in the types of business practices that will be scrutinized. The Bank is also subject
to numerous statutes and rules regulating mortgage markets.  *See, e.g.,* RESPA, 12 U.S.C. § 2601
*et seq.*; the Secure and Fair Enforcement for Mortgage Licensing Act of 2008, 12 U.S.C. § 5101
*et seq.*; the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701 *et seq.*

In addition, defendants argue persuasively that the Bank's decision to withdraw from the consumer mortgage market as of October 10, 2010, and to remain out of that market, as well as its decision to limit the number of remittance transfers to under 100, constitute "self-inflicted" injuries, in contravention of the Supreme Court's admonition that plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 153 S. Ct. at 1151.  As argued by defendants, the Bureau has not barred the Bank from reentering the consumer mortgage market nor limited the number of remittance transfers it can issue.  (*See* Tr. at 63.)  Rather, the Bank has chosen this route because of its fears of a possible hypothetical harm created by the mere existence of the Bureau's looming regulatory and enforcement powers.  Standing cannot be based on this type of voluntary act by a plaintiff.  *See, e.g., Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) (association lacked standing because its injury was "self-inflicted" insofar as it "ha[d] within its grasp an easy means for alleviating the alleged uncertainty"); *Rodos v. Michaelson*, 527 F.2d 582, 584-85 (1st Cir. 1975) (doctors lacked standing to challenge statute restricting abortions after they ceased performing abortions based on purely speculative "fear of prosecution"); *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1157 n.8 (10th Cir. 2005) (abortion provider's injury "self-inflicted" where it responded to statute imposing civil liability for abortions performed on minors without "parental consent or knowledge" by requiring all minors to obtain in-person parental consent).

To rebut this argument, the Bank tries to argue, based on several D.C. Circuit cases, that even though the law has yet to be enforced against it, it has standing because "it is 'reasonably certain' that the company's 'business decisions will be affected' by it."  (Pvt. Pl. Opp. at 20-21 (quoting *Sabre v. Department of Transportation*, 429 F.3d 1113 (D.C. Cir. 2005).)  But these

cases are factually distinguishable because we are nowhere near the preenforcement point found

sufficient in those cases, and to the extent that they hold that standing may be based on

"incurring costs in anticipation of non-imminent harm," they cannot survive *Clapper*, 133 S. Ct.

at 1155.

Most notably, the Bank relies on *Sabre*, 429 F.3d 1113, and *Chamber of Commerce v.

FEC*, 69 F.3d 600 (D.C. Cir. 1995).  In *Sabre*, the Court of Appeals held that the plaintiff had

standing "[a]lthough no regulations promulgated by the Department currently constrain [its]

business activity and no relevant enforcement actions are pending against any" entity in

plaintiff's line of business.  429 F.3d at 1115.  However, the Court made clear that its holding

was based on a combination of three particular circumstances: "[1] in the Final Rule, the

Department claims that it has jurisdiction over independent CRSs under section 411; [2] its

statements indicate a very high probability that it will act against a practice that Sabre would

otherwise find financially attractive; and [3] it has statutory authority to impose daily civil

penalties on Sabre for violation of section 411, which the Department plausibly asserts it may

enforce without prior warning by rulemaking or cease-and-desist order."  *Id.*

Comparable circumstances do not exist here.  First, it is the OCC, rather than the Bureau,

that has jurisdiction to enforce the UDAAP prohibition against the Bank, although the CFPB will

undoubtedly wield significant influence over the OCC's interpretation and enforcement of the

statute.  (*See* Mot. to Dismiss at 18 (citing 12 U.S.C. § 5516(d)(1), (d)(2)(A), (d)(2)(B)).)  More

importantly, it cannot be said that there is a "very high probability," or, for that matter, any

probability, that the Bureau would use its UDAAP authority to take action against the Bank even

with respect to its three higher-priced mortgages or any such mortgages that it might offer in the

future.  In *Sabre*, the Department of Transportation issued a Final Rule and made unequivocal

statements condemning the business practice in which the plaintiff wished to engage.  By

contrast, the Bank can only point to general statements by President Obama that the Bureau

would "crack down on the abusive practice of unscrupulous mortgage lenders," and by Cordray

that the Bureau would "address the origination of mortgages, including loan originator

compensation and the origination of high-priced mortgages."  (Second Am. Compl. ¶¶ 89, 91

(quoting 9/17/10 Address by President Obama and 3/14/12 Address by Richard Cordray).)

