—1—

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE NATIONAL BANK      )   Civil Action No.
OF BIG SPRING, et al.,   )   12-1032
                         )
          Plaintiffs,    )
                         )
    v.                   )
                         )
TIMOTHY F. GEITHNER      )   June 12, 2013
et al.,                  )   2:37 p.m.
                         )
          Defendants.    )
------------------------
                              Washington, D.C.

TRANSCRIPT OF MOTION HEARING

BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
UNITED STATES DISTRICT JUDGE

COURT REPORTER:    PATRICIA A. KANESHIRO-MILLER, RMR
                   Certified Realtime Reporter
                   Official Court Reporter
                   Room 4704B, U.S. Courthouse
                   Washington, D.C. 20001
                   202-354-3243

1

2                              APPEARANCES

3

     FOR THE PLAINTIFFS:
4
     PATRICK R. WYRICK, ESQ.
5    ATTORNEY GENERAL OF OKLAHOMA
     313 N.E. 21st Street
6    Oklahoma City, Okaloma  73105

7        -AND-

8    GREGORY F. JACOB, ESQ.
     O'MELVENY & MYERS, LLP
9    1625 Eye Street, NW
     Washington, DC 20006
10

11   FOR THE DEFENDANTS:
     JONATHAN G. COOPER, ESQ.
12   BRADLEY HEATH COHEN, ESQ.
     United States Department of Justice
13   Civil Division
     20 Massachusetts Avenue, N.W.
14   Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1          THE DEPUTY CLERK:  Civil Action 12-1032, State

2    National Bank of Big Spring, et al., versus Timothy F.

3    Geithner, et al.

4          Counsel, please identify yourselves for the record.

5          MR. COOPER:  Jonathan Cooper, Your Honor, from the

6    Department of Justice, on behalf of all the defendants.

7          THE COURT:  Good afternoon.  With you at the table?

8          MR. COOPER:  With me at counsel table is Susan Rudy,

9    Brad Cohen, and Ethan Davis, also from the Department of

10   Justice.

11         THE COURT:  Thank you.  Good afternoon.

12         MR. WYRICK:  Patrick Wyrick from the Oklahoma Attorney

13   General's Office on behalf of the state plaintiffs.  With me,

14   I have Greg Jacob on behalf of the private plaintiffs, Adam

15   White also on behalf of the private plaintiffs, and Kathryn

16   Tarbert on behalf of the private plaintiffs.

17         THE COURT:  The government has made a motion to

18   dismiss the complaint brought by various plaintiffs, including

19   states and the bank and two other entities, basically on

20   standing and ripeness grounds.  So if you don't mind, I would

21   like to begin with --  who is arguing on behalf of State

22   National Bank?

23         MR. JACOB:  I am, Your Honor.

24         THE COURT:  We'll start with you and then we'll switch

1    to Mr. Cooper.  Are you covering all four counts?

2            MR. COOPER:  I am.

3            THE COURT:  I guess seven counts.

4            Okay.  If I can start with the attorney for State

5    National Bank.  I would like to focus first on Counts I and

6    II, Title VII, and the appointments in terms of the standing

7    issue only.  Obviously, the Court of Appeals in Channing has

8    had much to say about appointments, recess appointments, but

9    we're not quite there.

10           What do you think, Mr. Jacob, is your strongest

11   standing argument for Counts I and II?

12           MR. JACOB:  With respect to the Consumer Financial

13   Protection Bureau and Title X of the Dodd-Frank Act, Your

14   Honor, our strongest argument is the compliance costs that the

15   bank has already incurred and that are pled in our

16   supplemental affidavit by Bank President Jim Purcell.

17           THE COURT:  Why don't we focus on that first as a

18   factual matter.  What are compliance costs specifically, and

19   why are they attributable or traceable to a separation of

20   powers problem and/or an appointment problem?

21           MR. JACOB:  Yes, Your Honor.  The bank, in the wake of

22   the enactment of the Dodd-Frank Act, subscribed to two new

23   subscription services.  One of those subscriptions is ongoing,

24   that's the subscription to the Compliance Alliance, which

25   costs the bank $9,900 per year.

1          THE COURT:  I haven't looked at it.  Have you looked

2     at it?  Do you know what it is?

3          MR. JACOB:  The Compliance Alliance, Your Honor?

4          THE COURT:  Yes.

5          MR. JACOB:  I have.  In fact, we have a number of

6     materials that are attached to the bank president's

7     declaration that show both the advertisements that Compliance

8     Alliance circulated among the banks, showing a tidal wave with

9     the letters CFPB on it, saying you need to subscribe to this

10    in order to deal with the tidal wave of regulations that are

11    coming your way.

12          THE COURT:  Have they come yet, by the way?

13          MR. JACOB:  Yes, Your Honor.  There have been to date

14    3,589 pages in the Federal Register devoted to CFPB

15    regulations that the bank is currently dealing with.  So, yes,

16    there are a number of regulations, as well as beyond the

17    regulations that the CFPB has issued, the CFPB has been

18    engaging in enforcement actions.  Just within the last couple

19    of weeks, the CFPB has launched its first enforcement action

20    in which it specifically invoked the abusive prong of its

21    UDAAP authority in Florida.  We've provided the Court --

22          THE COURT:  What does that case have to do with me

23    other than they're using their powers?  I understand that.

24    That's not a bank.  I would like to know exactly, out of these

25    3,589 pages in the Federal Register, how many of these regs

1  have much to do with the bank that is no longer -- is it

2  accurate to say your bank does not give consumer loans,

3  mortgages, or otherwise?  It doesn't advertise that.

4  MR. JACOB:  We have dropped out of the mortgage

5  lending market, although we still do hold mortgages we issued

6  prior to the bank -- in fact, those mortgages are affected by

7  two of the rules that the bureau has issued, the RESPA

8  foreclosure rule, as well as the qualified mortgage rule.  So

9  those mortgages that we still hold are both directly impacted

10  by that; and as we explain in both the complaint and in our

11  briefing, those regulations also prevent us from reentering

12  the market because of the additional costs that would be

13  imposed on us --

14  THE COURT:  Let's focus on the question here.  Are you

15  still doing -- I understand you have some existing mortgages.

16  What other consumer services do you provide?  I understand

17  there is checking, CDs, retirement accounts, and savings

18  accounts.  What else do you provide that might come within the

19  ambit of the bureau?

20  MR. JACOB:  We also provide other loans; so for

21  example, we provide agricultural loans, we provide automobile

22  loans, et cetera.

23  THE COURT:  And are they covering --

24  MR. JACOB:  The regulations that have thus far been

25  issued do not directly impact those as yet.  However, any of

1      our lending practices could fall within the UDAAP authority of

2      the bureau, particularly if they deem any of our lending

3      practices to be abusive.

4            THE COURT:  I am not familiar enough with the statute.

5      Would they cover a commercial loan, a business loan?

6            MR. JACOB:  All financial transactions --

7            THE COURT:  Regardless of who the borrower is?

8            MR. JACOB:  Well, there are a number of exceptions

9      that have been defined within the rules that are in terms of

10     the CFPB enforcement's authority.  For example, when they

11     issued some of the rules they have exceptions and safe harbors

12     that are located within those rules.  So it is not that every

13     transaction is directly regulated by them, but they are

14     potentially subject to the regulatory authority of the CFPB.

15     There are a number of different statutory authorities that

16     they have; for example, the remittance transfers we engaged

17     in, previously engaged in.  We exited the market because the

18     bureau's rule they issued made it prohibitively expensive to

19     engage in remittance transfers --

20           THE COURT:  Well, if you had waited a little while, it

21     wouldn't have happened.  You pulled the plug pretty quickly

22     down there.  The day that they issued the regulations, they

23     also said they were going to propose a safe harbor, and the

24     regulations still years later haven't gone into effect, but

25     the safe harbor has been adopted.  So now you've got -- even

1    when you filed suit, there was a proposal of a safe harbor.

2         MR. JACOB:  If Your Honor looks at the actual safe

3    harbor that was proposed at that point in time, they said,

4    we're considering whether or not we should adopt a safe

5    harbor.  This is at 77 Fed Reg. 6310.  They said this is a

6    possible safe harbor and we want to take comment on whether

7    we're even going to adopt one, and the one that we're

8    considering adopting is one that would exempt those who issue

9    25 or fewer a year.  However, upon the issuance of the 26th,

10   you would be regulated.

11        Our bank regularly issues more than 25 per year.  So

12   the proposed safe harbor that they were discussing at that

13   point in time wouldn't have even applied to us.  Now, it's

14   true --

15        THE COURT:  As a matter of ripeness as we stand here

16   now, the safe harbor would cover anything you've ever done in

17   the past; correct?  Yes or no?

18        MR. JACOB:  Yes, Your Honor, it would.  However,

19   standing is assessed as of the time that the complaint is

20   filed.  That's --

21        THE COURT:  Its ripeness gets assessed later on.

22        MR. JACOB:  That is true, Your Honor.  With respect to

23   that, though, it is their burden to show -- and *Nike v.*

24   *Already* makes this very clear -- that if what they have done

25   is said we're not going to enforce against conduct that

1    previously would have been within the ambit of our

2    enforcement, the burden falls to them -- and the Supreme Court

3    describes this in *Nike v. Already*, this is the voluntary

4    cessation doctrine -- the permittable burden of showing that

5    it is, quote, absolutely clear that, quote, it could not

6    reasonably be expected to recur.

7            The CFPB has modified this rule four times since the

8    time that the -- since the final rule was first issued.  Given

9    the number of changes that they have made to this rule in that

10   interim period of time, there is no way that they can satisfy

11   the burden that they bear of demonstrating mootness under the

12   voluntary cessation doctrine.

13           THE COURT:  Put that aside.  How are you going to say

14   it is ripe?  At the moment, the best we know -- it is a little

15   bit like Wheaton College -- what we know at the moment is that

16   you don't have a rule that you're going to limit yourself to

17   less than 100, and they have a rule that will exempt

18   everything less than 100.  So the status quo is that you don't

19   have any current harm.

20           MR. JACOB:  Your Honor, we did read with great

21   interest footnote 6 of your decision in the Wheaton case.

22   *Nike v. Already*, of course, came down after that, and that may

23   provide some additional clarity.  I know that in Your Honor's

24   decision there, you said the burden remains with us, as the

25   plaintiff, at all times to establish standing.  What *Nike v.*

1    *Already* says is, no, that is actually not the case.  Where we

2    had standing at the outset of the suit, as the plaintiff did

3    in *Nike v. Already*, and as we unquestionably did, it was

4    within the regular course of our business that we issued those

5    remittance transfers, where you have that --

6              THE COURT:  Never more than a hundred --

7              MR. JACOB:  But the burden --

8              THE COURT:  How many times --

9              MR. JACOB:  No, but, Your Honor, at the time that the

10   rule was handed down, there was no safe harbor at all, and the

11   safe harbor that was proposed --

12             THE COURT:  But the rule wasn't effective, so to say

13   that at the time when this thing was handed down, it almost

14   presupposed there was going to be further rulemaking.  I don't

15   know why this doesn't come within the EPA case, frankly,

16   *American Petroleum*.

17             MR. JACOB:  Your Honor, I think it is well established

18   that you don't have to wait for -- once something has been

19   finally acted upon by the agency or by a legislative body.

20   For example, in *Pierce v. Society of Sisters*, the United

21   States Supreme Court dealt with an Oregon statute that had an

22   effective date that was four years out.  It could have been

23   changed by the legislature in the interim.  The Court said

24   this is not a problem.  In fact, they decided that case a year

25   and a half -- a year and a half -- before that statute went

1    effective.

2            Similarly, the D.C. Circuit --

3            THE COURT:  Was there also talk of a safe harbor in

4    that case?  No.

5            MR. JACOB:  No, there wasn't a subsequently adopted

6    harbor --

7            THE COURT:  How do you get around the EPA case, the

8    Petroleum --

9            MR. JACOB:  Your Honor, I don't think there was --

10           THE COURT:  -- *American Petroleum Institute v. EPA*?

11   It is a ripeness case.  The rules hadn't yet become effective,

12   and there were a lot of changes going on.  We have a lot

13   greater picture at the moment about what the rule is than we

14   did earlier, but that may not be a standing issue.  It may or

15   may not, but it is certainly a ripeness issue.

16           MR. JACOB:  I agree it is a ripeness issue.  However,

17   the burden is on the defendants -- and this is squarely within

18   *Nike v. Already* -- once we established that we had standing as

19   of the time the complaint was filed, the burden shifts to them

20   to show that it is absolutely clear that the harm that we had

21   at that point in time has not recurred.  So under --

22           THE COURT:  It hasn't recurred.  I mean, we're now

23   four years later.

24           MR. JACOB:  But they have to show that it is

25   absolutely clear that it could not, and that is the burden

1   that is on them.  They hadn't even attempted to make that

2   demonstration in their briefing.  That might be something that

3   they could do later on, on a summary judgment after putting in

4   evidence, but at this stage of the case, with a motion to

5   dismiss, the Court can only look at our pleadings and the

6   supplemental affidavits that we've attached.

7        THE COURT:  I don't understand why people continually

8   talk about summary judgment; if you have standing to challenge

9   -- these are facial challenges.  There is not going to be

10  discovery here.  Why would the factual record as to standing,

11  or anything else for that matter, change an iota?  The next

12  round, if you have standing, will be to say whether it is a

13  violation of separation of powers and/or the appointment

14  clause for all counts.  There is no discovery.  I don't know

15  why people continually invoke the notion.  We are where we

16  are.  We're not going to have a discovery period on standing.

17       MR. JACOB:  Your Honor, we agree.  We don't think that

18  there would be discovery necessary for this Court.  We think

19  that we have made sufficient allegations.  The standard under

20  a motion to dismiss is whether our allegations are adequate to

21  establish standing.  We think that they are.  However --

22       THE COURT:  But I consider your affidavits, too.

23  You're not here without the opportunity, I mean, to have

24  supplemented the record and tell me everything -- you have the

25  burden on whatever number of things.  I'm not sure about this

1    mootness, this capable of occurring again.  Anything is

2    capable of occurring again.  One has to make some judgment

3    about whether it will.  There isn't anything on the books to

4    suggest that that safe harbor is going to be withdrawn; is

5    there?

6                MR. JACOB:  No, Your Honor, there is not, other than

7    the fact that the government has continuously shifted its

8    position on this time and time again.  We don't think we

9    should be at the mercy of the government --

10               THE COURT:  Sometimes they do it because of lobbyists,

11   you know.

12               MR. JACOB:  Well --

13               THE COURT:  Maybe your people wanted a safe harbor.

14   Ever think about that?

15               Anyways, all right, but I would like to go back to the

16   standard because, again, you say *Clapper* is distinguishable.

17   Well, *Clapper* had discovery, but I don't know, I have never

18   seen an APA case where there is discovery on standing.

19               MR. JACOB:  I think the seminal case on this issue in

20   the D.C. Circuit is *Haase v. Sessions,* at 835 F.2d 902, which

21   dealt specifically with how does the Court address and what is

22   properly before the Court on a 12(b)(1) motion to dismiss for

23   subject matter jurisdiction, which is where we are here.

24   There the Court said the Court should look at the complaint

25   plus any supplemental affidavits but needs to ignore any

1   factual material that the defendant has tried to bring

2   forward.  The actual quote is, "The plaintiff is the

3   beneficiary of this rule, as he can freely augment his

4   pleadings with affidavits, while the defendant is barred at

5   this stage of the proceedings from attacking the claims made

6   therein."

7          THE COURT:  Well, no, that's -- I don't have the case

8   in front of me, but obviously they can rely on public

9   information, I mean, if you say X and it has been publicly,

10  you know, not the case, but that isn't an APA constitutional

11  challenge to a statute case; is it?  That's the problem.

12         MR. JACOB:  In that case, the -- I believe it was a

13  statutory challenge in that case.  *Hasse* was alleging -- or

14  Mr. Sessions was alleging that -- actually, I believe it was

15  Mr. Haase was alleging -- he was a reporter and was alleging

16  that he was improperly subject to searches by the government

17  under rules that were invalid.  The Court specifically talked

18  about there what happens if the defendant thinks that there

19  are facts that should be put at issue, and the Court said

20  there can be a discovery period afterwards.  The Court can

21  launch a discovery and query sua sponte, if it wants to, in

22  which case both sides have to be given the opportunity to

23  engage in discovery.

