**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| STATE NATIONAL BANK OF BIG SPRING *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 1:12-cv-01032 (ESH) |
| JACOB J. LEW, in his official capacity as United States Secretary of the Treasury and *ex officio* Chairman of the Financial Stability Oversight Council, *et al.*, | ) ) ) ) ) ) | Judge: Hon. Ellen S. Huvelle |
| Defendants. | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

GREGORY JACOB
  *Counsel of Record*
O'MELVENY & MYERS LLP
1625 I St. NW
Washington, DC 20006
(202) 383-5300
gjacob@omm.com

C. BOYDEN GRAY
ADAM J. WHITE
BOYDEN GRAY & ASSOCIATES
1627 I Street NW, Suite 950
Washington, DC 20006
(202) 955-0620
adam@boydengrayassociates.com

*Counsel for Plaintiffs State National Bank of Big Spring,*
*the Competitive Enterprise Institute, and the 60 Plus Association*

SAM KAZMAN
HANS BADER
COMPETITIVE ENTERPRISE INSTITUTE
1899 L St. NW, Floor 12
Washington, DC 20036
(202) 331-1010

*Co-Counsel for Plaintiffs*
*Competitive Enterprise Institute*

**TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

    I.      THE PLAINTIFFS ............................................................................. 2

    II.    THE CFPB ........................................................................................ 3

    III.   THE RECESS APPOINTMENT OF RICHARD CORDRAY ................. 5

SUMMARY OF ARGUMENT ........................................................................................ 7

ARGUMENT ................................................................................................................. 10

    I.      CONGRESS VESTED THE DIRECTOR OF THE CFPB WITH
          BROAD EXECUTIVE AUTHORITY, BUT PLACED HIM
          OUTSIDE THE PRESIDENT'S OVERSIGHT AND CONTROL ........... 10

         A.     The CFPB has expansive executive authority. ................................. 10

         B.     The CFPB executes the law but does not answer to, and is not
             restrained by, the President. ............................................................ 11

         C.     The CFPB is unlike other executive entities approved by the
             courts. ............................................................................................. 16

         D.     Congress failed to create any mitigating internal checks and
             balances within the CFPB. ............................................................... 17

         E.     The Executive must defer to the CFPB. ........................................... 19

    II.    THE CFPB ENJOYS "FULL INDEPENDENCE" FROM
          CONGRESS ........................................................................................ 20

         A.     The Dodd-Frank Act frees the CFPB from Congress's "power
             of the purse." ................................................................................... 20

         B.     The Constitution's "power of the purse" is Congress's most
             powerful tool for overseeing and holding accountable
             agencies exercising federal law. ...................................................... 21

         C.     The CFPB has demonstrated that Congress cannot
             meaningfully oversee and restrain an agency without the
             power of the purse. .......................................................................... 27

    III.   CORDRAY'S RECESS APPOINTMENT WAS ILLEGAL, AND
          REGULATIONS HE PROMULGATED WHILE ILLEGALLY
          SERVING ARE INVALID ................................................................... 31

         A.     *Noel Canning* definitively establishes that Cordray's
             purported recess appointment was unconstitutional. ...................... 31

## TABLE OF CONTENTS
(continued)

Page

B.   All rules promulgated by Cordray during his illegal
     appointment are invalid. ................................................................. 32

C.   Cordray's nominal "ratification" does not cure his actions'
     unlawfulness. .................................................................................. 33

D.   The CFPB's invalidly enacted regulations cannot be rescued
     by the de facto officer doctrine or harmless error analysis. ............ 35

CONCLUSION ........................................................................................... 39

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States,*
    295 U.S. 495 (1935) ................................................................................................ 18

*Allen v. Wright,*
    468 U.S. 737 (1984) ................................................................................................ 26

*Andrade v. Lauer,*
    729 F.2d 1475 (D.C. Cir. 1984) ........................................................................ 36, 37

*Andrade v. Regnery,*
    824 F.2d 1253 (D.C. Cir. 1987) .............................................................................. 37

*Ass'n of Am. R.R. v. DOT,*
    721 F.3d 666 (D.C. Cir. 2013) .................................................................................. 9

*Beavers v. Sec'y of HEW,*
    577 F.2d 383 (6th Cir. 1978) .................................................................................. 15

*Bowen v. Yuckert,*
    482 U.S. 137 (1987) ................................................................................................ 15

*Bowsher v. Synar,*
    478 U.S. 714 (1986) .................................................................................................. 9

*Buckley v. Valeo,*
    424 U.S. 1 (1976) .................................................................................................... 36

*Decatur v. Paulding,*
    39 U.S. 497 (1840) .................................................................................................. 15

*DiCenso v. Cisneros,*
    96 F.3d 1004 (7th Cir. 1996) .................................................................................. 15

*Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision,*
    139 F.3d 203 (D.C. Cir. 1998) ................................................................................ 38

*Edmond v. United States,*
    520 U.S. 651 (1997) ................................................................................................ 31

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ...................................................................................... 24, 25, 27

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Fed. Elec. Comm'n v. Legi-Tech, Inc.*,
   75 F.3d 704 (D.C. Cir. 1996) ................................................................ 38

*Fed. Election Comm'n v. NRA Political Victory Fund*,
   513 U.S. 88 (1994) ................................................................ 33, 35

*Franklin Sav. Ass'n v. Director of Office of Thrift Supervision*,
   740 F. Supp. 1535 (D. Kan. 1990) ................................................................ 34

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.*,
   561 U. S. 477 (2010) ................................................................ *passim*

*Freytag v. Comm'r*,
   501 U.S. 868 (1991) ................................................................ 9

*Harrington v. Bush*,
   553 F.2d 190 (D.C. Cir. 1977) ................................................................ 27

*Humphrey's Ex'r v. United States*,
   295 U.S. 602 (1935) ................................................................ *passim*

*Intercollegiate Broad. Sys. Inc. v. Copyright Royalty Bd.*,
   684 F.3d 1332 (D.C. Cir. 2012) ................................................................ 36, 38, 39

*Laird v. Tatum*,
   408 U.S. 1 (1972) ................................................................ 26

*Landry v. FDIC*,
   204 F.3d 1125 (D.C. Cir. 2000) ................................................................ 38, 39

*Morrison v. Olson.*
   487 U.S. 654 (1988) ................................................................ 16

*Myers v. United States*,
   272 U.S 52 (1926) ................................................................ 13, 14, 15

*Nguyen v. United States*,
   539 U.S. 69 (2003) ................................................................ 36

*NLRB v. Noel Canning*,
   134 S. Ct. at 2550 (2014) ................................................................ 5, 6

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Noel Canning v. NLRB*,
705 F.3d 490 (D.C. Cir. 2013), *aff'd*, 134 S. Ct. 2250 (2014)..............................*passim*

*Office of Personnel Mgmt. v. Richmond*,
496 U.S. 414 (1990) ................................................................................................. 25

*Pub. Citizen v. NHTSA*,
489 F.3d 1279 (D.C. Cir. 2007) ............................................................................... 26

*Ryder v. United States*,
515 U.S. 177 (1995) ............................................................................................. 35, 36

*Sierra Club v. E.P.A.*,
699 F.3d 530 (D.C. Cir. 2012) ................................................................................. 32

*Silver v. U.S. Postal Serv.*,
951 F.2d 1033 ............................................................................................................ 36

*State National Bank of Big Spring v. Lew*,
795 F.3d 48 (D.C. Cir. 2015) ..................................................................................... 3

*SW Gen., Inc. v. NLRB*,
796 F.3d 67 (D.C. Cir. 2015) .................................................................... 36, 37, 38, 39

*U.S. Dep't of Navy v. FLRA*,
665 F.3d 1339 (D.C. Cir. 2012) ............................................................................... 25

*U.S. House of Representatives v. Burwell*,
2015 WL 5294762 (D.D.C. Sept. 9, 2015) ............................................................. 23

*United States v. Richardson*,
418 U.S. 166 (1974) ................................................................................................. 25

*W. Nat'l Bank of N.Y. v. Armstrong*,
152 U.S. 346 (1894) ................................................................................................. 34

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 7 ..................................................................................................... 31

U.S. Const. art. I, § 9, cl. 7 ............................................................................................ 21

U.S. Const. Art. II, § 1, cl. 1 .......................................................................................... 11

## TABLE OF AUTHORITIES
(continued)

Page(s)

U.S. Const. Art. II, § 2, cl. 2 ................................................................................ 31

U.S. Const. Art. II, § 4, cl. 4 ................................................................................ 11

**Statutes**

5 U.S.C. § 553 ...................................................................................................... 32

5 U.S.C. § 553(b) ................................................................................................. 33

5 U.S.C. § 553(c) ................................................................................................. 33

5 U.S.C. § 706(2) ................................................................................................. 32

12 U.S.C. § 2 ........................................................................................................ 20

12 U.S.C. § 5481(12) ..................................................................................... 3, 11

12 U.S.C. § 5491(a) .............................................................................................. 3

12 U.S.C. § 5491(b)(1) .................................................................................... 5, 34

12 U.S.C. § 5491(c)(2) .................................................................................... 4, 12

12 U.S.C. § 5491(c)(3) .................................................................................... 4, 12

12 U.S.C. § 5492(a)(4) ......................................................................................... 11

12 U.S.C. § 5492(a)(9) ......................................................................................... 11

12 U.S.C. § 5492(a)(10) ....................................................................................... 11

12 U.S.C. § 5492(a)(11) ....................................................................................... 11

12 U.S.C. § 5492(b) ............................................................................................. 32

12 U.S.C. § 5492(c) ............................................................................................... 4

12 U.S.C. § 5492(c)(4) ......................................................................................... 12

12 U.S.C. § 5497(a) ......................................................................... 4, 20, 30, 31

12 U.S.C. § 5497(a)(2)(C) .............................................................................. 4, 20

12 U.S.C. § 5497(a)(4)(E) ................................................................................... 12

## TABLE OF AUTHORITIES
(continued)

Page(s)

