## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STATE NATIONAL BANK OF BIG  )
SPRING *et al.*,  )
　　　　　　　　　　　　　　　 )
　　　　　　　　Plaintiffs,  )
　　　　　　　　　　　　　　　 )
　　v.  )　Case No. 1:12-cv-01032 (ESH)
　　　　　　　　　　　　　　　 )
JACOB J. LEW, in his official capacity  )　Judge: Hon. Ellen S. Huvelle
as United States Secretary of the  )
Treasury and *ex officio* Chairman of the  )
Financial Stability Oversight Council, *et*  )
*al.*,  )
　　　　　　　　　　　　　　　 )
　　　　　　　　Defendants.  )

## <u>COMBINED MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>

GREGORY JACOB
　　*Counsel of Record*
O'MELVENY & MYERS LLP
1625 I St. NW
Washington, DC 20006
(202) 383-5300
gjacob@omm.com

C. BOYDEN GRAY
ADAM J. WHITE
ADAM GUSTAFSON
DEREK S. LYONS
BOYDEN GRAY & ASSOCIATES
1627 I Street NW, Suite 950
Washington, DC 20006
(202) 955-0620
adam@boydengrayassociates.com

*Counsel for Plaintiffs State National Bank of Big Spring, the Competitive Enterprise Institute, and the 60 Plus Association*

SAM KAZMAN
HANS BADER
COMPETITIVE ENTERPRISE INSTITUTE
1899 L St. NW, Floor 12
Washington, DC 20036
(202) 331-1010

*Co-Counsel for Plaintiffs*
*Competitive Enterprise Institute*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

ARGUMENT ....................................................................................................... 3

I.     VIEWED AS A WHOLE, THE CFPB'S STRUCTURE AND
    POWERS VIOLATE FUNDAMENTAL SEPARATION-OF-
    POWERS PRINCIPLES ........................................................................... 3

    A.    Precedent dictates that the CFPB's constitutionality turns
        on a holistic assessment of the agency's powers and
        structure ........................................................................................ 4

    B.    The CFPB is unprecedented in its combination of broad
        executive regulatory and enforcement powers, placed
        outside the President's control and unchecked by other
        meaningful structural restraints ................................................. 9

    C.    Structural restraints matter in separation of powers cases
        because the purpose of that doctrine is to protect liberty
        by maintaining accountability and preventing the
        concentration of the government's distinct powers ................... 15

    D.    The CFPB's "full independence" from Congress
        impermissibly joins the powers of the sword and the purse
        in a politically unaccountable entity; the result is a major
        separation of powers violation ................................................... 19

        1.    The Government cites no case affirming a
            regulatory agency's perpetual independence from
            both the President and Congress ..................................... 21

        2.    The problems inherent in freeing the CFPB from
            Congress's power of the purse are not alleviated by
            the possibility that a future House of
            Representatives, Senate, and President might
            someday change the law ................................................. 26

        3.    The Government concedes no limiting principle on
            a single Congress's discretion to free an agency
            from future Congresses' Power of the Purse ................... 26

        4.    Even when considered in isolation, the CFPB's
            fiscal independence raises significant constitutional
            concerns ........................................................................ 28

# TABLE OF CONTENTS
## (continued)

**Page**

II.   CORDRAY'S RATIFICATION NOTE CANNOT REVIVE
REGULATIONS HE ILLEGALLY PROMULGATED DURING
THE PERIOD OF HIS INVALID RECESS APPOINTMENT ............ 31

    A.   Plaintiffs remain subject to Cordray's illegally
promulgated regulations, and their request for relief
accordingly is not moot ............................................................ 32

    B.   The Complaint seeks the requested injunctive relief ................ 33

    C.   Plaintiffs have standing to seek the relief requested ................ 35

    D.   Cordray's four-sentence ratification note was legally
insufficient to validate previously illegally promulgated
regulations ............................................................................... 38

        1.   A four-sentence note unaccompanied by meaningful
process cannot validate an illegal administrative
action of any kind ............................................................ 39

        2.   Ratification of a illegally promulgated rule can be
accomplished only through the process prescribed
by the APA ...................................................................... 41

III.   PLAINTIFFS COMPETITIVE ENTERPRISE INSTITUTE AND
THE 60 PLUS ASSOCIATION REMAIN IN THE CASE ................... 44

CONCLUSION ......................................................................................... 45

# TABLE OF AUTHORITIES

**Page**

## Cases

*Am. Fed. of Gov't Employees v. FLRA,*
  388 F.3d 405 (3d Cir. 2004) .......................................................................... 30, 31

*Andrade v. Regnery,*
  824 F.2d 1253 (D.C. Cir. 1987) ............................................................................ 40

*Ass'n of Am. R.R. v. DOT,*
  721 F.3d 666 (D.C. Cir. 2013) ................................................................. 22, 25, 27

*Carter v. Carter Coal Co.,*
  298 U.S. 238 (1936) ................................................................................................ 27

*Cincinnati Soap Co. v. United States,*
  301 U.S. 308 (1937) ................................................................................................ 29

*City of Boerne v. Flores,*
  521 U.S. 507 (1997) ................................................................................................ 28

*Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision,*
  139 F.3d 203 (D.C. Cir. 1998) ................................................................... 28, 40, 41

*Fed. Elec. Comm'n v. Legi-Tech, Inc.,*
  75 F.3d 704 (D.C. Cir. 1996) ............................................................... 34, 39, 40, 43

*Federal Election Com'n v. NRA Political Victory Fund,*
  513 U.S. 88 (1994) ........................................................................................... 13, 42

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,*
  561 U.S. 477 (2010) .......................................................... 2, 5, 9, 17-19, 21, 22, 25

*Freytag v. Comm'r,*
  501 U.S. 868 (1991) ................................................................................................ 43

*Harrington v. Bush,*
  553 F.2d 190 (D.C. Cir. 1977) .............................................................................. 30

*Humphrey's Executor v. United States,*
  295 U.S. 602 (1935) ..................................................................................... 2, 4-7, 12

*In re W.R. Grace & Co.,*
  316 F. Appx. 134 (3d Cir. 2009) ........................................................................... 42

# TABLE OF AUTHORITIES
## (continued)

Page

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.,*
  796 F.3d 111 (D.C. Cir. 2015) .................................................................. 40, 43, 44

*Landry v. FDIC,*
  204 F.3d 1125 (D.C. Cir. 2000)................................................................ 43

*Military Toxics Project v. E.P.A.,*
  146 F.3d 948 (D.C. Cir. 1998) ................................................................ 44

*Morrison v. Olson,*
  487 U.S. 654 (1988) ................................................................ 4, 7, 11

*Myers v. United States,*
  272 U.S. 52 (1926) ................................................................ 4, 5, 8, 19

*Office of Personnel Management v. Richmon,*
  496 U.S. 414 (1990) ................................................................ 29

*Ryder v. United States,*
  515 U.S. 177 (1995) ................................................................ 44

*State Nat'l Bank of Big Spring v. Lew,*
  795 F.3d 48 (D.C. Cir. 2015) ................................................................ 35, 36, 44

*Stryker Spine v. Biedermann Motech GmbH,*
  684 F.Supp. 2d 68 (D.D.C. 2010) ................................................................ 40

*SW Gen., Inc., v. NLRB,*
  796 F.3d 67 (D.C. Cir. 2015) ................................................................ 43

*Swan v. Clinton,*
  100 F.3d 973 (D.C. Cir. 1996) ................................................................ 23

*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001) ................................................................ 27

## Constitutional Provisions

U.S. Const. amdt. 14, § 5 ................................................................ 28

U.S. Const. art. I, § 8, cl. 3................................................................ 27

## TABLE OF AUTHORITIES
### (continued)

**Page**

**Statutes**

5 U.S.C. § 552b(a)(1) .................................................................................. 14

5 U.S.C. § 553(b)–(d) ................................................................................. 41

7 U.S.C. § 2(a)(2)(A) .................................................................................. 14

12 U.S.C. § 2 .............................................................................................. 22

12 U.S.C. § 225a .................................................................................. 15, 24

12 U.S.C. § 241 ........................................................................................... 14

12 U.S.C. § 243 ........................................................................................... 23

12 U.S.C. § 1752a(b) ................................................................................... 22

12 U.S.C. § 1812(c) ..................................................................................... 23

12 U.S.C. § 2242(b) ..................................................................................... 23

12 U.S.C. § 4511(b) ..................................................................................... 24

12 U.S.C. § 4512(b)(2) ................................................................................ 24

12 U.S.C. § 4516 ......................................................................................... 24

12 U.S.C. § 5481 ........................................................................................... 9

12 U.S.C. § 5497(a)(2) ................................................................................ 23

12 U.S.C. § 5497(c)(2) ................................................................................ 30

12 U.S.C. § 5511 ........................................................................................... 9

15 U.S.C. § 41 ............................................................................................. 14

15 U.S.C. § 78d(a) ...................................................................................... 14

42 U.S.C. § 7171(b)(1) ................................................................................ 14

47 U.S.C. § 154(b)(2)(B)(5) ........................................................................ 14

# TABLE OF AUTHORITIES
## (continued)

**Page**

Act of May 8, 1794, ch. 23, § 4, 1 Stat. 354, 358 ................................................... 24, 25

Pub. L. No. 101-73, § 301, 103 Stat. 183, 278 (1989)................................................... 23

**Regulations**

78 Fed. Reg. 53,734 (2013) ................................................................................. 41

**Other Authorities**

Ben S. Bernanke, *The Courage to Act: A Memoir of a Crisis and its Aftermath* 463 (2015)................................................................................. 23

Marshall J. Breger & Gary J. Edles, *Established by Practice: The Theory & Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111, 1116, 1135 (2000) ........................................................... 13, 14

*Consumer Financial Protection Bureau Strategic Plan, Budget, and Performance Plan and Report* (Mar. 2014)............................................ 20

*Consumer Financial Protection Bureau Strategic Plan: FY 2013 – FY 2017* (Apr. 2013) ................................................................................. 20

