**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| STATE NATIONAL BANK OF BIG SPRING, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:12-cv-01032 (ESH) |
| JACOB J. LEW, in his official capacity as United States Secretary of the Treasury and *ex officio* Chairman of the Financial Stability Oversight Council, *et al.*, | ) ) ) ) ) | |
| Defendants. | ) | |

_____

**REPLY IN SUPPORT OF DEFENDANTS' CROSS-MOTION**
**FOR SUMMARY JUDGMENT AND DISMISSAL**

_____

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 3

I.   DEFENDANTS ARE ENTITLED TO JUDGMENT ON SNB'S SEPARATION-OF-POWERS CLAIM. ............................................................................................... 3

    A.   TITLE X DOES NOT VIOLATE ARTICLE II. ............................................................4

        1.   *The Director's Tenure Protection Does Not Violate Article II.* ............................4

        2.   *Title X as a Whole Does Not Violate Article II.* .......................................8

    B.   TITLE X DOES NOT VIOLATE ARTICLE I. ............................................................13

    C.   WITHOUT A VIOLATION OF ARTICLE I, ARTICLE II, OR ARTICLE III, THERE IS NO SEPARATION-OF-POWERS VIOLATION. ..................................................18

II.  SNB'S CLAIM UNDER THE RECESS APPOINTMENTS CLAUSE SHOULD BE DISMISSED, OR JUDGMENT SHOULD BE ENTERED FOR DEFENDANTS......... 19

    A.   NO CHALLENGE TO ANY BUREAU RULE IS PROPERLY BEFORE THE COURT. .................20

    B.   THE RATIFICATION CURED ANY DEFECT IN THE RULES. ....................................22

        1.   *Precedent Eschews Formalistic Procedural Requirements for Ratification, and There Is No Valid Policy Argument for Them Either.* ..................................24

        2.   *The Agency Did Not Need to Engage in Notice and Comment Rulemaking a Second Time.* ......................................................................................27

CONCLUSION................................................................................................................... 30

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*AINS, Inc. v. United States,*
  56 Fed. Cl. 522 (Ct. Cl. 2003) ............................................................. 13

*Andrade v. Regnery,*
  824 F.2d 1253 (D.C. Cir. 1987) ................................................. 24, 25, 26

*Bowles v. Wheeler,*
  152 F.2d 34 (9th Cir. 1945) ............................................................... 26

*Bowsher v. Synar,*
  478 U.S. 714 (1986) ..................................................................... 5, 17

*City of Los Angeles v. Lyons,*
  461 U.S. 95 (1983) ......................................................................... 22

\* *Doolin Sav. Bank, F.S.B. v. Office of Thrift Supervision,*
  139 F.3d 203 (D.C. Cir. 1998) ............................................. 3, 25, 27, 28

*FCC v. Fox Television Stations,*
  556 U.S. 502 (2009) ....................................................................... 11

\* *FEC v. Legi-Tech, Inc.,*
  75 F.3d 704 (D.C. Cir. 1996) ................................ 2, 3, 23, 24, 25, 26, 27, 28, 29, 30

*FEC v. NRA Political Victory Fund,*
  513 U.S. 88 (1994) ..................................................................... 26, 28

*Foman v. Davis,*
  371 U.S. 178 (1962) ....................................................................... 21

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,*
  537 F.3d 667 (D.C. Cir. 2008) ........................................................ 5, 10

\* *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,*
  561 U.S. 477 (2010) ...................................... 4, 5, 7, 8, 12, 17, 18

*Freytag v. Comm'r,*
  501 U.S. 868 (1991) ..................................................................... 8, 19

*Friends Christian High Sch. v. Geneva Fin. Consultants,*
  39 F. Supp. 3d 58 (D.D.C. 2014) ....................................................... 21

*Harrington v. Bush,*
  553 F.2d 190 (D.C. Cir. 1977) .......................................................... 16

*Humphrey's Executor v. United States*,
   295 U.S. 602 (1935) ...................................................................... 1, 5, 6, 8, 10, 19

*Intercollegiate Broad. Sys. Inc. v. Copyright Royalty Bd.*,
   796 F.3d 111 (D.C. Cir. 2015) ............................................................... 3, 24, 25, 27

*Landry v. FDIC*,
   204 F.3d 1125 (D.C. Cir. 2000) ...................................................................... 29

*McConnell v. FEC*,
   540 U.S. 93 (2003) ...................................................................................... 22

*Morrison v. Olson*,
   487 U.S. 654 (1988) ............................................................... 1, 4, 5, 6, 7, 8, 10, 11, 19

*Nat'l Maritime Safety Ass'n v. OSHA*,
   649 F.3d 743 (D.C. Cir. 2011) ...................................................................... 14

*Oceana, Inc. v. Pritzker*,
   24 F. Supp. 3d 49 (D.D.C. 2014) .................................................................. 23

*Office of Pers. Mgmt. v. Richmond*,
   496 U.S. 414 (1990) ...................................................................................... 13

*Paulsen ex rel. N.L.R.B. v. All Am. Sch. Bus Corp.*,
   986 F. Supp. 2d 142 (E.D.N.Y. 2013) ............................................................ 26

*Queen v. Schultz*,
   310 F.R.D. 10 (D.D.C. 2015) ........................................................................ 22

*State Nat'l Bank of Big Spring v. Lew*,
   795 F.3d 48 (D.C. Cir. 2015) ........................................................................ 21

*State Nat'l Bank of Big Spring v. Lew*,
   958 F. Supp. 2d 127 (D.D.C. 2013) ................................................... 21, 22, 28, 30

*Stryker Spine v. Biedermann Motech GmbH*,
   684 F. Supp. 2d 68 (D.D.C. 2010) ................................................................ 25

*Swan v. Clinton*,
   100 F.3d 973 (D.C. Cir. 1996) ...................................................................... 15

*United States v. Klein*,
   80 U.S. (13 Wall.) 128 (1872) ...................................................................... 13

*Whitman v. Am. Trucking Ass'n*,
   531 U.S. 457 (2001) ...................................................................................... 14

*Wiener v. United States*,
  257 U.S. 249 (1958) ............................................................................................. 6

*In re W.R. Grace & Co.*,
  316 F. App'x 134 (3d Cir. 2009) ......................................................................... 28

**CONSTITUTION**

U.S. Const. art. I, § 1 ..................................................................................... 14, 19

U.S. Const. art. I, § 8, cl. 12 ................................................................................ 15

U.S. Const. art. I, § 8, cl. 13 ................................................................................ 15

U.S. Const. art. II, § 1, cl. 1 ................................................................................. 17

U.S. Const. art. II, § 1, cl. 8 ................................................................................. 27

**STATUTES**

2 U.S.C. § 439g (1995) ....................................................................................... 28

5 U.S.C. § 609 ....................................................................................................... 9

12 U.S.C. § 2807 ................................................................................................... 6

12 U.S.C. § 5321(b) .............................................................................................. 9

12 U.S.C. § 5321(b)(1)(A) .................................................................................... 9

12 U.S.C. § 5491(a) .............................................................................................. 4

12 U.S.C. § 5492(c)(4) ........................................................................................ 13

12 U.S.C. § 5493(c)(2)(B) ................................................................................... 10

12 U.S.C. § 5493(g)(3)(E) ................................................................................... 10

12 U.S.C. § 5497(a)(1) ........................................................................................ 14

12 U.S.C. § 5497(a)(2) ........................................................................................ 14

12 U.S.C. § 5497(a)(4) ........................................................................................ 13

12 U.S.C. § 5512 ................................................................................................... 6

12 U.S.C. § 5512(b)(2)(B) .................................................................................... 9

12 U.S.C. § 5512(b)(4)(B) ................................................................................... 11

12 U.S.C. § 5513(a) ............................................................................................... 9

12 U.S.C. § 5513(c)(1) .......................................................................................... 9

12 U.S.C. § 5513(c)(4)(A) ..................................................................................... 9

12 U.S.C. § 5514(a)(2) .......................................................................................... 9

12 U.S.C. § 5515(c) ............................................................................................... 9

12 U.S.C. § 5516(d) ............................................................................................... 9

12 U.S.C. § 5517(g)(3) .......................................................................................... 9

12 U.S.C. § 5531(e) ............................................................................................... 9

12 U.S.C. § 5534 ................................................................................................. 10

12 U.S.C. § 5535 ................................................................................................... 6

12 U.S.C. § 5535(a) ............................................................................................ 10

12 U.S.C. § 5563 ................................................................................................... 6

12 U.S.C. § 5564(b) ............................................................................................ 12

12 U.S.C. § 5564(d)(1) ....................................................................................... 10

12 U.S.C. § 5564(d)(2)(B) .................................................................................. 10

12 U.S.C. § 5564(e) ............................................................................................ 12

12 U.S.C. § 5603 ................................................................................................... 6

29 U.S.C. § 652(8) .............................................................................................. 14

42 U.S.C. § 902(a) .............................................................................................. 17

44 U.S.C. § 3502(3) .............................................................................................. 9

44 U.S.C. § 3507(a) .............................................................................................. 9

52 U.S.C. § 30109 .............................................................................................. 28

Dodd-Frank Wall Street Reform and Consumer Protection Act,
    Pub. L. No. 111-203, 124 Stat. 1376 (2010) ................................................... 3