Indeed, the Bureau has issued rules pertaining to mortgage practices (though, as noted, none

pursuant to its UDAAP authority).  However, it has consistently followed a course of creating

exceptions for small creditors such as SNB, including the recent amendment to the ATR-QM

Rule to expand the safe harbor for small creditors to include mortgages with up to 3.5% APR

over APOR.  (*See* 78 Fed. Reg. at 35431.)  Thus, far from the unequivocal statements by the

Department of Transportation in *Sabre*, the Bureau's enforcement approach against small

creditors like the Bank has been nothing short of a work in progress, and there is no evidence

that the Bureau intends to take action against the issuance of higher-priced mortgages in general

(as opposed to unscrupulous practices associated with those types of mortgages) of the sort that

the Bank has offered or would offer if it were to re-enter the market.[39]

　　　With respect to the third factor in *Sabre* (the possibility of enforcement through civil

penalties without prior notice), the Bank makes vague allegations about "*ex post facto*

enforcement activities" (Pvt. Pl. Opp. at 9 (citing Second Am. Compl. ¶¶ 16-17, 77, 91)), but the

---

[39] To date, no action has been taken against an entity simply for offering such mortgages (which, as far as the Court can determine, is the only practice about which the Bank is apprehensive). Rather, the only enforcement action the Bureau has taken based, in part, on its UDAAP authority is against a mortgage company accused of illegally giving bonuses to loan officers to reward them for steering consumers toward mortgages with higher interest rates.  *See CFPB v. Castle & Cooke Mortgage*, No. 13-0684 (D. Utah filed July 23, 2013) (alleging violations of the Compensation Rule, 12 C.F.R. § 1026.36(d)(1)(i); the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1); and Regulation Z's Record-Retention Requirements, 12 C.F.R. § 1026.25(a)).

Bureau denies that it has any such power or intent (*see* Tr. at 66), and the Bank has failed to provide any legal support for its allegations.  (*See id*. at 71.)  Thus, unlike *Sabre*, the Bank cannot claim the Bureau's actions to date give "rise to a significant risk" that plaintiffs' business interests will be injured in the future.  *Clapper*, 133 S. Ct. at 1153-54.

Nor are the facts in *Chamber of Commerce v. FEC*, 69 F.3d 600, similar to those presented here.  There, the Court based its decision in part on its conclusion that although "appellants are not faced with any present danger of an enforcement proceeding . . . [n]othing . . . prevents the Commission from enforcing its rule at any time."  69 F.3d at 603.  In the specific context of the plaintiff's First Amendment challenge, the Court treated its cessation of the scrutinized political activity as evidence of the challenged regulation's chilling effect.  *See id*.  The question of whether a regulation has a "chilling effect" has little application beyond the First Amendment context.  *See id*.  ("A party has standing to challenge, pre-enforcement, even the constitutionality of a statute *if First Amendment rights are arguably chilled*, so long as there is a credible threat of prosecution."  (original emphasis removed, emphasis added)); *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 294 (6th Cir. 1997) ("Except for cases involving core First Amendment rights, the existence of a chilling effect has never been considered a sufficient basis, in and of itself, for prohibiting government action." (internal quotation marks and citation omitted)).  Furthermore, the Court also considered that the plaintiff was particularly at risk of facing future litigation challenges to its activity because of an unusual feature of the statute in question that "permits a private party to challenge the FEC's decision *not* to enforce."  *Id*.  In this case, even though the Bank invokes the First Amendment doctrine of "chilling effect" (Second Am. Compl. ¶ 16), it has not substantiated its allegations by putting forward a credible "claim of specific present objective harm."  *Bigelow v. Virginia*, 421 U.S. 809, 816-17 (1975).