24         We don't think that is necessary here because the

25  factual record with respect to our compliance costs and with

1    respect --

2          THE COURT:  Let's go to those because they're

3    interesting.  Compliance costs, look at the affidavit.  And

4    what is it, what is it that you're watching so carefully by

5    reading a $9,000 subscription?  They don't have in-house

6    counsel?  What if somebody had in-house counsel that worked

7    for the bank that told them what's going on?  They wouldn't

8    have compliance costs because it's part of their

9    administration.

10          MR. JACOB:  Well, in fact, we do have internal people

11    who are charged with compliance, and the affidavit indicates

12    that that person has had to expend additional resources, both

13    to take classes that covered CFPB regulations, as well as to

14    spend simply additional time on digesting those rules.  That

15    is time that could have been devoted to other things in the

16    absence of the CFPB's regulatory tidal wave.

17          THE COURT:  Well, that's their job.  They're supposed

18    to know what's going on in the field.  They're subject, I

19    assume, to other banking regulations, the Office of the

20    Comptroller of the Currency, the FDIC if they're federally

21    insured.  I mean there is a whole slew of regulatory

22    regulations that are going to govern a bank like this.  They

23    have to have compliance officers.

24          So am I supposed to figure how many hours?  You know,

25    there's a statement here of $231,000 in compliance costs.  It

1    includes compliance personnel, including an outside auditor,

2    compliance software, and compliance education.  And that, I

3    assume, includes something to do with a subscription and going

4    to school.  But how much of that is related to this statute?

5    Because in your pleading, you talk about $10,000 when you're

6    talking about -- on page 14 of your opposition, you refer to

7    ten, and here I've got two hundred thirty-one, so I'm a little

8    confused exactly how much is attributable to the statute that

9    we're worried about to Title X only.  That is the only thing

10   we should be worrying about, is whether or not they have got

11   compliance costs associated -- we'll get to that definition in

12   a minute -- but compliance costs associated with complying

13   with Title X.

14            MR. JACOB:  Your Honor, the $9,900 per year -- we did

15   provide the Court with the total figure for all our compliance

16   costs, but then we broke out several specific costs that were

17   specific to the CFPB and Title X.  The $9,900 a year for

18   Compliance Alliance, which the affidavit indicates we

19   subscribe to specifically because of the enactment of Title X

20   and would not have subscribed to it but for the enactment of

21   Title X.

22            THE COURT:  No other titles of Dodd-Frank apply to

23   you?

24            MR. JACOB:  Some of them could in theory depending on

25   the circumstances.  There are other authorities that have been

1    transferred to the CFPB that then may affect us, but Title X

2    is the primary authority that applies to us, and it creates

3    the CFPB, and it gives it the ability to exercise those

4    transfer powers.  So prior to Title X, we didn't need the

5    Compliance Alliance.

6           THE COURT:  Did you hear what the Electronic Transfer

7    Act provided?

8           MR. JACOB:  Oh, we certainly did, Your Honor.  We had

9    in-house personnel to deal with that, but as the Court can see

10   from the materials that were attached to our -- to the

11   affidavit, the CFPB is marketed by the Compliance Alliance as

12   being the primary factor that they think requires banks to

13   subscribe; and in fact, not only did our bank president say in

14   this affidavit that he found those materials persuasive,

15   persuasive enough that he decided to subscribe, but since that

16   time, 16 state banking associations across 18 different states

17   have all joined into the Compliance Alliance, and so many

18   banks have subscribed to it, again, thinking in the world

19   governed by the CFPB we need to incur these additional costs.

20   So these are not theoretical costs.  These are costs that a

21   number of banks have decided that in order to comply with the

22   dictates of the CFPB, and we have attached to the affidavit

23   materials issued by the Compliance Alliance that the Court can

24   see provide analysis of what the CFPB has done.  It is not

25   simply raw regulatory material, as the government

1    characterizes it.  It is providing analysis.  It is monitoring

2    the CFPB's pronouncements as to where its enforcement

3    priorities will be.  It's monitoring speeches that CFPB

4    officials make.  Because in a world governed by the CFPB where

5    any practice might be deemed abusive by them, it is incredibly

6    important for every bank to stay on top of every pronouncement

7    that is made by the CFPB as to what it might deem abusive

8    because those are the things that we have to use in order to

9    make sure that we are steering clear of things that could

10   result in penalties.

11           THE COURT:  Okay, I get that.  Then, you got $2,000 to

12   send somebody to a compliance class that is solely related to

13   Title X?

14           MR. JACOB:  No, Your Honor, it did not relate solely

15   to Title X; it related to other subjects, as well, but Title X

16   is one of those things that required additional energy.  I

17   would refer the Court to the D.C. Circuit's decision in *Spann*

18   where the court said that, quote, increases in the resources

19   the group must devote, and alternatively, quote, if you have

20   to devote more time, effort, and money, that that is

21   sufficient to establish standing.  Those are --

22           THE COURT:  Is it sufficient to attack the

23   constitutionality on the basis of separation of powers of the

24   agency?  Is there any case that you find that that is what is

25   sufficient?  It may be sufficient for some other purpose, I

1    understand, but is it sufficient to give you standing to make

2    a constitutional attack on either the appointments or the

3    separation of powers?

4         MR. JACOB:  Well, Your Honor, where we have been

5    injured -- I suppose I would refer the Court to, for example,

6    *Free Enterprise* and to the *NRA Political Fund* case.  In both

7    of those cases, it was the constitutional composition of the

8    agency at issue.  With respect to the *Free Enterprise* case,

9    the allegation was that constitutionally speaking only the

10   chairman, as the head of the committee, could make

11   appointments, but the full committee had participated and that

12   that was unconstitutional.

13        THE COURT:  There you had an enforcement action.

14   Silberman made it very clear that the paradigm of being

15   directly affected by an agency was an enforcement action.  In

16   the *Free Enterprise* you had a very critical report of the

17   entity.  Here nobody really has said anything about your bank.

18   I mean, you're just -- you're keeping abreast of the law the

19   same way I keep abreast of the law in the hopes that I can

20   understand it when something like this comes up.

21        Are you really in the situation where you can compare

22   yourself to those -- I agree, they were constitutional

23   attacks.  But you had a different harm being imposed by the

24   very agency that is arguably unconstitutionally composed or

25   unconstitutional in violation of the separation of powers.  I

1    don't quite see that causal relationship as clearly as you

2    might.

3            MR. JACOB:  Well, Your Honor, I think that is actually

4    quite squarely on all fours with *NRA Political Victory*

5    *Committee*.  In that case, the NRA was challenging the

6    constitutional composition of the FEC.  They said they have

7    got two ex officio members that participated in the making of

8    this regulation that affects us and that we don't like.  And

9    similarly, our bank --

10           THE COURT:  It's more than that.  Wait, wait, wait.

11   You're cutting it short.  It wasn't just a regulation that

12   affected you there.  You were subject to a regulatory or an

13   enforcement action; weren't you?

14           MR. JACOB:  They had not been.  They had exited the

15   market, much as we have.

16           THE COURT:  The NRA?

17           MR. JACOB:  Yes, Your Honor.  They were not

18   facing -- they were not facing pending enforcement action in

19   that case, I don't believe.  *Chamber of Commerce* v. FEC is

20   another good example.

21           THE COURT:  Wait a minute.  It says the civil

22   sanctions are injuries, in fact.  It is not like they

23   weren't -- and then he says, an enforcement action is the

24   paradigm of direct government authority.  We may not be

25   looking at the same thing.  This is the *NRA Political Victory*

1    *Fund*.  It's much further along than we are here.

2              MR. JACOB:  Yes, Your Honor.  In fact --

3              THE COURT:  You're just engaging in the preventive --

4              MR. JACOB:  Much like the *Chamber of Commerce* -- and I

5    do apologize with respect to the enforcement action -- was

6    confusing the two -- in *Chamber of Commerce* v. FEC, which Your

7    Honor noted was a case that properly had standing in your

8    decision in *Wheaton*.  There the Chamber of Commerce exited the

9    market -- stopped engaging in the activity of sending certain

10   political missives to its members because the FEC had asserted

11   that doing so might be illegal.  In fact, there the FEC had

12   split three/three.  There was no impending enforcement action

13   at all.  The Chamber of Commerce exited from the market rather

14   than -- stopped engaging in the activity.  And Your Honor

15   noted in the *Wheaton* decision that the exit from engaging in

16   the activity provided an actual here and now harm, very

17   similar to the harm that we have, both from exiting the

18   mortgage market, from being subject to the foreclosure rule,

19   from being subject to the remittance rule, and by having to

20   deal with a slew of regulations and potential enforcement

21   actions that we must incur and risk compliance costs in order

22   to be prepared for that.

23             THE COURT:  Well, how do you jibe that with *Clapper*

24   and the notion of self-inflicted --

25             MR. JACOB:  Your Honor --

1          THE COURT:  -- where do you cross the line between

2     self-infliction the four years before you, say, get the

3     remittance rule in effect versus you have to do it in order to

4     avoid an imminent harm?

5          MR. JACOB:  Looking at *Clapper* in the context of our

6     compliance costs, *Clapper* very expressly distinguished the

7     context where an entity is actually regulated by the entity

8     with respect to which it is incurring compliance costs.  Our

9     bank, no question about it, is subject to the rules that are

10    issued by the CFPB.  We have to comply with the terms of the

11    RESPA foreclosure rule.  We have to comply with the terms of

12    the qualified mortgage rule.  When the --

13         THE COURT:  But you're out of the business for the

14    future.  It is a dwindling sort of compliance, if anything.

15    I'm having trouble understanding, if your compliance

16    requirements are dwindling, how come you are spending all this

17    money on understanding compliance?

18         MR. JACOB:  They are not merely dwindling, Your Honor.

19    For example, let's just take the remittance rule as one

20    example.  I know that you have mentioned that we now have a

21    safe harbor.  The only way we could figure out that we had a

22    safe harbor, first we had to read the original rule with

23    respect to which we didn't have a safe harbor.  Then, we had

24    to monitor for the agency's next pronouncement which said,

25    maybe we will adopt a safe harbor, please submit comments

1    about that.  Then, we had to follow up on the next

2    pronouncement by the agency.  So one pronouncement after

3    another, the only way that we could figure out what we're

4    supposed to do and whether we are governed by that particular

5    rule is by continuously monitoring the agency's

6    pronouncements, and the impact on the bank from getting that

7    wrong would be huge.  When they looked --

8         THE COURT:  Do you have any cases that are of a

9    similar kind of keep up with the law?

10        MR. JACOB:  Yes, Your Honor.  *Chambers Medical*

11   *Technologies of South Carolina*, in that case --

12        THE COURT:  That's a little different, though.  They

13   were required to comply with the state law.  Otherwise, they

14   would violate -- so they monitored the 16 states.  It wasn't

15   just keeping abreast of new developments in the law.  They

16   knew what they had to do.

17        MR. JACOB:  What they had to do was keep abreast of

18   whether any of the 16 states that were at issue enacted a law

19   that prohibited the incineration of waste in that state.

20   That's the only way that they could make sure that they were

21   in compliance with the law.  Because if one of those states

22   enacted such a law, they would have to stop accepting waste

23   from that state or face a penalty.  Similarly, if we didn't

24   monitor the actions of the CFPB, if we didn't read the

25   foreclosure rule and understand it, we wouldn't know when it

1    would apply.  If we engaged in the practices that we

2    previously were used to engaging in under Texas law, we would

3    end up running afoul of regulations promulgated by the CFPB.

4         THE COURT:  The foreclosure rule is one, and that is

5    you can't send out a notice under certain kinds of mortgages,

6    not all -- and I don't know how many you have that fit into

7    that category -- you can't use the 120 days.  Okay.  What else

8    do you have to worry about?

9         MR. JACOB:  Well, we had to monitor for the remittance

10   rule.  Although the safe harbor is there now, the only way for

11   us to understand that was to follow the four different

12   amendments to their regulations at different points in time.

13   We also have the qualified mortgage rule, which with respect

14   to any of our higher priced mortgages shifts the burden that

15   we bear with respect to our requirements for investigating the

16   ability of a borrower to repay the loan.  We need to make sure

17   with respect to any of those loans that we do additional due

18   diligence because we only get a rebuttable presumption with

19   respect to those loans because --

20        THE COURT:  How do you know that that rule would ever

21   be retroactive?  You seem to assume something about its

22   retroactivity; that if you did X, Y, Z five years ago when you

23   made the loan because you're not making any new ones, that the

24   law is going to now say what you did back then is abusive.  Is

25   that how they're operating as far as you know?  Have there

1    been rules that say what you did before we had a definition of

2    this being abusive is now retroactive?

3              MR. JACOB:   Particularly with respect to that rule,

4    the reason that we're monitoring, as the affidavit of Bank

5    President Purcell states, we desperately want to get back into

6    the mortgage market.   The moment that we can clear away these

7    rules that increase our cost of doing so, because every new

8    mortgage that we issue would be subject to the dictates of the

9    qualified mortgage rule, the foreclosure rule, the

10   potential --

11             THE COURT:   You didn't answer my question.   I talked

12   to you about retroactivity.   Why am I worried about the

13   mortgages you have on the book?   Whether you get back in or

14   don't get back into the mortgage business, I don't know.   So

15   far there's two rules:   One is the foreclosure rule, and one

16   is the qualified mortgage.   You have a dwindling stock of

17   consumer loans, but you are assuming that you're going to be

18   covered -- those loans will be covered by rules that, first of

19   all, haven't even become effective and there may be a safe

20   harbor.   So why is it that I should assume -- do they say in

21   the rules -- I don't monitor them, but apparently your client

22   must or else they're not incurring these costs for a reason.

23   When do they go into effect?   One of them in 2014, but it's

24   effective for mortgages that were issued five years earlier?

25             MR. JACOB:   The foreclosure rule is -- and the

1    government does not contest this -- the qualified mortgage

2    rule, I'm actually not entirely certain as I stand here right

3    now in terms of whether it would have applied to all of the

4    mortgages we have on the books.  I believe so.  The government

5    certainly didn't say otherwise.  But our additional costs for

6    reentry into that market, in addition to the effects that we

7    have with respect to our current business, where we want to

8    get back into that market and need to continuously both

9    monitor their pronouncements and stay out of it until we can

10   clear away the regulations and the "abusive" interpretations

11   that -- interpretations of what actions constitute abusive

12   behavior.  Once we clear that away, we will reenter into that

13   market.  That is what our affidavit states.

14       THE COURT:  There is uncertainty for you, and because

15   of the uncertainty, you don't feel confident that you can

16   comply with the rules and regulations at the present and make

17   money.  When the uncertainty gets resolved, you might be able

18   to because you may be covered by a safe harbor or,

19   alternatively, the rule of -- since you have so few

20   foreclosures for the last five years, you may decide if you

21   get a safe harbor for one, and there are various exceptions,

22   it's not a big deal, but all you're dealing with is

23   uncertainty.  You're not dealing with regulation particularly.

24       MR. JACOB:  No, Your Honor.  With respect to what the

25   CFPB may deem to be abusive, yes, there we're dealing with a

1    sea of uncertainty.  Nobody knows what the CFPB --

2           THE COURT:  That's life.  That's not standing.

3           MR. JACOB:  Well, Your Honor --

4           THE COURT:  It is.

5           MR. JACOB:  -- we don't think that's true.  When you

6    take a look at the various precedents of this Court, for

7    example, take *Great Lakes Gas*, in *Great Lakes Gas*, there the

8    company wanted to build a center to receive additional gas

9    from Canada on the Great Lakes, and FERC said, you can build

10   that facility but if you do and if Canada doesn't send as much

11   gas as you're anticipating, you are going to be on the hook

12   and -- for the unmet costs -- and we're not going to let you

13   pass them on to the consumers.  Great Lakes Gas sued saying,

14   hey, we can't bear that additional risk.  The D.C. Circuit

15   said, hey, nobody knows whether Canada is, in fact, going to

16   provide you less gas than you're expecting.  That's

17   speculative, but it is affecting your current business

18   decisions because that additional risk is sufficiently great

19   that it is impacting your current market decisions.