12 U.S.C. § 5511(14) ........................................................................................ 3, 11

12 U.S.C. § 5511(a) ............................................................................................... 11

12 U.S.C. § 5512(b)(1) ........................................................................................... 32

12 U.S.C. § 5512(b)(4) ........................................................................................... 13

12 U.S.C. § 5512(b)(4)(B) ...................................................................................... 19

12 U.S.C. § 5514 .................................................................................................... 19

12 U.S.C. § 5515 .................................................................................................... 19

12 U.S.C. § 5516 .................................................................................................... 19

12 U.S.C § 5531(a) .......................................................................................... 3, 11

12 U.S.C. § 5586(a) ................................................................................................ 34

15 U.S.C. § 1601 ...................................................................................................... 6

44 U.S.C. § 3502(5) .................................................................................................. 3

**Regulations**

77 Fed. Reg. 51 (Aug. 23, 2012) ............................................................................. 6

77 Fed. Reg. 115 (Aug. 23, 2012) ........................................................................... 6

77 Fed. Reg. 6193 (Feb. 7, 2012) ............................................................................ 6

77 Fed. Reg. 50,243 (Aug. 20, 2012) ...................................................................... 6

78 Fed. Reg. 10,696 (Feb. 14, 2013) ....................................................................... 6

78 Fed. Reg. 30,661 (May 22, 2013) ....................................................................... 6

78 Fed. Reg. 53,734 (Aug. 30, 2013) ................................................................. 7, 33

78 Fed. Reg. 79,730 (Dec. 31, 2013) ....................................................................... 6

78 Fed. Reg. 4725 (Jan. 22, 2013) ........................................................................... 6

78 Fed. Reg. 6407 (Jan. 30, 2013) ........................................................................... 6

# TABLE OF AUTHORITIES
(continued)

Page(s)

## LEGISLATIVE MATERIAL

157 Cong. Rec. S883–S8784 (daily ed. Dec. 17, 2011) ...................................................... 5

159 Cong. Rec. S5704–05 (daily ed. July 16, 2013) .......................................................... 6

Letter from Rep. Randy Neugebauer, Chairman, H.R. Comm. on Fin.
    Servs., Subcomm. on Oversight and Investigations, *et al.* to Richard
    Cordray, Director of the CFPB, at 1 (May 2, 2012) ..................................................... 29

Letter from Sen. Rob Portman, *et al.* to Richard Cordray, Director of the
    CFPB, at 1 (Oct. 30, 2013) ......................................................................................... 29

S. Rep. No. 111-176, at 163 (2010) ................................................................................. 20

S. Rep. No. 111-176, at 163 ........................................................................................ 20, 21

U.S. House of Representatives, Committee on Financial Services,
    "Committee Pushes for Accountability and Transparency at the CFPB"
    (Mar. 6, 2015) ............................................................................................................. 30

## Other Authorities

Am. Jur. 2d *Agency* (2014) ............................................................................................. 34

Rachel E. Barkow, *Insulating Agencies: Avoiding Capture Through
    Institutional Design*, 89 Tex. L. Rev. 15 (2010) ..................................................... 4, 28

Jack M. Beermann, *Congressional Administration*,
    43 San Diego L. Rev. 61 (2006) ................................................................................. 23

Randall L. Calvert *et al.*, *A Theory of Political Control and Agency
    Discretion*, 33 Am. J. Pol. Sci. 588 (1989) ................................................................ 23

CFPB, *The CFPB Strategic Plan, Budget, and Performance Plan and
    Report* (Feb. 2015) ....................................................................................................... 4

Joseph Cooper & Ann Cooper, *The Legislative Veto & the Constitution*,
    30 Geo. Wash. L. Rev. 467 (1961) .............................................................................. 23

*Consumer Financial Protection Bureau Strategic Plan: FY 2013-FY 2017*
    (Apr. 2013) ................................................................................................................... 28

Robert E. Cushman, *The Independent Regulatory Commissions* (1972) ......................... 24

viii

## TABLE OF AUTHORITIES
(continued)

Page(s)

Kirti Datla & Richard L. Revesz, *Independence, Congressional Weakness,
    and the Importance of Appointment: The Impact of Combining
    Budgetary Autonomy with Removal Protection*,
    125 Harv. L. Rev. 1822 (2012) ..................................................................... 28

Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies
    (and Executive Agencies)*, 98 Cornell L. Rev. 769 (2013) ............................... 5, 23, 28

Neal E. Devins, *Regulation of Government Agencies Through Limitation
    Riders*, 1987 Duke L.J. 456 (1987) ................................................................ 24

GAO, *Consumer Financial Protection Bureau: Some Privacy and Security
    Procedures for Data Collections Should Continue Being Enhanced*
    (Sept. 14, 2014) ............................................................................................. 29

GAO, *Principles of Federal Appropriations Law*, (3d ed. 2004) ..................................... 22

Charles H. Koch, Jr. & Richard Murphy, *Administrative Law and Practice*
    (3d ed. 2015) .................................................................................................. 32, 33

Ronald J. Krotoszynski, Jr. et al., *Partisan Balance Requirements in the
    Age of New Formalism*, 90 Notre Dame L. Rev. 941 (2015) .......................... 19

Charles Kruly, *Self-Funding and Agency Independence*, 81 Geo. Wash. L.
    Rev. 1733 (2013) ............................................................................................. 28

*Works of Alexander Hamilton* 218 (Henry Cabot Lodge, ed., 1904) ............................... 21

Jason A. MacDonald, *Limitation Riders and Congressional Influence Over
    Bureaucratic Policy Decisions*, 104 Am. Pol. Sci. Rev. 766 (2010) ............... 24

Jason A. MacDonald, *Congressional Power over Executive Branch Policy
    Making: Limitations on Bureaucratic Regulations, 1989-2009*, 43 Pres.
    Studies Q. 523 (2013) ...................................................................................... 24

Arthur W. Macmahon, *Congressional Oversight of Administration: The
    Power of the Purse I*, 58 Pol. Sci. Q. 161 (1943) .......................................... 23

Edwin Meese III and Todd Gaziano, *Obama's Recess Appointments Are
    Unconstitutional*, The Washington Post (Jan. 5, 2012) ................................. 37

Kate Stith, *Congress' Power of the Purse*, 97 Yale L.J. 1343 (1988) .............................. 23

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

Joseph Story, *Commentaries on the Constitution* § 1342 (1833) ...................................... 22

Nikki Sutton, *President Obama Nominates Richard Cordray to Lead
Consumer Financial Protection Bureau* (July 18, 2011, 3:55 PM) ............................. 5

St. George Tucker, *Blackstone's Commentaries*  (1803) .................................................. 22

*Study on Federal Regulatory Agencies* 42 (1977) ............................................................ 22

James Q. Wilson, *Bureaucracy* 239 (1989) ....................................................................... 30

Press Release, White House, President Obama Announces Recess
Appointments to Key Administration Posts (Jan. 4, 2012) ........................................... 5

Rachel Witkowski, *Lawmakers Fume Over Unanswered Questions to
CFPB*, Am. Banker (Sept. 12, 2013) ........................................................................... 29

Joshua D. Wright, *The Antitrust/Consumer Protection Paradox: The Two
Policies at War With Each Other*, 121 Yale L.J. 2216 (2012) ..................................... 18

Todd Zywicki, *The Consumer Financial Protection Bureau: Savior or
Menace?*, 81 Geo. Wash L. Rev. 856 (2013) ................................................................ 19

# INTRODUCTION

The Consumer Financial Protection Bureau ("CFPB") was designed to be—and operates as—a government unto itself.  It is vested with sweeping executive authority to make and enforce rules that affect virtually every sector of the U.S. economy.  This authority is entrusted to a single individual, the Director, who serves a five-year term that is longer than the President's.  Yet the Director does not answer to the President, who is prohibited from removing him from office except for cause.  Indeed, the Director stands above the President, as by statute the Director's view of consumer financial protection law prevails over the President's if the two disagree.

Further, unlike the President, who is checked in the exercise of his executive authority by his dependence on congressional appropriations to fund the government that he runs, the CFPB is exempted from Congress's power of the purse and accompanying congressional oversight.  Indeed, the CFPB has been created as an entirely self-perpetuating entity, empowered to appropriate hundreds of millions of dollars annually from the Federal Reserve System for its own use, without approval or review from the legislative or executive branches.  Nor did Congress stop at freeing the CFPB from external restraints; in the asserted interest of fostering energy and independence, Congress also eschewed the creation of any internal checks or balances within the CFPB, such as those that are afforded by a deliberative multi-member commission structure.

The Constitution does not permit the creation of such an entity.  Rather, to protect individual liberty, the Constitution mandates a separation of powers that imposes checks, balances, and accountability on the exercise of governmental authority.  In creating the

CFPB, however, Congress deliberately nullified these checks and balances in pursuit of a particular vision of expediency, efficiency, and the perceived virtues of having an *un*accountable agency placed in charge of enforcing consumer financial protection law. Whatever the merits of this policy objective, the Constitution does not permit the amalgamation of such sweeping and unchecked authority in a single executive entity. Certain features of the CFPB viewed in isolation may or may not be constitutionally permissible, but the combination cannot be reconciled with the text or structure of the Constitution. Fidelity to the Constitution requires that the CFPB be invalidated.

The CFPB's constitutional infirmities were significantly exacerbated between January 4, 2011 and July 16, 2013, during which period the CFPB's substantial executive authority was illegally exercised by Richard Cordray, an individual who was not legally serving as the CFPB's Director. The rules that Cordray promulgated during that period must be invalidated not only because the CFPB is unconstitutional, but also for the separate reason that they were promulgated by an individual who was not the Director of the CFPB.

## BACKGROUND

### I.   THE PLAINTIFFS

State National Bank ("SNB" or "the Bank") is a community bank that has served Big Spring, Texas and other communities for over a century. The Competitive Enterprise Institute ("CEI") is a nonprofit organization dedicated to advancing the principles of individual liberty, limited government, and free enterprise. Towards those ends, CEI engages in research, education, and advocacy efforts involving a broad range of

regulatory, trade, and legal issues. The 60 Plus Association is a non-profit, non-partisan seniors advocacy group devoted to advancing free markets.