Neal Devins & David Lewis, *Not-So Independent Agencies: Party Polarization & the Limits of Institutional Design*, 88 B.U. L. Rev. 459, 469–70 (2008)................................................................................. 13

The Federalist................................................................................. 16, 17

3 *Joseph Story's Commentaries on the Constitution of the United States* § 1348 (4th ed. 1873) ................................................................. 29

Charles Kruly, *Self-Funding & Agency Independence*, 81 Geo. Wash. L. Rev. 1733, 1749 (2013) ........................................................... 14

Cass R. Sunstein, *Deliberative Trouble? Why Groups Go to Extremes*, 110 Yale L.J. 71, 103 (2000).................................................................... 13

## INTRODUCTION

The Government's brief confirms that the Consumer Financial Protection Bureau ("CFPB") is an unprecedented amalgam of sweeping executive power devoid of structural or constitutional restraint, answerable neither to the President nor to Congress. Its regulatory jurisdiction covers a vast swath of the economy; it is vested with substantial direct enforcement authority; its powers are concentrated in a single individual, the Director, who serves a term longer than the President's, yet who cannot be removed by the President for policy reasons; when the Director and the President disagree in their interpretation of consumer financial protection law, the courts are required to defer to the Director over the President; and the CFPB is entirely self-perpetuating, drawing 100% of its funding from another independent agency's coffers, and thus able to regulate and enforce indefinitely without further action by Congress or the President. Yet for all this concentrated power, ***the CFPB is unchecked by any meaningful structural restraints.*** The Government contends this unprecedented combination is acceptable. The Constitution says otherwise.

As plaintiffs predicted in their opening brief, the Government attempts "to defend the CFPB with a piecemeal approach: pointing to a single structural feature of the CPFB (*e.g.*, for-cause removal protection), and citing cases in which the courts have endorsed that specific feature, in isolation." Pl. Br. 9. Binding precedent rejects this approach. Without exception, the precedential cases on which the government relies have determined the constitutionality of independent agencies

facing separation of powers challenges by balancing the nature and scope of the agency's powers, viewed as a whole, against the structural restraints imposed on their exercise. *See, e.g.*, *Humphrey's Executor v. United States*, 295 U.S. 602, 631 (1935) (constitutionality "depend[s] upon the character of the office"); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 496 (2010) ("This novel structure does not merely add to the Board's independence, but transforms it."). This Court accordingly must view the CFPB's regulatory powers, funding mechanism, and structural features **as a whole**.  So viewed, the CFPB's unprecedented concentration of the powers of the sword and the purse in the hands of a single unaccountable Director, who is vested with broad authority to regulate and enforce against the general public but is unchecked by any meaningful structural restraints, cannot be reconciled with the constitutionally prescribed separation of powers.  The CFPB is unconstitutional.

The January 2012 "recess appointment" of Richard Cordray was also unconstitutional, and every regulation Cordray promulgated during the period of his unlawful tenure was void *ab initio*.  The Government concedes as much, but argues that plaintiffs are not entitled to declaratory and injunctive relief preventing Cordray and the CFPB from enforcing the unlawfully adopted regulations because (1) the Complaint does not seek such relief and (2) Cordray rendered the regulations valid and enforceable by publishing a four-sentence "ratification" note in the Federal Register.  These arguments are without merit.  The Complaint plainly seeks such relief, and Cordray's cursory note, unaccompanied by any new

deliberative process or redetermination, could not lawfully ratify regulations that
were illegally promulgated.  Plaintiffs are accordingly entitled to summary
judgment, and to the requested declaratory and injunctive relief.

## ARGUMENT

## I.   VIEWED AS A WHOLE, THE CFPB'S STRUCTURE AND POWERS VIOLATE FUNDAMENTAL SEPARATION-OF-POWERS PRINCIPLES

Our constitutional system of government does not permit Congress to create
self-perpetuating entities vested with broad regulatory and enforcement authority,
and make them unanswerable to both the executive and legislative branches.  The
Government does not dispute that the CFPB is all of these things:  it is self-
perpetuating, it has broad powers to regulate and enforce, and it is beyond the
control of both the President and Congress.  Nor has the Government identified any
precedent blessing such a combination of features.  Instead, as predicted, the
Government urges the Court to analyze each structural feature of the CFPB in
isolation, citing cases that have approved each feature, but on different facts and in
wholly different contexts.  The cases upon which the Government relies, however,
foreclose this piecemeal approach, instructing that the constitutionality of an
independent agency challenged on separation of powers grounds must be assessed
by balancing the nature and scope of the agency's powers, viewed as a whole,
against the structural restraints imposed on their exercise.

So viewed, the CFPB is without precedent.  The CFPB wields executive
power that is at least as great as, and in many respects is greater than, those of any
agency whose independence the courts have upheld.  And critically, those cases that

have upheld independent agencies exercising executive powers even remotely comparable to the CFPB's against separation of powers challenges have uniformly stressed the presence of meaningful structural constraints the CFPB wholly lacks. An agency like the CFPB, which is simultaneously vested with sweeping executive powers, given the capacity to indefinitely self-perpetuate, and placed outside the control of ***both*** the political branches, cannot be reconciled with the Constitution.

### A.   Precedent dictates that the CFPB's constitutionality turns on a holistic assessment of the agency's powers and structure.

The parties agree that four cases are most relevant to determining the constitutionality of the CFPB:  *Myers v. United States*, 272 U.S. 52 (1926); *Humphrey's Executor*; *Morrison v. Olson*, 487 U.S. 654 (1988), and *Free Enterprise*. *Myers* invalidated removal restrictions on a postmaster of the first class, 272 U.S. at 161, and *Free Enterprise* invalidated "dual for-cause limitations" on the members of the Public Company Accounting Oversight Board ("PCAOB"), 561 U.S. at 492. *Humphrey's Executor* upheld removal restrictions on members of the Federal Trade Commission ("FTC") as it existed in 1935, 295 U.S. at 628, and *Morrison* upheld removal restrictions on the independent counsel, 487 U.S. at 691-92.

Whether read collectively or individually, these four cases establish that the constitutionality of measures that place a government agency outside the control of the political branches depends on the nature and scope of the agency's powers, and the extent to which the agency's exercise of its powers is constrained by structural restraints.  Most recently, in *Free Enterprise*, the Supreme Court reiterated that "Congress can, ***under certain circumstances***, create independent agencies run by

4

principal officers appointed by the President, whom the President may not remove at will but only for good cause." 561 U.S. at 483 (emphasis added). The Court similarly declared in *Humphrey's Executor* that "[w]hether the power of the President to remove an officer shall prevail over the authority of Congress to condition th[at] power by fixing a definite term and precluding a removal except for cause ***will depend upon the character of the office***." 295 U.S. at 631 (emphasis added). And while *Humphrey's Executor* upheld removal restrictions on FTC members under the facts and circumstances of that case, it emphasized that the constitutionality of applying identical restrictions to other agencies would depend on a balancing of the specific powers and structural features at issue in each case: "[B]etween the decision in the *Myers* case, which sustains the unrestrictable power of the President to remove purely executive officers, and our present decision that such power does not extend to an office ***such as that here involved***, there shall remain a field of doubt, [and] we leave such cases as may fall within it for future consideration and determination." *Id.* at 632 (emphasis added).

The Government relies heavily on *Humphrey's Executor* and *Morrison* to support its piecemeal approach, but that reliance is misplaced. Both cases analyze the agencies at issue by assessing their powers and structural limitations as a whole. In *Humphrey's Executor*, the Court upheld restrictions on the President's removal authority only after taking pains to emphasize the nonexecutive nature and limited scope of the FTC's powers. Specifically, the Court found that:

- the FTC's "duties are neither political nor executive, but predominantly quasi-judicial and quasi-legislative," and it performs its "specified duties as a legislative or as a judicial aid," *id.* 624, 628;

- the FTC was "charged with the enforcement of no policy except the policy of the law," *id.* at 624;

- the commissioners served as an impartial "body of experts" "informed by experience" and exercising "trained judgment," *id.* (quotation omitted);

- "[i]n making investigations and reports thereon for the information of Congress under § 6, in aid of the legislative power, it acts as a legislative agency," *id.* at 628;

- "[u]nder § 7, which authorizes the commission to act as a master in chancery under rules prescribed by the court, it acts as an agency of the judiciary," *id.*;

- "To the extent that it exercises ***any*** executive function, as distinguished from executive power in the constitutional sense, it does so in the discharge and effectuation of its quasi legislative or quasi judicial powers, or ***as an agency of the legislative or judicial departments of the government***," *id.* (emphasis added); and

- "Such a body cannot in any proper sense be characterized as an arm or an eye of the executive," and is in fact "wholly disconnected from the executive department," *id.* at 628, 630.

The Court further emphasized structural features that it believed would constrain and moderate the FTC's exercise of these limited and nonexecutive powers:

- The Court noted that out of the five-member commission, "[n]ot more than three of the commissioners [could] be members of the same [political] party," *id.* at 620;

- The Court further observed that the commissioners served staggered terms, which gave the President the opportunity to appoint a new commissioner almost every year, *id.*;

- The Court concluded that the Commission was "non-partisan; and it must, from the very nature of its duties, act with entire impartiality," *id.* at 624.