## RULES AND REGULATIONS

76 Fed. Reg. 11598 (Mar. 2, 2011) .................................................................... 23

76 Fed. Reg. 27390 (May 11, 2011) ......................................................................... 23

76 Fed. Reg. 29902 (May 23, 2011) ......................................................................... 23

77 Fed. Reg. 33120 (June 5, 2012) ........................................................................... 28

78 Fed. Reg. 53734 (Aug. 30, 2013) ........................................................................ 19

MISCELLANEOUS

AKHIL REED AMAR, AMERICA'S CONSTITUTION: A BIOGRAPHY (2005) ...................................... 15

Neal Devins, *Unitariness and Independence: Solicitor General Control over Independent Agency Litigation*,
82 Cal. L. Rev. 255 (1994) ..................................................................................... 12

Neal Devins & David Lewis *Not-So Independent Agencies: Party Polarization and the Limits of Institutional Design*,
88 B.U. L. Rev. 459 (2008) .................................................................................... 11

I GAO, Principles of Federal Appropriations Law (3d ed. 2004) ............................................... 17

III GAO, Principles of Federal Appropriations Law (3d ed. 2004) ............................................. 17

CHARLES A. JOHNSON & DANETTE BRICKMAN, INDEPENDENT COUNSEL: THE LAW AND THE INVESTIGATIONS (2001) ............................................................... 7

Elena Kagan, *Presidential Administration*,
114 Harv. L. Rev. 2245 (2001) .............................................................................. 18

Restatement (Third) of Agency § 4.02 (2006) ............................................................... 27

## INTRODUCTION

In its Reply, State National Bank of Big Spring ("SNB") ignores long-established precedent and concocts new legal theories in an unsuccessful effort to rebut Defendants' arguments that SNB's claims have no merit whatsoever. Because SNB has failed to advance any legally sustainable basis for its claim that the Consumer Finance Protection Bureau ("CFPB" or "the Bureau") is unconstitutional, or that rules issued when Director Cordray was serving as a recess appointee are now invalid, the Court should grant summary judgment to Defendants.

SNB's separation-of-powers claim rests on its rejection of *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), and eight decades of decisions following it. To show that the statutory limitation on the President's discretion to remove the Director from office, "taken by itself, impermissibly interferes with the President's exercise of his constitutionally appointed functions" in violation of Article II, *Morrison v. Olson*, 487 U.S. 654, 685 (1988), SNB would – at a minimum – need to establish that this restriction is meaningfully different from the others recognized to be constitutional under *Humphrey's Executor*. SNB has not made that showing. Nor has SNB shown that, "taken as a whole, the Act violates the separation of powers by reducing the President's ability to control the . . . powers wielded by the [Director]." *Id.* SNB cannot establish a separation-of-powers violation by simply pointing to certain features of the Bureau and calling their combination "unprecedented," particularly when most of those features are irrelevant to the President's ability to take care that Federal consumer financial law is faithfully executed. Under established law, therefore, the Director is accountable to the President in the manner required by Article II. *See* Defs.' Mem. at 12–22; *infra* at 4–13.

SNB's Article I claim also lacks merit. In general, and as applied to the Bureau, the Constitution does not prohibit Congress from funding federal agencies indefinitely. *See* Defs.' Mem. at 22–30; *infra* at 13–18. Such funding measures neither violate any specific provision of

the Constitution nor unconstitutionally delegate Congress's "power of the purse" to an agency. Indeed, there is no legal basis for SNB's sweeping and unsupported declaration that "the CFPB must be declared invalid" because Congress may not fund indefinitely any "executive agency" engaged in "regulation and enforcement." Reply at 31.

In an implicit acknowledgment that its Article II and Article I claims are deficient, SNB asserts that, even if the statute divests neither the Congress nor the Executive of its constitutional role, the Court can nevertheless find a separation-of-powers violation by "balancing the nature and scope of the agency's powers, viewed as a whole, against the structural restraints imposed on their exercise." Reply at 2, 3, 9. No court has ever applied this ill-defined standard, which has no basis in the Constitution's text and which serves no constitutional purpose where, as here, the role of each of the three branches is secure.

The Court should also reject SNB's challenge to Bureau rules proposed and/or issued while Director Cordray was serving as a recess appointee. All of the challenged rules have since been ratified, curing any defect attributable to Director Cordray's appointment status. In its opening brief, SNB challenged the ratification only on the ground that Director Cordray lacked authority to ratify any actions taken before his Senate confirmation. In response to Defendants' argument that this position is foreclosed by circuit precedent, Defs.' Mem. at 42–44, SNB has abandoned this approach and, instead, has introduced two new attacks on the ratification in its Reply. These arguments also fail. First, although characterizing the Notice of Ratification as "a single four-sentence note" that falls short of "reconsideration on the merits through a meaningful process," Reply at 39–40, SNB has not identified any case that has held a ratification order to be deficient on this ground. In rejecting similar challenges, the D.C. Circuit has declined to "examine the internal deliberations" of the agency, *FEC v. Legi-Tech, Inc.*, 75 F.3d 704, 709

(D.C. Cir. 1996), instead taking "ratification of its prior decisions at face value," *id.*, even when the court has "misgivings about whether the [agency] had engaged in a 'real fresh deliberation,'" *Doolin Sav. Bank, F.S.B. v. Office of Thrift Supervision*, 139 F.3d 203 (D.C. Cir. 1998). To require more here, particularly when the Director has not changed, would be inconsequential and result only in disrupting the Bureau's implementation of years-old rules.

SNB's second argument, that an agency can never ratify a regulation without going through all of the statutory notice-and-comment requirements that it went through to promulgate the rule in the first place, fares no better. *See* Reply at 41–44. The D.C. Circuit has repeatedly refused to require agencies to "redo the statutorily required procedures in their entirety" to cure the constitutional defect in a prior decision. *Legi-Tech*, 75 F.3d at 707; *see id.* at 708–09; *see also Intercollegiate Broad. Sys. Inc. v. Copyright Royalty Bd.* ("*Intercollegiate III*"), 796 F.3d 111, 123 n.5 (D.C. Cir. 2015). That is particularly so when private parties cannot show that, even following the ratification, continuing prejudice warrants additional relief. SNB cannot make that showing here. SNB failed to comment on any of the rules when they were proposed (even those proposed by the Federal Reserve before the rulemakings were transferred to the Bureau); does not suggest what substantive comments it might submit if given a new opportunity; and is unaffected by all but one of the challenged rules. The Court should grant Defendants' motion.

## ARGUMENT

## I.    DEFENDANTS ARE ENTITLED TO JUDGMENT ON SNB'S SEPARATION-OF-POWERS CLAIM.

As Defendants show in their opening brief and below, Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010), violates neither Article I nor Article II of the Constitution. SNB's separation-of-powers claim therefore is without merit.

### A.    TITLE X DOES NOT VIOLATE ARTICLE II.

SNB fails to establish that the provisions of Title X, individually or taken together, so limit the President's ability to oversee the Director that the Director "does not answer to the President" and is "outside the President's control" in violation of Article II. Reply at 9, 17. Notwithstanding SNB's dismissal of Defendants' approach to Article II as "piecemeal" (Reply at 1, 3, 5, 9, 21), Defendants' approach is the same as the Supreme Court's approach in *Morrison*.

> Two related issues must be addressed: The first is whether the provision of the Act restricting [the President's] power to remove the [Director] to only those instances in which he can show ["inefficiency," "neglect of duty," or "malfeasance,"] taken by itself, impermissibly interferes with the President's exercise of his constitutionally appointed functions. The second is whether, taken as a whole, the Act violates the separation of powers by reducing the President's ability to control the . . . powers wielded by the [Director].