The Bank also relies on two D.C. Circuit cases suggesting that an injury can be based on an agency action that causes a plaintiff to be exposed to additional risks, which in turn affect the plaintiff's business decisions.  *See Rio Grande Pipeline Co. v. FERC*, 178 F.3d 533 (D.C. Cir. 1999); *Great Lakes Gas Transmission Ltd. P'ship v. FERC*, 984 F.2d 426 (D.C. Cir. 1993). Both of these cases are readily distinguishable.  In each case, the agency *did something* that caused the plaintiff injury.  In the instant case, by contrast, the Bank exited the mortgage lending business before the Bureau had done *anything*.  Both cases also involved concrete consequences for the plaintiffs' business interests, in contrast to the speculative nature of the Bank's asserted injuries here.  In *Rio Grande*, the Court found that the risk of future litigation had a demonstrated *concrete* impact on the plaintiff's "present economic behavior – investment plans and creditworthiness – and its future business relationships."  178 F.3d at 540.[40]  Similarly, in *Great Lakes Gas*, the effect on the plaintiff's "business decisions and competitive posture within the industry" was also concrete and demonstrable.  984 F.2d at 430.[41]  But those cases involved a

---

[40] The Court's finding was based on a record indicating not only that "the current rate may be rendered ineffective if any party files a protest," but also reflecting the plaintiff's representation that "the orders 'have had a profoundly negative effect on the active marketing of [this] project to new potential users,' have made existing and potential investors 'extremely skeptical over further investment in the project,' and have 'negatively impact[ed] both [Rio Grande's] ability to raise debt capital and its general creditworthiness.'" *Rio Grande*, 178 F.3d at 540 (quoting Rio Grande's Brief at 19-20).

[41] The Court noted:

> Because of the condition [imposed by the agency], Great Lakes has the present burden of trying to lock in future shipping contracts and NEB export licenses so that it will not be placed at risk for millions of dollars in construction costs should its expansion facility be underutilized in 2005.  In the likely event that Great Lakes cannot arrange shipping contracts that far in advance, it will have to adjust its finances and investment strategy to prepare for the risk of underutilization. The at-risk condition also injures Great Lakes' competitiveness in the industry. The anticipation of a risk of lower future earnings lowers Great Lakes' creditworthiness, affecting its ability to raise capital by taking on debt.

credible threat of an actual enforcement, whereas here the Bank is worried about the hypothetical

possibility of an enforcement action or a threat of litigation by a mortgagee.  These possibilities

are simply too speculative.[42]

In sum, the Bank's claim that "[b]ut for the Bureau, its rules, and its enforcement

authority, the Bank would reenter the consumer mortgage and remittance markets without

limitation" (First Purcell Decl. ¶ 38) does not establish that the Bank has suffered an injury-in-

fact caused by the Bureau and Cordray, and redressable by this Court.  Therefore, the Bank lacks

standing on Counts One and Two.[43]

---

984 F.2d at 430-31.

[42] In addition to the forecast of regulatory uncertainty and a threat of litigation by mortgagees, the Bank also cites to greater compliance costs in the future as a reason to stay out of the consumer mortgage business.  (*See* Private Plaintiffs' Response to Defendants' Supplemental Brief [ECF NO. 41] at 2.)  As discussed above (*see supra* Section III.B.1), the plaintiffs define these costs as expenditures incurred to monitor the developments in the law, and as already held, they do not provide a basis upon which to find standing.

[43] None of the other plaintiffs has standing on these counts either.  CEI and 60 Plus claim, ever so summarily, that they have suffered injury because Title X has "increased the costs, and limited the availability, of financial services on which the Institute and the Association's members depend."  (Pvt. Pl. Opp. at 34.)  CEI claims injury because it maintains checking accounts with Wells Fargo, "which has recently increased fees on such accounts," while 60 Plus claims similar injuries, and in addition, claim that its members are "disproportionately impacted by the reduced interest rates offered by banks as a result of the increased regulatory burdens imposed by the CFPB."  (*Id*. at 34-35.)  In addition to failing to adequately allege that Title X actually caused these alleged injuries, they are the sort that fall squarely within the category of "generalized grievances," as increased checking account fees and reduced interest rates undoubtedly affect the public at large.  *See Valley Forge Christian Coll. v. Americans United for Separation of Church and State*, 454 U.S. 464, 474-75 (1982); *Warth*, 422 U.S. at 499-500.  The States did not join Counts One and Two.  *See* Pvt. Pl. Opp. at 7.

**CONCLUSION**

For the reasons stated above, the Court will grant Defendants' Motion to Dismiss in its entirety.  A separate Order accompanies this Memorandum Opinion.

_____/s/_____<br>
ELLEN SEGAL HUVELLE<br>
United States District Judge

DATE:  August 1, 2013