20          Similarly, in this D.C. Circuit's decision in

21   *Rio Grande*, there Rio Grande, again dealing with FERC, asked

22   FERC to approve the rates that it wanted to charge under one

23   section that would not be subject to potential future

24   litigation by third parties.  FERC declined and, instead,

25   approved it under one that was subject to potential future

1    litigation by third parties.  Again, no one knew whether

2    somebody was actually going to sue in the future, but that

3    additional uncertainty and risk that would attach that

4    transaction was affecting Rio Grande's current business

5    decisions.  That is squarely where the bank is with respect to

6    our decision to exit the market.  Our bank, being responsible,

7    looked at the market that it had profitably engaged in for

8    years.  It wants to be in this market.  It wants to serve the

9    people of its community.  That's its founding statement, to be

10   a community bank and to serve their needs.  But when it looked

11   at those additional risks, not knowing whether the five-year

12   balloon notes that it issued were going to be deemed to be

13   abusive or not by the FCPB --

14           THE COURT:  You still don't know that.

15           MR. JACOB:  We still don't know.

16           THE COURT:  You went out in the last quarter of 2010.

17   The law became effective in July 2010.  We're sitting here now

18   three years later, at least the qualified mortgage issue is

19   not going to go into effect until '14, and we have no idea how

20   many of your mortgages may or may not be exempt.  No one has

21   told me that.  But they're certainly under the safe harbor,

22   some of them could be.

23           So you're trying to blame this statute, this violation

24   of the constitutional law, and you're trying to say it caused

25   the separation of powers by giving unlimited powers and the

1   appointment of Caldray, which took place two years later,

2   essentially made you, in 2010, three months after the statute

3   went into effect, to pull out.  I mean that does not seem like

4   an obvious cause and effect by any means.  You're saying that

5   in some fashion, yes, we might have certain things that

6   might -- might -- violate certain statutes, so we're going to

7   get out now and never test it, and now you want to test it.

8   It seems like having your cake and eating it, too; isn't it?

9        MR. JACOB:  I don't think so, Your Honor.  There are a

10  number of decisions of the D.C. Circuit that have said you

11  aren't required to stay in the market and bear those

12  additional costs and incur those additional risks in order to

13  challenge it.  I have given the Court two examples, the

14  *Rio Grande* and the *Great Lake Gas* decisions, where the

15  potential for the risk was in the future, but there are a

16  number of decisions.  The Court in *Duncan*, there the issue was

17  states were either going to issue -- fail to issue regulations

18  that complied with what I believe the Department of Education

19  was requiring, in which case everybody would have to exit the

20  market, or they were going to issue regulations that would

21  increase their compliance costs.  Those were the choices that

22  the plaintiffs faced.  Either you go in with increased

23  compliance costs or you exit the market.  The Court said,

24  that's good enough.

25        In *Chamber of Commerce*, as I mentioned previously,

1    there the *Chamber of Commerce* ceased engaging in the activity.

2    Your Honor noted in *Wheaton* that was sufficient.  That showed

3    the actual present interest, the fact that they stopped

4    engaging in the activity was sufficient to establish their

5    standing even though they would have no possibility of

6    enforcement because they weren't engaging in it anymore.

7         The D.C. Circuit in *Ord*, similarly there they said

8    even though Mr. Ord was not going into the District anymore,

9    where he was subject to potential prosecution, the fact that

10   he is refraining from doing so is sufficient to establish the

11   injury for standing.  So there are simply a number of cases.

12        In *Pelican Chapter*, the Court said you face the

13   Hobson's choice here of either exiting the market or incurring

14   increased costs, and there is no question that if we were in

15   the mortgage market, every new mortgage that we issued would

16   be subject to the foreclosure rule and the qualified mortgage

17   rule, which increase our costs with respect to those

18   mortgages.  And we do, in fact, plead in the affidavit filed

19   by Bank President Purcell that some of those loans that we

20   currently hold are what would be considered to be higher

21   priced mortgages by the Consumer Financial Protection Bureau.

22   Some of them might be exempt from it, but some of them

23   certainly --

24        THE COURT:  That increased cost is the chance that

25   someone would sue you.  That's your increased cost for those

1    qualified mortgages, that somebody could sue; right?

2         MR. JACOB:  Yes, Your Honor, very similar to both

3    *Rio* Grande and *Great Lakes Gas*, where it is the possibility of

4    a third party suit in the future affecting your current

5    business decisions.  Because the bank, when it looks at the

6    mortgages that it issues, the bank's value -- the value of

7    that asset to the bank today is a product of the stream of

8    income that it expects to get from the mortgage payments going

9    forward, discounted by the possibility of foreclosure and the

10   possibility -- and the costs that the bank would incur in

11   going through the foreclosure process.  It always has to

12   evaluate the possibility of foreclosure and what it is going

13   to incur --

14         THE COURT:  If you take the five-year history, why

15   should I worry about foreclosure?  If you haven't had a

16   foreclosure in five years, why should we start now?  It has to

17   have plausibility to your claim.  You say, well, I'm going to

18   have increased foreclosure costs; but in all the years you had

19   all these mortgages, you didn't foreclose.

20         MR. JACOB:  We didn't formally foreclose.  As Bank

21   President Purcell noted in the affidavit, the ability to issue

22   that notice -- the statistics that are tracked by the

23   government which -- again, we don't believe any of that is

24   properly before the Court at this point in time.  Haase *v.*

25   *Sessions* says that can only be evaluated at summary

1    judgment to the extent there's factual conflict.  But even

2    looking at those materials, that is not measuring whether the

3    bank has used the power that it had to post that notice.

4    That's only measuring whether the bank ultimately actually

5    foreclosed, and the affidavit states this is actually a very

6    useful tool for us to be able to post a notice to induce

7    somebody who is in default to get current on their payments.

8    So the facts that the government has improperly tried to place

9    before the Court simply don't get them where they want to go

10   in terms of saying, well, this has no impact on you.

11          THE COURT:  I'm not so sure they can't use things that

12   are published by you.  Since when is that everything -- only

13   you can file something and they can't say anything using your

14   own statements?

15          MR. JACOB:  Your Honor, on a 12(b)(1) motion, they can

16   use our pleadings and the facts that we have put before the

17   Court.  They can't use other things that try to contest the

18   facts that we've put before the Court at this point in time.

19   Again, I would just refer the Court to Haase v. Sessions,

20   which --

21          THE COURT:  I have to judge the pleading by *Iqbal*

22   certainly; and if in fact there's big holes in your facts,

23   then that raises plausibility claims, problems.

24          MR. JACOB:  Yes, Your Honor.

25          THE COURT:  So if you say to me, you know, we're being

1    hurt by not being able to offer a remittance rule and you

2    tell -- it's been clear from probably your own affidavit you

3    haven't issued over a hundred of them ever, that has a problem

4    of plausibility.  Why should you start issuing -- there is no

5    evidence before me to indicate that the past is not an

6    indicator of the future.

7          MR. JACOB:  Well, specifically with respect to the

8    remittance rule, the question is not where we are today; the

9    question is with the exception of the voluntary cessation

10   doctrine.  In terms of what we pled in the complaint, the

11   question was:  Was it plausible as of the time --

12         THE COURT:  No, no, no, no, we've moved past that.

13   I'm not on mootness, and I'm not on standing; I'm on ripeness.

14   It's a ripeness issue assuming you had standing at the time.

15   Something has changed.  You don't ignore that.  You can't just

16   ignore the fact that there is a rule out there now that would

17   give you a reprieve.  So the question is whether -- you may

18   say that law is capable of repetition, but I think the

19   ripeness doctrine would say you wait and see, it's too early

20   to tell --

21         MR. JACOB:  Your Honor, again --

22         THE COURT:  -- premature --

23         MR. JACOB:  -- I would just refer to *Nike v. Already,*

24   which says it is their burden to show that it's absolutely

25   clear that the conduct could not recur --

1          THE COURT:  That's --

2          MR. JACOB:  -- with respect to ripeness.

3          THE COURT:  Is that a ripeness defense?

4          MR. JACOB:  Yes, Your Honor.  The Court specifically

5    says they had standing at the outset, the other side alleges

6    that it became moot later because in that case it was a

7    covenant that Nike issued that said we absolutely will not

8    enforce our trademark against you.  It said, where you've said

9    you're not going to enforce, the other side has to show that

10   there is absolutely no possibility, that it is absolutely

11   clear that the conduct could not recur.  So, again, I think

12   that is the seminal pronouncement on the issue of whose burden

13   it is.

14          Again, if they can meet that burden, that would be one

15   thing --

16          THE COURT:  Whose burden is ripeness?

17          MR. JACOB:  The defendants' in this case, where they

18   create the ripeness themselves.  They have created the

19   ripeness issue through their own voluntary statement that

20   they're not going to enforce --

21          THE COURT:  You get --

22          MR. JACOB:  -- against us --

23          THE COURT:  -- a proposed rule --

24          MR. JACOB:  -- where that --

25          THE COURT:  -- that's gone into effectiveness, has it

1    not?  It is not just they have done something to indicate it's

2    going to become moot.  Don't they have a rule that safe harbor

3    has been --

4            MR. JACOB:  Just as Nike had a covenant that was on

5    the books that it would not enforce its trademark.

6            The hard statement by the other party that they're not

7    going to enforce locked in, it's still the burden of the other

8    party to do that.  But the Court doesn't need to get to

9    ripeness issues with respect to those things because we have

10   actual current harm.

11           THE COURT:  That's the compliance, and your best

12   case --

13           MR. JACOB:  The compliance costs and the

14   foreclosure --

15           THE COURT:  -- is the Fourth Circuit, yes?  That's

16   your best case?

17           MR. JACOB:  On compliance costs?

18           THE COURT:  Yes, that's the closest.  There are

19   compliance costs where people have to build something to come

20   into compliance or that they have to change some procedure in

21   order to meet the requirements of the statute.  Your

22   compliance costs are not $230,000, that's for sure.  There is

23   some figure -- so far I have been given the figure of 9,000,

24   which I take it is fully attributable to X, and then some part

25   of the 2,500, I guess, but those costs are costs that people

1    are incurring because they want to be abreast of the law.  I

2    just want to make sure we're talking about that is compliance

3    costs, and your best case scenario for that is the monitoring

4    of the states in the Fourth Circuit case?

5         MR. JACOB:  That and the Pacific Legal Foundation,

6    which involved also a Fourth Circuit case.  There it was a

7    question of the FDA had put out a rule that was going to

8    reimburse those who wanted to participate --

9         THE COURT:  Right.

10        MR. JACOB:  -- in the agency proceedings for their

11   costs.  Pacific Legal Foundation was deemed to have standing

12   expressly because it was going to increase its costs in

13   monitoring all of the filings in the cases in which it

14   participated.

15        THE COURT:  It wasn't attorney's fees issue?

16        MR. JACOB:  Pacific Legal Foundation was not eligible

17   for reimbursement of attorney's fees.  The only additional

18   cost Pacific Legal Foundation was going to incur was

19   monitoring the docket and responding to additional complaints

20   that would be put forward.  The D.C. Circuit favorably cited

21   *Pacific Legal Foundation* in *Spann*, where it said, if you

22   increase the resources the group must devote, that is

23   sufficient to establish standing.  The amount is actually not

24   relevant.  The D.C. Circuit very clearly stated that in

25   *Duncan v. Association of Private Sector Colleges and*

1    *Universities*, where --

2          THE COURT:  I don't think they held that.  They just

3    said somebody stated that.  Okay.  Have to be a little

4    careful.  That wasn't their holding that it didn't matter.

5    That was the position that it was minimal costs but --

6          MR. JACOB:  They said the government concedes that

7    there are costs, although not significant costs.

8          Similarly, I would just note, at 78 Fed Reg. 10998,

9    the CFPB in its mortgage servicing rules under the Truth in

10   Lending Act notes that the bureau believes that small services

11   will incur one-time costs to learn about the final rule.  In

12   other words, we are not just saying that these are costs that

13   we expect to incur; the bureau itself is saying that the

14   entities that we regulate should expect to incur costs because

15   of the regulations that we issue.

16         THE COURT:  Okay.  Now let's get to the question of

17   why does this enable you to -- if we proceed with the notion

18   you should avoid constitutional questions where possible, as

19   the D.C. Circuit recognizes in *Hastings*, why is it that just

20   because you have extra costs, which the harm is that you are

21   spending money to keep abreast, that you are able to bring --

22   why is that caused by a violation of the separation of powers

23   or appointment of Cordray?  I understand when the NRB issues

24   an opinion that bangs the parties, the parties can rightly say

25   that the people who participated are not proper recess

1    appointments.  I get that.  I don't see the same argument

2    here.

3              MR. JACOB:  Your Honor, there is no exception to the

4    standing doctrine for separation of powers claims.  As long as

5    we show actual injury that is traceable to their conduct and

6    that it would be redressable by our action, we have standing

7    to bring the claim.

8              Now, in terms of ripeness, whether there is some

9    reason for the Court not to hear this complaint, the

10    government has not pointed to a single fact that further

11    development over time would shed elucidation on the separation

12    of power issues that are before the Court.  Director Cordray's

13    appointment either was constitutional at the time it was made

14    or it wasn't.  No further factual development is going to

15    change that.  It's --

16              THE COURT:  That's why standing --

17              MR. JACOB:  -- frozen in time --

18              THE COURT:  -- is not going to change.  It is a

19    mistake to tell me the record on standing will change because

20    the next issue will be the constitutional issues.

21              Again, why is it fairly traceable to his appointment

22    that you're spending costs?

23              MR. JACOB:  Your Honor, both Free Enterprise and NRA

24    Political Fund hold that as long as action has been taken, and

25    Director Cordray's signature is on the foreclosure rule, it is

1     on the remittance rule, it is on the qualified mortgage rule,

2     so all of these --

3               THE COURT:  You skipped the question --

4               MR. JACOB:  -- that apply to us --

5               THE COURT:  No, no, no.  I'm back to just compliance

6     costs.  You say that's your best grounds for standing.  I tend

7     to agree with you.  I don't think your other ones are as

8     strong.  So let's stick with the compliance costs.

9               Why is it fairly traceable to his appointment and/or

10    separation of powers and would be redressable?

11              MR. JACOB:  I should say with respect to Director

12    Cordray, we actually think the foreclosure rule is our

13    strongest argument with respect to that.  There are

14    additional compliance --

15              THE COURT:  Which foreclosure?  The one that says 20

16    days versus --

17              MR. JACOB:  The RESPA foreclosure rule, yes, Your

18    Honor, which we are directly regulated by that Director

19    Cordray's signature is on.  And under those circumstances,

20    both *Free Enterprise* and *NRA Political Fund* both say, we don't

21    have to show that if Director Cordray wasn't there, they would

22    have made a different decision or the rule would have been

23    better.  As long as we're subject to it, that's good enough.

24    We are clearly directly regulated by this rule that Director

25    Cordray's signature is on --

1          THE COURT:  Unless the safe harbor gets you out, or is

2     that --

3          MR. JACOB:  There is no safe harbor on the RESPA

4     foreclosure.

5          THE COURT:  Okay.

6          MR. JACOB:  Now, with respect to compliance costs, we

7     do think that we do have some additional compliance costs

8     because of Director Cordray because, for example, several of

9     the authorities that the CFPB has and has been exercising,

10    including its abusive authority to prosecute abusive actions,

11    weren't activated until Director Cordray was appointed.  So we

12    wouldn't be having to spend additional time and resources

13    monitoring that portion of the CFPB's activity, including the

14    enforcement action that it just recently brought in Florida

15    where it defined abusive, and statements made by Director

16    Cordray as to how he plans to go about prosecuting and

17    determining which actions are abusive.  Those are all things

18    that we have to pay attention to that we wouldn't have to pay

19    attention to had Director Cordray not been appointed.  So we

20    think that we have the traceability and redressability linked

21    there.

22         THE COURT:  Of course, if they hadn't had an

23    appointment clause problem, you would have had to incur these

24    costs because someone else would have been there who might

25    have been appointed at a different point in time --

1          MR. JACOB:  Well, with respect to the abusive

2     authority, actually that's not the case.  They couldn't

3     exercise their authorities until there is a trigger in the

4     Dodd-Frank Act --

5          THE COURT:  Yeah, when they get somebody.

6          MR. JACOB:  When they get somebody.  And the director

7     is the first person that they got.  So but for that

8     unconstitutional appointment, we wouldn't have those costs.