In *State National Bank of Big Spring v. Lew*, 795 F.3d 48 (D.C. Cir. 2015), the D.C. Circuit held that "[t]here is no doubt that the Bank is regulated by the Bureau," and "therefore has standing to challenge the constitutionality of the Bureau." *Id*. at 53. It further held that "[f]or the same reasons that the Bank has standing to challenge the constitutionality of the Bureau, the Bank has standing to challenge Director Cordray's recess appointment." *Id*. at 54.

## II.    THE CFPB

The CFPB was created in 2010 by Title X of the Dodd-Frank Act.[1] Dodd-Frank vested the CFPB with exclusive jurisdiction to administer eighteen "Federal consumer financial law[s]" previously administered by myriad other agencies. 12 U.S.C. §§ 5481(12), (14), 5511. And Dodd-Frank further vested the CFPB with newly created authority to regulate or prosecute "unfair, deceptive, or abusive" consumer lending practices. *Id.* § 5531(a).

The CFPB is an "independent bureau" within the Federal Reserve System. *Id.* § 5491(a); *see also* 44 U.S.C. § 3502(5) (designating the CFPB as an "independent regulatory agency," and thus excluding it from E.O. 12866's process for regulatory review by the Office of Management and Budget). Yet the CFPB is not answerable to the Federal Reserve, as the Federal Reserve cannot intervene in any CFPB matter or

---

[1] Formally, the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010).

proceeding or appoint or remove any CFPB employee.  *See* 12 U.S.C. § 5492(c).  And

the CFPB's Director enjoys the "defining hallmark of an independent agency":  the

President cannot remove him except "for inefficiency, neglect of duty, or malfeasance in

office." 12 U.S.C. § 5491(c)(3); Rachel E. Barkow, *Insulating Agencies: Avoiding*

*Capture Through Institutional Design*, 89 Tex. L. Rev. 15, 16 (2010) ("defining

hallmark").  Moreover, the Director serves longer than a full presidential term, being

accorded a minimum term of five years, and the authority to hold over in office

indefinitely until the Senate affirmatively confirms a successor (or the President makes a

genuine recess appointment).  12 U.S.C. § 5491(c)(1)-(2).

The CFPB is also entirely independent from Congress's power of the purse.

Instead of relying on congressional appropriations to fund its activities, the CFPB is

statutorily entitled to claim about $600 million annually from the Federal Reserve

System.[2]  Congress is prohibited even from attempting to "*review*" the CFPB's non-

appropriated budget.  *See* 12 U.S.C. § 5497(a)(2)(C) (emphasis added).

Dodd-Frank takes yet further steps to empower the CFPB Director to act without

restraint or accountability.  Eschewing the traditional, bipartisan "independent

---

[2] Specifically, the CFPB is entitled to up to 12 percent of the Federal Reserve's operating expenses. 12 U.S.C. § 5497(a).  According to the CFPB, this amounts to $539 million in 2015 and $605.5 million in 2016.  CFPB, *The CFPB Strategic Plan, Budget, and Performance Plan and Report* 21 (Feb. 2015),  http://files.consumerfinance.gov/f/201502_cfpb_report_strategic-plan-budget-and-performance-plan_FY2014-2016.pdf.

commission" model, in which several commissioners check and balance each other,[3] the

Act vests the agency's power in a single director. 12 U.S.C. § 5491(b)(1).

## III.    THE RECESS APPOINTMENT OF RICHARD CORDRAY

The President nominated Cordray to serve as the Director of the CFPB on July 18,

2011.[4]  The Senate never consented to that nomination.  Nevertheless, the President

appointed Cordray to the position on January 4, 2012,[5] under the purported authority of

the Recess Appointments Clause.  The same day, the President unilaterally appointed

three members to the National Labor Relations Board ("NLRB"), also under the

purported authority of the Recess Appointments Clause.  The Senate, however, was not in

recess at the time.  157 Cong. Rec. S883–S8784 (daily ed. Dec. 17, 2011).  To the

contrary, it was in the midst of a three-day break between pro forma sessions.  *Id*.

The NLRB recess appointments were challenged in court.  In *NLRB v. Noel

Canning*, the Supreme Court unanimously held that the President lacked the

constitutional authority to recess appoint the NLRB members because the Senate was not

---

[3] *See* Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 Cornell L. Rev. 769, 794 (2013) (describing benefits of independent commissions' multimember structure).

[4] Nikki Sutton, *President Obama Nominates Richard Cordray to Lead Consumer Financial Protection Bureau* (July 18, 2011, 3:55 PM), https://www.whitehouse.gov/blog/2011/07/18/president-obama-nominates-richard-cordray-lead-consumer-financial-protection-bureau.

[5] Press Release, White House, President Obama Announces Recess Appointments to Key Administration Posts (Jan. 4, 2012), http://www.whitehouse.gov/the-press-office/2012/01/04/president-obama-announces-recessappointments- key-administration-posts.

in recess on January 4, 2012, but was instead on a three-day break. 134 S. Ct. at 2550,

2556–57, 2573–78 (2014).  For that reason, the Court invalidated the NLRB recess

appointments as unconstitutional.  *Id.* at 2557, 2578.

      Prior to the Supreme Court's decision in *Noel Canning*, on January 24, 2013, the

President re-nominated Cordray to serve as Director of the CFPB—the position in which

he had purported to serve as a recess appointee since January 4, 2012.  The Senate

confirmed Cordray on July 16, 2013.  159 Cong. Rec. S5704–05 (daily ed. July 16,

2013).

      During the period of Cordray's alleged recess appointment—that is, between

January 4, 2012, and July 16, 2013—Cordray exercised final decision-making authority

concerning numerous CFPB rulemakings.  Many of those rulemakings impact plaintiffs,

particularly SNB.  The regulations that most directly impact SNB are the Electronic Fund

Transfers Rule (Regulation E), 77 Fed. Reg. 6193 (Feb. 7, 2012), 77 Fed. Reg. 50,243

(Aug. 20, 2012), and 78 Fed. Reg. 30,661 (May 22, 2013); the Mortgage Servicing Rules

Under the Real Estate Settlement Procedures Act (Regulation X), 78 Fed. Reg. 10,696

(Feb. 14, 2013); the Escrow Requirements Under the Truth in Lending Act (Regulation

Z), 78 Fed. Reg. 4725 (Jan. 22, 2013); the Ability-to-Repay and Qualified Mortgage

Standards Under the Truth in Lending Act (Regulation Z), 78 Fed. Reg. 6407 (Jan. 30,

2013); and the Integrated Mortgage Disclosures Under the Real Estate Settlement

Procedures Act (Regulation X) and the Truth In Lending Act (Regulation Z), 77 Fed.

Reg. 51,115 (Aug. 23, 2012) (NPRM, finalized Dec. 31, 2013, 78 Fed. Reg. 79,730).

The impacts of these rules are described in Plaintiffs' Statement of Undisputed Material Facts, filed herewith.

On August 30, 2013, Cordray published a one-paragraph "notice" in the Federal Register, "[t]o avoid any possible uncertainty" about the validity of the CFPB's actions taken during the period of his recess appointment. The notice purported to "affirm and ratify any and all actions" Cordray took on behalf of the CFPB during that time. 78 Fed. Reg. 53,734 (Aug. 30, 2013).

### SUMMARY OF ARGUMENT

In a constitutional system that separates power among the legislative, executive, and judicial branches, "independent" agencies exist as a limited exception to that fundamental structural rule. The President has general power to "keep [agency heads] accountable" by "removing them from office, if necessary." *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U. S. 477, 483 (2010) (citing *Myers v. United States*, 272 U.S 52 (1926)). But Congress "can, *under certain circumstances*, create independent agencies" run by officers removable only for good cause. *Id.* (emphasis added) (citing *Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935)).

Notably, the courts have not allowed this limited exception to swallow the general rule that checks, balances, and accountability are necessary elements of governance under our constitutional structure. In *Free Enterprise Fund*, the Supreme Court stressed that *Humphrey's Executor* represents the outermost limit on agency independence. 561 U.S. at 514 ("While we have sustained in certain cases limits on the President's removal power, the act before us imposes a new type of restriction[.]"). Thus, the Sarbanes-Oxley

7

Act violated the Constitution by creating an agency with two layers of independence from the President.

The Dodd-Frank Act crosses the constitutional line yet again—not by giving an independent regulatory agency an unprecedented double layer of insulation from the President, but rather by giving it an unprecedented double lack of accountability to the political branches. The CFPB has broad executive regulatory and enforcement powers, yet it has been structured to remove *all* meaningful executive, legislative, and internal checks. As a result, the CFPB is far more unaccountable and unchecked than the FTC of *Humphrey's Executor*.

Our constitutional system of government does not permit Congress to create self-perpetuating entities with broad powers to regulate and enforce that exist outside of, and are unanswerable to, both the executive and legislative branches. *See, e.g.*, Federalist No. 9 (Hamilton) ("The regular distribution of power into distinct departments [and] the introduction of legislative balances and checks …. are means, and powerful means, by which the excellences of republican government may be retained and its imperfections lessened or avoided."); *Free Enter. Fund*, 561 U.S. at 499. Yet the Dodd-Frank Act vests the CFPB with vast executive authority, exempts it from accountability to the political branches, provides no mitigating internal checks and balances, and allows it to make and execute law on its own *indefinitely* without further involvement or oversight by Congress or the President.

Congress evidently saw the CFPB's structural "independence" as a salutary feature that it hoped would make it more energetic and effective. But the liberty-

protecting value of checks, balances, oversight, and accountability cannot be sacrificed at the altar of expediency. *Bowsher v. Synar*, 478 U.S. 714, 736 (1986) ("Convenience and efficiency are not the primary objectives—or the hallmarks—of democratic government."); *Free Enter. Fund*, 561 U.S. at 498 (separation of powers violations are not saved by perceived need for "technical competence" and "apolitical expertise" (quotations omitted)).  Nor is the CFPB saved by the fact that Congress and the President jointly participated in its creation, as "[n]either Congress nor the Executive can agree to waive" the Constitution's "structural protection." *Freytag v. Comm'r*, 501 U.S. 868, 880 (1991); *Free Enter. Fund*, 561 U.S. at 498.