6

Nowhere does *Humphrey's Executor* say that restrictions on the President's removal authority are always or even usually constitutional.  Indeed, the Government grossly distorts *Humphrey's Executor* by trying to read it to eliminate the importance to its holding of the Court's assessment of the limited, nonexecutive, and properly checked nature of the FTC's authority.[1]

As in *Humphrey's Executor*, the *Morrison* Court balanced the Office of the Independent Counsel's powers and structural features in determining that it did not violate the separation of powers.  At the very outset of its separation of powers analysis, the Court cited *Humphrey's Executor*'s clear holding that the constitutionality of an agency's independence from the executive will in all circumstances "depend upon the character of the office," 487 U.S. at 687, *quoting Humphrey's Executor*, 295 U.S. at 631.  While acknowledging that the independent counsel's prosecutorial powers were without question purely executive in nature, the Court repeatedly emphasized the significant limitations on their scope.  Specifically, the Court found that the independent counsel:

- "is an inferior officer under the Appointments Clause," 487 U.S. at 691;

- "lack[s] policymaking or significant administrative authority," *id*.; and

---

[1] In *Morrison*, the Court stated in a footnote that "it is hard to dispute" that some of the FTC's powers would today be considered "executive," "at least to some degree." 487 U.S. at 690 n.28.  That observation does not minimize that **both** cases balanced the scope and nature of the challenged agency's powers, viewed as a whole, against mitigating structural features that constrained and moderated their exercise.  Nor does it diminish the entire dependence of *Humphrey's Executor*'s reasoning on its view that the FTC's particular mix of powers, duties, and structural features rendered it a body that "cannot in any proper sense be characterized as an arm or an eye of the executive."  295 U.S. at 628.

- had "limited jurisdiction" "restricted primarily to investigation and, if appropriate, prosecution" only of "certain federal officials suspected of certain serious federal crimes," *id.* at 671-72, 691.

Notably, *Morrison* did not end its analysis with its determination that the independent counsel enjoyed very limited powers.  Rather, the Court went on to highlight a number of structural features of the Independent Counsel Act that it deemed to impose important restraints on the independent counsel's exercise of those powers.  Specifically, the Court observed that:

- "the jurisdiction of the independent counsel is defined with reference to the facts submitted by the Attorney General," and "an independent counsel can only act within the scope of the jurisdiction that has been granted by the Special Division pursuant to a request by the Attorney General," *id.* at 672, 696;

- "No independent counsel may be appointed without a specific request by the Attorney General, and the Attorney General's decision not to request appointment if he finds 'no reasonable grounds to believe that further investigation is warranted' is committed to his unreviewable discretion," *id.* at 696;

- the independent counsel is "limited in tenure," because an independent counsel is "appointed essentially to accomplish a single task, and when that task is over the office is terminated," *id.* at 672, 691

- "the Act requires that the counsel abide by Justice Department policy unless it is not 'possible' to do so," *id.* at 696.

These mitigating structural features were necessary to the Court's holding, since they are what gave "the Executive Branch sufficient control over the independent counsel to ensure that the President is able to perform his constitutionally assigned duties." *Id.*  And their significance is further reinforced by *Free Enterprise*'s renewed emphasis that *Myers*, which it described as a "landmark case," was

8

founded in "the traditional default rule" that "removal is incident to the power of appointment."  561 U.S. at 492, 509.

In sum, the key cases on which the Government relies do not countenance the piecemeal approach to separation of powers analysis which the Government advocates.[2]  To the contrary, the precedents the parties agree are most relevant uniformly balance the scope and nature of an independent agency's powers, viewed as a whole, against the structural features that check and constrain their exercise.

## B.     The CFPB is unprecedented in its combination of broad executive regulatory and enforcement powers, placed outside the President's control and unchecked by other meaningful structural restraints.

The Government does not dispute that the CFPB has been granted broad authority in the field of consumer financial law, as plaintiffs described in detail in their opening brief.  Pl. Br. 10-11.  The CFPB "implement[s] the Federal consumer financial laws through rules, orders, guidance, interpretations, statements of policy, examinations, and enforcement actions," *id.*, under eighteen "Federal consumer financial law[s]" previously administered by seven other agencies, 12 U.S.C. §§ 5481(12), (14), 5511, as well as a newly created prohibition on "unfair, deceptive, or abusive" consumer-lending practices, *id.* § 5531(a).  In addition, the Dodd-Frank Act

---

[2] Notably, the Government can find no comfort among the dissenting Justices in *Free Enterprise*, who also stressed the importance of constraining structural features to separation of powers analysis—such as "the way in which the statute defines the scope of the power the relevant administrator can exercise, the decision as to who controls the agency's budget requests and funding, the relationships between one agency or department and another, as well as more purely political factors (including Congress' ability to assert influence). . . ."  *See Free Enterprise Fund*, 561 U.S. at 524 (Breyer, J., dissenting).  The CFPB, of course, flunks most of these tests.

contains an unusual provision specifying that when the Director and the President

disagree on their interpretation of consumer financial laws with respect to which

both have enforcement authority, the courts must ignore the President's view and

defer to the Director's.  Pl. Br. 19-20, *citing* 12 U.S.C. § 5512(b)(4)(B).  The

Government disputes that this provision "requires the President and other

executive officers to defer to the Director," Gov. Br. 21-22, but the President's

posited ability to stick to his preferred interpretation for his own purposes is small

consolation when the judiciary, as the final arbiter of what the correct

interpretation is, has been instructed in advance that the Director's views shall

prevail.  The Act effectively makes the Director the "President of Consumer

Financial Policy."

These powers are wholly unlike those of the independent counsel at issue in

*Morrison*.  Unlike the independent counsel, the Director is not an inferior officer.

He exercises significant regulatory and enforcement authority.  He broadly sets

government policy with respect to consumer financial law, which forms the

backbone of the nation's economy.  A principal officer with regulatory authority for

the entire consumer credit economy cannot be compared to an inferior officer whose

jurisdiction is strictly limited to a government-facing sliver of the criminal justice

system.

Moreover, the CFPB is not limited by any of the structural restraints the

*Morrison* court highlighted as constraining the powers of the independent counsel.

The CFPB's jurisdiction and authority cannot be limited by decisions made by

executive branch officials.  *Cf.* 487 U.S. at 672, 696.  Unlike the Office of the

Independent Counsel, which was filled only intermittently, the CFPB is perpetual.

Further, the Director's tenure is not temporary or meaningfully limited, but rather

lasts for five-years, with holdover authority that extends until the Senate confirms

a successor.  Under this arrangement, the Director's tenure could eclipse a

President's ***entire term in office***, leaving the elected Chief Executive without any

policy influence at all on the broad and crucially important field of consumer

financial protection.  And unlike the independent counsel, the Director is under no

obligation ever to adhere to executive branch policies, even when such adherence is

"possible."

With *Morrison* so clearly inapposite, the Government attempts to lash the

CFPB to the mast of the FTC and *Humphrey's Executor*.  Gov. Br. 13-18.  This effort

also fails.  To begin, none of *Humphrey's Executor*'s reasoning concerning the FTC's

powers has any application to the CFPB.  *Humphrey's Executor*'s approval of

removal restrictions was founded on the Court's conclusion that the FTC's powers

were wholly nonexecutive, and that the FTC commissioners performed their various

duties "as a legislative or as a judicial aid." 295 U.S. 628.[3]  By contrast, the

Government does not dispute that the powers exercised by the CFPB are executive

---

[3] As previously noted, the Court stated in a footnote in *Morrison* that "it is hard to
dispute" that some of the FTC's powers would today be considered executive in
nature, "at least to some degree." 487 U.S. at 690 n.28.  With respect to at least
some of the FTC's authorities, however—such as its ability to "act as a master in
chancery under rules prescribed by the court"—*Humphrey's Executor*'s description
was clearly correct.  295 U.S. 628.  In any event, *Humphrey's Executor* was adamant
in founding its conclusions on its belief that the powers in question were
nonexecutive in nature, and its reasoning does not translate outside that context.

in nature.  Gov. Br. 14-16.  Indeed, the Government ***could not*** dispute that point because unlike the FTC, many of the CFPB's authorities were previously exercised by the executive branch, but were stripped away and handed to the Director by the Dodd-Frank Act.  Pl. Br. 10-11.  Moreover, the breadth of the CFPB's interpretive and enforcement authority is substantially greater than that of the 1935 FTC,[4] and the FTC was not (and is not) the beneficiary of any legal authority comparable to the section of Dodd-Frank that exalts the CFPB's interpretations of jointly administered statutes and regulations over the President's.  Pl. Br. 19-20.  In short, the CFPB's powers are meaningfully different for purposes of separation of powers analysis.

In any event, even if the CFPB's regulatory and enforcement powers were exactly identical to the FTC's, *Humphrey's Executor* would still provide no support for the constitutionality of the CFPB, both because the CFPB is entirely devoid of meaningful mitigating structural restraints, and because *Humphrey's Executor* did not address the constitutionality of independent agencies that simultaneously enjoy independence from both the executive and legislative branches.  In affirming the constitutionality of the FTC's independence from executive control, *Humphrey's Executor* invoked the FTC's multimember and bipartisan structure.  295 U.S. at 620, 624.  The Government dismisses these features as irrelevant to the Court's holding, but as previously discussed, lower courts have repeatedly relied on these and other mitigating structural restraints when evaluating the constitutionality of

---

[4] *See* https://www.ftc.gov/about-ftc (describing substantial expansions to the FTC's powers beginning in 1938).

agency independence from the President.  *See* Section I(A), *supra*; *FEC v. NRA Political Victory Fund*, 6 F.3d 821, 826 (D.C. Cir. 1993) (upholding removal restrictions on the Federal Election Commission on the ground that "[t]he Commission is patterned on the classic independent regulatory agency" that was approved by *Humphrey's Executor*).