487 U.S. at 685. Because the answer to both questions here is "no," the Director is accountable to the President in the manner required by Article II.[1]

#### 1.    The Director's Tenure Protection Does Not Violate Article II.

The constitutionality of a statutory restriction on the President's removal authority depends on factors including the officer's powers and functions, the means available to the President to control the exercise of such powers and functions, and the nature of the applicable removal restriction. *See Free Enterprise*, 561 U.S. at 495–96, 502–05; *Morrison*, 487 U.S. at

---

[1] SNB resists application of the *Morrison* standard. *See* Reply at 15, 17–18. SNB asserts that *Morrison* applies only to officers within a "department of the executive" who lack "regulatory and policymaking authority that might affect the general public," and argues that this case is instead governed by *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477 (2010), which involved officers of "an independent agency housed *outside* the executive and vested with regulatory powers that affect[] the public." *Id.* at 18. SNB's position is triply wrong:  (1) *Free Enterprise* involved officers within "a freestanding component of the Executive Branch" (*i.e.*, a "Department"), 561 U.S. at 511, not in an entity "*outside* the executive"; (2) the Bureau is itself "an Executive agency," 12 U.S.C. § 5491(a); and (3) the Court in *Free Enterprise* did not adopt some new constitutional test, but rather, as in *Morrison*, asked whether the removal restrictions "contravene[d] the President's 'constitutional obligation to ensure the faithful execution of the laws.'" *E.g.*, 561 U.S. at 484.

685–96. Considering these factors under the framework established by binding precedent, the Director's removal protection does not "impermissibly interfere[] with the President's exercise of his constitutionally appointed functions," *Morrison*, 487 U.S. at 685, such that "the CFPB should be invalidated for that reason alone," Reply at 15.

SNB has not shown that the Director is meaningfully different from the officers whose removal protection was upheld in *Morrison* and *Humphrey's Executor*, or that Title X is different from the statute left intact after the *Free Enterprise* Court invalidated one of the Board's two layers of for-cause removal protection. Further, SNB fails to identify legally significant grounds to distinguish the Bureau from the many similar agencies that have been held constitutional by lower courts applying *Humphrey's Executor* or that are "commonly understood" to be constitutional based on a fair reading of that decision, *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 537 F.3d 667, 695 (D.C. Cir. 2008) (Kavanaugh, J., dissenting).

To begin with, SNB's insistence that the Director "does not answer to the President" (Reply at 17) disregards the degree to which the President's power to remove the Director for "inefficiency," "neglect of duty," or "malfeasance" allows the President to hold the Director accountable. *Cf. Bowsher v. Synar*, 478 U.S. 714, 729 (1986) (explaining, about a statute providing for removal by Congress, that "[t]hese terms are very broad and . . . could sustain removal of [an officer] for any number of actual or perceived transgressions"). Like the Board at issue in *Free Enterprise* once it was separated from the President by only one layer of for-cause removal protection, the Director here is "accountable to the Executive." 561 U.S. at 513.

SNB's principal argument that *Humphrey's Executor* does not control here rests on its bald assertion that the Bureau has "substantially greater" authority than the FTC did, Reply at 12, but SNB fails to counter Defendants' refutation of that assertion, Defs.' Mem. at 15.

SNB also tries to distinguish *Humphrey's Executor* on the ground the Director exercises "executive" powers while the Court in *Humphrey's Executor* treated "the FTC's powers [as] wholly nonexecutive." Reply at 11. Actually, the *Humphrey's Executor* Court recognized that the FTC performs an "executive function," 295 U.S. at 628; *see id.* 628 n.1. Further, *Humphrey's Executor* must be read in the context of the Court's later explanations of that decision. Although the Court found it significant in *Humphrey's Executor* that the FTC "acts in part quasi legislatively and in part quasi judicially," *id.* at 628; *see also id.* at 624 (duties are "predominantly quasi judicial and quasi legislative"), the Court later stated in *Morrison* that "it is hard to dispute that the powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered 'executive,' at least to some degree." 487 U.S. at 689 n.28. The Court in *Morrison* further clarified that the "quasi-judicial" and "quasi-legislative" labels "in large part reflected our judgment that it was not essential to the President's proper execution of his Article II powers that these agencies be headed up by individuals who were removable at will," *id.* at 691, and that "the determination of whether the Constitution allows Congress to impose a 'good cause'-type restriction . . . cannot be made to turn on whether or not that official is classified as 'purely executive.'" *Id.* at 689. In any event, the Director of the Bureau *does* perform the kinds of functions that were characterized as quasi-judicial and quasi-legislative in *Humphrey's Executor* as well as in *Wiener v. United States*, 257 U.S. 249 (1958). *See, e.g.*, 12 U.S.C. §§ 2807, 5535, 5603 (reports to Congress); *id.* § 5512 (rulemaking); *id.* § 5563 (adjudication).

SNB's attempts to distinguish *Morrison* similarly fall flat. SNB asserts that the Director's powers are "wholly unlike those of the independent counsel," who lacked "significant regulatory and enforcement authority" and whose jurisdiction was "government-facing." Reply at 10. The *Morrison* Court rejected such distinctions, finding "the prosecutorial powers" of the independent

counsels "analogous" to the "civil enforcement powers" exercised by "various federal agencies whose officers are covered by 'good cause' removal restrictions." 487 U.S. at 692 n.31.

What differences exist between the Director and independent counsels favor upholding the Director's tenure protection. The Director may promulgate rules in accordance with statutory limits and procedural requirements, but he lacks the independent counsels' authority to wield "all investigative and prosecutorial functions and powers of the Department of Justice" on matters within their jurisdiction. *Id.* at 662. SNB does not and cannot argue that these differences make control of the Director more "central to the functioning of the Executive Branch" than control of the independent counsels, so "as to require as a matter of constitutional law that the [Director] be terminable at will by the President," *id.* at 691–92; *see* Defs.' Mem. at 16; Reply at 18.

Likewise, SNB's attempt to distinguish *Morrison* on the ground that "the CFPB is perpetual" and "the Director's tenure is not temporary or meaningfully limited," Reply at 11, is without merit. Although a particular independent counsel's service was temporary, as is that of the Director, the *position* was not. And, once an independent counsel had been appointed, his tenure was unlimited. Several independent counsels continued in office for over five years, without reappointment and without the prospect that the President could replace them by appointing a successor. *See, e.g.*, CHARLES A. JOHNSON & DANETTE BRICKMAN, INDEPENDENT COUNSEL: THE LAW AND THE INVESTIGATIONS 144, 163–68, 175–80, 188–208 (2001).

Finally, *Free Enterprise* supports the constitutionality of the Director's tenure protection. After the Court in that case invalidated one of two layers of removal protection, it deemed the Board a "constitutional agency accountable to the Executive," 561 U.S. at 513, despite its insulation from the President by the remaining layer and its exercise of "significant executive power," *id.* at 514, including "expansive powers to govern an entire industry," *id.* at 485.

In short, the Director is not so unlike other officers whom Congress may constitutionally protect from removal without cause that Section 1011(c)(3) "impermissibly interferes with the President's exercise of his constitutionally appointed functions," *Morrison*, 487 U.S. at 685.[2]

### 2.    *Title X as a Whole Does Not Violate Article II.*

Nor can SNB show that, "taken as a whole, the Act violates the separation of powers by reducing the President's ability to control the . . . powers wielded by the [Director]," *Morrison*, 487 U.S. at 685. Taken as a whole, the statute provides the President a host of ways to oversee the Bureau. And although SNB points to various statutory provisions that purportedly diminish the President's control, those provisions in fact either have no bearing on the President's oversight of the powers wielded by the Director or fail to distinguish the Bureau from other agencies that have been treated as constitutional in the wake of *Humphrey's Executor*.

Other Executive Oversight. As an initial matter, despite claiming to take a "holistic" approach, Reply at 4, SNB ignores the many tools short of removal that the President has to check the Director.

For example, any Director who hopes to serve a second term depends on the President, as well as the Senate, for re-appointment. *Cf. Free Enterprise*, 561 U.S. at 500 n.6 (officer was "dependent upon the Senate, because they must consent to his [reappointment] for every term of

---

[2] Unable to distinguish the various removal restrictions that courts have upheld, SNB erroneously contends that upholding the Director's removal protection would require upholding for-cause restrictions on the removal of Cabinet Secretaries. Reply at 19. Such a restriction is not before the Court. Suffice it to say that the case law does not "define rigid categories of those officials who may or may not be removed at will by the President," *Morrison*, 487 U.S. at 689, and that Cabinet status alone may justify differential treatment for some constitutional purposes, *see, e.g.*, *Freytag v. Comm'r*, 501 U.S. 868, 886–87 & n.4 (1991); *id.* at 916–17 (Scalia, J., concurring). The Court can – and should – uphold Title X without opining on any hypothetical removal restriction not at issue in this case.

years"). And, as SNB acknowledges, when Congress passes legislation affecting the Bureau, the Director must look to the President to veto or sign it. *See* Reply at 26.