9     We are continuing to incur those costs.  The foreclosure rule

10    continues to apply to us.  We continue to subscribe to

11    Compliance Alliance and to incur the cost of monitoring the

12    director's statements.  If he wasn't appointed, we wouldn't be

13    incurring those costs right now.  Again, I think that squarely

14    within Free Enterprise and *NRA Political Victory Fund* those

15    give -- show that where we're subject to what he has done, we

16    don't have to show --

17         THE COURT:  Is *Free Enterprise* a standing case?

18         MR. JACOB:  It was, Your Honor, with respect to the

19    question of whether they had the authority to challenge --

20    specifically here there was a constitutional challenge brought

21    to the ability of the full committee to make board

22    appointments together.  They said only the chairman acting

23    alone can do it, and they launched that as a constitutional

24    challenge.  And the Court said, well, the government said that

25    there was no standing here because the chairman had never

1    objected to any of the appointments that the other committee

2    members had participated in selecting, and the Supreme Court

3    said, look, if there were unconstitutional entities

4    participating in the process, we don't have to show, or the

5    litigants don't have to show, that the chairman would have

6    made a different decision under the circumstances.  The mere

7    fact that there were other participants who participated in

8    the process unconstitutionally.  And on the merits they lost.

9    But with respect to standing, that is sufficient to show an

10   injury that you can argue.  You don't need to show further

11   traceability other than to show that they participated in the

12   process.

13          THE COURT:  Just to make sure I get it, you think your

14   strongest argument for Cordray is the fact that he signed off

15   on the foreclosure rule that says 20 days and not 120?

16          MR. JACOB:  Yes, Your Honor.

17          THE COURT:  You think if he weren't there, you would

18   be back in that business?  You think if he weren't there,

19   you'd be back in the business, or you would just be back in

20   the business if the whole Title X gets invalidated?

21          MR. JACOB:  Well, we certainly wouldn't be -- with

22   respect to the foreclosure rule, that in and of itself

23   wouldn't get us back into the business because we need to

24   clear out other things, as well.  The mere taking away of

25   Director Cordray wouldn't be enough to get us back into that

1    market alone.  However, it would be enough to free all of the

2    mortgages that we now have on the books that are subject to

3    that regulation from the terms of that regulation.  So that

4    would be the immediate redressable effect for us.  If Director

5    Cordray was declared to have been unconstitutionally

6    appointed, we would no longer have to follow the terms of that

7    rule.  We could again rely on Texas law.

8         With respect to compliance costs that are attributable

9    to Director Cordray, we wouldn't be having to spend time and

10   effort monitoring his statements about what he deems to be

11   abusive or even what the CFPB deems to be abusive because that

12   authority wouldn't be triggered yet.  So those are the things

13   that are the immediately redressable harms from declaring the

14   director's appointment to be unconstitutional.

15        THE COURT:  But you can't put a figure on it in any

16   event?

17        MR. JACOB:  A dollar figure, Your Honor?

18        THE COURT:  You're going to be monitoring a whole

19   bunch of statutes no matter what.  Just because he is not

20   exercising UDAAP, until they get someone else in there, it's

21   hard to say what really would happen.

22        MR. JACOB:  I think that that is true, Your Honor.  We

23   don't know what would happen in that counterfactual world, but

24   what we do know is that we wouldn't be subject to this

25   particular rule.  And again, *Free Enterprise* says that is

1    sufficient to get you there.

2            THE COURT:   What page is that, *Free Enterprise*?

3            MR. JACOB:   Unfortunately, I don't have the page right

4    in front of me, Your Honor.   I could certainly get it and give

5    it to Your Honor if I get another opportunity to get up

6    because I have it back on the table.

7            Both *Free Enterprise* and *NRA Political Fund* say all

8    you have to show is the unconstitutional composition and that

9    is sufficient to show that as long as you're subject to their

10   authority, that's sufficient to get you standing.

11           THE COURT:   Do you stand on that argument; that if

12   you're subject to their authority, that's it?   Do you say that

13   that's the meaning of the Committee on Monetary Reform, or do

14   you say you have to have something else?

15           MR. JACOB:   We do think that's what *Committee for*

16   *Monetary Reform* stands for.   We don't launch -- it's the fifth

17   argument for standing that we have in our brief.   So we have

18   many alternative arguments.

19           THE COURT:   You don't think you need a harm?   I mean,

20   that would say that as long as you're subject to the

21   regulation that you could bring any challenge you want,

22   whether constitutional, APA, or otherwise.   You don't really

23   read those cases to mean that, do you?

24           MR. JACOB:   No, Your Honor.   We do think that you have

25   to have some level of harm, the fact that an agency exists

1    that you're having to keep up with its dictates.  I think that

2    is what the Court was trying to get at here.  Here you are,

3    you're subject to the authority of this agency, you're having

4    to comply with its regulatory pronouncements, you're having to

5    follow what it says, very similar to our bank, we do think

6    that's --

7          THE COURT:  You're mushing two words together.  Does

8    comply necessarily mean you follow what the law says as

9    opposed to you do things in order to satisfy the law's

10   requirements?  You're talking about compliance costs as being

11   nothing more than keeping up with the law, and so I don't know

12   for sure other than that Fourth Circuit case, which arguably

13   is similar, whether that satisfies compliance costs if that's

14   what they have in mind.

15         MR. JACOB:  Well, certainly, that's all that was going

16   on --

17         THE COURT:  All lawyers keep current with the law.  Do

18   they have standing to attack any law that affects lawyers?

19         MR. JACOB:  Your Honor, if I have to spend additional

20   time and energy on it -- again, this is the D.C. Circuit in

21   *Spann* -- if I have to devote increased resources to it, then

22   that is sufficient.  But again, we're not talking about a

23   small amount of costs here, we're not talking about something

24   negligible, we're not talking about just having to measure

25   whether I have to spend 15 more minutes in a year paying

1    attention to some new ethics rule; we have hard and solid

2    numbers, $9,900 a year for the Compliance Alliance, $2,500 for

3    the additional class that had to be taken.  So we actually do

4    have hard and not insubstantial numbers here.  The Courts have

5    said --

6              THE COURT:  They're compliance costs.

7              MR. JACOB:  Your Honor, there is nothing -- the

8    government cites no authority whatsoever for its proposition

9    that the government can impose additional costs on you and

10   that you have to do in order to make sure that you comply with

11   the law.  If we didn't expend additional resources, there is

12   no way that we could comply with the foreclosure rule, the

13   remittance rule.  If we just engaged in our previous practices

14   and paid no attention whatsoever, we would absolutely end up

15   violating the law.  There is no authority that says that the

16   government can impose those additional costs on you without

17   you having an injury that is sufficient to challenge it.  They

18   cite no authority for that proposition, and I submit that none

19   exists.  Where the government is directly imposing those costs

20   on us, in order for us --

21             THE COURT:  They are and they're not.  I mean it's not

22   the kind of costs where the government, you have to comply, do

23   X and Y in order not to be prosecuted or not to have a civil

24   fine.  That is not it.  Yes, I know that this benefits you

25   insofar as you are going to avoid a civil fine.  There are

1    very few regulations out there at the moment that are a

2    pitfall for you, really.  Most of them haven't even gone into

3    effect.  So you wouldn't fall down for a good long time.  The

4    one that you sent me a 70-page brief on, complaint on, has no

5    relevance to your particular situation.  It shows that they're

6    using their authority, but how do you define what you need to

7    know and what you don't need to know in order to avoid

8    something serious?  Generally speaking, you have to register X

9    in order not to be prosecuted for Y.  That isn't it at all.

10   You're just saying to properly advise the bank on various

11   alternatives, you have to keep abreast of the law, and that's

12   a lawyer's typical job, and I can understand that people get

13   paid, and every time there is a new law on the books, there

14   are efforts made to inform yourselves about it.  And that

15   you'd think would give a lot of people entrance to the door,

16   which I'm not sure it has.

17        Let's hear from Mr. Cooper.  It's tough, but it is not

18   as simple as you make it.

19        MR. JACOB:  Your Honor, did you want to hear anything

20   about the Financial Stability Oversight Council or --

21        THE COURT:  Later.  This part is harder.

22        All right.  So Mr. Cooper, you can start with the

23   proposition that he thinks you lose because they have to spend

24   $20,000 knowing what is going on with your complicated agency.

25        MR. COOPER:  We don't think we lose for that reason,

1    Your Honor.  If this Court were to accept plaintiff's novel

2    theory here that paying to keep up with the law constitutes

3    article III injury, then every single case that has ever been

4    decided in which a plaintiff was found to lack standing to

5    challenge a government regulation or a federal law or a

6    government action, every single one of those cases would have

7    been wrongly decided because every single one of those

8    plaintiffs spent time or money learning what that government

9    law or regulation or action is.

10         THE COURT:  Well, we don't know that.  They had to

11   argue it for anybody to know it.  He relies on some cases, the

12   Fourth Circuit case, and there are a couple in the Fourth

13   Circuit, and he cited -- I'm not so sure I remember -- *Spann*

14   and a few other ones.

15         MR. COOPER:  That's right, Your Honor.  And the

16   government isn't arguing that compliance costs, real

17   compliance costs, can provide article III standing.  I think

18   as Your Honor noted before, real compliance costs is when a

19   regulation sets out a mandate that requires a regulated entity

20   to take action to comply with that regulation.  To give an

21   example, if a new environmental regulation comes out and says

22   factories can only pollute this amount, at this level, and

23   then a factory owner has to spend money to retrofit their

24   factory to come into compliance with that regulation, that

25   would be a real compliance cost, and that would presumably

1    provide standing to challenge that regulation.  We don't have

2    that here.

3            In particular, I think it is telling, Your Honor, that

4    the plaintiffs separate out their argument about compliance

5    cost from their arguments about any particular regulation.

6    They don't point to the RESPA servicing rule or the ability to

7    repay rule or the remittance transfer rule and say that's

8    imposing compliance costs on us.  They can't say that.

9    Instead, what they say is we have to spend money to learn that

10   the law doesn't apply to us and that gives us an injury

11   sufficient to challenge the law's constitutionality, and

12   that's a --

13           THE COURT:  They don't have to say we have to read

14   those rules?  Didn't he say we had to read the rule about

15   foreclosure in 20 days, 120 --

16           MR. COOPER:  Well, I'm sure they say they have to read

17   the rules, Your Honor, but a compliance cost isn't having to

18   read a rule.  A compliance cost is when a rule says you have

19   to do X or you'll get in trouble.  So then the plaintiff

20   spends money to come into compliance with that rule.  The

21   plaintiffs haven't had to spend any money to come into

22   compliance with any of the rules that have been promulgated by

23   the Consumer Financial Protection --

24           THE COURT:  What about the Fourth Circuit case that

25   they use?

1      MR. COOPER:  They cite two Fourth Circuit cases, Your

2  Honor, *Chambers Medical Technologies* and *Pacific Legal*

3  *Foundation*.  Neither of those support standing here.  As I

4  think Your Honor pointed out in this *Chambers* case, state

5  agency regulations said that state -- waste treatment facility

6  could only accept infectious waste from other states when

7  those other states had certain laws.  So it was incumbent upon

8  this regulated entity to find out whether other states had the

9  proper laws to allow it to accept the waste.  It was

10  essentially a regulation saying, to come to compliance with

11  state law, you must learn the law of other states.  That would

12  be a real compliance cost, presumably, but that is not the

13  situation here.  We don't have any regulation saying here you

14  have to spend money to learn what the law is.  As the Supreme

15  Court pointed out in *Steel Co.*, Your Honor, plaintiffs can't

16  gain standing by paying to bring a lawsuit.  That was a direct

17  holding in *Steel Co.*, and that is the same kind of idea here.

18  You can't spend money paying to learn what the law is, in

19  particular here, paying to learn that the law doesn't injure

20  you and say that's enough to injure me and give me standing to

21  challenge the law.

22      THE COURT:  What about the issue on causation and

23  redressability for both the Cordray appointment as well as

24  the -- they say that the remittance -- no, the mortgage rule

25  is their ticket to standing in that one and that compliance

1    costs, in particular, for the Title X.  Do I have any

2    problems, assuming I find injury from the compliance costs or

3    from that rule, which is -- I understand that you can test --

4    but let's say for a moment that we move on from injury.  Do I

5    have any problems of redressability and causation?

6         MR. COOPER:  If you were to find injury from the RESPA

7    servicing rule?

8         THE COURT:  Yeah, or the compliance costs.  That the

9    increased compliance costs, what they're defining, causes an

10   injury.  Is the answer that you invalidate constitutional

11   grounds for Title X?

12        MR. COOPER:  Well, so it depends on what specific rule

13   we're talking about, Your Honor.  For example, the ability to

14   repay rule, the qualified mortgage rule --

15        THE COURT:  No, I'm just talking, they say their

16   strongest point for standing is compliance costs.

17        MR. COOPER:  Okay.  So for compliance costs, if that

18   were a real article III injury, then I would agree, I don't

19   see how that would be, one, fairly traceable to the bureau's

20   actions; and two, redressable by this Court for the simple

21   premise that even if this Court were to invalidate every

22   federal law in existence right now, the bank would presumably

23   still have to pay money to keep up with what Congress was

24   doing, to see if it was going to pass new laws, if it was

25   going to pass a new Dodd-Frank law tomorrow.  The bank would

1    still have to spend money to learn what the laws applicable to

2    the bank are.  And so striking down all of Title X --

3              THE COURT:  They're just saying that with all this

4    mess out there, we have to spend more money.  It costs us

5    $9,000 to get somebody who says, help available, Compliance

6    Alliance.

7              MR. COOPER:  The Compliance Alliance --

8              THE COURT:  What do we do?  "Compliance Alliance

9    Benefits:  Forms, notices, website, notifications of changes,

10   FAQs, and more to come."  So they're saying that without this,

11   we won't have to read these Powerpoint presentations.

12             MR. COOPER:  The Compliance Alliance documents I'm

13   sure puff up their usefulness to banks and make that point.  I

14   would refer this Court, then, to the Supreme Court's decision

15   in *Clapper*, which just a few months ago said, quote,

16   plaintiffs can't manufacture standing merely by inflicting

17   harm on themselves based on their fears of hypothetical future

18   harm that's not certainly impending.

19             THE COURT:  Well, they say it is not hypothetical

20   because we have to figure out whether this applies to us or

21   this doesn't apply to us.  It is not hypothetical.  It is not

22   a question of whether maybe they will get my telephone

23   conversations or not.

24             MR. COOPER:  It is actually quite similar, I think,

25   Your Honor, because as I pointed out earlier, these compliance

1    costs don't stem from any particular rule.  So what the bank

2    has learned is none of the rules have required it to spend a

3    single dime to change its practices as they currently are to

4    come into compliance with the law.  Just like, then, the

5    plaintiffs in *Clapper*, who were fearful that perhaps some of

6    their telephone communications would be intercepted, but they

7    couldn't be sure of it, and it certainly wasn't certainly

8    impending, as the Supreme Court said it had to be.  That's the

9    same situation here.  There is no current action of the

10   Consumer Financial Protection Bureau that is going to inflict

11   a certainly impending or present actual injury on the bank.

12   The only injury the bank has suffered is self-inflicted.  It

13   is spending money paying the Compliance Alliance because it

14   fears in the future perhaps it will run afoul of the law, but

15   that is not certainly impending, and so there is just no

16   standing then.

17           THE COURT:  What is not pending?  What is not

18   certainly pending?  That it will run into legal problems?

19           MR. COOPER:  Exactly, Your Honor.  We can't assume

20   that the plaintiffs are going to run afoul of the law.  That's

21   what the Supreme Court said long ago in the *Lyons* case.  And

22   we also can't assume that the bank is going to take any

23   enforcement action -- excuse me -- the bureau is going to take

24   any enforcement action against the bank or that the bureau is

25   going to promulgate some regulation that is going to somehow

1    impose specific costs on the bank.

2           THE COURT:  Well, if they're predicting that their

3    mortgage practices could be termed abusive, and so they want

4    to read what abusive means as the regulations come out so they

5    can know whether they can get into the mortgage business, what

6    do you say about that?  That they want to go back into the

7    business.

8           MR. COOPER:  There's a couple of things about this

9    abusive authority, Your Honor.  First, as we pointed out in

10   our briefs, the bureau can't enforce this UDAAP authority --

11          THE COURT:  Right, but they do make the rules and

12   regulations, and those rules and recollections get enforced by

13   the OCC.  Maybe not all the time and all kinds of -- but the

14   rulemaking applies to the bank; right?