The Government may attempt to defend the CFPB with a piecemeal approach: pointing to a single structural feature of the CPFB (e.g., for-cause removal protection), and citing cases in which the courts have endorsed that specific feature, in isolation. Neither this Court nor the Supreme Court has ever blessed the unprecedented combination of sweeping executive powers and stripped-away constitutional restraints that is embodied in the CFPB, however.  That combination must be viewed by this Court *as a whole*, and when so viewed it cannot be reconciled with the constitutionally required separation of powers. *Ass'n of Am. R.R. v. DOT*, 721 F.3d 666, 673 (D.C. Cir. 2013) ("just because two structural features raise no constitutional concerns independently does not mean Congress may combine them in a single statute"), *rev'd on other grounds*, 136 S. Ct. 1225 (2015); *Free Enter. Fund*, 561 U.S. at 496 ("This novel structure does not merely add to the Board's independence, but transforms it.").  The CFPB is

unconstitutionally constituted, and Title X of the Dodd-Frank Act must be declared invalid.

In addition, plaintiffs seek redress for the multiple occasions between January 2011 and July 2013 when the CFPB's rulemaking authority was illegally exercised by Richard Cordray, an individual who was not then legally serving as the CFPB's Director. The illegality of Cordray's January 2011 recess appointment is definitively established by the Supreme Court's decision in *Noel Canning*. During the roughly eighteen months that Cordray was illegally exercising the CFPB's various authorities, he promulgated several rules that harm plaintiffs. Although Cordray later attempted to retroactively bless his illegal actions through a statement published in the Federal Register, no doctrine permits rules that were illegally promulgated in violation of statutory requirements to be rendered legal through such a notice. The rules in question must accordingly be invalidated—not only because the agency that promulgated them is unconstitutional, but also for the independent reason that they were promulgated by an individual who was not the Director of the CFPB, in violation of statutory requirements.

## ARGUMENT

### I. CONGRESS VESTED THE DIRECTOR OF THE CFPB WITH BROAD EXECUTIVE AUTHORITY, BUT PLACED HIM OUTSIDE THE PRESIDENT'S OVERSIGHT AND CONTROL

#### A.    The CFPB has expansive executive authority.

The Dodd-Frank Act vests the CFPB with broad authority to exercise executive power in its designated domain. The CFPB has the power to "establish the general policies of the [CFPB] with respect to *all executive and administrative functions*,"

10

including "implementing the Federal consumer financial laws through rules, orders,

guidance, interpretations, statements of policy, examinations, and enforcement actions";

deciding on the appropriate "use and expenditure of funds" for those purposes;

"coordinat[ing] and oversee[ing] the operation of all administrative, enforcement, and

research activities of the [CFPB];" and "performing such other functions as may be

authorized or required by law."  12 U.S.C. § 5492(a)(4), (9), (10), (11) (emphasis added).

Among these broad powers, Dodd-Frank grants the CFPB exclusive jurisdiction to

administer eighteen "Federal consumer financial law[s]" previously administered by

other agencies, 12 U.S.C. §§ 5481(12) & (14), 5511, and further vests the CFPB with

newly created authority to regulate and prosecute "unfair, deceptive, or abusive"

consumer lending practices.  *Id.* § 5531(a).  In sum, the core purpose of the CFPB is "to

implement and, where applicable, enforce Federal consumer financial law," *id.* §

5511(a)—that is, to "take Care that the [Federal consumer financial laws] be faithfully

executed," *see* U.S. Const. Art. II, § 4, cl. 4—a clear executive responsibility.

> **B.     The CFPB executes the law but does not answer to, and is not
> restrained by, the President.**

"But where, in all this, is the role for oversight by an elected President?" *Free

Enter. Fund*, 561 U.S. at 499.  Because the CFPB performs a role constitutionally

committed to the executive branch, it must remain ultimately accountable to the President

as the Chief Executive.  *See* U.S. Const. Art. II, § 1, cl. 1; *see also Free Enter. Fund*, 561

U.S. at 484.  Yet the Congress and the President that enacted the Dodd-Frank Act took

pains to ensure this was not the case.  The CFPB and its Director have been thoroughly insulated from future Presidents' control.

In its day-to-day operations, the CFPB operates entirely outside the President's sphere of influence.  The Director of the CFPB is not required to coordinate with any other executive branch official regarding "legislative recommendations, or testimony or comments on legislation."  12 U.S.C. § 5492(c)(4).  Likewise, the Director is independent from the President's financial oversight.  Though he must provide the Director of the Office of Management and Budget ("OMB") copies of certain financial reports, he has no "obligation … to consult with or obtain the consent or approval of the Director of the [OMB] with respect to any report, plan, forecast, or other information," and the OMB lacks "any jurisdiction or oversight over the affairs or operations of the [CFPB]."  *Id.* § 5497(a)(4)(E).

Most significantly, the Director of the CFPB is protected from removal and, as a result, from ultimate accountability to the Chief Executive.  Once appointed, the Director serves a five-year term and can be removed only for "inefficiency, neglect of duty, or malfeasance in office."  *Id.* § 5491(c)(3).  This term can extend indefinitely, until the Senate affirmatively confirms his successor (or the President makes a genuine recess appointment).  *Id.* § 5491(c)(2).  The Director therefore cannot be removed by the President merely for failing to execute the law in a manner inconsistent with the President's policies and directives.  *See Free Enter. Fund*, 561 U.S. at 496.  And if the President and the Director disagree in the field of consumer finance, by statute the Director's view prevails.  *See* 12 U.S.C. § 5512(b)(4).

12

In effect, the Dodd-Frank Act establishes the Director as a mini-President of consumer finance, vested with sweeping executive authority within his prescribed domain, yet entirely unaccountable in its exercise to the Chief Executive (or to the Congress).  This structure cannot be reconciled with the constitutionally prescribed separation of powers, as explained by the Supreme Court in *Free Enterprise Fund*, 561 U.S. 477, and in what the Court there described as its "landmark" decision in *Myers v. United States*, 272 U.S. 52 (1926).  Those cases establish that the President's constitutional responsibilities require that he have the authority to remove appointed executive officers, and that only "under certain circumstances" can even "limited restrictions" be imposed on the removal power, *Free Enter. Fund*, 561 U.S. at 483, 495.  These holdings recognize that the removal power is "perhaps *the* key means" that the President has for "appointing, overseeing, and controlling those who execute the laws.'" *Id.* at 501 (quoting 1 Annals of Cong. 463 (1789)).  After all, "[t]he President cannot 'take Care that the Laws be faithfully executed' if he cannot oversee the faithfulness of the officers who execute them." *Free Enter. Fund*, 561 U.S. at 484.  And the Constitution "requires that a President chosen by the entire Nation oversee the execution of the laws." *Id.* at 499.

Yet as is discussed in more detail below, none of the "certain circumstances" the courts have deemed sufficient to warrant even "limited restrictions" being imposed on the removal power are present in the CFPB.  Its executive authority is not minor or narrow.  It has no internal checks and balances.  And it is accorded a perpetual funding supply outside the appropriations process that exempts it from Congress's power of the purse.

13

This combination of features has produced a "novel structure [that] does not merely add to the [CFPB's] independence, but transforms it." *Id.* at 496.

If for-cause removal restrictions can be applied to the Director of an agency with the powers and structural features of the CFPB, then *Myers* must be entirely overruled, and nothing prevents Congress from imposing similar removal restrictions on the head of every Department of the government. At minimum, *Myers* must be understood to establish that the Constitution guarantees the President authority to remove at will any executive official that exercises the powers of a Department head. *Myers*, 272 U.S. at 133–35 (noting that the heads of the "executive departments"—also known as "cabinet ministers"—are designed to "aid [the President] in the performance of the great duties of his office," especially in ensuring that he "take care that the laws be faithfully executed" (quotation omitted)); *id*. at 176 (declaring invalid the Tenure of Office Act of 1867, which restricted the President's ability to remove Cabinet Secretaries and other executive officers). And in *Free Enterprise Fund*, the Court reaffirmed this central holding of *Myers*, holding that "the separation-of-powers principle guarantees the President the authority to dismiss certain Executive Branch officials at will." *Free Enter. Fund*, 561 U.S. at 516 (citing *Myers*, 272 U.S. at 52). The Court elaborated, "[s]ince 1789, the Constitution has been understood to empower the President to keep [executive] officers accountable—by removing them from office, if necessary." *Id.* at 483 (citing *Myers*, 272 U.S. at 52).

What, then, differentiates the Director of the CFPB from a Cabinet-level official? Cabinet Secretaries cannot be distinguished from the Director on the ground that they are

"purely executive," but that because of his role in making rules and adjudicating disputes the Director is not.  *Cf. Humphrey's Ex'r*, 295 U.S. at 630-32 (distinguishing *Myers* on the ground that it involved "purely executive officials").  Many Cabinet Secretaries perform the very same kind of rulemaking and adjudicative functions that the Director does.[6]  And the Director's authorities are by no means limited to rulemaking and adjudication.  *Cf. Humphrey's Ex'r*, 295 U.S. at 628 (finding FTC acted "as a legislative or as a judicial aid" rather than an eye or arm of the executive).  The Director's powers simply cannot be meaningfully distinguished from those of formally recognized Department heads.  *See Decatur v. Paulding*, 39 U.S. 497, 515 (1840) ("The head of an executive department of the government, in the administration of the various and important concerns of his office, is continually required to exercise judgment and discretion.  He must exercise his judgment in expounding the laws and resolutions of Congress, under which he is from time to time required to act.").

True, Congress has slapped the "independent" label on the CFPB.  But the Constitution does not permit Congress to talismanically invoke the word "independent" to transform any agency—no matter how broad and wide its law-executing authority— from an arm of the executive into an unaccountable bureaucratic entity.  *Humphrey's*

---

[6] *See, e.g.*, *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) ("[T]he Secretary decides more than 2 million claims for disability benefits each year, of which more than 200,000 are reviewed by administrative law judges.");  *DiCenso v. Cisneros*, 96 F.3d 1004 (7th Cir. 1996) (HUD secretary adjudication of hostile housing environment sexual harassment); *Beavers v. Sec'y of HEW*, 577 F.2d 383, 386 (6th Cir. 1978) ("[T]he Secretary is entrusted with the duty of making all findings of fact . . . the statutorily-mandated deference to findings of fact runs in favor of the Secretary, not the administrative law judge….").