Although the government dismisses a multimember commission structure as useful only for "policy" reasons, it in fact provides the President a greater measure of control over the agency, helping to safeguard the public's liberty from overzealous bureaucrats.  Presidents are reliably able to exert influence over independent agencies with multimember commissions in a relatively short span of time because of their staggered appointment structure.  Neal Devins & David Lewis, *Not-So Independent Agencies: Party Polarization & the Limits of Institutional Design*, 88 B.U. L. Rev. 459, 469–70 (2008) ("On average, Presidents [a]re able to obtain majorities for their party [on an independent agency commission] after nine or ten months.").  By contrast, the Director's five-year tenure and holdover authority could eclipse an elected President's ability to exert ***any*** influence over the CFPB. Similarly, it is well understood that multimember bipartisan commissions promote openness and provide a moderating influence that helps guard against extremes— both of which are important liberty-protecting functions.[5]  By contrast, the

---

[5] *See, e.g.*, Marshall J. Breger & Gary J. Edles, *Established by Practice: The Theory & Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111, 1116, 1135 (2000) (multimember commission structure provides "independence [from] one-sided partisan control"); Cass R. Sunstein, *Deliberative Trouble?  Why Groups Go to Extremes*, 110 Yale L.J. 71, 103 (2000) ("An independent agency that is all

Director's regulatory and enforcement decisions are neither debated in an open forum—where dissenting officials can make a public record—nor constrained by the need to cobble together the votes of anyone other than himself.[6]

Importantly, plaintiffs do not contend that a multimember commission structure is constitutionally required for all independent agencies under all circumstances to mitigate a loss of executive accountability. Other structural features and limits may do. But some meaningfully mitigating features there must be, especially with respect to an independent agency that wields substantial executive regulatory and enforcement authority that applies to the general public in nearly all of their economic transactions.[7] The absence of *any* meaningful

---

Democratic, or all Republican, might polarize toward an extreme position, likely more extreme than that of the median Democrat or Republican, and possibly more extreme than that of any member standing alone. A requirement of bipartisan membership can operate as a check against movements of this kind."); Charles Kruly, *Self-Funding & Agency Independence*, 81 Geo. Wash. L. Rev. 1733, 1749 (2013) ("A corollary of the multi-member structure, a bipartisan balance requirement should, in theory, depoliticize agency decisionmaking.").

[6] The requirements of the Government in the Sunshine Act, for example, do not apply to an agency like the CFPB that is headed by a single individual. 5 U.S.C. § 552b(a)(1) (extending only to agencies "headed by a collegial body composed of two or more individual members").

[7] Plaintiffs do not concede that *Humphrey's Executor* effectively validates all the agencies cited by the Government—"the CFTC, the FCC, the Federal Reserve, the FTC, FERC, the NLRB, and the SEC," Gov. Br. 13 & n.9. Moreover, these agencies differ meaningfully from the CFPB. All of the listed agencies are led by multi-member commissions, and all but the Federal Reserve have mandatory or traditional bipartisan requirements. *See* 7 U.S.C. § 2(a)(2)(A) (CFTC); 47 U.S.C. § 154(b)(2)(B)(5) (FCC); 15 U.S.C. § 41 (FTC); 42 U.S.C. § 7171(b)(1) (FERC); 15 U.S.C. § 78d(a) (SEC); Breger & Edles, *Established by Practice*, *supra* at 13 n.5, at 1139 n.137 (NLRB traditional bipartisan requirement). Moreover, even though the Federal Reserve does not have a political diversity requirement, it does have other requirements designed to ensure viewpoint diversity, including requirements regarding geographic and industry representation. 12 U.S.C. § 241. Finally, the

mitigating structural restraints on the CFPB—particularly when considered in light of the CFPB's full independence from Congress, *see* Section I(D), *infra*—is fatal to its constitutionality.

### C. Structural restraints matter in separation of powers cases because the purpose of that doctrine is to protect liberty by maintaining accountability and preventing the concentration of the government's distinct powers.

The Government claims that "the real question" in a separation of powers case is "whether the removal restrictions are of such a nature that they impede the President's ability to perform his constitutional duty." Gov. Br. 19, *quoting Morrison*, 487 U.S. at 691. It is true, of course, that any removal restrictions that impeded the President's ability to perform his constitutional duty would be invalid—and the CFPB should be invalidated for that reason alone. That is not, however, the sole inquiry of separation of powers analysis, which not only guards against encroachment on the executive, but more broadly protects against improper concentrations of the legislative, executive, and judicial powers in ways that threaten liberty. The Dodd-Frank Act's unprecedented combination of sweeping regulatory and enforcement power in a self-funding agency that is not accountable to the President or to Congress and has no meaningful structural restraints threatens liberty, violates the separation of powers, and requires that the CFPB be invalidated.

---

Federal Reserve's primary function is not to exercise regulatory and enforcement authority over the general public, but rather is to conduct the nation's monetary policy to promote the goals of maximum employment, stable prices, and moderate long-term interest rates. *See* 12 U.S.C. § 225a.

In *Free Enterprise*, the Court reinforced that the purpose of safeguarding the constitutional separation of powers is to protect liberty:  "[W]hile a government of 'opposite and rival interests' may sometimes inhibit the smooth functioning of administration, The Federalist No. 51 [(J. Madison)] … '[t]he Framers recognized that, in the long term, structural protections against abuse of power were critical to preserving liberty.'"  561 U.S. at 501 (fourth alteration in original) (quoting *Bowsher v. Synar*, 478 U.S. 714, 726 (1986)).  The Court noted that "[t]he Framers created a structure in which '[a] dependence on the people' would be the 'primary control on the government,'" and observed that this "dependence is maintained, not just by 'parchment barriers,' but by letting 'ambition counteract ambition,' giving each branch 'the necessary constitutional means, and personal motives, to resist encroachments of the others.'"  561 U.S. at 501, *quoting* The Federalist No. 51 and The Federalist No. 48 (J. Madison).

In stating these principles, the Court invoked Madison's *Federalist* essays, which make clear that the danger guarded against by the separation of powers is the "gradual concentration of the several powers in the same department … ."  The Federalist No. 51.  Madison expounded that "where the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department, the fundamental principles of a free constitution are subverted."  The Federalist No. 47 (J. Madison) (emphasis in original).  Thus, "no person shall exercise the powers of more than one of [the legislative, executive, and judiciary departments] at the same time."  The Federalist No. 48.  Indeed, Madison

(quoting Thomas Jefferson) termed "concentrating [more than one power] in the same hands . . . precisely the definition of despotic government." *Id.*

The Dodd Frank act violates these principles by concentrating the powers of the sword and the purse in the single person of the Director, while simultaneously stripping away the checks and balances that traditionally render officials accountable to the President, the Congress, and the people. *Free Enterprise* stressed that a key objective of the separation of powers is preserving accountability, since the people are the ultimate liberty-preserving check on the government. "Without a clear and effective chain of command, the public cannot 'determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall.'" 561 U.S. at 498, *quoting* The Federalist No. 72 (A. Hamilton). "That is why the Framers sought to ensure that 'those who are employed in the execution of the law will be in their proper situation, and the chain of dependence be preserved; the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community.'" *Id.*, *quoting* 1 Annals of Cong. 499. But the CFPB does not answer to the President, or to the Congress, or the regulated community. Indeed, its highly unusual power to fund itself out of another agency's coffers in its own wholly unreviewable discretion makes it particularly difficult to hold the CFPB accountable, further exacerbating its lack of other structural restraints.

The government invokes the referenced executive encroachment language from *Morrison* in an attempt to avoid inquiry into these features. Notably, however,

17

of the four *Morrison* quotes that the Government characterizes as representing the "real" separation of powers test, two do not appear in *Free Enterprise* at all, Gov. Br. 13, 16, and the other two appear only in Justice Breyer's dissent.  Gov. Br. 13, 19; *cf.* 561 U.S. at 519, 533.  The *Morrison* quotes were stated in the context of removal restrictions having been placed on an official within the Department of Justice, a flagship department of the executive.  The independent counsel had no regulatory or policymaking authority that might affect the general public, and even its prosecutorial authority applied only within the government.  In this context, it made perfect sense for *Morrison* to focus solely on questions of encroachment and interference with the President's performance of his constitutional duties.

The Court in *Free Enterprise*, by contrast, was faced with an independent agency housed **outside** the executive and vested with regulatory powers that affected the public.  Its response was to broaden its focus from encroachment concerns alone, and to examine whether diminution of accountability and the absence of the "opposite and rival interests" the Framers believed essential to checking governmental power threatened to undermine liberty.  In that case, it found they did.

The Government is thus flat wrong in suggesting that this Court can resolve this case by examining each of the CFPB's powers in turn and asking whether they are so "central to the functioning of the Executive" that the President cannot do without them.  Gov. Br. 16, *citing Morrison*, 487 U.S. at 691-92.  That vacuous test would allow Congress to place virtually the entire Government outside the

President's direct control, except perhaps for the original Departments of Defense (then War and Navy), State, and Treasury.  How could it ever be shown that the powers vested in the Departments of Labor, Health and Human Services, Commerce, Energy, Education, Transportation, and other similar departments are "central to the functioning of the executive branch," when the executive branch existed for decades or centuries without them?  Indeed, the bankruptcy of the Government's position is made clear by its refusal to accept that *Myers* forbids Congress from imposing removal limitations on Cabinet Secretaries, Gov. Br. 17-18—a position *Free Enterprise* characterized as "universally" accepted today.  561 U.S. at 494 n.3.

Mixing and matching constitutional innovations that have been elsewhere individually approved does not, as the Government contends, mean that the resulting innovation is also constitutional.  Fidelity to the Constitution and to the Framers' vision of the separation of powers requires attention not only to "interference" with the "central" functioning of each of the branches writ large, but also to guarding against the concentration of the government's distinct powers in a single individual or entity's hands without adequate mitigating restraints.  The CFPB, created as a virtual government unto itself, fails this test.

**D.    The CFPB's "full independence" from Congress impermissibly joins the powers of the sword and the purse in a politically unaccountable entity; the result is a major separation of powers violation.**

In its statements outside of Court, the CFPB has not hesitated to announce its "*full independence*" from Congress, independence that is protected by the CFPB's

19

perpetual, annual entitlement to hundreds of millions of dollars in "funding outside the congressional appropriations process." *Consumer Financial Protection Bureau Strategic Plan: FY 2013 – FY 2017* 36 (Apr. 2013), http://files.consumerfinance.gov/f/strategic-plan.pdf; *accord Consumer Financial Protection Bureau Strategic Plan, Budget, and Performance Plan and Report* 89 (Mar. 2014), http://files.consumerfinance.gov/f/strategic-plan-budget-and-performance-plan-and-report.pdf.  To the Court, however, the CFPB tells a different story, claiming to be subject to Congress's "full authority." Gov. Br. 24.