With respect to rulemaking, any member agency of the Financial Stability Oversight Council, including those headed by officers who are removable at will by the President, may petition to "set aside a final regulation prescribed by the Bureau, or any provision thereof," 12 U.S.C. § 5513(a); *see id.* § 5321(b); the Secretary of the Treasury may stay Bureau rules while under consideration by the Council, *id.* § 5513(c)(1); *see id.* § 5321(b)(1)(A); and the Council may "render . . . unenforceable" any Bureau rule that "would put the safety and soundness of the United States banking system or the stability of the financial system of the United States at risk," *id.* § 5513(a), (c)(4)(A). The Bureau generally may not engage in the "collection of information," including imposing disclosure, recordkeeping, or reporting requirements on industry, without the approval of OMB, 44 U.S.C. §§ 3502(3), 3507(a), and must consult with OMB and/or other agencies before issuing certain rules. *See, e.g.*, 5 U.S.C. § 609 (OMB, Small Business Administration); 12 U.S.C. §§ 5512(b)(2)(B), 5531(e) (Federal Reserve, FDIC, NCUA, OCC, and other agencies, as appropriate); *id.* § 5514(a)(2) (FTC). Furthermore, the Bureau may implement certain consumer protection standards only if authorized by the Secretaries of the Treasury and Labor. *See id.* § 5517(g)(3).

With respect to enforcement, Title X divides authority between the Bureau and other agencies. Enforcement authority over certain covered persons that may be subject to Bureau regulations is generally vested in other agencies, to the exclusion of the Bureau. *See id.* § 5516(d). With respect to other covered persons, the Bureau has primary enforcement authority, but another agency may bring an enforcement action if the Bureau does not. *See id.* § 5515(c). The Bureau must coordinate its investigations and proceedings with the Attorney General, and

must notify the Attorney General when it initiates litigation to enforce Federal consumer financial law. *Id.* § 5564(d)(1), (2)(B). And, as discussed below, the Attorney General can block the Bureau from representing itself in any litigation before the Supreme Court. *Infra* at 12 & n.6.

Thus, SNB's assertions that the Bureau's "authority cannot be limited by decisions made by executive branch officials" and that the Director "is under no obligation ever to adhere to executive branch policies" are completely erroneous.[3]

Single-Director Leadership Structure. Ignoring all the ways in which the President may control the execution of Federal consumer financial law, SNB focuses on the Bureau's single-director leadership structure. But the fact that the Bureau is headed by a single Director rather than a multimember commission does not "reduc[e] the President's ability to control the . . . powers wielded by the [Director]," *Morrison*, 487 U.S. at 685. On the contrary, it should be *easier* for the President to hold accountable a single principal officer than several.

Moreover, SNB does not dispute that *Humphrey's Executor* has been understood to support the constitutionality of independent agencies headed by a single principal officer or that Congress has relied on the decision in that case in creating such agencies. *See* Defs.' Mem. at 19 (quoting *Free Enterprise*, 537 F.3d at 695 (Kavanaugh, J., dissenting)).[4] Nor does SNB dispute that the President's ability to control members of multimember commissions is often limited by restrictions regarding who he can appoint or by the fact that the President might need to remove multiple commissioners in order to replace the agency's leadership. *See* Defs.' Mem. at 19.

---

[3] Title X further requires the Bureau to submit regular reports to the President and OMB, *see* Defs.' Mem. at 6, and to coordinate with other agencies in various situations not already discussed above, *see, e.g.*, 12 U.S.C. § 5493(c)(2)(B), (g)(3)(E); *id.* § 5534; *id.* § 5535(a).

[4] Although SNB claims that the FTC's multimember, mixed-party leadership structure was critical in *Humphrey's Executor*, these features were not mentioned in the part of the opinion that addresses the constitutional question. *See* 295 U.S. at 626–32.

SNB posits—contrary to the conventional wisdom—that a multimember commission structure actually provides the President with more control because "[o]n average, Presidents [a]re able to obtain majorities for their party . . . after nine or ten months." Reply at 13. But the very study on which SNB relies found that this average (from the decades since Warren Harding was President) "masks consequential changes . . . over time" and that today "Presidents are unable to quickly appoint a majority of commissioners." Neal Devins & David Lewis, *Not-So Independent Agencies: Party Polarization and the Limits of Institutional Design*, 88 B.U. L. Rev. 459, 461, 472 (2008). In any event, the constitutional issue turns not on any member's party affiliation but on the President's ability to ensure that individual officers faithfully execute the laws that they are entrusted with administering. By that measure, the President can hold the Bureau's Director as accountable as he can any member of a multimember board.[5]

Judicial Deference. SNB also takes issue with a statutory provision that, according to SNB, requires courts to "ignore the President's view and defer to the Director's" when the two disagree about the interpretation of Federal consumer financial law. Reply at 10 (citing 12 U.S.C. § 5512(b)(4)(B)). But, as Defendants have explained, the CFPB is no different from other independent agencies in this regard. *See* Defs.' Mem. at 22 (citing *FCC v. Fox Television Stations*, 556 U.S. 502, 523–26 (2009)). And SNB makes no attempt to explain in its Reply how this provision differentiates the CFPB from other independent agencies such as the FTC or SEC.

---

[5] SNB argues that a multimember leadership structure serves "important liberty-protecting functions," Reply at 13, by forcing public deliberation and preventing agency action in the absence of a majority vote, *id.* at 13–14. Even if one accepts SNB's premise, the virtues that SNB attributes to the multimember leadership structure are irrelevant to "the President's ability to control the . . . powers wielded by the [agency]," *Morrison*, 487 U.S. at 685. Indeed, because these features make it harder for multimember agencies to accomplish anything, and to attribute responsibility for their inaction, a multimember leadership structure may make it harder for the President to hold an agency's principal officers accountable. *See* Defs.' Mem. at 18–20.

SNB also fails to acknowledge the means available to the President to control the positions that the Bureau advances in court (in addition to removal of the Director). The Bureau may not represent itself in the Supreme Court unless permitted to do so by the Attorney General. *See* 12 U.S.C. § 5564(e). The Bureau therefore can be prevented from advancing in the Supreme Court positions that the Attorney General, an officer removable by the President without cause, views as inconsistent with faithful execution of Federal consumer financial law. And, while the Bureau has independent litigating authority in lower courts, *see id.* § 5564(b), the prospect that the Department of Justice will decline to defend a Bureau policy serves to check the Bureau's interpretation of Federal consumer financial law in both judicial and administrative proceedings.[6]

Permanent Funding. Finally, the Bureau's funding mechanism has no bearing on the Article II analysis because it does not hinder the President's ability to oversee the Bureau. SNB claims that the Bureau's funding mechanism reduces Congress's ability to exert influence over Bureau policy. *See* Pls.' Mem. at 23–24 & n.11. Even if that were so (and the Bureau is accountable to Congress the way the Constitution requires), it would *mitigate* one of the concerns underlying the Supreme Court's Article II cases—that limits on Presidential oversight will result in "extensive expansion of the legislative power." *Free Enterprise*, 561 U.S. at 500.

As Defendants have noted, neither the independent counsel in *Morrison* nor the Public Company Accounting Oversight Board left intact by *Free Enterprise* was funded through the ordinary appropriations process, yet in considering the Article II issues in those cases, the Supreme Court did not treat that fact as relevant. *See* Defs.' Mem. at 26. SNB has not countered this point, and it cannot, because combining otherwise constitutional limits on Presidential

---

[6] *See generally* Neal Devins, *Unitariness and Independence: Solicitor General Control over Independent Agency Litigation*, 82 Cal. L. Rev. 255 (1994) (DOJ often has "the last word on judicial resolution of policy disputes between independent agencies and the Executive").

oversight with otherwise constitutional limits on Congress does not add up to an Article II violation.[7]

## B.   TITLE X DOES NOT VIOLATE ARTICLE I.

There is no more merit to SNB's Article I argument. SNB's Reply makes clear that its Article I challenge rests solely on its own *ipse dixit* that Congress may not indefinitely fund "an executive agency" engaged in "regulation and enforcement." Reply at 31.[8] SNB's position lacks any basis in the text of Article I, historical practice, or judicial precedent, Defs.' Mem. at 22–30, and indeed, SNB points to no case in which any court has endorsed its theory.

Title X does not violate the Appropriations Clause, which has always been read, according to its "straightforward and explicit command," *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990), as a restriction on the Executive. The Clause itself imposes no restriction on Congress. *E.g.*, *AINS, Inc. v. United States*, 56 Fed. Cl. 522, 539 (Ct. Cl. 2003) ("It has long been held that the Appropriations Clause is not a restriction on Congress."). That does not mean that Congress has unlimited discretion in its funding choices. But when Congress enacts a statute pursuant to its enumerated powers, the question is whether the statute violates any other provision of the Constitution. *See, e.g.*, *United States v. Klein*, 80 U.S. (13 Wall.) 128 (1872) (appropriations act unconstitutionally impaired the President's pardon power). SNB has not identified any such provision.