15          MR. COOPER:  That's correct, yes.  So the bureau can

16   define what abusive means.  The statute, of course, does set

17   out a definition of abusive in 12 U.S.C. 5531, and even if the

18   bureau could promulgate a definition of abusive that would say

19   a specific class of activities that the bank currently engages

20   in isn't abusive, first of all, the bureau hasn't done that.

21   It hasn't even provided a notice of proposed rulemaking that

22   it is going to do that.  So it is just wholly speculative that

23   the bureau would come up with some definition that would

24   injure the bank in the future.

25          More to the point, again as we said, the Office of the

1    Comptroller of the Currency is the only entity, the only

2    government agency that can enforce this prohibition against

3    the bank.  And just as in the *Clapper* case, the Office of the

4    Comptroller of the Currency has multiple statutory authorities

5    available to it that it could enforce against the bank.  In

6    particular, Section 5 of the Federal Trade Commission Act,

7    which has been on the books for decades, says you can't engage

8    in unfair or deceptive practices.  It doesn't also penalize

9    abusive, but it does prohibit unfair and deceptive acts.  So

10   the bank has been subject to the Federal Trade Commission Act

11   for decades.  So it can't argue that it left the market

12   because of unfair or deceptive activities that it wants to

13   engage in because that has been prohibited for decades.

14           THE COURT:  It can't argue what?

15           MR. COOPER:  The bank couldn't argue that it left the

16   mortgage lending because of this new UDAAP authority in

17   Title X because two of the three -- at least two of the three

18   things that are prohibited by UDAAP, the unfair and the

19   deceptive -- not the abusive -- but the unfair and the

20   deceptive have been prohibited for decades already under the

21   Federal Trade Commission Act, and the Office of the

22   Comptroller of the Currency could have and can enforce that

23   against the bank no matter what.

24           THE COURT:  Well, this brings us back to the issue of

25   what can they say plausibly in a motion to dismiss and what

1    difference would it make if we were in a motion for summary

2    judgment, if any.  They say but for this -- I can't get the

3    language right in front of me -- Mr. Purcell seems to say,

4    well, if we didn't have this problem, we would be back there.

5    We would reenter the consumer mortgage and remittance markets

6    without limitations but for the bureau, its rules and its

7    enforcement authority.  And they say the bank's inability to

8    offer mortgages has harmed it financially.  And the

9    regulations providing the bank with a rebuttable presumption

10   only says this imposes a risk factor, it affects costs, so we

11   can't get back in, and we decided to exit because we could no

12   longer offer consumer mortgage loans due to the fear that they

13   would be subject to enforcement action under Dodd-Frank.  So

14   they're not saying we're worried about the FTC.  Now, is it

15   plausible to say we're worried about Dodd-Frank if they have

16   got four other regulatory frameworks that are also of interest

17   to mortgages?  That comes down to the problem of what do you

18   do at this stage with an affidavit that makes these kinds of

19   allegations.

20        MR. COOPER:  We're not disputing the specific facts in

21   the affidavit, Your Honor, but the plaintiffs still can't rest

22   on speculative assertions about the future.  And it's, again,

23   just wholly speculative that there will be some future

24   enforcement action.  Basically, what's speculative is the

25   bank's fear.  It may actually currently be afraid of an

1    enforcement action, but whether or not there will be an

2    enforcement action, that is the speculative assertion, and

3    that is something that the bank can plead at this point

4    without more evidence.  It is just not plausible that there

5    will be an enforcement action at this point.

6         THE COURT:  Well, there won't be if they stay out of

7    the business.  They say, we'd come back in but for all these

8    scary things.  And you're saying that's not a reason to stay

9    out.

10        MR. COOPER:  That's correct, Your Honor.  I would note

11   just real quickly, it's interesting that the plaintiffs

12   emphasize that standing turns on what existed at the moment

13   the complaint was filed, because when the complaint was filed

14   most of the rules they're now challenging weren't even

15   finalized at that point.  The plaintiffs wouldn't have any

16   standing based on the RESPA servicing rule, the ability to

17   repay rule if you're going to focus on the moment when the

18   first complaint was filed.  Those rules weren't finalized

19   until earlier this year, well months after the complaint was

20   filed.  I think this just goes to show the uncertain nature of

21   all that is going on right now.  It goes to show that the

22   plaintiffs' injuries are speculative and that their claims are

23   unripe because the agencies are still acting even as we speak.

24        THE COURT:  You make the statement in your pleading --

25   let me get it right, if I may -- and your opponent can respond

1    to it, as well -- but it is a rather broad statement, and you

2    say that no bureau regulation applies to SNB.  Is that true?

3    SNB has not identified any bureau regulation with which it

4    must comply.

5            MR. COOPER:  I'm not sure about the specific page Your

6    Honor is referring to.

7            THE COURT:  I'm on page 30 of your reply brief, in the

8    middle of the page.  NSB has not identified any bureau

9    regulation with which it must comply.  The truth of that

10   statement is pretty critical.

11           MR. COOPER:  Is this our opening brief, Your Honor?

12           THE COURT:  No, it's the reply.

13           MR. COOPER:  Well, Your Honor --

14           THE COURT:  It was filed in April.

15           MR. COOPER:  We can go through each of the rules and

16   show how they don't apply, but the rules --

17           THE COURT:  Because some of the rules are not

18   effective yet, you mean?

19           MR. COOPER:  First of all, yes, most of these

20   rules -- I don't think any of the rules that the bank has

21   pointed to are yet in effect.  And then more than that --

22           THE COURT:  The mortgage one is, the one about 20 days

23   and 120, I think.

24           MR. COOPER:  The RESPA servicing rule.  That may be

25   correct, Your Honor.  The RESPA servicing rule may be in

effect right now.  No, excuse me, that's incorrect.  The RESPA servicing rule becomes effective January 10th, 2014, and you can see that at 78 Fed Reg. 10696.  So the RESPA servicing rule becomes effective in January.  The ability to repay, qualified mortgage rule becomes effective in January of 2014.  And the remittances transfer rule is going to become effective October 28th of this year.  So none of these rules are currently in effect.  Moreover, Your Honor, safe harbor exempts the bank from virtually every one of the regulatory requirements under these rules.

THE COURT:  Except for RESPA.

MR. COOPER:  Even the RESPA servicing rule, Your Honor, it sets out a number of regulatory requirements, and the bank is exempt from most of them, though not all of them.  Because it is an entity that services 5,000 or fewer mortgages, it's what's called a small servicer.  Small servicers are exempt from various requirements about billing statements, interest rate notices, et cetera.  But it does have to comply with this one provision that says you can't initiate a foreclosure proceeding until 120 days after a mortgage has gone into default.  But as I think Your Honor noted before and as we pointed out in our briefs, none of the bank's current mortgages are in default.  It has not initiated foreclosure in the history that was available in the public documents, and it's not clear that the rule will apply to

1   mortgages it does hold because we just don't know if these are

2   mortgages secured by 25 acres or more of property, if they're

3   mortgages on the borrower's principal residence.  These are

4   all requirements, preconditions for the RESPA servicing rule

5   to apply.

6          THE COURT:  But the fact that they haven't foreclosed

7   in four years or what-have-you doesn't mean they haven't sent

8   these letters.  He's saying that it's an effective tool to get

9   people to comply.

10          MR. COOPER:  Well, he says that in the affidavit.  If

11  you notice, the bank doesn't say it's ever sent one of these

12  letters in the affidavit.  It just says we would like to have

13  that ability in our back pocket if we want to.

14          I would also point Your Honor's attention to what the

15  bureau said in its regulatory notice when it promulgated the

16  rule.  It points out that small servicers in its study would

17  hardly ever, if ever, want to foreclose or initiate a

18  foreclosure proceeding in 120 days because it could impair

19  their reputation in the community as a small bank.

20          THE COURT:  Am I entitled to rely on things like that?

21  He's saying that I can only rely on his affidavit and his

22  complaint, and I assume I can rely on public statements but

23  that I can't rely on the information that you've proffered

24  about their loan recalls --

25          MR. COOPER:  As the D.C. Circuit held in *Kaempe v.*

1    *Myers*, Your Honor, at 367 F.3d 958, Courts on a motion to

2    dismiss are entitled to take judicial notice of public

3    records.  The call data that we provided are all public

4    records published by federal financial agencies that the bank

5    submitted to them.  This Court also, of course, take notice of

6    what's published in the Federal Register.  It has to accept as

7    true the bank's plausible allegations, but that doesn't mean

8    it can't also accept, take judicial notice of other evidence

9    that shows that the bank's allegations are implausible.

10           THE COURT:  And do you think that the argument -- is

11   there redressability and causation with respect to Cordray's

12   appointment clause issue if one were to find that the only

13   grounds for standing is that he authorized this foreclosure

14   rule, which some part of it does apply to the bank, we agree?

15           MR. COOPER:  It is uncertain, Your Honor, at this

16   point.  We just don't know going forward.  If a new director

17   is going to be appointed, that director could retroactively

18   ratify these rules.  There are -- it's just uncertain whether

19   or not it would be redressable to strike down the appointment

20   of Director Cordray as a result of this rule.

21           THE COURT:  There is a big difference between striking

22   down the rule, that's the mortgage rule, and striking down

23   Title X, which is basically what they're asking.

24           MR. COOPER:  Yes --

25           THE COURT:  I think they're asking to strike down all

1    of the bureau from creation because he is the bureau, I think.

2    They're not just saying strike down the one rule he's

3    responsible for.  We can ask them that, but that's my

4    understanding.

5          MR. COOPER:  Yeah, it does seem to me that they are

6    seeking to strike down the whole bureau; and again, the

7    Supreme Court has made clear you have to cabin the claims that

8    plaintiffs bring to the specific injuries that they identify.

9    It is not clear to me that -- it doesn't seem clear to the

10   government that Director Cordray's appointment would turn on

11   whether or not this RESPA servicing rule has injured the bank,

12   but we do think that because the plaintiffs haven't shown any

13   concrete or certainly impending injury from the servicing rule

14   that it could be the basis for striking down Title X or

15   Director Cordray or Director Cordray's appointment.  Excuse

16   me.

17         THE COURT:  What about the cost for compliance?  Does

18   that get you into striking down X?  Isn't that their best

19   argument for going beyond the specific rule?

20         MR. COOPER:  I think it is the best of a bad lot of

21   arguments, Your Honor.  Again, as we pointed out in the

22   *Clapper* case, the fact that plaintiffs have spent money

23   anticipating some future harm isn't enough to give them

24   standing.

25         THE COURT:  Does it matter that in *Clapper* that they

1    weren't regulated; whereas, this bank is regulated by the

2    Dodd-Frank?

3           MR. COOPER:  I don't think so, Your Honor, because in

4    both situations the enforcement action is still speculative.

5    Any actual harm to the bank that they would be spending its

6    money to prevent is speculative.  All it has found from

7    spending money to learn what the law is is the law doesn't

8    require it to change anything it's already doing.  It doesn't

9    require it to change the amount of remittance transfers its

10   offering, it doesn't require it to change its current

11   foreclosure practices, it doesn't require it --

12          THE COURT:  Well, it does.  That's why he's pointing

13   to the mortgage, that you can't send out the letter at

14   20 days.

15          MR. COOPER:  The bank hasn't alleged that it ever has

16   done this or that it wants to do it, let alone that a mortgage

17   is currently in default, that it will go into default, that

18   the bank will want to initiate foreclosure.  The number of

19   speculative assumptions we would have to make to get to the

20   part where the bank would actually be injured by this rule is

21   so great as to render wholly implausible their allegations

22   here.

23          THE COURT:  Okay.  What do you say that you have the

24   burden on the defense of showing that you'll never institute a

25   remittance rule that will hurt them?

1          MR. COOPER:  I would like to --

2          THE COURT:  Is this just a question -- does mootness

3     arise in the context of ripeness?

4          MR. COOPER:  Your Honor, we do think that the claim

5     against the remittance transfer rule is unripe, but we also

6     think they pretty clearly lack standing.  When the initial

7     final rule was promulgated on February 7th, 2012, in that rule

8     it said we're also issuing in a separate rulemaking this same

9     day a notice of proposed rulemaking to create a safe harbor.

10    It is very important to understand what the safe harbor is

11    about.  What the statute says and what the remittances rule

12    says is that it will only apply to an entity that provides

13    remittance transfers, quote, in the normal course of business,

14    end quote.  What the safe harbor was about is defining that

15    term, "in the normal course of business."  It wasn't clear

16    from the statute.  It wasn't clear from the initial final rule

17    what "in the normal course of business" means.  So they can't

18    say that when the first final rule was promulgated, even

19    though it lacked a safe harbor, it was clear the rule would

20    apply to us because it wasn't clear what "in the normal course

21    of business" meant.

22         THE COURT:  And they filed when?  May?

23         MR. COOPER:  They filed their initial complaint

24    June 21, 2012.

25         THE COURT:  And when did the "safe harbor" get

1    defined?

2           MR. COOPER:  The bureau finalized its safe harbor on

3    August 20, 2012.  And the plaintiffs, of course, then filed an

4    amended complaint on September 20th, and a second amended

5    complaint on February 19, 2013.  So the bank and the

6    plaintiffs have filed a couple of complaints since the

7    final or safe harbor was finalized.

8           THE COURT:  Yeah, I never know, when they say you've

9    got standing at the time you filed the complaint, whether that

10   matters that you've amended it two times.  They don't tell you

11   that.  Okay.  But what he keeps coming back to, it's your job

12   to show that you wouldn't do it again.  That is not my

13   recollection that that is part of the ripeness doctrine.

14   Maybe I'm wrong.

15          MR. COOPER:  The burden isn't clear to me either, Your

16   Honor.  What the Court says in *Already*, that it must be clear

17   that the harm could not reasonably be expected to occur.

18          We think the plaintiffs overstate the likelihood that

19   this harm will recur.  They, for instance, speak in a bit of

20   hyperbole that this rule has been amended four times.  Well,

21   the rule might have been, but the safe harbor has only been

22   amended that one time when the notice of proposed rulemaking

23   was issued and then it was finalized.  It hasn't been amended

24   since.  There is no current notice of proposed rulemaking to

25   change the safe harbor.  There is no other nonspeculative

1    assertion that could show that the bureau is planning to

2    change the current definition of the safe harbor.

3         THE COURT:  Is there anything in the rules and

4    regulations that would indicate that you would change the

5    definition of what is an abusive mortgage and apply it

6    retroactively?  Some of your concerns relate to what they have

7    out there that could become covered by some new definition

8    even though they've gotten out of the business.

9         MR. COOPER:  Right.

10        THE COURT:  Is there any basis for understanding these

11   rules to apply retroactively?

12        MR. COOPER:  There is no basis to my understanding,

13   Your Honor.  It wouldn't make sense to delay the effective

14   date of a rule if you're just going to make it retroactive

15   anyways.  You would just put it into effect anyways.  So I

16   don't understand why -- I don't think the bank argued that it

17   was going to apply retroactively, and I don't understand any

18   basis for them to make such an argument.

19        THE COURT:  But you didn't respond to their argument.

20   You didn't say anything about retroactivity.

21        The other thing the government didn't do, you didn't

22   say anything in terms of Cordray about -- you argued that he

23   couldn't have been the reason he got out of the mortgage

24   market because he hadn't been appointed for two years, and

25   that sort of seems to make sense causally, but they say you

1    don't address the compliance costs or the remittance rule --

2         MR. COOPER:  Well, again, Your Honor --

3         THE COURT:  -- in terms of his appointment challenge.

4         MR. COOPER:  Again, because we think these injuries

5    are wholly speculative, they can't be the basis for an

6    article III claim to challenge the constitutionality of

7    Director Cordray's appointment.  For the same reasons that the

8    plaintiffs can't use them to challenge Title X, so they can't

9    use these supposed injuries to challenge the appointment.

10        THE COURT:  You're not making the argument that the

11   compliance costs, whatever you call them, is speculative

12   because we know they have incurred them.  That is a current

13   injury so to speak.  The question is, is it an injury.  That's

14   what the law recognizes, I would think.  Give me your best

15   argument why it is not.