*Executor* did not remotely sanction such a result.  Nor does Congress's apparent hope

that unaccountability would render the CFPB more energetic and efficient alter the

analysis.  "[C]onvenience and efficiency are not the primary objectives—or the

hallmarks—of democratic government," and the "fact that a given law or procedure is

efficient, convenient, and useful in facilitating functions of government, standing alone,

will not save it if it is contrary to the Constitution."  *Free Enter. Fund*, 561 U.S. at 499

(alteration in original) (quoting *Bowsher*, 478 U.S. at 736).

### C.    The CFPB is unlike other executive entities approved by the courts.

This case is materially unlike others in which the Supreme Court has upheld

restrictions on the President's removal power.  In *Morrison v. Olson*, the Supreme Court

upheld a statute that insulated a special "independent counsel" from Presidential

oversight and removal, but it did so because the independent counsel had "limited

jurisdiction and tenure and lack[ed] policymaking or significant administrative

authority."  487 U.S. 654, 691, 696 (1988).  Because the independent counsel had limited

enforcement powers and no policy-setting role, the Court did not think that restrictions on

the President's ability to remove him "unduly intefer[ed] with the role of the Executive

Branch."  *Id.* at 693.

Likewise, in *Humphrey's Executor v. United States*, the Court upheld a for-cause

removal requirement on members of the Federal Trade Commission ("FTC") in

substantial part because the Commission was statutorily created as a "nonpartisan" entity

and had almost no role in setting executive policy.  295 U.S. at 624.[7]  The FTC was

structured to ensure a degree of political impartiality:  By statute, no more than three of

the FTC's five commissioners could come from the same political party.  *Id.* at 611, 624.

And the FTC commissioners were intended to act primarily "as a legislative or … judicial

aid[]," using their expertise to carry out predominately ministerial and adjudicative tasks,

rather than functioning as "arm[s] or … eye[s] of the executive."  *Id.* at 628.[8]  Because

the FTC ultimately served "as a means of carrying into operation legislative and judicial

powers" and ultimately acted "as an agency of the legislative and judicial departments,"

Congress could impose a good-cause removal requirement to preserve some of the

agency's independence from the President.

### D.     Congress failed to create any mitigating internal checks and balances within the CFPB.

By design, the CFPB was created with *no* mitigating internal checks and balances.

By placing a single Director at its head—beholden to no one, charged with running a self-

perpetuating executive agency with vast enforcement authority, and able to act

---

[7] *Humphrey's Executor*'s continued validity has been called into question by the reasoning of *Free Enterprise Fund*, and plaintiffs here preserve the argument that it should be overruled.

[8] The current FTC has been accorded additional executive powers that go beyond the quasi-legislative and quasi-judicial functions that were identified by the Supreme Court in *Humphrey's Executor* as the basis for the Court's passing muster on the FTC's for cause removal.  The impact of those additional features on the FTC's constitutionality has not yet been considered by the courts.  In any event, today's FTC is subject to a variety of checks and balances that do not constrain the CFPB—most notably, appropriation by Congress.

unilaterally and without need to deliberate or persuade—Congress has exacerbated the underlying separation of powers violation.

The Supreme Court has on several occasions favorably cited multi-member commission structures as providing useful checks, balances, and accountability.  In *Humphrey's Executor*, the Supreme Court upheld for-cause removal with respect to the FTC in part because the Commission was expressly created as a "non-partisan" entity; by statute, no more than three of the five commissioners serving on the Commission could come from the same political party.  295 U.S. 602, 611, 624 (1935).  Similarly, in *A.L.A. Schechter Poultry Corp. v. United States*, in striking down an impermissible delegation of authority, the Supreme Court expressly distinguished other grants of power to multi-member commissions, including the FTC, the Interstate Commerce Commission, and the Radio Commission.  295 U.S. 495 (1935).

Much has been written on the benefits of multi-member bodies relative to sole directorships.  For example, one scholar (later an FTC commissioner himself) has explained that a single directorship prevents "the agency from enjoying the benefits of deliberation which produces more informed judgments about the direction of regulatory policy."  Joshua D. Wright, *The Antitrust/Consumer Protection Paradox:  The Two Policies at War With Each Other*, 121 Yale L.J. 2216, 2260 (2012).  "[M]ultimember structures," on the other hand, foster collegiality and thereby "the potential for exposure to a variety of views and improved decisionmaking."  *Id*.  Others have explained that "collective governance can constrain overconfidence or cognitive errors by providing critical assessments and viewpoints of proposals," and "can also constrain shirking, self-

dealing, and capture by providing multilateral monitoring and raising the number of people who need to be corrupted for improper action to occur."  Todd Zywicki, *The Consumer Financial Protection Bureau: Savior or Menace?*, 81 Geo. Wash L. Rev. 856, 897–98 (2013).  The bipartisan multimember commission structure has thus been the standard one for independent agencies for over 125 years.  *See* Ronald J. Krotoszynski, Jr. et al., *Partisan Balance Requirements in the Age of New Formalism*, 90 Notre Dame L. Rev. 941, 962–983 (2015) (explaining that discussion regarding whether to have a bipartisan commission structure is often devoid from agencies' legislative histories, because it was assumed that such a structure would be used).

### E.      The Executive must defer to the CFPB.

The Dodd-Frank Act further insulates the CFPB from the President's control by elevating the CFPB's interpretation of consumer financial laws above that of all other executive agencies charged with enforcing those laws.[9]  Specifically, the statute provides that "the deference that a court affords to the Bureau with respect to a determination by the Bureau regarding the meaning or interpretation of any provision of a Federal consumer financial law shall be applied as if the Bureau were the only agency authorized to apply, enforce, interpret, or administer the provisions of such Federal consumer financial law."  12 U.S.C. § 5512(b)(4)(B).  This provision further diminishes the

---

[9] Title X of the Dodd-Frank Act divides federal supervisory and enforcement responsibilities for consumer financial law between the federal banking regulators, who supervise and enforce consumer financial laws for banks whose assets are less than or equal to $10 billion, and the CFPB, which is the primary supervisor and enforcement authority for banks whose assets exceed $10 billion.  *See* 12 U.S.C. §§ 5514, 5515, 5516.

President's authority to interpret and execute the consumer financial laws, and indeed places the President in a position of subservience to the CFPB, by requiring the heads of those financial regulatory agencies that are subject to removal at will by the President (*e.g.*, the Comptroller of the Currency—*see* 12 U.S.C. § 2) to defer to the CFPB Director—over whom the President has no control—rather than to the President.

## II.   THE CFPB ENJOYS "FULL INDEPENDENCE" FROM CONGRESS

### A.   The Dodd-Frank Act frees the CFPB from Congress's "power of the purse."

The CFPB is not funded by appropriations.  Instead, the Dodd-Frank Act gives the CFPB a perpetual, annual entitlement to hundreds of millions of dollars from the Federal Reserve. 12 U.S.C. § 5497(a).  Indeed, the Dodd-Frank Act goes so far as to expressly prohibit Congress even from attempting to "*review*" the CFPB's automatically funded budget.  *See id.* § 5497(a)(2)(C) (emphasis added).

The President and Congress included this provision in the Dodd-Frank Act in order to free the CFPB from congressional oversight.  S. Rep. No. 111-176, at 163 (2010)).  They characterized this as a salutary feature, viewing such funding as "absolutely essential" to ensuring the agency's "independent operations"—independent, that is, from future Congresses.  S. Rep. No. 111-176, at 163.  But the D.C. Circuit, the Supreme Court, and the Framers would characterize it quite differently.

**B.     The Constitution's "power of the purse" is Congress's most powerful tool for overseeing and holding accountable agencies exercising federal law.**

The Constitution entrusts taxpayers' money to Congress, requiring that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. As the D.C. Circuit recognizes, the Constitution commits that power and responsibility to Congress for a very specific reason: "The Framers placed the power of the purse in the Congress in large part because the British experience taught that the appropriations power was a tool with which the legislature could resist 'the overgrown prerogatives of the other branches of government.'" *Noel Canning v. NLRB*, 705 F.3d 490, 510 (D.C. Cir. 2013), *aff'd*, 134 S. Ct. 2250 (2014).

On this point, the Framers were emphatic. James Madison stressed that "[t]his power over the purse may, in fact, be regarded as the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people, for obtaining a redress of every grievance, . . . for carrying into effect every just and salutary measure," and for "reducing . . . all the overgrown prerogatives of the other branches of the government." Federalist No. 58 (Madison). Alexander Hamilton was all the more blunt: "[T]hat power which holds the purse-strings absolutely, must rule." 1 *Works of Alexander Hamilton* 218–19 (Henry Cabot Lodge, ed., 1904) (Letter to James Duane).[10] Thus, while the Executive Branch "holds the sword," Congress "prescribes the

---

[10] *See also* 2 *Works of Alexander Hamilton* 8–9 (Address to New York Ratification Convention) ("Will any man who entertains a wish for the safety of his country trust the sword and the purse with a single Assembly, organized on principles so defective?"); *id.* at 61 ("Neither [the Legislative Branch] nor the [Executive Branch] shall have both [the

rules by which the duties and rights of every citizen are to be regulated" and, to that end, also "commands the purse." Federalist No. 78 (Hamilton).

The earliest major constitutional commentators, too, reiterated the importance of Congress's power of the purse as both a check against the other parts of government and a means of accountability between Congress and the Executive to the People.  "The power to control, and direct the appropriations," wrote Joseph Story, "constitutes a most useful and salutary check upon profusion and extravagance, as well as upon corrupt influence and public peculation."  3 Joseph Story, *Commentaries on the Constitution* § 1342 (1833); *see also* 1 St. George Tucker, *Blackstone's Commentaries*, Appx., p. 362 (1803) ("All the expenses of government being paid by the people, it is the right of the people . . . to be actually consulted upon the disposal of the money which they have brought into the treasury . . . .").