The CFPB was correct the first time.  It enjoys full independence from Congress's constitutional power of the purse; instead of needing to convince Congress to fund it from year to year, the Bureau enjoys an automatic entitlement to hundreds of millions of dollars that it draws from the coffers of another independent agency in its unreviewable discretion.  Moreover, the CFPB's extraordinary power to self-appropriate can be ended only if the House, the Senate, and the President come together to amend the Dodd-Frank Act.  In other words, having abdicated its power of the purse to an agency vested with broad executive authority to regulate and enforce, Congress can retrieve it only with the agreement of the Chief Executive, or by mustering enough votes to override a presidential veto.

This complete budgetary independence, viewed (as it must be, *see* Section I(A), *supra*) in combination with the CFPB's other means of structural independence, is indeed "uniquely constitutionally problematic." Gov. Br. 30 (quoting Pl. Br. 30).  The Government argues that the Constitution places no limits whatsoever on the ability

of one Congress and one President to place an agency outside of the appropriations process in perpetuity, regardless of its structure, substantive powers, or other considerations. *See id.* at 23.  But as the Framers, scholars, and the Supreme Court have repeatedly recognized, Congress's power of the purse is "the most complete and effectual tool" for Congress to check "all the overgrown prerogatives of the other branches of government," and thus to vindicate the will of the people. Federalist No. 58 (Madison); *see generally* Pl. Br. 21-28. And as the CFPB's own public statements and interactions with Congress demonstrate, its "full independence" from Congress's power of the purse has created a federal regulatory agency utterly foreign to the Framers and the Constitution.

      1.     *The Government cites no case affirming a regulatory agency's perpetual independence from both the President and Congress.*

The Government dedicates the bulk of its brief to arguing that the CFPB's automatic funding stream, viewed ***in isolation from*** the rest of the CFPB's structural features, is permissible under Article I of the Constitution. *See* Gov. Br. 22.  In fact, Plaintiffs have made clear from the outset of this litigation that their primary constitutional challenge to the CFPB's structure is to its financial independence from Congress, ***in combination*** with the Director's independence from removal at-will by the President, and in the absence of any potentially mitigating structural features that might serve as internal checks and balances. *See* Pl. Br. 9; Second Am. Compl. ¶¶ 203-05.  As set forth above, the CFPB's piecemeal approach disregards the Supreme Court's insistence upon a functional analysis of the agency's combined structural features.  *Free Enter. Fund*, 561 U.S. at

496; *see also Ass'n of Am. R.R. v. DOT*, 721 F.3d 666, 673 (D.C. Cir. 2013) ("just because two structural features raise no constitutional concerns independently does not mean Congress may combine them in a single statute"), *rev'd on other grounds*, 136 S. Ct. 1225 (2015).  The CFPB's autonomous funding structure and the Director's independence from the President must be viewed together, because such a "novel structure does not merely add to the Board's independence, but transforms it." *Free Enter. Fund*, 561 U.S. at 496.

The CFPB cites no case approving such a self-perpetuating, doubly independent structure for a regulatory agency, because neither the Supreme Court nor the D.C. Circuit has ever approved of such a combination—and with good reason.  In the absence of full presidential oversight of an officer executing the law, auxiliary structural protections become all the more important.  *See supra* Part I(A). Nor do any of the other agencies (past or present) invoked by the CFPB that are funded outside the appropriations process reflect anything remotely similar to the combination of broad public-facing regulatory and enforcement authority and sweeping structural independence that is enjoyed by the CFPB.  *See* Gov. Br. 26 n.15.  The Office of the Comptroller of the Currency, though funded without appropriations, enjoys no independence from the President. 12 U.S.C. § 2 (Comptroller "shall hold his office for a term of five years unless sooner removed by the President, upon reasons to be communicated by him to the Senate").  Likewise, the National Credit Union Administration's members enjoy no statutory protection from presidential removal at will, 12 U.S.C. § 1752a(b), and the D.C. Circuit has

expressly cast doubt upon the notion that they enjoy any implicit "independence," either. *Swan v. Clinton*, 100 F.3d 973, 981-88 (D.C. Cir. 1996).  Similarly, Congress has granted no removal protection to the heads of the Farm Credit Administration, 12 U.S.C. § 2242(b), the Federal Deposit Insurance Corporation, 12 U.S.C. § 1812(c), or the defunct Office of Thrift Supervision, Pub. L. No. 101-73, § 301, 103 Stat. 183, 278 (1989) (formerly codified at 12 U.S.C. § 1462a(c)(2)).  Even the Federal Reserve System, cited by the CFPB as a comparable agency,[8] does not enjoy the funding discretion the CFPB enjoys.  Whereas the CFPB is statutorily entitled to claim hundreds of millions of dollars annually from the Federal Reserve unencumbered by any connection to its activities, functions, or to market participants,[9] the funding of the Federal Reserve System is tied to its specific functions, and it must be both faithful to specific statutory direction and mindful of the reactions of private sector market participants.[10]

---

[8]  Although the CFPB is technically dubbed a Bureau within the Federal Reserve, Def. Br. 5, the label is a meaningless accounting convention, and the CFPB in fact functions with complete independence.  *See* Ben S. Bernanke, *The Courage to Act:  A Memoir of a Crisis and its Aftermath* 463 (2015) ("[I]t became technically part of the Federal Reserve.  That was in name only. … The Fed would have no power to hire, fire, or direct any of its employees; no power to delay or disprove its rules; and no power to intervene in any of its examinations or proceedings.  We were required, however, to pay its operating expenses indefinitely….").

[9]  The CFPB calls this "but a fraction of the Federal Reserve System's operating expenses." Gov. Br. 26.  This understates the significant amount of money the CFPB appropriates to itself from the Federal Reserve.  The CFPB is entitled to up to *twelve percent* of the Federal Reserve System's total operating expenses, 12 U.S.C. § 5497(a)(2).

[10]  For example, one source of Federal Reserve funding, which is levied on Reserve Banks, must be "in proportion to their capital stock and surplus."  12 U.S.C. § 243 (cited in Gov. Br. 25).  This limitation provides a direct and meaningful market-based, performance-based, and publicly accountable check on the Federal Reserve's

The only even arguably similar example cited by the Government is the Federal Housing Finance Agency ("FHFA"), which does enjoy both fiscal independence (12 U.S.C. § 4516) and presidential independence (12 U.S.C. § 4512(b)(2)).  The FHFA, however, exists solely for the purpose of "regulating" other federal or quasi-federal entities—government-sponsored entities such as Fannie Mae, Freddie Mac, and the Federal Home Loan Banks, *see* 12 U.S.C. § 4511(b), not the public at large.

The 1794 Act regarding post offices also does not bear the weight the Government places upon it.  True, the Act directed the Postmaster General to provide the Treasury Secretary a "quarterly account of all the receipts and expenditures in the said department, to be adjusted and settled," and to "pay, quarterly into the treasury of the United States, the balance in his hands."  Act of May 8, 1794, ch. 23, § 4, 1 Stat. 354, 358.  But the Act further specified precisely the salary to be paid to the Postmaster General and each of his assistants, and the maximum salary to be paid to his four clerks.  *Id.* § 8.  Meanwhile, the Act further

---

management.  Likewise, another source of Federal Reserve funding, fees for services provided to banks in connection with automated clearinghouse operations, is inherently constrained by market participants because if Federal Reserve fees were excessive, banks could opt not to use the services.  Finally, the Federal Reserve's income from the securities it acquires through open market operations—essentially the buying and selling of securities to maintain interest rate targets—is constrained by Congress having set forth specific goals the Federal Reserve must attend to in the conduct of its open market operations.  *See* 12 U.S.C. § 225a  ("The Board of Governors of the Federal Reserve System and the Federal Open Market Committee shall maintain long run growth of the monetary and credit aggregates commensurate with the economy's long run potential to increase production, so as to promote effectively the goals of maximum employment, stable prices, and moderate long-term interest rates.").

specified the fees that the Post Office could charge the public for its services.  *Id.*
§§ 9-10.  (And, just to be safe, the Act further specified the fine to by paid by Post
Office employees who charged in excess of those rates. *Id.* § 11.)  Furthermore, while
post offices indisputably provide a service to the public, it hardly could be said to
wield the power of the sword in regulating and enforcing against it.

    The CFPB's structural independence is thus unprecedented among the many
examples the Government presents in its briefs.  The Supreme Court, in striking
down the Public Company Accounting Oversight Board's unprecedented measure of
independence, stressed that "[p]erhaps the most telling indication of the severe
constitutional problem with the PCAOB is the lack of historical precedent for this
entity." *Free Enter. Fund*, 561 U.S. at 505 (quoting 537 F.3d 667, 699 (D.C. Cir.
2008) (Kavanaugh, J., dissenting)); *see also Ass'n of Am. R.R.*, 721 F.3d at 673
("[N]ovelty may, in certain circumstances, signal unconstitutionality. That double
good-cause tenure, for example, lacked an antecedent in the history of the
administrative state was one reason to suspect its legality.").  The CFPB's own
novel structural independence deserves no less exacting scrutiny, in order to
preserve the Constitution's systems of checks and balances.  And it is easy to
conclude that the CFPB's doubly independent structure goes beyond any line
previously drawn by the Supreme Court.  *Free Enterprise*, 561 U.S. at 514 ("While
we have sustained in certain cases limits on the President's removal power, the Act
before us imposes a new type of restriction[.]").