---

[7] Defendants' opening brief rebutted SNB's arguments based on the provisions of Title X governing Executive Branch review of the Bureau's submissions to Congress and its financial plans and reports. *See* Defs.' Mem. at 21–22 (citing 12 U.S.C. §§ 5492(c)(4), 5497(a)(4)). SNB abandons these arguments in its Reply, mentioning neither provision.

[8] SNB fails to explain why its new principle of constitutional law should be limited to agencies engaged in "regulation and enforcement," as opposed to the provision of public services and benefits, if (as SNB contends) a purpose of vesting the appropriations power in Congress was to make it "guardian of [the public] treasure," Reply at 29.

SNB implicitly argues that Title X violates the non-delegation doctrine by delegating "legislative Powers" to the Bureau in violation of Article I's vesting clause. U.S. Const. art. I, § 1; *see Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 472 (2001) ("In a delegation challenge, the constitutional question is whether the statute has delegated legislative power to the agency."); Reply at 27, 29 (referencing limits on Congress's "discretion to delegate legislative power"); *id.* at 31 (suggesting Congress has "hand[ed the Bureau] the power of the purse"). Any non-delegation argument plainly fails. SNB identifies no case that has invalidated an agency funding provision on non-delegation grounds. In any event, Title X sets forth "the authorities of the Bureau under Federal consumer financial law" and authorizes the Bureau to draw from a designated fund "the amount determined by the Director to be reasonably necessary to carry out" those authorities, 12 U.S.C. § 5497(a)(1), subject to annual statutory caps, *id.* § 5497(a)(2). Congress thus "la[id] down by legislative act an intelligible principle to which the persons or body authorized to [act] is directed to conform." *Whitman*, 531 U.S. at 472; *see, e.g.*, *Nat'l Maritime Safety Ass'n v. OSHA*, 649 F.3d 743, 755–56 (D.C. Cir. 2011) ("[O]ne cannot plausibly argue that [29 U.S.C. § 652(8)'s 'reasonably necessary or appropriate to provide safe or healthful employment and places of employment'] standard is not an intelligible principle.'" (second alteration in original)). Accordingly, the Director's determination of the amount to draw from the Federal Reserve is not an exercise of "legislative Power[]" and there is no violation of Article I's vesting clause.

Significantly, SNB has ignored Defendants' argument that Article I should not be read to include an implicit ban on open-ended funding for any "executive agency" engaged in "regulation and enforcement" when the Framers themselves chose only to impose time limits on funding of the Army. *See* Defs.' Mem. at 23–24. The Framers adopted the two-year limit on

appropriations to "raise and support Armies," U.S. Const. art. I, § 8, cl. 12, because they knew

that "[f]or all other purposes—even navies—Congress could authorize standing appropriations

that would keep funds flowing until a later Congress repealed the initial appropriation law."

AKHIL REED AMAR, AMERICA'S CONSTITUTION: A BIOGRAPHY 116 (2005) [hereinafter AMAR].

*Compare* U.S. Const. art. I, § 8, cl. 12 (Congress may "raise and support Armies, but no

Appropriation of Money to that Use shall be for a longer Term than two Years"), *with* U.S.

Const. art. I, § 8, cl. 13 (Congress may "provide and maintain a Navy"). This "special sunset

rule" requires "army—and only army—appropriations to run a stricter gauntlet" that includes re-

approval of both Houses and the President (or a veto override) during every Congress. AMAR at

116. SNB asks the Court to apply the special rule for the Army to innumerable agencies. But

because the Framers saw no need to ban open-ended funding for *the Navy*, there is clearly no

merit to SNB's contention (at 31) that the Constitution prohibits open-ended funding for any

agency that "has been armed with the [*metaphorical*] sword of regulation and enforcement."

History and judicial precedent further show that SNB's argument lacks substance.

Defendants have shown that Congress has funded agencies permanently and outside the ordinary

appropriations process since the 1790s. *See* Defs.' Mem. at 25. Many of those agencies have

engaged in "regulation and enforcement."[9] SNB cites no decision that has held this practice to be

---

[9] SNB asserts that several of these agencies are headed by principal officers who lack for-cause removal protection. Reply at 22–23. That assertion is questionable with respect to some of the agencies. *See Swan v. Clinton*, 100 F.3d 973, 982, 983 (D.C. Cir. 1996) (NCUA and FDIC). And it is irrelevant under SNB's own reading of Article I. *See* Reply at 28–31.

As for the Federal Reserve, SNB suggests that the Governors must be "mindful of the reactions of private sector market participants." Reply at 23. SNB does not explain why it considers this an acceptable substitute for Presidential or congressional oversight. SNB's other observations about the Federal Reserve (that it must be "faithful to specific statutory direction" and that its funding is "tied to its specific functions," *id.*) apply equally to the Bureau.

unconstitutional, and it fails in its attempts to explain away cases that recognize Congress's

discretion (Reply at 28–31). For instance, SNB claims that Defendants "mischaracterize[]"

*Harrington v. Bush*, 553 F.2d 190 (D.C. Cir. 1977), as upholding Congress's funding of the CIA

"outside the ordinary appropriations process." Reply at 30 n.11 (quoting Defs.' Mem. at 25). But

*Harrington* itself described the process of funding the CIA as "an exception to the general

method for appropriating . . . federal funds." 553 F.2d at 194. Nor is SNB correct that "the only

'exception' at issue in that case" was that "the Executive and Legislative Branches . . . obscured

the specific details of the CIA's budget requests from public review." Reply at 30 & n.11. The

*Harrington* litigation came about because the CIA's funding was *secret from most members of*

*Congress. See* 553 F.2d at 195–97 (noting only the Chairman of the Appropriations Committee

and the members of the Subcommittee on Intelligence are informed). SNB fails to explain how a

Congress which knows nothing of an agency's funding is better equipped to control that agency

than a Congress which knows what an agency spends and can modify its funding at any time.

Although SNB seeks to distinguish the CIA on the grounds that it is funded through

"appropriations" and that its funds are drawn from the Treasury instead of the Federal Reserve,

neither distinction matters to Congress's continuing exercise of the "power of the purse."

Changing or halting an agency's funding may require enactment of a new statute even when the

agency's funds are consider "appropriations" for statutory purposes and are drawn from the

Treasury. Congress can make a "permanent" or "standing" appropriation, "which, once made, is

always available for specified purposes and does not require repeated action by Congress to

---

SNB concedes that the Federal Housing Finance Agency is "arguably similar" to the
Bureau, but tries to distinguish it on the ground that it does not regulate "the public at large."
Reply at 24. Neither does the Bureau. Besides, the extent of an agency's authority does not
determine the extent of Congress's funding discretion.

authorize its use." I GAO, Principles of Federal Appropriations Law 2-14 (3d ed. 2004). And it can make a "permanent indefinite appropriation," which is not only perpetual (like the Bureau's funding) but also for an unspecified amount (unlike the Bureau's funding). *See id.* at 2-14 to -15. The Social Security Trust Funds—the largest item in the federal budget—provide a notable example. *See* III GAO, Principles of Federal Appropriations Law 15-313 to -314.[10] These are labeled "appropriated" funds, yet Congress can change or halt them only by satisfying the same requirements of bicameralism and presentment that it must satisfy to halt the CFPB's funding. Likewise, once an agency has a permanent funding stream, it does not matter whether the source is a fund in the Treasury or elsewhere; either way, Congress can terminate the agency's funds only through a new statute.

That Congress may not be able to control agency action without enacting a new statute (*i.e.*, by satisfying the requirements of bicameralism and presentment) reflects the Constitution's allocation of powers. The President exercises the "executive Power," U.S. Const. art. II, § 1. cl.1, including the power to "oversee[] and control[] those who execute the laws," *Free Enterprise*, 561 U.S. at 492. Members of Congress may also have some practical ability to cajole an agency into exercising its authority in a certain way, but as a constitutional matter, "[o]nce Congress makes its choice in enacting legislation, its participation ends. Congress can thereafter control the execution of its enactment only indirectly—by passing new legislation." *Bowsher*, 478 U.S. at 733–34. Because Congress retains that power with respect to Title X to the same degree as it does any other law, Title X does not violate Article I. Defs.' Mem. at 27–29.

---

[10] The Social Security Administration ("SSA") is run by a single principal removable only for cause. *See* 42 U.S.C. § 902(a). SNB does not indicate whether these features, alone or in combination, cause the SSA to fail SNB's amorphous separation-of-powers balancing test.