16        MR. COOPER:  That is fair to say, Your Honor.  The

17   plaintiffs have certainly pleaded that they have incurred

18   these costs, so we're not challenging the veracity of that

19   allegation.  But what the Supreme Court pointed out in *Clapper*

20   is that if plaintiffs can't challenge speculative future

21   injuries, then they can't then seek to get around that

22   standard by saying, well, we're spending money now to prevent

23   speculative future injuries.  That's what the Supreme Court

24   held in *Clapper*.  That's why I'm saying these compliance costs

25   are speculative.  Because even if the bank has incurred them,

1    they're in anticipation of speculative future events; in

2    particular, in anticipation of future enforcement actions

3    against them or future real regulatory burdens on them that

4    they haven't suffered yet.  And until they can say that there

5    is a certainly impending injury that they're spending money to

6    prevent, they can't say that they have any compliance costs.

7    I think we should try to avoid using even the term "compliance

8    costs" because what plaintiffs are spending money on aren't

9    compliance costs; they're costs to learn what the law is.  As

10   Your Honor pointed out, every lawyer spends money to learn

11   what the law is.  They spend either their time or money or

12   both.  That's what the plaintiffs are doing, and that's what a

13   lot of people around this country do, and that doesn't give

14   everyone around the country -- to challenge every federal law

15   passed or --

16          THE COURT:  Obviously, under the *Committee For*

17   *Monetary Reform*, you've got to be subject.  That's the one

18   thing that you can figure out.  So I'm not subject to the law,

19   and the fact that I read about it doesn't help, but their bank

20   is.  That much -- nobody contests they're subject to the law;

21   correct?

22          MR. COOPER:  That's correct, Your Honor.  They are

23   subject to the bank's regulatory authority in certain

24   capacities.

25          Let me address very quickly, Your Honor, the *Committee*

1     *For Monetary Reform*.  The plaintiffs take out of context a

2     statement from the case.  What that case held was a group of

3     businesses and other entities don't have standing to challenge

4     the Federal Reserve Board as it's instituting its monetary

5     policy.  And what the Court said was they don't have standing

6     because they're not regulated directly by the Federal Reserve

7     Board.  Plaintiffs say, oh, good, that's all we need for

8     standing.  But that's not what the Court said at all.  The

9     Court said this is a necessary condition for standing.  It

10    didn't say it was a sufficient condition for standing.

11          In addition, the Court said you also have to have

12    concrete injuries.  That was made abundantly clear in the *NRA*

13    *Political Victory Fund* case, which later cited this *Committee*

14    *for Monetary Reform* and said, even in this case, you have to

15    show concrete injury fairly traceable and redressable, and so

16    it is just abundantly clear you can't just be subject to an

17    agency regulation to have standing; you also have to have

18    these concrete injuries fairly traceable to the agency action.

19          THE COURT:  We'll take a break until quarter past, and

20    then we'll take up the last two parts of the argument.

21          Thank you.

22          (Recess taken from 4:10 p.m. to 4:20 p.m.)

23          THE COURT:  Before we get to the states' argument,

24    Mr. Jacob, are you taking the count of Title II, or is it

25    Title --

1      MR. JACOB:  Title I, Financial Stability Oversight

2      Council.

3           THE COURT:  I'm still troubled -- and both sides can

4      address it -- but I still don't understand -- if you have

5      standing based on a rule, what is the remedy, what is

6      redressable, and what is the causal, if you're arguing across

7      the board separation of powers and/or appointments clause when

8      I'm supposed to avoid constitutional --

9           MR. JACOB:  In terms of separation of powers, Your

10     Honor?

11          THE COURT:  Yes.  Why if the rule that says you have

12     to have 20 days' or 120 days' notice as opposed to you can't

13     send out something in 20 days, why should I invalidate all of

14     Title X?

15          MR. JACOB:  Well, Your Honor -- and I think -- I

16     promised to give you the page number from the *Free Enterprise*

17     before, and *Free Enterprise* right at that page number speaks

18     to this issue.  The page number is 3163, where it deals with

19     the standing issue.  Then, at 3164, the Supreme Court says,

20     the plaintiffs in the case are entitled to declaratory relief

21     sufficient to ensure that the reporting requirements and

22     auditing standards to which they are subject will be enforced

23     only by a constitutional agency accountable to the executive.

24          In other words, with respect to both Director Cordray

25     and the CFPB as a whole, to the extent that we are regulated

1    by them, have rules that bind us that they have already

2    issued, have to worry about what they're going to be deeming

3    abusive and ex post facto enforcing against us, we have an

4    entitlement and the ability to challenge constitutionally

5    their composition because we have a right to have only a

6    constitutionally constituted authority promulgating

7    regulations, issuing enforcement directives, and then

8    enforcing them against us.  So I think it is squarely within

9    Free Enterprise's statement there, that where we have an

10   injury that flows from their actions, we are, in fact, harmed

11   in a variety of ways and they are not constitutionally

12   constituted, we do have standing to raise that.  *NRA Political*

13   *Victory Fund* is also squarely on point on that issue.

14            THE COURT:  One second, please.

15            Okay.  Also, you were going to tell me whether

16   anything was retroactive I think we discussed before.

17            MR. JACOB:  Yes, Your Honor.  We don't have the entire

18   qualified mortgage rule with us.  So we could certainly submit

19   supplemental --

20            THE COURT:  Why don't you use that Alliance bulletin?

21            MR. JACOB:  If I had access to that service here, Your

22   Honor, I'm sure I could have found the answer.

23            THE COURT:  I bet it is online.

24            Now we're moving to Title I.

25            MR. JACOB:  Title I, Your Honor, yes, the Financial

1   Stability Oversight Council.

2           THE COURT:  Okay.  Now you're telling me -- I'm a

3   little unclear how the bank is a competitor of Prudential or

4   AIG.  You have to be in the same market with the same product;

5   right?

6           MR. JACOB:  We have to have at least very similar

7   products that we are competing against them with respect to;

8   and in fact, we compete against them in two different markets.

9   One of those markets is the market to raise capital.  We

10   compete with them for deposits essentially, and the materials

11   that we've submitted to the Court, the Court can see that

12   GE Capital, for example, offers accounts to people where they

13   can buy corporate debt essentially of GE, they can use that to

14   write checks against it, they earn interest on that.  It

15   functions just like a bank account with the exception of the

16   fact that it is not subject to the FDIC insurance rules.  So

17   we compete, and that is available online to all of the people

18   in Big Spring and locations that we have banks, so --

19           THE COURT:  What is online?  The checking account?

20   You can get a checking account or something else?

21           MR. JACOB:  Yes, Your Honor.

22           THE COURT:  You're not talking about consumer loans;

23   you're talking about the capital that you loan --

24           MR. JACOB:  This is where we raise capital by getting

25   in deposits from people.  Just as the bank would pay out

1    interest on an account and would allow checks to be written on

2    an account, GE does the same thing, and all of those online

3    materials where people can subscribe to GE Capital through the

4    online system are right there.  So we compete with them there.

5    We also compete with them in offering consumer loans, and the

6    materials also show --

7         THE COURT:  You offer consumer loans.  That's what I

8    can't figure out.  I'm baffled.  It's not in your complaint,

9    by the way.

10         MR. JACOB:  We do, Your Honor.

11         THE COURT:  You do?  It's not in your brochures.

12         MR. JACOB:  We mention, I believe, the loans that we

13   offer in Bank President Purcell's affidavit as one of the

14   services that the bank offers.

15         THE COURT:  I don't think so.  I know you have a few

16   outstanding mortgages, but you're not offering them anymore.

17   I don't understand why you're in the same market as GE,

18   Prudential, or AIG.

19         MR. JACOB:  We do offer a number of loans; for

20   example, we offer loans for agricultural leases, we offer

21   loans for agricultural equipment that is needed and --

22         THE COURT:  Does GE?

23         MR. JACOB:  Yes, the Court can see, it is the last two

24   or three pages of that submission, that agriculture is one of

25   the industry focuses that GE has for the loans that it makes.

1    It also lists automotive.  The bank holds, I believe, about

2    $1.2 million in automotive type loans and will make loans for

3    dealer floors and that sort of thing, as well.  So all of

4    these places are places where we compete.  And the cost of

5    capital advantage that --

6         THE COURT:  That means what interest rate you're

7    charged?

8         MR. JACOB:  That's correct.

9         THE COURT:  What determines an interest rate?  I've

10   always wanted to know.

11        MR. JACOB:  Well, when a -- the market essentially

12   determines what the interest rate is.  The investors are

13   looking and assessing what is my expected return on this

14   investment.  That's the interest rate that is offered.  But

15   they have to discount that by the risk that is associated with

16   the investment.  So because GE Capital is now a lower risk

17   investment because of the signaling effect of the government's

18   imminent designation of them as a significant --

19        THE COURT:  What is the interest rate offered by GE

20   compared to your interest rate?  How am I to judge this?  All

21   you're saying is we compete for capital and we compete for

22   loans, to offer loans.  We don't know who you're competing

23   against.  Now you're throwing in GE Capital.  I have no idea

24   what the difference of interest rate is between them.  You

25   would have to know now before they get some designation, I

1    would assume.

2            MR. JACOB:  Your Honor can see, actually, I believe,

3    the GE Capital interest rate that's listed on the web shots

4    that we've provided is 1 percent, which is significantly

5    higher than the Federal Reserve rate, which is much lower than

6    that right now.  But the relevant point of distinction --

7            THE COURT:  What is your rate?

8            MR. JACOB:  I actually don't know what it is today,

9    Your Honor, but the relevant point of distinction isn't what

10   the bank rate today is versus what GE Capital's rate today is

11   because an investor, the day of the designation, the day that

12   the imminent designation of GE Capital was announced, if I'm

13   going to invest my deposit someplace, what I'm analyzing is

14   the relative risk of the two investments as well as the

15   interest rates.  GE Capital became a less risky place for me

16   to put my deposits the day that they gave that designation.

17           THE COURT:  I don't understand that at all.  How does

18   the everyday investor know that being called an SIFI in some

19   way or another makes it less risky?  You're basing this on the

20   investor, and you're saying that this is how they'll behave.

21           MR. JACOB:  I'm basing it on the market, Your Honor.

22   In fact, I'm basing it on the statements of Federal Reserve

23   Chairman Bernanke, who said companies that are considered to

24   be too big to fail, government backed, enjoy a cost of capital

25   advantage in the market.  Normally, if I invest in a company,

1     I bear the risk that that company is going to fail, in which

2     case I will lose my money, but they become less risky when the

3     government designates somebody as being so big that we can't

4     afford to let them fail because that signals the government is

5     going to take measures to ensure that they, in fact, do not,

6     rendering them a less risky investment.  So that is what

7     Chairman Bernanke said.  We cite that at paragraph 146 of our

8     complaint, Chairman Bernanke's quote.  We also provide a

9     number of economic studies, all of which have shown that there

10    is a cost of capital advantage associated with being

11    considered to be too big to fail.  Again, from the market's

12    perspective, you can see why you would want -- that becomes a

13    more attractive investment the day that they get that

14    designation because there is less risk associated.

15         THE COURT:  We don't even know who they will be.

16    You're speculating it is going to be GE Financial.  Can you in

17    a straight face tell me you compete with, say, J.P. Morgan?

18    Your geographic market has to be different.  You are not in

19    the same market as some of these people you're talking about.

20    I mean it is an antitrust principle, I would think.

21         MR. JACOB:  Well, I don't think we bear the burden to

22    show that we compete with every SIFI out there.  We only need

23    to show that there is one non-bank financial institution that

24    is imminently to be designated by the Financial Stability

25    Oversight Council and with respect to which we directly

1    compete --

2         THE COURT:  You compete --

3         MR. JACOB:  GE Capital is that systemically important

4    or imminently to be systemically important financial

5    institution.

6         THE COURT:  Meaning that we are counting on that the

7    market will treat them better than the bank for purposes of

8    where you compete as opposed to something else, even though

9    the fact is that people are influenced by the interest rate.

10   It is not irrelevant.  You're saying risk and interest rate,

11   but you can't even tell me the interest rate that will be

12   available if you were going to get a loan from GE versus you.

13        MR. JACOB:  The bank's pricing isn't actually

14   relevant.  I can direct the Court to several decisions of the

15   D.C. Circuit where they said we don't need to know what the

16   actual prices are that are going to be charged by the two

17   entities that are in competition.  One of those is the

18   *Louisiana Energy* case where *Louisiana Energy* was asserting

19   that its potential competitor was going to be -- when it was

20   given the rate and approved to offer certain rates, that it

21   would be able to engage in predatory pricing.  And the

22   D.C. Circuit said, we don't know if they're actually going to

23   engage in predatory pricing or not.  What we do know is that

24   they have now been freed to charge a lower price than they

25   previously could.  Don't know what the price is going to be

1    that they charge, but it has increased the competition with

2    *Louisiana Energy*, and that was sufficient to establish

3    standing.  They're now able to offer a lower price.

4         Similarly, in the *USTA* case, the *United States*

5    *Telecommunications Association*, there there was a regulation

6    that provided a subsidy to the Iowa entity --

7         THE COURT:  You call this a subsidy.  Have you ever

8    asked the GE Capital whether this is a "subsidy"?  I

9    understand what a subsidy is.  That means the government is

10   giving them something that puts them in a better position.

11   The SIFI is not a "subsidy."  You're just saying it's a

12   benefit in the marketplace for those -- do you have proof

13   historically, anything to offer that says that for the people

14   who have been SIFIs for all this time, that they are beating

15   you out in some way with the direct cost of capital?

16        MR. JACOB:  What we have are the statement of Chairman

17   Bernanke that it, in fact, functions in that way, it gives

18   them an ability to out compete their competitors by virtue of

19   being lower risk.  We have a number of economic studies.  In

20   fact, there was a letter from the senate that said in numerous

21   sources that detail and document the cost of capital advantage

22   that flows from it, so we certainly have pled it, and that is

23   certainly plausible in light of Chairman Bernanke's

24   statements, as well as all of those economic studies.  It is

25   certainly plausible that that competitive harm will flow

1    therefrom; that they end up getting a market advantage from

2    that.  A market advantage is all that it takes.  That is what

3    *Louisiana Energy* stands for.

4         In the *Sherley* case, where more participants were

5    allowed in to compete for grants for stem cell research, the

6    doctors were deemed to have standing to challenge that.  The

7    Court said, "No one can say exactly how likely the doctors are

8    to lose funding."  But the fact that you have increased the

9    competition by allowing additional actors to compete for

10   limited funds there, that was sufficient to establish

11   standing.

12        Again, the *Shays* case is another example, where the

13   congressman was going to face increased competition in the

14   political arena.  It wasn't even directly monetary.  But

15   because of the rules that the FEC had enacted in promulgating

16   rules pursuant to the Campaign Finance Reform, they were

17   allowing more competitors in to spend more money against him

18   than he asserted was legally allowed.  They said he has

19   standard to do that because by allowing more intense

20   competition, he has alleged sufficient harm.

21        So I don't think that there could be any question

22   under the governing precedents that our plausible pleadings

23   that --

24        THE COURT:  Well, your plausible pleading says, I'm a

25   competitor.  It doesn't tell me another thing.  That's your

1    plausible pleading.  That's a legal conclusion.

2         MR. JACOB:  It's not just a legal conclusion.  There

3    are a number of supporting facts that we have put into the

4    record.  I mean, we have shown, Your Honor --

5         THE COURT:  What are the number of supporting facts to

6    say that there is an SIFI that you are a competitor with which

7    is defined as offering the same line of product in the same

8    market?

9         MR. JACOB:  We have put in GE Capital's solicitation

10   of investments into accounts that allow checking to be written

11   from them and that provide interest.  That is virtually

12   identical to the banking deposit services that State National

13   Bank offers.  So somebody in Big Spring, Texas, who is

14   deciding what to do with their money is going to look online

15   at their home computer, ah, here is GE Capital, I could sign

16   up and invest my money here with them.  Now they're less risky

17   than they used to be.  That makes them an even better bet than

18   they were the day before.  So every consumer in that market

19   who is looking where to put their deposits knows the day after

20   that designation that GE Capital is a safer place to put it.

21   It is not that every single one of them will necessarily

22   choose GE Capital.  We don't have to show that.  We just have

23   to show that their decision is likely to be influenced by the

24   fact that GE Capital now has that cost of capital advantage.

25   Similarly --

1          THE COURT:  How is the cost of capital advantage going

2     to show itself?  By interest rates; right?