Modern Congresses have recognized the significance of their "power of the purse," not merely as an end in itself, but as a means for ensuring that the other parts of government conduct their work in a manner consistent with the law, the public interest, and the public will.  "The appropriations process is the *most potent form* of congressional oversight, particularly with regard to the federal regulatory agencies."  S. Comm. on Gov't Operations, 95th Cong. 1st Sess., 2 *Study on Federal Regulatory Agencies* 42 (1977) (emphasis added); *see also* 1 GAO, *Principles of Federal Appropriations Law*, pp.

---

power of the purse and the sword]; because this would destroy that division of powers on which political liberty is founded, and would furnish one body with all the means of tyranny. But when the purse is lodged in one branch, and the sword in another, there can be no danger.").

1-4 to 1-5 (3d ed. 2004) ("The Appropriations Clause has been described as 'the most important single curb in the Constitution on Presidential power.' . . . [T]he congressional power of the purse reflects the fundamental proposition that a federal agency is dependent on Congress for its funding.").  Congress's continued recognition of the fundamental significance of its "power of the purse" is most recently evidenced by the House of Representatives' decision to file a federal lawsuit to prevent the executive branch from undertaking activities beyond the limits of Congress's appropriations—or, in this court's words, "to preserve its power of the purse and to maintain constitutional equilibrium between the Executive and the Legislature."  *U.S. House of Representatives v. Burwell*, --- F. Supp. 3d ----, 2015 WL 5294762, at *1 (D.D.C. Sept. 9, 2015).

Myriad legal scholars have highlighted the fact that the power of the purse is the foundation for "most of the oversight that Congress exercises over administration."  *See, e.g.*, Arthur W. Macmahon, *Congressional Oversight of Administration: The Power of the Purse I*, 58 Pol. Sci. Q. 161, 173 (1943).[11]  Congress has relied on "limitations riders"

---

[11] *See also, e.g.*, Kate Stith, *Congress' Power of the Purse*, 97 Yale L.J. 1343, 1360 (1988) ("Appropriations limitations constrain every government action and activity and, assuming general compliance with legislative prescriptions, constitute a low-cost vehicle for effective legislative control over executive activity."); Jack M. Beermann, *Congressional Administration*, 43 San Diego L. Rev. 61, 84 (2006) ("One way in which Congress has supervised agencies with great particularity, both formally and informally, is through the appropriations process"); Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 Cornell L. Rev. 769, 816 (2013) ("Congress primarily exerts influence over agency heads . . . through the power of the purse. Thus '[an] agency has an incentive to shade its policy choice toward the legislature's ideal point to take advantage of that inducement.'" (second alteration in original) (quoting Randall L. Calvert *et al.*, *A Theory of Political Control and Agency Discretion*, 33 Am. J. Pol. Sci. 588, 602 (1989)); Joseph Cooper & Ann Cooper, *The*

since at least the 1870s to rein in the executive branch and agencies.  Neal E. Devins,

*Regulation of Government Agencies Through Limitation Riders*, 1987 Duke L.J. 456, 462

(1987); *see also* Jason A. MacDonald, *Congressional Power over Executive Branch*

*Policy Making: Limitations on Bureaucratic Regulations, 1989-2009*, 43 Pres. Studies Q.

523 (2013).  But appropriations are all the more "critical to governing in an era

characterized by large delegation to the executive branch."  Jason A. MacDonald,

*Limitation Riders and Congressional Influence Over Bureaucratic Policy Decisions*, 104

Am. Pol. Sci. Rev. 766, 781 (2010); *see also id.* ("[L]imitation riders provide Congress

with much more influence . . . over the substance of regulations about which members of

Congress, and their constituencies, care for political and policy reasons.").

And Congress's "power of the purse" is all the more important with respect to the

independent regulatory agencies not subject to direct presidential oversight: "The most

constant and effective control which Congress can exercise over an independent

regulatory commission is financial control. . . . Viewed broadly, the financial control

exercised by Congress over the [independent] commissions is a necessary and desirable

form of supervision."  Robert E. Cushman, *The Independent Regulatory Commissions*

674–75 (1972).  For example, the FCC policy change at the center of *FCC v. Fox*, the

Supreme Court's landmark case on agency discretion to change policies, was itself

"spurred by significant political pressure from Congress," via "the congressional

---

*Legislative Veto & the Constitution*, 30 Geo. Wash. L. Rev. 467, 491 (1961) ("Congress
constantly uses the appropriations bills to control and supervise executive decision-
making with regard to both policy and operations.").

committees responsible for oversight and appropriations with respect to the relevant agency." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 523 & nn.4–5 (2009) (plurality op.).

The Supreme Court and D.C. Circuit share this appreciation of the power of the purse.  The Appropriations Clause is nothing less than "a bulwark of the Constitution's separation of powers among the three branches of the National Government," a power that is "particularly important as a restraint on Executive Branch officers." *U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1347 (D.C. Cir. 2012); *see also Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 425 (1990) ("Any exercise of a power granted by the Constitution to one of the other Branches of Government is limited by a valid reservation of congressional control over funds in the Treasury."); *United States v. Richardson*, 418 U.S. 166, 178 n.11 (1974) ("The ultimate weapon of enforcement available to Congress [to rein in an rogue agency] would, of course, be the 'power of the purse.'").

Indeed, in *Free Enterprise Fund*, the majority and dissent *both* stressed the power of the purse's paramount importance—and each side invoked it in support of its own broader constitutional argument.  Justice Breyer, writing for the four dissenting justices, downplayed the practical importance of "for cause" removal by pointing out that even when the President can threaten to remove officers, that influence is dwarfed by Congress's *fiscal* influence: "the decision as to who controls the agency's budget requests and funding, the relationships between one agency or department and another, as well as more purely political factors (including Congress' ability to assert influence) are more likely to affect the President's power to get something done." *Free Enter. Fund*, 561 U.S.

25

at 524 (Breyer, J., dissenting).  Replying to that argument, the Court's majority did not downplay the power of the purse; rather, it stressed that the sheer potency of this core legislative power—Congress's "plenary control over the salary, duties, and even existence of executive offices"—is the very reason why the President must retain full power to act as a counterweight against Congress's influence.  *Id.* at 500.

The courts' recognition of these principles is more than merely theoretical; the principles undergird other doctrines respecting the Constitution's separation of powers. In decisions denying standing to private parties challenging government policies, for example, the Supreme Court and D.C. Circuit have stressed that recourse is better found in the purse-strings of Congress.  Thus, when the Supreme Court dismissed a suit challenging Vietnam-era military surveillance of American civilians, it stressed that the task of monitoring "the wisdom and soundness of Executive action" is "a role [that] is appropriate for the Congress acting through its committees and the 'power of the purse'; it is not the role of the judiciary . . . ."  *Laird v. Tatum*, 408 U.S. 1, 15 (1972); *see also Allen v. Wright*, 468 U.S. 737, 760 (1984) (quoting *Laird* in denying standing to lawsuit against federal government to change tax-exemption policy).  More recently, when the D.C. Circuit denied judicial review to those challenging federal regulators' decision not to modify auto safety standards, it pointed the challengers to Congress: "[t]o the extent Congress is concerned about Executive under-regulation or under-enforcement of statutes, it also may exercise its oversight role and power of the purse." *Pub. Citizen v. NHTSA*, 489 F.3d 1279, 1295 (D.C. Cir. 2007).

Indeed, the D.C. Circuit's prohibition against individual congressmen bringing suit to restrain agencies reflects the fact that Congress ordinarily has its constitutional "power of the purse" at hand to rein in the agency. *Harrington v. Bush*, 553 F.2d 190, 213 (D.C. Cir. 1977) ("The abuse of delegated authority does not invade the lawmaking power of Congress or appellant; all the traditional alternatives related to the 'power of the purse' remain intact.").

Moreover, even when the specific question of Congress's "power of the purse" is not expressly invoked, it still can serve to silently undergird significant doctrines involving the separation of powers. In *Humphrey's Executor* itself, for example, the Supreme Court justified the FTC's independence from the President on the basis that Congress remained the agency's "master." 295 U.S. at 630; *see also id.* (describing the FTC as "wholly disconnected from the executive department" but "an agency of the legislative . . . department[]"). Freed from Congress's power of the purse, the FTC would have been no such agent, and Congress no such master. *Cf. Fox*, 556 U.S. at 523 ("The independent agencies are sheltered not from politics but from the President, and it has often been observed that their freedom from presidential oversight (and protection) has simply been replaced by increased subservience to congressional direction.").

### C.     The CFPB has demonstrated that Congress cannot meaningfully oversee and restrain an agency without the power of the purse.

Given that the Appropriations Power is a bulwark of Congress's legislative oversight authority, scholars have come to recognize that an agency's protection against the President's removal authority is not the only form of "independence" that an agency

may enjoy.  Protection against Congress's power of the purse is another: if an agency can rely upon "an independent funding source," then an independent agency "is insulated from Congress as well as the President."  Rachel E. Barkow, *Insulating Agencies: Avoiding Capture Through Institutional Design*, 89 Tex. L. Rev. 15, 44 (2010); *see also id.* at 43 ("To be sure, the power of the purse is one of the key ways in which democratic accountability is served.").[12]

The CFPB proves the theory as a matter of fact.  The Dodd-Frank Act's framers gave the CFPB a permanent source of non-congressional funding for the express goal of ensuring the agency's full independence from future Congresses.  And the CFPB does not hesitate to assert this independence, in both word and deed.  The CFPB recognizes that its legal entitlement to hundreds of millions of dollars in "funding outside the congressional appropriations process" ensures its "full independence" from Congress. *Consumer Financial Protection Bureau Strategic Plan: FY 2013-FY 2017* 36 (Apr. 2013), http://files.consumerfinance.gov/f/strategic-plan.pdf.  As such, while the CFPB may sometimes agree to appear before congressional committees, submit reports to Congress, or undergo GAO audits, the agency faces no serious consequences for refusing to respond meaningfully to Congress's attempts to conduct oversight regarding the agency's regulatory and enforcement activities.