2.  *The problems inherent in freeing the CFPB from Congress's power of the purse are not alleviated by the possibility that a future House of Representatives, Senate, and President might someday change the law.*

The CFPB's statutory entitlement to hundreds of millions of dollars annually, outside of the congressional appropriations process, gives it full independence from future Congresses.  The Comptroller General might "audit" the CFPB, Gov. Br. 29; and the CFPB might send reports to Congress, *id.*  But a Congress dissatisfied with those reports or the results of the audits has no tool at its disposal to rein in the agency.  The CFPB can refuse repeatedly to provide Congress with the information it requests, either in person or in writing, Pl. Br. 29-30, yet Congress will have no substantive power to sanction the CFPB, precisely because the CFPB need not convince the House of Representatives, the Senate, and the President to affirmatively vote to fund it.  Instead, the CFPB need only convince one of those three actors—or, in the case of the Senate, enough Senators to maintain a filibuster—to prevent the others from amending the law. Contrary to the Government's assertions, that is a far cry from subjection to the "full authority" of Congress.  Gov. Br. 24.

3.  *The Government concedes no limiting principle on a single Congress's discretion to free an agency from future Congresses' Power of the Purse.*

Under the Government's theory, a single Congress's power to give the CFPB a perpetual federal funding stream, and thus perpetual independence from future Congresses, knows literally no bounds.  According to the Government, the Appropriations Clause places absolutely no "duty" or "limits" on Congress.  *See* Gov. Br. 23-24.  Thus—says the Bureau—a single Congress is free to establish a

framework in which **any** agency is perpetually funded by the Federal Reserve instead of by future Congresses.  *Id.*  The CFPB infers that because the Constitution frames appropriation as a *power* entrusted to Congress, the Appropriations Clause contains no implicit *limitations* on Congress's ability to delegate, abdicate, circumvent, or constrain it.  *Id.* at 23 ("nothing in the Appropriations Clause prohibits Congress . . .").

That inference is mistaken.  The Supreme Court repeatedly has found significant limitations implicit in the Constitution's grants of power to Congress, when the limits are necessary to preserve the Constitution's vertical and horizontal separation of powers and other fundamental constitutional values.

For example, the Constitution affirmatively vests Congress with the legislative power, including the power to regulate interstate commerce, U.S. Const. art. I, § 8, cl. 3, yet this grant implicitly prohibits Congress from delegating legislative power to an independent agency or executive agency without at least specifying an "intelligible principle."  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (citing *J.W. Hampton, Jr. & Co. v. U.S.*, 276 U.S. 394, 409 (1928)).  Similarly, the Constitution's affirmative grant of legislative power over interstate commerce does not leave Congress free to delegate legislative power to private groups.  *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936); *Ass'n of Am. R.R. v. DOT*, 721 F.3d 666, 670-71 (D.C. Cir. 2013), *rev'd on other grounds*, 136 S. Ct. 1225 (2015).  And while Section 5 of the 14th Amendment affirmatively grants to Congress the "power to enforce, by appropriate legislation, the provisions of [the

Amendment]" in order to remedy racial discrimination, U.S. Const. amdt. 14, § 5, that grant of power implicitly prohibits Congress from enacting remedial laws that lack "congruence between the means used and the ends to be achieved," *City of Boerne v. Flores*, 521 U.S. 507, 530, 536 (1997).  To allow otherwise would "contradict[] vital principles necessary to maintain separation of powers and the federal balance." *Id*.

In those cases and others, the Supreme Court recognized that constitutional grants of power to Congress often come with implicit limits, in order to ensure that one provision, read in isolation and taken to extreme lengths, not be allowed to undermine the Constitution's basic framework of separated powers and checks and balances.

4. *Even when considered in isolation, the CFPB's fiscal independence raises significant constitutional concerns.*

As noted above, Plaintiffs' primary constitutional challenge to the CFPB's structure is based on the combination of the agency's independence from the President and its independence from Congress, without any mitigating structural restraints.  Nevertheless, even considering the agency's fiscal independence in isolation from its other structural failings, Congress's abandonment of financial control of an entire executive agency that exercises vast regulatory and enforcement powers over a significant portion of the economy raises constitutional concerns that are not addressed, let alone rejected by, the cases cited in the Government's brief.

It is no doubt true, as the Court held in *Office of Personnel Management v. Richmond*, that the Appropriations Clause prohibits the Executive Branch from

paying benefits to a claimant when Congress has not appropriated funds for that purpose.  496 U.S. 414, 424 (1990), *quoted in* Gov. Br. 36.  But, as noted above, *supra* pp. 27-28, that express limitation on what the Executive Branch can do absent congressional appropriations does not indicate that Congress itself enjoys unlimited discretion to authorize agencies to spend nonappropriated federal money in perpetuity.  That is a non sequitur, just as the prohibition against an agency's exercising undelegated powers does not imply that Congress itself has unlimited discretion to delegate legislative power.

Similarly, when the Court noted in *Cincinnati Soap* that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress," it by no means suggested that Congress's own discretion to fund an agency outside the appropriations process is unlimited.  *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937), *quoted in* Gov. Br. 23.  Indeed, the very authority cited by the Court in *Cincinnati Soap* described Congress's appropriations power in terms of not just Congress's "power" but also its "responsibility"—that is, Congress's "responsibility" as "guardian of this treasure."  3 *Joseph Story's Commentaries on the Constitution of the United States* § 1348 (4th ed. 1873), *cited in Cincinnati Soap*, 301 U.S. at 321. It further stressed that "[t]he power to control and direct the appropriations constitutes a most useful and salutary check upon the profusion of extravagance, as well as upon corrupt influence and public peculation." *Id.* § 1348.

And while in *Harrington v. Bush* the D.C. Circuit stated that "Congressional power is plenary with respect to the definition of the appropriations process and

reporting requirements," 553 F.2d 190, 195 (D.C. Cir. 1977), the court did not go so far as to say that Congress *also* has plenary power to establish and entrench funding mechanisms *outside* the appropriations process—which, as the Government accepts, is the nature of the CFPB's funding. *See*, *e.g.*, Gov. Br. 25; *see also* 12 U.S.C. 5497(c)(2) (funds transferred to the CFPB from the Federal Reserve "shall not be construed to be Government funds or appropriated monies"). Indeed, in *Harrington* the court stressed the fact that the CIA's funding *was* appropriated by Congress; the only "exception" at issue in that case was Congress's decision to exempt the CIA's appropriations requests from generally applicable reporting requirements. 553 F.2d at 195. There was no suggestion in that case that Congress was abrogating its constitutional "responsib[ility] for its exercise of this great power," the power of the purse. *Id* at 194 n.7.[11]

Nor does the FLRA case cited by the CFPB support its broad view of Congress's purported discretion to release any and all agencies from the Constitution's power of the purse. While that court did suggest that Congress "may choose . . . to loosen its own reins on public expenditures," it nowhere endorsed the creation of an agency fully funded by the Government outside of the appropriations process, in perpetuity. *Am. Fed. of Gov't Employees v. FLRA*, 388 F.3d 405, 409 (3d Cir. 2004), *cited in* Gov. Br. 25. The court recognized that Congress might create

---

[11]   The CFPB mischaracterizes *Harrington*, stating that the CIA was funded "outside the ordinary appropriations process." Gov. Br. 25. As noted above, the Court made clear in that case that the CIA was indeed funded by appropriations; the Executive and Legislative Branches merely obscured the specific details of the CIA's budget requests from public view. 553 F.2d at 195.

"nonappropriated fund instrumentalities," but such entities would be funded "primarily from [their] own activities, services, and product sales"—not from another instrumentality of the Government.   *Id.* (alteration in original) (quotation omitted).  The Third Circuit stressed that its examples of nonappropriated funding all were intended to "insulate[] the public fisc," *id.* at 410; it did not endorse anything resembling the Dodd-Frank Act's establishment and (due to the inherent structural roadblocks to repeal) entrenchment of an independent agency's perpetual claim on revenues from another part of the federal government.

To be clear, plaintiffs do not here challenge Congress's ability to fund certain governmental ventures indefinitely, and under some circumstances to do so outside the appropriations process.  Where, however, an executive agency has been armed with the sword of regulation and enforcement, neither the Appropriations Clause nor general separation of powers principles permit Congress to hand that agency the power of the purse as well.  To do so impermissibly combines powers that the Constitution expressly separates, and does so in a manner that a future Congress cannot unwind without either securing the Chief Executive's assent or by mustering two-thirds supermajorities to overcome his veto.  This is a separate and independent ground on which the CFPB must be declared invalid.

## II.   CORDRAY'S RATIFICATION NOTE CANNOT REVIVE REGULATIONS HE ILLEGALLY PROMULGATED DURING THE PERIOD OF HIS INVALID RECESS APPOINTMENT

The Government makes several key concessions concerning plaintiffs' challenge to the January 2012 recess appointment of Richard Cordray to serve as director of the CFPB.  First, the Government makes no argument that Cordray's

31

recess appointment was legal, and the Court should take its unconstitutionality as admitted.  Second, the Government makes no argument that as an illegal recess appointee, Cordray could legally exercise the CFPB's regulatory authority.  The Court should accordingly accept as conceded that every regulation promulgated by Cordray during the period of his recess appointment was illegal and void, at least as of the time of its promulgation.  Third, the Government makes no argument that any of the regulations Cordray illegally promulgated are rendered valid by the de facto officer doctrine or by harmless error analysis, such a conclusion being foreclosed by precedent.  Pl. Br. 35-38.

The Government nevertheless advances four arguments that plaintiffs are not entitled to summary judgment and an injunction preventing the enforcement of the illegally promulgated regulations.  Plaintiffs address each of these arguments in turn.

### A.   Plaintiffs remain subject to Cordray's illegally promulgated regulations, and their request for relief accordingly is not moot.

The Government argues that plaintiffs' request for injunctive relief has been rendered moot by Cordray's confirmation.  Gov. Br. 32.  This argument is frivolous. The Government acknowledges that in the Second Amended Complaint, plaintiffs seek a judgment "enjoining [Director] Cordray from carrying out any of the powers delegated to the office of CFPB Director by the Act."  *Id.*, *citing* Second Am. Compl. ¶ 257.  This request for relief clearly extends to any powers Cordray actually exercised during the period of his unlawful appointment, to the extent that their illegal exercise continues to affect plaintiffs.  It would make no sense to construe the

Complaint, as the Government does, as seeking an injunction relating solely to *un*exercised powers, thus permitting Cordray to entirely circumvent plaintiffs' requested relief through the simple expedient of illegally exercising the very powers plaintiffs sought to enjoin.