Finally, SNB's Article II arguments do not affect the Article I analysis. Once Congress grants the Executive Branch authority to act, Congress's power to modify that grant of authority is the same whether Congress empowers an independent agency, an agency whose head is removable at will, or the President himself. That the President may remove the Director only for cause does not reduce Congress's power over the Bureau.[11] Limits on the President's control of the Director have no effect on the powers of Congress under Article I. Accordingly, SNB's Article I arguments fail.

### C.   WITHOUT A VIOLATION OF ARTICLE I, ARTICLE II, OR ARTICLE III, THERE IS NO SEPARATION-OF-POWERS VIOLATION.

But SNB does not stop there. According to SNB, a focus on Articles I and II reflects "a piecemeal approach" to the separation of powers (Reply at 1, 3, 5, 9, 21) that does not address its "primary constitutional challenge" (*id.* at 28). SNB's "primary" claim is that Title X violates separation-of-powers principles—apparently even if it does not violate Article I or II—based on a "balancing" of "the nature and scope of the agency's powers, viewed as a whole, against the structural restraints imposed on their exercise." *Id.* at 2, 3, 9. That amorphous test has no basis in the Constitution, appears in no reported opinion, and has never been applied by any court.

SNB asserts that Title X violates its putative balancing test because it combines "the [Bureau's] independence from the President and its independence from Congress, without any mitigating structural restraints." Reply at 28. But the premises of this assertion are faulty where, as here, there is no violation of Article I or II because Congress and the President remain able to

---

[11] Indeed, the fact that the President may remove the Director only for cause may lead the Director to be more responsive to congressional interests. *Cf. Free Enterprise*, 561 U.S. at 500 ("Power abhors a vacuum, and one branch's handicap is another's strength."); Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2271 n.93 (2001) ("[I]nsulation of administration from the President—even if accomplished in the name of 'independence'—will tend to enhance Congress's own authority over the insulated activities.").

perform their constitutional functions.[12] Because Congress may fund an agency for an indefinite

period without violating any specific provision of Article I or impermissibly delegating its

"legislative Powers," U.S. Const. art. I, § 1, it is not accurate to say that Congress has abdicated

its own powers or "hand[ed the Bureau] the power of the purse," Reply at 31. And, because Title

X does not violate Article II by impermissibly "reducing the President's ability to control the . . .

powers wielded by the [Director]," *Morrison*, 487 U.S. at 685, the Director is accountable to the

President—and, through him, to the People—in the way that Article II demands. Contrary to

SNB's contention, a combination of constitutional limits on the President's control of an agency

and on Congress's appropriations leverage over that agency does not present a separate

constitutional problem because each branch continues to play its part in the constitutional

"system of . . . checks and balances," *id.* at 693.[13]

## II.     DEFENDANTS ARE ENTITLED TO DISMISSAL OR JUDGMENT WITH RESPECT TO SNB'S RECESS APPOINTMENTS CLAUSE CLAIM.

SNB challenges a number of regulations proposed or adopted while Director Cordray was

serving as a recess appointee. But no challenge to the regulations is properly presented, and in

any event, Director Cordray has now been confirmed by the Senate, and any defect in the

regulations was cured when they were "affirm[ed] and ratif[ied]" following his confirmation. *See*

*Notice of Ratification*, 78 Fed. Reg. 53734 (Aug. 30, 2013).

---

[12] SNB also fails to explain why judicial review does not qualify as a "structural restraint" on potential agency abuses of authority under its balancing test.

[13] SNB's arguments seem designed to attack *Humphrey's Executor* from the flank by imposing new restrictions on Congress's ability to establish agencies whose principals are removable only for cause (*e.g.*, by applying Article I differently to them). But the decision remains good law, and there is no basis for "adjusting the remainder of the Constitution to compensate for *Humphrey's Executor*," *Freytag*, 501 U.S. at 921 (Scalia, J., concurring).

**A.  NO CHALLENGE TO ANY BUREAU RULE IS PROPERLY BEFORE THE COURT.**

The Court should not reach the merits on Count II because the only relief requested in the

Complaint can no longer be granted and SNB lacks standing to challenge most of the regulations.

First, the Court should not entertain SNB's attempt to expand this lawsuit to seek relief

beyond that requested in the Second Amended Complaint. *See* Defs.' Mem. at 32–34.

SNB's assertion that the Second Amended Complaint's demand for forward-looking

relief is not moot verges on nonsensical. SNB now claims that the complaint seeks to enjoin the

regulations because "[t]he Director's *lawfully vested authority does not extend* to enforcing

illegally promulgated regulations." Reply at 33 (emphasis added). The relief actually requested,

however, would have "enjoin[ed] [Director] Cordray from carrying out *any of the powers

delegated* to the office of CFPB Director." *Id.* at 32. There is no overlap between the injunction

originally requested and SNB's present characterization of it. Although "if granted at the time

the Complaint was filed," *id.* at 33, the requested injunction would have prevented Director

Cordray from signing or enforcing regulations, no such injunction in fact was entered. Moreover,

SNB does not seek in its motion for summary judgment an injunction barring the Director "from

carrying out any of [his] powers"—an implicit acknowledgment that such an injunction is not

appropriate now. And it does not dispute that, had such an injunction been issued, it would not

prevent a properly appointed Director (other than Director Cordray) from enforcing the

regulations. *See* Pls.' Mem. at 32–33. This case is no different from any other that becomes moot

when intervening events render the prospective relief requested no longer appropriate.

With no basis at this point for prospectively enjoining Director Cordray "from carrying

out any of the powers delegated to the office of the CFPB Director," the only remaining question

is whether the Second Amended Complaint should be read to include a demand for declaratory

relief with respect to the Director's past actions on the ground that they exceeded the powers of the office. As already shown, the Second Amended Complaint does not seek such relief.[14]

Second, SNB lacks standing to challenge any regulation but the Remittances Rule.

Defendants' opening brief argued that SNB does not have standing to challenge the ATR-QM Rule, the Escrow Rule, or the Integrated Mortgage Disclosure Rule because its alleged injuries are speculative and/or flow directly from the authorizing statute or previously issued regulations. See Defs.' Mem. at 37–40. SNB's lack of standing with respect to these rules is effectively not disputed. SNB "stand[s] on [Plaintiffs'] dismissal briefing" with respect to these rules. Reply at 37 (citing ECF No. 27 at 12–31). But Plaintiffs' dismissal briefing did not even address the Escrow Rule or the Integrated Mortgage Disclosure Rule, and this Court rejected SNB's earlier arguments regarding the ATR-QM Rule. SNB does not contend that the D.C. Circuit's decision changes that analysis.

In arguing that it has standing to challenge the RESPA Servicing Rule because the Rule "directly regulates SNB," Reply at 36, SNB misreads the D.C. Circuit's decision in this case. "[N]o case stands for the proposition that standing can be established merely by being subject to governmental authority in the absence of any agency action that causes injury." State Nat'l Bank of Big Spring v. Lew ("SNB I"), 958 F. Supp. 2d 127, 150 (D.D.C. 2013). The D.C. Circuit's standing analysis did not rest solely on the fact that "the Bank is regulated by the Bureau" but specifically rested on the fact that the Bank was presently incurring costs to comply with the Remittances Rule. See State Nat'l Bank of Big Spring v. Lew, 795 F.3d 48, 53 (D.C. Cir. 2015).

---

[14] SNB requests leave to file a Third Amended Complaint to remedy this problem. That request should be denied because SNB has not properly moved to amend, see, e.g., Friends Christian High School v. Geneva Financial Consultants, 39 F. Supp. 3d 58, 65 n.4 (D.D.C. 2014), and has unduly delayed in seeking amendment, and because the ratification of the challenged rules makes any amendment futile. See Foman v. Davis, 371 U.S. 178, 182 (1962).

By contrast, although SNB claims that it could incur costs to comply with the RESPA Servicing Rule's foreclosure requirements, those requirements will affect SNB only if one of SNB's mortgages goes into default and SNB seeks to foreclose. SNB does not contend that these events are likely to occur, and therefore cannot show that the Rule causes it a sufficiently imminent injury to establish standing. *See McConnell v. FEC*, 540 U.S. 93, 224–26 (2003), *overruled on other grounds*, *Citizens United v. FEC*, 558 U.S. 310 (2010); *City of Los Angeles v. Lyons*, 461 U.S. 95, 106 n.7 (1983).