3          MR. JACOB:  Not necessarily, Your Honor.  From the

4     perspective of an investor, even if GE Capital didn't change

5     its interest rate at all, I would rather have GE Capital, the

6     designated SIFI, as the place where I put my money --

7          THE COURT:  Why don't you want an FDIC insured bank?

8     They're going to insure the money.  If you're worried about

9     risk, they don't insure, as far as I know, GE Capital --

10         MR. JACOB:  Certainly.  I can represent to the Court

11    that our interest rate is lower than what GE Capital offers.

12    We can't offer the same rates that they do.  However, an

13    investor in Big Spring, Texas, who is looking before the SIFI

14    designation at the two entities takes a look at the bank and

15    let's say for example -- and we do have investments and

16    deposits that are in excess of $250,000, so we are not just

17    talking about FDIC --

18         THE COURT:  I don't know that.

19         MR. JACOB:  I believe that we have attached records

20    about our loan portfolio, but at any rate, we can certainly

21    submit a supplemental affidavit.  The Court noted that in the

22    USTA v. FERC case that it is perfectly permissible to solicit

23    additional affidavits even in argument about it.  If the Court

24    needed that additional fact and isn't sufficiently satisfied,

25    we would be happy to provide the full loan portfolio, the full

1    interest rates, and everything else for the Court to make a

2    decision.

3            But the relevant point is that a consumer in that

4    market the day before the SIFI designation took a look at the

5    bank and said, here's its risk portfolio, maybe my deposit is

6    only $10,000, so it is going to be FDIC insured, bedrock

7    solid, I'm not going to lose that money, but the bank is only

8    offering .25 percent as the interest rate.  Now I've got

9    GE Capital.  They are offering a higher interest rate but they

10   are more risky, so maybe I would decide to go with the less

11   risky but lower interest rate investment.  But the day after

12   that SIFI designation that market participant has a different

13   calculus to make because now GE Capital isn't as risky an

14   investment as it was the day before.  So at the same interest

15   rate, even if GE doesn't change its interest rate at all, it

16   becomes a better investment option for me than it was the day

17   before because they are less risky, because if they were to

18   start to fail, I now can believe that the government is going

19   to back them.  Again, this is well documented in a number of

20   economic studies.

21           THE COURT:  Which study have you referred me to?

22           MR. JACOB:  We have a number of them, Your Honor, that

23   are cited in the complaint.  We also, in the supplemental --

24           THE COURT:  In the complaint?

25           MR. JACOB:  -- we have Chairman Bernanke's statement,

1    which is at paragraph 146.

2              THE COURT:  That is not a study.

3              MR. JACOB:  At paragraph 146 of the complaint.

4              THE COURT:  Yeah.

5              MR. JACOB:  And I believe that there are studies that

6    are cited on either side of that in the complaint, as well.  I

7    don't have them.

8              Paragraph 145, Your Honor, cites to some of the

9    studies.  And we also submitted in our first supplemental

10   submission of facts a letter from the senate, which went

11   through an extensive list of sources, all of which have

12   documented this cost of capital advantage.

13             THE COURT:  Are you in competition with AIG or

14   Prudential Life?  Is it Prudential Life that has popped up?

15             MR. JACOB:  We may be, Your Honor.  We haven't fully

16   investigated those.  Once we saw that we had GE Capital as an

17   entity, with which we clearly were in competition, and again

18   these designations were just made last week, so with limited

19   time --

20             THE COURT:  They haven't been made; correct?

21             MR. JACOB:  The vote was taken to preliminarily

22   designate them.  They get to respond within a 30-day window.

23   So it's true they are not made, but it is imminent and thus an

24   imminent injury for us.

25             Unless Your Honor has further questions --

1          THE COURT:  No, let's hear from the other side on the

2     Title I.

3          So we now have GE Capital because before we had no

4     competitors.  Now we allegedly have a competitor.

5          MR. COOPER:  Thank you, Your Honor.

6          I think plaintiffs' lack of standing to challenge

7     Title I is best demonstrated by the number of times that my

8     esteemed opposing counsel used the word "if" when talking to

9     you just now:  If the Financial Stability Council ends up

10    designating a company, and if this company ends up being a

11    competitor of State National Bank --

12         THE COURT:  To be fair, they are going to be

13    designated, according to him, it's not a hundred percent but

14    it's getting closer; and two, they are a competitor because

15    they both make loans.

16         MR. COOPER:  Even then, Your Honor, my esteemed

17    opposing counsel would still say, if they then received more

18    deposits from consumers, or if the creditors treat them as

19    safer investments and choose to invest more money.  There are

20    still a plethora of the use of the word "if."  I think that

21    just goes to show how speculative this particular alleged

22    injury is.

23         THE COURT:  Does it depend on the people offering the

24    loans or the people getting the loans?  Whose conduct are we

25    predicting here?

1          MR. COOPER:  It is hard exactly to say, Your Honor.  I

2     think the plaintiffs are speculating about the conduct of

3     third parties and of fourth parties.  It is just not clear

4     there.

5          Just to emphasize, Your Honor, although the plaintiffs

6     yesterday submitted new affidavits, including articles saying

7     that certain companies like GE Capital have said that they

8     have received a proposed designation, no company yet has been

9     finally designated by the Financial Stability Oversight

10    Council, and there also is not a single allegation anywhere in

11    plaintiffs' complaint, anywhere in their briefs, or anywhere

12    in their affidavits that the bank competes with any of the

13    entities that they submitted articles about.  They submit the

14    brute fact of the articles but there is no evidence whatsoever

15    about any allegations of competition.  That is wholly

16    hypothetical and speculative at this point.

17         THE COURT:  Well, he just said they do.

18         MR. COOPER:  He just said it, Your Honor, but the

19    government -- the very first time the government has ever

20    heard this allegation is today.  Beyond that, Your Honor --

21         THE COURT:  No, he has made the allegation in the

22    complaint without any names.  Now he is putting a name to it.

23    I mean, I think that's --

24         MR. COOPER:  It's true that the plaintiffs allege that

25    they competed with some non-bank financial company that could

1    be designated and now they're saying today that these

2    companies are being designated, but other than counsel's

3    statement, they have no statements from the parties, no signed

4    affidavits from the bank saying they actually compete with any

5    of these entities.

6            Even bracketing that somewhat speculative assumption

7    here, we still have to look at what third party creditors are

8    going to do, whether they're going to actually treat

9    systematically important financial institutions as safer

10   environments and then lend to them at better interest rates.

11           THE COURT:  Do you know whether GE Capital is in the

12   agricultural lending field?

13           MR. COOPER:  I don't know, Your Honor, and it is

14   also -- although opposing counsel did say that State National

15   Bank makes certain loans, I have not seen any such allegations

16   in the complaint or any of the affidavits --

17           THE COURT:  Nor on their website, by the way.  Okay.

18   All right.

19           MR. COOPER:  That may be true, but I have no basis for

20   saying whether or not it is true.

21           I would also like to point Your Honor's attention,

22   there was a decision issued Friday by Judge Howell --

23           THE COURT:  The *Bloomberg* --

24           MR. COOPER:  Yes, Your Honor, the *Bloomberg* case.  I

25   have a copy here if you or opposing counsel would like to see

1     it, in which Judge Howell found that plaintiffs lack standing

2     to challenge a regulation issued by the CFTC pursuant to the

3     Dodd-Frank Act because it depended on speculation about the

4     activities of third parties and whether or not they would

5     respond in certain ways to a regulation.  It is the same

6     kind -- it goes on at length about how difficult it is to show

7     standing when you're speculating about third party behavior,

8     and that's what's going on here.

9          Additionally, Your Honor, I would point the Court's

10    attention to the Supreme Court's decision in the *Already v.*

11    *Nike* case, which said, just because a competitor receives a

12    benefit, that is not enough.  You still have to show that that

13    benefit causes an injury to the plaintiff.  So even assuming

14    that the Financial Stability Oversight Council designates a

15    direct and current competitor of the bank and even assuming

16    that the bank then receives better interest rates from

17    creditors, third party creditors, that is still not enough to

18    get plaintiffs standing here.  They would also have to show

19    that this competitor is able to use these better interest

20    rates to out compete the bank.  That is wholly speculative in

21    part because being designated, even assuming for the moment it

22    does give you better interest rates, that's not the only thing

23    designation does.  It also subjects you to a host of new

24    regulatory requirements.  In particular, there's greater

25    liquidity requirements, leverage requirements, capital

1    requirements, risk management requirements and --

2           THE COURT:  You're saying that can affect the interest

3    rate, too?

4           MR. COOPER:  That can affect the interest rate, too,

5    and it can affect whatever business practices the competitor

6    engages in.  So it is wholly speculative whether a designated

7    entity will be able to use cheaper capital to out compete

8    State National Bank.  It may have to spend more money as a

9    result of being designated, it may have to spend less; we just

10   don't know.  It also may have to withdraw from -- it may have

11   to withdraw from certain lending practices or other practices

12   if they're deemed too risky.  So we just don't know the

13   effects of the designation.  It is at this point wholly

14   conjectural whether or not a designation will give a

15   competitive benefit to a direct and current competitor of the

16   bank and that that competitor could then use this designation

17   to somehow harm competitively the State National Bank.

18          THE COURT:  I don't know how you figure out who their

19   direct and current competitors are, either.

20          Okay.  Let's go on to the last three counts -- let me

21   hear from the states at this time -- which have to do with the

22   liquidation authority.

23          Good afternoon.

24          MR. WYRICK:  Good afternoon, Your Honor.  Patrick

25   Wyrick on behalf of the states.

1          An orderly liquidation authority injures the states

2     because it deprives them of rights that they have as creditors

3     under the bankruptcy code.  They no longer have those rights.

4     That's an injury now; it's not the future injury that the

5     government alleges.

6          THE COURT:  Let's state it that they say it's

7     contingent on a few things happening.  You don't lose any

8     rights until a whole string of things happen.  Why is that

9     enough?

10          MR. WYRICK:  I disagree with the premise of that, Your

11    Honor, because we have lost those rights now.  Under the

12    bankruptcy code, we knew that we were entitled to equal

13    treatment as creditors.  We have lost that right.  Now in the

14    event of a default by one of our --

15          THE COURT:  Well, first, you have to have someone call

16    a failing financial institution.  Then you've got to appoint

17    the FDIC as a receiver.  Then there's votes about liquidation.

18    And then the FDIC has to decide whether or not to do this.

19    Why isn't this covered by the recent case of *Deutsche Bank*?

20          MR. WYRICK:  Those all go to whether we can be injured

21    in the future, Your Honor, I mean whether -- we can only ever

22    be injured by this if they actually pull the trigger on the

23    authority.  But as a creditor it matters now, whether we know

24    how we're going to be treated in the event of a default.  If

25    you go down --

1          THE COURT:  You might be treated very well.

2          MR. WYRICK:  We might be treated well, we might not

3     be; but what we do know is that the bundle of sticks of

4     creditors' rights that we have under the bankruptcy code have

5     been reduced and in some cases eliminated.

6          THE COURT:  It is a contingent reduction.

7          MR. WYRICK:  The guarantee of the right to equal

8     treatment no longer exists.  That's not contingent; that's

9     happened.  Our right to participate in a bankruptcy

10    proceeding, that is no longer contingent.  That has been

11    eliminated.  Our right to --

12         THE COURT:  You might end up in a bankruptcy

13    proceeding depending on whether they don't do all these things

14    they have a right to do down the road when it happens.  I see

15    this as a serious ripeness problem because right now you're

16    just saying if all these things happen we lose that right.

17    Otherwise, the rule is go to bankruptcy.

18         MR. WYRICK:  That was the rule prior to Dodd-Frank.

19    We knew exactly what we had under the bankruptcy code.  Now,

20    you're right, the government may not choose to exercise the

21    orderly liquidation authority, but what we know right now at

22    this moment in time as a creditor is that that's an option.

23    Under the bankruptcy code, we knew exactly where we were going

24    to be in the event of a default.  We knew exactly what our

25    rights were in the event of a default.  If you walk down to

1    your local banker's office and walk in and say, you know, that

2    first mortgage that you have on my house, it might be a second

3    mortgage now, we'll figure that out in the future, in the

4    event of a foreclosure you might not even get to find out if

5    the foreclosure proceedings have been initiated or are

6    ongoing, and you might not get to make a claim in that

7    proceeding, but don't worry about that banker, that may never

8    happen, I might stay current on my mortgage payments, your

9    lending officer is going to come across the desk at you,

10   because as a banker that matters to him now, knowing what he

11   holds.  That is something of value to creditors, and it is

12   something of particular value to these creditors, these state

13   plaintiffs who are really -- I mean they're investing the

14   funds of their state employees.  They have in many instances

15   obligations under state law to seek out the safest types of

16   investments, the safest type of corporate bonds.  They really

17   have to manage their risk much more so than perhaps hedge fund

18   managers.

19            THE COURT:  About how many institutions are going to

20   land up in this?  You have no idea.  It could be one in ten

21   years, it could be five in five years; you don't even know

22   whether it is a realistic thing.  If you had said this five

23   years ago, no one would believe it.  This is in response to

24   what happened, but it doesn't mean that it will never happen

25   again.

1          MR. WYRICK:  Your Honor, in 2006, if you had asked the

2     federal government or, for that matter, the world's leading

3     financial experts what is the likelihood that one of these

4     financial companies would be in default or in danger of

5     default in a way that might affect the market systemically,

6     they probably would have told you next to nil.  I was able to

7     count 14 in the last five years, 14 instances in which this

8     orderly liquidation authority trigger could have been pulled

9     by the federal government.  I think first as a threshold

10    matter --

11          THE COURT:  But it wasn't.  It could have been.

12          MR. WYRICK:  It didn't exist.  That's why it exists

13    now so that if it happens in the next year, in the coming

14    years, they have the ability to do this.  But I think,

15    frankly, whether they -- the probability of whether they

16    exercise the authority in the future is irrelevant to the

17    question of whether we have been harmed now as a creditor.

18    Again, it's whether you buy into the premise that as a

19    rational creditor you are harmed now by having the certainty

20    that you had under the bankruptcy code and the knowledge of

21    what would happen in the event of a default taken away.  No

22    rational investor in these types of obligations would choose

23    the bundle of creditors' rights that they now have offered to

24    them after Title II over what they had prior to that under the

25    bankruptcy code because --

1          THE COURT:  How do I know that?

2          MR. WYRICK:  The scholarship is virtually unanimous on

3     this point.  Look at the Cohen article that we cite in our

4     brief.  She does a wonderful job of explaining how just on its

5     face Title II -- it's based on the entire rubric, if you look

6     at the first purpose of the law, it's to ensure that

7     shareholders and creditors bear the burden of losses in the

8     event of one of these defaults.  The purpose of Title II is to

9     ensure that the creditors, in fact, bear losses rather than

10    taxpayers, rather than the financial markets as a whole.  That

11    was the point.  It was a shift away from the bankruptcy code.

12         THE COURT:  It was to protect creditors.  The fact

13    that you don't think it is as nice as the bankruptcy code, but

14    certainly the goals that they're supposed to invoke are to

15    protect the creditors.

16         MR. WYRICK:  I disagree.  The goal was to protect the

17    taxpayers, to bear the burden of the losses should the federal

18    government choose to bail out these companies; and secondly,

19    to protect against the systemic risk that could occur if they

20    didn't exercise this authority and if the financial company

21    otherwise defaulted and went into liquidation.  That's the

22    purpose.

23         THE COURT:  Can you go back to the question of how you

24    distinguish the *Deutsche Bank* case --

25         MR. WYRICK:  I'm not familiar with the case offhand,

1    Your Honor.  I think in this particular instance, what we -- I

2    mean the question for the Court in terms of standing is

3    whether we have been injured now, and the government continues

4    to point to the future and the contingent events that they say

5    would have to occur for us to have an injury, and that ignores

6    the injury that we have now.  As creditors --

7         THE COURT:  I have a hard time not defining it as a

8    contingent injury.  It won't be an injury until somebody does

9    a lot of things down the road.  I understand you think that

10   the uncertainty is created; but as I said before, I don't

11   think that uncertainty and nervousness is necessarily

12   standing.  That's what you're saying.  Maybe this little

13   bundle feels a little less secure than it did before, but at

14   the same time, it's not the Court's -- it has to be more

15   concrete.  Injury has to be concrete, and you're saying that

16   people will feel a little less secure with their creditor

17   rights.