---

[12] *See also* Charles Kruly, *Self-Funding and Agency Independence*, 81 Geo. Wash. L. Rev. 1733 (2013); Note, *Independence, Congressional Weakness, and the Importance of Appointment: The Impact of Combining Budgetary Autonomy with Removal Protection*, 125 Harv. L. Rev. 1822 (2012); Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 Cornell L. Rev. 769, 782–83 (2013) (reiterating Barkow's focus on budgetary autonomy).

Congressmen and Senators can write letters to the CFPB, complaining that the agency is "wholly unresponsive to our requests for additional budget information,"[13] or that the agency "has yet to explain its basis for" controversial policies.[14]  At hearings, Congress can criticize the agency's failure to answer questions about its secret "data gathering activities," and "deman[d] to know why the agency's director . . . and his staff have not yet answered roughly 200 questions sent to the agency."[15]  Congress can do all of those things, but without the power of the purse its ability to secure answers to its questions, let alone to guide the agency's policies, is severely limited.

This dynamic was fully on display at a hearing earlier this year, at which a Congresswoman asked CFPB Director Cordray for information as to who at the agency was directing renovation projects costing hundreds of millions of dollars.  The Director declined to answer her question; instead, he asked her bluntly, "*why does that matter to*

---

[13]  Letter from Rep. Randy Neugebauer, Chairman, H.R. Comm. on Fin. Servs., Subcomm. on Oversight and Investigations, *et al.* to Richard Cordray, Director of the CFPB, at 1 (May 2, 2012),  http://www.aba.com/aba/documents/winnews/ CFPB_OversightMemo_050212.pdf.

[14]  Letter from Sen. Rob Portman, *et al.* to Richard Cordray, Director of the CFPB, at 1 (Oct. 30, 2013),  http://www.portman.senate.gov/public/index.cfm/files/ serve?File_id=ad73c8d1-39c6-4c4f-80da-c13c57013b12.

[15]  Rachel Witkowski, *Lawmakers Fume Over Unanswered Questions to CFPB*, Am. Banker (Sept. 12, 2013), http://www.americanbanker.com/issues/178_177/ lawmakers-fume-over-unanswered-questions-to-cfpb-1062015-1.html. A year later, an investigation by the GAO revealed that the CFPB had collected information regarding over 10 million individuals' credit reports, 29 million active mortgage loans, and up to 75 million credit card accounts. GAO, *Consumer Financial Protection Bureau: Some Privacy and Security Procedures for Data Collections Should Continue Being Enhanced* 15–16 (Sept. 14, 2014), http://www.gao.gov/assets/670/666000.pdf. The GAO further concluded that the "CFPB lacks written procedures and documentation needed to address privacy risks and better ensure ongoing compliance with requirements." *Id.* at 37 (capitalization modified).

*you?*" *See* U.S. House of Representatives, Committee on Financial Services, "Committee Pushes for Accountability and Transparency at the CFPB" (Mar. 6, 2015) (emphasis added), http://financialservices.house.gov/blog/?postid=398780.[16]

The loss of Congress's constitutional power over the CFPB is not ameliorated by the fact that a previous Congress passed the statute eliminating Congress's power of the purse. After all, an individual Congress, like an individual President, "might find advantages in tying [its] own hands." *Free Enter. Fund*, 561 U.S. at 497; *see also* James Q. Wilson, *Bureaucracy* 239 (1989) ("[P]oliticians have good reasons to tie their own hands. But once tied, they cannot easily be untied."). But just as "the separation of powers does not depend on the views of individual Presidents," *Free Enter. Fund*, 561 U.S. at 497, nor does it depend on the views of an individual Congress. And therefore, just as a single President "cannot . . . choose to bind his successors by diminishing their powers," *id.*, nor can a single Congress choose to bind its successors by diminishing theirs.

Whatever flexibility Congress may have in effecting appropriations, the perpetual nature of § 5497(a)'s massive funding stream—amounting to more than $600 million in 2016, enough to fund the entire operations of an agency that cannot meaningfully be distinguished from an executive Department—is uniquely constitutionally problematic. And make no mistake: having granted the CFPB perpetual authority to self-appropriate its funding from a source outside the Treasury, a future Congress cannot simply restore

---

[16] Video of the exchange is available at https://www.youtube.com/ watch?v=5IxSfJ638cs.

its constitutionally prescribed oversight role.  Even if both houses of Congress were to

pass a bill that eliminated § 5497(a) and required the CFPB to seek all of its future

funding from Congress, that bill could be vetoed by the President.  *See* U.S. Const. Art. I,

§ 7.  The Dodd-Frank Congress having abdicated its power of the purse check on

executive authority, and rendered the CFPB entirely self-sustaining, a successor Congress

cannot simply cannot take its constitutionally prescribed authority back.  The

Constitution cannot be read to permit the Dodd Frank Congress to strip successor

Congresses of their core power of the purse authority in this manner.

## III.  CORDRAY'S RECESS APPOINTMENT WAS ILLEGAL, AND REGULATIONS HE PROMULGATED WHILE ILLEGALLY SERVING ARE INVALID

### A.  *Noel Canning* definitively establishes that Cordray's purported recess appointment was unconstitutional.

Nothing differentiates Cordray's recess appointment from the NLRB recess

appointments that the Supreme Court invalidated in *Noel Canning*.  The President

appointed Cordray on the same day as the three NLRB members, and using the same

process.  And the position to which Cordray was appointed—Director of the CFPB—was

of equal or greater executive stature.

The Constitution requires that all principal Officers of the United States be

appointed to their posts by the President "with the Advice and Consent of the Senate."

U.S. Const. Art. II, § 2, cl. 2.  The Director of the CFPB exercises significant executive

authority, and does not answer to any other appointed executive official.  He thus acts as

a principal Officer of the United States, *see Edmond v. United States*, 520 U.S. 651, 663

(1997) (principal officers are those whose work is not directed or supervised at some level by other appointed officers), and his appointment is subject to the requirements of the Appointments Clause.

> **B.    All rules promulgated by Cordray during his illegal appointment are invalid.**

All of the regulations challenged by plaintiffs were published under Cordray's signature, either as final rules or as notices of proposed rulemaking, at a time that neither Cordray nor anyone else was legally serving as Director of the CFPB.  Because each of these acts of publication, as well as the agency actions underlying them (such as consideration of comments and compilation of the administrative record) was legally invalid, the rules themselves must be held to be illegal and without effect.  *See* 5 U.S.C. § 553 (requiring publication of notice of proposed rule, consideration of comments, and publication of final rule); 5 U.S.C. § 706(2) (courts should "hold unlawful and set aside agency action" taken "without observance of procedure required by law"); *Sierra Club v. E.P.A.*, 699 F.3d 530, 531 (D.C. Cir. 2012) (vacating and remanding a rulemaking action taken by the agency "[b]ecause EPA issued the [rulemaking] Determination without providing notice and opportunity for comment" consistent with the requirements of 5 U.S.C. § 553).[17]

---

[17] The involvement of CFPB staff in the rulemakings in no way saves them.  By statute, all of the CFPB's rulemaking authorities are vested in a legally appointed Director or his delegee. 12 U.S.C. §§ 5492(b), 5512(b)(1).  The Director could not have had any valid delegees prior to July 2013, since there was no constitutionally appointed Director who could delegate the Director's authorities.  "The head of the agency is generally the final rulemaking authority."  1 Charles H. Koch, Jr. & Richard Murphy, *Administrative Law*

### C.   Cordray's nominal "ratification" does not cure his actions' unlawfulness.

After Cordray was finally appointed CFPB Director with Senate advice and consent in July 2013, he issued a proclamation "[t]o address any possible uncertainty" about the validity of the CFPB's actions taken during his recess appointment.  Published in the Federal Register, the notice purported to "affirm and ratify any and all actions" Cordray took on behalf of the CFPB before his reappointment on July 16, 2013. 78 Fed. Reg. 53,734 (Aug. 30, 2013).  That proclamation did not—and could not—have the alchemic effect he hoped it would with respect to past invalid rulemakings.

To start, Cordray's purported "ratification" was not an independently valid rulemaking.  Under the Administrative Procedure Act ("APA"), to engage in rulemaking an agency must publish notice of the proposed rule and give interested persons at least 30 days to submit "written data, views, or arguments" regarding the proposal.  5 U.S.C. § 553(b)–(d).  Cordray did not follow this notice-and-comment procedure with respect to the "notice of ratification."  *See* 78 Fed. Reg. 53,734.  He simply published the notice.

Second, to the extent the notice was an attempt to retroactively ratify previously invalid rulemakings, such ratification was likewise ineffective.  It is black letter law that ratification of a past action can be effective only when the purported ratifier possessed the legal authority take the action both when it was originally taken, and at the time of ratification.  *See Fed. Election Comm'n v. NRA Political Victory Fund*, 513 U.S. 88, 98

---

*and Practice* § 4:42 (3d ed. 2015).   "While the staff may make recommendations, the decision-making authority rest[s] in the top of the agency hierarchy"  *Id*. at 4:42[3].

(1994) ("[I]t is essential that the party ratifying should be able not merely to do the act ratified at the time the act was done, but also at the time the ratification was made."). This rule is grounded in a fundamental principle of agency law: "[A] person may not ratify an act which he or she could not have originally authorized." 3 Am. Jur. 2d *Agency* § 177 (2014); *see also W. Nat'l Bank of N.Y. v. Armstrong*, 152 U.S. 346, 352 (1894) ("[A] ratification, to be efficacious, must be made by a party who had power to do the act in the first place."); *Franklin Sav. Ass'n v. Director of Office of Thrift Supervision*, 740 F. Supp. 1535, 1539 (D. Kan. 1990) ("[F]or a ratification to be effective, the ratifying person or entity must have had authority to do the underlying act both at the time of the original act and at the time of ratification.").

Cordray's ratification fails because he lacked the authority to exercise the CFPB's rulemaking powers at the time the challenged regulations were initially proposed and enacted. The only individuals authorized to exercise the CFPB's rulemaking authority between January 4, 2012 and July 16, 2013 were a constitutionally appointed Bureau Director or his delegee, or (with respect to certain rules) the Treasury Secretary. *See* 12 U.S.C. § 5491(b)(1) (naming the Director head of the CFPB); *id.* § 5586(a) [Needs to be separate citation and not an id.] (authorizing the Treasury Secretary to exercise certain CFPB authorities until a Director is appointed and confirmed). Cordray was neither of these things prior to his July 2013 reappointment.