To be sure, plaintiffs do not dispute that subsequent to his confirmation, Cordray could (subject to plaintiffs' separation of powers challenge) properly exercise those authorities that are lawfully vested in him as Director of the CFPB. The Director's lawfully vested authority does not extend to enforcing illegally promulgated regulations, however, and the Complaint is properly construed as seeking declaratory and injunctive relief preventing Cordray from presently enforcing against plaintiffs any regulations he promulgated while illegally serving as a recess appointee.  This controversy is live, and cannot be dismissed as moot.

### B.      The Complaint seeks the requested injunctive relief.

The Government advances two grounds in support of its argument that plaintiffs' request for declaratory and injunctive relief is not properly pleaded.  First, the Government contends that the Complaint "did not seek relief with respect to any Bureau rule." Gov. Br. 33.  As just discussed, however, plaintiffs expressly requested an injunction that, if granted at the time the Complaint was filed, would have prevented Cordray from promulgating, maintaining, or enforcing the rules in question.  Plaintiffs were not required under notice pleading rules to list each and every power that Cordray might illegally exercise, or to name each illegally

promulgated rule.  Plaintiffs requested an injunction extending to all of Cordray's illegal exercises of power, and that is all that was required.[12]

Second, the government charges plaintiffs with "introduc[ing] multiple [Administrative Procedure Act] claims into the case at the summary judgment stage . . . ." Gov. Br. 34.  This fundamentally misunderstands the nature of plaintiffs' request for relief, as well as their invocation of the APA.  Plaintiffs assert that "each [rule], as well as the agency actions underlying them (such as consideration of comments and compilation of the administrative record) was legally invalid," and that as a result "the rules themselves Must be held to be illegal and without effect." Pl. Br. 32.  The legal invalidity of the rules stems not from an independent violation of the APA, but rather flows directly from the unconstitutionality of Cordray's recess appointment.  *Id.* at 31-32, 34 (arguing that Cordray "lacked the authority to exercise the CFPB's rulemaking powers at the time the challenged regulations were initially proposed and enacted").  This contention is part and parcel of the Second Amended Complaint.  SAC ¶¶ 15, 95-96, 101-102, 111-123, 256-257.

Plaintiffs discuss the APA in their brief in support of summary judgment for two reasons, neither of which constitutes an unpleaded APA claim.  First, plaintiffs demonstrated that each of the challenged rules ***required*** the signature of a legally appointed Director to have legal force.  Gov. Br. 32.  The purpose of this discussion

---

[12] To the extent the court considers there to be any defect in plaintiffs' pleading, the request leave to amend. *Fed. Elec. Comm'n v. Legi-Tech*, 75 F.3d 704, 707 (D.C. Cir. 1996) (noting that it is appropriate for a district court to grant leave to amend where necessary to address structural constitutional violations).

was to show that each of the rules plaintiffs are seeking to enjoin depended on Cordray's illegal exercise of power for its existence, and could not be rescued on the theory that Cordray was merely incidentally involved in their promulgation and that they could have legal effect without him. *Id.* Second, as will be discussed in greater detail below, plaintiffs invoked the APA to rebut the Government's affirmative defense of ratification. Gov. Br. 33-35. At the time the Second Amended Complaint was filed, Cordray had not yet been confirmed, and had not yet published his purported ratification. Plaintiffs were not required to anticipate that the Government would later raise an affirmative ratification defense, and to plead a rebuttal to that defense in the Complaint. And plaintiffs are of course permitted to explain in their summary judgment briefing why Cordray's four-sentence "ratification" note cannot validly breathe legal life into past illegal actions that by statute can have no lawful force unless each step of a statutorily prescribed process was properly followed. There is no merit to the Government's argument for dismissal on the pleadings.

### C.     Plaintiffs have standing to seek the relief requested.

The Government all but concedes that plaintiffs have standing to challenge the Remittance Rule. Gov. Br. 35. The Government argues that plaintiffs lack standing to seek "much" of the relief they request, but acknowledges the Remittance Rule is a "potential exception," citing the D.C. Circuit's decision in this case. *Id.* The D.C. Circuit's decision does in fact definitively establish that plaintiffs have standing to challenge the Remittance Rule, 795 F.3d 48, 53 (D.C. Cir. 2015) (discussing the Remittance Rule's impact on plaintiffs), which is why the

Government advances no argument to the contrary. The Government's arguments concerning plaintiffs' standing to challenge the other rules Cordray illegally promulgated accordingly have no impact on plaintiffs' entitlement to a judgment on the merits.

The only remaining question, then, is the scope of the injunction to which plaintiffs are entitled. Beyond the remittance rule, plaintiffs challenge some rules that currently directly regulate SNB, and other rules that affect SNB by keeping it from reentering the mortgage market, despite its declared desire to do so. First Purcell Decl. ¶¶ 26-38 (ECF No. 27-2).

The Government does not dispute that the RESPA Servicing Rule directly regulates SNB, but rather contends that it is "speculative" whether the rule would ever be enforced against it. Gov. Br. 37. The D.C. Circuit's decision in this case forecloses this mode of analysis. "The Supreme Court has stated that 'there is ordinarily little question' that a regulated individual or entity has standing to challenge an allegedly illegal statute or rule under which it is regulated. … So it is in this case." 795 F.3d at 53, *quoting Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561–62 (1992). The court went on to hold that "[t]here is no doubt that the Bank is regulated by the Bureau . . . [and] therefore has standing to challenge" its constitutionality. *Id.* There is equally no question that SNB is regulated by the

RESPA Servicing Rule, and SNB accordingly has standing to seek relief from it based on its illegal promulgation.[13]

The Government also argues that plaintiffs have no standing to challenge the RESPA Servicing Rule because it had not been issued at the time the lawsuit was filed. Gov. Br. 37. This argument is frivolous. As previously discussed, plaintiffs' challenge is to the constitutionality of Cordray's recess appointment. The *relief* plaintiffs seek, and expressly requested in their Complaint, is an injunction shielding them from Cordray's illegal exercise of power. If a rule was illegally promulgated by Cordray, the fact that it was promulgated subsequent to the filing of the Complaint has no effect on plaintiffs' standing to seek the relief requested.[14]

The remaining rules with respect to which plaintiffs seek injunctive relief are the ATR-QM Rule, the Escrow Rule, and the Integrated Mortgage Disclosure Rule. The Government recycles its dismissal briefing arguments that SNB's injuries under these rules are self-inflicted, speculative, and/or flow directly from the authorizing statute rather than the illegally promulgated regulation. Gov. Br. 37-40. Plaintiffs stand on their dismissal briefing arguments on these points. ECF No. 27 at 12-31.

The Government also argues that a new statutory exemption makes the Escrow Rule's impact on SNB "even more speculative." Gov. Br. 39. Plaintiffs have

---

[13] Plaintiffs hereby incorporate by reference the arguments they made in their prior dismissal briefing concerning their standing to seek relief with respect to the various rules in question. ECF No. 27 at 12-31.

[14] For this reason, the timing of promulgation is no obstacle to plaintiffs' standing to challenge the ATR-QM Rule, the Escrow Rule, or the Integrated Mortgage Disclosure Rule.

filed a declaration, however, establishing that to benefit from that exemption, "the Bank would need to examine the list before making each new mortgage, identify the applicable rural census block, and count its mortgages by census block type so as to ensure it makes mortgages predominantly in rural census blocks." Purcell Decl. ¶ 17 (ECF No. 53-6).  In other words, qualifying for the exemption would itself impose the very kinds of counting costs on SNB that the D.C. Circuit has already held give plaintiffs standing to challenge the Remittance Rule. 795 F.3d at 53.  To the extent the Government is suggesting that pursuant to the new statutory provision it *might* one day establish a procedure to petition for a county-wide exemption, and *if* such a petition was filed it *might* grant it, it is the Government, not plaintiffs, that is speculating.

Finally, the Government argues that because the final Integrated Mortgage Disclosure Rule was adopted subsequent to Cordray's confirmation, the NPRM that Cordray illegally promulgated did not injure plaintiffs.  Gov. Br. 40.  That argument fails because the validity of the final rule depends on the validity of the previously issued NPRM.  Pl. Br. 32-35.

### D. Cordray's four-sentence ratification note was legally insufficient to validate previously illegally promulgated regulations.

The Government asserts that with a simple stroke of the pen, unaccompanied by any meaningful process, Cordray was able to "ratify" the regulations that he previously illegally promulgated and thereby render them legally operative.  Not so. Even if ratification could have force in the face of an Appointments Clause challenge—which, as plaintiffs explained in their opening brief, recent precedent

establishes it cannot, *see* Pl. Br. at 38 n.21—Cordray's process-free and entirely cursory ratification note was plainly insufficient to breathe new life into illegally adopted legislative rules, the validity of which depends as a matter of law on properly following all of the procedural steps prescribed by the APA.

> 1.   *A four-sentence note unaccompanied by meaningful process cannot validate an illegal administrative action of any kind.*

Because "[s]eparation of powers is a structural constitutional defect," every administrative action that Cordray took during the period of his illegal recess appointment is "void *ab initio*." *Fed. Elec. Comm'n v. Legi-Tech, Inc.*, 75 F.3d 704, 707 (D.C. Cir. 1996). The D.C. Circuit has recognized, however, that under certain circumstances a proper ratification can serve as "an adequate remedy" for a constitutional violation. *Id.* at 709. The key question in a ratification case is whether the agency has taken "remedial actions" sufficient to minimize or eliminate the prejudice caused to the injured party. *Id.* at 708 n.5.

Cordray's attempt to ratify the regulations he illegally promulgated (together with all of his other illegal administrative actions) through a single four-sentence note published in the Federal Register fails for two reasons. First, it is established law in this Circuit that ratification requires **reconsideration on the merits** through a **meaningful process**, but Cordray's ratification note evidences neither. Second, no case cited by the Government has permitted summary ratification of an illegal rulemaking, and it would be inconsistent with the APA to allow rules that were void *ab initio* to be rendered legally effective through anything short of re-promulgation through notice and comment procedures.