Finally, as this Court already held, SNB cannot establish standing with respect to rules that had not "been issued at the time of the filing of the suit" or rules promulgated before the filing of the Second Amended Complaint if "the Bank added no allegations about the rules." *SNB I*, 958 F. Supp. 2d at 156. Those rules caused SNB none of the injuries alleged in the complaint. This precludes SNB's challenges to all but the Remittances Rule.[15]

## B.   THE RATIFICATION CURED ANY DEFECT IN THE RULES.

In any event, the Notice of Ratification has remedied any appointment-related defect in the challenged regulations, and SNB is entitled to no further remedy. SNB argued in its opening brief that the ratification was invalid because Director Cordray "lacked the authority to exercise the CFPB's rulemaking powers at the time the challenged regulations were initially proposed and enacted." Pls.' Mem. at 33–34. SNB has now abandoned that line of attack by not defending the argument in its Reply. *See, e.g.*, *Queen v. Schultz*, 310 F.R.D. 10, 25 (D.D.C. 2015) ("[B]y

---

[15] CEI and 60 Plus do not dispute that they have failed to carry their burden to demonstrate standing for purposes of summary judgment. *See* Defs.' Mem. at 50; Pls.' Reply at 44–45. Their claims should therefore be dismissed now if they remain parties to the case. As explained previously, however, CEI and 60 Plus are bound by this Court's earlier dismissal of their claims. *See* Defs.' Mem. at 49–50. Plaintiffs note that courts need not consider whether every party has standing as long as one does, but they cite no case in which a party was permitted to remain in a case after failing to challenge on appeal a decision holding that it lacks standing.

failing to respond to the defendant's opposing arguments in his reply, the plaintiff has abandoned these arguments."). Instead, SNB assails the ratification with two new arguments: (1) the ratification is ineffective because, after his reappointment, Director Cordray did not reconsider the merits through a meaningful process; and (2) the ratification did not cure any defect in the regulations because the agency did not engage in a second round of notice and comment rulemaking. Reply at 39.

Neither of these arguments has merit.[16] D.C. Circuit case law does not impose SNB's suggested re-deliberation requirement, *Legi-Tech*, 75 F.3d at 708 n.5, nor does that precedent obligate the agency to repeat the notice and comment procedures that it already has undertaken. Strikingly, SNB has not explained how any appointment-related defect in the original rulemakings continues to cause it harm even after a Senate-confirmed Director ratified the rules. Indeed, SNB would be hard pressed to show any ongoing harm given that it did not participate in the original rulemakings, even though three of the five challenged rules – including the Remittances Rule, the only one that it has standing to challenge – were proposed not by the Bureau, but by the Federal Reserve Board.[17] Nor has SNB explained what comments it would make if given a second opportunity. SNB's failure to identify any harm wholly undercuts its position because SNB admits that the key question is whether any prejudice remains after the ratification. *See* Reply at 39.

---

[16] In addition, SNB forfeited these arguments by failing to raise them in its opening brief. *See, e.g.*, *Oceana, Inc. v. Pritzker*, 24 F. Supp. 3d 49, 65 n.12, 72 (D.D.C. 2014).

[17] *See Truth in Lending*, 76 Fed. Reg. 11598 (Mar. 2, 2011) (Escrow Rule NPRM); *Regulation Z; Truth in Lending*, 76 Fed. Reg. 27390 (May 11, 2011) (ATR-QM Rule NPRM); *Electronic Fund Transfers*, 76 Fed. Reg. 29902 (May 23, 2011) (Remittances Rule NPRM).

  1. *Precedent Eschews Formalistic Procedural Requirements for Ratification,*
    *and There Is No Valid Policy Argument for Them Either.*

  SNB contends that D.C. Circuit precedent on ratification "requires reconsideration on the merits through a meaningful process." *Id.* (emphasis removed). It adds that if this were not required, then "ratification would be a farce" and that Defendants' approach would reduce Presidents' incentives to comply with the Appointments Clause. *Id.* at 41.

  None of the cases SNB cites imposes the rigid re-deliberation standard that it advocates. Rather, the standard for assessing ratifications is flexible: "[T]he issue is not whether [SNB] was prejudiced by the original [decision] . . . but whether, given the [CFPB's] remedial actions, there is sufficient remaining prejudice to warrant [additional remedial action]." *Legi-Tech*, 75 F.3d at 708 n.5; *see Intercollegiate III*, 796 F.3d at 124 (similar). One way to reduce prejudice may be to deliberate anew and largely repeat previously undertaken procedures. *See Intercollegiate III,* 796 F.3d 124. But such an approach was not required in *Intercollegiate III*, *see id.* at 123 n.5 ("[W]e do not mean to suggest that a review of similar scope (which was, in fact, quite expansive [and involved de novo reconsideration based on prior paper submissions]) was required to ensure the absence of an Appointments Clause problem on remand.")—and is certainly not required here, where there has been no change in personnel. Indeed, SNB cites to no case in which a ratification decision has been rejected as being too cursory.

  Here, after being reappointed in an indisputably constitutional manner, Director Cordray affirmed the propriety of his prior decisions on behalf of the Government. That was all that was required. *See Legi-Tech,* 75 F.3d 709 (upholding ratification that may have been nothing more than a "rubber stamp"); *Andrade v. Regnery,* 824 F.2d 1253, 1257 (D.C. Cir. 1987) (upholding action in appointments clause challenge because it was taken by an individual with authority,

without probing the individual's knowledge of the merits).[18] Even if a more robust re-engagement with the merits or some additional process – though SNB never explains what process it is referring to apart from its separate APA argument – might be appropriate in other circumstances, it is not required here. Director Cordray issued the challenged decisions initially, so he did not need to go through any robust process to be able to consider those decisions on the merits again—he was already well aware of the relevant considerations.[19]

Obligating Director Cordray to jump through SNB's hoops (Reply at 39–41) would merely be formalism for formalism's sake. D.C. Circuit precedent rejects the notion that courts should adopt wooden standards requiring some precise amount of re-deliberation when reviewing remedial actions taken by agencies. In *Legi-Tech*, the Court reasoned that "Legi-Tech may well be right in arguing that the Commission's 'review' of the case after *NRA* was decided was nothing more than a 'rubberstamp' . . . [b]ut we cannot, as Legi-Tech argues, examine the internal deliberations of the Commission, at least absent a contention that one or more of the Commissioners was actually biased." 75 F.3d at 709; *see also id.* ("Even were the Commission to return to square one . . . it is virtually inconceivable that its decisions would differ in any way the second time from that which occurred the first time."). *Doolin* and *Intercollegiate III* affirm this proposition. *See Doolin*, 139 F.3d at 213 ("We sustained the ratification [in *Legi-Tech*] despite misgivings about whether the new FEC had engaged in a real fresh deliberation."); *Intercollegiate III*, 796 F.3d at 118 (noting that the *Legi-Tech* ratification "was sufficient to cure

---

[18] SNB argues that *Andrade* is not a ratification case, but it has been treated as such by the D.C. Circuit, *see Intercollegiate III*, 796 F.3d at 118 n.1, and other courts in this jurisdiction, *Stryker Spine v. Biedermann Motech GmbH*, 684 F. Supp. 2d 68, 88 (D.D.C. 2010).

[19] On this score, this case is unlike *Intercollegiate III*, which involved an entirely new board that had not rendered the previous decision and that therefore could not rely on memory to reconsider the merits.

the constitutional violation . . . notwithstanding the possibility that the Commission may have in

fact 'rubberstamp[ed]' the enforcement action"). And in *Andrade,* the D.C. Circuit paid no

attention to the extent to which the ratifying official immersed himself in the merits; the court

looked merely to his authority to make the decision. *See Andrade*, 824 F.2d at 1257.

Taking the "ratification of [Director Cordray's] prior decisions at face value," *Legi-Tech*,

75 F.3d at 709, makes sense here, where the only question about the challenged decisions –

whether Director Cordray had the authority to make them – has been answered. Precedent from

other courts also supports the commonsense rejection of SNB's argument. *See Bowles v.*

*Wheeler*, 152 F.2d 34, 40 (9th Cir. 1945) (rejecting claim that ratification was "too general" and

failed to take account of individual decisions); *Paulsen ex rel. N.L.R.B. v. All Am. Sch. Bus*

*Corp*., 986 F. Supp. 2d 142, 150 (E.D.N.Y. 2013) (accepting a one-line ratification).