18        MR. WYRICK:  They won't just feel less secure; they

19   will be less secure precisely because they would no longer

20   have the guarantees they have under the bankruptcy code.  As a

21   creditor, that matters.  It matters in the first instance in

22   making the lending decision; it matters in the second instance

23   in how you value your holdings on your books and how the

24   market treats those holdings; and it certainly matters down

25   the road when the time comes to perhaps sell those holdings

1    or, God forbid, there is actually one of these events of

2    default and you get zeroed out as a creditor.

3         THE COURT:  You don't get zeroed out.  Section 7, the

4    government can tell me what the difference of recovery under 7

5    and 11 is.  How do you respond to their argument about it's a

6    procedural right and it's not a substantive right and,

7    therefore, you're not being harmed?

8         MR. WYRICK:  I disagree wholeheartedly.  The right to

9    equal treatment as a creditor isn't a right to have a court

10   proceeding occur in a certain matter.  That's an actual right

11   as a creditor to receive a recovery equal to the recovery of

12   the other creditors.  It is no less a substantive right than

13   the right to equal protection of the law generally.  If we get

14   to their idea that even the rights that relate to the judicial

15   process that occurs or the rights I have as a creditor in the

16   judicial process, perhaps they would have an argument that

17   we've simply lost procedural rights.  If all that had happened

18   was the rights that we have, the process that we engage in has

19   been changed, but the courthouse doors actually have been

20   slammed in our face in terms of that initial proceeding that

21   occurs in this very courthouse to determine whether a

22   liquidation goes forward.

23        THE COURT:  You're not closed out of challenging the

24   constitutionality of the statute, that's for sure.  You may be

25   able to be closed out of the designation process.  That is

1  beyond judicial review or challenge.  You're not closed out of

2  the process of contesting your recovery, whether it's equal to

3  what it would be under Section 7.  If the statute is

4  unconstitutional, it is pretty clear from the case law,

5  including *Free Enterprise*, that you don't lose that right.  It

6  doesn't matter whether there's limited judicial review along

7  the way for certain agency decisions.

8  MR. WYRICK:  That's right.  Even if we had a

9  constitutional claim down the road, you know, again as we

10  point out in the briefing, our narrowly circumscribed remedies

11  that we have are simply the difference between what we might

12  have earned as creditors in that alternate universe world

13  where a chapter 7 liquidation occurred, which really requires

14  a judge to do a pretty remarkable thing and imagine the

15  scenario where the markets are in a meltdown and a liquidation

16  occurs --

17  THE COURT:  But isn't that the time to do it, when

18  there is a real thing happening as opposed to a hypothetical

19  that I'm losing a right that I might lose down the road and it

20  is going to have an effect and all the rest?

21  MR. WYRICK:  I disagree.  The government's view of the

22  world is that they can come and bulldoze your house, and so

23  long as they cut you a check for the price of the house and

24  everything that was in it, all is good.  We're trying to

25  prevent the harm from occurring in the first instance.  That's

1    why we're bringing the claim now and raising these

2    constitutional challenges.  That's why we're seeking

3    injunctive relief.

4        THE COURT:  It may be that you're doing a good thing,

5    but the fact is the law requires you to be harmed now, not

6    that you're predicting the future, you have to have a concrete

7    imminent harm, and yours is that we've lost a statutory

8    guarantee maybe.

9        MR. WYRICK:  No, we have lost the guarantee, Your

10   Honor.  I mean, this is a Zivotofsky --

11       THE COURT:  No, he was not allowed to put on his

12   passport where he was born.  He had the right to do it.  You

13   have a right to be treated in -- let's just assume you have

14   the right to be treated in bankruptcy.  You will be treated in

15   bankruptcy unless and until somebody invokes these

16   extraordinary powers that will be very rarely used after going

17   through 47 different hoops, and that could be ten years down

18   the road.

19       MR. WYRICK:  What we had was a guarantee that we would

20   have a bankruptcy proceeding, and that's been taken away.

21   That's the right that's been deprived.  I think what Judge

22   Randolph said in Zivotofsky is exactly on point.  I mean, the

23   natural tendency is to look for some economic harm now, but

24   when Congress confers a right and then takes it away, that is

25   an injury.

1          THE COURT:  But the person had a right to put that on

2     his passport, the same way you have a right to get the

3     government's documents unless there is an exemption.  So if

4     they don't give you the document, you have a right to sue, and

5     then you have litigation.  You don't have a right to be in

6     bankruptcy until there is some entity that has gone into

7     bankruptcy or liquidation or whichever way it goes.  That's

8     when your rights become real.  The right of Zivotofsky, as

9     well as a FOIA person, is as soon as the government says we're

10    not going to give you what arguably the statute says.

11          MR. WYRICK:  I think the difference between those

12    cases as to whether we've actually -- you're looking at it in

13    terms of I've actually made a request to have the government

14    do something and they've told me no and I have a statutory

15    right to do it.  What we have here is where Congress has

16    conferred a right, it's not dissimilar to the *Hodel* case, the

17    tribal case that involved the right for a tribal member to

18    pass their property on to their heirs.  Congress came along,

19    said that system just isn't working.  They changed it to where

20    if the fractional interest got to a certain sliver of a

21    property interest, the tribal member lost the right to pass

22    the property on.  So Congress had taken away that right.  In

23    that case, the Court squarely found that those plaintiffs had

24    standing to challenge the loss of that right --

25          THE COURT:  Because he lost property.

1          MR. WYRICK:  It was a loss of one of the sticks in

2     their bundle of property rights.

3          THE COURT:  It wasn't the sticks.  He lost the

4     property.  There's a big difference.  He's not talking about,

5     you know, you have a bundle of rights.  He's saying that you

6     are out money, real money.  You're not out real money.

7          MR. WYRICK:  If the Court's suggestion is that the

8     owner of the property wouldn't have similarly had a right to

9     challenge that provision -- because the plaintiffs in that

10    case were the children who were saying they were deprived of

11    the property.  The only -- even a tribal member who owned the

12    property who had been deprived of the right to pass it on also

13    would have had standing to challenge that particular loss of

14    the right because what they lost was part of the property

15    right.  Can you easily attach a value to the right to be able

16    to pass your property on to your heirs?  It is a little more

17    difficult than valuing the property parcel as a whole.  It is

18    certainly something of value to the owner of the property.

19    They would have had standing to challenge that.  That's what

20    we have here.  It goes back to just the fundamental premise.

21    For us to have standing, we have to show you that we have

22    suffered that injury now.  As creditors, as rational creditors

23    in this market, it absolutely is a thing of value to us as

24    states to know, one, that we're going to be treated equally,

25    similarly to other creditors in the event of a default; it

1    matters to us to know that we're going to have some say in the

2    process.

3              THE COURT:  The other creditors aren't coming out any

4    better than you are.  They're going to be subject to the same

5    orderly liquidation problems, so you're not going to be

6    treated dissimilarly anymore.  You'll be treated similarly.

7    Once they put the entity in this and declare it as too big to

8    fail and go through 47 other hoops of which they go on forever

9    and ever, you all are going to be equal.  You may not be

10   happy, but you're going to be equal.

11             MR. WYRICK:  All creditors would be subject to this

12   new authority that they have under Title II.  5390(b)(4)

13   expressly gives them the power to discriminate against one

14   creditor over another.  Right?  They have another --

15             THE COURT:  It doesn't necessarily mean you'll be the

16   one --

17             MR. WYRICK:  It doesn't necessarily mean that, but

18   it's a departure from the baseline rule under the bankruptcy

19   code that that doesn't happen; that under the bankruptcy code,

20   the Supreme Court said in the Begier case, the central tenet

21   of the bankruptcy code is the quality of treatment among

22   creditors.  Title II fundamentally changed that.  That is no

23   longer the baseline rule for holders of this particular type

24   of debt.

25             THE COURT:  Thank you.  We'll hear for a couple of

1    minutes from the government and then I think we've heard

2    enough.  If you could be brief, please.

3          MR. COOPER:  Certainly, Your Honor.

4          If I may quickly, there were two prior points I would

5    like to get to from earlier in the argument, one just about

6    the burden for this voluntary cessation standard in the

7    mootness context.  I just wanted to be clear that the

8    plaintiff, of course, bears the burden for showing that their

9    claims are ripe; and that mootness is a whole separate

10   doctrine, of course, and the plaintiffs I think were talking

11   about the voluntary cessation exception to the mootness

12   doctrine, and the defendants haven't pressed mootness as a

13   reason to dismiss this case.

14         I also just wanted to make sure the Court was aware

15   that about two weeks ago now the Consumer Financial Protection

16   Bureau published on its website a final rule for the ability

17   to repay a qualified mortgage rule, a final amendment

18   to -- expanding the safe harbor applicable to it.  I have a

19   copy here.  The rule of this amendment is going to be

20   published in the Federal Register tomorrow.  It slightly

21   expands the safe harbor for the ability to repay rule.  I just

22   wanted --

23         THE COURT:  What do you mean the ability to repay

24   rule?  The one that has to do with the QT --

25         MR. COOPER:  Yeah, the qualified mortgage --

1        THE COURT:  They're amending that again --

2        MR. COOPER:  Yes, as we pointed out in our brief,

3    there was a notice of proposed rulemaking or this expanded

4    safe harbor, and the bureau finalized it about ten days ago.

5        THE COURT:  What does it do for them?

6        MR. COOPER:  My understanding, Your Honor, is that the

7    new safe harbor now allows banks, small community banks like

8    State National Bank, to issue mortgages up to 3.5 percent

9    above the average offer -- the average offer prime rate; and

10   that before this final rule was issued, the bank was only able

11   to issue -- or small creditors would only be able to issue

12   about 1.5 percent rates above the average prime offer rate.

13   So it increases --

14       THE COURT:  High-end mortgages.

15       MR. COOPER:  It increases the price that small banks

16   can charge --

17       THE COURT:  Do you have a cite?

18       MR. COOPER:  So I have a copy here I would be happy to

19   provide to Your Honor.  It will be published, as I said, in

20   the Federal Register tomorrow.  So it is not published yet.

21   But on the Consumer Financial Protection Bureau's website.

22       THE COURT:  I read the Federal Register just to keep

23   abreast of what's happening.

24       MR. COOPER:  I'm sure you do.

25       THE COURT:  In case I don't catch it.

1      MR. COOPER:  I have a copy here if Your Honor would

2   like a copy.

3      Turning then to Title II, I will be very brief, Your

4   Honor.  I think for the reasons set forth in our brief the

5   plaintiffs lack standing --

6      THE COURT:  Do you think *Deutsche Bank* has anything to

7   say about this?  Are you familiar with Silberman's opinion in

8   Deutsche Bank?

9      MR. COOPER:  We did see -- this is the opinion that

10  came out about 10 or 15 days ago, Your Honor?

11     THE COURT:  Against the FDIC.

12     MR. COOPER:  We think it does have some bearing on the

13  case, Your Honor.  My understanding is that it is suggestive

14  that when the FDIC exercises -- when a plaintiff's injury is

15  predicated on the FDIC's exercise of discretionary authority,

16  in that case, I think its authority to settle a complaint, the

17  plaintiff lacks standing, and I think that falls in nicely

18  with this case given the fact that 5390(b)(4), which is the

19  provision the plaintiffs are challenging, gives the FDIC the

20  discretion --

21     THE COURT:  *Clapper* talks about discretion versus

22  mandate, as well.  They just say, though, that they've lost a

23  bundle, they've lost a stick in the bundle, I think is what

24  they said.  What do you say to that?  Tough luck?

25     MR. COOPER:  They do say that, Your Honor, but we

1    don't think this is a property right, for one thing.  The

2    right to be equal -- what a property right would be is

3    if -- excuse me -- what a deprivation of a property right

4    would be in this context would be if the orderly liquidation

5    authority said creditors can no longer recover on liens to

6    companies in the orderly liquidation authority or something

7    like that where it fully extinguished a creditor's right to

8    recover.  That's not what's happened here at all.  What's

9    happened here is the FDIC has given the authority in very

10   limited circumstances to treat creditors dissimilarly only

11   when it is going to benefit all of the creditors and all of

12   the creditors will be better off.  Despite plaintiffs'

13   assurance that they had some inviolable right under the

14   bankruptcy code that's changed, that's not the case.  As the

15   government pointed out in the *In re Lernout* case we cite in

16   page 31, footnote 19 of our brief, there are many instances in

17   bankruptcy law where creditors are treated dissimilarly for

18   certain reasons; for example, to pay the electric company to

19   keep the electricity on so that the debtor can continue to

20   have electricity and continue its business operations and,

21   therefore, make more money and, therefore, have more money for

22   all creditors to receive.

23           THE COURT:  I'm sorry.  I didn't catch the case.

24           MR. COOPER:  It's *In re Lernout*, Your Honor.  It is

25   301 B.R. 651 from the District of Delaware Bankruptcy Court.

1    It is on page 31, footnote 19, of our brief.  The government

2    didn't want to get into all the intricacies of bankruptcy law,

3    so we didn't flesh out this point greatly, but -- because it

4    seems to us pretty clearly that the plaintiffs lack standing

5    even accepting for the moment the assumption that the states

6    did have some inviolable right to equal treatment with other

7    similarly situated creditors.  The states would still lack

8    standing here because the deprivation of procedural right is

9    not enough by itself to convey standing.  Notice that the

10   plaintiffs don't ever allege that they have suffered some

11   monetary loss, that their investments have gone down, that

12   they have tried to sell them and been able to sell them for

13   less money.  Just as they concede their lack of future

14   financial injury, they don't allege any present financial

15   injury.

16          THE COURT:  No, but they constructively argue you

17   don't have to have an injury that is financial.  Zivotofsky

18   wasn't financial.  The Indian case is financial, but there are

19   cases where the law provides you rights that if you lose

20   you've lost something that is valuable.  They say in their

21   complaint it is valuable, but I don't know why that

22   necessarily carries the day.  I mean that is a legal

23   conclusion.

24          Okay.  Wrap it up.

25          MR. COOPER:  Okay.  So Your Honor, just to sum up, we

1    think then for four reasons the plaintiffs lack standing here

2    or the state plaintiffs lack standing here:  One, they only

3    allege a procedural injury, not a substantive injury; two,

4    they haven't even suffered this procedural injury and it is

5    speculative that they ever will; finally, the states' injury

6    isn't fairly traceable to all of Title II.  At most, it is

7    fairly traceable only to the one statutory provision they have

8    identified, this 5390 (b)(4).  It doesn't give them grounds to

9    challenge all of Title II.  Also, as we mentioned in our reply

10   brief when we cite the *Katzenbach* case, states aren't persons

11   under the due process clause and can't --

12        THE COURT:  They have been allowed to sue.  Nobody

13   ever brings that up, it seems.  States have sued.

14        MR. COOPER:  Under the due process laws?

15        THE COURT:  Yeah.

16        MR. COOPER:  Well, from our research of the case law,

17   we haven't found any case that says *Katzenbach* is no longer

18   good law on this point; and any cases we're aware of citing

19   *Katzenbach* have found that states lack the right to bring due

20   process in separation of powers claims.

21        Thank you, Your Honor.

22        THE COURT:  Thank you to both sides and for many very

23   extensive briefs, that's for sure.  It gives us a lot to work

24   on.  Thank you.

25        MR. JACOB:  You inquired about limited facts, our

1    interest rates at the bank and the consumer loans --

2         THE COURT:  I don't think the court reporter can hear

3    you unless you get to a mike.

4         MR. JACOB:  Your Honor had mentioned a couple of

5    additional facts that you would find useful from us, the

6    interest rate that the bank now offers on its deposits, as

7    well as the consumer loans that we offer other than the

8    mortgages we used to offer, and now that they have raised the

9    new safe harbor, the increased safe harbor on the qualified

10   mortgage rule, it would probably also be useful to Your Honor

11   to know how many of our loans would still not qualify for that

12   safe harbor.  So I would just ask for permission, as under

13   *USTA v. FERC,* to just submit a supplemental affidavit covering

14   those very limited set of facts.

15        THE COURT:  Very, very limited.  You have to do it by

16   Thursday.

17        MR. JACOB:  Thank you, Your Honor.

18        THE COURT:  I need an affidavit, though, not from you.

19        (Proceedings concluded at 5:22 p.m.)

20

21

22

23

24

25

1

2                        CERTIFICATE

3          I, PATRICIA A. KANESHIRO-MILLER, Official Court

4   Reporter, certify that the foregoing pages are a correct

5   transcript from the record of proceedings in the

6   above-entitled matter.

7                   _____
                    PATRICIA A. KANESHIRO-MILLER
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25