As an illegally appointed Director from January 4, 2012 until July 16, 2013, Cordray lacked the authority to exercise the CFPB's executive powers during that time, including its power to propose and approve regulations. *See Noel Canning*, 134 S. Ct. at

2574, 2557–58, 2578 (intra-session appointments were constitutionally invalid and thus improperly appointed NLRB members could not act as executive officers); *see also Noel Canning v. NLRB*, 705 F.3d 490, 514 (D.C. Cir. 2013) (because appointments were constitutionally invalid, NLRB "had no quorum, and its order [was] void").  And of course Cordray never served as Treasury Secretary.  Because Cordray lacked the power "to do the act[s] ratified" at the time the actions were taken—namely, propose and authorize regulations on the CFPB's behalf during the period of his unconstitutional appointment—he cannot legally ratify those past actions.  *NRA Political Victory Fund*, 513 U.S. at 98. [18]

## D.    The CFPB's invalidly enacted regulations cannot be rescued by the de facto officer doctrine or harmless error analysis.

Courts have at times applied two narrow rules to affirm agency actions by improperly appointed officers:  the de facto officer doctrine and harmless error analysis. Neither can save Cordray's rulemaking actions in this case, because the challenged rulemakings were infected with a structural constitutional error.

The de facto officer doctrine may "confer[] validity upon acts performed by a person acting under the color of official title even though it is later discovered that the legality of that person's appointment or election to office is deficient."  *Ryder v. United States*, 515 U.S. 177, 180 (1995).  But as the Supreme Court has recently held, this doctrine does not apply in cases where the officer's authority to act is challenged because

---

[18]  Cordray can no more "ratify" regulations promulgated by an unlawfully appointed "Director" than he can "ratify" regulations promulgated by anyone else purporting to issue regulations in the CFPB's name without a lawful appointment to the office.

he was unconstitutionally appointed to his post—for if it did, the "rule would create a disincentive to raise Appointments Clause challenges." *Id.* at 182–83; *see also Nguyen v. United States*, 539 U.S. 69 (2003) (refusing to apply de facto officer doctrine to uphold actions of an appellate panel where one of the panel members was not properly appointed pursuant to Article III). In cases post-dating *Ryder*, the D.C. Circuit and other courts consequently have not applied the doctrine where the constitutionality of an officer's appointment is at issue. *SW Gen., Inc. v. NLRB*, 796 F.3d 67, 81 (D.C. Cir. 2015) ("In its most recent cases . . . the Supreme Court has limited the doctrine, declining to apply it when reviewing Appointments Clause challenges and important statutory defects to an adjudicator's authority." (citation omitted)).[19]

Moreover, even if the de facto officer doctrine could be applied to Appointments Clause challenges, the D.C. Circuit has held it does not apply in any event where two conditions are satisfied. First, the challenger "must bring his action at or around the time that the challenged government action is taken." *Andrade v. Lauer*, 729 F.2d 1475, 1499 (D.C. Cir. 1984). Second, "the agency or department involved [must have] reasonable

---

[19] *See also Silver v. U.S. Postal Serv.*, 951 F.2d 1033, 1036 n.2 (noting that "[t]he continued vitality of the de facto officer doctrine is in serious doubt" after "the Supreme Court entertained collateral challenges based on the Appointments Clause without ever mentioning … the de facto officer doctrine"). *Cf. Intercollegiate Broad. Sys. Inc. v. Copyright Royalty Bd.* ("*Intercollegiate Broad. Sys., Inc. I*"), 684 F.3d 1332, 1333 (D.C. Cir. 2012) (vacating and remanding the Board's decision "[b]ecause of the Appointments Clause violation at the time of decision" without considering whether the Board members were de facto officers). Although the Supreme Court in *Buckley v. Valeo* accorded de facto validity to the actions of the Federal Election Commission despite finding an Appointments Clause violation, *see* 424 U.S. 1, 142 (1976), the Court in *Ryder* limited *Buckley*'s holding to its facts, *Ryder*, 515 U.S. at 183–84.

36

notice under all the circumstances of the claimed defect in the official's title to office."
*Id.*  Where those two conditions are met, the doctrine does not apply because allowing a
legal challenge to proceed "adequately protect[s] citizens' reliance on past government
actions and the government's ability to take effective and final action."  *Id.*

Here, both requirements are satisfied.  Plaintiffs filed suit challenging Cordray's
authority to enact certain regulations on behalf of the CFPB just six months after
Cordray's unconstitutional appointment.  *See* ECF No. 1.  And the CFPB had ample
notice that Cordray's purported recess appointment could be constitutionally defective —
from this lawsuit, from the *Noel Canning* litigation, and from widespread publicity of its
questionable constitutional character.  *See SW Gen., Inc.*, 796 F.3d at 82 ("[T]he notice
requirement is satisfied if the agency learns of the defect from *any* source, not only the
petitioner."); *Andrade v. Regnery*, 824 F.2d 1253, 1256 (D.C. Cir. 1987) ("The filing of
the underlying suit ... in and of itself notified the government of appellants' ...
challenge.").  Indeed, just one day after Cordray was initially named CFPB Director,
newspaper pieces already decried his recess appointment as unconstitutional.  *See, e.g.*,
Edwin Meese III and Todd Gaziano, *Obama's Recess Appointments Are
Unconstitutional*, The Washington Post (Jan. 5, 2012).[20]  The CFPB thus had ample
opportunity to "remedy any defects … either before it permit[ted Cordray] to act or
shortly thereafter."  *SW Gen., Inc.*, 796 F.3d at 82 (internal quotation marks omitted).

---

[20]  *Available  at*  https://www.washingtonpost.com/opinions/obamas-recess-appointments-
are-unconstitutional/2012/01/05/gIQAnWRfdP_story.html.

For similar reasons, the Court should reject any claim that the regulations are valid because their promulgation during Cordray's unconstitutional tenure was harmless error. "[S]eparation of powers"—an interest the Appointments Clause protects— "is a *structural safeguard* rather than a remedy to be applied only when specific harm, or risk of specific harm, can be identified." *Landry v. FDIC*, 204 F.3d 1125, 1131 (D.C. Cir. 2000); *see also SW Gen., Inc.*, 796 F.3d at 80 (noting that the Appointments Clause requirements are "structural safeguard[s] intended to curb Executive abuses of the appointment power and to promote a judicious choice of persons for filling the offices of the union." (internal quotation marks omitted)).  For this reason, courts must assume that structural errors are harmful, "even where any possible injury is radically attenuated." *Id.* at 1130–32 (harmless error analysis could not apply to save an unconstitutionally appointed administrative law judge's involvement in recommending a decision to the FDIC).  Indeed, applying the harmless error doctrine to Appointments Clause violations would effectively render it optional, rather than a mandatory safeguard.[21]

---

[21] The presence of an uncured structural constitutional error in this case distinguishes it from others in which the D.C. Circuit concluded that the harmless error doctrine saved agency actions. *See, e.g.*, *Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision*, 139 F.3d 203, 211–12 (D.C. Cir. 1998) (concluding that issue of a notice of charges by an officer whose appointment was statutorily improper was rendered harmless when a properly appointed official considered the charges de novo and found sufficient evidence to conclude that the bank had committed the noticed violations); *Fed. Elec. Comm'n v. Legi-Tech, Inc.*, 75 F.3d 704 (D.C. Cir. 1996) (finding that ratification by a constitutionally composed council of prior adjudication decisions rendered by an unconstitutionally composed council were adequate to cure the constitutional violation); *see also Intercollegiate Broad. Sys., Inc. II*, 796 F.3d at 120–21 (noting that "review by a properly appointed body can be insufficient to cure an Appointments Clause violation" including when "a statute expressly requires" the decision-maker to follow a particular

Because Cordray's recess appointment violated the Appointments Clause, any rulemaking actions Cordray took while illegally serving are tainted with structural constitutional error. *See id.* Accordingly, they cannot be saved by harmless error analysis and must be declared invalid.

## CONCLUSION

This Court should hold that the CFPB unconstitutionally violates the separation of powers, that Richard Cordray's January 4, 2011 recess appointment was unconstitutional, and that the challenged regulations are invalid and cannot be enforced against plaintiffs.

Respectfully submitted.

GREGORY JACOB                           C. BOYDEN GRAY
  *Counsel of Record*                     ADAM J. WHITE
O'MELVENY & MYERS LLP            BOYDEN GRAY & ASSOCIATES
1625 I St. NW                                  1627 I Street NW, Suite 950
Washington, DC 20006                    Washington, DC 20006
(202) 383-5300                               (202) 955-0620
gjacob@omm.com                          adam@boydengrayassociates.com

*Counsel for Plaintiffs State National Bank of Big Spring,
the Competitive Enterprise Institute, and the 60 Plus Association*

---

procedure).  To the extent any of these decisions present circumstances similar to this case, their reasoning has been abandoned by subsequent decisions holding that structural constitutional errors cannot be considered harmless. *See Landry*, 204 F.3d at 1131; *see also SW Gen., Inc.*, 796 F.3d at 79–80 (noting that harmless error analysis seems ill-suited to cases involving structural constitutional errors); *Intercollegiate Broad. Sys., Inc. I*, 684 F.3d at 1342 (vacating and remanding the Board's decision without considering whether any error was harmless because the Board was unconstitutionally structured in violation of the Appointments Clause at the time it acted).

SAM KAZMAN
HANS BADER
COMPETITIVE ENTERPRISE INSTITUTE
1899 L St. NW, Floor 12
Washington, DC 20036
(202) 331-1010

*Co-Counsel for Plaintiffs*
*Competitive Enterprise Institute*

November 6, 2015

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 6th day of November 2015, I electronically filed the foregoing

brief with the Court.  I further certify that on this 6th day of November 2015, I served the

foregoing brief on all counsel of record through the Court's CM/ECF system.


/s/ Gregory F. Jacob
Gregory F. Jacob
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, D.C. 20006
Telephone: (202) 383-5300