In *every* ratification case on which the Government relies, ratification was found to be effective *only* where a properly appointed officer reconsidered the merits of the prior illegal action through a *de novo* deliberative process. *See, e.g.*, *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 117-18, 123-24 (D.C. Cir. 2015) ("*Intercollegiate III*") (ratification requires "a subsequent determination" by "a properly appointed official" who "has the power to conduct an independent evaluation of the merits and does so"); *Legi-Tech, Inc.*, 75 F.3d at 708-09 (ratification effective where the FEC reconstituted itself, received new recommendations from the General Counsel, and engaged in three days of deliberation before voting to authorize continued litigation); *Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision*, 139 F.3d 203, 213-14 (D.C. Cir. 1998) (ratification effective where properly appointed officer ratified after making a "detached and considered judgment in deciding the merits against the Bank"); *Stryker Spine v. Biedermann Motech GmbH*, 684 F.Supp. 2d 68, 87 (D.D.C. 2010) (ratification effective where "Board conducted the same analysis and reached the same conclusion on rehearing as it did in its initial decision").[15]

Cordray's attempt to ratify all of his illegal actions over an 18 month span with a single four-sentence note evidencing no accompanying process would not have satisfied any of these courts.  In *Doolin*, for example, the Court found that ratification was effective only after observing that rather than "simply writing a letter or a memorandum adopting the Notice of Charges as his own," the ratifying

---

[15] *Andrade v. Regnery*, another case Defendants cite, is irrelevant because it was not decided on ratification grounds.  824 F.2d 1253, 1256-57 (D.C. Cir. 1987).

official "acted in the normal course of agency adjudication" and provided a

"reasoned conclusion." *Doolin*, 139 F.3d at 213.  Cordray's four-sentence note in the

Federal Register, by contrast, provides no "remedial action" at all.  *Legi-Tech,* 75

F.3d at 708 n.5.  There is no process, no reasoning, no conclusion—indeed, there is

no acknowledgment that a constitutional violation even occurred.  *See* 78 Fed. Reg.

53,734 (2013) (stating "I believe that the actions I took during the period I was

serving as a recess appointee were legally authorized and entirely proper.").

Permitting Cordray to ratify 18 months of illegal actions in this manner would turn

ratification into a farce, and would instruct future officials considering how to

remedy Appointments Clause violations not to trouble themselves to do anything

more.  It would also substantially reduce the incentive for Presidents to avoid

committing violations of the Appointments Clause in the first place.

      2.    *Ratification of a illegally promulgated rule can be accomplished only through the process prescribed by the APA.*

Cordray's ratification note has no valid claim to legal effect for any purpose,

but it is particularly inadequate to the task of ratifying illegally promulgated rules,

which can be validly adopted ***only*** by following the procedural steps set forth in the

APA.  A critical component of the deliberative process for rulemaking under the

APA is the requirement that an agency publish notice of the proposed rule and give

interested persons at least 30 days to submit "written data, views, or arguments"

regarding the proposal. 5 U.S.C. § 553(b)–(d).  The APA also sets forth specific

timing requirements between a Notice of Proposed Rulemaking and the

promulgation of a final rule.  *See id.*  Plaintiffs (and everyone else regulated by the

CFPB) were legally entitled to have each step of this process conducted under the authority of a constitutionally appointed officer.  Ratification of illegally adopted regulations accordingly requires, at a minimum, repromulgation of the regulations pursuant to the APA's notice and comment rulemaking procedures, under the supervision and signature of a properly-confirmed CFPB Director.

As discussed above, Cordray entirely skipped these steps when "ratifying" his prior decisions. Notably, the Government makes no claim that Cordray ever reconsidered the merits or his prior rulemakings, much less that he followed the procedural requirements of the APA.  And the APA plainly does not permit Cordray to simultaneously ratify an illegally promulgated notice of proposed rulemaking and an illegally promulgated final rule, as the APA requires a specific type of process and amount of time that must occur ***between*** the two acts for the latter to be valid. *See Federal Election Com'n v. NRA Political Victory Fund*, 513 U.S. 88, 98 (1994); *see also In re W.R. Grace & Co.*, 316 F. Appx. 134, 136 (3d Cir. 2009) (finding ratification "ineffective in the face of an intervening deadline").  His attempted ratification is accordingly without effect.[16]

Two additional considerations further weaken Cordray's ratification defense. First, the threshold to sustain ratification is particularly high in cases involving violations of the Appointments Clause.  The D.C. Circuit has, subsequent to the

---

[16] Plaintiffs do not contend that the entire administrative rulemaking process, such as ministerial drafting work typically performed by agency staff, must be repeated from scratch.  Instead, they argue only that the steps ***directly*** implicated by Cordray's unconstitutional appointment must be redone, such as the signing and publication of the Notice of Proposed Rulemaking, consideration of comments, and signing and publication of the final rule.

cases primarily relied on by the Government, definitively held that an Appointments Clause violation constitutes a structural constitutional error where the presumed prejudice warrants ***automatic nullification*** of the illegally appointed officer's actions. *Landry v. FDIC*, 204 F.3d 1125, 1131 (D.C. Cir. 2000) (finding an Appointments Clause violation without considering whether prejudice could be shown); *Intercollegiate III*, 796 F.3d at 123-24 (indicating that an Appointments Clause violation constitutes a structural error warranting reversal regardless of a showing of prejudice); *see SW Gen., Inc., v. NLRB*, 796 F.3d 67, 79 (D.C. Cir. 2015) (stating that prejudice is unnecessary "if the alleged error is 'structural' in nature"); *see also Freytag v. Comm'r*, 501 U.S. 868, 878, 880 (1991) (indicating that Appointments Clause violations are structural). Indeed, the logical foundation of these decisions recognize the "special problem" that Appointments Clause violations present. *Landry*, 204 F.3d at 1132. If a subsequent constitutionally appointed officer could merely "cleanse the [Appointments Clause] violation of its harmful impact" with the simple stroke of a pen, then ***all*** Appointments Clause violations "would escape judicial review." *Id.*; *see id.* at 1130-31 (Appointments Clause violation existed even though properly appointed officials affirmed the decision of an allegedly improperly appointed administrative law judge on direct *de novo* review).

Second, this Circuit has held that ratification cannot remedy an Appointments Clause violation if continued prejudice remains. *Legi-Tech, Inc.*, 75 F.3d 704 at 708 (stating that if ratification did not "adequately address[] the

prejudice . . . from" an Appointments Clause violation then dismissal of the enforcement action is required); *Intercollegiate III*, 796 F.3d at 124 (noting similarly).  Here, Plaintiffs continue to suffer prejudice from Cordray's purported ratification because they never had an opportunity to present objections or comments to the proposed rules to a constitutionally appointed official.  *See id.* at 122 (considering whether Intercollegiate had an opportunity to be heard "before a panel of judges whose appointment does not offend the Constitution"); *see also Ryder v. United States*, 515 U.S. 177, 188 (1995) (finding that Ryder was "entitled to a hearing before a properly appointed panel").

## III.   PLAINTIFFS COMPETITIVE ENTERPRISE INSTITUTE AND THE 60 PLUS ASSOCIATION REMAIN IN THE CASE

The Government contends that the Competitive Enterprise Institute ("CEI") and the 60 Plus Association ("60 Plus") "are no longer parties to this litigation and should not be treated as such."  Gov. Br. 4 n.1.  This is incorrect.  The D.C. Circuit did not hold that CEI and 60 Plus lack standing and a ripe claim.  To the contrary, the D.C. Circuit merely noted that CEI and 60 Plus "do not advance arguments for standing independent of the Bank's arguments," *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53 n.1 (D.C. Cir. 2015), and went on to hold both that the Bank had standing to challenge the constitutionality of the CFPB and Director Cordray's recess appointment, and that the claims were ripe.  *Id.* at 57.  Where multiple parties make the same arguments in joint briefs and one of the parties has standing to advance a ripe claim, this is the end of the standing inquiry, and all parties advancing this claim remain in the action.  *See Military Toxics Project v. E.P.A.*, 146

44

F.3d 948, 954 (D.C. Cir. 1998) ( "[i]f one party has standing in an action, a court need not reach the issue of the standing of other parties…" (quoting *Ry. Labor Executives' Ass'n v. United States*, 987 F.2d 806, 810 (D.C. Cir. 1993)).

## CONCLUSION

This Court should hold that the CFPB unconstitutionally violates the separation of powers, that Richard Cordray's January 4, 2012 recess appointment was unconstitutional, and that the challenged regulations are invalid and cannot be enforced against plaintiffs.

Respectfully submitted.

GREGORY JACOB
    *Counsel of Record*
O'MELVENY & MYERS LLP
1625 I St. NW
Washington, DC 20006
(202) 383-5300
gjacob@omm.com

C. BOYDEN GRAY
ADAM J. WHITE
ADAM GUSTAFSON
DEREK S. LYONS
BOYDEN GRAY & ASSOCIATES
1627 I Street NW, Suite 950
Washington, DC 20006
(202) 955-0620
adam@boydengrayassociates.com

*Counsel for Plaintiffs State National Bank of Big Spring,
the Competitive Enterprise Institute, and the 60 Plus Association*

SAM KAZMAN
HANS BADER
COMPETITIVE ENTERPRISE INSTITUTE
1899 L St. NW, Floor 12
Washington, DC 20036
(202) 331-1010

*Co-Counsel for Plaintiffs
Competitive Enterprise Institute*

February 24, 2016

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 24th day of February 2016, I electronically filed the

foregoing brief with the Court.  I further certify that on this 6th day of November

2015, I served the foregoing brief on all counsel of record through the Court's

CM/ECF system.


/s/ Gregory F. Jacob
Gregory F. Jacob
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, D.C. 20006
Telephone: (202) 383-5300