SNB's policy argument – *i.e*., that permitting this ratification would turn ratification into

a "farce" and meaningfully decrease the incentive to comply with the Appointments Clause –

fares no better. Nothing about this ratification is "farc[ical]" given that it accords with precedent

and common sense (as explained above). Nor would the Court's (correct) approval of this

ratification lead to Appointments Clause-related shenanigans. Because the ratification at issue

satisfies the existing standard, it does not reset the bar, and so would not establish a precedent for

Presidential misconduct. In any event, there remain plenty of reasons for Presidents to comply

with the Appointments Clause, *e.g*.: there are limits – including temporal ones – to the scope

ratification doctrine, as explained in *FEC v. NRA Political Victory Fund*, 513 U.S. 88, 98–99

(1994); there may be uncertainty about whether a future appointee will ever be confirmed or will

ratify past decisions (especially if there were a change in administrations); and the oath of office

requires the President to swear or affirm that he will "preserve, protect and defend the

Constitution of the United States," U.S. Const., Art. II, § 1, cl. 8, which includes the

Appointments Clause. Thus, the Court need not heed SNB's call for formalism – and needless

process – to ensure the vitality of the Clause.

> **2.** *The Agency Did Not Need to Engage in Notice and Comment Rulemaking a Second Time.*

SNB's second argument is that, under the APA, the agency was required to engage in

notice and comment rulemaking to ratify the rules issued prior to Director Cordray's

reappointment. Reply at 41. Not so. *Legi-Tech* establishes that an agency need not "redo the

statutorily required procedures in their entirety" for a ratification to be effective. 75 F.3d at 707;

*see also id.* at 709 ("[F]orcing the Commission to start at the beginning of the administrative

process, given human nature, promises no more detached and 'pure' consideration of the merits

of the case than the Commission's ratification decision reflected."); *see also Intercollegiate III*,

796 F.3d at 123 n.5; *Doolin*, 139 F.3d at 213–14. And if the agency were to accede to SNB's

demand, it would be repeating actions that were already taken: Each of the five rules targeted by

SNB was promulgated after notice and comment rulemaking. *See* Defs.' Mem. at 31–32 n.19.

Moreover, to the extent there was a defect in any of the steps initially (including the issuance of

any notice of proposed rulemaking), that defect has been cured by the subsequent adoption of

those actions through the ratification. *See, e.g.*, Restatement (Third) of Agency § 4.02 (2006)

(stating that ratification generally gives the ratified act the validity that it would have had if it

had been properly authorized in the first instance).

Nevertheless, SNB insists that the ratification was ineffective because the proposed rules

and final rules were ratified simultaneously even though the "APA requires a specific type of

process and amount of time that must occur ***between*** the two acts for the latter to be valid."

Reply at 42 (emphasis in original). But the APA requires "a specific type of process and amount

of time that most occur between the two acts" when they first happen; the APA is silent about

ratification. *Cf. Doolin*, 139 F.3d at 213 & n.9 (noting that *Legi-Tech* did not require the FEC to

repeat the "lengthy, elaborate series of administrative steps involving investigation and

deliberation before it votes to bring an enforcement action in court"); 2 U.S.C. § 439g (1995)

(now codified as amended at 52 U.S.C. § 30109) (prescribing steps in FEC enforcement process,

including minimum time periods between steps). And there would be no point – other than delay

– in requiring Director Cordray to ratify a notice of proposed rulemaking one day and the final

rule 30 days later. Delay is not a proper basis for a remedy. *See Doolin*, 139 F.3d at 214

(rejecting request "[t]o require another Director sign a new notice containing charges already

found to be supported, not merely by probable cause, but by substantial evidence" because it

"would do nothing but give the Bank the benefit of delay").[20]  In any event, the Federal Reserve

Board issued the notice of proposed rulemaking for several of the rules, and as those notices did

not need to be ratified, SNB's argument does not apply to them. *See supra* at 23 & n.17.[21]

　　　In support of its APA argument, SNB offers two "additional considerations." Reply at 42.

Neither is persuasive.

---

[20] The cases cited by SNB—*NRA Political Victory Fund* and *In re W.R. Grace & Co.*, 316 F. App'x 134, 136 (3d Cir. 2009)—do not hold otherwise. They stand for the unexceptionable proposition that the ratifying official must have the authority to take the underlying action at the time of the ratification, and SNB does not dispute that Director Cordray could now authorize the issuances of proposed and final rules.

[21] The Bureau later amended the Remittances Rule that it adopted based on the Federal Reserve Board's NPRM, but SNB cannot challenge the amendments independently of the original rule because the amendments are either irrelevant to SNB or had the effect of permitting it to reenter the remittances market. *See SNB I*, 958 F. Supp. 2d at 148, 154–56. The Bureau also reopened the comment period for the Board's proposed ATR-QM Rule to accept additional comments on new data. *See Truth in Lending (Regulation Z)*, 77 Fed. Reg. 33120 (June 5, 2012). That the Bureau permitted more comments is no reason to require it to restart the process now.

First, SNB argues that the D.C. Circuit has held that an Appointments Clause violation is a "structural constitutional error" that renders void the improperly appointed officer's actions. Reply at 43. The assertion that the Director's original acts are void is a *non sequitur*, as Defendants pointed out in their opening brief in arguments that SNB does not address. *See* Defs.' Mem. at 44–45.[22] The agency has not argued in this case that actions taken by Director Cordray prior to his reappointment are in and of themselves valid. Rather, it has argued that they have been ratified. So, whether they would be void (or valid) without the ratification is beside the point. *See Legi-Tech*, 75 F.3d at 708.

SNB adds that "[i]f a subsequent constitutionally appointed officer could merely 'cleanse the [Appointments Clause] violation of its harmful impact' with the simple stroke of a pen, then ***all*** Appointments Clause violations would 'escape judicial review.'" Reply at 43 (quoting *Landry v. FDIC*, 204 F.3d 1125, 1130–31 (D.C. Cir. 2000)). This argument also fails, as it flows from a misunderstanding of *Landry*. In *Landry*, the court worried that the improper appointment of an employee who lacks final decision-making authority would evade judicial review indefinitely if *de novo* review conducted by higher-ranking officials were deemed to render any errors harmless—because those higher ranking officials would necessarily conduct their review before a challenge could ever reach the courts. *Landry*, 204 F.3d at 1132. And, without judicial review, the potential Appointments Clause problem could continue unremedied. To eliminate this concern, the D.C. Circuit concluded that *de novo* review by higher ranking officials did not strip the court of the power to review the Appointments Clause challenge. *See id.* But upholding this ratification would not leave any Appointments Clause problem unremedied: Any defect in

---

[22] SNB also did not respond to Defendants' argument that SNB has identified no precedent applying the structural error analysis to informal rulemakings. Defs' Mem. at 45 n.23.

Direct Cordray's appointment has *already* been cured. At all events, requiring a ratification to be preceded by more process would not make potential Appointments Clause violations more amenable to judicial review. The purported problem that SNB identifies follows from the "cleansing effect" of ratification, not the process that precedes it. And if the cleansing effect of ratification were a bug (rather than a feature), no ratification would ever be acceptable – but that is not the law. *See, e.g.*, *Legi-Tech*, 75 F.3d at 709.

Second, SNB maintains that the ratification failed because SNB "never had an opportunity to present objections or comments to the proposed rules to a constitutionally appointed official." Reply at 44. This argument is flawed. SNB had an opportunity to comment, but chose not to. The agency considered comments as required by the APA and precedent, *see, e.g.*, *SNB I*, 958 F. Supp. 2d at 160 ("agency is clearly taking seriously public comments that it has received" on the ATR-QM Rule), and those comments were part of a process that culminated in the approval of a "constitutionally appointed official," Reply at 44, either in the form of the Notice of Ratification or the later-issued Integrated Mortgage Disclosure Rule. Indeed, SNB did not even provide comments when the Federal Reserve Board issued the notices of proposed rulemaking. *See supra* at 23 & n.17. Thus, it cannot credibly attribute its failure to comment on its belief that the proposed rule was invalid.

## CONCLUSION

For the reasons discussed above and in Defendants' opening brief, the Court should grant Defendants' motion and deny Plaintiffs' motion.

Dated: March 28, 2016

*Of Counsel:*

MARY MCLEOD
General Counsel
TO-QUYEN TRUONG
Deputy General Counsel
JOHN R. COLEMAN
Assistant General Counsel
LAWRENCE DEMILLE-WAGMAN
Senior Litigation Counsel
KRISTIN BATEMAN
Counsel
Consumer Financial Protection Bureau
1700 G St. NW
Washington, DC 20552

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

CHANNING D. PHILLIPS.
United States Attorney

SARAH LEVINE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director
Federal Programs Branch

CARLOTTA P. WELLS
Assistant Director
Federal Programs Branch

  /s/ Matthew J. Berns
MATTHEW J. BERNS, DC Bar 998094
JUSTIN M. SANDBERG, IL Bar 6278377
Trial Attorneys
Federal Programs Branch
U.S. Department of Justice, Civil Division
20 Massachusetts Ave. NW
Washington, DC 20530
Telephone: (202) 616-8016
Fax: (202) 616-8470
Email: matthew.j.berns@usdoj.gov

*Counsel for Defendants*